UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KERRY ASHDOWN,

                *Plaintiff,*

       -against-

EQUINOX *a/k/a*
EQUINOX FITNESS CLUB *and incorporated as*
EQUINOX HOLDINGS, INC.,
JOE MATARAZZO *a/k/a* JOSEPH MATARAZZO,
MAURO MAIETTA,
LAWRENCE SANDERS,
MATT PLOTKIN *a/k/a* MATTHEW PLOTKIN, *and*
MATT HERBERT *a/k/a* MATTHEW HERBERT,

                *Defendants.*
-------------------------------------------------------------------X

**13 CV 1374 (HB)(GWG)**

**AMENDED COMPLAINT**



Plaintiff, Kerry Ashdown, by her attorneys, The Harman Firm, PC, in this Amended

Complaint, alleges as follows:

## PARTIES AND NATURE OF ACTION

1.    This case is about gender discrimination, disability discrimination and perceived

disability.  The Plaintiff, Ms. Ashdown, who worked as a Personal Training Manager in a male-

dominated arena, and who ultimately developed cancer, was terminated from her job because of

her gender and because she was illegally perceived to be incapable of performing her job duties

because of her health.

2.    This action seeks damages for discrimination based on gender discrimination,

disability discrimination, and contractual and statutory violations related to Plaintiff's

immigration status, hostile work environment under the New York City Human Rights Law

("NYCHRL"), which is codified at N.Y.C. ADMIN. CODE §§ 8-101–31.  This action also seeks

damages for aiding and abetting illegal discrimination under the NYCHRL.

3.      At all times relevant hereto, Plaintiff Kerry Ashdown, has been a citizen of the United Kingdom at all relevant times temporarily residing in the City, County, and State of New York, who was subjected to discrimination based on gender and disability among other violations, and unlawfully terminated from her job.

4.      Despite the fact that Plaintiff's work performance never suffered, and in fact remained excellent as reported by her clients, she was falsely perceived to be too impaired to fulfill the requirements of her job during the time that she was treated for ovarian cancer.

5.      As a woman, Plaintiff was targeted for prejudicial mistreatment in the male-dominated gym environment.   As such, Plaintiff is a member of two (2) protected classes, pursuant to the NYCHRL.

6.      At all times relevant hereto, corporate Defendant Equinox Holdings, Inc., ("Equinox") is a corporation under the jurisdiction of the state of Delaware, with offices located at 895 Broadway, 3rd Floor, New York, New York 10003.  Defendant Equinox is well known in the United States for its highly regarded gyms.  Nevertheless, it is a harmful place for a female trainer to work for the reasons enumerated herein.

7.      Defendant Equinox subjected Plaintiff to discrimination based on gender, disability and a hostile work environment, and unlawfully terminated her in response to utterly baseless claims.

8.      Upon information and belief, at all times relevant hereto, Defendant Joe Matarazzo a/k/a Joseph Matarazzo was a resident and citizen of the State of New York.

9.      Upon information and belief, at all times relevant hereto, Defendant Mauro Maietta was a resident and citizen of the State of New York.

10.    Defendant Maietta subjected Plaintiff to discrimination based on gender, disability and a hostile work environment, and caused her to be unlawfully terminated due to his personal, sexist resentment at being supervised by Plaintiff, a woman.

11.    Upon information and belief, at all times relevant hereto, Defendant Lawrence Sanders was a resident and citizen of the State of New York.[1]

12.    Upon information and belief, at all times relevant hereto, Defendant Matt Plotkin a/k/a Matthew Plotkin was a resident and citizen of the State of New York.[2]

13.    Upon information and belief, at all times relevant hereto, Defendant Matt Herbert a/k/a Matthew Herbert was a resident and citizen of the State of New York.[3]

## VENUE AND JURISDICTION

14.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332, in that Plaintiff is a temporary resident of this jurisdiction, but a citizen of the United Kingdom; Defendant Equinox's headquarters is in the State of New York but under the jurisdiction of the state of Delaware, and the amount in controversy exceeds the requisite amount of seventy-five thousand dollars ($75,000).

## DEMAND FOR A JURY TRIAL

15.    Plaintiff hereby demands a jury trial.

---

[1] Upon further information and belief, Defendant Sanders is a male, approximately forty (40) to fifty (50) years of age and a current resident of the County of Kings, whose telephone number is (646) 431-8512.

[2] Upon further information and belief, Defendant Plotkin is a male in his mid- to late 30s, and a current resident of the County of New York.

[3] Upon further information and belief, Defendant Herbert is a male whose telephone number is (646) 572-3283.

## STATEMENT OF FACTS

16.     On or around April 4, 2010, Plaintiff contacted Johanna Subotovsky regarding Plaintiff's interest in personal training and submitted her resume.

17.     On or around April 6, 2010, Plaintiff conducted a telephone interview from London with Ms. Subotovsky.  She was then invited to an in-person interview in New York City.

18.     On or around April 21, 2010, Plaintiff met and interviewed with Defendant Matarazzo and Elizabeth Minton, both employees of Defendant Equinox.

19.     Thereafter, Plaintiff received an email from Ms. Minton, requesting that Plaintiff return to New York City at her convenience for a second interview.

20.     On or around June 11, 2010, Plaintiff returned to New York City for the second interview, which occurred on or around June 13, 2010.

21.     Present at the second interview were Ms. Minton, David Harris, Rich Velazquez, Darren Cappetta, and Defendant Matarazzo, all of whom were employees of Defendant Equinox.

22.     On or around June 23, 2010, Defendant Matarazzo offered the job of Personal Training Manager to Plaintiff by telephone, and informed her that she would have to use Defendants' legal company for the visa process.

23.     On or around August 9, 2010, Plaintiff transferred approximately six thousand three hundred twenty dollars ($6,320) to Defendants' legal company, Seham, Seham, Meltz & Petersen, LLP for Plaintiff's legal and visa costs.

24.     On or around September 22, 2010, Defendant Matarazzo informed Plaintiff that Defendants wanted to pay the expediting fee for the visa and asked Plaintiff if she could commit to moving fifteen (15) days from its being processed, to which Plaintiff agreed.

25.     Plaintiff immediately thereafter submitted her two-weeks notice to her contemporary employers.

26.     On or around October 4, 2010, Defendant Herbert submitted Plaintiff's Non-immigration Petition to the United States Citizenship and Immigration Services ("USCIS"), which represented that Defendants would compensate Plaintiff sixty-seven thousand dollars ($67,000) *per annum*.[4]

27.     On or around October 28, 2010, USCIS requested more evidence in support of Plaintiff's petition.

28.     The legal costs then expanded and Plaintiff was forced to ask Defendant Equinox for a one-thousand-dollar ($1,000) payday loan for a service that Defendant Equinox had originally agreed to pay.

29.     On or around December 13, 2010, USCIS approved Plaintiff's H-1B visa.

30.     On or around January 6, 2011, the U.S. Embassy in London also approved Plaintiff's visa.

31.     On or around January 15, 2011, Plaintiff moved to New York City.

32.     On or around January 17, 2011, Plaintiff began training at Defendant Equinox for her upcoming employment with Defendants.

33.     On or around January 31, 2011, Ms. Minton asked Plaintiff to meet with Defendant Plotkin, the area club manager, for an interview.

34.     A few days thereafter, Plaintiff met with Defendant Sanders at Defendants' Soho location.

35.     On or around February 9, 2011, Defendant Equinox formally offered the position of Personal Training Manager at an annual base salary of forty-nine thousand dollars ($49,000), which Plaintiff accepted.

---

[4] Although this Complaint is brought as a civil matter, Plaintiff notes that submitting false information to a federal agency is a crime pursuant to 18 U.S.C. § 1001(a)(1)–(3).

36.     Plaintiff's term of employment with Defendants began February 10, 2011.

37.     Defendant Equinox's job offer included certain costs that Defendants agreed to cover, including but not limited to Plaintiff's:

      (i)     Travel costs;

      (ii)    Legal fees; and

      (iii)   Fees to secure an H-1B visa.

38.     Plaintiff regularly worked sixteen-hour (16-hour) days and routinely worked on her customary "day off," which was Friday.

39.     Plaintiff was diagnosed with ovarian cancer in or around May 2011.

40.     She immediately shared her diagnosis with Defendant Sanders, Defendant Maietta and Ryan Hopkins (her contemporary trainer).

41.     Defendant Sanders never informed Plaintiff to contact Human Resources regarding the news.

42.     In or around August 2011, Plaintiff decided to inform her other colleagues about the diagnosis, as that was when she found out that chemotherapy would be a required component of her treatment.

43.     Remarkably, Plaintiff managed to work schedule her chemotherapy around her work in order to maintain the *status quo* at Defendant Equinox, especially because she was new to the company and new to the city.

44.     Plaintiff informed Defendant Sanders about this, including Plaintiff's insistence that she would not change or adapt what she normally did due to cancer and that Plaintiff felt as though the cancer would beat her if she did accommodate it, which she was not prepared to do.

6

45.     During Plaintiff's chemotherapy, everything became more difficult for her.  Her energy levels dropped and she was exceedingly exhausted.  Awaking at 5:00 a.m. is difficult for everyone, but especially for patients using chemotherapy.  Sores grew all over Plaintiff's body and her gums began to bleed randomly.

46.     Plaintiff then began to struggle even to breathe sometimes and suffered from terrible pain in her chest and abdomen.  Plaintiff did not slow her workload or hours and despite the adversities tried to remain positive at all times.  Neither of these facts concerned Defendants, who treated this as another opportunity, besides Plaintiff's gender, to seek her termination at any cost.

47.     During August 2011, Defendant Maietta intensified his campaign against Plaintiff by instigating malicious gossip and bringing false accusations against Plaintiff to the attention of the other Defendants, who used Defendant Maietta's misinformation and acts of tortious interference as impetus to bring false accusations to Plaintiff.

48.     Defendant Maietta's actions were all part of his extended crusade to have Plaintiff terminated and to take her job.

49.     Defendant Maietta's gossip included, but was not limited to allegations that:

(i)     Plaintiff was purportedly getting very drunk with her staff;[5]

(ii)    Plaintiff purportedly favored males over females and that her behavior was purportedly inappropriate; and that

(iii)   Plaintiff was purportedly not professional.

50.     Thereafter, Plaintiff was asked to provide all my client programs as Defendant Maietta questioned Plaintiff's training and attempted to have Ms. Minton terminate her.

---

[5] In actuality, the time during which this purportedly occurred, Plaintiff was undergoing treatment for cancer and disallowed from, and disinterested in, alcohol consumption altogether.

51.     Defendant Sanders brought Defendant Maietta's allegations to Plaintiff's attention.  She asked Defendant Sanders to speak to her staff to confirm whether or not Plaintiff was in fact biased, or whether she treated them differently or was inappropriate in any way.

52.     Plaintiff requested that she be able to investigate this herself, but was castigated and told not to.

53.     After Defendant Sanders had made Plaintiff feel terrible by repeating these ridiculous and malicious allegations and coming down harshly on Plaintiff, he said that it was just malicious rumors and not worth Plaintiff worrying about.

54.     Plaintiff then called for a meeting with Ms. Minton at Defendant Equinox's headquarters.

55.     It was Plaintiff's intention to inform Ms. Minton that she had cancer and that Defendant Maietta's rumors could not be true.

56.     Plaintiff also brought it to Ms. Minton's attention that Defendants, and Defendant Maietta especially, were targeting Plaintiff and illegally trying to ruin her career.

57.     Thereafter, Plaintiff called a meeting with Defendant Maietta in order to address the hostile work environment that he was creating for her.  Plaintiff made a good-faith attempt at reconciliation and believed at that time that things could improve.

58.     Defendant Maietta had created a hostile work environment in multifarious ways including, but not limited to his having sent emails to an incorrect, dummy email address, to which Plaintiff never had access.  When Defendant Maietta failed to receive responses to his ruse emails, he complained to Defendant Sanders about it.[6]

---

[6] Defendant Sanders checked Defendant Maietta emails personally, as he had asked Defendant Maietta to forward them to him.  Defendant Maietta preposterously claimed that the emails were automatically deleted from his BlackBerry when they were sent.

59.     Defendant Sanders saw first-hand the false email address and Defendant Maietta insisted to both Defendant Sanders and Plaintiff that is was to and from Equinox accounts, which Defendant Maietta had purportedly reconfirmed.  Defendant Sanders did nothing about this.

60.     With Defendant Maietta, Plaintiff was always his target.

61.     Defendant Maietta was overly competitive and instead of acting like Plaintiff's colleague was her adversary.

62.     Defendant Sanders was in the habit of training with Defendant Maietta prior to Defendant Maietta's vacation following his wedding.

63.     Defendant Maietta told Defendant Sanders that he thought Plaintiff would "crash and burn" in his absence, which comment was a reference to Plaintiff's gender and health and part of Defendant Maietta's ongoing campaign to sabotage Plaintiff's career.

64.     Although Defendant Sanders described this to Plaintiff, he again failed to act to react or to prevent the same thing from happening again.

65.     Plaintiff's job performance was by all accounts was exceptionally good.

66.     At a company awards presentation, Scott Rosen, the Chief Operating Officer of Defendant Equinox, referred to Plaintiff as a "superstar" and told her to expect to receive awards for her performance.

67.     The allegations of Defendant Equinox and Defendant Maietta reflected their entrenched, sexist, boys-club resistance to a female supervisor.

68.     Defendant Sanders subjected Plaintiff to discrimination based on gender, disability and a hostile work environment, and personally participated in her unlawful termination.

69.     Defendant Plotkin subjected Plaintiff to discrimination based on gender, disability and a hostile work environment, and personally performed her unlawful termination.

70.     Defendant Herbert subjected Plaintiff to discrimination based on gender, disability and a hostile work environment.

71.     Plaintiff was set up for termination by Defendant because she looked sick—regardless of the fact that she was so dedicated to her job that she continued work through chemotherapy.

72.     Plaintiff was subsequently caused to feel severe emotional and financial distress resulting from Defendants' outrageous discriminatory conduct.

## GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

73.     Approximately seventy-five percent (75%) of the trainers at Plaintiff's Equinox location were male.

74.     Throughout Plaintiff's employment, she was always treated worse than were her male colleagues.

## DISABILITY DISCRIMINATION

75.     Plaintiff was diagnosed with ovarian cancer in May 2011.

76.     She began a treatment that continued until April 2012, including nine (9) weeks of radiation and three (3) cycles of chemotherapy, followed by six (6) months of medication.

77.     Despite the grueling medical regimen, Plaintiff continued to work hard for long hours.

78.     In fact, Plaintiff only recalls taking one and one-half (1.5) days off while she was being treated for cancer and that was because she could not breathe.  At the time, Plaintiff texted

Defendant Sanders requesting access to a planned conference call in order to join from the hospital.

79.     Defendant Sanders never responded, and Plaintiff was later reprimanded for missing the call.

80.     From her hospital bed, Plaintiff attempted to contact both Defendant Sanders and Defendant Maietta in order to alert them to work that Plaintiff had booked that she would not be able to complete herself.  It was always a challenge for Defendants to remain in contact with Plaintiff.

81.     In fact, she only very rarely ever missed a day of work.  Her clients' descriptions of her performance at the time underscore her dedication:

> (i)     "[Plaintiff] was tireless, cheerful and motivating";
>
> (ii)    "At no time during my training was I aware of [Plaintiff's] treatment for cancer";
>
> (iii)   "I began to notice how hard [Plaintiff] was working, very often having her first clients at [6:00 a.m.] and finishing her day at [7:00 p.m.]";
>
> (iv)   "[Plaintiff worked] ridiculously long hours";
>
> (v)    "[One] would never even know what [Plaintiff] was going through"; and even that
>
> (vi)   "[Plaintiff] is truly one of the most inspirational individuals [that] I have ever met."

82.     In August 2011, Plaintiff Ashdown spoke to Defendant Sanders, the Club Manager, and her team individually, in order to explain her diagnosis and the impending chemotherapy that she was to undergo.

83.     Throughout Plaintiff Ashdown's employment at Defendant Equinox, Defendant Maietta made no secret of his resentment of being supervised by Plaintiff Ashdown, a woman. On a regular basis, he complained about her to management based on fictional infractions.

84.     In about August 2011, Plaintiff Ashdown was falsely accused of excessive drinking, when in fact her treatment prevented any consumption of alcohol.   She did not consume alcohol.

85.     Plaintiff Ashdown was falsely accused of improper activity on firm computers, when in fact the activity was performed under a different employee's identification number.

86.     Plaintiff Ashdown has reason to believe these spurious complaints originated from Defendant Maietta.

87.     Defendant Maietta treated Plaintiff differently and was hostile toward Plaintiff due to her being a female supervisor.

88.     Plaintiff Ashdown re-iterated the fact of her cancer to a supervisor, Elizabeth Minton, the National Director of Personal Training Development.  Plaintiff Ashdown informed Minton that the accusations against her were untrue, and that she was having difficulty with Defendant Maietta.

89.     Plaintiff Ashdown was then subject to false allegations of "pulling sessions" or having "pulled sessions."  That refers essentially, to fabricating personal training sessions that had not taken place.  These fabricated sessions were not pulled for Plaintiff Ashdown, and were not pulled under her identification number.

**ILLEGAL TERMINATION**

90.     In or about early September 2011, Defendant Equinox abruptly terminated Plaintiff.   Plaintiff was called into Defendant Sanders's office, where Defendant Plotkin

informed her that, based on the spurious allegations of "session-pulling," Plaintiff was terminated effective immediately.  Plaintiff offered to furnish and take a lie detector test; this offer was declined.

91.     When Plaintiff was initially pulled aside regarding this, Defendant Sanders asked her if she had done it.  Plaintiff replied honestly, "no."

92.     Plaintiff was never written up and never had any disciplinary issues.

93.     Plaintiff mentioned in the ensuing meeting Defendant Maietta's issues with Plaintiff and from where Plaintiff believed that the false accusations and information had arisen.

94.     Even though Defendant Sanders was aware of all the issues that Defendant Maietta had, he sat silently and said nothing in Plaintiff's defense.

95.     After Plaintiff was fired, Defendant Plotkin escorted her out the building and said that he knew Plaintiff needed a job for her visa and that she should contact Defendant Sanders for a job the following day.[7]

96.     Plaintiff had always kept Defendant Sanders well informed about all of her work and considering the grand investment in time, energy, and money that moving to the United States had created for her, Plaintiff would never have done anything like the misdeeds of which she was accused to risk everything.

97.     Defendant Plotkin escorted Plaintiff out of the building, at which time he offered to help her obtain a different job at the company.  This contradictory and confusing action by management of Defendant Equinox is indicative of the illegitimate, unfounded nature of Plaintiff's termination.

---

[7] Even Plaintiff were actually worthy of being terminated, which she was not, Defendants would not have offered her a job elsewhere directly after her termination.

98.     It is very clear that Plaintiff was subjected to discrimination based on gender, perceived disability and a hostile work environment.

99.     Plaintiff never received any documentation regarding her termination.

100.    After her termination, Plaintiff came to find out that Defendants had underpaid her by approximately eighteen thousand dollars ($18,000).

101.    In or around December 2011, Plaintiff brought this to the attention of Defendant Herbert and he threatened her with her immigration status.

102.    It was around this time that Plaintiff also discovered that her visa costs were never paid and neither were her relocation costs.

103.    Plaintiff was thereabout informed from her former colleagues that they were advised that it would be harmful to their jobs if they socialized with Plaintiff.

104.    When Plaintiff asked a few of her previous colleagues for personal reference for her with her new visa application.  She was again informed that they had been told that they were not allowed to do so.

105.    Defendant Sanders called Plaintiff when he heard that Plaintiff had gone into remission.  He said he knew that he was the last person with whom Plaintiff would want to speak and that he was "sorry for what had happened."  Plaintiff said nothing at all and hung up on Defendant Sanders.

106.    Considering Plaintiff's substantial accomplishments during her tenure at Defendant Equinox and the gratitude she was awarded for such accomplishments, discrimination on the basis of her gender and perceived disability are the only viable basis for Plaintiff's termination.  Therefore, Defendant Equinox unlawfully terminated Plaintiff in September 2011, in violation of the NYCHRL.

107.     Subsequent to her termination, Plaintiff inquired about the lost back wages she had recently discovered.

108.     When Plaintiff brought the lost back wages to Defendant Herbert's attention, he verbally threatened Plaintiff regarding her immigration status, which Defendants had intended to use as blackmail.[8]

109.     Defendant Herbert told Plaintiff[9] that "[he] would advise [Plaintiff not] to [be in conduct with legal counsel] as the immigration service [did not] know about [Plaintiff's] immigration status."

110.     Following Defendants' reprehensible malice, Defendant Maietta was afforded Plaintiff's former job after he helped in Defendants' campaign to have her terminated.

## FIRST CAUSE OF ACTION
### Disability Discrimination against
### Defendant Equinox, Defendant Plotkin, Defendant Sanders

111.     Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

112.     Defendants Equinox, Plotkin, and Sanders subjected Plaintiff to discrimination based on perceived disability in violation of the NYCHRL, §§ 8-101 *et seq*.

113.     As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

---

[8] When Defendant Herbert made the threat, Plaintiff had already updated her immigration status; although his threat made with malice, it was at that point, moot.

[9] Defendant Herbert said, "I would advise you not to do that as the immigration service doesn't know about your immigration status."

## SECOND CAUSE OF ACTION
### Hostile Work Environment against Defendant Equinox

114.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

115.    Defendant Equinox subjected Plaintiff to a hostile work environment in violation of the NYCHRL, § 8-107.

116.    As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Aiding and Abetting Hostile Work Environment against Defendant Sanders

117.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

118.    Defendant Sanders aided and abetted in the creation and maintenance of a hostile work environment by failing to remedy the circumstances under which Plaintiff was forced to suffer, which is illegal under NYCHRL, § 8-107(6)

## FOURTH CAUSE OF ACTION
### Gender Discrimination against Defendant Equinox

119.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

120.    The NYCHRL, § 8-107 prohibits gender discrimination in employment.  As a female, Plaintiff is protected against discrimination based on sex within the meaning of the aforementioned law.

121.    Defendant Equinox willfully and consciously discriminated based on gender in violation of the NYCHRL.

16

122.   Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

123.   As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered adverse employment consequences.  Plaintiff was caused to suffer lost wages, professional opportunities, other valuable benefits and emoluments of gainful employment as well as to endure severe emotional pain and trauma, all to her detriment.

## FIFTH CAUSE OF ACTION
### Aiding and Abetting Gender Discrimination against
### Defendant Sanders

124.   Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

125.   Pursuant to NYCHRL § 8-107(6), it is "unlawful . . . for any person to aid[] [or] abet . . . the doing of any of the acts forbidden under [NYCHRL § 8-107]."

126.   Defendant Sanders aided and abetted in the creation and maintenance of gender discrimination by failing to remedy the circumstances under which Plaintiff was forced to suffer.

## SIXTH CAUSE OF ACTION
### Breach of Contract against Defendant Equinox

127.   Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

128.   Plaintiff signed the employment contract and agreement ("Contract") with Defendants regarding the reimbursements for which they would be responsible.

129.   Thereby, a contractual relationship was formed by and between the parties.

130.   Defendant Equinox breached the Contract by failing to comply with the terms to which the parties agreed.

131.   Due to Defendant Equinox's breach of contract, and as a direct and proximate cause thereof, Defendants damaged Plaintiff seriously and irreparably.  Plaintiff was caused to suffer the losses of:

(i)     Compensation;

(ii)    Reimbursement for:

(a)     Temporary immigration fees;

(b)     Travel costs;

(c)     Legal fees; and

(d)     Wages;

(iii)   Professional opportunities missed due to Plaintiff's compliance with the terms of her agreement;[10]

(iv)    Degradation of future employment opportunities;

(v)     Reputational damage;

(vi)    Loss of future earning capacity; and

(vii)   Other valuable benefits of fulsome employment, all to Plaintiff's detriment.

132.   Accordingly, Defendants are liable to Plaintiff for breach of contract, and all damages attendant thereto.

---

[10] As Plaintiff was followed the terms of the Contract, whereas Defendants did not, Plaintiff was not able to seek professional opportunities with other employers where Plaintiff would not have suffered Defendants' multifarious abuse detailed herein.

## SEVENTH CAUSE OF ACTION
### Tortious Interference with the Right to Conduct Business against Defendant Maietta

133.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

134.    Plaintiff has prospective business and economic advantage in maintaining her career in physical fitness.

135.    There was a reasonable probability of future economic benefit to Plaintiff from the prospective business and economic advantage of keeping her job with Defendant Equinox about which Defendants were aware and of which Defendant Maietta knew and coveted for himself.

136.    Defendant Maietta used improper methods to interfere with the prospective business and economic advantages to Plaintiff by, though not limited to perpetrating malicious and untrue gossip about Plaintiff due to her gender and her health and attempting to have Defendant Equinox terminate Plaintiff's employment.

137.    Defendant Maietta intended to interfere with Plaintiff's prospective business and economic advantage.

138.    It is reasonably certain that the prospective business and economic advantage would have been realized in the absence of the Defendants Maietta's conduct.

139.    Defendant Maietta's actions were done with malice and/or wantonness.

140.    Plaintiff was damaged by the disruption of the prospective business and economic advantage.

## EIGHTH CAUSE OF ACTION
### Tortious Interference with the Right to Contract against Defendant Maietta

141.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

142.    Plaintiff had the unfettered right to—and in fact did—enter into contractual relationships in order to conduct business related to her employment.

143.    By the signatures on the Contract of Defendant Equinox and Plaintiff, they entered into a valid, enforceable Contract.

144.    Plaintiff became Defendant Maietta's colleague at Defendant Equinox.

145.    Defendant Maietta was at all times aware that as a Personal Training Manager, Plaintiff was under contract with Defendant Equinox.

146.    Notwithstanding the Contract, Defendant Maietta successfully assisted in undermining the parties' work relationship by instigating malicious gossip against Plaintiff and in his acts of gender discrimination against Plaintiff, both of which are partially detailed herein.

147.    Defendant Maietta successfully helped to break the Contract and thereby usurped Plaintiff and was able to take her job.

148.    Defendant Maietta is therefore liable for Tortious Interference because due to intentionally helping Defendants to breach their contract obligations with Plaintiff.

## NINTH CAUSE OF ACTION
### *Prima Facie* Tort

149.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

150.    Defendants' activities amount to an unlawful *prima facie* tort.

151.    Plaintiff was damaged in an amount exceeding one million dollars ($1,000,000), which will be proven with certainty at the time of trial.

152.    Defendants' activities were willful and malicious.  By reason thereof, Defendants are liable to Plaintiff for damages in an amount of one million dollars ($1,000,000) or more, to be determined by the trier of fact.

**TENTH CAUSE OF ACTION**
**Negligent Hiring and Supervision against Defendant Equinox**

153.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

154.    Defendant Equinox knew or should have known that their employees and subordinates were sexist predators who would continue to victimize Plaintiff with outrageous and offensive discrimination and harassment.

155.    Defendants, however, took no necessary or reasonable steps to protect Plaintiff from such behavior, including without limitation, exercising reasonable supervision and control over Plaintiff's supervisors and colleagues.  Instead, Defendant Equinox permitted sexist and abusive behavior to continue, and by doing so, encouraged it to grow worse.

156.    As a direct and proximate result of such negligence and breach of fiduciary responsibilities, Plaintiff suffered adverse employment consequences.

157.    Plaintiff was caused to suffer lost wages, professional opportunities, other valuable benefits and emoluments of fulsome employment, as well as to endure severe emotional pain and trauma, all to her detriment.

## ELEVENTH CAUSE OF ACTION
### Alienage Discrimination against Defendant Equinox and Defendant Herbert

158.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force and effect as though separately alleged and reiterated herein.

159.    Pursuant to NYCHRL § 8-107, discrimination based on immigration status by employers or agents thereof is illegal.

160.    Defendant Equinox and Defendant Herbert broke the terms of the statute in attempting to threaten Plaintiff's immigration status.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(i)    A judgment and an award of no less than six million dollars ($6,000,000),[11] consisting of:

    (a)    Compensatory damages for lost wages;

    (b)    Past employment benefits;

    (c)    Future employment benefits;

    (d)    Damages for emotional distress;

    (e)    Punitive damages;

    (f)    Exemplary damages;

    (g)    Attorneys' fees;

---

[11] Ten (10) Causes of Action are for five hundred thousand dollars ($500,000) each.  The Ninth Cause of Action, (*Prima Facie* Tort) is for one million dollars ($1,000,000).  *I.e.*, Plaintiff seeks a judgment and award of six million dollars ($6,000,000) *in toto*.

(h)    Pre-judgment interest;

(i)    Post-judgment interest; and,

(j)    Such further relief as this Honorable Court may deem just, equitable, and proper.


Dated: New York, New York
       April 8, 2013


By: _____
    Walker G. Harman, Jr.
    THE HARMAN FIRM, PC
    *Attorneys for Plaintiff*
    200 West 57th Street, Suite 900
    New York, New York 10019
    (212) 425-2600
    wharman@theharmanfirm.com

23