```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                  :
                                              Docket #13CV1374
 KERRY ASHDOWN,                         :

                    Plaintiff,          :

   - against -                          :

 EQUINOX, et al.,                       : New York, New York
                                          September 13, 2013
                    Defendants.         :

--------------------------------------- :

                      PROCEEDINGS BEFORE
             THE HONORABLE GABRIEL W. GORENSTEIN,
               UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:      THE HARMAN FIRM PC
                        BY:  WALKER HARMAN, ESQ.
                        200 West 57th Street
                        New York, New York 10123
                        (212) 425-2600


For the Defendants:     LAROCCA HORNIK ROSEN GREENBERG & BLAHA
                        BY:  PATRICK McPARTLAND, ESQ.
                        40 Wall Street, 32nd Floor
                        New York, New York 10005
                        (212)-530-4837




Transcription Service:  Carole Ludwig, *Transcription Services*
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

```
 1                                                          3
 2            THE COURT:   Hello, this is Judge Gorenstein.
 3   Who's on the line?
 4            MR. WALKER HARMAN:   Walker Harman for the
 5   plaintiff Kerry Ashdown.
 6            MR. PATRICK McPARTLAND:   Good afternoon, Judge,
 7   Pat McFarland for defendant Equinox.
 8            THE COURT:   Mr. Harman, are you on speakerphone?
 9            MR. HARMAN:   Yes, I am.
10            THE COURT:   If you come off, it'll be a help to
11   me.
12            MR. HARMAN:   Sorry about that.
13            THE COURT:   That's no problem.  Okay, we're being
14   recorded.  It's the case of Ashdown v. Equinox, 13cv1374.
15            ATTORNEY:   (inaudible)
16            THE COURT:   Oh, I'll try to speak up a little
17   bit.  We're being recorded.  We're here based on three
18   letters that were dated September 9.  I recall reading
19   them, the way I recall the problem is, you know, I had
20   ordered production of prior complaints.  I left open the
21   possibility if there was burdensomeness, to hear the
22   defendants on that.  I understand that the defendants don't
23   have a problem with sort of filed complaints or litigation
24   type complaints but that they have a problem in some way
25   with retrieving internal complaints.  Is that right?
```

```
                                                              4
 1
 2              MR. McPARTLAND:   Yes, that's correct, Judge.
 3   I've gone back --
 4              (interposing)
 5              MR. McPARTLAND:   Sure, I've gone back and
 6   revisited with our Director of Human Resources how these -
 7   what they would need to undertake to actually locate these
 8   types of complaints.
 9              THE COURT:   They don't keep a file of internal
10   complaints?
11              MR. McPARTLAND:   They do not.  They do not keep a
12   log or a separate file of internal complaints.  So it
13   would, these are - it's 20, I believe it was 20 clubs in
14   the New York City area, fitness clubs, at which there are
15   typically more than 100 employees over a five-year period.
16   And this would involve human resources going back and
17   basically digging through personnel files and other records
18   to come up with, you know, internal complaints that
19   obviously never even made it to any type of litigation
20   level that probably, you know, don't even have anything to
21   do with the people involved in this case.
22              So it's too burdensome for our client to do that
23   given the, you know, minimal relevance.  This case is very
24   specific as to the people that we're allegedly
25   discriminatory towards plaintiff.
```

```
 1                                                          5
 2            THE COURT:    I'm a little --
 3            MR. HARMAN:    Your Honor --
 4            THE COURT:    I'm a little nonplussed only because
 5  I think it's literally the first time I've heard of
 6  corporation of any size with a human resources office that
 7  didn't keep a record of complaints of discrimination.  It's
 8  just almost incredible.  You personally verified that?
 9            MR. McPARTLAND:    I was informed by the - I spoke
10  to the Director of Human Resources.  They do not keep a
11  log.
12            THE COURT:    It's just amazing.  So the proposal
13  for how to do this would be to look - so what happens to,
14  when someone comes in and says I've been discriminated
15  against because of my race, religion, whatever the
16  protected categories are, is there a process, is there
17  handbook that describes that it, is there something that's
18  supposed to happen, is there a way they're supposed to do
19  it?  Is any of that --
20            MR. McPARTLAND:    Well, no, I mean there are ways
21  in the employee manual to complain, for them to lodge
22  complaints.  There are three different ways basically.  You
23  can go to your supervisor, you can go directly to human
24  resources or Equinox also, as a third-party venture which
25  maintains the confidential, a 1-800 confidential hotline
```

```
 1                                                              6
 2   that the employee can call.  But with respect to complaints
 3   to supervisors or complaints to HR, I mean those can come
 4   in virtually any form.  I mean it could be an email, it
 5   could be a telephone call, it could be somebody who walks
 6   into the office.
 7            THE COURT:  And do they have a process for
 8   handling complaints that involves a written record?
 9            MR. McPARTLAND:  It depends on whether the, you
10   know, I mean there's whatever the investigation is.  You
11   know, HR determines what investigation they're gonna
12   conduct.
13            THE COURT:  And they don't keep a record of their
14   investigations?
15            MR. McPARTLAND:  No, they do keep a record of
16   their investigation, Judge, but they need to go back in and
17   go through, you know, files basically, personnel files --
18            (interposing)
19            THE COURT:  No, no, back up, back up, back up.
20            MR. McPARTLAND:  Sure.
21            THE COURT:  I asked do they keep a record of
22   their investigation, and so the answer's yes.  The next
23   question is in what form and what location do they keep a
24   record of the investigation?
25            MR. McPARTLAND:  It could be in the form of
```

                                                                    7

emails, could in the form of, you know, a meeting on the
investigation, it could be in the form of handwritten
notes.  Could be in the form of notice that goes --
          (interposing)
          MR. McPARTLAND:  I'm sorry.
          THE COURT:  I think where we have to go with
this, I tell you right now, is I need someone to swear this
to me under oath because I don't trust the information
you're getting about this.  It doesn't make sense to me.
It doesn't make sense, I mean I understand maybe with
supervisors, you know, there's no process.  But I'd like
someone to swear an oath in public that this human resource
office does not keep a specific record of investigations
other than something that ultimately gets put in a
personnel file and has no other way of retrieving it.  It's
so incredible to me, I'd like to see it under oath.
          Now, if they say under oath, then we'll decide
whether Mr. Harman should get further discovery on that,
but I need an affidavit that's gonna describe this burden,
and even if they say it under oath, describe what possible
means they could think to do it because I'm not sure I'm
gonna let them off the hook on this.  So I think before we
do anything further, we have to do that.
          MR. McPARTLAND:  Okay, I'll go back to --

```
 1                                                            8
 2              (interposing)
 3              THE COURT:   Now, I don't want people to, you
 4   know, think, oh, they told you one thing.  You better have
 5   a talk with them.  You know, they told you one thing and
 6   now they're just gonna say in the affidavit, because it's
 7   gonna create big problems for them, if, in fact, it's not
 8   accurate.  So you need to obviously sit down with them and
 9   talk about this and make sure they get this 100 percent
10   accurate.  Right?
11              MR. HARMAN:   Your Honor, I just want to add for
12   the record that I deposed a general manager of the Soho
13   location today, and he indicated in his deposition that he
14   was accused of making an inappropriate comment of a sexual
15   nature and that he was himself taken through a process
16   where he was interviewed by HR and he was issued corrective
17   action and he had to countersign the corrective action and
18   that there was a whole process that he was brought through
19   because an individual complained that he made an
20   inappropriate conduct, a comment.  And it's just hard for
21   me to believe that HR doesn't maintain records on that sort
22   of stuff.  I just don't get it.
23              MR. McPARTLAND:   He testified as to one – it's
24   actually, you know, it --
25              (interposing)
```

```
                                                              9
  1
  2              THE COURT:   Well, hold on, I'm not sure what --
  3              (interposing)
  4              THE COURT:   Hold on, hold on.
  5              MR. McPARTLAND:   Sure.
  6              THE COURT:   Mr. Harman is in agreement, it sounds
  7   like, with my proposal.
  8              MR. HARMAN:   Yes, I am.  So long as it contains
  9   detail of what it would take to search for records and
 10   information --
 11              THE COURT:   We definitely need to hear that, Mr.
 12   McPartland --
 13              MR. McPARTLAND:   Okay.
 14              THE COURT:   -- and don't think that you're
 15   necessarily off the hook or your client rather is off the
 16   hook.  So this needs to be taken much more - this needs to
 17   be outlined in great detail and under oath and soon.  So
 18   let's shoot - today is what, Thursday?  I assume we could
 19   do this, could we do this by Monday, Tuesday?
 20              MR. McPARTLAND:   Tuesday would be better, Judge.
 21   I'm gonna be in - we have another deposition scheduled
 22   tomorrow afternoon.  Tomorrow morning I'm in court.
 23              THE COURT:   All right, well, I want to get this
 24   right, so why don't we say Wednesday of next week.
 25              MR. McPARTLAND:   Okay, that'll be great.
```

```
                                                                  10
             THE COURT:   And then --
             MR. McPARTLAND:   Judge, the only other issue I
would raise here, you know, the case law in this area, I'm
looking, you know, particularly at a case, Vuona v. Merrill
Lynch in the SDNY.  They --
             THE COURT:   Give me the citation.
             MR. McPARTLAND:   Sure, it's 2011 - it's a Westlaw
citation, 2011 WL 5553709, and it's from the Southern
District from November 15 of 2011.  It's a very similar
complaint where they were looking for, you know, complaints
about any other personnel at a branch who may have come
into contact with these trainees at Merrill Lynch.  The
Court concluded that it was just, you know, it was
overbroad, you know, the complaint says of gender
discrimination as to any manager at the branch who had any
contact with these trainees was overbroad.  But the way I
understand it is they limited it just to the employees who
actually terminated the plaintiffs, which is certainly, you
know, we would certainly be amendable to that.
             THE COURT:   What was the last thing, they limited
it to what, I'm sorry?
             MR. McPARTLAND:   It's my understanding is they
limited it just to managers who actually supervised these
trainees.  In other words, they didn't have to, you know,
```

```
 1                                                            11
 2   if there were other managers in the branch, you know, you
 3   didn't have to, they didn't have to dig around and look for
 4   complaints about all these other managers.
 5             And what's happening is we have to go through, you
 6   know, this is one specific health club in New York City,
 7   and we're gonna have to produce complaints from 19 other
 8   clubs.  I mean it's --
 9             THE COURT:   Well, the way --
10             (interposing)
11             MR. McPARTLAND:   -- it is burdensome and it's
12   overbroad.
13             THE COURT:   I mean is it that - I think when we
14   first went through this in the hearing, and maybe I
15   remember this incorrectly.  When we went through it in the
16   hearing, the contention was that the decision to fire was
17   not made in that particular health club, that that was made
18   at some corporate level.  Am I wrong?
19             MR. McPARTLAND:   No, it was made by the general
20   manager of the club and an area manager of the club, but
21   the people who were involved can easily --
22             THE COURT:   Hold on, stop, stop.
23             MR. McPARTLAND:   I'm sorry.
24             THE COURT:   Area manager of the club, which means
25   not someone in that particular club.  Right?
```

```
 1                                                             12
 2            MR. McPARTLAND:   Well, he's not associated with
 3   any particular club, Judge, that's correct.
 4            THE COURT:   Right, right --
 5            MR. McPARTLAND:   But I could explain that a
 6   little bit --
 7            THE COURT:   That was the basis - well, no.  But I
 8   mean that was the basis - if you told me that this was
 9   entirely a decision of an individual in a particular club,
10   I might have made a different ruling, but that's not what I
11   was told.  I was told that there was someone at a higher
12   level who, in fact, supervised at least these New York City
13   clubs if not more.
14            MR. McPARTLAND:   Well --
15            THE COURT:   My issue was what kind of complaints
16   and how did that person act with respect to other
17   employees, and that to me seems entirely relevant even
18   under the Vuona case.
19            MR. McPARTLAND:   Right, how that particular -
20   which, Judge, with respect to that, those particular
21   individuals.  I guess the point is that these are not
22   necessarily complaints that would have - if there was a
23   complaint as to - the area manager in question here is Matt
24   Plotkin.  He's the guy on the corporate level overseeing
25   the clubs.  Any complaint as to Matt Plotkin I'm happy to
```

```
 1                                                          13
 2   produce.
 3             THE COURT:   I'm not talking that as to Matt, I'm
 4   not talking about as to Matt Plotkin.  I'm talking about
 5   complaints for which Matt Plotkin made a decision.
 6             MR. McPARTLAND:   For which he made a decision.
 7             THE COURT:   Yeah.
 8             MR. McPARTLAND:   Okay.
 9             MR. HARMAN:   But wait a minute, I mean like you -
10   this was first raised almost a month ago with specificity
11   in court, and we talked about a corporate, HR corporate
12   decision-making process that involved a lot of different
13   people reviewing employment related decisions and
14   addressing my client's cancer and making decisions
15   regarding termination.  And so I thought that this issue
16   had been resolved, and now it's being reargued and a case
17   citation that's being thrown out.  And with all due respect
18   --
19             THE COURT:   I'm not changing my ruling, Mr.
20   Harman.  I'm sorry, I hope I wasn't unclear just now.  I
21   didn't mean you could limit it, Mr. McPartland, to Mr.
22   whatever that guy's name was, Plotkin.  I mean that, I'm
23   pointing to why it's relevant that - I'm assuming that
24   complaints about these 19 clubs ultimately were handled by
25   Mr. Plotkin.  Am I wrong?
```

```
 1                                                         14
 2              MR. McPARTLAND:   No, no, that would not be
 3   accurate.  That would not be accurate, Judge.
 4              THE COURT:   Why?
 5              MR. McPARTLAND:   Because Mr. Plotkin does not
 6   oversee these clubs in that capacity.  There are only
 7   certain issues that may involve him.  I mean I guess that's
 8   the only way I'm trying to limit this, and then it would
 9   be, the issue would be resolved.  If it's just any
10   complaints that Matt Plotkin would have been involved in or
11   supervised over or that, you know, Lawrence Sanders as the
12   GM of the club would have been involved in and supervised
13   over, if I can limit it to the complaints that have some
14   nexus to these people, I'm fine with that.  I don't - it's
15   just that there are going to be, you know, there could be
16   complaints from, you know, somebody who complained to their
17   maintenance manager at the club level.  It's just, it's -
18   which would not go up to Matt Plotkin.
19              THE COURT:   Well, we're cutting it too fine right
20   now because I don't know what is available to you and what
21   is not. Right now it sounds like complaints made to
22   supervisors is not even gonna be an issue because that I at
23   least might understand that if - HR is never informed about
24   something, that that's gonna be hopeless.  But if HR is
25   informed about something, I imagine something happening at
```

```
                                                             15
 1
 2   corporate headquarters, I assume HR is involved, and I
 3   don't see how this is not gonna be relevant.  But if you
 4   wish in your affidavit make some argument about this based
 5   upon information in the affidavit, you can say something,
 6   and Mr. Harman can respond.
 7             MR. McPARTLAND:  Okay.
 8             THE COURT:  But at this point I don't imagine
 9   changing my ruling.
10             MR. McPARTLAND:  Okay.
11             THE COURT:  All right, so what's, you know, do
12   this on Wednesday and, Mr. Harman, you can respond, when do
13   you want to respond, Thursday, Friday?
14             MR. HARMAN:  Friday's fine.
15             THE COURT:  Okay.  And then if I can do it on the
16   letters, I'll do it on the letters; otherwise I'll set up
17   another phone conference I guess.
18             MR. McPARTLAND:  Okay.
19             MR. HARMAN:  Okay.
20             THE COURT:  All right, thank you, everyone.
21             MR. McPARTLAND:  I'm sorry, we were just wrapping
22   up depositions, and the parties have had some, you know,
23   some items that have come during the depositions for
24   follow-up discovery.  We've given each other lists already,
25   and the discovery deadline is on Sunday.
```

```
                                                              16
 1
 2           So I just want to clarify, you know, how that will
 3   be handled.  In other words, if someone has a dispute that
 4   somebody did not produce something that is responsive or
 5   relevant to the kids based on this follow-up discovery from
 6   depositions, you know, what is the parties' recourse?
 7           THE COURT:  Well, if it's something that's sort
 8   of been produced and it was reasons that people didn't
 9   raise it beforehand, then I'm not gonna stop them from
10   raising it, I'm not gonna stop it from getting produced
11   after the discovery deadline.  I'm not gonna move any of
12   the other deadlines, but we're gonna finish out what has to
13   be finished out.
14           MR. McPARTLAND:  Okay.
15           THE COURT:  Okay, any questions, Mr. Harman?
16           MR. HARMAN:  No, Your Honor, thank you.
17           THE COURT:  Anything from the defendant?
18           MR. McPARTLAND:  Nothing, thank you, Judge.
19           THE COURT:  All right, thank you.
20              (Whereupon the matter is adjourned.)
21
22
23
24
25
```

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Ashdown v. Equinox, et al., Docket #13-cv-1374, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____

Date:    September 15, 2013