1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK

2

3   ------------------------------------X
                           :

4   ASHDOWN,                    :
                           : 13-CV-1374 (HB)

5              Plaintiff,    :
                         : September 26, 2013

6           v.              :
                         : 500 Pearl Street

7   EQUINOX, et al.,       : New York, New York
                         :

8              Defendants.   :
   ------------------------------------X

9

10      TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY DISPUTES
         BEFORE THE HONORABLE GABRIEL W. GORENSTEIN

11           UNITED STATES MAGISTRATE JUDGE

12
   APPEARANCES:

13

14   For the Plaintiff:       WALKER HARMAN, ESQ.
                        LUCAS LARSON, ESQ.

15                      The Harman Firm, PC
                      200 West 57th Street

16                      New York, New York 10123

17

18   For the Defendants:      THOMAS McPARTLAND, ESQ.
                      Larocca, Hornick, Rosen,

19                       Greenberg & Blaha LLP
                      40 Wall Street

20                      New York, New York 10005

21

22

23   Court Transcriber:       SHARI RIEMER
                      TypeWrite Word Processing Service

24                      211 N. Milton Road
                      Saratoga Springs, NY 12866

25

   Proceedings recorded by electronic sound recording,
   transcript produced by transcription service

1            THE COURT: This is Judge Gorenstein.  Who's on the
2    line?
3            MR. HARMAN:  Walker Harman for the plaintiff, Ms.
4    Ashdown, and I believe Mr. McPartland is on the phone for the
5    defendant.
6            MR. McPARTLAND: Good afternoon, Judge Gorenstein.
7            THE COURT: Can you state your appearance?  We're
8    being recorded.
9            MR. McPARTLAND: Sure.  Yes, this is Patrick
10   McPartland for the defendants.
11           THE COURT: All right.  We're here based on
12   letters -- well, first an affidavit that's attached to a
13   letter dated September 18th, a responsive letter dated
14   September 20th and then another letter dated September 24th fro
15   the defendants.
16           So there's two issues.  One is the complaint.  The
17   other is the discovery extension issue.  Let's deal with the
18   complaints first.  One thing I couldn't tell for sure from the
19   affidavit is if there is an investigation does this go into
20   the file of the person who complains or the person who is
21   complained about or don't you know the answer to that
22   question?
23           MR. McPARTLAND:  Judge, I believe the answer what
24   I've understood from Equinox's practice is it goes into the
25   person -- it goes into the file of the person complained

3

1    about.

2         THE COURT: So now, Mr. Harman, I read your letter

3    and I don't have a basis for question the veracity of this

4    witness.  I would not object if you wanted to go through the

5    expense of your deposing that person because it is such an

6    unusual practice in my view but that is an expense to you.

7         Barring that, I think -- I'd be willing to think

8    about some compromise.  I just don't know that searching what

9    is now claimed to be I guess literally hundreds of personnel

10   files is -- maybe even thousands is an appropriate burden.

11   Maybe there's some subset of people.  Maybe there's people

12   you're interested in.  Maybe there's managers you're

13   interested in.  Can you think of some way to lessen the

14   burden?

15        MR. HARMAN: Well, I can't imagine how it could be

16   thousands when we're talking about 22 locations in the New

17   York City area.

18        THE COURT: Well, he said 140 for each one.  So I

19   just multiplied 20 times 140.  That's where I got that number

20   from.

21        MR. HARMAN: But I'm not talking about -- I would not

22   include maintenance staff or -- I would include people who

23   actually worked as personal trainers or in the management

24   staff.

25        THE COURT: Do you have any information as to how

4

1   many people we're talking about?

2          MR. HARMAN: Do I?

3          THE COURT: Yes.  Do you know how many managers are

4   in a location?  I'll ask the other side if you want but I

5   thought you might have some idea.

6          MR. HARMAN: Well, I think that the size of locations

7   vary.  So I couldn't tell you exactly how many personal

8   trainers there are at each location.  I will say though that

9   with respect to burden this issue was raised a long time ago

10  and so I don't even know why I need to -- I would need to

11  depose someone.  All we seek is the complaints and had they

12  endeavored to search the files months ago when they were first

13  requested or at least in August when we sufficiently and

14  clearly narrowed it on the record we wouldn't be here today.

15         So I'm a little confused as to why now somehow the

16  burden is on us to explain exactly why -- how they should

17  comply.  I think we've been repeatedly clear over and over and

18  over again about what we want and I can't guess about how many

19  complaints there are, how many employees have made complaints

20  or how many employees there are at each location.  It's

21  something that the defendant should have undertook to marshal

22  quite some time ago.

23         THE COURT: Well, I'm confused why you're confused.

24  They threw up the burden objection and they did it by saying

25  it's not in any centralized place, that we're talking about

5

1   140 employees per location and they basically said it's

2   burdensome for us to go through that many employees for all

3   the locations.  So --

4           MR. HARMAN: That's not -- that's not really true.

5           THE COURT: Mr. Harman, Mr. Harman stop.  Let me

6   finish when I'm talking.  So I turned to you because I have no

7   information about this to see if you had some proposal as to

8   what you might want to require them to do that would be a

9   lesser burden.  Now, you may not have the information to make

10  a proposal and I'm happy to question the defendant but I

11  thought I would give you the opportunity initially to make a

12  proposal but if you don't want to I'll ask the defendant if

13  they have a proposal.  Go ahead, Mr. Harman.

14          MR. HARMAN: But that is not what they've said.  What

15  they've said is they've given a variety of different types of

16  last minute excuses.  They've said there's a hotline.  They've

17  said that sometimes complaints are made to corporate

18  headquarters.  Why can't those be produced.  Then they've also

19  said that there could be complaints at individual locations.

20  They've offered three different alternative theories as to why

21  it's all of a sudden now at the end of the day too burdensome

22  for them to look for any types of information whatsoever.

23  Therefore they're not supposed to -- they don't need to do

24  anything.  What we --

25          THE COURT: Mr. Harman, I don't think we're

6

1 understanding each other.  Let's stop.  I will now turn to

2 them to see what their -- I was giving you a chance to do it

3 first.  If you don't wish to that's fine.  You said you don't

4 wish to.  I will now turn to them to see if they have a

5 proposal.

6           So turning you, Mr. McPartland, I don't know that

7 it's reasonable for you to say there's things all over the

8 place, we're giving you nothing.  So if you have a proposal as

9 to what you think would be reasonable I'm willing to hear from

10 you.

11           MR. McPARTLAND: Yes, I do, Judge.  There are -- I

12 mean they're actually named in defendant's -- as defendants in

13 this action.  There were a handful of -- there's the few

14 decision makers here.  Anybody who had any nexus to this case,

15 and I can actually name those names, I will produce -- I can

16 look at their files and I can produce any complaints in their

17 files.  That's not burdensome.  That's actually fair and

18 relevant and I think that that's the scope that should be

19 proffered here.

20           THE COURT: I'm not sure I understand what the --

21 hold on.  Hold on.  Stop, stop.  Folks, if I'm talking you've

22 to stop.

23           I don't know who you're referring to.  So is it some

24 list of names?  Is it some category that's easily

25 recognizable?  What are you talking about?

1          MR. McPARTLAND: It is a list of names, Judge.  So in

2     this case there was Lawrence Sanders who's the general manager

3     on the Soho Club who was directly involved in the decision to

4     terminate Ms. Ashdown's employment.  We could produce anything

5     from his personnel file.  There is Matthew Plotkin who is an

6     area manager who oversees the -- he oversees the Soho Club as

7     well as other clubs.  Any complaints in Mr. Plotkin's

8     personnel file we can produce.  There is Elizabeth Minten who

9     is a regional director of personal training at the corporate

10    level who was consulted with respect to the termination of Ms.

11    Ashdown.  We can produce anything in her files.  There is

12    David Harris who was also consulted.  He's the national

13    director of personal training.  We can produce anything in his

14    file.  There is also Joseph Mattarazo who is the -- I don't

15    have -- he's the regional personal training director at the

16    corporate level.  We could produce anything in his file.

17          These are all that -- these are the handful -- and

18    Maura Mietta actually.  We could produce anything in his file.

19    He's the alleged -- he's one of the alleged harassers.  So any

20    one of these fact witnesses to this case we could go to their

21    files, look at their files and produce whatever is in their

22    files.

23          THE COURT: Mr. McPartland, this isn't quite getting

24    at the issue.  Let me explain to you why.  The discrimination

25    here as I understand it did not happen at the corporate level.

1   It happened at a facility, is that right, or whatever the

2   words --

3           MR. McPARTLAND: The allegation is there are -- there

4   are two allegations basically, Judge.  The one allegation is

5   that Ms. Ashdown was terminated because she had recently

6   undergone cancer treatment.  So that that's the disability --

7           THE COURT: And she worked where though?

8           MR. McPARTLAND: She worked at the Soho Club.  She

9   was a personal trainer.

10          THE COURT: She worked at a fitness club, right.

11          MR. McPARTLAND: Yes, correct.

12          THE COURT: So my point -- so let me just finish my

13  thought.

14          MR. McPARTLAND: Sure.

15          THE COURT: The issue here is whether people in the

16  chain of command up through and including the corporate level

17  engaged in discrimination.  But it's not so much that there

18  would be a complaint in their file that they personally

19  discriminated against someone but what we're trying to get at

20  is did something come to these folks' attention about

21  discrimination at a lower level through fitness clubs, that

22  they then had a decision making role in.  Do you understand

23  what I'm getting at?

24          MR. McPARTLAND: Yes.

25          THE COURT: So to finish the thought, if you folks

1  had a list of discrimination complaints we wouldn't be talking

2  here.  We would just look -- have those complaints and that

3  would be the end of it.  So we're now trying to figure out a

4  way to get at it.  The way to get at it is not to look at the

5  person at the top of the pyramid and say are there any

6  discrimination complaints against them.  The way to get at it

7  is to look at discrimination complaints at lower levels that

8  could have gone to him at some point, figure out what those

9  complaints are and then figure out how they were handled and

10  we're not going to get that by looking at the person or people

11  at the top.  Do you see the problem?

12          MR. McPARTLAND: Yes, I do see the problem, Judge,

13  and the flip side to that problem is the burden issue which we

14  outlined.

15          THE COURT: Right.  Which is why I'm trying to figure

16  out is there some way short of reviewing -- I don't know if

17  it's hundreds or thousands, whatever it is, employee's

18  personnel files.  Is there a way to cull it so that we can get

19  to the people who are actually in a position to do

20  discrimination?  For example, people who have employees under

21  them.  That may be a much, much smaller number.

22          MR. McPARTLAND: Judge, I'm willing to -- I'm

23  obviously willing to do whatever is reasonable but I'm not

24  sure that I'm following you.

25          THE COURT: Well, the people who do -- let me ask

1   this.  This is a case where a person was I assume

2   discriminated against by a supervisor.  Is that what was going

3   on?

4          MR. McPARTLAND: The allegation is against the

5   general manager of -- that's correct.

6          THE COURT: For example, if each of -- if we have,

7   how many fitness clubs, 14, 20?

8          MR. McPARTLAND: We have 21.

9          THE COURT: It seems to me like an easy start would

10  be to look at the discrimination complaints against the

11  general managers in those clubs.  That wouldn't be burdensome

12  at all.  Then we -- hold on.  I'm not saying that's the end of

13  it but I'm just trying to figure out a way to do this that

14  gets at what the plaintiff needs.

15         So if we look through those personnel files then

16  some of them might have some discrimination claims and those

17  might reasonably infer went up the chain and either were acted

18  on favorably or unfavorably to the complainant.

19         Now, I don't know if there's some other category --

20  I think what we're really looking at are people who supervised

21  other people and to see if there were complaints against them

22  because there's a whole premise of this is that if there's a

23  complaint it's going to be in that person's personnel file.

24  So assuming that premise to be true this seems like a way to

25  caption complaints by supervisors is to look at the personnel

1 files of these supervisors.  Other than that, if we look at a

2 fitness club, who are the supervising people?  Is it just the

3 general manager or is there other people?

4          MR. McPARTLAND: In this case, Judge, since Ms.

5 Ashdown was a manager she would have reported to the general

6 manager as would --

7          THE COURT: But I don't want to just think about Ms.

8 Ashdown.  I want to think about the concept more generally.

9 So as --

10          MR. McPARTLAND: As with the other -- I'm sorry, go

11 ahead, Judge.

12          THE COURT: If you can answer the question.  Do you

13 know within a fitness club are we talking about one

14 supervisor, ten, 20, what are we talking about, or don't you

15 know?

16          MR. McPARTLAND: You're talking about a general

17 manager.  You're talking about --

18          THE COURT: I'm asking within a fitness club -- I

19 assume there are a lot of people who don't supervise anyone.

20 The cleaner uppers, personal trainers, whatever.  They don't

21 supervise anybody.

22          MR. McPARTLAND: Correct.

23          THE COURT: I want to know who has a supervisory role

24 within a fitness club, who has people under them.  Is it one

25 person, five people, ten people or don't you know?

12

1          MR. McPARTLAND: It's several people and I can rattle

2     them off for you.  It does depend a little bit on the size of

3     the club but I could actually rattle off the positions for you

4     if that will help but it is -- we're talking probably

5     definitely five to ten I would say per club at a managerial

6     level

7          THE COURT: It could be one, it could be ten, you

8     don't know?

9          MR. McPARTLAND: No, no, that it could be one or it

10    could be ten.  I'm saying it's going to be a minimum -- there

11    are certain departments at each club that have a manager and

12    then there are certain managers at each club which I could

13    rattle off --

14         THE COURT: It will help.  The more information I

15    have the better.  Go ahead.

16         MR. McPARTLAND: Sure.  At every club there's a

17    general manager who oversees a number of other managers.

18    There are assistant general managers.  I believe there is one

19    or two assistant general managers.  They oversee operations.

20    There is a personal training manager which was the position

21    that Ms. Ashdown held.  They oversee the personal trainers.

22    There was a fitness manager which also oversees the personal

23    trainers.  There is a maintenance manager.  There is typically

24    a Palates manager.  There's typically a fitness manager.

25    There's typically a membership like sales role type of

1  manager.  I'm trying to figure out if that's the whole

2  universe.  That's what you're going to have at pretty much

3  every club that those departments cover.

4            THE COURT: So --

5            MR. McPARTLAND: There's a front desk manager as

6  well.  I'm sorry.  I'm trying to -- I'm doing this off the top

7  of my head but each department -- there's a spa manager as

8  well.  So each department -- there are several departments at

9  the club.  Each department has one to two managers each and

10 then overseeing each of those departments you'll have a

11 general manager and you'll also have assistant general

12 managers, one or two assistant general managers.

13           So that's what I was trying to say.  It's going to

14 be at least probably seven per club.  It could be -- depending

15 on the size of the club it could potentially be over ten.

16           The other thing I would point out too is there's

17 this obviously turnover at the club.  So what exists right now

18 you start adding numbers to that over the last five years

19 because people have come and gone.

20           THE COURT: When was the termination in this case?

21 What year?

22           MR. McPARTLAND: The termination in this case was

23 September 2011.

24           THE COURT: Okay.  So we now have a little more

25 information.  I'm now thinking about how to do this.  Mr.

14

1   Harman, is there anything you want to propose?

2          MR. HARMAN: Well, I just wanted to remind the Court

3   that there has been testimony both regarding an anonymous

4   hotline which I presume is dealt with by a third party

5   administrator.  I don't see why that information couldn't be

6   turned over or we couldn't subpoena that information.

7          Also, Mr. Sanders, the GM of the Soho location

8   testified that he himself had been the object of a complaint

9   of inappropriate workplace conduct and described the procedure

10  which involved corporate HR and involved being coaxed and

11  having to sign a written warning of some sort.  So the

12  individual to whom we claim discriminated against my client

13  described a corporate procedure for processing a complaint.

14         So it seems to me that at a bare minimum I don't

15  understand why Equinox can't turn over at least the

16  information that it has that it has retained pursuant to the

17  policy that Mr. Sanders testified to himself as part of this

18  proceeding.

19         MR. McPARTLAND: Judge, I don't know whether Mr.

20  Harman read Mr. Herbert's email but --

21         THE COURT: I'm confused now.  I thought that the

22  claim by the company was that they literally didn't keep

23  records there, they put anything they had in personnel files.

24  That was the only location of the records.

25         MR. McPARTLAND: And that's correct.  That's what mr.

15

1  Herbert's affidavit says.

2        THE COURT: So that answers the second part.  The

3  hotline we can talk about.  Let's talk about the hotline.

4  Does the hotline have or do we have any information about

5  whether the hotline might keep records by company of

6  complaints?

7        MR. McPARTLAND: No, I don't know that, Judge, but I

8  mean it's certainly an inquiry.  It is a third party vendor.

9  It's a company called Global Compliance.  I could certainly --

10        THE COURT: I think you should make inquiry of them

11  because I think they're in your control for purposes --

12        MR. McPARTLAND: No, no, I'm not saying I wouldn't do

13  it, Judge.  There needs to be a subpoena.  I'm happy to do it

14  if the Court so directs.  I don't know the answer to your

15  question though.

16        THE COURT: But my point is I think it's in your

17  control and for that reason actually I think it should have

18  been a long time ago.  So you should immediately reach out to

19  the hotline company to see if they have records of complaints

20  by company.  I'd be amazed if they don't.  And if they have

21  them to turn them over, get them arranged to be turned over

22  quickly.

23        So, Mr. Harman, you brought up these other topics

24  and I was talking about something else.  Did you want to

25  address the thing I was talking about or not?

1        MR. HARMAN: As far as manager's files, this is just

2   such an unusual sort of factual scenario.  It's hard for me to

3   imagine that it would capture what we're entitled to and what

4   we're seeking which is have any other employees under these

5   corporate supervision in the last five years complained about

6   gender and/or disability discrimination if we just look in the

7   GM's files or assistant GM's or even the list that Mr.

8   McPartland provided.  I really -- I don't -- I would not agree

9   that that would be -- that that would sufficiently address

10  these issues that we've been raising for some time.  I don't

11  know what other suggestion to make at this point.

12        THE COURT: Well, tell me why you don't think it

13  would sufficiently address it.  I'm not saying I'm going to

14  order it but if I did why would it be --

15        MR. HARMAN: Because if the complaint is more -- if

16  the complaint is more generalized, if the complaint is I don't

17  think that Equinox has -- I think they have discriminated

18  against me based on my disability but doesn't necessarily name

19  a particular person why would that complaint be in any

20  particular person's file.  So it also -- it really boggles my

21  mind as to why -- I'm not even I guess clear myself.  Is it

22  Equinox's position that if an employee makes a complaint that

23  a copy of that complaint goes into the employee's file and if

24  it is -- if it names a particular individual as an actor it

25  also goes in that individual's file as well?  Is that a clear

1    understanding of Equinox's position on that issue?

2            THE COURT: That was the purpose of all this.  So,

3    Mr. McPartland, we need to know if that's correct or not.

4            MR. McPARTLAND: My understanding is that it goes

5    into the alleged actor's file.  So, for instance, with Mr.

6    Sanders the general manager, a corrective action notice would

7    have been placed into his file.

8            THE COURT: A corrective action notice but if there

9    was a complaint of discrimination let's say that led nowhere

10   would that also be in his file or not?

11           MR. McPARTLAND: If it was made against him it's my

12   understanding it would be in his file.

13           THE COURT: Okay.

14           MR. HARMAN: I honestly think, Judge, that I couldn't

15   really effectively do my job frankly without exploring this

16   with someone who has actual knowledge because with all due

17   respect to Mr. McPartland I just -- it seems like we've sort

18   of been dealing with a lot of ambiguity here and I just don't

19   fully understand.  I guess in essence we already have to deal

20   with whether the discovery period is going to be extended for

21   Mr. Plotkin's deposition which unfortunately I had to cancel

22   at the last minute because I became very, very ill one

23   morning.  That was the only remaining deposition but I don't

24   have a better idea at this point except to explore the issues

25   of how and in what ways complaints of discrimination are

18

maintained with the individual who offered the affidavit I

guess more thoroughly in a short deposition.

          I don't have a better idea.  Otherwise I just think

that this could go on and on and on and I don't think that

that's good for this case or an efficient use of the Court's

time to continue to write letters and have phone conferences

every two weeks especially when we have some deadlines with

Judge Baer to deal with.

          THE COURT: This is the very thing I asked you at the

beginning and you told me you were not interested so I guess

you're interested now.  That's fine.

          MR. HARMAN: Well, I don't have a better idea --

          THE COURT: Mr. McPartland, what's your thought?

          MR. McPARTLAND: My thought is I believe we've -- we

had previously made Mr. Herbert available for a deposition.

Depositions got pushed back to the last minute here because of

plaintiff's counsel and we made everybody available back in

August.  We went right at literally the date of the discovery

deadline.  My client -- my witness was at Mr. Harman's office

on that Friday ready for his deposition and I received a phone

call from his office that the deposition is not going forward.

So I mean my only concern with -- my only concern with

extending the -- I'll produce whatever the Court instructs me

to produce obviously but my only concern is I have to make a

summary judgment motion in this case and I'm already eating

1  into my time.  I have until October 26th to make that motion.

2          THE COURT: The person who's missing is your witness?

3  The person who hasn't been deposed.

4          MR. McPARTLAND: Yes, that's correct.

5          THE COURT: Why -- you have total access to him.  So

6  anything you need from him for summary judgment motion you can

7  do as an affidavit; right?

8          MR. McPARTLAND: Yes, I could.

9          THE COURT: Really those are kind of Judge Baer's

10  deadlines.  So I think those need to be complied with unless

11  you get an extension from him.  I don't view this discovery as

12  affecting our ability -- Mr. Harman, were you planning to move

13  for summary judgment?

14          MR. HARMAN: No.

15          THE COURT: So I don't view this as affecting your

16  ability to move for summary judgment, Mr. McPartland.  So you

17  should just go full speed ahead and make your summary judgment

18  motion.  It may have some effect on the plaintiff's response

19  but that at least buys us a few weeks depending upon what

20  schedule you two are planning.  It was supposed to be fully

21  briefed by November 15th.  So if it's filed -- I don't know --

22  in the next couple of weeks then presumably the plaintiff's

23  response won't be until the end of October.  So that gives us

24  a little bit of time to work with to make whatever --

25          MR. McPARTLAND: Judge, I unfortunately will not be

1  able to -- I'm going on trial in Kings [inaudible] I'm picking

2  a jury on October 10th.

3          THE COURT: I don't quite know how Judge Baer expects

4  this to happen.  I think -- the only thing I can think of is

5  that if you don't agree on a schedule you have to follow the

6  local rules which would allow essentially four weeks for the

7  briefing.  So under Judge Baer's rule you'd basically have to

8  file by October 14th.

9          MR. McPARTLAND: I --

10         THE COURT: Do you see what I'm saying?

11         MR. McPARTLAND: I believe the rule is -- I believe

12  the rule would be -- it's November 15th.  I think it's -- I

13  serve and then it's two weeks for opposition and then I have

14  one week for a reply.

15         THE COURT: So that would mean your brief is due

16  when?

17         MR. McPARTLAND: October 25th.

18         THE COURT: You're right.  So you have until October

19  25th which means the plaintiff has until November 8th which

20  means there's no problem in my mind on some of this just

21  dribbling over slightly because it's not your problem.  It's

22  going to be the plaintiff's problem and I'm quite confident

23  we'll have it resolved by November 8th.  So I think that solves

24  the discovery problem.  I don't mind discovery happening after

25  the deadline as long as it doesn't interfere with Judge Baer's

21

1   schedule.  Do you see what I'm saying?

2           In terms of scheduling the other deposition you

3   should -- the plan was to schedule it I assume within the next

4   week or two.  I'm talking about the deposition of the person

5   who's mentioned ion the letters.  I forget his name.  Mr.

6   Plotkin.  You're planning to do that in the next week or so;

7   right?  Hello?

8           MR. McPARTLAND: Yes.

9           THE COURT: Anybody.

10          MR. McPARTLAND: I haven't spoken to plaintiff about

11  his schedule.  I mean I'm not available until October 2nd

12  because of depositions that I have over the next few days.

13          THE COURT: But you're going to do it before this

14  trial obviously which is the 14th; right?  I mean I'm telling

15  you to do it.  You need to do it between the 2nd and the 11th.

16          MR. McPARTLAND: Yes.  My client is going to be ready

17  -- my client will be ready next week.  I'm just --

18          THE COURT: So that will -- that's going to happen in

19  plenty of time for both of you to use his deposition if you

20  wanted to do that.

21          Now we have the issue -- now back to my discovery,

22  the larger discovery problem.  My inclination is to -- by the

23  way, the personnel files of people who were in place September

24  2011 beforehand are located at the clubs or in some central

25  place or what?

1          MR. McPARTLAND: They're electronically -- they're in

2    electronic format.

3          THE COURT: Oh, interesting.  Well, how hard is it to

4    search files in electronic format for complaints of

5    discrimination?  Have you looked into that?

6          MR. McPARTLAND: [Inaudible] they cannot be searched

7    by keyword.  Yes, we did.  That's in Mr. Herbert's affidavit.

8          THE COURT: They have to be searched by someone

9    examining them.

10          MR. McPARTLAND: Yes.

11          THE COURT: Still I don't view it as very burdensome

12    to do sort of the kind of numbers we're talking about which is

13    those managers times 20 clubs.  I guess it adds up to about

14    200 but that seems like about the right number that I might

15    expect you to do given -- with the balancing of the burden and

16    the benefit.  Again, all this could be avoided if a record

17    were kept the way most corporations keep them.

18          So here's the way I'm going to leave it.  I'm going

19    to direct that anyone with a title, general manager, assistant

20    manager or manager have their files searched for complaints of

21    gender, disability discrimination for people who are present -

22    - -- who are working from September 2011 -- I'm going to say

23    the three years prior.  So that might in some cases mean more

24    than maybe nine or ten people I just mentioned or what you

25    just mentioned but you'll have to live with that.  So that's

23

1   the ruling.

2          If, Mr. Harman, you want to make a pitch for

3   something further based upon deposition testimony you

4   obtained, you're welcome to try to get that deposition.  You

5   need to do that in the next -- in that same time period before

6   the 11th if you want to go forward with that.  Then if you

7   think based on that you want to seek something else.

8          I'm also ordering that the defendant contact this

9   company that takes the telephonic complaints to obtain from

10  them a list which I'm sure they would have by a company of

11  gender, disability complaints.  Now, if they don't have it

12  that needs to be explained by someone in an affidavit.

13         Any questions on the ruling, Mr. McPartland?

14         MR. McPARTLAND: No, Judge.  I just do have a

15  question with respect to Judge Baer's schedule.

16         THE COURT: Yes.

17         MR. McPARTLAND: With respect to moving back to

18  summary judgment motion, that's an issue we can raise --

19         THE COURT: If you want something later than that

20  just write to Judge Baer and do whatever he -- whatever he

21  requires under his rules.

22         MR. McPARTLAND: Okay.  Thank you.

23         THE COURT: Any questions, Mr. Harman, about the

24  ruling?

25         MR. HARMAN: No.  Thank you very much, Judge.

24

1          THE COURT: Thank you everyone.

2          THE COURT: Bye.

3                         *  *  *  *  *

25

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                              Shari Riemer

7   Dated:  October 8, 2013