# **EXHIBIT D**

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------x

3   KERRY ASHDOWN,
                        Plaintiff,
4
            -against-          Case No.
5                              13 CV 1374 (HB)(GWG)

6   EQUINOX a/k/a EQUINOX FITNESS CLUB and incorporated
    as EQUINOX HOLDINGS,  INC., JOE MATARAZZO a/k/a
7   JOSEPH MATARAZZO, MAURO MAIETTA, LAWRENCE SANDERS,
    MATT PLOTKIN a/k/a MATTHEW PLOTKIN, AND MATT HERBERT
8   a/k/a MATTHEW HERBERT,
                        Defendants.
9   ------------------------------------------------x

10

11              DEPOSITION OF

12              MAURO MAIETTA

13           NEW YORK, NEW YORK

14           SEPTEMBER 10, 2013

15

16

17

18

19
    ATKINSON-BAKER, INC.
20    COURT REPORTERS

21    (800) 288-3376
      www.depo.com
22
    REPORTED BY:  RENATE REID, RPR
23  FILE NO. A70997F

24

25
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------------x

 3   KERRY ASHDOWN,
                          Plaintiff,
 4
             -against-          Case No.
 5                              13 CV 1374 (HB)(GWG)

 6   EQUINOX a/k/a EQUINOX FITNESS CLUB and incorporated
     as EQUINOX HOLDINGS, INC., JOE MATARAZZO a/k/a
 7   JOSEPH MATARAZZO, MAURO MAIETTA, LAWRENCE SANDERS,
     MATT PLOTKIN a/k/a MATTHEW PLOTKIN, AND MATT HERBERT
 8   a/k/a MATTHEW HERBERT,
                          Defendants.
 9   ----------------------------------------x

10                       September 10, 2013

11                       10:04 a.m.

12

13      Deposition of MAURO MAIETTA, held at The Harman

14   Firm, PC, 200 West 57th Street, New York, New York,

15   before Renate Reid, Registered Professional Reporter

16   and Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25
```

```
1   A P P E A R A N C E S:

2

3     THE HARMAN FIRM, PC

4     Attorneys for Plaintiff

5          200 West 57th Street

6          Suite 900

7          New York, N.Y. 10019

8     BY:  WALKER G. HARMAN, JR., Esq.

9

10

11    LAROCCA HORNIK ROSEN GREENBERG & BLAHA, LLP

12    Attorneys for Defendants

13         40 Wall Street, 32nd Floor

14         New York, N.Y. 10005

15    BY:  PATRICK T. MCPARTLAND, Esq.

16

17

18

19

20

21

22

23

24

25
```

1            IT IS HEREBY STIPULATED AND AGREED, by and

2         between counsel for the respective parties

3      hereto, that the filing, sealing and certification of

4      the within deposition shall be and the same are

5      hereby waived;

6            IT IS FURTHER STIPULATED AND AGREED that

7      all objections, except as to the form of the

8      question, shall be reserved to the time of the trial;

9            IT IS FURTHER STIPULATED AND AGREED that

10     the within deposition may be signed before any Notary

11     Public with the same force and effect as if signed

12     and sworn to before the Court.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    M A U R O   M A I E T T A, called as a witness,

 2    having been first duly sworn by the Notary Public, was

 3    examined and testified as follows:

 4

 5    EXAMINATION BY

 6    BY MR. HARMAN:

 7             Q.  Good morning.

 8             A.  Good morning.

 9             Q.  Could you please state your name and

10        address for the record?

11             A.  Mauro Maietta, ███████████████████

12        ████████████████████████████████████████████

13             Q.  And have you ever gone by any other

14        name?

15             A.  No.

16             Q.  How long have you lived at that

17        address?

18             A.  Since February of 2013.

19             Q.  And is Mauro Maietta your full legal

20        name?

21             A.  Yes.  My middle name is Salvatore.

22             Q.  Have you ever been deposed before?

23             A.  No, I have not.

24             Q.  Have you ever been a party to a lawsuit

25        before?
```

```
1                A.  No.

2                Q.  And just to be clear, you've never sued

3       anyone?

4                A.  No.

5                Q.  And no one has ever sued you?

6                A.  No.

7                Q.  All right.  Let me go over a few of the

8       ground rules because you've never been deposed

9       before.  My name is Walker Harman.  I'm a lawyer.

10      I represent Kerry Ashdown in a lawsuit that she

11      brought against Equinox and others in their

12      individual capacity.

13                Do you understand that?

14                A.  Yes.

15                Q.  And do you understand that you have

16      been named as an individual defendant in Kerry

17      Ashdown's lawsuit?

18                A.  Yes.

19                Q.  I'm going to ask you a series of

20      questions today concerning Ms. Ashdown's lawsuit.

21      If you don't understand a question I ask you,

22      please ask me to repeat it or rephrase it, I'll

23      endeavor to do either or both.  In other words, if

24      you answer the question, the transcript is going

25      to read as you understood the question.  So make
```

1       sure that you understand what I'm saying.  I want

2       you to understand what I'm saying.

3               Do you understand that?

4          A.  Thank you.  Yes.

5          Q.  During the deposition today, you can

6       take a break at any time.  I'm not sure how long

7       we're going to go today.  We could go into the

8       afternoon.  We'll certainly take a lunch break and

9       other short breaks throughout the day.

10              Let me know if you need to take a break,

11      use the bathroom, to get some water or whatever.

12      The only request I have of you is that you answer

13      any pending question.  So if I've asked a

14      question, you need to provide an answer before you

15      take a break.

16              Do you understand that?

17         A.  Yes.

18         Q.  Are you aware that you're under oath

19      today?

20         A.  Yes.

21         Q.  And that failing to tell the truth

22      under oath is a crime called perjury?

23         A.  Yes.

24         Q.  You're under the same oath as if you

25      were appearing in court.

1              Do you understand that?

2         A.  Yes.

3         Q.  While your deposition is ongoing, I'm

4    going to ask you not to talk about your testimony

5    with anyone.

6              Do you understand that?

7         A.  Yes.

8         Q.  I don't think we're going to have a

9    problem, but you also need to verbalize your

10   answers to any questions.  So a gesture, the

11   nodding of the head, or some other physical

12   response can't always be taken down by the court

13   reporter.  So I would ask you to just verbalize

14   your answers to any questions.

15             Do you understand that?

16        A.  Yes.

17        Q.  Along those same lines -- and it's a

18   two-way street -- we need to try not to interrupt

19   one another.  So let me finish my question, you

20   can then provide a response.  There might be

21   occasions where your lawyer may object or make an

22   instruction and you can answer, so let's try not

23   to cut one another off because it makes it

24   difficult for the court reporter.

25             Do you understand that?

1          A.  Yes.

2          Q.  The questions I'm going to ask you are

3     routine questions I would ask anyone at a

4     deposition.

5               Can I have your date of birth?

6          A.  August 31, ████

7          Q.  And have you had any alcohol in the

8     last 24 hours?

9          A.  No.

10         Q.  Have you taken any medications in the

11    last 24 hours?

12         A.  Just Advil yesterday.

13         Q.  Have you been prescribed any

14    medications that you were not taking?

15         A.  No.

16         Q.  And are you currently employed?

17         A.  Yes.

18         Q.  Where?

19         A.  Equinox Fitness.  I work at the Soho

20    location.

21         Q.  What is your job title?

22         A.  Personal training manager.

23         Q.  How long have you held that title?

24         A.  Since 2011, I believe, September.

25         Q.  Can you think of any reason why you

1       couldn't provide your best and truthful answers

2       here today during the deposition?

3              A.  Can you say that again, please?

4              Q.  Can you think of any reason why you

5       could not provide your best and most truthful

6       answers here today?

7              A.  No.

8              Q.  Has anyone told you to provide

9       dishonest answers today?

10             A.  No.

11             Q.  Have you ever been arrested?

12             A.  No.

13             Q.  Have you ever been accused of a crime?

14             A.  No.

15             Q.  Have you ever been accused of lying?

16             A.  No.

17             Q.  Have you ever been accused of a

18      dishonest act?

19             A.  No.

20             Q.  Have you ever been terminated from a

21      job?

22             A.  No.

23             Q.  What, if anything, did you do to

24      prepare for today's deposition?

25             A.  Met with this gentleman on the right.

```
1              MR. MCPARTLAND:  To put it on the
2              record, there's an attorney-client
3              privilege, so don't disclose the nature of
4              any communications.  I don't think that
5              Mr. Harman is going to ask any questions
6              like that, but just so that you're aware of
7              that.
8              THE WITNESS:  Okay.  Thank you.
9         Q.  Certainly.  So the record is crystal
10   clear, I am not going to ask you about the content
11   of your communications with Mr. McPartland or any
12   other lawyer you've spoken to regarding this
13   matter.
14              Are you represented by counsel in this
15   case?
16         A.  Yes.
17         Q.  Who is your counsel?
18         A.  The gentleman to my right.
19         Q.  What is his name?
20         A.  Can't remember his last name off the
21   top of my head, but I know his first name is Pat,
22   so I've been calling him Pat.
23         Q.  How long has he been your lawyer?
24         A.  I believe, June of this year.
25         Q.  And are you compensating your lawyer
```

```
 1          for his time?
 2                    MR. MCPARTLAND:  Objection.
 3                 You can answer.
 4                 A.  No.
 5                 Q.  And did you sign a retainer agreement
 6          to retain your lawyer?
 7                 A.  I don't believe so.
 8                 Q.  And other than Pat, are you represented
 9          by any other lawyer?
10                 A.  No.
11                    MR. MCPARTLAND:  By counsel, he's
12                 represented by our law firm.  There are
13                 other lawyers at our firm, so I'll clarify
14                 that.
15                    MR. HARMAN:  I would ask you not to
16                 make speaking objections, please.
17                    MR. MCPARTLAND:  That was just a
18                 statement for the record.
19                    MR. HARMAN:  I'm seeking the witness's
20                 understanding; not counsel's.
21                    MR. MCPARTLAND:  Okay.
22            BY MR. HARMAN:
23                 Q.  Have you met with anyone, any other
24          lawyer other than Pat, regarding Ms. Ashdown's
25          lawsuit?
```

1               A.   I met with one of his colleagues.   I

2       don't remember his name.

3               Q.   When was that?

4               A.   Did you say when was that or what was

5       that?

6               Q.   When was that?

7               A.   I believe it was June of this year.

8               Q.   Where did that take place?

9               A.   At their law offices.

10              Q.   Was that in lower Manhattan?

11              A.   I don't remember the address.

12              Q.   And was anyone else present at that

13      meeting?

14              A.   Just myself, Pat and his colleague.

15              Q.   And did you review any documents during

16      that meeting?

17              A.   Yes.

18              Q.   What documents did you review?

19              A.   E-mails, stuff relating to my job.

20              Q.   Anything else?

21              A.   No.   I believe that was the nature of

22      the documents.

23              Q.   What e-mails did you look at?

24              A.   When you say, "what e-mails," you want

25      to know the nature of the e-mails?

1              Q.  I want to know what e-mails you looked

2       at.

3              A.  They were correspondence that I was

4       involved in.

5              Q.  What type of correspondence?

6              A.  Some of them were between me and my

7       supervisor, some were between myself and Kerry

8       Ashdown.  I think that was all the e-mails.

9              Q.  And when you say your supervisor, who

10      do you mean by that?

11             A.  Lawrence Sanders, my general manager.

12             Q.  So it's your recollection that you

13      looked at e-mails between you and Mr. Sanders; yes

14      or no?

15             A.  Yes.

16             Q.  And then you looked at e-mails between

17      you and Ms. Ashdown?

18             A.  Yes.

19             Q.  And did you look at any other e-mails?

20             A.  I don't recall.

21  REQ        MR. HARMAN:  I'm just going to call for the

22  production of all e-mails that were reviewed by

23  Mr. Maietta during the June meeting, and we will follow

24  up in writing, and that would be true with respect to any

25  additional requests made on the record today.

```
 1                    MR. McPARTLAND:  Okay.

 2    BY MR. HARMAN:

 3             Q.  And then you also testified, in

 4         addition to the e-mails, that you looked at stuff

 5         related to the job?

 6                  Is that a fair recollection?

 7             A.  Stuff related to my job, yes.

 8             Q.  What do you mean by that?

 9             A.  There's a report called the performance

10         commission, and we took a look at one of those.

11             Q.  And which one did you look at?

12             A.  I don't know the specific dates of it,

13         but it involved sessions from a member.  I don't

14         remember the member's name.  The performance

15         commission goes over pay period reports for

16         trainers, so I don't remember the dates of this

17         particular one.

18             Q.  Was this report for you?  Was it

19         generated for your -- was it a performance

20         commission report for you?

21             A.  No.

22                  MR. McPARTLAND:  Object to the form.

23             Q.  Whose performance commission report was

24         it?

25             A.  I don't remember the trainer's name on
```

1          this one.  I think it was one of the trainers that

2          I was in charge of at that time.  It's a report

3          that I run for all the trainers, including myself.

4                    Q.  Was there some inaccuracy contained

5          within the report?

6                    A.  Define "inaccuracy."

7                    Q.  Well, was the report related to

8          Ms. Ashdown?

9                    MR. McPARTLAND:  Object to the form.

10                   A.  I don't remember which trainer report

11         it was run for.  The way the report works is it's

12         a system that the personal training manager and

13         fitness manager have access to.  And during the

14         course of any pay period, you run this report to

15         make sure the trainers are properly compensated

16         for sessions, the correct sessions were pulled,

17         following up to make sure training clients are

18         utilizing their sessions.  So it's something that

19         the managers are very intimate with in relation to

20         the PT business.

21                   Q.  But you looked at the report?

22                   A.  Yes.  Part of my job is I have to look

23         at the report on a daily basis.

24                   Q.  But in June, in your lawyer's office,

25         you looked at a performance commission report?

```
 1                    A.   That's correct.

 2                    Q.   Did you look at more than one?

 3                    A.   No.  It was the same report.

 4   DIR              Q.   And without delving into conversations

 5         you had with your lawyer, what was your understanding

 6         of the purpose of looking at the report?

 7                         MR. MCPARTLAND:  Objection. Don't

 8                    answer that.  You're going into

 9                    communications now. You can ask him what he

10                    looked at.

11   RUL              Q.   I'm not asking you about your

12   communications with your lawyer.  I'm asking you about

13   whether you have any independent understanding as to why

14   you were looking at that report.

15                         MR. McPARTLAND:  Objection.  It's

16                    privileged.

17                      I'm instructing you not to answer.

18                         MR. HARMAN:  Mark it for a ruling,

19                    please.

20                    Q.   Do you remember any names on the

21         report?

22                    A.   No.  As I said, I don't remember the

23         names of the clients that we were looking at.

24         There's a lot of clients that appear normally on

25         these reports.
```

1           Q.  And you don't remember what trainer it

2      was for?

3           A.  I don't want to tell you the wrong

4      name.

5           Q.  Do you remember anything about the name

6      of the trainer?

7           A.  If I don't remember the name, I don't

8      know if I would remember --

9           Q.  Just so the record is clear, this was

10     in June this year, three months or so ago?

11          A.  Yes.  We were looking at performance

12     commissions, and that's one of the reports you're

13     asking me that I looked at, and I'm trying to give

14     you the most truthful answer.

15          Q.  Did you look at more than one report?

16              MR. McPARTLAND:  Asked and answered.

17            You can answer.

18          A.  No.  I just looked at one performance

19     commission.

20          Q.  But you don't remember the name of the

21     trainer?

22          A.  No.

23          Q.  And do you remember whether this was a

24     man?

25          A.  Yes.  It could have either been Ryan

1          Hopkins or Bobby Dwyer.

2                Q.  Why do you believe it was either Ryan

3          Hopkins or Bobby Dwyer?

4                A.  These are the trainers that were

5          involved, I believe, in what we're speaking about

6          today.

7                Q.  Well, what do you mean by "what we are

8          speaking about today"?

9                A.  Well, the performance commission that

10         we're looking over -- I don't know if I'm

11         answering you incorrectly -- it was in relation to

12         sessions that shouldn't have been on the

13         performance commission.  And these are the two

14         trainers that were involved.  And when I answer

15         you that I don't remember which trainer, I don't

16         remember if we were looking at Bobby's specific

17         performance commission or Ryan's.  So I don't want

18         to answer you inaccurately.

19               Q.  Is Ryan still employed at Equinox?

20               A.  No.

21               Q.  And when was the last time that he was

22         employed by Equinox?

23               A.  I believe it was June of this year.

24         June of 2013.

25               Q.  And how did his employment end with

1      Equinox?

2              A.  He voluntarily resigned for another

3      position.

4              Q.  Another position where?

5              A.  I believe he's currently working in

6      Soho, at another -- his own practice, his own

7      fitness center.

8              Q.  And, again, when you say, "what we are

9      speaking about today," I don't know what that

10     means exactly.  So you're going to have to work

11     with me.

12              What is -- what did you mean when you

13     said, "what we're speaking about today"?

14                  MR. McPARTLAND:  Asked and answered.

15              You can answer.

16              A.  I was speaking about the performance

17     commissions.  You asked me what I looked at, and I

18     told you I looked at performance commissions and

19     e-mails.

20              Q.  So let's stick with the performance

21     commissions.

22              And you believe it was either for Ryan or

23     Bobby; right?

24              A.  That's correct.

25              Q.  What do you recall about the

1        performance commission?

2               A.   There were sessions, but that's what's

3        on performance commissions; either Equifits, free

4        PTs, tiered sessions, AmEx sessions.  So what I

5        remember specifically about that one, is we were

6        looking at AmEx PT sessions from an expired

7        member -- or excuse me, a cancelled member.

8               Q.  You were looking at expired AmEx PT

9        sessions?

10              A.   No.  I was looking at AmEx PT sessions

11       for a cancelled member.

12                   MR. McPARTLAND:  I'm going to object to

13                   this line of questioning.  We're delving

14                   into what was happening during an

15                   attorney-client meeting and it's

16                   inappropriate.  You have copies of the

17                   commission reports.  Put them in front of

18                   him and ask him questions about it.

19                    But you have to stop asking him questions

20                   about the meeting or I will instruct him

21                   not to answer.  I don't want to interrupt

22                   the deposition, but this is an odd way to

23                   go about this.

24                   MR. HARMAN:  I have a right to ask him

25                   about everything he looked at.

1            MR. McPARTLAND:  You can ask him what

2       he looked at, but you can't ask him why it

3       was shown to him or what he understood --

4            MR. HARMAN:  I didn't ask him why it

5       was shown to him.  If you continue these

6       kinds of speaking objections in the

7       presence of your client, we're --

8            MR. MCPARTLAND:  It's not a speaking

9       objection.  It's an attorney-client

10      privilege.

11           MR. HARMAN:  You have made your

12      objection known.  So far he's not testified

13      to any communications between an attorney

14      and client.

15         Can I move on, please?

16           MR. McPARTLAND:  Sure.

17 BY MR. HARMAN:

18           Q.  With respect to the document that you

19      looked at, you recall that there were AmEx

20      personal training sessions from a cancelled

21      member; is that correct?

22           A.  Yes.

23           Q.  What was the significance, if anything,

24      about that?

25           A.  The significance of sessions pulled for

1         a cancelled member are just inherent in the

2         phrase.  Sessions should be pulled for members who

3         are no longer utilizing the gym unless there is an

4         extenuating circumstance, or note in their account

5         as to why these sessions should be pulled.

6                  And at the time, I was a fitness manager,

7         and one of the jobs of the fitness manager is to

8         do the payroll, do the pay period ending.  So I

9         was reviewing the performance commission, like I

10        do every pay period, to make sure sessions were

11        properly pulled for trainers, to make sure the

12        trainers were properly compensated for their time.

13                 And you become quite familiar with the

14        reports in making sure that everything is in its

15        proper order.  And what I had noticed on this

16        particular report were there were three or four

17        sessions pulled on the same date for a member.

18        Part of my job is to actually go into the system,

19        check the member's account, make sure the sessions

20        were properly pulled, to see if there were any

21        notes on the sessions.

22                 There are occasions where multiple

23        sessions are pulled on the same day, but there are

24        notes indicating that the session is from another

25        day.  Either the training client late-cancelled or

1       no-showed; there was an issue at the front desk.

2       These particular sessions, there weren't any

3       notes.  They were just all pulled on the same day,

4       and it turned out that that member had not even

5       utilized the club in quite some time.

6              Q.  And were these conclusions that you

7       came to in June of this year?

8              A.  No.  This was a performance commission,

9       I believe, when I was the fitness manager of Soho,

10      which was in 2011.

11             Q.  So these are conclusions you reached in

12      2011?

13             A.  Yes, when I was running the reports.

14      Like I told you, it's something that on a daily

15      basis, you run it.  During that time in 2011, when

16      we used a system called eTrac there was a

17      spreadsheet that we developed to make sure that

18      new members had utilized their Equifits and their

19      free PTs.

20             There's also a type of member in 2011

21      that had American Express sessions.  These were

22      the type of leads that we wanted to make sure we

23      made priority for the fact that trainers had

24      additional times to train them based on the

25      American Express sessions.

1                    So the job of the fitness manager is to

2          track that on the spreadsheet, make sure the

3          sessions were utilized by the right trainer, in

4          the proper time frame, and then we want to check

5          up with the trainer to make sure that the client

6          was converted into an actual purchasing training

7          member.

8                    Q.  Is the eTrac system still utilized

9          today?

10                   A.  No.  We've moved to a different system.

11         It's a little more automated.

12                   Q.  What is the system?

13                   A.  It's called Blue Sky.  It's an ESP

14         pipeline.

15                   Q.  When did you start using Blue Sky?

16                   A.  Blue Sky was rolled down -- we've been

17         using Blue Sky for other programs, but now, as far

18         as the tracking of leads and notes, that started

19         in 2012.

20                   Q.  So it's your recollection that you

21         noticed the three or four sessions on the

22         performance commission report back in 2011?

23                   A.  Yes.

24                   Q.  And when in 2011 did you notice that?

25                   A.  I don't remember the exact monthly time

1        frame, but the performance commission that you're

2        speaking about, I think, was the second time that

3        I had noticed an aberration on the report.  And

4        after the first occasion, I just made a note of it

5        just to see if maybe it was something that might

6        have happened, computer error.  And it wasn't

7        until I noticed it this time, the second time,

8        that it didn't seem right to me.

9              Q.  When you say you noticed it on two

10       different occasions, was that on the -- a

11       performance commission report with the same

12       trainer?

13             A.  I believe so, yes.

14             Q.  And when was the first time that you

15       noticed it?

16             A.  I don't remember the exact dates, but

17       it was after February, in 2011.  That's when I

18       started at the Soho location as a fitness manager.

19             Q.  And you say on the first occasion, you

20       noticed what?

21             A.  On the first occasion, I believe it was

22       one or two sessions that didn't coincide with the

23       trainer's active client roster.  So I didn't know

24       if it was maybe a training client who trained as a

25       one-off.  It wasn't until the second time, where I

1          believe it was three or four sessions, that I

2          decided I needed to look further and make sure

3          this was actually a training client for that

4          particular trainer.

5                    Q.   And you said you made a note the first

6          time?

7                    A.   Mental note.  Mental note.

8                    Q.   You didn't speak to anyone about it?

9                    A.   No.  I just went home and I spoke to my

10         wife about it.  I said, "Hey, I noticed this at

11         work today."

12                   Q.   And what is your wife's name?

13                   A.   Sheila Maietta.

14                   Q.   And how long have you been married to

15         Sheila?

16                   A.   Since April 8, 2011.

17                   Q.   And does your wife work at Equinox?

18                   A.   No.

19                   Q.   Is she a personal trainer?

20                   A.   No.

21                   Q.   What does she do for a living?

22                   A.   She works for North Shore Hospital.

23         She's involved in third-party billing.

24                   Q.   So you didn't speak to Mr. Sanders

25         about it?

```
 1                 A.  No.

 2                 Q.  And you didn't speak to Ms. Ashdown

 3        about it?

 4                 A.  No.

 5                 Q.  And at that time, it was your -- who

 6        was your direct supervisor?

 7                 A.  Lawrence Sanders.

 8                 Q.  And you didn't speak to the particular

 9        trainer about it?

10                 A.  No.

11                 Q.  What did you say to your wife?

12                 A.  I told my wife that I noticed some

13        sessions that were pulled for a trainer for a

14        client that was not his.  I just want to keep my

15        eye on it.

16                 Q.  Now, earlier, you testified that you

17        noticed that it was a client that was not on his

18        roster.  So at the time of the first incident, did

19        you know for sure whether or not the client was

20        the personal trainer or not?

21                     MR. McPARTLAND:  Object to the form.

22                     You can answer.

23                 A.  The first time, I believe, was one or

24        two sessions.  We have, on any given month,

25        anywhere from 400 to 500 active clients.  It's
```

1    hard to remember all their names.  So generally,

2    in a day, I want to utilize my energies for either

3    big inaccuracies or things that really require my

4    attention.

5              So this first case where it was just one

6    or two sessions, I assumed that it could have been

7    a member that the trainer met on the floor, met

8    through a referral and they just pulled the

9    session for either an hour on the floor, something

10   of that nature.

11             When I saw it the second time and it was

12   four sessions on the same day, that's something

13   that is a little more glaring that you're going to

14   have to look a little further into.

15        Q.  It would be helpful if you just

16   focus -- just in terms of time efficiency, if you

17   just answer my questions.

18             So on that particular day, when you

19   noticed the one or two, what was alarming about

20   it, specifically?

21        A.  That they were American Express

22   sessions.

23        Q.  And what was alarming about American

24   Express sessions?

25        A.  As a fitness manager, I'm responsible

1        for the leads that are given out to the trainers.

2        So the American Express leads, specifically, they

3        are few and far between, and those are names that

4        I generally have a better time recalling or

5        knowing who I gave that lead to.

6                 This particular member was not a lead

7        that I gave to that trainer.  So I was -- just

8        made a mental note to see if maybe the person

9        might have met that client on the floor, and if I

10       saw it again, I was going to look into it a little

11       further.

12               Q.  And I believe I already asked this, but

13       what did you say to your wife?

14               A.  I went home, I told her that I noticed

15       sessions that were pulled for a trainer that may

16       not be his training client, and something I wanted

17       to keep an eye on.

18               Q.  And you didn't talk to the trainer at

19       that time?

20               A.  No.

21               Q.  You didn't think to just go and ask

22       him?

23               A.  No, because it was just one or two.

24       Like I told you, it's something where part of what

25       the trainer needs to do is generate business for

1     themselves.  The trainer could have very well been

2     on the floor, engaged the member.

3          Q.  You didn't talk to the trainer; yes or

4     no?

5          A.  No, not for the one session.

6          Q.  Who was the trainer's direct supervisor

7     at that time?

8          A.  At that time, it would be myself, Mauro

9     Maietta, and Kerry Ashdown, the personal training

10    manager.

11         Q.  Are you testifying today that you were

12    the trainer's direct supervisor?

13         A.  Yes, one of them.

14         Q.  And the trainer had another direct

15    supervisor?

16         A.  Yes.  The way the personal training

17    department works --

18         Q.  Answer the question, yes or no; there

19    was another direct supervisor?

20         A.  Yes.

21         Q.  Who was that?

22         A.  Kerry Ashdown, the personal training

23    manager.

24         Q.  And you didn't think to go speak to

25    Ms. Ashdown about it?

```
 1                 A.   It's not something that --
 2                 Q.   Just answer the question, please.  Just
 3           answer the question; you didn't think to speak to
 4           Ms. Ashdown about it?
 5                     MR. McPARTLAND:  Object to the form.
 6                  You can answer.
 7                 A.   No.
 8                 Q.   So there was a second time where you
 9           noticed three or four sessions; yes?
10                 A.   That's correct, yes.
11                 Q.   And at that time, what, if anything,
12           did you do about it?
13                 A.   At the time of when I noticed the
14           sessions?
15                 Q.   Correct.  This is the same personal
16           trainer?
17                 A.   On that report, yes.
18                 Q.   And this time there are three or four
19           sessions?
20                 A.   Yes.  So what -- part of the daily
21           tasks I have to go through, like I told you, is
22           track, and what I did that time -- because I
23           noticed it again for the same trainer with the
24           same type of sessions, I looked into the member's
25           account, noticed the member was a cancelled
```

1     member.  The member hadn't even used the Soho

2     location.

3               If I remember correctly, that member was

4     using one of our Florida clubs.  And I noticed

5     there were no notes as to why the sessions were

6     pulled.  I noticed who pulled the sessions.  And I

7     printed out the report just to verify with my

8     eTrac.  And then, it was really something where I

9     had to decide what to do in relation to it in our

10    department, and I felt the best course of action

11    was to speak with my supervisor, Lawrence Sanders,

12    somebody that I've known for the entire time that

13    I was in the company.

14              I went to Lawrence and I asked him for

15    advice on what I should do with this particular

16    situation.  He's somebody that I trust to ask

17    advice.  He's been my general manager now two

18    locations, and I asked him how I should handle the

19    situation because I wanted to ask Kerry about it,

20    but I did not know how to ask her because I was

21    always very fearful of how she would respond when

22    I would bring up things in the office.

23              We didn't have the best communication in

24    the PT office.  Any time she didn't like my

25    opinion on something, she had a tendency to raise

1    her voice --

2          Q.  I haven't asked you about your

3    relationship with Ms. Ashdown.  I want you to

4    answer my questions.  It's going to be a lot

5    easier.

6              I just asked you, what, if anything, you

7    did about the second incident when you noticed the

8    three or four sessions?

9              MR. McPARTLAND:  He is answering the

10            question.

11         A.  I just wanted to give you a --

12         Q.  So you spoke to Mr. Sanders; yes or no?

13         A.  Yes.

14         Q.  And you chose not to speak to

15   Ms. Ashdown; yes or no?

16         A.  Not until I -- after I spoke with

17   Lawrence because I was asking his advice on how to

18   speak with her.

19         Q.  So you noticed these three or four

20   sessions for this personal trainer, and you did

21   not speak to Ms. Ashdown?

22         A.  No.

23         Q.  And you never spoke to Ms. Ashdown

24   prior to reporting the session pulls to

25   Mr. Sanders; correct?

1              A.  About the sessions or spoke to her in

2       general?

3              Q.  About the sessions.

4              A.  No, I didn't speak to her about the

5       sessions.

6              Q.  And the personal trainer, did you ever

7       speak to him about the sessions?

8              A.  No.

9              Q.  And so you went and spoke to

10      Mr. Sanders.

11              Did you go and speak to him on that day?

12             A.  I told him that day that I wanted to

13      speak with him.  I don't remember if I spoke to

14      him later that day or the next day.

15             Q.  What did you say to him?

16             A.  I told him I needed to speak to him

17      about sessions that I noticed were pulled, and I

18      wanted his advice on how to handle it and how to

19      approach Kerry with the information.

20             Q.  And what did he say?

21             A.  I showed him the forms commission.  I

22      think he was in a little bit of disbelief.  He

23      said, "Okay.  I'll handle it from here.  No need

24      for you to make a big deal about it."

25              I don't remember his exact verbiage, but

1     he told me he was going to handle the situation

2     from that moment forward.

3          Q.  Did he say anything else?

4          A.  No.

5          Q.  Did you say anything to him?

6          A.  Just in relation to the performance

7     commission.  I told him what I had told you about

8     what I determined about the sessions; they were

9     for a cancelled member.  There were no notes as to

10    why the sessions were pulled.  The member wasn't

11    utilizing our club.  And he said, "Okay.  I'll

12    take care of it from here."

13         Q.  Did the performance commission report

14    indicate who had pulled the sessions?

15         A.  The report doesn't tell you who pulled

16    the sessions, but when you go into the member's

17    account to look at the sessions pulled, it does

18    have an initial system of the individual who

19    pulled the sessions.

20         Q.  And when you first noticed -- during

21    the first incident, when you first noticed the two

22    sessions, did you go into the account to see who

23    had initialed it?

24              MR. McPARTLAND:  Object to the form.

25              You can answer.

1          A.  When I first went in, I don't remember

2     if I looked at the initials, no.

3          Q.  And how about the second time?

4          A.  Yes.  Like I told you, I went in to

5     look because it was three or more sessions.  When

6     I went into the account, and you pull it up to see

7     if there are notes, that's right there on the same

8     line item.  It's notes and then the initials of

9     the person who pulled it.

10          Q.  And what notes were there?

11          A.  There were no notes for any of the

12     three or four sessions pulled, and the initials

13     were KA.

14          Q.  When you say "initials," what do you

15     mean by that?

16          A.  Well, the way the system works is they

17     take the first letter of the first name, first

18     letter of your last name, and they put that -- I

19     guess, associated with the individual who pulled

20     the sessions.

21          Q.  So by the second time, was it your

22     belief that -- what does "KA" stand for, if you

23     know?

24          A.  KA, in relation to that performance

25     commission, would be Kerry Ashdown.

1          Q.  And so after your review of the second
2      situation that you've testified to, was it your
3      belief that Kerry Ashdown had pulled these
4      sessions?
5          A.  Based on the initials, I would believe
6      that she pulled them, yes.
7          Q.  You tell Lawrence Sanders that Kerry
8      Ashdown had pulled these sessions?
9          A.  No.  I just told him that her initials
10     were on the report, so it looks as if Kerry had
11     pulled the sessions.
12         Q.  So you did tell him that it looks as if
13     Kerry had pulled the sessions?
14         A.  Well, yes, because I told him that the
15     information on the sessions, they were AmEx
16     sessions for a cancelled member.  And when I
17     looked in to make sure, to see the notes, the
18     initials I saw were KA.
19         Q.  And you never spoke to the trainer to
20     ask the trainer whether Kerry had pulled the
21     sessions for him?
22         A.  No.
23         Q.  You never asked Kerry if she had pulled
24     the sessions?
25         A.  No.

1          Q.  Do you ever pull sessions for anyone?

2          A.  All the time.  The training manager,

3    the personal training manager, fitness manager, we

4    have to pull sessions on a daily basis.

5          Q.  So is it fair to say, then, that the

6    initials KA would appear on a lot of commission

7    reports?

8          A.  Yes.

9          Q.  At the time that Ms. Ashdown was

10   working as the personal trainer -- please let me

11   finish the question --

12              MR. HARMAN:  Could you repeat --

13         Q.  As the personal training manager, is it

14   fair to say that her initials would have appeared

15   on a lot of the reports that you review?

16         A.  They wouldn't appear on the commission

17   reports.  They would appear in the system, in the

18   E-club system, where we would go in and look or

19   pull the sessions from.  The report just gives you

20   the member ID number, the date they were pulled,

21   the member's name.  And then on that corresponding

22   page, which trainer they were pulled for.

23         Q.  And can a trainer pull sessions him or

24   herself?

25         A.  No.

1          Q.  So a manager has to pull a session for

2     a trainer?

3          A.  Managers can pull the sessions, or the

4     front desk when the member signs into the club.

5          Q.  So let's set the -- there's two ways,

6     then.  You either pull a session when you check in

7     at the club; right?

8          A.  Yes.

9          Q.  Or a manager has to pull the session

10    for the trainer and the member?

11         A.  Yes.

12              MR. McPARTLAND:  Objection to the form.

13               You can answer.

14         A.  It's what's called a forget-to-pull.

15    So the training client didn't pull it at the front

16    desk, and then the manager would pull the session

17    to make sure the trainer is properly compensated.

18         Q.  And it's your testimony that you have

19    to do that all the time?

20         A.  On a daily basis, yes.

21         Q.  Is it fair to say that Ms. Ashdown

22    would have done that on a daily basis?

23         A.  Absolutely.

24         Q.  And you have Ms. Ashdown's former

25    position; is that correct?

1          A.  Yes.  I'm now the personal training

2     manager of Equinox.

3          Q.  And it's your testimony that she was

4     never your supervisor?

5          A.  No.  We worked together in the same

6     department.

7          Q.  Just answer the question.  Was she your

8     supervisor or not?

9          A.  Can you define "supervisor"?  I'm not

10    trying to be --

11         Q.  I'm asking you -- you worked at Equinox

12    for a while.  How long have you worked at the Soho

13    location?

14         A.  Since 2011; February 2011.

15         Q.  Okay.  And during that time, was

16    Ms. Ashdown ever your supervisor?

17         A.  Yes.

18         Q.  And when did she first become your

19    supervisor?

20         A.  I believe it was the end of the month

21    of February.  When I originally started, I was

22    working with Jessica Dart, who was the personal

23    training manager.  I worked with her, I think, for

24    less than two weeks.

25         Q.  Is there a fitness manager at the Soho

1         location now?

2                   A.   Yes.

3                   Q.   Who is that?

4                   A.   Darwin Diaz.

5                   Q.   Do you supervise -- is that a man or a

6         woman?

7                   A.   That's a man.

8                   Q.   And Mr. Diaz, do you supervise

9         Mr. Diaz?

10                  A.   Yes.

11                  Q.   How long have you supervised Mr. Diaz?

12                  A.   I believe he started October 2012.

13                  Q.   So it's fair to say, then, that any

14        time you -- when you look at commission --

15        performance commission reports, there's always

16        going to be a manager's initials beside a

17        forget-to-pull?

18                  A.   Not on the report.  There are no

19        managerial initials on the report.

20                       MR. McPARTLAND:  Object to form.

21                  A.   There are always going to be initials

22        next to a session that is pulled inside of E-club,

23        but not on the commission report.

24                  Q.   And how do you get into E-club?

25                  A.   On the Equinox computers, they're

1          already set up.  There's an icon on the desktop.

2          You click on it, and it asks you for a user name

3          and password.

4                Q.  How long does that process take?

5                A.  You have to click the desktop icon.  If

6          the computer is loading quickly that day, it's

7          pretty quick.  It asks you for your user name, you

8          put the user name, put the password, and you're in

9          the E-club.  And you have sorted options on the

10         screen.

11               Q.  And how frequently do you go into

12         E-club to check the initials of a session?

13               A.  You're not going into E-club to check

14         initials.  You're going into E-club to check the

15         sessions are pulled, pulled for the right trainer,

16         pulled on the right dates, checking notes, getting

17         member contact information.  That's where their

18         e-mail address and phone numbers are stored.  So

19         you have to go into E-club for that, to run the

20         performance commissions through E-club.  To run

21         first-time buyer reports is through E-club.  We

22         run a number of reports through that.  And that

23         program is pretty much open throughout the day.

24               Q.  Had you ever had a discussion with

25         Ms. Ashdown, prior to this conversation you had

1     with Mr. Sanders, about why she pulled a session

2     for a trainer?

3          A.  We've had discussions in relation to --

4     the main thing that I would probably ask questions

5     about are comp PTs and the free PTs that you would

6     find on the commission report.  One of the things

7     we never want trainers to do is pull these

8     sessions on the same day.  Part of the Equinox

9     brand is they meet first for an equal fit, and on

10    a separate day, they're supposed to meet for the

11    free PT.  Gives the trainer time to develop a

12    program.

13          So part of the relationship with PTM and

14    FM is to follow up with leads.  If a session was

15    pulled, just update the eTrac at that time to make

16    sure that it wasn't done on the same day.  So

17    there are probably numerous occasions where PTM

18    and FM would have to speak about sessions being

19    pulled.

20          Q.  And do you believe that Ms. Ashdown had

21    improperly pulled sessions for this particular

22    trainer?

23          A.  Yes.  Those sessions on the performance

24    commission, those three or four, what was most --

25    what made it feel as if they were improperly

1      pulled was the fact that the member was cancelled,

2      that the member never used the Soho location on

3      that year, primarily used one of our Florida

4      locations.

5              So those are the type of warning signs

6      that would make you think a session wasn't pulled

7      correctly.  You know, if a session was pulled for

8      a member who utilizes our club, who is an active

9      training client of the trainer, that really

10     doesn't set off any alarms.

11         Q.  When you say "cancelled," what do you

12     mean by that?

13         A.  Meaning you're no longer a member of

14     Equinox.  After a member's membership is

15     cancelled, what is in their inventory stays, it

16     persists in E-club.  I don't know how long it

17     persists, but if I were to be a member of Equinox

18     and cancelled my membership, anything I had in my

19     inventory would still be there.  Even after the

20     membership was cancelled.

21         Q.  But you testified that the member was

22     using a location in Florida; correct?

23         A.  At the time, where their membership was

24     active, I believe it was a 2009 cancellation, and

25     that's when they were using the Florida location.

```
1              Q.  So they were using the Florida location
2        and then the membership was cancelled?
3              A.  Yes.  They were a Florida Equinox
4        member with a cancelled membership with sessions
5        pulled at the Soho location in a time where they
6        didn't have an active membership.
7              Q.  Had sessions ever been pulled at the
8        Soho location?
9              A.  No.
10             MR. McPARTLAND:  Objection to the form.
11             Q.  And for how long a period was this
12        report, this commission report?
13             A.  This one we're speaking about,
14        generally we process reports for the pay period,
15        which is a two-week period.  So this one was
16        either for a two-week period, or it was from the
17        day prior to when I was running it.
18             Because at the time, like I told you,
19        with eTrac, I would come in and run the report
20        from the day before to make sure that Equifits
21        were pulled, free PTs were pulled; and then in
22        that eTrac, AmEx clients, to make sure they were
23        utilizing their American Express sessions.
24             So at the time we were using eTrac,
25        performance commission was run every day by the
```

1      fitness manager.

2            Q.  And at the time that you went to

3      Mr. Sanders, I take it that you thought there was

4      a real problem?

5            A.  Yes.

6            Q.  And you thought that Ms. Ashdown caused

7      the problem?

8            A.  In the nature of the fact that when I

9      looked into the account, her initials were next to

10     it, yes.

11           Q.  And you had this confidential with

12     Mr. Sanders that you described.

13              Did you ever have another conversation

14     with him about this particular issue?

15           A.  No.  That was the first time I spoke to

16     him about it, and then that day he told me, "I'll

17     take care of it from here."

18           Q.  Did you ever speak to him about the

19     situation involving the session pulls and

20     Ms. Ashdown at any other time?

21           A.  After that period of time, no.  He

22     said, "I'll take it from here," so it was out of

23     my hands at that point.

24           Q.  Did he ever report anything back to

25     you?

1          A.  No.

2          Q.  So as you sit here today, do you have

3     any idea whether the trainer was involved in

4     pulling the sessions?

5               MR. McPARTLAND:  Object to the form.

6          A.  Repeat.  You want to know if the

7     trainer knew about the sessions being pulled?  Is

8     that your question?

9          Q.  Yes.

10         A.  I don't know if the trainer was

11    involved, no.

12         Q.  But this was a trainer that you

13    supervised?

14         A.  That's correct.

15         Q.  And at that time, around that time

16    period, you never learned whether or not this

17    particular trainer was involved in pulling the

18    sessions?

19         A.  No.  After I spoke with Lawrence, he

20    told me he would take it from there, so I didn't

21    want to get involved in the situation.  I was just

22    listening to what he instructed me to do.

23         Q.  And what did he instruct you to do?

24         A.  That he would handle it from here.

25         Q.  Did he give you any other instructions?

1          A.   No.   I just went about business as

2     usual every day after that, continued to run the

3     report, continued to deal with the trainers,

4     continued to work with Kerry.

5          Q.   Did you apply for Ms. Ashdown's

6     position when it was vacant?

7          A.   No.

8          Q.   And what I mean by that is, prior to

9     Ms. Ashdown joining Equinox, did you apply for her

10    position?

11         A.   No.   I was at the -- I don't

12    remember -- I don't know when she was hired by

13    Equinox.   I was working at the Chelsea location as

14    the fitness manager.   That was around -- I worked

15    there since the Chelsea location opened.   I

16    started there as a trainer, I then moved up into

17    the manager and training program.   They approached

18    me, the company did, my supervisor at the time,

19    Rich Velasquez, said, "We would love you to be a

20    manager, would you like to?"   I said,

21    "Absolutely."   That was early in 2008.

22              By June of 2008, I was promoted as

23    fitness manager of the Chelsea location.   I was

24    fitness manager there for about three-and-a-half

25    years.   And the natural progression at Equinox is

1    you go, generally, from manager in the training

2    program to fitness manager, and then eventually to

3    personal training manager.

4              Every year at Equinox we have

5    professional meetings.  Your general manager calls

6    you into the office, you speak about your career

7    growth, things you're looking for yourself, where

8    you stand on a personal level.  It's one of those

9    things where they always coach you as to where

10   your career can go, options that you have.

11             And one of the things we spoke about

12   towards the end of my 10-year fitness manager is

13   where did I see my career going.  And I said I

14   loved the fitness manager position it, I've been

15   doing it for a long time, I'm looking for the next

16   step.  I want to develop my career with the

17   company.  I'm ready, one day, for the personal

18   training manager position of a club, wherever that

19   might be.

20        Q.   When did that conversation take place?

21        A.   That happens yearly, so I had one in

22   2008, one in 2009, 2010.  My 2011 one, I don't

23   remember the exact date.  I had one in 2012.  I'll

24   probably have one this year, also, in 2013.

25        Q.   But you became the personal training

1     manager in September of 2011?

2            A.   That's correct.

3            Q.   When would your personal development

4     meeting have taken place in 2011?

5            A.   In 2011, they either happen at the

6     start of the year or they happened at the end of

7     the year.  That year, I don't remember which one

8     it was.

9            Q.   Were you working at Soho at the end of

10    2010?

11           A.   No.  I was at the Chelsea location as

12    the fitness manager.

13           Q.   When did you start working in Soho?

14           A.   February 2011.

15           Q.   What is your understanding of the

16    circumstances that led to Ms. Ashdown's departure

17    from Equinox?

18           A.   All I know is that she was terminated

19    from her position.  No one ever told me the

20    reason.  And I asked what I should instruct the

21    trainers, and they said, "It's not really for them

22    to know why, it's just she's no longer a member of

23    the Equinox staff."  And I understood it as such

24    and I didn't press the matter.

25           Q.   So as you sit here today, do you have

1       an understanding of why she was terminated?

2               A.  No.  They never -- my supervisor,

3       Lawrence Sanders, nor anyone else, ever told me

4       why.

5               Q.  Just so the record is clear -- and I'm

6       reminding you you're under oath -- you never had a

7       conversation with anybody regarding why

8       Ms. Ashdown was terminated?

9               A.  No.

10              MR. McPARTLAND:  Objection.

11              Q.  Did you have a conversation with your

12      wife about why Ms. Ashdown was terminated?

13              A.  I spoke with my wife about it.

14              Q.  So your early testimony wasn't

15      accurate?

16              MR. McPARTLAND:  Objection.  What

17              testimony are we referring to?

18              Q.  You just testified, under oath, that

19      you haven't spoken to anybody about why

20      Ms. Ashdown was terminated.  Then I asked you if

21      you had spoken to your wife about it, and you said

22      yes?

23              MR. McPARTLAND:  Objection.  Objection

24              to form.  Please don't harass the witness.

25              If you want to read back your question, I

1            don't know -- note my objection.  That's

2            all.

3                You can answer.

4                MR. HARMAN:  Your objection is noted.

5            Q.  So let's go back.  Tell me who you've

6       spoken to about Ms. Ashdown's termination.

7            A.  I speak to my wife.  I don't list my

8       wife when I say someone or anybody.  To me she's

9       my wife, she's my partner.  So it's something

10      where when I speak to her, it's not as if I'm

11      speaking to anybody in this room, you know.

12           So I spoke to her about it.  I got a

13      phone call when I was home on my day off to say

14      that Kerry was no longer the PTM.  My wife was

15      sitting next to me on the couch, I told her what

16      had happened.  She said, "Why?"  I said, "They

17      didn't tell me."  That's it.  And I reported to

18      work the next day as the fitness manager of the

19      club.

20           Q.  When were you made the personal

21      training manager?

22           A.  I don't know if it was two or three

23      weeks after she was terminated.  I was doing -- I

24      was running the whole department for about a two-,

25      three-week period on my own, and they approached

1            me and said, "Based on how long you've been with

2            the company, based on your hard work and things

3            that you've done, we think that you would be a

4            good fit for this role."

5                     Q.  Were you pleased to see Ms. Ashdown

6            leave Equinox?

7                     A.  No.  I wouldn't say I was pleased.

8                     Q.  Now, you said, you spoke to your wife.

9                        Did you speak with anyone else

10           regarding -- have you, at any other time?

11                    A.  I don't recall, no.

12                    Q.  You don't recall or you haven't?

13                    A.  I don't believe I have.

14                        MR. McPARTLAND:  Other than counsel,

15                    obviously.

16                    Q.  Other than counsel, obviously.

17                    A.  No, just my wife.

18                    Q.  And you said you spoke to her when you

19           received a phone call?

20                    A.  Yes.  We were on the couch in our

21           apartment.

22                    Q.  Have you spoken to her at any other

23           time?

24                    A.  To my wife?

25                    Q.  About Ms. Ashdown's termination?

```
1                A.  No.  It was just back in 2011.

2                Q.  And have you read the complaint in this

3       lawsuit?

4                A.  I read it.  I wouldn't say I digested

5       everything, no.  It was quite wordy.

6                Q.  Did you read it or not?

7                A.  Yes, I read it.

8                Q.  And were you served a hard copy of it?

9                A.  Yes.  I believe I have the --

10               MR. McPARTLAND:  Object to the form.

11               Q.  Did someone hand you a hard copy of the

12      complaint at Soho Equinox?

13               A.  No.

14               Q.  Were you given a hard copy of the

15      complaint?

16               A.  Yes.  I think I actually printed it

17      out.  I think I might have received it via e-mail.

18               Q.  And you read it?

19               A.  Yes.

20               Q.  And after having read it, do you have

21      an understanding of why Equinox claims Ms. Ashdown

22      was terminated?

23               A.  I don't remember even reading it, if it

24      was listed as to why she was terminated.

25               Q.  As you sit here today, under oath, do
```

1              you know why Ms. Ashdown was terminated?

2                    A.  I can't say I know.  I can only assume.

3                    Q.  I'm not asking you to assume anything.

4                       I'm asking you, as you sit here today, do

5              you know why she was terminated?

6                    A.  The reason why I'm wording it that way

7              is I misunderstood you earlier with the

8              who-I-spoke-to question.  So I want to make sure

9              I'm not misleading you again.  I can assume as to

10             why, but no one has clearly told me this is why

11             she was terminated from Equinox.

12                   Q.  Does Ms. Ashdown have a -- any kind of

13             personnel profile at Equinox?

14                   A.  Personnel profile?

15                   Q.  You testified to a Mr. Diaz; correct?

16                   A.  Darwin Diaz, yes, my fitness manager.

17                   Q.  Does he have a profile as an employee?

18                   A.  When you say "profile," I don't

19             understand what you mean.

20                   Q.  Some type of computerized profile that

21             identifies him and that would track his

22             performance.

23                   A.  Well, we would all be on the

24             performance commission, because not only managers,

25             we also have training clients.

1          Q.  Let's take it one step at a time.

2          A.  I want to make sure I understand you.

3     Like a Facebook profile?  I don't understand what

4     you mean.  Similar to that?

5          Q.  I'm going to try to make it clear,

6     then.

7               How many personal trainers do you manage?

8          A.  Currently, 37.

9          Q.  And of those 37, how many of them are

10    men?

11         A.  I would say, I think that's 22.  We

12    have a pretty good split over there.  We have

13    quite a few female trainers.

14         Q.  And can you give me the name of one of

15    your female trainers?

16         A.  Sure.  Danielle Vetrano.

17         Q.  Danielle.  Did Danielle have an

18    employee profile on Equinox's Intranet?  And do

19    you know what I mean by that?

20         A.  No.  Are you asking if it's similar to

21    member?

22         Q.  Correct.

23         A.  When we go into the system, we -- or it

24    can be found in E-club also.  Just like I

25    explained to you, you can find a member's contact

1          info and e-mail address.  Employees are also

2          entered, but we have a different ID number.  It's

3          an employee number.  It starts with an "S."

4          That's how you know, and it generally tells you

5          underneath whether they're a manager of the club,

6          trainer, what department they're working in.

7                    Q.  What is the name of the system that you

8          access for employees?

9                    A.  There is no separate one for employees.

10         This is just E-club.  An E-club is -- like I told

11         you earlier, we access a lot of different

12         information through E-club.  We can -- on

13         performance commission, first-time buyer report,

14         member information.  We can also -- we purchase

15         packages through that system.  It's pretty much

16         our whole encompassing system.

17                    Q.  And if there is negative feedback on

18         Danielle, could that be entered into the E-club

19         system?

20                    A.  The only way it would be able -- it

21         couldn't be entered by a member.  A member

22         wouldn't be able to enter that.  In the notes of a

23         session, I guess if you wanted to write something

24         negative, you could, about the trainer, but that's

25         not what E-club is used for.

1           Q.  What about managers; could they enter

2      something negative?

3           A.  Can a manager enter something about

4      another manager?

5           Q.  About a trainer.

6               MR. McPARTLAND:  Object to the form.

7           He can answer.

8           A.  The only way to enter it about the

9      trainer is if the trainer had sessions.  Because

10     you can't go into a profile and just make a

11     comment about somebody.  You would have to be

12     making a note in reference to a -- something of

13     inventory in the system.

14          Q.  If the trainer was terminated, would

15     that be -- would it indicate that a trainer was

16     terminated in the E-club system?

17          A.  I don't believe they would be in E-club

18     anymore once they terminate.  IT, I think, goes

19     through occasionally and removes terminated

20     employees from the system.

21          Q.  Occasionally.  So there would be a

22     period of time where you could still access an

23     E-club profile after the employee is terminated?

24          A.  I don't know what that window is.  I've

25     never looked into a terminated employee's report.

1          The only reason why you would go into E-club to

2     bring up an employee's profile, as you call it, is

3     if they have sessions that I need to pull.

4               There are some employees throughout the

5     company that purchase training, Pilates, and then

6     you would go in there.  There would be no other

7     reason to bring up an employee unless you were

8     pulling a session from their inventory.

9          Q.  Do you have an E-club profile?

10         A.  I believe so.

11         Q.  And did Ms. Ashdown have an E-club

12    profile?

13         A.  I believe so, yes.

14         Q.  And did you ever access her E-club

15    profile?

16         A.  She had purchased sessions, and she

17    would buy one pack for Ryan, because she was

18    training with Ryan.  I don't know if she ever

19    asked me to pull a session for her.

20         Q.  Did you access her E-club profile; yes

21    or no?

22              MR. McPARTLAND:  Object to the form.

23         A.  I don't remember if I ever accessed it.

24    I'm sure there would be an occasion where I would

25    need to if she asked me to pull a session.  But

1      like I told you earlier, you don't pull up an

2      E-club profile unless you're trying to pull a

3      session from inventory.

4           Q.   I'm not asking what the protocol is.

5      I'm asking if you recall ever accessing her E-club

6      profile.

7           A.   To answer your question, I don't recall

8      if I ever accessed it.

9           Q.   But you testified that you would pull

10     sessions for Ryan for her; is that correct?

11          A.   No.   I said to you -- I never said that

12     I pulled sessions for Ryan for her.   You asked me

13     if I had accessed it.   I told you I don't remember

14     if I would have ever had to pull a session for

15     Ryan for her.

16          Q.   Could she have pulled the session

17     herself?

18          A.   Yes.

19          Q.   Why would she have had to pull that?

20          A.   Could be she had a day off from the

21     club, the pay period was going to end, and she

22     reaches out to me and says, "Hey, I forgot to pull

23     the session for Ryan."   Ryan could have come into

24     the office and say, "I trained Kerry on Thursday,

25     pay period's going to end, can you pull up the

1    session for me," something that like that could

2    have occurred.

3              At that point, Kerry would have been

4    considered an active client of Ryan's, so there

5    could very well be a session that needs to be

6    pulled so that it shows on the performance

7    commission.  That's how the trainers get pulled.

8              If the session's not pulled from

9    inventory and it doesn't appear on the performance

10   commission, technically they wouldn't be paid for

11   that session on the paycheck.

12        Q.  So you testified earlier about a

13   commission, a performance commission that was

14   covering about a two-week period.

15              And as you sit here now, you still don't

16   know whether it was Ryan or Bobby?

17        A.  I don't want to answer you

18   untruthfully.  That's why I'm telling you I don't

19   know.

20        Q.  And this commission report, the second

21   time had three or four AmEx sessions, and you've

22   testified why that caused you concern; correct?

23        A.  Yes.

24        Q.  And that you believe that Ms. Ashdown

25   improperly pulled these sessions; correct?

1          A.  Yes.

2          Q.  And do you believe that she should have

3     been terminated for improperly pulling sessions?

4          A.  You're asking me my opinion?

5          Q.  Yes.

6          A.  I think there's more context to that.

7     It would have to do in relation to the whole

8     individual, what's going on.  But that's

9     technically stealing from the company, so if you

10    pull things inappropriately, I guess termination

11    can happen.

12         Q.  So the answer is "yes"?

13              MR. McPARTLAND:  Object to the form.

14         He answered the question.

15         A.  Yes.

16         Q.  So you believe that Ms. Ashdown stole

17    from the company?

18         A.  With these performance commissions,

19    sort of why flags can go up with them also is

20    trainers are always training on a two-week period

21    to hit what's called pay period bonus.

22              So in a pay period bonus, you'll always

23    hear talk around the club, especially coming close

24    on Saturdays, Fridays, that they need to get to

25    42.  If a trainer only trains 41 sessions, they

1          would only be paid a certain amount of money for

2          the sessions.  For instance, they'll take $10 for

3          all 41 of those sessions, so it would be ten times

4          41.  If they make it to 42, it deems them for

5          bonus possibilities.  Which means retroactively,

6          for all those sessions, they would be paid more.

7                    So instead of ten, they would be paid $5

8          for every session.  So these sessions that I

9          noticed, they also brought the trainer to over 42.

10         So technically, there's additional bonus monies

11         that were taken from the company because the

12         trainer didn't earn 42, which would have been

13         bonus.

14                   Q.  But you never spoke to the trainer

15         about it?

16                   A.  No.

17                   Q.  And the trainer remained employed there

18         up until recently?

19                   A.  Yes.

20                   Q.  And was the trainer ever disciplined?

21                   A.  For the sessions?

22                   Q.  Um-hum.

23                   A.  I didn't discipline the trainer, no.

24                   Q.  Were you aware of any discipline?

25                   A.  No.

1          Q.  Is it your responsibility to provide

2      performance feedback to trainers?

3          A.  No.  We have business meetings, we talk

4      about leads.  You know, in the course of these

5      discussions, you can speak about how their

6      training is going, how their programming is

7      progressing.

8          Q.  Did you ever write a written

9      performance review of your trainers?

10         A.  No.

11         Q.  If a trainer was disciplined, would you

12     be aware of it?

13         A.  If it was something where they lost

14     privilege or they were suspended, yes.

15         Q.  And so, again, I'm going to ask you the

16     same question.  I'm going to ask you to answer the

17     question this time.

18             So you believe Ms. Ashdown stole sessions

19     from Equinox?

20             MR. McPARTLAND:  Object to the form.

21         A.  I wouldn't say it was sessions; it

22     would be money.

23         Q.  So do you believe Ms. Ashdown stole

24     money from Equinox?

25         A.  By pulling extra sessions, yes.

1          Q.  And I take it you believe that's a

2     pretty serious act; correct?

3          A.  Yes.

4          Q.  And someone who steals from Equinox, do

5     you believe they should be terminated?

6          A.  Like I told you earlier, I would want

7     to understand the context.  I don't think that

8     would be black and white.  I would want to

9     understand the situation, what caused it.  That

10    would make me make a full decision.

11         Q.  If someone stole sessions from Equinox

12    without any justification whatsoever, do you

13    believe that that employee should be terminated?

14              MR. McPARTLAND:  Objection.

15            You can answer.

16         A.  If it was intentionally and

17    maliciously, yes.

18         Q.  And do you believe that Ms. Ashdown

19    intentionally and maliciously stole sessions from

20    Equinox?

21              MR. McPARTLAND:  Objection.

22            You can answer.

23         A.  I never spoke to her or had discussions

24    with her.  I was instructed not to, so I don't

25    even know what her mindset to pulling the sessions

1   was.  So I don't want to speculate as to what she

2   was thinking when she did it.

3          Q.  But you believed she committed a

4   serious offense; correct?

5          A.  I believe she pulled sessions for a

6   trainer that shouldn't have been pulled.

7          Q.  And that was during a two-week period;

8   correct?

9          A.  When the sessions were pulled?

10         Q.  Yes.

11         A.  Well, the performance commission is

12  during a two-week period, so those sessions would

13  have been pulled during said period of the report.

14  These particular sessions were all pulled on the

15  same day.

16         Q.  But you testified it concerned you

17  enough to go to the location manager, Mr. Sanders;

18  right?

19         A.  Yes.

20         Q.  And did you look at the report for the

21  two weeks prior to that?

22         A.  I definitely did my due diligence and

23  looked back to see if there was personal --

24         Q.  Just, did you look at the report for

25  the two weeks prior to that?

1          A.  I looked at every report, so I probably

2     looked at that one, two weeks prior, the one

3     after, the one before that.

4          Q.  And did you see any other AmEx sessions

5     on the other reports?

6          A.  There were AmEx sessions on all

7     reports.

8          Q.  Did you see any improper AmEx sessions?

9          A.  Just the one or two that we spoke about

10     earlier, and I don't know which pay period was in

11     conjunction --

12          Q.  Did you physically show the report to

13     Mr. Sanders?

14          A.  Which report?  The one with the three

15     or four --

16          Q.  Yes.  The one with the three or four

17     sessions.

18          A.  Yes.

19          Q.  So you printed it out?

20          A.  That's correct.

21          Q.  And you walked it -- you physically

22     handed it to him?

23          A.  Yes.

24          Q.  Did you have any -- did you mark any

25     hand notations on it?

```
 1                    A.  I don't believe so.  I think I might

 2          have circled the four AmEx sessions.

 3                    Q.  Did you make a copy of it?

 4                    A.  No.  Just the one that I printed out.

 5  REQ             MR. HARMAN:  We're going to call for the

 6      production of the report that was handed to Mr. Sanders

 7      by Mr. Maietta.

 8                      MR. McPARTLAND:  Take it under

 9                      advisement.

10                    Q.  You testified that you looked at other

11          periods; right?  So did you look at other periods

12          -- on that day, you were concerned; correct?

13                    A.  On the day where I noticed those AmEx

14          sessions pulled, yes.

15                    Q.  And so, what else, if anything, did you

16          do to complete your investigation?

17                    A.  I looked in eTrac to make sure that the

18          client was not an active client of the trainer.

19          Also, went into E-club, used a member ID number

20          that's on the performance commission to look up

21          the member.  Then I went into their inventory to

22          look at the sessions.  I looked to see if there

23          were any notes.

24                      The sessions are generally pulled the

25          same day.  I want to make sure if they were
```

1      forgot-to-pulls, are they going to have notes for

2      these sessions from earlier in the week, earlier

3      in the pay period, earlier in the month, that just

4      were owed to the trainer.

5           I looked to see who the member was, to

6      see if it was one of our active clients.  When I

7      realized that it was a cancelled member, who, when

8      they were a member, was using a Florida club and

9      wasn't an active client of the trainer, that's

10      when I noticed that it was a problem.

11           Q.  And as part of this investigation, did

12      you look at the trainer's -- any other commission

13      reports for any other periods for this particular

14      trainer?

15           A.  I think that day, I tried to remember

16      when I noticed the other discrepancy.  And I think

17      I went back to look and see if it was either the

18      same client, if they were notes or if they were

19      pulled by the same individual.

20           Q.  So you did look at other periods of

21      time, other than this two-week period?

22           A.  I believe so, yes.

23           Q.  What other periods of time did you look

24      at?

25           A.  I don't remember the exact dates of

1    them.  I looked at the report, I told you, in 2011

2    on a daily basis for the pay period.

3         Q.  I'm not asking you what you did on a

4    daily basis.  I'm asking you what you did as part

5    of this investigation into Ms. Ashdown.

6             So what other periods of time do you

7    recall looking at, if any --

8         A.  I don't recall the exact dates.

9             MR. MCPARTLAND:  Object to the form.

10            You can answer.  I'm sorry.

11        A.  And I wouldn't call it an investigation

12   into Ms. Ashdown.  I would call it an

13   investigation into the sessions that were pulled.

14   I wanted to see why they were pulled for this

15   trainer.

16        Q.  As part of your investigation, what

17   other time periods, if any, do you recall looking

18   at?

19            MR. McPARTLAND:  Object to the form.

20        A.  I don't know the exact dates, but I

21   tried to find the initial discrepancies, and I

22   believe I found in that report it was a different

23   member.  But I don't know the time period of that

24   report.

25        Q.  As part of this investigation, did you

1          find that any other sessions were improperly

2          pulled other than the one you testified to?

3                    MR. McPARTLAND:  Object to the form.

4               A.  No, I don't remember finding any other

5          ones.

6               Q.  Why do you believe that Bobby Dwyer

7          might have been the individual whose name was on

8          the commission report?

9               A.   That's why earlier I told you I didn't

10          want to answer you untruthfully.  I don't remember

11          if the first one was Bobby's, the second one was

12          Ryan.  But Kerry was very close with those two

13          trainers.  She trained with Ryan three days a

14          week, and I think she had a more personal

15          relationship with Bobby.  I don't know how

16          personal.

17                    So these were two trainers that were most

18          associated with her.  That's why -- and I didn't

19          remember which one because I didn't want to give

20          you misinformation.

21               Q.  So is it your testimony -- is your

22          testimony that Ryan was involved in -- that the

23          first two sessions were pulled for either Bobby or

24          Ryan?

25               A.  As we're speaking today, I don't

1           remember if the first one or two were pulled for

2           Bobby or Ryan.  I'm leaning towards Bobby, and the

3           three or four AmEx PTs, I believe, were pulled for

4           Ryan.  But I don't remember --

5                 Q.  But both of them were involved?

6                 A.  Both names were involved.  I don't know

7           if the trainers were involved in the sessions

8           being pulled --

9                 Q.  Both names were involved?

10                MR. McPARTLAND:  Object to the form.

11                A.  If I remember correctly, yes.

12                MR. HARMAN:  What's the nature of the

13           objection?

14                MR. McPARTLAND:  Involved in what?

15           Both the names were involved in what?  I

16           don't understand.

17                MR. HARMAN:  It's not for you to

18           understand.  You made your objection.

19                MR. MCPARTLAND:  You asked me a

20           question.

21                Q.  And is Bobby still working at Equinox?

22                A.  No.

23                Q.  And what was the nature of his

24           departure from Equinox, from an employment

25           standpoint?

```
 1                    A.  He voluntarily resigned, I think, for

 2          another position in Jersey closer to home.

 3                    Q.  When was that?

 4                    A.  I believe it was in 2011.  I don't

 5          remember the exact date.

 6   REQ                  MR. HARMAN:  I'm going to call for the

 7          last known address of Bobby Dwyer.

 8                       MR. McPARTLAND:  Take that under

 9              advisement.

10   REQ                  MR. HARMAN:  Also call for the last

11            known address of Ryan Hopkins.

12                       MR. McPARTLAND:  We'll take that under

13              advisement.

14                    Q.  And Ryan Hopkins, you said he

15          voluntarily resigned recently, in June?

16                    A.  Yes, that's correct.

17                    Q.  Did you ever discipline Ryan Hopkins?

18                    A.  In what instance?

19                    Q.  In any instance.

20                    A.  Like any trainer, if he didn't have his

21          name tag on, I told him to put his name tag on.

22                    Q.  Any other reason?

23                    A.  Not that I can remember, no.  I had a

24          good staff.  They're generally not troublemakers.

25                    Q.  Do you use a cell phone?
```

```
 1              A.   Yes, I do.

 2              Q.   What type of cell phone do you use?

 3              A.   I'm using an iPhone 4S.

 4              Q.   And what's your cell provider?

 5              A.   Currently, Verizon.

 6              Q.   And what is your cell phone number?

 7              A.   ███████████

 8                   MR. McPARTLAND:  Note my objection.

 9              Q.   How long have you used that number?

10              A.   Let's say, at least 10 years.

11              Q.   And how long have you used Verizon as a

12         provider?

13              A.   I don't know if it's two or three years

14         now.

15              Q.   Who was your provider before Verizon?

16              A.   AT&T.

17              Q.   And do you use your iPhone 4S for work

18         purposes?

19              A.   Yes.

20              Q.   Do you access work e-mail through your

21         iPhone?

22              A.   Yes.

23              Q.   And do you use your texting feature?

24         Just in general, do you use your texting feature?

25         Do you text?
```

1          A.  Yes.

2          Q.  And do you text employees at Equinox?

3          A.  Yes.

4          Q.  Do you text on a daily basis?

5          A.  Do I text on a daily basis --

6          Q.  With employees of Equinox.

7          A.  Yes.

8          Q.  And how long have you been texting

9     employees of Equinox?

10         A.  Since I have been an employee at

11    Equinox.

12         Q.  And that was in 2008?

13         A.  End of 2007.

14         Q.  Did you ever text Ms. Ashdown?

15         A.  I think so, yes.

16         Q.  And did you ever text Ryan Hopkins?

17         A.  I have, yes.

18         Q.  And have you ever texted Bobby Dwyer?

19         A.  I don't remember texting him.  I don't

20    believe so.

21         Q.  And how about Lawrence Sanders; have

22    you ever texted him?

23         A.  Yes.

24         Q.  When is the last time you remember

25    texting him?

1          A.   Lawrence?

2          Q.   Yes.

3          A.   On my birthday, he texted me to wish me

4     happy birthday, and I responded, "Thank you, sir."

5          Q.   And that was recently?

6          A.   Yes.  I just turned 30 on August 31st.

7          Q.   Congratulations.

8          A.   Thank you.

9          Q.   How frequently would you say that you

10    text Lawrence Sanders?

11         A.   Very infrequently.

12         Q.   How frequently do you text Mr. Diaz?

13         A.   More frequently.

14         Q.   How frequently?

15         A.   I wouldn't say once a day, but I would

16    say a couple of times a week.

17         Q.   How frequently would you say you

18    interact via text with the 37 trainers that you

19    oversee?

20         A.   Very infrequently.  Only if they texted

21    me because they're going to be running late for a

22    shift.  One or two of them texted me for my

23    birthday, but I'm primarily an e-mail individual

24    when it comes to work.

25         Q.   So most work is conducted via e-mail?

1        A.   For me, yes.

2        Q.   Do you use one e-mail account for work?

3        A.   Yes.  I use the Equinox provided e-mail

4    address for work.

5        Q.   And what e-mail address is that?

6        A.   ███████████████████████

7        Q.   And is that one continuous --

8        A.   Yes.  ██████████████████████

9    ████████████████████████████████████

10       Q.   And do you use any other accounts for

11   work purposes?

12       A.   Not for work purposes, no.

13       Q.   And your interaction with trainers in

14   terms of scheduling and routine sort of matters

15   would be done by e-mail?

16       A.   Yes.  Anything that is business related

17   is e-mail.

18       Q.   And do trainers use -- are trainers

19   obligated to use an Equinox e-mail address?

20       A.   For anything involving their clients,

21   the company prefers they use the company-issued

22   e-mail address.  They recently issued e-mail

23   addresses for personal trainers.  I don't remember

24   when.  In recent history it was.  I don't remember

25   if it was end of 2011, beginning of 2012, but they

```
1          recently gave them e-mail addresses.  We feel it's

2          just more professional to contact members.

3                     MR. HARMAN:  Let's take a break for a

4               few minutes.  Let's take 10 minutes.

5                     (Recess taken).

6

7     CONTINUED EXAMINATION

8     BY MR. HARMAN:

9                     Q.  Mr. Maietta, you testified earlier to

10         an employee ID number beginning with an "S"; is

11         that correct?

12                    A.  Yes.

13                    Q.  What is your employee ID number?

14                    A.  I don't know it.

15                    Q.  And how do you use it?  Do you have it

16         written down somewhere?

17                    A.  No.  I don't really need it for

18         anything.

19                    Q.  Why is that?

20                    A.  I don't utilize it.  I don't have a

21         trainer, so I would never have to go into my --

22         this account to purchase something.

23                    Q.  When is the last time you recall using

24         it?

25                    A.  When I probably signed up for --
```

1          through PT on the Net, we have this site where we

2          could sign up for education and for certificates,

3          so I probably needed that number to make sure that

4          the course was deducted from my paycheck.

5                    Q.   And when was that?

6                    A.   The last course I signed up for was

7          sometime in 2012.  They required payroll

8          deduction.

9                    Q.   If you want to use your payroll

10         identification number, where would you find it?

11                   A.   In E-club.

12                   Q.   So you could find it if you wanted to?

13                   A.   Yes.

14                   Q.   When you went to work and used the

15         computers at work?

16                   A.   Yes.

17                   Q.   Do you have a computer at work?

18                   A.   I do.

19                   Q.   And is it solely for your use, or do

20         you share it?

21                   A.   My computer can be used by numerous

22         people.  Just when I utilize it for my work, I

23         have to sign in with my code to start the day.

24                   Q.   Where is the computer located?

25                   A.   It's in the personal training office.

```
1                It's right off the training floor right next to

2          the cardio area.

3                     Q.  And how -- are there desks in the

4          office?

5                     A.  It's not desks.  I don't know what you

6          call it when it's attached to the wall.  It's like

7          a slab of wood attached to the wall.  So it's one

8          long -- I guess you call it a conference desk

9          against the wall, and there's two computers on it.

10                    Q.  And do you use one of those computers

11         as --

12                    A.  Primarily, I use the one on the left.

13                    Q.  And in order to use it, you have to

14         sign in with a log-in ID?

15                    A.  Your user name, and then it asks you

16         for your password.

17                    Q.  What is your user name?

18                    A.  My first initial and my last name.

19  DIR          Q.  What is your password?

20                       MR. McPARTLAND:  Objection.

21                    I'm instructing you not to answer.

22                    I think -- you can, if you have a good

23               reason for asking for it, write to me

24               afterwards and I'll let you know about it.

25                    Q.  Has your user name ever changed during
```

1          your tenure at Soho?

2                    A.   My user name, no.

3                    Q.   Has your password ever changed?

4                    A.   Yes.  We have to change the password to

5          log on, I think, every month or two.  The system

6          just notifies you.

7                    Q.   Have you ever given your log-in

8          information to any other Equinox employee?

9                    A.   No.

10                   Q.   Have you ever given your log-in

11         information to anyone?

12                   A.   No.

13                   Q.   And when you are logged into the

14         computer, using it in the personal training

15         office, do you log out at the end of your work

16         time on the computer?

17                   A.   No.  I just lock my computer.

18                   Q.   How do you do that?

19                   A.   Well, I hit "control alt delete."  It

20         asks you whether you want to restart the computer,

21         lock it, shut it down.  I just click "lock."

22                   Q.   When it is locked, can someone else

23         then log on?

24                   A.   They wouldn't be able to log on using

25         my interface on the computer.  You wouldn't be

1    able to -- you would only be able to kick me off

2    if you were an administrator, but then you

3    wouldn't be able to access my files.

4         Q.  On a typical day, you've gone in,

5    you've logged in to your computer.

6           The one on the right or the left?

7         A.  Left.

8         Q.  So you typically work on the computer

9    on the left.

10          Do other people use that computer?

11        A.  They do, but not when it's logged on to

12   my name.  Whenever I leave the office, I lock it.

13        Q.  When you're present at the Soho

14   location, are you always logged in to that

15   computer?

16        A.  Yes.

17        Q.  And when you're present at the Soho

18   location, does anyone else use that computer?

19        A.  No.

20        Q.  And when Ms. Ashdown was the personal

21   training manager, did she have that same computer?

22        A.  Yes.  She had the one on the left that

23   I'm using now.  It was the same area, but the

24   computers have since been upgraded, so it's not

25   the same motherboard.

1          Q.   When were they upgraded?

2          A.   I think they did them in July of this

3     year.  They came in and they gave us new memory

4     cards, made them faster.  They gave use more RAM.

5     I'm not very computer literate, but that's what

6     they did.

7          Q.   What type of computers are they?

8          A.   Dell computers.

9          Q.   So the Dell computer, the monitor, and

10    the actual plastic box that contains the

11    components that make the computer function, is

12    that still the same?

13         A.   I don't know.  I wasn't there when IT

14    switched them out, so I don't know whether they

15    took the entire motherboard out when they added

16    things in.

17         Q.   Does the monitor look the same?

18         A.   Yes.

19         Q.   Does it look new?

20         A.   The monitor doesn't -- define "new."

21         Q.   Do you believe it's the same monitor

22    that's been there since Ms. Ashdown was there?

23         A.   I think so, yes.

24         Q.   Do you believe the computer is the same

25    computer that was there since Ms. Ashdown was

1          there?

2                   A.   You mean like the motherboard and all

3          that stuff?

4                   Q.   I mean the box that's underneath the

5          desk.

6                        MR. McPARTLAND:  Object to the form.

7                   A.   I don't know.

8                   Q.   Do you know what I'm talking about?

9                   A.   You're talking about where the memory

10         and everything is stored --

11                  Q.   Correct.

12                  A.   -- the monitor.

13                  Q.   Yes.

14                  A.   I believe they replaced those out.

15                  Q.   Okay.  You testified earlier that you

16         text for work.

17                   Did you ever look for any text messages

18         concerning Ms. Ashdown?

19                  A.   Earlier I told you I e-mail for work.

20                  Q.   But you also said that you had texted

21         Ms. Ashdown.

22                  A.   That we have texted, yes.

23                  Q.   Did you ever conduct a search for any

24         text messages with Ms. Ashdown?

25                  A.   Like, you mean, Kerry, did we look

1        for --

2               Q.  Did you ever look for any text messages

3        that you exchanged with Ms. Ashdown?

4               A.  No.

5               Q.  Never at any time?

6                    MR. McPARTLAND:  Object to the form.

7               A.  No.

8               Q.  And did you ever look for any text

9        messages exchanged with Mr. Sanders that concerned

10       Ms. Ashdown?

11                   MR. MCPARTLAND:  Object to the form.

12              A.  No.

13              Q.  Have you ever texted with Mr.

14       Matarazzo?

15              A.  No.

16              Q.  How about with Mr. Plotkin?

17              A.  No.

18              Q.  Earlier you testified that you met with

19       your attorney to prepare for today's deposition

20       and that you looked at some e-mails, and that you

21       looked at a performance commission report.

22                   Did you do anything else to prepare for

23       today's deposition?

24              A.  No.

25              Q.  And other than Pat, did you speak with

1    anyone else to prepare for today's deposition?

2         A.   No.

3         Q.   Is today a normal workday for you?

4         A.   Yes.

5         Q.   So can you take the day off?

6         A.   No.  I'll be going in to work later

7    today.

8         Q.   What are your normal work hours?  What

9    were you scheduled to work today?

10        A.   I start at 8:30 and I go till about

11   8:00 tonight.

12        Q.   And so on Tuesdays, you normally start

13   at 8:30?

14        A.   Yes.

15        Q.   And did you tell anyone at work that

16   you would be in at a different time?

17        A.   I let my trainers know this morning

18   that I would be in a meeting, and I would be in

19   later in the afternoon.  And I reminded my

20   supervisor, Lawrence, that I would be coming into

21   the deposition today and I wouldn't be in until

22   later.

23        Q.   How did you do that?

24        A.   Told him in person.  We have a

25   manager's meeting on Monday.  I went to the

```
1          manager's meeting and said, "I'm not going to be
2          here at the beginning of the day.  I have a court
3          deposition.  I'll be in later."
4               Q.  Did he have a response?
5               A.  He said, "Okay."
6               Q.  Now, you testified that you printed out
7          and read the complaint in this case; is that
8          correct?
9               A.  Yes.
10              Q.  And did you ever discuss that complaint
11         with Mr. Sanders?
12              A.  I told him that I read it and that I
13         noticed that I was named, but we didn't speak in
14         depth about what it was about.
15              Q.  And when did that conversation take
16         place?
17              A.  I believe it was June of this year.
18         May or June.  I don't remember exactly when I
19         found out that I was named.
20              Q.  And what did you say to him?
21              A.  I don't remember the exact words, but I
22         told him I couldn't believe I was being sued and
23         what do we do now.
24              Q.  What did he say in response that?
25              A.  He said, "I don't know.  Let me speak
```

1        to my boss, because Equinox was named in it, and

2        you're an Equinox employee, and let me get back to

3        you."  And that's when I found out we were being

4        defended by Pat and his law firm.

5              Q.  And did you say anything else to

6        Mr. Sanders?

7              A.  In relation to being sued?

8              Q.  Well, you said you went to him and you

9        had a conversation with him and you said you can't

10       believe that you were being sued, and he said he

11       would get back to you.

12             My question to you was, did you say

13       anything else to him?

14             A.  No, not that day.  Just briefly, we

15       were at work, and then we haven't been discussing

16       the case since.

17             Q.  So that day, you had a conversation

18       with him and I've asked you about it.

19             Is there anything else about the

20       conversation that you remember?

21             A.  No, sir.

22             Q.  Did he say anything other than that

23       he'll get back to you?

24             A.  No.  That's all I remember that he

25       said.

1              Q.   And did he get back to you?

2              A.   No.  We then found out we were being

3         defended, we were told about the nature of the

4         case --

5                   MR. McPARTLAND:  I'm going to object.

6              Anything, even an attorney within

7              Equinox, just don't disclose any attorney

8              communications.  You can answer the

9              question, but don't discuss anything you

10             discussed with me or with counsel at

11             Equinox.  Okay?  I just want you to

12             understand that.

13                  THE WITNESS:  Okay.

14             Q.   Do you know whether Equinox has

15        in-house counsel?

16             A.   I believe they do.  I don't know the

17        name.

18             Q.   What makes you believe that they do?

19             A.   I believe from an e-mail I read.  I

20        think it might have said, I think, general counsel

21        and the person's signature.

22             Q.   And have you ever spoken to the

23        individual who signed the e-mail, general counsel?

24             A.   I don't remember his name, so I don't

25        remember if I spoke to that person.  We never had

1       a conversation face to face.

2             Q.  Have you ever had -- other than with

3       your lawyers, have you ever had a meeting with any

4       of the corporate employees of Equinox concerning

5       this lawsuit?

6             A.  When you say I've had a meeting with

7       the corporate employees, what do you mean?

8             Q.  Anyone ever talk to you about this

9       lawsuit?

10            A.  No.  It was just to explain to us that

11      there was a lawsuit over the phone, and what the

12      next steps would be, and we would be reached out

13      to if we were needed, and I was reached out to for

14      a deposition.

15                  MR. McPARTLAND:  Objection.  Again, no

16                  attorney communications.

17            Q.  So you said Sanders would get back to

18      you, and did Sanders get back to you or not?

19            A.  No.

20            Q.  And did you ever discuss the complaint

21      with him again?

22            A.  No.

23            Q.  You said you printed out a physical

24      copy; correct?

25            A.  Yes.

1                Q.  What did you do with it?

2                A.  It was in either one of my files.  I

3      brought it home, I was going to read it, I never

4      really read it fully again.  I just read it when I

5      first printed it out.  I perused the first few

6      pages, and I have the hard copy somewhere.  It

7      hasn't really been the focus of my mind over the

8      last couple of months.

9  REQ            MR. HARMAN:  I'm going to call for

10   production of the hard copy that Mr. Maietta has

11   testified he has in his possession at home or

12   elsewhere.

13              MR. McPARTLAND:  Taken under

14        advisement.

15        Q.  You said you have a file.

16         Do you have a file on Ms. Ashdown?

17        A.  No.  I put it in one of those folders

18      so it doesn't get bent or ruined.  I'm very

19      regimented that way.  I don't like wrinkles.

20        Q.  Is there anything else that you put in

21      the file?

22        A.  No.

23        Q.  Do you maintain any other documents on

24      Ms. Ashdown?

25        A.  No.

1          Q.  You said at some point someone reached

2     out to you regarding this lawsuit.

3              Who is that?  Again, I'm not asking you

4     about content of conversations with a lawyer.  I'm

5     asking you, who reached out to you?

6              You had this conversation with Lawrence

7     Sanders, then someone reached out to you by

8     telephone.  Who was that?

9          A.  It was a member of Pat's office just

10    explaining to me the --

11              MR. McPARTLAND:  Not what we spoke

12         about; just who it was.  That's all.

13         A.  Just a member of Pat's office.

14         Q.  And other than a member -- other than

15    Pat or a member of Pat's office, did anyone else

16    reach out to you regarding this lawsuit?

17         A.  No.

18         Q.  And did you ever have any other

19    conversations with Mr. Sanders about this lawsuit

20    after that first conversation?

21         A.  Just that he was being deposed and that

22    I was being deposed, but we didn't speak about the

23    content of it.

24         Q.  When did those conversations take

25    place?

1          A.   Yesterday, when I told him that I was

2     coming in for a deposition.  And he said, "I go in

3     on Thursday," and that was it.

4          Q.   So what did you -- where did this

5     conversation take place?

6          A.   It's on the gym floor on the way to the

7     managers' meeting.

8          Q.   What did you say?

9          A.   "Hey, I'll be in late tomorrow.  I have

10    my deposition."  He said, "Okay.  I have mine on

11    Thursday."  And then we went to the managers'

12    meeting.

13         Q.   That's the only conversation you've had

14    with him about this lawsuit since you spoke to him

15    about the complaint?

16         A.   Yes.

17         Q.   And how would you describe your

18    relationship with Mr. Sanders?

19         A.   I don't know --

20         Q.   Let's take, professionally, how would

21    you describe your relationship with Mr. Sanders?

22         A.   I think it's very good.  We've been --

23    he's been my general manager at two locations.  He

24    was my general manager at the Chelsea location.

25    He became my general manager at the Soho location.

1          After he moved to that area, he realized that the

2          personal training department needed some help,

3          needed some fixing.

4                   So he reached out to my general manager

5          at the Chelsea location at the time and said,

6          "Listen, I would like to bring Mauro over here to

7          be my fitness manager and help run the

8          department."

9                   Q.  So you'd describe the relationship as

10         very good?

11                  A.  Yes.  We get along well.

12                  Q.  And do you have a social relationship

13         with him?

14                  A.  No.  Just work relationship.

15                  Q.  Have you ever interacted with him

16         outside of the Soho Equinox location?

17                  A.  Yes.  We -- every year we play an

18         Equinox softball league.  He plays on the softball

19         team.  I'm usually the captain, so we play

20         softball together.  Occasionally we play

21         basketball with the trainers.  We go to the courts

22         and he plays basketball also, so he joins us.

23                  Q.  Other than an Equinox-sponsored event,

24         have there been any other occasions where you've

25         interacted with him outside of Equinox?

1           A.   No.  It's always been Equinox events.

2           Q.   Do you talk to him about personal

3      things?

4           A.   Yes.

5           Q.   On a regular basis?

6           A.   Not on a regular basis.  Just when --

7      if it's something that is going to affect work,

8      I'll bring it up to him.

9           Q.   Can you give me an example?  I'm not

10     trying to pry into your personal life, but can you

11     give me an example of what you mean by that?

12          A.   Yes.  He's known me for the past

13     six years since I've been an employee in 2009.  My

14     father passed away from lung cancer, and, you

15     know, there were days when I had a tough time at

16     work or I needed time to leave early, and I would

17     go to him and I would say, "Listen, this is what

18     I'm going through, is it all right if I leave

19     early?  This is how I'm feeling."  And he would

20     sit there and he'd listen, give me some advice,

21     because he knows I was very close to my father.

22          Q.   So he was helpful to you during that

23     period?

24          A.   Helpful in that he was very

25     understanding and he was just somebody -- he would

1      listen when I was having a tough time at work.

2      I'm very family-oriented.  When my father passed

3      away from lung cancer, it hit me pretty hard.

4      There are days when you're at work and you think

5      about it, or something reminds you and you -- who

6      can you go to?  It's somebody I can trust to speak

7      to about it.

8          Q.  Did you take time off from work during

9      that period?

10         A.  When my father was sick, I was still

11     working.  Just on my days off I would, of course,

12     go visit him.  On days when I was working and he

13     needed a ride to chemo, I would drive him to chemo

14     and then come back after I dropped him back home.

15     And then after he passed away, I was off for about

16     three or five days, help my mother plan the

17     funeral, the wake, and just getting the house in

18     order.  But I came back to work pretty quickly.  I

19     needed something to take my mind off of what had

20     just happened.

21         Q.  How much time in total would you say

22     that you took off during that time period?

23         A.  I was in the hospital the day my father

24     died, and I think the next three to four days I

25     wasn't at work.  I think I was fortunate to -- one

1    or two of those days were days that I was -- were

2    my normal scheduled days off.

3         Q.  Did you take personal days on the other

4    days that you were scheduled?

5         A.  Yes.  They're called bereavement days.

6    Equinox gives you three bereavement days.

7         Q.  Other than bereavement days, did you

8    take any other types of leave from Equinox during

9    that period?

10        A.  No.  I think it was three bereavement

11   days and two of my normal days off.

12        Q.  Were you aware that Ms. Ashdown had

13   health issues?

14        A.  Yes.

15        Q.  When did you become aware of that?

16        A.  When she told me about them.

17        Q.  When did she tell you about them?

18        A.  When we first started working together,

19   I think she had told me that she recovered from

20   cancer.  I don't remember which type she told me

21   she recovered from.  And I think we had some good

22   conversations on that, because cancer is -- it was

23   a big thing in my family, so I -- of course, I

24   understood what she went through personally, but I

25   know how that can affect you.

1          My mother beat breast cancer twice, my

2     aunt beat breast cancer.  Both my grandparents, my

3     female grandparents, died from breast cancer.  And

4     my father had died from lung cancer, so we had

5     good conversations about that, and I understood.

6          And then, when she told me it had come

7     back -- I believe it was ovarian cancer, I don't

8     remember correctly what she told me -- I told her,

9     "Listen, you have to take care of yourself, take

10    care of your body.  Take as much time as you need.

11    I'm here, I'll hold it down."

12          But she was very, very diligent with

13    scheduling her treatments early in the morning.

14    She would come to work, she would still put in

15    long days, and I said, "Listen, work will always

16    be here, but you have to make sure you take care

17    of yourself."  Because I know how important it is

18    to rest.

19          I mean, my mother did the same thing.

20    She kept teaching while she was doing treatment,

21    and I think she needed that, so maybe Kerry needed

22    to work also just to help her feel strong so the

23    body would stay strong.

24          Q.  I'm going to stop you there.

25          You said you had good conversations with

1       Ms. Ashdown regarding cancer.

2              Did you have good conversations with

3       Ms. Ashdown regarding anything else?

4              A.  Yes.  We -- it was -- we had -- I would

5       say -- I don't know what -- the word I want to use

6       to describe it.  The relationship in the office,

7       there were days where it was tense, and there were

8       days where everything was fine.

9              You can't really have a good conversation

10      about cancer, but what I meant by that is we found

11      common ground on it, and we were able to discuss

12      it openly.  And neither one of us would really --

13      you can't really find a negative in the other

14      person when you're having that kind of

15      conversation.

16             There were some days in the office

17      where --

18             Q.  I understand that.

19             Is there any other topic that you share

20      that commonality with her on, other than cancer?

21             A.  I think leading the team.  We had good

22      conversations on leading the team.

23             Q.  Anything else other than leading the

24      team?

25             A.  I can't remember other specific

1    categories.

2         Q.  So you had commonality on leading the

3    team and you had commonality on cancer.

4              Was there anything else that you had

5    commonality on?

6              MR. McPARTLAND:  Object to the form.

7         A.  Not that I remember.

8         Q.  Describe to me your commonality on

9    leading the team.

10        A.  Well, she came over from the UK where

11   she was in charge of trainers in departments.

12   Part of why I became a manager at Equinox is

13   because I like to teach, I like to work with other

14   trainers, see them be successful.  So whereas

15   she's been a manager before, I've been a manager

16   before -- (interruption).

17        Q.  I'm sorry.  Go ahead.

18        A.  You know, we had commonality on that

19   based on the fact that we led teams before, we've

20   been doing it for a period of time.  You know,

21   being a manager is something where you hire a

22   trainer and you see them go from either a

23   different career to becoming a successful trainer.

24   It's a rewarding experience.

25        Q.  Did you want her job?

1            A.  Did I want -- eventually I wanted to be

2       a personal training manager.  Not necessarily her

3       job, but at Equinox Soho.

4            Q.  Was there another location that you

5       would rather have been at?

6            A.  It's not a question of rather.  I told

7       you earlier in the day that's the natural

8       progression of --

9            Q.  Did you want her job; yes or no?

10            MR. McPARTLAND:  Objection.  It's been

11            asked and answered.

12            A.  No, I didn't want her job.

13            Q.  You didn't want her job.

14            So did you ever volunteer to cover shifts

15       for her?

16            A.  We don't really work in shifts.  It

17       would be fitness manager and personal training

18       manager work together Monday through Wednesday.

19            Q.  So you didn't.

20            Did you ever volunteer to cover days for

21       her?

22            MR. McPARTLAND:  Objection.

23            You can continue.

24            MR. HARMAN:  I'm going to start moving

25            to strike as nonresponsive.

1          Q.  I just want you to answer the

2     questions.  I'm not trying to be difficult.

3               MR. MCPARTLAND:  He answered your

4          question.

5          A.  I'm answering them.  I'm trying to --

6          Q.  So did you ever volunteer to cover days

7     for her?

8          A.  I told her once she told me that she

9     was sick, that I would be here and I would be able

10    to hold down the team, take whatever time she

11    needed.

12         Q.  I understand your statement, hold down

13    the team.

14            I'm asking if you ever volunteered to

15    cover a day for her?

16         A.  If it was necessary, absolutely.

17         Q.  Did you volunteer to cover a day for

18    her?

19         A.  I don't remember ever phrasing a

20    sentence like it.  That's not how the PTM and FM

21    would really speak about -- it's not a matter of

22    covering.  It's a matter of we have to make

23    sure -- the reason why there is two of us is that

24    everything is available to the team.

25               So if there was ever a day or time where

1          she couldn't get something done, absolutely, I

2          would step in.  Vice-versa, where if there is

3          something I couldn't get to or I couldn't do --

4               Q.  I'm asking about your specific

5          recollection.  I'm not asking you about

6          generalities.

7                  I'm asking you about if you specifically

8          recall making an adjustment in your schedule

9          because Ms. Ashdown had cancer?

10                 MR. McPARTLAND:  Object to the form.

11              A.  No.

12              Q.  I'm handing you what's been marked for

13         identification as Exhibit 1.  Please take a look

14         at it.

15                 (Plaintiff's Exhibit 1, second

16              amended complaint between Kerry Ashdown

17              and Equinox, et. al., was marked for

18              identification.)

19              A.  (Witness reviews document.)

20                 MR. HARMAN:  For the record,

21              Plaintiff's Exhibit 1 is the second amended

22              complaint between Kerry Ashdown and Equinox

23              et. al.  It's a 20-page document dated

24              May 24, 2013.

25

1    BY MR. HARMAN:

2              Q.  Let me know when you're ready.  Take as

3         much time as you need.

4              A.  (Witness reviews document.) I finished

5         reading it.

6                   Am I able to use the restroom now, or was

7         there a question you asked me before you handed it

8         to me?

9                   MR. McPARTLAND:  I don't think there's

10        a question pending, is there?

11                  MR. HARMAN:  No, there's no question.

12                  (Recess taken).

13   BY MR. HARMAN:

14             Q.  Have you ever terminated anyone in your

15        tenure as personal training manager?

16             A.  Yes.

17             Q.  Who did you terminate?

18             A.  David Buklas, Jessica Desmond.  I think

19        that's it, as personal training manager.

20             Q.  Why did you terminate David?

21             A.  I remember he didn't show up to

22        numerous floor shifts, and he had been late to a

23        number of client sessions.

24             Q.  And did you give him any written

25        warnings prior to terminating him?

1           A.  I think they were primarily verbal with

2       David.  We had a number of meetings in the office.

3       I don't remember if I had a written verbal in his

4       file.

5           Q.  But do you recall giving him warnings?

6           A.  Yes.

7           Q.  And you maintained a file on him?

8           A.  All employees have files.  So we keep

9       their certification, their CPR card --

10          Q.  Where is that file located?

11          A.  In the PT office, in the filing

12      cabinet.

13          Q.  And is it locked?

14          A.  No.

15          Q.  So anybody can access a file?

16          A.  Yes.

17          Q.  So if you put a -- if you put a written

18      warning in someone's file, that would be available

19      to any personal trainer?

20          A.  Well, the personal trainer shouldn't

21      know where the files are.  They don't really make

22      it public knowledge.  But yes, if no one was in

23      the office, someone could go into the file cabinet

24      and disrupt the files if they chose.

25          Q.  I'm not asking about disrupting the

```
 1              files.
 2                      If you gave someone a verbal warning for
 3              no-showing however many times, and you
 4              memorialized that on a piece of paper and put that
 5              in the employee's file, according to your
 6              testimony, that would be available to anyone who
 7              wanted to access it, who could go into the office;
 8              is that correct?
 9                      A.   That's correct.
10                      MR. MCPARTLAND:  Over my objection.
11                      Q.   There are files for all 37,
12              approximate, personal trainers?
13                      A.   Yes.
14                      Q.   Is there a file on you?
15                      A.   No.
16                      Q.   Is there a file on Mr. Diaz?
17                      A.   No.
18                      Q.   And do you have a personnel file, if
19              you know?
20                      A.   I believe I do.  I believe Lawrence
21              Sanders has that one.  He has the managers' files.
22                      Q.   And Lawrence Sanders has an office?
23                      A.   Yes.
24                      Q.   Where is that located?
25                      A.   It's behind the front desk in the gym.
```

1         Q.  And have you ever seen your file?

2         A.  I've seen him take it out.  I've never

3     seen what's in the file.

4         Q.  And have you ever seen Ms. Ashdown's

5     file?

6         A.  No.

7         Q.  Can you describe the circumstances when

8     Mr. Sanders took your personnel file out?

9         A.  When we have our professional

10    development meetings, copies, I think, of recent

11    ones are in there.  And when I was hired to be the

12    fitness manager, I believe they put a copy of my

13    contract in my file.

14        Q.  So you have an employment contract?

15        A.  Yes.  It stipulates what my bonus

16    structure is and what my salary structure is and

17    what the position is.

18        Q.  Did you physically see it put in there?

19        A.  I didn't see it put into the file.

20        Q.  But you know the document was

21    generated.

22            Did you countersign it?

23        A.  Yes, I signed it.

24        Q.  And was there any reason, other than

25    what you testified to, that you terminated David?

1          A.   No.  He was also an underperforming

2     trainer, but I don't generally terminate or want

3     to get rid of trainers for underperformance.  It's

4     generally when they do things that take away from

5     the team that I really find it for grounds for

6     termination.

7          Q.   Why did you terminate Jessica?

8          A.   I found out that she was training in

9     another location, and that a lot of the times,

10    when she couldn't train leads or clients who we're

11    giving her here, she was either turning them down

12    or rescheduling them for the other position.

13         Q.   When did you terminate David?

14         A.   When did I terminate David?  It was

15    sometime in 2011.

16         Q.   How about Jessica?

17         A.   If it wasn't -- I think it might have

18    been early 2012 or late 2011.

19         Q.   And other than David and Jessica, have

20    you terminated anybody else?

21         A.   Not as a personal training manager.

22         Q.   How about a fitness manager?

23         A.   At Soho, I don't think I terminated

24    anybody in -- at Chelsea, I had to terminate a

25    trainer who was working the floor.  I don't

1   remember his name.  He got into an altercation

2   with one of the other trainers in front of the

3   members during prime time, and it was a pretty

4   aggressive occasion, so I had to terminate him

5   on-site.

6          Q.  And do you remember that individual's

7   name?

8          A.  I don't.  I think his name was -- I

9   think his first name was Nakia.  I think it's

10  Blair.  N-a-k-i-a, Blair.

11         Q.  Have you ever given a trainer a written

12  warning?

13         A.  Yes.

14         Q.  And when is the last time you gave a

15  trainer a written warning?

16         A.  Sometime in 2012.

17         Q.  So this year you haven't given a

18  trainer a written warning?

19         A.  No written warnings, no.

20         Q.  Not in the last nine months?

21         A.  No.  It's --

22         Q.  Just --

23         A.  No.

24         Q.  How many written warnings do you think

25  you issued in 2012?

1           A.   Less than 15.

2           Q.   And when you issue a written warning,

3      do you physically hand the written warning to the

4      employee?

5           A.   I call him into the office.  Generally,

6      I already have the written warning written up.  We

7      speak about what actions led to it, allow them to

8      read it.  If they understand what further

9      disciplinary actions will happen if the situation

10     happens again, I sign and date it, then I give it

11     to them to sign and date it.  They sign and date

12     it and I put it in their file.

13          Q.   How about verbal warnings; when is the

14     last time you gave a verbal warning?

15          A.   I don't want to use verbal warning.  I

16     want to use it more as a coaching.  I don't go up

17     to the trainers and scold them.  It's not -- I

18     want to give them best practices.  So it can be as

19     simple as if a trainer doesn't have their name tag

20     on, I'll go up and say, "Sam, where's your name

21     tag?"

22               "It's in my backpack."

23               "Next time you have a break with a

24     client, please go and get it."

25               If they don't have their program out

1          visible during the session, I could say, "Andy,

2          where's your program today?"  He'll say, "Sorry,"

3          takes it out of his folder.

4                    So it could either be in passing on the

5          gym floor, or if it's something -- it's the second

6          time they don't have a name tag on, maybe I'll

7          call them into the office and I'll say, "Theo, how

8          come you don't have your name tag on?  Again, do

9          you need me to print another one for you?"

10                   So it can happen either on the floor, in

11         the office.  The situation dictates where it

12         happens.

13              Q.  When you were the fitness training

14         manager, were you responsible for supervising the

15         trainers?

16              A.  Yes.

17              Q.  And did you issue any written warnings

18         during that period?

19              A.  I may have, but it probably wasn't

20         many.

21              Q.  Did you terminate anyone during that

22         period?

23              A.  No.

24              Q.  And did you ever issue any written

25         warnings in conjunction with Ms. Ashdown?  In

1        other words, did you ever decide with her that

2        someone should be given a written warning?

3             A.   I don't believe so.

4             Q.   While you were the fitness training

5        manager, were you aware of any trainers with

6        problems with substance abuse problems?

7             A.   Meaning, did the trainers have,

8        currently, substance abuse problems?

9             Q.   Yes.

10            A.   No.

11            Q.   How about trainers who had, in the

12       past, had substance abuse problems?

13            A.   Yes.  One trainer, you know, in a

14       business meeting, let me know a little bit about

15       her past, and that she turned her life around when

16       she found training.

17            Q.   What is her name?

18            A.   Danielle Vetrano.

19            Q.   And other than Danielle, are you aware

20       of any other trainers who had substance abuse

21       problems?

22            A.   No.  Just trainers, like a lot of

23       people, they go out and drink Friday nights,

24       Saturday nights, but I wouldn't quantify that as a

25       substance abuse problem.

1          Q.  Did you ever observe any behavior of

2     any trainers, while working at Equinox, that would

3     lead you to believe that they had substance abuse

4     problems?

5          A.  No.

6          Q.  Did Ms. Ashdown ever tell you that she

7     was concerned about the behavior of any of the

8     trainers with respect to substance abuse?

9          A.  No.

10          Q.  Do you consider yourself a competitive

11     person?

12          A.  Yes.

13          Q.  And do you recognize what's been marked

14     for identification as Plaintiff's Exhibit 1?

15          A.  Yes.

16          Q.  Have you read this document?

17          A.  Just now, I perused it all the way to

18     page 20.  The first few pages, I read more in

19     depth than the others.

20          Q.  Have you read this document prior to

21     today?

22          A.  Yes.

23          Q.  When did you read it?

24          A.  I don't remember the exact dates, but

25     when I first heard about it.  And I don't

1      remember, like I told you earlier, if I received

2      it via e-mail or if I got a hard copy, but I

3      believe I printed it out of an e-mail, and I did

4      read the first few pages.

5             Q.  Is it your understanding that this is

6      the same document that you have in your possession

7      in some location?

8             A.  Before when you said, let the record

9      show that it was the second amended, I don't know

10     what that means.  So, I don't know if it was --

11     there's a first amended, I would guess, if there's

12     a second.  So I don't know whether the one I have

13     is the first or second.

14            Q.  Fair enough.  Is that your name in the

15     caption?

16            A.  Yes, sir.

17            Q.  The copy that you have of the

18     complaint, whether it's the first amended or

19     second amended, did you show it to anyone?

20            A.  No.  After I read it, I printed it, I

21     put it in the manila folder, I put it in one of my

22     backpacks.  And a lot of other things have been

23     going on in my life.  I haven't gone back to it.

24            Q.  Do you train at Equinox?

25            A.  Yes, I do.

1          Q.  When I [sic] mean train, I mean, do you

2      yourself train?

3          A.  You mean, do I work out?

4          Q.  Yes.

5          A.  Yes, I work out there.

6          Q.  Do you have a regimen?

7          A.  Yes.

8          Q.  And do you work out with anyone?

9          A.  Generally, I work out on my own, but

10     there are times that I work out with some of my

11     trainers in a group workout as a fitness manager.

12     I arrange workouts, so I've worked out with some

13     of my trainers.  I've worked out with my brother

14     when he comes, I work out with my wife.

15          I generally work out on my own, but there

16     are times when I've worked out with other people.

17          Q.  Is your wife a member?

18          A.  No.

19          Q.  And is your brother a member?

20          A.  Yes.

21          Q.  And what is your brother's name?

22          A.  Joseph Maietta.

23          Q.  And does he work for Equinox?

24          A.  No.

25          Q.  And have you discussed this lawsuit

1          with him?

2                    A.   No.

3                    Q.   Have you ever worked out with Lawrence

4          Sanders?

5                    A.   Yes.  I used to train Lawrence Sanders.

6                    Q.   How frequently would you train Lawrence

7          Sanders?

8                    A.   It was supposed to be twice a week of

9          training.  Very often, more often than not, it

10         wasn't.  Because of his duties there, there were

11         whole weeks that he couldn't. There were times

12         where he didn't have a package.  But there were

13         times where I had a program for him and I trained

14         him as a trainer.  I didn't work out in

15         conjunction with him.  I was training him.

16                   Q.   So you trained him as a personal

17         trainer?

18                   A.   Yes.

19                   Q.   And do you train anybody now as a

20         professional trainer?

21                   A.   Yes.  I have about six or seven clients

22         now.

23                   Q.   Who are your clients?

24                   A.   You want to know the names?

25                   Q.   Um-hum.

1    A. ███████████████████████████

2    ███████████████████████████████████

3    ███████████████████████████████████

4         MR. McPARTLAND:  Note for the record, I

5         believe with personal training clients'

6         names, we've had an agreement of

7         confidentiality, the way it's going to be

8         shared.  They'll apply equally to this

9         list.

10        MR. HARMAN:  I understand and agree.

11        Q.  For what period of time were you

12   training Lawrence Sanders?

13        A.  I trained him sporadically at the

14   Chelsea location.  I was there for

15   three-and-a-half years.  I didn't train him for

16   the entire three-and-a-half years.  There were

17   just periods where we would train, and then I

18   trained him when I first came on to the Soho

19   location.  He was looking for a trainer.  He had

20   been training with somebody else, then -- he

21   bounces back and forth.  He likes to train with a

22   few of the trainers every so often, and we

23   trained, I think, for about the first three,

24   four months that I was at the location in Soho.

25        Q.  Was that during the time that

1    Ms. Ashdown was working at the Soho location?

2         A.   Yes.  And then he stopped training with

3    me for a little bit.  He worked on his own, and

4    then he started training again with one of our

5    trainers, Pagan Jordan, and he trained with her

6    for all of 2012.

7         Q.   Focusing on the time that -- in 2011,

8    when Ms. Ashdown was the personal training

9    manager, there was a time where you were regularly

10   training Mr. Sanders; is that correct?

11        A.   Yes.  It was about -- it was probably a

12   package or package and a half that we trained, I

13   would say, during that time.  Maybe we had about

14   10 to 12 sessions.  It wasn't as frequent as when

15   it was in Chelsea.

16        Q.   And during the sessions, did you

17   discuss personal matters with him?

18        A.   Most times, it was just sports.  We

19   would talk -- as far as personal matters, it was

20   mostly sports.  It was -- during my sessions, I

21   don't really speak too much, especially when the

22   client is actually involved in the movement.  Just

23   normally during the break periods.

24             And he -- I didn't give him any break

25   periods.  His goals didn't really allow for

1    extensive break periods, but we talked sports, we

2    would talk about MMA, boxing, you know, just

3    normal client-trainer chitchat.  It was never one

4    specific topic that --

5         Q.  How about work-related topics; did you

6    discuss work-related topics while you were

7    training with him?

8         A.  Yes.  Maybe he would ask me about

9    program compliance.  He would ask me about how the

10   new trainers that we hired are doing.  You know,

11   the role of the general manager is oversee all the

12   departments, so he's always been very good at

13   speaking with his managers about what is actually

14   going on in your department.

15        Q.  So you talk about work?

16        A.  Yes.  We talk about everything.

17        Q.  Did you talk about Kerry Ashdown?

18        A.  She came up in conversation.  Most

19   times, if we spoke -- and I don't know if they're

20   exclusive to the sessions, but I would ask hum,

21   you know, how to handle certain conversations with

22   her.  You know, for advice on how maybe to speak

23   to her and some of the tensions that were going on

24   in the office.

25             But it has been like that for the

1       six years that I've been a manager.  It's

2       always -- you're able to speak with all the

3       different people you work with.  I mean, we have a

4       manager's meeting every week.

5              Q.  You said that you spoke with Lawrence

6       Sanders about how to handle Ms. Ashdown.

7                 So you were having problems handling

8       Ms. Ashdown?

9              A.  No.  If you want to say "handle" in

10      that regard --

11             Q.  I'm using your words.  I'm asking you,

12      how --

13             A.  More along the lines of how to

14      communicate with her.

15             Q.  So you didn't have a problem handling

16      her?

17             A.  Handling is more -- what I mean by

18      handling is, in our day-to-day interactions, how

19      we would communicate, how I would get her to see

20      my point of view on certain matters about the

21      business.  She has her point of view, I have my

22      point of view, but we're both responsible for

23      running the department.  And us working as a

24      cohesive pair is really something that's important

25      to the success of a PT department.

```
1              And I had very open lines of

2       communications with the PTMs that I worked with

3       before, so I would ask him for advice on either

4       how to open up those lines with Kerry, how to make

5       them more smooth.

6              Q.  So there were times where she didn't

7       see your point of view; yes or no?

8              A.  There were frequent times where she

9       didn't see my point of view.

10             Q.  When you say "frequent," do you mean

11      every day?

12             A.  Every week.

13             Q.  And did you ever tell anyone that

14      Ms. Ashdown drank excessively at work?

15             A.  I never told anyone that she drank at

16      work.

17             Q.  Did you ever tell anyone that she drank

18      with her staff?  Did you ever tell anyone that she

19      was getting drunk with her staff?

20                 MR. McPARTLAND:  Objection to the form.

21             There's two questions there.

22             Q.  Can you answer?

23             A.  You want to repeat the question?

24                 MR. HARMAN:  She can read it back.

25                 (Record was read back.)
```

1              MR. McPARTLAND:  Which question is the

2         real one?

3              MR. HARMAN:  The second.

4         A.  I never used the word "drunk."  I did

5    speak to Lawrence that trainers had come up to me,

6    that at a few social functions, that she was

7    drinking with them.

8         Q.  What do you mean by "drinking"?

9         A.  Alcoholic beverages.

10        Q.  So you told Sanders that Ashdown was

11   drinking with trainers?

12        A.  Yes.  We have a managers' meeting once

13   a week, and Lawrence also, for all his managers.

14   He has manager 101s.  So he calls you into the

15   office, you speak about how the department is

16   going from your point of view, how are you doing

17   on a personal level, how are you feeling.  Just

18   anything that's going on.

19             So part of my asking him for advice, I

20   said, "Some of the trainers are giving me

21   feedback, that she's a little close with some of

22   them, and there have been times when she goes out

23   and drinks with them."

24        Q.  You oversee 37 trainers; right?

25        A.  Currently, yes.

1          Q.  I would imagine some of them drink;

2     right?

3          A.  Yes.

4          Q.  I would imagine some of them drink

5     together; right?

6          A.  Yes.

7          Q.  Have you ever had a beer with one of

8     your trainers?

9          A.  Yes.

10          Q.  Did you ever complain to Sanders that

11     Ms. Ashdown favored males over females?

12          A.  I didn't complain to him.  I told him

13     it was around the time that me and her were

14     discussing certain things, and she said she was

15     hearing from the staff that I favor the females,

16     and I said, you know, they're coming to me saying

17     that she's favoring the male trainers because

18     she's training with one of them, she's close with

19     another.

20          Q.  Who told you that?

21          A.  Who told me she was close?  A few of my

22     female trainers at the time.  One of them was

23     Danielle Vetrano, another one is Nicole Hummel.  I

24     think those are the only two.

25          Q.  Did you believe that Ms. Ashdown was

1        favoring males over females?

2              A.  No.  It's just -- just like I didn't

3        believe that I was favoring females, one of the

4        things that we deal with as managers, is there's

5        always going to be this perceived favoritism, and

6        it's our job to make them all feel equally

7        represented by the department, especially us.  So

8        it is a challenge.

9              Q.  Did you ever tell Sanders that

10       Ashdown -- Ms. Ashdown wasn't responding to your

11       e-mails?

12             A.  Yes.  Once I had -- it was a closeout

13       period, and --

14             Q.  So you did?

15             A.  Yes.

16             Q.  And have you ever set up a fake e-mail

17       address at Equinox?

18             A.  No.

19             Q.  And did you speak to Ms. Ashdown

20       directly about her not, according to you,

21       responding to e-mails?

22             A.  We spoke about it in the office, I

23       think, after that event.

24             Q.  But you went to Sanders first; right?

25             A.  No.  It was during a closeout period of

1          time.

2                    Q.  Well, just, let's --

3                    A.  I would like to answer the question for

4          you.

5                    Q.  I want you to answer the question.

6                    MR. McPARTLAND:  "No" is good enough.

7          That's what he's looking for.

8                    Q.  Did you speak with Ms. Ashdown prior to

9          your complaint to Mr. Sanders?

10                   MR. McPARTLAND:  Object to the form.

11                   A.  I didn't complain to Lawrence, but I

12         spoke to Lawrence before.

13                   Q.  You spoke to Lawrence.  We established

14         that.  You spoke to Lawrence about your belief

15         that Ms. Ashdown didn't respond to your e-mail.

16         Okay.  We've established that.  That's correct.

17         We understand that.

18                   Is that correct?

19                   A.  I spoke to him because I wanted to get

20         in touch with Kerry in response to my e-mail.

21                   Q.  But you couldn't text her?

22                   A.  No.  I was e-mailing her.

23                   Q.  Did you have her phone number?

24                   A.  I did.

25                   Q.  You could text her; right?

```
 1                    A.  I could have texted her, right.

 2                    Q.  But you chose not to; right?

 3                    A.  I don't know when I received her phone

 4          number in relation to her e-mail address.

 5                    Q.  You don't recall texting her, do you?

 6                    A.  I believe I texted her, but I didn't

 7          text her --

 8                    Q.  Did you text her at that time?

 9                    MR. MCPARTLAND:  I'm going to object.

10                    Can you let him finish as well, instead of

11                    talking over each other?

12                    A.  What I do with -- deal with business, I

13          always -- like I told you earlier, I go through

14          e-mail.

15                    Q.  But this was another manager at the

16          Soho location; right?

17                    A.  Who was another?

18                    Q.  Ms. Ashdown.

19                    A.  Kerry?

20                    Q.  Yes.  And you could have texted her;

21          right?

22                    A.  What I did instead was I called.  I

23          called, asking for Kerry.  I called the front desk

24          and I said, "Is Kerry in the office," and they

25          said, "No, Kerry is not in the PT office."  I
```

1        said, "Okay, then let me talk to Lawrence," and

2        they transferred me to Lawrence's office.

3               It just so happened that Kerry was in

4        Lawrence's office, and I said, "Hey, is Kerry at

5        work today?  I sent her an e-mail about some" -- I

6        don't remember what it was related to in the

7        business, "but I want to make sure it went

8        through.  I'm not getting a response."

9               And that's how --

10               Q.  What did Sanders say in response to

11       that?

12               A.  He said -- I think he told me that

13       Kerry was actually in the room, and that she would

14       check the e-mails.  What I did was I told him the

15       nature of it.  I believe it was just a member

16       wanted to purchase a package, so he relayed the

17       information and the package was purchased and

18       everything was fine.

19               Q.  And for how long a period did you

20       believe that Ms. Ashdown wasn't responding to your

21       e-mails?

22               A.  It was just that day.  It was during

23       one of the -- I think it was probably the last day

24       of closeout in the month.  Closeout is the final

25       four days of the month where we're -- really

1          buckle down for budgets.  In the PT department, we

2          alternate the days.  So I was there on the day

3          before, she was here on this last day, and I sent

4          her an e-mail about it in the morning.  I didn't

5          get a response in the afternoon.  I believe I sent

6          another one, and I wanted to make sure we got a

7          process, so I called Equinox looking for her, but

8          she wasn't in the office.  She was in Lawrence's

9          office.

10              Q.  So your testimony is that you sent her

11         several e-mails and she didn't respond to them?

12              A.  Not several.  Just, probably, two.

13              Q.  Two.

14 REQ             MR. HARMAN:  We're going to call for

15    production of the e-mails that were sent to Kerry

16    Ashdown that the witness claims he didn't get a

17    response to.

18                 MR. McPARTLAND:  I take that under

19                 advisement.

20              Q.  Was there any other time that

21         Ms. Ashdown, according to your recollection,

22         didn't respond to e-mails?

23              A.  Not that I remember.

24              Q.  Did you ever tell Mr. Sanders that you

25         thought that Ms. Ashdown would crash and burn?

1           A.  No.

2           Q.  Did you ever tell Mr. Sanders that

3      Ms. Ashdown wasn't doing her job?

4           A.  No.

5           Q.  Did you ever tell Mr. Sanders

6      Ms. Ashdown didn't look well?

7           A.  No.  When she didn't look well, I would

8      turn to her, because she would sit right next to

9      me, and I would tell her, I would say, "Listen,

10      why don't you leave early, I'll be here."

11           Q.  Did you ever tell Mr. Sanders that,

12      though?

13           A.  No.

14           Q.  Did you ever tell anybody, other than

15      Ms. Ashdown directly, that Ms. Ashdown didn't look

16      well?

17           A.  Well, when I would go home and I would

18      talk to my wife, I would say, "I think her

19      treatment is really affecting her.  I could see it

20      today."  It's something that I'm very sensitive

21      to.

22           Q.  Other than your wife, did you talk with

23      anyone else?

24           A.  No.

25           Q.  How about any of the trainers?

1          A.   No.  It's not their business to know.

2          Q.   Did anyone ask you?

3          A.   They would ask, and if they did ask, I

4     would always say, "Speak to her about it," or "I

5     don't know about the situation."

6          Q.   Who asked you?

7          A.   I don't know specifically.  I was more

8     answering if the trainers were to ask, and I know

9     that would be my default answer.  It's not their

10    business to know what's going on with Kerry.

11         Q.   Do you believe that Ms. Ashdown's

12    cancer treatments affected her ability to perform

13    her job duties?

14         A.   No.  I think they affected her

15    physically, like I told you earlier.

16         Q.   I'd like for you to just answer the

17    question.

18              Do you believe that Ms. Ashdown's cancer

19    treatments affected her ability to perform her job

20    duties?

21         A.   No.

22         Q.   So do you believe that there were --

23    from your professional opinion, that Ms. Ashdown

24    had any performance issues?

25              MR. McPARTLAND:  Objection --

1          A.   Performance issues, as far as what?

2               MR. McPARTLAND:  -- to form.

3               MR. HARMAN:  I'm sorry.  Is there

4          something that you'd like to say?

5               MR. McPARTLAND:  I just objected to the

6          form.  Do you want me to clarify it?

7               MR. HARMAN:  No.

8               MR. McPARTLAND:  Okay.

9          Q.   You've worked at Equinox for

10     five years; right?

11          A.   Since November 2007.

12          Q.   Six years?

13          A.   Almost six, yes.

14          Q.   And you've worked as a manager for

15     about half that, a little more?

16          A.   No.  Probably about 90 percent of it.

17          Q.   90 percent of it you worked as a

18     manager.

19               And you're now functioning in

20     Ms. Ashdown's former position; correct?

21          A.   That's correct.

22          Q.   And you've been in lots of manager

23     meetings; correct?

24          A.   Yes.

25          Q.   And you've had manager training;

1          correct?

2                  A.   Yes.

3                  Q.   Do you consider yourself a good

4          manager?

5                  A.   Yes, I do.

6                  Q.   Are you as knowledgeable as you could

7          be of Equinox's requirements of you as a personal

8          training manager?

9                  A.   Say that one more time, please.

10                 Q.   Are you as knowledgeable as you could

11         be of Equinox's requirements for you as a personal

12         training manager?

13                 A.   On a day-to-day basis, absolutely.  I

14         always want to learn more on a daily basis.  I

15         think there's always something to learn.

16                 Q.   I'm talking about today, though.  I'm

17         not talking about the future.

18                      Have you done everything you're supposed

19         to do to learn your job?

20                 A.   Yes.

21                 Q.   Are you good at it?

22                 A.   Yes.

23                 Q.   Was Ms. Ashdown good at her job?

24                 A.   Yes.

25                 Q.   And did you ever identify any

1          performance issues with Ms. Ashdown?

2              A.  Yes, I did.

3              Q.  What were those?

4              A.  Part of the job as the fitness manager

5          is I'm involved with the brand.  So sort of how

6          our jobs break down is she's the business -- the

7          personal training manager's business numbers, the

8          fitness manager is brand.  So what I'm responsible

9          for is program design, program design compliance

10         with the trainers.

11             So one of the things, when I came over to

12         the Soho location, as a team, they weren't very

13         programming compliant.  We had a program

14         compliance spreadsheet, and at the time when I

15         first got there, I noticed that they were -- less

16         than 20 percent of the staff was utilizing the

17         programs correctly.

18             So one of my tasks coming in there was to

19         make sure that more of the trainers were

20         programming with the eventual goal of being at a

21         hundred percent compliance.  And one of the things

22         that I noticed and made that job difficult is that

23         Kerry didn't actually utilize programs with her

24         training clients.  They weren't visible when she's

25         on the floor, which is a requirement of the

1      trainer.

2             And they weren't -- they weren't in the

3      share drive.  They would be easily accessible.

4      Like all the other trainers and managers need to

5      have them on the share drive.  So it made my

6      ability to get trainer buy-in less effective

7      because there could be easily something where they

8      could say, "Well, why do I need the program if the

9      personal training manager doesn't have the

10     program?"

11            Q.  So did you complain about that?

12            A.  I didn't complain about it.  I spoke to

13     Lawrence in my one-on-one and said, "Hey, listen,

14     you guys have me in here to improve our

15     programming complaints.  Kerry doesn't use

16     programs, nor does she have them visible during

17     the training sessions.  It's something that I've

18     told her that I can help her with, programming,

19     because that's one of the things that I'm good at.

20     She doesn't really want my help, so it's going to

21     be difficult for me to improve the program

22     compliance of the staff if she's not open to me

23     assisting her with the programming or actually

24     having programs with her clients."

25            Q.  Is it a requirement at Equinox that you

1    have programs visible on the floor?

2              A.  Yes.

3              Q.  Where is that?  Is that written down

4    somewhere?

5              A.  I believe it's part of our EFTI

6    curriculum.  I don't know where it is written

7    down, but it's something that we educate and tell

8    the trainers when we hire them.  We're -- part of

9    the Equinox programming system is we program

10   six weeks in advance on our programming template.

11   And how the managers are coached and all the

12   trainers are coached needs to be visible during

13   the session.

14              In our complimentary services, we

15   actually show the program to the training client

16   when we first start training them.  So after we

17   meet for the Equifit assessment, where we meet for

18   that first training session, what we're supposed

19   to do as trainers at Equinox is show them the

20   program, explain to them what they can expect in

21   this fitness program.

22              Q.  So if I went to an Equinox location,

23   according to Equinox's policy, if I see a trainer,

24   I should see them with some kind of piece of paper

25   or something like that?

1          A.  You will see them either with our

2     branded, six-week program on a clipboard, either

3     attached to a notebook, or very recently trainers

4     have moved over to the digital version of the

5     template, which you can find it on there, on the

6     iPad or any other type of tablet.  But it should

7     always be present during the session.

8          Q.  And if it's not, they're violating

9     Equinox's policy, according to your testimony?

10          A.  If it's not there, it's the job of

11     either the fitness manager to either ask them why

12     it's not there, ask to see their program, see what

13     the reason is.  It could be the trainer forgot it

14     and they go get it during the rest period.

15          Q.  And it's your testimony that

16     Ms. Ashdown didn't use programs at all?

17          A.  In the beginning of her tenure there,

18     she didn't have programs visible during the

19     sessions.

20          Q.  How long a period would you consider to

21     be the beginning?

22          A.  I would say, at least the first

23     two months.  Then Lawrence is always very good

24     about that in their one-on-one.  He addressed it

25     with her and said, "Hey, let me see your

1      programs."  From that point forward, there were
2      programs visible during sessions.
3              Q.  So she only didn't use programs in the
4      very beginning?
5              A.  Yes.
6              Q.  But -- and she hadn't worked at Equinox
7      prior to that first beginning period that you're
8      talking about; correct?
9              A.  No.  It's my understanding she was
10     hired in the beginning of 2011.  She used to work
11     in the United Kingdom.
12             Q.  And then she started using programs
13     after that beginning period?
14             A.  After Lawrence spoke with her about
15     having programs during sessions, yes.
16             Q.  How do you know Lawrence spoke to her?
17             A.  He told me in his -- in our one-on-one
18     that "I'll speak to Kerry about there being
19     programs visible during the training sessions."
20             Q.  So he talked to you about his
21     conversations with Ms. Ashdown?
22             A.  No.  He told me what he would do in
23     response to my conversation with him.
24             Q.  Did you ever bring any other concerns
25     to Mr. Sanders about Ms. Ashdown?

1          A.   No.   The only concerns were the

2      inability to communicate, something where we had a

3      different opinion.   She was often condescending.

4      She would speak to me like I was a child, so I

5      never was the -- the office is visible to the

6      training floor.   I never wanted us to get into a

7      back-and-forth, and there was one specific

8      occasion where she was yelling at me.   I don't

9      remember what the topic was, and I left the

10     office.

11               Then I went to Lawrence.   I said, "You

12     need to talk to Kerry.   She's raising her voice to

13     me, and I would rather not have the whole training

14     staff see it."

15          Q.   So it's your testimony that she yelled

16     at you?

17          A.   She has yelled at me, yes.

18          Q.   Yell at you about what?

19          A.   I don't remember the topics.   It was us

20     just -- disagreements we were having.

21          Q.   And was she yelling at you in front of

22     anybody?

23          A.   You could say the whole gym floor

24     because our window, behind us in the office -- our

25     office is only about three-and-a-half feet wide,

1          and it's -- the whole gym floor can be seen right

2          into our windows.

3                    Q.   So it's your testimony that she yelled

4          at you in front of the whole gym floor?

5                    MR. McPARTLAND:   Objection.

6                    A.   She yelled at me in my office.  She was

7          yelling at me, and we were visible from the gym

8          floor.

9                    Q.   And so you went to Sanders and you said

10         that Ashdown was yelling at you?

11                   A.   That's correct.

12                   Q.   What did he say?

13                   A.   He said, "I will speak with her."

14                   Q.   And did he?

15                   A.   I believe so.  I didn't see the

16         conversation.

17                   Q.   What happened after that?  Did you go

18         back to the office?

19                   A.   I went back to the office, and probably

20         for the next week, we barely said a word to each

21         other.  And there was a noticeable tension when

22         you would come into the office.

23                   Q.   And do you recall what the dispute was

24         about?

25                   A.   No, I do not.

1              Q.  And you said she was condescending to

2      you?

3              A.  Yes.

4              Q.  What do you mean by that?

5              A.  I'm always looking to learn, I also

6      like to teach.  So in our beginning conversations,

7      when she first started, she let me know a little

8      bit about her background, what she would do in the

9      UK.  I definitely took it as something where I

10     could learn how to manage business from a member's

11     prospective well from her, because she definitely

12     had a talent for that.  She was very organized

13     with how she had the trainers -- (cross talk)

14             Q.  In what ways was she condescending to

15     you?

16             A.  I was trying to finish the question

17     that you asked me.  And I would respond with

18     trying to give her some ways of -- like you said

19     earlier, she had never worked at Equinox before,

20     so I was trying to explain to her the brand.  It

21     was obvious when she came in that she didn't --

22     she wanted to run it the way it was run in the UK.

23     Every business is different, every even department

24     within Equinox is different, different culture.

25             So when I would try to give my opinion or

1    my advice, she didn't really care to hear it, and

2    that's when she would be condescending.

3        Q.  So it's your testimony that she didn't

4    want your advice?

5        A.  I don't think she felt she could learn

6    anything from me.

7        Q.  So it's your testimony that you don't

8    think that she felt that she could learn anything

9    from you?

10       A.  That's correct.

11       Q.  And did she tell you that?

12       A.  No.  That's how I felt.

13       Q.  And did you complain to Lawrence

14   Sanders that she -- that you didn't think that she

15   could learn anything from you?

16       A.   In our one-on-one, I would say to him,

17   you know, we're supposed to be working as a team,

18   PTM and FMs are supposed to feed off of each

19   other.  I've had two very productive relationships

20   with other PTMs in my tenure.  And I said for us

21   to turn around Soho like they're expecting us to

22   turn around Soho, it's not going to work unless we

23   work together.

24       Q.  If you have a disagreement with

25   Mr. Diaz over a work-related issue, who makes the

1    final decision about what to do?

2            A.  I would make the final decision, but we

3    always want to go after everything as a

4    partnership.  It's definitely something where I

5    value his feedback and what his opinion would be.

6    Unless it was grossly inaccurate, I would

7    definitely take what he said into consideration.

8            Q.  But you have the final decision?

9            A.  Final decision, but we make it as a

10   team.  It's all relationships with PTMs and FMs.

11   We work as a team.

12           Q.  Were there other occasions where you

13   allege that Ms. Ashdown yelled at you?

14           A.  There were frequent times where she

15   would raise her voice.  In my opinion, when two

16   people are working together, we should be speaking

17   to each other like we're speaking right now.  It

18   should never -- in a business setting, especially

19   one where it's so visible to all the members and

20   trainers walking by, that it should never look

21   like we're being verbally aggressive or animated.

22   It should be a very professional demeanor whenever

23   you're speaking in the office.

24           Q.  So she was verbally aggressive with

25   you?

1          A.   Yes.   The tone and the volume, there

2     were times where -- were inappropriate for the

3     situation.

4          Q.   And you said "frequent."  How

5     frequently was she being verbally aggressive with

6     you?

7          A.   More than once.  It was frequent in the

8     workplace.

9          Q.   You said "frequent."  Does that mean

10     once a week?

11          A.   More than once is my answer.

12          Q.   More than five?

13          A.   I believe so.

14          Q.   More than ten?

15          A.   Where she raised her voice?  Probably

16     not more than ten where she was condescending,

17     absolutely.

18          Q.   So there is more than five, but not

19     more than ten times that she was verbally

20     aggressive with you.  And then there was more than

21     ten times where she was condescending toward you?

22          A.   I would say almost every situation

23     where we had a difference in opinion, she had a

24     condescending tone in her voice.

25          Q.   And did you ever call anyone in the HR

```
1              department about Ms. Ashdown?

2                   A.  I don't remember.  I don't think I

3              have.

4                   Q.  And did you e-mail anyone in the HR

5              department about Ms. Ashdown?

6                   A.  No, I don't believe so.

7                   Q.  Has Mr. Sanders ever yelled at you?

8                   A.  No.

9                   Q.  And if Mr. Sanders yelled at you

10             between five and ten times in front of others at

11             Equinox, would you talk to someone about it?

12                  A.  Absolutely.

13                  Q.  Who would you talk to?

14                  A.  It would depend on which club we're at,

15             who is superior -- I would talk to my wife first

16             and see how she would -- "what do you think I

17             should do," and then I would probably speak to my

18             area personal training manager, Rich Velasquez.

19                  Q.  But you would speak to someone about

20             it?

21                  A.  Absolutely.

22                  Q.  And did you speak to Mr. Sanders about

23             all these instances of yelling with Ms. Ashdown?

24                  A.  In our one-on-ones, I would speak about

25             the nature of our relationship in the PT office.
```

1          Q.  Did you speak to Mr. Sanders about all

2     these instances of yelling?

3          A.  I wouldn't speak to him after every

4     single instance, but once I felt like it was too

5     much, there would be times where I would go speak

6     to him in the one-on-one.

7          Q.  So you did --

8          A.  I wasn't the type that I would

9     tattletale after every -- oh, she yelled at me.

10    But after she would yell, it would be

11    condescending and I would speak to her and say, "I

12    don't appreciate the way you're speaking to me."

13    And it wouldn't change.  Then I would speak to

14    Lawrence.  I would address it with Kerry also,

15    that I didn't like the way she spoke to me.

16         Q.  Is it your testimony that you directly

17    addressed it with Kerry and then you spoke to

18    Mr. Sanders?

19         A.  Absolutely.  The first event we were

20    talking about before, where she was yelling, was

21    after I had spoken to her on another occasion.

22    And I said, "Listen, there's no reason for us to

23    be yelling.  I don't appreciate the way you're

24    speaking to me," and it didn't change.

25              And that day, when she was yelling,

1    that's when I left the office, because I didn't

2    want to respond in kind.  I wanted to keep even

3    tone, so I left the office, because I felt that

4    was appropriate, and went to Lawrence.  I said,

5    "She's yelling at me in the office.  I need you to

6    speak to her."

7         Q.  And did he report back to you after

8    that?

9         A.  No.  He didn't report back to me, but

10   like I told you, for at least that week, it was

11   pretty much a "hi" and "bye" with me and her.  It

12   was very, very tense in the office.

13        Q.  Did you ever observe Ms. Ashdown, as

14   you say, allegedly yelling at anyone else?

15        A.  I never told you I saw her yelling at

16   somebody else.

17        Q.  Well, I'm asking you, did you ever

18   observe her yelling at anyone else?

19        A.  No.

20        Q.  Did you ever observe her being

21   condescending to anyone else?

22        A.  There could be times in the office

23   where something she could say to the trainer in

24   relation to the business could be condescending

25   but that would be about it.

1          MR. McPARTLAND:  Let me interrupt.

2          (Recess taken)

3          MR. HARMAN:  We're going to break now

4     for lunch.

5        I'm going to remind the witness that

6     you're still under oath and instruct you

7     not to discuss your testimony with anybody

8     during the break.

9        Do you understand that?

10          THE WITNESS:  Okay.  Can I check with

11     my wife to let her know that I'm still

12     here?

13          MR. HARMAN:  Sure.  I'm talking about

14     the content and the substance of your

15     testimony; not your whereabouts.

16

17          (Luncheon recess taken at:  1:16 p.m.)

18

19

20

21

22

23

24

25

```
1              A F T E R N O O N   S E S S I O N
2                       (2:04 p.m.)
3    CONTINUED EXAMINATION
4    BY MR. HARMAN:
5              Q.  Did you discuss your testimony while we
6         were on lunch break today?
7              A.  No.
8              Q.  And is there any portion of the
9         testimony that you gave earlier in the day that
10        you want to change?
11             A.  No.
12             Q.  Is there any testimony that you
13        provided earlier in the day that you believe to be
14        inaccurate?
15             A.  No.
16             Q.  We had some discussions earlier about
17        the computer that's in your office.
18                  Did you ever, at any point, conduct a
19        search of your computer for information regarding
20        Ms. Ashdown?
21             A.  Which computer; the one on the left or
22        the one on the right?
23             Q.  Let's talk about the computer that you
24        had before it was changed by the IT department.
25                  So I take it that you took over
```

1          Ms. Ashdown's computer; is that correct?

2              A.   Yes.   The way the office is set up, PTM

3          is historically always set on left, the FM is

4          always set on the right.

5              Q.   After Ms. Ashdown's departure, isn't it

6          true you were almost immediately placed in the

7          interim position of personal training manager?

8              A.   No.   I just did both tasks for about

9          two or three weeks, but I stayed on the computer

10         on the right.

11             Q.   And when did you move to the computer

12         on the left?

13             A.   Once they found the fitness manager to

14         work with me at the location.

15             Q.   That was about three weeks?

16             A.   Yes.   It was sometime in October.

17             Q.   October 2011?

18             A.   That's correct.

19             Q.   And at any point after that -- and you

20         started to use the same computer that Ms. Ashdown

21         was using in October of 2011?

22             A.   Yes.   After they brought in someone to

23         work, I moved to the computer on the left, that

24         Kerry had used, yes.

25             Q.   At any point after October 11th, did

1          you conduct any search for any information

2          regarding Ms. Ashdown?

3                    A.  No.

4                    Q.  How about within the physical office

5          itself; have you ever conducted a search for

6          information regarding Ms. Ashdown?

7                    A.  No.

8                    Q.  I'm handing you what's been marked as

9          Plaintiff's Exhibit 2.  Please take a look at it.

10                   (Plaintiff's Exhibit 2, two-page

11                   document dated January 9th to Joseph

12                   Matarazzo from Walker G. Harman, Junior,

13                   was marked for identification.)

14                   A.  (Witness reviews document.)

15                   MR. HARMAN:  For the record, this is a

16                   two-page document dated January 9th to

17                   Joseph Matarazzo from Walker G. Harman,

18                   Junior.

19                   Q.  Have you had an opportunity to read

20         Plaintiff's Exhibit 2?

21                   A.  Yes.

22                   Q.  Do you recognize this document?

23                   A.  No.

24                   Q.  Have you ever seen this document

25         before?

```
 1              A.  No.

 2              Q.  Do you have any understanding of what

 3       it means?

 4              A.  I believe it's your firm letting Joe

 5       Matarazzo know that Kerry Ashdown has brought a

 6       legal disagreement against Equinox.

 7              Q.  And as you sit here today, after having

 8       read it, is there any other purpose to the letter?

 9              A.  If I'm understanding correctly, it's

10       preparing Equinox that there's a potential legal

11       matter, and that anything in relation to the case

12       should be retained as such.

13              Q.  And do you see your name there in the

14       Re line?

15              A.  Yes.

16              Q.  But you never received a copy of this

17       letter?

18              A.  No.

19              Q.  And did you interview Mr. Diaz?

20              A.  Yes, I did.

21              Q.  And was he an internal hire?

22              A.  Yes, he was.

23              Q.  And was he at the Soho location?

24              A.  No.  He was in a midtown location.  I

25       don't remember if it was our Graybar location.  He
```

1       was a manager in training.

2              Q.  Did you interview anyone else?

3              A.  We had just met with -- once the

4       interview gets to my hands, it's less a matter of

5       me picking the candidate.  More of just making

6       sure I vibed with the candidate.  So he was pretty

7       much our option, or the option the company had.

8       And I met with him just to make sure -- he had,

9       like, some of the answers to my questions.  I

10      thought he was a positive candidate, and that's

11      pretty much my involvement as hiring.

12             Q.  How many times did you meet with him

13      before he was hired?

14             A.  I believe it was two times.

15             Q.  Did you train with him?

16             A.  No.

17             Q.  And what would have happened if you

18      didn't vibe with him?

19             A.  I guess -- I'm sure Lawrence and my

20      area personal training manager, Rich, would have

21      asked me why.  I guess if there were tangible

22      reasons, they would have looked for another

23      candidate, or they would have tried to find ways

24      for the match to work.

25             Q.  And was there anybody else that you met

1        with that was a candidate for that position?

2               A.  I don't believe so.  I think people --

3        like Lawrence and Rich were, I think, discussing

4        other candidates, but Darwin was the only one

5        brought to my attention.

6               Q.  Do you remember any other candidates

7        that were being discussed?

8               A.  No.

9               Q.  And can you tell me other supervisors

10       that you had other than Mr. Sanders, other

11       supervisors you've had at Equinox?

12              A.  I've had -- currently, now, I have Jed

13       Prisby, who's an assistant general manager; Jane

14       Montoya, who's an assistant general manager;

15       Lauren Buck, who's an assistant general manager;

16       Michelle -- I can't remember her last name.  She's

17       an assistant general manager now, the general

18       manager at a location in Chicago.

19              Morgan Zamorra, she was an AGM, and now

20       she's a general manager at the Chelsea location.

21              Q.  Anybody else?

22              A.  There was another gentleman, but I

23       can't remember his name.  He was there earlier in

24       my tenure.  That's an assistant general manager.

25       And then Nick Aliferis was an assistant general

1        manager, and then he became the general manager of

2        Chelsea, and now he's the general manager of

3        Columbus Circle.

4                Q.  So these are managers that you've had

5        during your time at Chelsea and Soho at Equinox?

6                A.  Correct.

7                Q.  And of these individuals that you

8        named, were you supervised directly by any of

9        them?

10               A.  They're involved in our PT meetings.

11       It's direct supervision.  It's not as if I just

12       answer to them.  We kind of all work together as a

13       team.  It's not something where I would just speak

14       to one of them.  You know, I would speak to the

15       AGMs, too, at bigger clubs, they have the same

16       title, but they may be responsible for different

17       duties.  I may have to go to one for something

18       involving towels, some involving equipment, it

19       depends on the role and the nature of the

20       question.

21               Q.  Well, you would consider the

22       personal -- you would consider yourself to be the

23       direct supervisor of the personal trainers;

24       correct?

25               A.  That's correct.

1          Q.  And would you consider Lawrence Sanders

2     to be your direct supervisor?

3          A.  Yes.

4          Q.  Tell me other direct supervisors that

5     you've had.

6          A.  The people that I listed on that --

7          Q.  All these individuals were your direct

8     supervisors?

9          A.  Yes.  The AGMs work under the general

10    managers, and they, on a more specific level, deal

11    with things at the club level.

12         Q.  Are you aware of any employee at

13    Equinox ever being terminated for, allegedly,

14    improperly pulling sessions?

15         A.  Yes.

16         Q.  Can you tell me who, please?

17         A.  I know the Brooklyn personal training

18    manager, I forget his name, I think it was -- I

19    know the Brooklyn training personal training

20    manager, and I had heard of another personal

21    training manager, but I don't know which location

22    and which name.

23         Q.  When did you hear this, about the

24    Brooklyn personal training manager?

25         A.  I would say, it's sometime in 2012.  I

1      didn't hear about it this year.

2              Q.  And what did you hear?

3              A.  That he was pulling sessions

4      inappropriately for himself and for another

5      trainer, and he was discovered and he was

6      terminated.

7              Q.  And did you hear anything else?

8              A.  No.

9              Q.  Who told you this?

10             A.  I think I might have actually heard it

11     from Darwin because Darwin used to know people at

12     the Brooklyn Equinox, and then he has friends in

13     some other locations.

14             Q.  And then you recall another instance in

15     which an employee was terminated for improper

16     session pulling?

17             A.  Yes.  I remember hearing it.  I don't

18     remember the -- I don't know which location it

19     was.

20             Q.  You don't remember any specific

21     details?

22             A.  No, sir.

23             Q.  What is your educational background?

24             A.  I attended a four-year private

25     university, Hofstra University.  I have a BA in

1        biology and psychology.

2               Q.  And beyond your combined bachelor's

3        degree, do you have any other degrees?

4               A.  No.  I would like to go back to school,

5        but I don't.

6               Q.  What would you like to go back to

7        school for?

8               A.  I want to get a master's in sports

9        nutrition.

10              Q.  Do you hold any certificates?

11              A.  What type of certificates?

12              Q.  Any kind of certificates related to

13       your job?

14              A.  Yes.  I have my national certification

15       through the Aerobics Fitness Association of

16       America, I'm TRX certified, Kettlebell certified.

17       I was certified using the biker through Equinox,

18       pre- and postnatal certified.

19              Q.  Anything else?

20              A.  That's all I can remember off the top

21       of my head.

22                  MR. HARMAN:  I'm handing you what has

23              been marked as Plaintiff's Exhibit 3.

24              Please take a look at it.

25                  (Plaintiff's Exhibit 3, Defendants'

1          responses to initial discovery dated

2          June 17, 2013, was marked for

3          identification.)

4              THE WITNESS:  (Witness reviews

5          document.)

6              MR. HARMAN:  For the record, this is

7          Defendants' responses to initial discovery

8          protocols, with this matter's CIV number,

9          dated June 17, 2013.

10         Q.  Have you seen this document before?

11         A.  No, sir.

12         Q.  Do you know who David Harris is?

13         A.  Yes, I do.

14         Q.  Who is he?

15         A.  He's one of the heads of the personal

16    training department for Equinox.

17         Q.  And have you ever discussed Kerry

18    Ashdown with him?

19         A.  No.

20         Q.  And how about Elizabeth Minton; who is

21    she?

22         A.  She's, I think, senior director for

23    development for personal training for Equinox.  I

24    don't know her exact title.

25         Q.  Have you ever discussed Kerry Ashdown

1    with Elizabeth Minton?

2         A.   I have spoken with Liz about my

3    relationship with Kerry while we were working

4    together, and ways to improve it.

5         Q.   What about -- we've talked about

6    Lawrence Sanders.

7              This document is entitled, "Defendants'

8    responses to initial discovery protocols."  And

9    with respect to 3, 3 is, "Identify person the

10   defendant believes to have knowledge of facts

11   concerning the claims or defenses at issue in this

12   lawsuit and a brief description of that

13   knowledge."  And then "Defendants in this case,"

14   and that includes you, "provided the following

15   response."  And there are individuals listed, and

16   Lawrence Sanders is listed there.

17             And my question to you is, other than

18   what we've already spoken about, do you have any

19   specific knowledge about your interactions with

20   Lawrence Sanders -- and I'm sorry about the

21   convoluted question, but I think it will be clear.

22             Other than what you've already testified

23   to, did you have any other interactions with

24   Lawrence Sanders regarding Kerry Ashdown that you

25   can think of?

```
 1                 A.  No, sir.

 2                 Q.  And do you know who Matthew Plotkin is?

 3                 A.  Yes, I do.

 4                 Q.  And have you ever had any decisions

 5          with -- and by "discussions," I mean, e-mail,

 6          text, phone, in person, with Matthew Plotkin

 7          regarding Ms. Ashdown?

 8                 A.  No.  After she was let go, he just said

 9          that he and Lawrence made the decision, and we

10          moved on from there.

11                 Q.  And you're also identified here as

12          having knowledge or information regarding

13          Plaintiff's employment with Equinox, as well as

14          other facts and circumstances related to the

15          claims and defenses in this lawsuit.

16                     Do you have any reason to disagree with

17          that statement?

18                 A.  If this is saying that I was there

19          during the time, that's all I would really say I

20          know about.  I wasn't involved in the decision nor

21          do I know how they came to the decision or what

22          the decision was actually made off of.  I just

23          know my relationship with Kerry while we worked

24          together.

25                 Q.  Other than what you've testified to
```

1     today regarding Ms. Ashdown's employment with

2     Equinox, do you have anything to add that you

3     haven't already testified to, with respect to your

4     knowledge regarding Ms. Ashdown's employment with

5     Equinox?

6               MR. MCPARTLAND:  Note my objection to

7          form.

8          A.  No.

9          Q.  How about Matthew Herbert; do you know

10    who he is?

11         A.  Yes.  I believe the head of -- or he

12    works in the Human Resources department.

13         Q.  Have you discussed Ms. Ashdown with

14    him?

15         A.  No.

16         Q.  How about Joseph Matarazzo?

17         A.  No, sir.

18         Q.  Do you know who he is?

19         A.  I know who he is.  I thought you meant

20    having discussions with him.

21         Q.  Yes.  Did you ever have discussions

22    with him about Ms. Ashdown?

23         A.  No, sir.

24         Q.  Let's go back to Liz Minton.

25              When is the first time that you had a

1      discussion with Ms. Minton regarding Ms. Ashdown?

2          A.  I think it was around the time where I

3      was speaking to Lawrence for advice.  I think Liz

4      was speaking to -- Kerry was speaking to Liz about

5      advice on how to work on our relationship.  I

6      think after Liz and Kerry spoke, Liz reached out

7      to me and said that Kerry and I should get

8      together at an off-site location just to talk

9      about my wants and desires, Kerry's wants and

10     desires, in ways that we can meet and come up with

11     a compromise and move forward.

12         Q.  Did you refuse to meet with her

13     off-site?

14         A.  I didn't feel comfortable about meeting

15     off-site.  I wanted to have the meeting either in

16     our office or somewhere in Equinox Soho.  Just

17     because in the past, in how she's spoken to me, I

18     didn't want there to be any possible way or

19     inference that anything less than positive or

20     negative on my end came out.

21             So I expressed to Liz that I would rather

22     meet with Kerry at the gym in our office on the

23     mezzanine, and both Kerry and Liz said it would

24     probably be best if we met at a neutral location.

25         Q.  Where did you meet?

1          A.  We met across the street from the gym

2     at a delicatessen.  It's a restaurant on the

3     corner of Prince.

4          Q.  Did she yell at you during that

5     meeting?

6          A.  No.  The meeting was -- of course we

7     were in a restaurant.  I spoke for the majority in

8     the beginning because Kerry gave me the floor.  I

9     spoke about ways for us to improve, just things

10    that I felt slighted on or not involved in.

11          One of my main bones of contention was

12    that there was a time where on my day off, she

13    interviewed some training candidates and hired

14    them without my knowledge or even me meeting them.

15    When I came in to work that next day, she said,

16    "Oh, by the way, your two new trainers you need to

17    train, they start on Monday."

18          So I told her that -- in this meeting,

19    that I wanted to be involved in things like that,

20    that for us to -- for us to be successful in the

21    department, we need to work together.  I conceded

22    a lot of -- I told her that we would speak more

23    amongst ourselves.  She agreed we should speak to

24    each other when there was an issue, and she would

25    try to work better on how she spoke to me.

1              So she didn't yell during that time.  But

2       the meeting felt as if we both spoke to each

3       other, and then from that meeting, I didn't really

4       see much of a change in our interactions.

5              Q.  But you took the reigns at the

6       beginning of the meeting?

7              A.  No, Kerry started it.

8              Q.  But --

9              A.  One of the things that Liz and Lawrence

10      told her is that as the personal training manager,

11      she needs to work the hardest to repair our

12      fractured relationship, so she started the lunch

13      by saying, you know, "Why don't you start and let

14      me know how you're feeling."  So I started.

15             It's not that I took the reigns.  She had

16      asked me to start speaking, so I started speaking.

17             Q.  How do you know that Liz and Larry had

18      told her that?

19             A.  She had told me and said that, you

20      know, "I need to work towards doing this."  And I

21      believe when I spoke to Liz on the phone, she said

22      that she had the personal training manager, so, go

23      to a neutral site, that's where she'd like to go,

24      allow her to take the lead on repairing the

25      relationship.  And I said, "Okay."  And I trust

1          Liz.  I've known Liz since I've been employed, and

2          that's why I felt okay with going to an off-site

3          meeting spot.

4                    Q.  Where were you when Ms. Ashdown hired

5          these trainers?

6                    A.  I was probably home.  It was my day

7          off.

8                    Q.  Hadn't you taken some time off during

9          that period?

10                   A.  No.  Not when these trainers were

11          hired.

12                   Q.  You weren't on your honeymoon?

13                   A.  That was in April.  If it was

14         concurrent, I would imagine that I was around

15         for -- the way we do an interview process is a

16         phone screen in person.

17                   Q.  I'm not asking about the interview

18         process.  I'm asking you about whether you took a

19         honeymoon or not.

20                   A.  The first question was where was I.

21                   Q.  All right.  So you didn't know where

22         you were, so I'm asking you if you took a

23         honeymoon.

24                   MR. MCPARTLAND:  Over my objection.

25                   A.  My response to your question, that I

1          was home on my day off, and then as I was

2          answering, you said, "Did you take a honeymoon?"

3                    Yes, I took a honeymoon.

4                    Q.   How long did you take?

5                    A.   A week.

6                    Q.   How many personal trainers have you

7          hired since Ms. Ashdown departed Equinox?

8                    A.   Over 20.

9                    Q.   And has Mr. Diaz been present at every

10         single one of those interviews?

11                   A.   Diaz -- Darwin Diaz meets all the

12         candidates before we hire them.

13                   Q.   I understand that's your testimony,

14         that that's your policy.  I'm asking you if he's

15         been present at every single interview that you've

16         conducted for personal trainers?

17                   A.   He's not been to every interview, but

18         he meets them at one of our interview stages

19         before the hiring process is complete.

20                   Q.   And that's the procedure and that's

21         what you and Ms. Ashdown had utilized when you

22         were working together as well; correct?

23                   A.   In this case, with these two trainers,

24         we didn't utilize that procedure.

25                   Q.   And has Mr. Diaz ever taken vacation?

```
1                    A.  Yes.

2                    Q.  And has he ever taken any other types

3          of leaves?  Has he ever been ill?

4                    A.  I think since we've worked together, he

5          has only taken one sick day.

6                    Q.  But he's taken vacation?

7                    A.  He's on vacation now.  This is his

8          first vacation since we started.

9                    Q.  How long is that vacation for?

10                   A.  One week.

11                   Q.  I'm handing you what's been marked for

12         identification as Plaintiff's Exhibit 4.  Please

13         take a look at it.

14                        (Plaintiff's Exhibit 4, Defendants'

15                        responses to Plaintiff's first set of

16                        interrogatories dated June 10, 2013, was

17                        marked for identification.)

18                   A.  (Witness reviews document.)

19                       MR. HARMAN:  For the record, this is

20                        Defendants' responses to Plaintiff's first

21                        set of interrogatories.  It's dated

22                        June 10, 2013.

23                   A.  To be honest with you, I'm reading it,

24         but I don't understand it.  I know science; I

25         don't know legalese.
```

1          Q.  Okay.  Do you recognize your name there

2     on the caption on the first page?

3          A.  Yes, sir.

4          Q.  And could you please turn your

5     attention to Interrogatory Number 16.  And just so

6     that we are clear on what these are -- because I'm

7     not -- this is not an argument, nobody is trying

8     to trick anybody.

9               To take the legalese out of it, these are

10     questions that have to be answered; right?  So,

11     for instance, if you turn to Number 5 on Page 4.

12               Number 5 on Page 4 says, "Identify each

13     and every person with knowledge or information

14     regarding Defendants' policies and/or procedures

15     concerning hostile work environment."  And the

16     response there is "Equinox identifies Matthew

17     Herbert."

18               So there are questions and there are

19     answers.  If you'll turn your attention to

20     Interrogatory 16, Interrogatory 16 states,

21     "Identify each and every person who, in any

22     manner, participated in the answers of these

23     interrogatories."  And the response is "Equinox

24     identifies Patrick McPartland, Lawrence Rosen,

25     Lawrence Sanders, Elizabeth Minton, Matthew

1          Plotkin, Joseph Matarazzo and Matthew Herbert."

2                    Is it an accurate statement that you did

3          not provide any information in response to any of

4          these interrogatories?

5                    MR. MCPARTLAND:  Object to the form.

6                 You can answer.

7          A.  I don't know what the questions are.

8          Q.  Well, you don't see your name there;

9          right?

10         A.  That's correct.

11         Q.  And do you have any reason to believe

12         that that response provided by Equinox is

13         inaccurate?

14         A.  I don't understand the rest of these

15         questions that need to be answered.  So isn't that

16         what I'm doing right now; I'm answering your

17         questions?

18         Q.  I'm asking you if you believe that --

19         you're not identified as having provided any

20         information in response to these interrogatories.

21                    Do you believe that you did?  Did anyone

22         ever go over any interrogatory questions with you?

23         A.  No.

24         Q.  Okay.  That's all I wanted to know.

25         It's not a trick question.  I just wanted to know

1          whether --

2                    A.  Okay.

3                    Q.  I'm handing you what has been marked as

4          Plaintiff's Exhibit 5.  Please take a look at it.

5                         (Plaintiff's Exhibit 5, Defendants'

6                         responses to Plaintiff's first request

7                         for the production of documents dated

8                         June 10, 2013, was marked for

9                         identification.)

10                   Q.  You don't need to read the entire

11         document.  It's similar in its nature in that it's

12         in legal format, and it contains a lot of

13         legalese, but I'll explain to you -- I just have a

14         few questions.

15                       So take a moment to generally peruse it.

16         If you need further time to read it, you're

17         certainly entitled to that, whatever time you

18         need.

19                   A.  (Witness reviews document.)

20                       MR. HARMAN:  For the record, this is

21                       Defendants' responses to Plaintiff's first

22                       request for the production of documents

23                       saying caption and CIV number is this

24                       action, and it's dated June 10, 2013.

25                   A.  I'm looking at it, but it's just words

1          on a page to me.

2                    Q.   Okay.  Similar in nature, these are

3          requests that the plaintiff, Ms. Ashdown, made of

4          defendants in this action, which include you.  But

5          where these are -- the previous exhibit,

6          Plaintiff's 4, were requests for written

7          responses, Plaintiff's 5 is a request for

8          documents, which includes documents and

9          information, which is anything, really.

10                   So I'm going to ask you to turn your

11         attention to Number 29 on Page 16.  29 states,

12         "All communications, all documents, and all

13         electronically-memorialized information sent to or

14         from Defendant Maietta via text message concerning

15         Plaintiff wherein Plaintiff is referenced.  Such

16         references include, but are not limited to,

17         Plaintiff's first name, last name, full name,

18         initials, nickname, or any variation of her name."

19                   My question to you is, have you ever seen

20         this before?

21                   A.   This response sheet?

22                   Q.   This question.

23                   MR. MCPARTLAND:  Object to the form.

24                   A.   I don't remember reading a document

25         like this, no.

1           MR. HARMAN:  Okay.  Give me a few

2      minutes.  You can set that down for the

3      court reporter.  The exhibits with the

4      green tabs go to the court reporter.

5        Give me a few minutes.  I think I may be

6      wrapping up.  Give me a few minutes to

7      review my notes.

8          (Recess taken)

9        MR. HARMAN:  I don't have any further

10     questions.

11       Mr. Maietta, unless you have anything to

12     add to today's testimony -- there might be

13     additional questions for you, but I'll take

14     that up with your lawyer.  There might be

15     additional legal issues or questions, but

16     I'll take it up with your lawyer, and you

17     will certainly hear through him if there

18     are any additional discovery issues that

19     arise.

20       Thank you very much for your time.

21         THE WITNESS:  Thank you.

22

23         (Time noted 2:57 p.m.)

24

25

```
1                     I N D E X

2

3   WITNESS: Mauro Maietta

4   EXAMINATION BY:                           PAGE

5   Mr. Harman                                  5

6

7      DIRECTION NOT TO ANSWER               PAGE

8       DIR                                   17

9       DIR                                   81

10

11     PLAINTIFF EXHIBITS                     PAGE

12       1, second amended complaint between   104

13      Kerry Ashdown and Equinox, et. Al.

14       2, two-page document dated January 9th   151

15      to Joseph Matarazzo from Walker G.

16      Harman, Junior

17       3, Defendants' responses to initial   158

18      discovery dated June 17, 2013

19       4, Defendants' responses to Plaintiff's   168

20      first set of interrogatories dated

21      June 10, 2013

22       5, Defendants' responses to Plaintiff's   171

23      first request for the production of

24      documents dated June 10, 2013

25
```

```
1      RULING                        PAGE

2        RUL                         17

3

4      REQUESTS                      PAGE

5        REQ                         14

6        REQ                         69

7        REQ                         74

8        REQ                         74

9        REQ                         92

10       REQ                         129

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

3    I, MAURO MAIETTA, do hereby acknowledge I have

4   read and examined the foregoing pages of testimony,

5   and the same is a true, correct and complete

6   transcription of the testimony given by me, and any

7   changes or corrections, if any, appear in the

8   attached errata sheet signed by me.

9

10

11

12  _____     _____

13  Date          MAURO MAIETTA

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2        I, RENATE REID, the officer before whom the

 3   foregoing deposition was taken, do hereby certify

 4   that the witness, MAURO MAIETTA, whose testimony

 5   appears in the foregoing deposition, was duly sworn

 6   by me; that the testimony of said witness was taken

 7   by me in stenotypy and thereafter reduced to

 8   typewriting under my direction; that said deposition

 9   is a true record of the testimony given by said

10   witness;

11             That I am neither counsel for, related to,

12   nor employed by and of the parties to the action in

13   which this deposition was taken; and, further, that I

14   am not a relative or employee of any counsel or

15   attorney employed by the parties hereto, nor

16   financially or otherwise interested in the outcome of

17   this action. The witness will sign.

18             IN WITNESS WHEREOF, I have hereunto set

19   my hand this 23rd day of September, 2013.

20

21

22                          RENATE REID

23                     Notary Public in and for

24                      The State of New York

25
```