# **EXHIBIT E**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - -x

KERRY ASHDOWN,

        Plaintiff,

        -against-          13-CV-1374
                        (HB)(GWG)
EQUINOX a/k/a
EQUINOX FITNESS CLUB and incorporated as
EQUINOX HOLDINGS, INC.,
JOE MATARAZZO, a/k/a JOSEPH MATARAZZO,
MAURO MAIETTA, LAWRENCE SANDERS,
MATT PLOTKIN, a/k/a MATTHEW PLOTKIN, and
MATT HERBERT, a/k/a MATTHEW HERBERT,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

        DEPOSITION of LAWRENCE SANDERS, taken by

Plaintiffs, pursuant to Stipulation, held at 200

West 57th Street, New York, New York, on

Thursday, September 12, 2013, commencing at

10:00 a.m., before Margaret M. Harris, a

Shorthand (Stenotype) Reporter and Notary Public

within and for the State of New York.

MCM REPORTING SERVICE
(516) 775-5209

2

A P P E A R A N C E S:

        THE HARMAN FIRM, P.C.
                Attorneys for Plaintiffs
                200 West 57th Street
                Suite 900
                New York, New York  10019

        BY:  WALKER HARMAN, ESQ.


        LAROCCA HORNIK ROSEN GREENBERG &
         BLAHA, LLP
                Attorneys for Defendants
                40 Broadway
                New York, New York  10005

        BY:  PATRICK McPARTLAND, ESQ.



P R E S E N T:

        Lucas Larson

        Kerry Ashdown (A.M. only)

3

1

2                    IT IS HEREBY STIPULATED AND

3            AGREED that the filing and sealing of

4            the within deposition be, and the same

5            are hereby waived;

6                     IT IS FURTHER STIPULATED AND

7            AGREED that all objections, except as

8            to the form of the question, be and

9            the same are hereby reserved to the

10           time of the trial;

11                    IT IS FURTHER STIPULATED AND

12           AGREED that the within deposition may

13           be sworn to before any Notary Public

14           with the same force and effect as if

15           sworn to before a Judge of this Court;

16                    IT IS FURTHER STIPULATED that

17           the transcript is to be certified by

18           the reporter.

19

20

21

22

23

24

25

4

```
 1                      Sanders
 2   L A W R E N C E    S A N D E R S,   called as a
 3           witness, having been first duly
 4           sworn/affirmed by Margaret M. Harris, a
 5           Notary Public within and for the State of
 6           New York, was examined and testified as
 7           follows:
 8   EXAMINATION
 9   BY MR. HARMAN:
10           Q      Would you please state your full
11   name for the record.
12           A      Lawrence Sanders.
13           Q      And is that your legal name?
14           A      Yes.
15           Q      And have you gone by any other
16   name?
17           A      No.
18           Q      And what is your address?
19           A      ███████████████████
20           Q      Is that --
21           A      ████████████ New York.
22           Q      And your zip?
23           A      ████████
24           Q      And how long have you lived at
25   that address?
```

5

```
 1                      Sanders
 2         A     A week, I just moved there.
 3         Q     What was your prior address?
 4         A     ███████████████████████
 5         Q     Is there an apartment number?
 6         A     ████████████████ New York ██████
 7         Q     ████
 8         A     ████
 9         Q     And how long did you live there?
10         A     Five years.
11         Q     Have you ever been deposed
12    before?
13         A     Yes.
14         Q     How many times?
15         A     Once.
16         Q     Under what circumstances were you
17    deposed?
18         A     A case against Equinox.
19         Q     What type of case was it?
20         A     A member against Equinox.
21         Q     A member had sued Equinox?
22         A     I guess she was trying, I'm
23    assuming.
24         Q     What was she suing Equinox for?
25         A     She fell off a moving treadmill,
```

6

1                          Sanders

2    she stepped onto a moving treadmill.

3          Q     So did you attend a deposition

4    like this in a conference room with a court

5    reporter?

6          A     Yes.

7          Q     And were you a defendant in the

8    case?

9          A     No.

10         Q     What was the member's name?

11         A     I believe it was Collette Malouf.

12         Q     And were you a witness in the

13   case?  In other words, did you witness anything

14   happen?

15         A     No.

16         Q     Did this incident allegedly occur

17   at the Soho location?

18         A     Yes.

19         Q     And about how long ago did this

20   deposition take place?

21         A     Approximately two years ago,

22   maybe between a year to two years, I'm not sure

23   exactly.

24         Q     So that's the only time that you

25   have been deposed?

7

1                           Sanders

2            A       Yes.

3            Q       And were you represented by

4     counsel at that deposition?

5            A       Yes.

6            Q       Who was your lawyer?

7            A       LaRocco, the same firm.

8            Q       Did you work with any individual

9     lawyer or lawyers?

10           A       No.

11           Q       When you say "the same firm,"

12    what do you mean by that?

13           A       The firm that's representing

14    Equinox.

15           Q       The firm that's representing

16    Equinox.

17                   And do you mean the firm that's

18    representing Equinox in this case?

19           A       Yes, it's the same firm.

20           Q       And are you represented by

21    counsel today?

22           A       Yes.

23           Q       And who is your lawyer today?

24           A       Patrick McPartland.

25           Q       And have you worked with any

8

```
 1                        Sanders
 2     other lawyers with respect to this matter?
 3          A      With respect to which matter?
 4          Q      This matter?
 5          A      No.
 6          Q      Have you ever been a party to a
 7     lawsuit?
 8          A      No.
 9          Q      And just so the record is clear,
10     you have never sued anyone before?
11          A      No.
12          Q      And has anyone ever sued you
13     before?
14          A      No.
15          Q      Has anyone ever made any
16     work-related claims against you?
17          A      Yes.
18          Q      How many times have work-related
19     claims been made against you?
20          A      Once.
21          Q      When was that?
22          A      2009, I believe.
23          Q      And what happened in 2009?
24          A      I made some comments that made
25     someone feel uncomfortable.
```

9

```
 1                          Sanders
 2          Q      What comments were those?
 3          A      Comments about how someone
 4   looked.
 5          Q      What did you say?
 6          A      I said that what she was wearing
 7   was very nice, and, you know, she looked nice in
 8   this, what she was wearing, she had a nice
 9   bottom in what she was wearing.
10          Q      A nice bottom?
11          A      Yeah, a nice butt.
12          Q      So you used the word "butt"?
13          A      I don't recall exactly, but I
14   know that's what I made reference to.
15          Q      So you stated that someone looked
16   nice and they had a nice butt?
17          A      Yes.
18          Q      And who did you make that comment
19   to?
20          A      Another manager in the club.
21          Q      What was that manager's name?
22          A      Elizabeth Lefrois.
23          Q      And she then brought a claim
24   against you related to the comments?
25          A      She spoke to someone who
```

10

```
 1                          Sanders
 2    basically spoke to someone else, so I guess you
 3    could say yes.
 4             Q       Who did she speak to?
 5             A       She spoke to her boss, her
 6    superior.
 7             Q       Who was her boss?
 8             A       Rachel Siboney.
 9             Q       What was your job?  Was this at
10    the Equinox location?
11             A       Yes.
12             Q       And in 2009 when this incident
13    occurred, what was your title?
14             A       General manager.
15             Q       And what was her title?
16             A       Group fitness manager.
17             Q       Were you her direct superior?
18             A       Yes.
19             Q       And she spoke with Rachel
20    Siboney.
21                     What was Rachel Siboney's role at
22    the time?
23             A       Director of the group fitness
24    managers for New York.
25             Q       And what happened, if anything,
```

11

1                           Sanders

2     after that?

3             A       I was brought in to the HR

4     department's office and they had a conversation

5     with me about the situation and I had corrective

6     action done.

7             Q       What was the corrective action?

8             A       That I obviously made someone

9     feel uncomfortable in my club and to obviously

10    not do that.

11            Q       Were you given anything in

12    writing?

13            A       I had something that I signed.

14            Q       So you did --

15            A       In writing --

16            Q       So you did -- you were given

17    something to --

18            A       There was something that they

19    wrote up and I signed the document.

20            Q       And have you ever been given

21    corrective action on any other occasion?

22            A       No.

23            Q       And is Ms. Lefrois still the

24    group fitness manager?

25            A       No.

12

1                          Sanders

2          Q       How long after that incident did

3     she remain the group fitness manager?

4          A       For a few years.

5          Q       And do you know where Ms. Lefrois

6     is now?

7          A       She's an instructor at Equinox.

8          Q       At what location?

9          A       She teaches all over.

10         Q       So she no longer works in a

11    managerial capacity?

12         A       No.

13         Q       And is that the only incident in

14    which a work-related claim has been brought

15    against you?

16         A       Yes.

17         Q       I know you have been deposed

18    before, but just so the record is clear and so

19    that you and I can work as efficiently as

20    possible today together, I'm going to go over or

21    give you a little background and go over a few

22    rules.

23                 My name is Walker Harman.  I'm a

24    lawyer.  I'm part of the Harman Firm that

25    represents Kerry Ashdown in a lawsuit that she

13

1                              Sanders

2    has brought against Equinox and individuals

3    related to her job there.

4                  Do you understand that?

5         A     Yes.

6         Q     I'm going to ask you a series of

7    questions today regarding that lawsuit.

8                  If you don't understand a

9    question that I ask you, tell me that you don't

10   understand it and I will endeavor to rephrase

11   it, but the idea will be that if you answer the

12   question the record is going to read as though

13   you understood the question.

14                 Do you understand that?

15        A     Yes.

16        Q     During the deposition today you

17   can take a break at any time you would like to

18   except when there is a question pending.  If you

19   need to use the restroom, get something to

20   drink.

21        A     Okay.

22        Q     I would just ask that you finish

23   any pending question.

24                 Along those same lines, after you

25   were sworn in this morning, you are under oath

14

1                              Sanders

2     and that continues throughout the day, whether

3     you're on a break, whether you go to lunch, et

4     cetera.  And the rules state that you are not to

5     talk about your testimony to anyone while you're

6     under oath and while the deposition is ongoing.

7                    Do you understand that?

8          A     Yes.

9          Q     You have to verbalize, well, you

10    don't have to, it's helpful if you verbalize

11    your answers to questions because the court

12    reporter can't always take down gestures or, you

13    know, things like "yeah," you know, so --

14                    MR. HARMAN:  I don't even

15                    know if you got that.

16         A     Understood.

17         Q     So do your best to give specific

18    verbal answers to questions.

19                    Also along those same lines, in

20    terms of the clarification of the record, try to

21    let me finish my question and I will in turn

22    allow you to finish your answer so that we are

23    not interrupting each other.

24                    Do you understand that?

25         A     Yes.

15

1                         Sanders

2          Q      Are you aware that you're under

3    oath today?

4          A      Yes.

5          Q      And that failing to tell the

6    truth under oath is a crime called perjury?

7          A      Yes.

8          Q      And that you are appearing at a

9    deposition today before a court reporter and it

10   is the same oath that you would take as though

11   you were appearing in Federal Court as part of

12   this action.

13                Do you understand that?

14         A      Yes.

15         Q      Do you live alone?

16         A      No.

17         Q      Who did you live with?

18         A      My children.

19         Q      Are you married?

20         A      No.

21         Q      Do you have a domestic partner?

22         A      Yes.

23         Q      Do you live with your domestic

24   partner?

25         A      Yes.

```
 1                        Sanders

 2            Q      Who is that?

 3            A      Shelley.

 4            Q      And Shelley's last name?

 5            A      Springer.

 6            Q      And then you also live with

 7   children?

 8            A      Yes.

 9            Q      And how old are your children?

10            A      ████████████

11            Q      And have you discussed this

12   matter with any of your children?

13            A      No.

14            Q      And have you discussed this

15   matter with Ms. Springer?

16            A      No.

17            Q      What's your date of birth?

18            A      ████████

19            Q      And what's your cell phone

20   number?

21            A      ████████████████

22            Q      And your cell phone provider?

23            A      T-Mobile.

24            Q      And how long have you used

25   T-Mobile?
```

MCM REPORTING SERVICE
(516) 775-5209

17

1                      Sanders

2          A      A long time.  I'm not sure how

3     many years, at least over five, six years.

4          Q      During that time using T-Mobile,

5     have you always maintained the same cell phone

6     number?

7          A      Uh-hum, yes.

8          Q      Have you had any alcohol in the

9     last 24 hours?

10         A      No.

11         Q      Have you taken any drugs or

12    narcotics in the last 24 hours?

13         A      No.

14         Q      Are you currently taking any

15    prescription medications?

16         A      No.

17         Q      Can you think of any reason why

18    you could not provide your best and truthful

19    answers today?

20         A      No.

21         Q      Did anyone tell you to make

22    dishonest statements today?

23         A      No.

24         Q      Have you ever been arrested?

25         A      No.

18

```
1                        Sanders
2         Q        Have you ever been accused of a
3    crime?
4         A        In college, just criminal
5    destruction to property.
6         Q        How old were you?
7         A        18, 19.
8         Q        And what was the resolution on
9    that accusation of criminal destruction of
10   property?
11        A        Probation.
12        Q        Did you plead guilty to any kind
13   of offense?
14        A        I guess criminal destruction of
15   property.
16        Q        So you pled guilty to criminal
17   destruction of property and you were given a
18   sentence of probation?
19        A        And paid for court costs.
20        Q        And where did that take place?
21        A        In college.
22        Q        Where did you go to college?
23        A        Western Illinois University.
24        Q        West Illinois?
25        A        Western Illinois University.
```

19

```
1                         Sanders
2           Q       And any other instances in which
3    you have been accused of criminal activity?
4           A       No.
5           Q       Have you ever been fired from a
6    job?
7           A       No.
8           Q       What, if anything, did you do to
9    prepare for today's deposition?
10          A       Met with Patrick and talked to
11   Patrick over the phone.
12          Q       When is the first time that you
13   met with Patrick to prepare for today's
14   deposition?
15          A       Approximately two months ago.
16          Q       And where did that meeting take
17   place?
18          A       At his office.
19          Q       Was anybody else present?
20          A       I don't recall.
21          Q       Did you review any documents
22   during that meeting?
23          A       Yes.
24          Q       What documents did you review?
25          A       Documents in regards to pulling
```

20

Sanders

1

2     up sessions, like a computer document.

3          Q     Was there more than one document

4     that you reviewed that date two months ago?

5          A     I think I might have reviewed

6     some e-mails, copies of e-mails.

7          Q     Anything else?

8          A     No.

9          Q     So let's start with the computer

10    documents regarding pulling of sessions.

11               What do you recall about those

12    documents?

13         A     They just had names on them,

14    dates.

15               That's it.

16         Q     Anything else?

17         A     No.

18         Q     And I'm not asking about the

19    substance of the communications that you had

20    with your lawyer or the conversation with your

21    lawyer --

22         A     I understand.

23         Q     What I want to know is what you

24    know about the document.

25               Had you seen the document before

21

1                              Sanders

2      that day?

3           A      Oh, yes.

4           Q      And how does that document, if it

5      does, how does that document relate to this

6      lawsuit?

7           A      It relates because that was the

8      documentation of when vouchers were pulled and

9      when vouchers were reinstated, when vouchers

10     expired and who they were pulled for and who

11     they were pulled by.

12                 That's what the report was.

13          Q      What's the report called?

14          A      It was an IT report, so it was

15     the IT department pulling the report, so I'm not

16     sure if it has a name.

17          Q      Did you ask the IT department to

18     pull that report?

19          A      Yes, I did.

20          Q      When did you do that?

21          A      Approximately sometime in August

22     of 2011.

23          Q      And was the report that you are

24     looking at in your lawyer's office two months

25     ago the same document that you asked the IT

22

                              Sanders

1

2      department to pull in August of 2011?

3              A       Yes.

4              Q       And why in August of 2011 did you

5      ask the IT department to pull a report?

6              A       Because there was some

7      accusations of misappropriating vouchers of

8      sessions, people being paid for sessions that

9      they didn't do.

10             Q       And who made these accusations?

11             A       Mauro.

12             Q       And is this Mauro Maietta?

13             A       Yes.

14             Q       And to whom did he make these

15     accusations?

16             A       He brought it to my attention.

17             Q       And when did he do that?

18             A       Did you say when?

19             Q       Yes.

20             A       Sometime between July and August

21     of 2011.

22                     I can't remember the exact date

23     or time.

24             Q       So with respect to the IT

25     document, you stated that the document evidenced

23

1                          Sanders

2     when sessions were pulled?

3          A      Yes.

4          Q      What does that mean?

5          A      The personal trainers do sessions

6     and the clients must sign for the session before

7     they do the session or after they do the

8     session, so we term that as pulling the session.

9                 So what that means is -- that's

10    how the personal trainer gets paid for doing

11    that session, is when the session is actually

12    signed for or pulled by the client or a manager.

13         Q      Well, let's go back.

14                So Mauro accused -- who did Mauro

15    accuse of pulling, what did Mauro accuse, what

16    was the basis of the accusation that Mauro made?

17         A      Mauro didn't accuse anyone.

18    Mauro just said "You need to take a look at

19    this."

20         Q      Sir, I'm using your word.

21                So are you retracting your word,

22    because you used the word "accusation."

23                So what did you mean by

24    accusation when you used it earlier in your

25    testimony?

24

1                              Sanders

2          A      He was making an accusation that

3    there was something going on with the sessions

4    that were being pulled for particular

5    individuals, and that's all he did, he said,

6    "There's something going on and you need to look

7    at this."

8          Q      And did he accuse anyone of

9    wrongdoing?

10         A      No.

11         Q      Why was he bringing this to your

12   attention?

13         A      Because it's part of his job to

14   manage the sessions that are being pulled

15   specifically as it relates to AMEX and it

16   relates to certain types of sessions being

17   pulled with trainers and he prints out reports

18   for his staff as it relates to their commission,

19   so if he sees something that is not right, his

20   job is to either bring it to my attention or

21   bring it to his boss, the PT manager's

22   attention.

23         Q      So it's his job to bring issues

24   to the PT manager's attention?

25                       MR. McPARTLAND:   Objection

25

1                         Sanders

2                  to form.

3         A        Or my attention.

4         Q        You can answer.

5         A        It's his job to bring issues to

6    either the PT manager or myself as the general

7    manager.

8         Q        At this time in 2011, who was

9    Mauro's direct supervisor?

10        A        Kerry Ashdown.

11        Q        And you said that he brought

12   something to your attention that was not right?

13        A        Yes.

14        Q        What was not right?

15        A        That sessions were being

16   reinstated and sessions were, expired sessions

17   were being reinstated, and the sessions were

18   getting pulled for particular clients that had

19   no usage in our facility during the time that

20   these sessions were being pulled for, and for

21   these particular trainers.

22                 So he wanted me to look into it.

23        Q        Who was pulling sessions?

24        A        Kerry Ashdown pulled some of them

25   and -- according to the codes that were used,

26

Sanders

1          and the other codes that we used was Cornelia

2          Hobbie.

3                    Q       Who is Cornelia Hobbie?

4                    A       At the time she was a manager in

5          training working under Kerry and Mauro.

6                    Q       Just so the record is clear, did

7          Mr. Maietta accuse Ms. Ashdown of improperly

8          pulling sessions?

9                              MR. McPARTLAND:   Object to

10                             the form.

11                             You can answer if you

12                             understand.

13                   A       No, he didn't accuse her.

14                   Q       Did he claim that Ms. Ashdown

15         improperly pulled sessions?

16                   A       He claimed that there was

17         obviously something wrong going on, that's what

18         he claimed, and he wanted me to look into it.

19                   Q       And did he claim that there was

20         something wrong going on and that Ms. Ashdown

21         was responsible for it?

22                   A       No, he never said Ms. Ashdown was

23         responsible for it.

24                   Q       Is Ms. Hobbie still working at

27

1                        Sanders

2    Equinox?

3         A     I don't believe so.

4         Q     And how long after the summer of

5    2011 did Ms. Hobbie remain employed at Equinox?

6         A     I don't know the answer to that

7    question.

8         Q     Can you give me a guess -- well,

9    you terminated Ms. Ashdown, right?

10        A     Yes.

11        Q     So when did you do that?

12        A     I believe it was the first couple

13   of days of September, within the first couple of

14   days of September.

15        Q     And how long after you terminated

16   Ms. Ashdown did Ms. Hobbie remain employed at

17   the Soho Equinox location?

18        A     She was there for probably a

19   couple of months and then she was promoted to be

20   a fitness manager at one of the clubs, I believe

21   43rd Street.

22        Q     She was promoted?

23        A     Yes.

24        Q     Now, as you sit here today, is it

25   your belief that Ms. Ashdown improperly took

28

Sanders

1

2      sessions at Equinox?

3              A       Yes.

4              Q       And did she steal them?

5              A       I would say, yes.

6              Q       So it's your testimony that

7      Ms. Ashdown stole sessions at Equinox?

8              A       Yes.

9              Q       Now, when you came to this

10     belief, did you call the police?

11             A       No.

12             Q       And did you come to the

13     conclusion that Ms. Hobbie stole sessions at

14     Equinox?

15             A       A possibility.

16             Q       How was it a possibility?

17             A       Because at the time there were

18     codes that were used to pull sessions, there

19     were sessions that were pulled for Kerry Ashdown

20     to get paid on that were used by Cornelia's

21     code, so, yes, you could believe that Cornelia

22     stole something for Kerry.

23             Q       And did you try to terminate her?

24             A       There was a full investigation of

25     the whole situation.

29

1                          Sanders

2          Q        Please just answer my question.

3                   Did you terminate Ms. Hobbie?

4          A        No, I didn't.

5          Q        Did anyone else try to terminate

6    Ms. Hobbie?

7          A        No, they didn't.

8          Q        And other than Ms. Hobbie and

9    Ms. Ashdown, were any other individuals involved

10   in this session pulling incident in the summer

11   of 2011?

12         A        No.

13         Q        And can you explain to me how you

14   formed the belief that Ms. Ashdown stole

15   sessions at Equinox?

16         A        Because her codes were used,

17   because she was the one in the club during the

18   time of the sessions being pulled from her

19   computer, and then there was no one else in the

20   club that would have access to her code or --

21   and she had access to Cornelia's code, because

22   she had to give Cornelia her code in order to be

23   able to teach her and train her on how to do

24   part of the job, so Kerry had access to

25   Cornelia's code.

30

1                           Sanders

2                 So, again, you know, that's what

3       led us to believe, led me to believe that she

4       pulled the sessions and she, you know, she

5       benefitted from the sessions by being paid for

6       sessions that she didn't do and then there were

7       two trainers that got paid for sessions that

8       they had no idea that these clients were even on

9       their rosters and they weren't using the

10      facility.

11                One of the trainers that got paid

12      for the sessions was her personal trainer and

13      another one was a trainer that she was very, you

14      know, close to.

15           Q      What were those trainers' names?

16           A      Ryan Hopkins and Bobby O'Dwyer.

17           Q      Have you ever terminated, other

18      than Ms. Ashdown, have you ever terminated

19      anyone for pulling sessions improperly?

20           A      No, I haven't.

21           Q      And have you ever terminated

22      anyone for stealing?

23           A      Yes, I have.

24           Q      Who did you terminate for

25      stealing other than Ms. Ashdown?

31

1                         Sanders

2           A       I don't remember the employees'

3    names, but there were two employees that a

4    deposit went missing, and I terminated both of

5    them, but it happened a while ago, so I don't

6    really remember their names.

7                   I had another employee that was

8    witnessed stealing something out of the locker,

9    and I terminated him, actually had him arrested,

10   and those are the only three that I can think of

11   off the top of my head right now.

12          Q       What is alleged to have been

13   stolen out of a locker?

14          A       A wallet.

15          Q       Do you have any idea what was in

16   the wallet?

17          A       I'm not sure.

18          Q       So you don't know the value of

19   the contents of the wallet?

20          A       No, I don't.

21          Q       But you called the police on that

22   incident?

23          A       Yes.

24          Q       And what was the employee's name

25   that was involved in that stealing incident?

32

1                           Sanders

2            A       I believe his name was Ramon.   I

3       don't remember his last name.

4            Q       Did Mr. Maietta ever accuse

5       Ms. Ashdown of any other illegal conduct?

6                           MR. McPARTLAND:   Object to

7                   the form.

8                           You can answer.

9            A       No.

10           Q       Did Mr. Maietta ever accuse

11      Ms. Ashdown of any other improper conduct?

12                          MR. McPARTLAND:   Object to

13                  the form.

14                          You can answer.

15           A       No.

16           Q       Did you ever have any discussions

17      with Cornelia Hobbie about sessions that were

18      associated with her name?

19           A       Yes.

20           Q       And what did she say?

21           A       She had no knowledge of,

22      obviously, what I was asking her about, and she,

23      again, wasn't in the building or around the club

24      at the time that the sessions were pulled.

25           Q       When did this conversation take

33

1                              Sanders

2      place?

3             A      Probably in August of 2011.  I

4      don't remember the exact date.

5             Q      And where did the conversation

6      take place?

7             A      The conversation happened in the

8      gym at the club.

9             Q      In June?

10            A      In the gym, in the club.

11            Q      Oh, in the gym.

12                   And what did you say to her?

13            A      I asked her does she know who

14     these people are or why these things were

15     pulled.

16            Q      And what did she say?

17            A      And she had no knowledge of any

18     of what I was asking her.

19            Q      You know she had no knowledge?

20            A      That's what she said.

21            Q      And these were sessions that were

22     pulled under her code?

23            A      Yes.

24            Q      And they were pulled under her

25     code for other trainers?

34

1                            Sanders

2           A       For Kerry Ashdown.

3           Q       They were pulled under her code

4    for Kerry Ashdown?

5           A       Yes.

6           Q       How many sessions?

7           A       I believe it was at least four I

8    know of, but I don't remember exactly how many.

9           Q       And so there were sessions pulled

10   for Kerry Ashdown for a training session that

11   you believe never took place?

12          A       Yes.

13          Q       And you believe that Ms. Ashdown

14   deliberately did that to gain money?

15          A       Yes.

16          Q       And that she did it dishonestly?

17          A       Yes.

18          Q       Was she paid for the four

19   sessions?

20          A       Yes.

21          Q       How much was she paid for those

22   sessions?

23          A       Probably about 60 bucks.

24          Q       So it's your testimony as you sit

25   here today that Ms. Ashdown engaged in this

35

                              Sanders
1
2    conduct in order to gain 60 bucks?

3         A      I don't know why she --

4         Q      I'm asking you --

5                  MR. McPARTLAND:  Please

6                  don't interrupt him.  Let him

7                  answer your question.

8         A      I'm not sure what the question

9    is.

10        Q      So it's your testimony that

11   Ms. Ashdown engaged in this activity that you

12   have described in order to gain 60 bucks?

13        A      I don't know why she would engage

14   in that activity, so I don't know.

15        Q      Well, would she gain anything

16   else?

17        A      I don't think I'm the person to

18   judge why --

19        Q      You managed the club, right?

20        A      I'm not the person to judge why

21   someone would do something.

22        Q      Let me keep it simple for you.

23               I'm talking about economics.  I'm

24   talking about dollars, right?

25                  MR. McPARTLAND:  Objection.


                    MCM REPORTING SERVICE
                       (516) 775-5209

36

1                     Sanders

2              Please don't harass the

3         witness.

4              It's just improper.  You

5         can ask him direct questions.

6              MR. HARMAN:  I am not

7         harassing the witness.  And I

8         would appreciate you keeping your

9         comments to speaking, to not

10        doing speaking objections.

11             MR. McPARTLAND:  It's not

12        a speaking objection to tell you

13        not to harass the witness.

14             MR. HARMAN:  You are

15        speaking now.

16             MR. McPARTLAND:  I'm

17        allowed to speak if you're

18        harassing the witness.

19             MR. HARMAN:  I am not

20        harassing the witness.

21             MR. McPARTLAND:  That's

22        not a speaking objection.

23             MR. HARMAN:  Are you done?

24             MR. McPARTLAND:  Ask him a

25        question.

37

```
 1                     Sanders
 2               MR. HARMAN:  Are you done?
 3               MR. McPARTLAND:  Are you
 4          done?
 5               MR. HARMAN:  No.  It's my
 6          deposition.
 7               MR. McPARTLAND:  So ask
 8          him a question.
 9               MR. HARMAN:  Can you read
10          back the last question?
11               (Whereupon, the record was
12          read back by the reporter.)
13  BY MR. HARMAN:
14          Q    That's the question.  Yes or no?
15          A    I guess yes.
16          Q    And were there sessions pulled
17  for Cornelia Hobbie where she would have gained
18  an economic advantage?
19          A    No.
20          Q    Were there sessions pulled for
21  anyone else where that person could have gained
22  an economic advantage?
23          A    Ryan Hopkins and Bobby O'Dwyer.
24          Q    So did you speak to Ryan Hopkins
25  about the sessions that were pulled for him?
```

38

                              Sanders

1

2          A        Yes.

3          Q        And what did he say?

4          A        He said he didn't know what --

5   who those people were, or who that person was,

6   he said he doesn't know why those sessions were

7   pulled for him, because those are not clients of

8   his.

9                   And he said that he knew that

10  there were times when Kerry would train with him

11  and she wouldn't pay for sessions with him, so

12  she would pull sessions from her clients and he

13  said maybe that's what those were.

14         Q        So Ryan told you that Kerry would

15  pull sessions from other clients and give them

16  to him?

17         A        Yes.

18         Q        And does that violate Equinox's

19  policy?

20         A        Yes, it would.

21         Q        So sessions were taken from

22  clients' accounts that they hadn't used?

23         A        Sessions were taken --

24         Q        Well, you just told me that Kerry

25  would -- so how does it violate Equinox's

39

                           Sanders

1
2   policy?
3          A      How does it violate Equinox's
4   policy --
5          Q      Yes.
6          A      -- to pull sessions for trainers
7   who haven't performed those sessions?
8          Q      Well, your testimony is that Ryan
9   told you that sessions were pulled and given to
10  him?
11                    MR. McPARTLAND:  Object to
12              the form.
13                    You can answer.
14         Q      I'm just trying to understand
15  what Ryan told you.
16                    So Ryan told you, Ryan said, you
17  asked him about the sessions that were in his,
18  that were on his --
19         A      Commission report.
20         Q      -- his commission report.
21                    And he said he didn't recognize
22  the names?
23         A      He said they weren't clients of
24  his.  He didn't know who they were.
25         Q      Not clients of his.

40

1                          Sanders

2              And what else did he say?

3         A      And I said to him, I said, "You

4    didn't recognize the sessions that were pulled

5    for you that you don't train these people?"

6              And he proceeded to say there

7    were times when Kerry would train with him and

8    pull sessions through her clients, her clients,

9    so that Ryan would get paid.

10             So she wouldn't get paid for her

11   clients during the session she was doing with

12   her clients, but she would pull it for Ryan so

13   he could get paid so he wasn't training her for

14   free.  That's what he said she told him.

15             So there would be names on his

16   report sometimes that were not his clients, but

17   he just assumed that these were clients that

18   were possibly Kerry's that she was pulling for

19   him.

20        Q      But as I understand your

21   testimony, the client was getting trained,

22   correct?

23        A      No, the client was not.

24        Q      How do you know?

25        A      Because there was no usage in our

                                                              41
1                        Sanders
2    facility.
3            Q      And how do you know that?
4            A      Because I look in our system and
5    see if the person was using the club.
6            Q      You said that Ryan told you that
7    there were times where Kerry pulled sessions for
8    her clients and gave them to him?
9            A      Uh-hum.
10           Q      Did you investigate that?
11           A      Did I investigate?
12           Q      That accusation?
13           A      No, I didn't.
14           Q      So as you sit here today Ryan
15   told you something that violated Equinox's
16   policy, but you didn't investigate it?
17           A      Because that was all a part of
18   this investigation.
19           Q      Just tell me whether you
20   investigated it or not.
21                      MR. McPARTLAND:  Object to
22              the form.
23                      You can answer.
24           A      I didn't.
25           Q      Did you look at any of Ryan's

                    MCM REPORTING SERVICE
                        (516) 775-5209

42

1                          Sanders

2     other commission reports?

3          A     I looked at commission reports

4     probably for a couple of pay periods.

5          Q     How many pay periods?

6          A     A couple in July.

7          Q     Is that it?

8          A     Yes.

9          Q     And did you ask Ryan how long he

10    alleged that Kerry had been pulling sessions for

11    her clients and giving them to him?

12         A     No, I didn't.

13         Q     So it's your testimony as you sit

14    here today that Kerry was also stealing sessions

15    from her clients and giving them to Ryan?

16                    MR. McPARTLAND:  Object to

17                the form.

18         A     I don't understand the question.

19         Q     Well, you just told me, didn't

20    you, that Ryan told you that Kerry was just

21    taking sessions from clients' accounts and

22    giving them to him, correct?

23         A     Kerry was performing the sessions

24    for her clients, so she was performing work that

25    she voluntarily decided not to get paid for and

43

1                          Sanders

2     paid Ryan instead by pulling those sessions for

3     him instead of herself.

4             Q      Oh, I see.

5                    But you approved that, didn't

6     you?

7             A      No, I didn't.

8             Q      You know that you are under oath

9     today?

10            A      I'm very much aware of that.

11            Q      And you never approved that?

12            A      I did not approve that.

13            Q      You never told Kerry for any

14    period of time that you would give her

15    authorization for that?

16            A      Nope.

17            Q      All right.

18                   So let's talk about Bobby.

19                   Did you speak with Bobby?

20            A      Yes.

21            Q      What did Bobby have to say?

22            A      He didn't know who the people

23    were.

24            Q      When you say "the people," who

25    are the people?

44

1                        Sanders

2          A      The members, the clients, the

3    clients that were pulled, the sessions.

4          Q      Who was that?

5          A      Who is what?

6          Q      Who were the clients?

7          A      I don't remember all their names.

8          Q      Do you remember any names?

9          A      I think one was Daniel Levy.  One

10   might have been Brian Candida, C-A-N-D-I-D-A, I

11   believe.

12         Q      Anybody else?

13         A      I believe another one was Jacques

14   Levy.

15         Q      So it was Daniel Levy and Jacques

16   Levy?

17         A      I'm not sure.  I think Jacques

18   was definitely one of the names, I'm pretty

19   sure, but I don't remember the last name.

20   Sorry.

21         Q      You said that you met with your

22   lawyer a couple of months ago and you reviewed

23   some documents and you don't recall whether

24   anyone was present; is that correct?

25         A      Correct.

45

```
1                        Sanders
2           Q       And did you do anything to
3    prepare for your deposition today?
4           A       No.  I mean, I talked to him on
5    the phone.  That's about it.
6           Q       When did you talk to your lawyer
7    on the phone?
8           A       Yesterday.
9           Q       And when did that conversation
10   take place?
11          A       Late afternoon.
12          Q       And how long did that
13   conversation last?
14          A       Twenty minutes maybe.
15          Q       And was anybody else on that
16   call?
17          A       Not to my knowledge.
18          Q       And where were you when the
19   conversation took place?
20          A       At work.
21          Q       When you say "at work"?
22          A       At Equinox.
23          Q       Where were you physically located
24   at work?
25          A       In my office in Soho in Equinox.
```

46

1                          Sanders

2          Q       Is that a closed office?

3          A       Yes.

4          Q       Was your door closed?

5          A       Yes.

6          Q       And did you talk to Mr. Maietta

7    yesterday?

8          A       I mean, I talked to him for

9    business, yeah.  We work together.

10         Q       I'm asking you whether you talked

11   to Mr. Maietta.

12         A       Yeah, I talked to him yesterday.

13         Q       When did you talk to Mr. Maietta?

14         A       Late afternoon.

15         Q       And what did he say to you

16   yesterday, late afternoon?

17         A       He told me that he needed to

18   leave work a little early because he had to go

19   to Lamaze with his wife, because his wife was

20   pregnant.

21         Q       Did he tell you anything else?

22         A       No.

23         Q       That's the only thing he told you

24   yesterday?

25         A       Yes.

47

1                         Sanders

2          Q      And did you ask Mr. Maietta

3    anything yesterday?

4          A      No.

5          Q      Did you tell Mr. Maietta anything

6    yesterday?

7          A      No.

8          Q      And when is the last time you

9    discussed this case with Mr. Maietta?

10         A      Don't know.

11         Q      What do you mean by that?

12         A      I don't recall when I have

13   discussed this case with him, outside of getting

14   e-mails that we had to talk to attorneys or

15   whatever.

16                Outside of that, we haven't, I

17   haven't talked to him.

18                So I don't remember when that was

19   when we started getting e-mails about, oh, we

20   have got to have these depositions or whatever

21   and we all were part of these e-mails.

22                So that's not the only time that

23   we have talked about it.

24         Q      When you say "we talked about

25   it," what do you mean by that?

48

1                        Sanders

2          A       Meaning all of us that, you know,

3     have to be a part of this.

4          Q       Who are "all of us"?

5          A       Me, Matt and Mauro.

6          Q       Anybody else?

7          A       No.

8          Q       So have you ever had a

9     conversation with Mauro about this case?

10         A       No.

11         Q       Never?

12         A       No.

13         Q       And have you ever had a

14    conversation with Matt about this case?

15         A       No.

16         Q       Have you ever exchanged an e-mail

17    with Mauro about this case?

18         A       No.

19         Q       Have you ever exchanged text

20    messages with Mauro about this case?

21         A       No.

22         Q       How about with Matt, have you

23    ever exchanged an e-mail with Matt about this

24    case?

25         A       No.

49

```
 1                         Sanders
 2           Q       And text message with --
 3           A       No.
 4           Q       And what type of phone do you
 5      have?
 6           A       A BlackBerry.
 7           Q       And do you text with your
 8      BlackBerry?
 9           A       Occasionally.
10           Q       And do you text with Mauro?
11           A       Not really.
12           Q       When you say "not really"?
13           A       Once every six months, maybe,
14      once every year.  Not really.
15           Q       So you're not a big texter?
16           A       Not on business, no.
17           Q       And so that would include Matt,
18      too, you don't text with him?
19           A       No.
20           Q       On a regular basis you don't text
21      with him?
22           A       No.
23           Q       And would that include any other
24      Equinox employee?  You are not a big texter?
25           A       No.
```

50

1                           Sanders

2          Q       And other than this meeting that

3     you had two months ago where you looked at these

4     two documents, we are talking about the second

5     set of documents and the telephone call that you

6     had yesterday, did you do anything to prepare

7     for today's deposition?

8          A       No.

9          Q       Did you speak to anyone else

10    about today's deposition?

11         A       No.

12         Q       Is this a regular workday for

13    you?

14         A       Yes, sir.

15         Q       And did you tell anyone that you

16    would be away from work today?

17         A       I told my assistant general

18    manager that I would be away from work, yes.

19         Q       Did you give her a reason why?

20         A       Just told her that I had to do

21    some business outside of the club.

22         Q       Do you have an Equinox-issued

23    cell phone?

24         A       Yes.

25         Q       And who is issued cell phones at

51

1                        Sanders

2    Equinox?

3         A      Who what?

4         Q      At the location level, other than

5    the general manager of a location, is anyone

6    else issued cell phones?

7         A      Outside of the general managers,

8    you said is anyone else in the club issued cell

9    phones?

10        Q      Yes.

11        A      Not to my knowledge.

12        Q      So just the general manager?

13        A      Yes.  And I mean regional

14   managers or whatever, they're not in the clubs.

15        Q      Did you talk to Ms. Ashdown when

16   -- well, you terminated her, right?

17        A      Yes.

18        Q      And you terminated her because

19   you thought she was stealing?

20        A      Uh-hum.

21                   MR. McPARTLAND:  Please

22               keep your answers verbal,

23               Lawrence, yes.

24        A      Yes, I'm sorry.

25        Q      Did she admit to stealing?

52

1                          Sanders

2          A      No.

3          Q      Did she deny it?

4          A      Yes.

5          Q      Did she offer to take a lie

6   detector test?

7          A      Yes.

8          Q      And did you make any arrangement

9   to have her take a lie detector test?

10         A      No.

11         Q      Did you tell anyone that she

12  offered to take a lie detector test?

13         A      I believe so.  I'm not 100

14  percent certain though.

15         Q      You're an ambitious person, would

16  you say?

17         A      Yes.

18         Q      And being a general manager at

19  the Soho Equinox is a lofty achievement in your

20  field, would you say that?

21         A      I guess so, yeah.

22         Q      And you worked with Ms. Ashdown

23  for a period of time --

24         A      Yes.

25         Q      -- correct?

53

1                           Sanders

2                 And would you consider her, based

3      on your observations of her only, would you

4      consider her to be an ambitious person?

5           A     Yes.

6           Q     And by that I mean in the field

7      of fitness and fitness management, that's what I

8      mean.

9           A     Yes.

10          Q     And I take it if you had an

11     opportunity to advance in your field that you

12     would want to do that, correct?

13          A     Yes.

14          Q     Can you give me an example of how

15     you might advance in your field?

16          A     Get a bigger club, become an area

17     manager, regional manager.

18          Q     By the way, what's a bigger club?

19     I'm not being a jerk, I just don't know.

20          A     Meaning a larger club that has

21     more employees, more revenue going through it,

22     it's a larger club in the Equinox brand as far

23     as maybe it's a flagship location or something

24     like that, more members, busier.

25          Q     And what would be an advancement

54

1                          Sanders

2      for someone who is a personal training manager?

3           A      What would be an advancement for

4      a training manager?

5           Q      Yes.

6           A      Along the same lines, you know,

7      starting at a smaller club, going to a bigger

8      club that's busier, larger staff, becoming an

9      area manager, you know, doing something, you

10     know, that's bigger than just managing one

11     location.

12          Q      And based on your observation,

13     did Ms. Ashdown appear to be someone who would

14     want to advance in that way?

15          A      Yes.

16          Q      Are you aware that other

17     depositions have taken place in this case?

18          A      Yes.

19          Q      And are you aware that I've taken

20     those depositions?

21          A      I'm not aware of that.

22          Q      I will tell you that I have.

23                 And it's my understanding, and

24     please correct me if I've misunderstood, that

25     managers at a location can pull sessions if the

55

1                          Sanders
2        client doesn't pull them from the front desk,
3        correct?
4                A       Yes.
5                Q       And a manager would include the
6        general manager?
7                A       Yes.
8                Q       Which in this case would be you,
9        correct?
10               A       Yes.
11               Q       And the personal training
12       manager?
13               A       Yes.
14               Q       And the fitness manager?
15               A       Yes.
16               Q       And a general, assistant general
17       manager?
18               A       Yes.
19               Q       And in order to do that, you need
20       a code, correct?
21               A       Yes.
22               Q       And if someone came to you and
23       accused you of using your code to improperly
24       pull sessions, and you hadn't done it, would you
25       want the opportunity to prove that you hadn't

56

1                          Sanders

2    done it?

3          A      Of course.

4          Q      Right.  Would you volunteer to

5    take a lie detector test?

6          A      I would just do everything in my

7    power to prove that it wasn't me as opposed to

8    just saying it wasn't me.

9          Q      And you don't think that

10   Ms. Ashdown did everything in her power?

11         A      I don't think so.

12         Q      What else could she have done?

13         A      I think there are multiple things

14   that could be done.

15         Q      Let's start with the first one

16   then.

17         A      If I'm being accused of doing

18   something that's inappropriate and the

19   documentation is given to me of this is what

20   was, what I'm being accused of, I'm going to do

21   my own investigation and I am going to bring it

22   back to my superiors and say, "This is what I

23   found out, this is what I've investigated, this

24   is what I've done and this is what I believe has

25   happened."

57

1                        Sanders

2              I gave Kerry that opportunity.

3     When I first brought it to Kerry's attention, I

4     didn't say, "Kerry, you did something wrong."

5              I said, "Kerry, this is what was

6     brought to my attention.  I need you to explain

7     this for me."

8              All Kerry said to me was "I

9     didn't do it.  I don't care what you have, I

10    didn't do it and I know I didn't do it," and

11    that was it.

12             And I said, "You've got to

13    explain this for me."

14             This was before I went to the

15    bosses and said, "Hey, I've got a situation.

16    What are we going to do about this?"

17             So I gave her that opportunity.

18    I presented it to her.  I hired her.  I like

19    her.  She was a good employee.  She was someone

20    that, you know, I thought we were close, you

21    know, and so I wanted to give her that

22    opportunity to show me that she would

23    investigate it.

24             I didn't investigate it right

25    away.  I wanted her to show me, let her go do

58
```
 1                        Sanders

 2   her homework.  Let her go do her research.  Let

 3   her go and question Ryan, question Bobby,

 4   question Cornelia.

 5                 That's part of, if I'm the person

 6   being accused of something and they are giving

 7   me, you know, the documents, that's what I would

 8   do, I would at least try to do that to show,

 9   "Look, I'm investigating this, I'm looking into

10   this, I'm going to get to the bottom of it,

11   because it's not me and I'm going to show you

12   it's not me and why it's not me."

13                 That didn't happen.

14        Q       Did you ever sit down and talk

15   with Kerry and Mauro at the same time about this

16   issue?

17        A       No.

18        Q       Did you ever sit down and talk

19   with Kerry and Ryan together about this issue?

20        A       No.

21        Q       Did you ever sit down and talk

22   with Kerry and Bobby about this issue?

23        A       No.

24        Q       Tell me when you first approached

25   Ms. Ashdown about this issue.
```

59

1                            Sanders

2           A       What do you mean?

3           Q       Well, I mean, you said you gave

4    her the opportunity.

5                   I mean, how long was that?

6           A       At least a week.

7           Q       So it's your testimony as you sit

8    here today that you gave her a week to

9    investigate this issue before you mentioned it

10   to anyone else?

11          A       Before I got others involved to

12   the point of "What are we going to do about

13   this?"

14          Q       When did you come to the

15   conclusion that she in your mind had stolen

16   something from Equinox?

17          A       I don't remember the exact date.

18   I mean ...

19          Q       Well, there's a week, right?

20                  Was it during that week?

21          A       I would say when there was no

22   information from her as it relates to how this

23   happened and why this happened and who is

24   responsible for this, and then after speaking

25   with the individuals that I spoke with, it led

60

1                        Sanders

2     me to believe that she could definitely have

3     done this.

4          Q     So during this week you were

5     conducting your own investigation?

6          A     Yes.

7          Q     But you weren't communicating

8     with her about that?

9          A     No.

10         Q     Then when she volunteered to take

11    a lie detector test, you didn't pursue that

12    avenue?

13         A     No.

14         Q     Now, isn't it true that initially

15    Ms. Ashdown wasn't allowed to conduct her own

16    investigation?

17         A     I don't believe that to be the

18    case.

19         Q     So as the club manager, you, it's

20    your testimony that you had -- did you instruct

21    Ms. Ashdown to conduct her own investigation?

22         A     I specifically asked her or said

23    to her, "This is what the situation is.  I need

24    you to explain this for me."

25               So to me that means her figuring

61

```
 1                         Sanders
 2   out how she's going to explain to me this
 3   situation.
 4                   And forgive me for assuming, it's
 5   wrong to assume, but I would, again, assume that
 6   if I'm telling her, "I need you to explain this
 7   for me," that she is going to be able to try to
 8   explain it to me or for me.
 9                   She did not do that.  She just
10   said, "I didn't do anything wrong."  That's it.
11         Q       Did you ever tell her to conduct
12   her own investigation?
13         A       No.
14         Q       Did you ever tell her to speak to
15   Ryan?
16         A       No.
17         Q       Did you ever tell her to speak to
18   Bobby?
19         A       No.
20         Q       Did you ever tell her to speak to
21   Mauro?
22         A       No.
23         Q       Did Mauro ever complain about
24   Ms. Ashdown?
25         A       He voiced concerns about how she
```

62

```
1                           Sanders

2     spoke to him and how he felt she didn't respect

3     him.

4            Q      Ms. Ashdown was his superior,

5     correct?

6            A      She was his boss.  But in the PT

7     world, the PT manager and fitness manager need

8     to work closely together as a team even though

9     the PT manager --

10                          MR. HARMAN:  Move to

11                  strike as nonresponsive.

12                          I'm going to take a break

13                  now.

14                          Thank you.

15                          (Whereupon, at 11:13 a.m., a

16                  recess was taken.)

17                          (Whereupon, at 11:22 a.m.,

18                  the deposition resumed with all

19                  parties present.)

20                          MR. HARMAN:  Back on the

21                  record.

22    BY MR. HARMAN:

23           Q      Mr. Sanders, have you made any

24    false statements today on the record?

25           A      No.
```

MCM REPORTING SERVICE
(516) 775-5209

63

1                          Sanders

2          Q       I'm sorry.  I didn't hear you.

3          A       No.

4          Q       Are you positive of that?

5          A       Yes.

6          Q       I take it if you had made any

7     false statements on the record that you would

8     tell me?

9          A       Yes.

10         Q       Isn't it true that you called

11    Ms. Ashdown after you terminated her?

12         A       Yes.

13         Q       And why did you do that?

14         A       Because I'm a human being first

15    and foremost, and, like I said, I thought we had

16    a, somewhat of a friendship, I guess a work

17    friendship, and I knew what she was going

18    through, obviously, and I heard that she was

19    doing better, so just as a human being, I do

20    care about people, so I made a call to her to

21    just let her know that I was glad she was doing

22    better.

23                 My mistake if that was taken any

24    way out of context.

25                 But I am a human being first and

64

```
 1                         Sanders
 2      foremost.
 3                      And, again, regardless of a
 4      business relationship or a business situation,
 5      business and personal are two very different
 6      things.
 7                      I was just trying to, again, let
 8      her know that I'm glad that she was doing
 9      better.
10           Q      And that was after you had
11      accused her of stealing?
12           A      Yes.
13           Q      And you believed that she had
14      stolen?
15           A      Yes.
16           Q      And that she had stolen $60?
17                      MR. McPARTLAND:  Object to
18                  the form.
19                      You can answer.
20           A      Yes.
21           Q      Do you understand the question?
22           A      Yes.
23           Q      How long have you been a manager
24      at Equinox?
25           A      About five years probably.
```

65

1                          Sanders

2          Q       And during that time you have

3     never terminated anyone for stealing sessions?

4          A       No.

5          Q       Have you investigated anyone for

6     stealing sessions during that time, other than

7     Ms. Ashdown?

8          A       Not that I'm aware of, no, not

9     that I recall.

10         Q       Mr. Maietta didn't like

11    Ms. Ashdown, did he?

12         A       I don't think I would say that.

13         Q       Did he like her?

14         A       Like her as a person or like her

15    as a boss?  I mean, he didn't dislike her --

16         Q       Well, let's be --

17         A       He didn't dislike her.  I can --

18    he didn't dislike her.

19         Q       You're positive of that?

20         A       I'm pretty certain that he did

21    not dislike her.

22         Q       Didn't he accuse her of drinking

23    with employees?

24         A       He didn't accuse her of that.

25         Q       Oh, he didn't?

66

1                        Sanders

2          A      No.

3          Q      You have no recollection as you

4    sit here today of Mauro Maietta accusing

5    Ms. Ashdown of improper behavior and drinking

6    with other trainers?

7          A      I think -- he -- he said others

8    were accusing her of that, not him.

9          Q      But he brought that to your

10   attention, right?

11         A      Yeah.

12         Q      And he liked to bring negative

13   things about Ms. Ashdown to your attention,

14   right?

15                    MR. McPARTLAND:  Object to

16             the form.

17         A      I wouldn't say that, no.

18         Q      Was there more than one occasion

19   on which Mr. Maietta brought negative things

20   regarding Ms. Ashdown to your attention?

21                    MR. McPARTLAND:  Object to

22             the form.

23                    You can answer.

24         A      Again, like I said earlier, he

25   didn't like how she spoke to him or he felt that

67

1                          Sanders

2    she talked down to him and he felt she didn't

3    have respect for him.

4                    MR. HARMAN:  Move to

5              strike as nonresponsive.

6                    Would you please repeat

7              the question?

8                    MR. McPARTLAND:  He

9              answered the question.

10                   MR. HARMAN:  Could you

11             please repeat the question?

12                   (Whereupon, the record was

13             read back by the reporter.)

14   Q       That's a yes or no question.

15                   MR. McPARTLAND:  Object to

16             the question.

17                   Asked and answered.

18                   You can answer.

19   A       Again, as I stated, he --

20   Q       Was there more than one, yes or

21   no?

22   A       More than one?  Yes.

23   Q       And so he brought a drinking

24   accusation to your attention, right?

25                   MR. McPARTLAND:  Object to

68

1                          Sanders

2                the form.

3                          Asked and answered.

4          A      Yes.

5          Q      And isn't it true that

6  Ms. Ashdown wanted to investigate that

7  particular accusation?

8          A      Yes.

9          Q      And isn't it true that you

10  wouldn't let her?

11          A      No, I didn't not let her.

12          Q      Did you allow her to go and speak

13  with the individuals that were allegedly

14  involved in the incident?

15          A      She could have done that if she

16  wanted to.

17          Q      Did you speak with them?

18          A      I told her that it was something

19  that I was not concerned about.

20          Q      You were not concerned about?

21          A      I was not concerned about

22  something that, again, there was no substance

23  behind it, there was no reason to investigate

24  it.

25          Q      Why did you bring it to her

69

```
1                            Sanders
2      attention in the first place?
3            A      Because I think it's important
4      for her to know or a manager to know what things
5      are being said about them that could be, that
6      can put them in a position where they need to be
7      mindful of whatever it is they're doing or not
8      doing and how, because, again, people look at us
9      as the managers, as the leaders, and regardless
10     of whether accusations are true or not, we
11     should be aware of them and her job wasn't in
12     jeopardy for that accusation, her job wasn't at
13     risk for that accusation, so it wasn't something
14     that needed to be investigated from that
15     perspective, whether it was true or not true.
16           Q      What do you mean "it"?  What's
17     "it"?
18           A      Issues of drinking with employees
19     or drinking with staff.
20           Q      Have you ever had, have you ever
21     gone drinking with staff?
22           A      Yes.
23           Q      Anyone ever talk to you about --
24     what kind of alcoholic beverages do you like to
25     drink?
```

70

```
 1                          Sanders
 2          A       Vodka.
 3          Q       Have you ever had a vodka with a
 4     staff member of Equinox?
 5          A       Yes.
 6          Q       Anyone ever discuss that conduct
 7     with you about being a problem at work?
 8          A       No.
 9          Q       But Maietta thought it was a
10     problem, right?
11                          MR. McPARTLAND:  Object to
12                  the form.
13          A       Maietta thought that the people,
14     that whoever it was that brought it to his
15     attention, it was a problem.
16                  People brought it to his
17     attention and he thought it might be a problem,
18     so he brought it to my attention.
19                  When I had a conversation with
20     her I just said, "I'm just making you aware that
21     this is what people are saying."
22                  Again, I don't think it's that
23     big a deal, we don't need to do anything, but if
24     she wanted to investigate it, she could have
25     investigated, but it wasn't like there was any
```

71

```
 1                         Sanders
 2    risk in her position or jeopardy in her
 3    position.
 4                   So if someone came to me and
 5    said, "Lawrence, I heard that you were out
 6    drinking with your staff and it's not cool," or
 7    "this is what people are saying," I would either
 8    say, "Do you know what, I didn't do this
 9    particular incident," or I would take heed to if
10    I did do it, say, you know, what I'm going to
11    make sure, I'm going to be mindful not to do it
12    again.
13                   That's the point in bringing it
14    up.
15                   If I felt that it was a threat to
16    her or a threat to her situation or jeopardizing
17    her situation, then we would have done a full
18    investigation.
19                   So that's why I didn't deem it
20    necessary to do a full investigation.
21                   Because, again, I'm just making
22    her aware of what people are possibly saying
23    about her so that she could be mindful of it
24    when she's managing her people.
25                   That's the only reason I brought
```

72

```
1                      Sanders
2   it to her attention.
3        Q     So did you ever go and speak to
4   any of the individuals who had brought this --
5        A     No, I didn't.
6        Q     So you don't know whether it was
7   true or not?
8        A     No, I don't know if it was true
9   or not.
10             To be very honest, it didn't
11   matter to me whether it was true or not, because
12   it wasn't, again, something that was going to
13   jeopardize her employment with Equinox.
14        Q     It didn't matter whether it was
15   true or not?
16             Okay.
17             So Maietta also brought the
18   allegation to your attention that Ms. Ashdown
19   favored men over women, is that true?
20        A     There were some of the female
21   trainers that felt that way.
22             You know, again, it's another bit
23   of information that if I'm a manager I would
24   want to know what people are saying about me,
25   and it was, you know, something that the female,
```

73

1                          Sanders

2    some of the female trainers felt.

3                    Whether it was true or not, I'm

4    not managing her on a day-to-day -- I'm not

5    micromanaging her on a day-to-day, I'm not

6    micromanaging everything she does in the club

7    every day.

8           Q      You didn't investigate that?

9           A      Again, that's not something that

10   would cause her to lose her employment.

11                  If I don't have the substance

12   that I need where there's a lot of people are

13   coming to me complaining about that situation.

14          Q      Has anybody ever told you

15   anything negative about Mauro Maietta?

16          A      Of course.

17          Q      Like what?

18          A      That he's competitive, he's very

19   competitive.

20          Q      Anything else?

21          A      That's about it.

22          Q      That's the only negative thing

23   that anyone's ever told you about Mr. Maietta?

24          A      Yeah.

25          Q      How long have you been working

74

1                          Sanders

2       with Mr. Maietta?

3              A       I worked with him for a period of

4       two years, then I didn't work with him for two

5       more years, then we have now been working

6       together again for about, I guess, two years.

7              Q       And that includes during the time

8       that Mr. Maietta was supervised by Ms. Ashdown,

9       that's the only thing that was ever brought to

10      your attention about Mr. Maietta, that he's

11      competitive?

12             A       Yes.

13             Q       And I asked you about negative

14      things that were brought to your attention.

15             A       Uh-hum.

16             Q       In what way was it brought to

17      your attention in a negative way that Mr.

18      Maietta is competitive?

19             A       Kerry specifically said to me

20      that she hates that he's so competitive.

21             Q       Anybody else?

22             A       I can't recall, to be honest.

23             Q       So sitting here today the only

24      negative thing that anyone has ever told you

25      about Mauro Maietta was by Ms. Ashdown, and it

75

                              Sanders

1

2     was that he was competitive?

3           A      I mean, I think it's, you know,

4     if you were to ask me who specifically said

5     this, who said that, I think that it's kind of

6     known that Mauro is a competitive person.

7                  It's -- but it's -- has someone

8     specifically come to me and said, "Hey, I want

9     to complain about the fact that he's

10    competitive"?  No one has really done that, but

11    I think I'm aware of how he is, so I know that

12    he's competitive.  So I don't really need -- I

13    know that that can be viewed sometimes as a

14    negative thing when you're, you know, managing

15    people.

16                 I have had conversations with him

17    about it, of course.

18          Q      My question to you was, other

19    than Ms. Ashdown telling you that she thought

20    that Mr. Maietta was competitive, has anyone

21    ever said anything negative to you about Mr.

22    Maietta?

23          A      Not that I can remember.

24          Q      Did Mr. Maietta want

25    Ms. Ashdown's job?

76

1                           Sanders

2          A        No.

3          Q        And what's the basis of your

4     statement?

5          A        The basis of my statement is that

6     if he wanted her job when prior to us bringing

7     her on board, he would have tried to get the job

8     and he didn't do that, because when the prior PT

9     manager was let go, he was there as the fitness

10    manager and he never approached me, he never

11    came to me and said, "Do you know what, since we

12    are now in this change and we have got to get a

13    new PT manager," he never came to me and said,

14    "I want to be the PT manager."

15               It was known, obviously, he wants

16    to grow and he wants to, you know, that's

17    something that we promote, we encourage in our

18    company, for people to grow and develop.

19               So he was definitely on track to

20    wanting to be a PT manager, but at that point he

21    could have definitely come to me and said, "Do

22    you know what, I want this job."

23               He never came to me and said, "I

24    want this job."

25               He never came to me and said, "I

77

1                           Sanders

2     want her gone, because I want her job."

3                 He never did that.

4           Q     Do you believe that Mr. Maietta

5     wanted to be a personal training manager?

6           A     I think in his long-term goals,

7     yes.

8           Q     And isn't it true that Mr.

9     Maietta had just moved over from another

10    location at the time that Ms. Ashdown came on

11    board at Soho?

12          A     Yes, fairly soon, yes.

13          Q     So he had just been there only a

14    couple of weeks, right?

15          A     He had been there, yeah, he would

16    have been there probably a couple of weeks.

17          Q     When Mr. Maietta was moved into

18    Ms. Ashdown's position, did you interview anyone

19    else for Ms. Ashdown's position?

20          A     At that time I don't believe so,

21    don't recall.  But I don't believe so.

22          Q     Are you aware that Ms. Ashdown

23    was invited to return as a personal trainer?

24          A     Yes.

25          Q     And did you support that

78

1                        Sanders

2   invitation?

3          A      Yes.

4          Q      How many personal trainers are

5   there at the Soho Equinox?

6          A      Thirty-five to 40.

7          Q      And if any of those 35 to 40

8   personal trainers had sessions improperly

9   pulled, i.e., they had stolen sessions, do you

10  believe that they should have been terminated?

11         A      If any of the trainers had

12  sessions pulled improperly, do I believe they

13  should be terminated?

14         Q      As the general manager of the

15  Equinox, if any of the personal trainers at Soho

16  stole sessions, do you think they should have

17  been terminated?

18         A      Yes.

19                       (Second amended complaint

20                       was marked as Plaintiff's Exhibit 1

21                       for identification, as of this

22                       date.)

23  BY MR. HARMAN:

24         Q      I'm handing you what's been

25  marked as Plaintiff's Exhibit 1 (handing).

79

1                       Sanders

2                       MR. HARMAN:  And we have

3                       individually marked, just for the

4                       record, exhibits beginning with

5                       one for each deposition.

6                            So, for example, in the

7                       Maietta deposition we began with

8                       1 and we rebegan with 1 in the

9                       Sanders deposition and so forth,

10                      just for the record.

11    BY MR. HARMAN:

12           Q     If you would please take a look

13    at this document and let me know when you're

14    done.

15           A     (Perusing document.)  What do you

16    want me to look at, just the first page?

17           Q     Have you seen this document

18    before?

19           A     Yes, I believe so.

20           Q     When did you first see the

21    document?

22           A     When it was communicated that

23    this lawsuit was happening.

24           Q     I'm not asking you about any

25    communications with lawyers, but when did you

80

```
 1                         Sanders
 2    first learn that this lawsuit was happening?
 3            A       When it was communicated by
 4    Equinox's attorney.
 5            Q       And were you ever served with a
 6    copy of this complaint?
 7            A       I believe I did have a copy sent
 8    to me.
 9            Q       Were you physically handed a
10    copy?
11            A       I don't recall how, if I was
12    handed a copy or if it was sent in an e-mail
13    document.
14                    I don't remember.
15            Q       And when do you recall first
16    receiving a copy of this document?
17            A       Probably a few months ago.  I
18    don't remember exactly.
19            Q       A few months ago.
20                    Are you aware that you are named
21    as an individual defendant in this action?
22            A       Yes.
23            Q       And what's your understanding of
24    that?
25            A       That I'm being, I guess, sued
```

81
                              Sanders

1                             Sanders

2       individually.

3              Q      For what?

4              A      For I'm assuming wrongful

5       termination.  I don't know.  I'm not sure, I

6       guess.

7              Q      Again, I'm not asking you about

8       the conversations you had with your lawyer.

9                     Did you read this document?

10             A      I looked through it, yes.

11             Q      And did you consider being sued a

12      serious issue?

13             A      Of course.

14             Q      And you don't recall whether you

15      read the document or not?

16                    MR. McPARTLAND:  Object to

17                    the question.

18                    Asked and answered.

19             A      No, I said I looked through it.

20             Q      You did read it?

21             A      I did say I looked through it.

22             Q      And you said you recall reading,

23      you said you recall looking through it a couple

24      of months ago?

25             A      Probably.  I don't remember the

82

1                         Sanders

2      exact date or time.

3              Q      Did you read a paper copy like

4      this (indicating), or did you read it on your

5      computer?

6              A      I read a paper copy.

7              Q      Where did you do that?

8              A      In my office with the door

9      closed.

10             Q      And what did you do with that

11     paper copy?

12             A      It's locked away.

13             Q      Where is it now?

14             A      In a file locked away.

15             Q      And do you have a file on this

16     case?

17             A      No.

18             Q      You don't?

19             A      I have a file for my personal

20     stuff that I don't want anyone else to obviously

21     see.

22             Q      Where is that located?

23             A      In my office.

24             Q      And it's locked?

25             A      Uh-hum.

83

1                         Sanders

2          Q       And it has a copy of this

3    complaint in it?

4          A       Probably.

5          Q       Does it have anything else

6    related to this case?

7          A       No.

8          Q       Is it a drawer?

9          A       A file cabinet.

10         Q       It's a file cabinet.

11                 You put the complaint there?

12         A       Yes.

13         Q       And when you were reading it, did

14   you mark up anything?

15         A       No.

16         Q       And have you ever received any

17   other documentation related to this case?

18         A       No.

19         Q       Ever search for documents related

20   to this case?

21         A       No.

22         Q       Ever searched, do you have a

23   computer at work?

24         A       Yes.

25         Q       What kind of computer do you

84

```
 1                          Sanders

 2     have?

 3              A        I guess a desktop.

 4              Q        A desktop.

 5                       How long have you had that

 6     computer?

 7              A        Since I have been working at

 8     Equinox Soho.

 9              Q        How long is that?

10              A        Three years.

11              Q        And has the computer ever

12     changed?

13              A        I think it, I think we have

14     updated our systems probably a few months ago.

15              Q        How about the hardware, did you

16     have the same hardware, the same physical

17     computer?

18              A        It might be new, because IT was

19     upgrading all the computers.

20              Q        Why did you say it might be new?

21              A        Like the physical -- are you

22     talking about the physical computer?

23                       I think it's a new physical

24     computer.

25              Q        And when did that take place?
```

85

1                           Sanders

2          A      Within the last few months.

3          Q      Within the last few months?

4          A      Yeah.

5          Q      Prior to that, were there any

6    other replacements of your computer?

7          A      No.

8          Q      So if I understand your testimony

9    correctly, you had a computer at the time that

10   you were supervising Ms. Ashdown?

11         A      Uh-hum.

12         Q      And you maintained that same

13   computer up until a few months ago?

14         A      Yes.

15         Q      And did you ever search that

16   computer for any documents related to

17   Ms. Ashdown?

18         A      Did I ever search my computer

19   for -- I'm not sure I understand what --

20         Q      Did you ever look for documents

21   in your computer related to Ms. Ashdown?

22         A      I may have looked for old e-mails

23   when this all came up to see if I had the

24   e-mails or whatever.

25         Q      I'm asking about, I'm really not

86

Sanders

1

2      asking you to speculate.

3                I'm asking you if you conducted a

4      search in your computer for anything related to

5      Ms. Ashdown?

6           A      Yes.

7           Q      When?

8           A      When this came up, we had to go

9      back and obviously secure whatever documents we

10     may have had.

11          Q      When did this come up?

12          A      Again, I don't remember the exact

13     date.  Whenever we got contacted that we had a

14     lawsuit against us, we needed to make sure all

15     of the documents that we have as it relates to

16     this are saved and not destroyed.

17          Q      And when was that?

18          A      Whenever, again, I don't remember

19     the exact date, whenever a few months ago was.

20          Q      So it's your recollection that

21     that was a few months ago?

22          A      Yes.

23          Q      So you searched your new computer

24     then?

25          A      I didn't have a new computer

87

1                          Sanders

2      then.

3                          MR. McPARTLAND:  Objection

4                  to form.

5           Q       So you searched your old

6      computer?

7           A       Yes.

8           Q       How do you know that it was your

9      old computer?

10          A       Because I know my computer.

11          Q       How do you know your computer?

12          A       Because I have been working there

13     for three years.

14          Q       How did you search your old

15     computer?

16          A       Searched my e-mails and searched

17     our shared folder, which is a folder that's on

18     our shared -- on our server at corporate, so no

19     matter what computer you have, you have access

20     to that document, to that folder.

21          Q       So you searched your e-mail and

22     shared folder.

23                  Anything else?

24          A       No.

25          Q       And did you instruct anyone else

88

1                        Sanders

2      to search their computers?

3           A      No.

4           Q      Did you have any conversations

5      with Mauro Maietta about preserving information?

6           A      No.

7           Q      Did you search anywhere else at

8      the Soho Equinox for information related to

9      Ms. Ashdown?

10          A      No.

11          Q      Did you search her former office?

12          A      No.

13          Q      Did you ask anyone to search her

14     former office?

15          A      No.

16          Q      Did you search your office?

17          A      No.

18          Q      So you said you searched for

19     e-mails.

20                 Did you find any e-mails?

21          A      I found some, yeah.

22          Q      And what did you do with them?

23          A      Sent them to the attorneys.

24          Q      What did those e-mails say?

25          A      They were about the investigation

89

1                          Sanders

2     into the sessions and about, you know, what we

3     were doing.

4                    Basically most of the e-mail

5     exchange was about that, and the conversations

6     that were being had.

7          Q      Who were the e-mails from?

8          A      I believe that all parties on

9     the -- Joe, Liz, Minton, David Harris, Matt

10    Plotkin.  I believe they were all copied on most

11    of those e-mails.

12         Q      So you found e-mails concerning

13    an investigation and what was going on?

14         A      Yes.

15                    MR. McPARTLAND:  Object to

16                the form.

17         Q      And a conversation.

18                I'm just trying to understand.

19                And approximately how many

20    e-mails did you find?

21         A      Going back and forth probably, I

22    mean, probably five to 10.

23                I'm not sure exactly.

24         Q      Did you keep copies of those?

25         A      No.

90

```
1                    Sanders
2         Q      How did you forward them to your
3    attorneys?
4         A      Forwarded it to their e-mail.
5         Q      So you clicked forward and
6    forwarded the e-mails that you found to the
7    attorneys?
8         A      Or the HR department, you know,
9    or both parties.
10        Q      Did the instruction to preserve
11   e-mails or information come from the HR
12   department?
13                   MR. McPARTLAND:  Objection.
14        Q      You can answer.
15        A      I believe so.
16        Q      And who in the HR department
17   instructed you to preserve information?
18        A      Probably, I'm thinking Matt
19   Herbert.  I believe it was from him.
20        Q      And it's your recollection that
21   that took place a few months ago?
22        A      Yes.
23        Q      And how did he convey that
24   instruction to you?
25        A      I believe we had a conference
```

91

1                              Sanders

2      call, if I'm not mistaken.  We had a conference

3      call with the attorneys and all of us on it to

4      discuss --

5                      MR. McPARTLAND:  Nothing

6                      about what was discussed on the

7                      call.

8          A       Right.

9                  No, just told us to preserve.

10         Q       Outside of conversations that you

11     have had with your attorneys, and that would

12     include any person or over the phone or even

13     e-mails with your attorneys.

14                 Did Matt Herbert independently

15     discuss the preservation of information

16     regarding this case with you?

17         A       I don't recall that.

18         Q       But it was your understanding

19     that you needed to preserve information?

20         A       Yes.

21         Q       And you told me what you did and

22     what you didn't do, right?

23         A       Yes.

24         Q       Who else was on that call?

25         A       Which call?

92

1                        Sanders

2          Q      The call that you just described.

3          A      Joe, Matt Plotkin, Matt Herbert

4    and Mauro, I believe, and Joe and myself.

5          Q      We talked about some of the other

6    things that Mauro raised with you concerning

7    Ms. Ashdown.  We talked about several of those.

8                 Did Mauro Maietta ever accuse

9    Ms. Ashdown of not responding to his e-mails?

10         A      Not that I recall.

11         Q      And did Ms. Ashdown ever tell you

12   that Mauro had made up a fake e-mail address?

13         A      Yes, she did.

14         Q      She did?

15         A      Yeah, she said that.

16         Q      Okay.

17                What did she say?  How did that

18   come up?

19         A      It came up because there was some

20   miscommunication about something.  I don't

21   recall what it was specifically.

22                And I think she was looking for

23   communication from him or he was looking for

24   communication from her and they both were

25   expecting some form of communication, and he

93

1                              Sanders

2    said he sent it to her, I think, and she said

3    she never received it.

4                    And then she said that she felt

5    that he was sending whatever he was trying to

6    communicate to her to some e-mail that was not

7    her e-mail.

8         Q    So she accused him of making up a

9    fraudulent e-mail?

10        A    Something along those lines, yes.

11        Q    And did you investigate that?

12        A    No.

13                  MR. HARMAN:  For the

14                  record, Plaintiff's Exhibit 1 is

15                  the second amended complaint in

16                  this action, with this action Civ

17                  number 13 CV 1374, and it's dated

18                  May 24, 2013.

19        Q    Do you have the ability to log

20   onto Mauro Maietta's computer?

21        A    Under my own name, yes, but not

22   under his login.

23        Q    Could you access his login if you

24   wanted to?

25        A    No.

94

1                         Sanders

2         Q       And when Ms. Ashdown accused Mr.

3    Maietta of making up a fraudulent e-mail

4    address, did you ever sit with her and look at

5    Mr. Maietta's computer?

6                         MR. McPARTLAND:  Object to

7                    the form.

8                         You can answer.

9         A       I don't recall.

10        Q       When Mr. Maietta made these

11   accusations of session stealing to you, did he

12   bring a piece of paper to you?

13                        MR. McPARTLAND:  Object to

14                   the form.

15        A       No, I'm not -- no -- what do you

16   mean?

17        Q       Well, I mean you described this

18   whole scheme where you believe that Ms. Ashdown

19   stole this money from Equinox and so forth and

20   that that was brought to your attention by Mr.

21   Maietta, right?

22                        MR. McPARTLAND:  Object to

23                   the form.

24        Q       How did he bring that to your

25   attention?  He obviously had a discussion with

95

1                        Sanders

2    you, correct?

3           A       With commission reports.

4           Q       So he brought commission reports

5    to you?

6           A       Yes.

7           Q       And what did you do with those?

8    Did you take them from him?

9           A       I probably did at the time, yes.

10          Q       And what did you do with them?

11          A       Looked them over.

12          Q       Where are they now?

13          A       I have no idea.  I probably

14   destroyed them.

15          Q       You probably destroyed them?

16          A       I don't know.  I don't know.  I

17   didn't keep them.

18          Q       Did you ever show them to

19   Ms. Ashdown?

20          A       I don't remember.

21                      (A two-page letter dated

22                      January 9, 2013 was marked as

23                      Plaintiff's Exhibit 2 for

24                      identification, as of this date.)

25

                    MCM REPORTING SERVICE
                       (516) 775-5209

96

```
1                         Sanders

2     BY MR. HARMAN:

3             Q      I'm handing you what has been

4     marked as Plaintiff's 2.

5                         MR. HARMAN:  For the

6                         record, it's a January 9th letter

7                         from my office to Joseph

8                         Matarazzo referencing Kerry

9                         Ashdown and others.

10            Q      (Handing.)

11            A      (Perusing document.)  Okay.

12            Q      Have you seen this document

13    before?

14            A      I'm not sure.  I'm not sure.

15            Q      Have you had an opportunity to

16    read the document?

17            A      I've glanced through it.  I

18    didn't read the whole thing.

19            Q      Do you understand what the

20    document means?

21            A      You are notifying Joe Matarazzo

22    that you are representing Kerry Ashdown and she

23    obviously has a claim or is about to pursue a

24    claim against Equinox.

25                        And, you know, and these people
```

97

1                            Sanders

2      are, I guess, the people listed, and make sure

3      that things are preserved.

4            Q      And you see that day, January 9,

5      2013?

6            A      Yes.

7            Q      And do you have any recollection

8      as to whether you received this document or not?

9            A      I don't recall if I got this

10     document or not.

11           Q      Do you recall having any

12     conversations with Joseph Matarazzo in January

13     of this year regarding Ms. Ashdown?

14           A      Not that I recall, no.

15           Q      And do you recall having any

16     conversation with the human resources department

17     in January 2013 regarding Ms. Ashdown?

18           A      Nothing I can recall.

19           Q      And have you ever conducted a

20     search of your BlackBerry for any information

21     regarding Ms. Ashdown?

22           A      No.

23           Q      And how long have you had the

24     BlackBerry?

25           A      Since 2008.

98

1                         Sanders

2          Q       Since you terminated Ms. Ashdown,

3     have you had any conversations with anyone

4     regarding Ms. Ashdown?

5          A       No.

6          Q       Other than lawyers, obviously?

7          A       No.

8          Q       Not at all?

9          A       No.

10          Q       And you testified that you phoned

11     Ms. Ashdown after you terminated her, correct?

12          A       Yes.

13          Q       And did you have any

14     conversations with anyone around that time about

15     that phone conversation?

16          A       Yes.

17          Q       So you did speak with someone

18     about Ms. Ashdown?

19          A       Right after that phone

20     conversation, yes.

21          Q       So do you want to correct your

22     earlier testimony?

23                  You did, in fact, speak with

24     somebody about Ms. Ashdown, correct, after you

25     terminated her?

99

1                          Sanders

2          A      Oh, yes.

3          Q      Who did you speak with?

4          A      Candra.

5          Q      And what did you say?

6          A      Actually, Candra was the one who

7     told me about her being better, and I said that

8     I just called and reached out to Kerry, but she

9     didn't obviously respond to me, and I said what

10    I said and, you know, I hung up the phone.

11         Q      And did you speak with anyone

12    else regarding Ms. Ashdown after you terminated

13    her?

14         A      I don't recall.

15         Q      Did you text anyone regarding

16    Ms. Ashdown after you terminated her?

17         A      No.

18         Q      Did you e-mail anyone regarding

19    Ms. Ashdown after you terminated her?

20         A      No.

21         Q      After you terminated Ms. Ashdown,

22    did you speak with any trainers?

23         A      Speak with any trainers?

24         Q      About Ms. Ashdown?

25         A      I don't believe so, no.

100

1                          Sanders

2          Q      Did you give them any

3    instructions regarding Ms. Ashdown?

4          A      No, I don't believe I gave them

5    any instructions.

6          Q      Did anyone ever ask you where

7    Ms. Ashdown is?

8          A      I don't remember if anyone ever

9    asked me that.

10          Q      So you terminated Ms. Ashdown,

11   right?

12          A      Uh-hum.

13          Q      And she was escorted out of the

14   club, right?

15          A      Uh-hum.

16          Q      Abruptly, right?

17                      MR. McPARTLAND:  Object to

18               the form.

19          A      I wouldn't say abruptly, but,

20   yes, she was escorted out of the club.

21          Q      Before the day ended, right,

22   right after you terminated her?

23          A      Yes.

24          Q      In front of everyone?

25          A      Yes.

101

1                          Sanders

2          Q      Now, if that happened to you, how

3    would you feel?

4          A      Of course it's not --

5                 MR. McPARTLAND:  Objection

6          to form.

7                 You can answer.

8          Q      I'm asking you.

9                 THE WITNESS:  What?

10                MR. McPARTLAND:  Object to

11         the form, but you can answer I

12         said.

13         Q      How would you feel?

14         A      Of course it's not a good

15   feeling.

16         Q      Would you consider it a

17   humiliating experience if you were escorted out

18   of the club?

19         A      It wouldn't be a good feeling.

20         Q      Do you believe that that

21   termination was handled properly?

22         A      Do I believe what?

23         Q      That that termination was handled

24   properly?

25         A      Yes, I do.

102

1                          Sanders

2          Q       Isn't it true that you told

3     trainers not to give references for Ms. Ashdown?

4          A       It was told -- I wasn't the one

5     that told someone that.  It was the human

6     resources, probably, department, I believe, that

7     said, you know, we shouldn't do that.

8          Q       Did you instruct any trainers not

9     to give references for Ms. Ashdown?

10         A       I don't recall giving

11    instructions specifically to someone to not give

12    them.

13         Q       Did you tell any trainer not to

14    give a reference to Ms. Ashdown?

15         A       Again, I don't recall that.

16         Q       Did you e-mail any trainers and

17    tell them not to give references for

18    Ms. Ashdown?

19         A       I don't recall.

20         Q       Were you aware that during

21    Ms. Ashdown's tenure at Equinox that she became

22    ill?

23         A       Yes.

24         Q       When did you become aware of

25    that?

103

1                              Sanders

2          A       When she told me.

3          Q       When did she tell you that?

4          A       I'm guessing maybe June 2011.

5          Q       And how did she tell you?

6          A       She told me in my office.  She

7    came in my office and had a conversation with

8    me.

9          Q       What did she say?

10         A       That she's got to go to the

11   doctor and she's got to get treatment and, you

12   know, so she was going to beat, you know, deal

13   with what she's got to deal with and, you know,

14   she told me not to share with anyone, because

15   she didn't want me to tell anyone, and I

16   respected her wishes and I didn't tell anyone,

17   didn't talk to anyone.

18               She said, "I don't want my staff

19   to know.  I don't want anyone to know."

20               And she said, "You," I think she

21   may have told Mauro and possibly Liz Minton, so

22   she told me that, you know, she was going to get

23   treated and it wouldn't affect her work and she

24   would beat this, you know, and I supported that.

25         Q       Did she say anything else?

104

1                          Sanders

2          A      I don't recall anything else.

3          Q      Were you ever aware of any

4    conflict between the scheduling of days for Mr.

5    Maietta versus Ms. Ashdown?

6          A      I think they might have had some

7    scheduling conflicts where they covered for each

8    other, you know, because there always has to be

9    one of them in the club.

10                 So I don't recall exactly what

11   the issue was, I mean how the issue came about,

12   but I do recall something along those lines,

13   that there was some scheduling issues where they

14   seemed not to be on the same page.

15         Q      Now, if there is a conflict

16   between scheduling, I take it there always has

17   to be a manager in the club, is that correct,

18   when the club is open?

19         A      Yes.

20         Q      And you are not always in the

21   club, correct?

22         A      Correct.

23         Q      And if there's a conflict

24   between, a scheduling conflict between you and

25   Mauro, who has the final say?

105

                            Sanders

1

2          A       A scheduling conflict between me

3     and Mauro?

4          Q       Yes.

5          A       I probably would have the final

6     say.

7          Q       And prior to June, when did

8     Ms. Ashdown start working at Equinox?

9          A       I believe February 2011.

10          Q       So she had been working there

11     approximately five months or so before you

12     learned that she had cancer?

13          A       Yeah, I guess.

14          Q       Did she tell you what type of

15     cancer she had?

16          A       I believe she did at the time,

17     but I don't recall exactly what it is or what it

18     was.

19          Q       Go ahead.

20          A       What?

21          Q       Go ahead.

22          A       I mean, again, I believe she did

23     tell me at the time specifically what it was,

24     but I don't remember asking in depth or, you

25     know.

106
1                        Sanders

2           Q        As you sit here today, do you

3      know what type of cancer?

4           A        No, I don't.

5           Q        And prior to June of 2011, did

6      anyone express any concerns about, to you, about

7      Ms. Ashdown's health?

8           A        No.

9           Q        Did anyone express any concerns

10     to you about Ms. Ashdown's appearance?

11          A        No.

12          Q        Did Mr. Maietta ever tell you

13     that he didn't think Ms. Ashdown was up for the

14     job?

15          A        No.

16          Q        Did you notice a change in

17     Ms. Ashdown's appearance during her employment?

18          A        I mean, outside of her being

19     maybe tired, no.

20          Q        So you noticed her being tired?

21          A        She looked a little tired

22     sometimes.

23          Q        And when was that?

24          A        When she started getting

25     treatment again.

107
1                              Sanders

2              Q      So that was after June of 2011?

3              A      Yes.

4              Q      And did you approach her about

5      that?

6              A      No, I don't think so.  I don't

7      recall.

8              Q      Did you express any concern?

9              A      No, I didn't express any concern.

10             Q      Okay.

11                    Did you ask her if she needed

12     some time off?

13             A      I don't recall if I asked her

14     that, no.

15             Q      Did you ever ask her if she

16     needed to leave work, get some rest?

17             A      I don't recall ever asking her

18     that either.

19             Q      Did you make any other

20     observations about Ms. Ashdown's physical

21     appearance?

22             A      No.

23             Q      And were you aware that she was

24     undergoing chemotherapy?

25             A      Yes.

108

1                          Sanders

2          Q      And were you aware that she was

3    undergoing radiation?

4          A      Yes.

5          Q      And what were Ms. Ashdown's

6    working hours?

7          A      Three days a week, probably the

8    expectation is maybe ten hours a day, you know,

9    three days a week and then two days a week

10   probably like eight to nine hours.

11                So probably 45 hours, maybe 50.

12         Q      And was Ms. Ashdown working those

13   amount of hours?

14         A      She worked, yes.

15         Q      Was she working longer than that?

16         A      I don't know if she worked longer

17   than that.

18                I know she worked, she told me

19   that she was going to work and this was not

20   going to stop her from working and she was going

21   to do what she needed to do, and, you know,

22   that's what she wanted to do.

23         Q      Did she arrive to work before

24   you?

25         A      Sometimes.

109

1                          Sanders

2          Q       Sometimes.  What does that mean?

3          A       When I get to the club, she's

4     there, you know.  If she's there, that means she

5     arrived before me.

6          Q       What are your working hours?

7          A       My working hours are usually 9:00

8     to 8:00, 9:00 to 9:00.

9                  I work anywhere from 11 to 12

10    hours a day, Monday, Tuesday, Wednesday;

11    Thursdays I put in that same thing, about 11

12    hours, 9:00 to 8:00, you know.  Saturdays I

13    work, you know, probably 9:00 to about 6:00, so

14    I'm working about 50 hours a week.

15         Q       So you don't work on Fridays or

16    Sundays?

17         A       Correct, unless it's needed.

18         Q       Did Mr. Maietta ever express any

19    concerns about Ms. Ashdown's physical

20    appearance?

21         A       Not to me.

22         Q       Did any trainers ever express

23    concern about Ms. Ashdown's physical appearance?

24         A       Not to me.

25         Q       Did they ever express any

MCM REPORTING SERVICE
(516) 775-5209

110

1                              Sanders

2      concerns about Ms. Ashdown's ability to, and I'm

3      talking about the trainers now, Ms. Ashdown's

4      ability to perform her job?

5            A       Not that I'm aware of, no.

6            Q       Did any clients or members, I

7      guess you call them, any members of Equinox ever

8      complain about Ms. Ashdown?

9            A       Not that I'm aware of.

10           Q       Do you think Ms. Ashdown was a

11     good trainer?

12           A       I guess.

13           Q       You guess.

14                   Did she ever train you?

15           A       No.

16           Q       Did you ever ask Ryan about her

17     training ability?

18           A       Did I ever ask Ryan?  No.

19                   About her training abilities?

20           Q       Yes.

21           A       No.

22           Q       Did Mauro think that Ms. Ashdown

23     was a good trainer?

24                         MR. McPARTLAND:  Object to

25                   the form.

111

```
 1                      Sanders
 2                 You can answer.
 3         Q       Do you understand the question?
 4                 It's a pretty simple question.
 5  Do you understand it?
 6         A       Of course.
 7                 We never really talked about it,
 8  to be honest.
 9         Q       You never talked with Mauro about
10  how --
11         A       About how she was as a trainer?
12  No.  We never really talked about that.
13         Q       Ever?
14         A       About how she was as a trainer?
15  No.
16                 If she was a good trainer or not
17  a good trainer, no.
18         Q       Did you ever train with Mauro?
19         A       Yes.
20         Q       Is he a good trainer?
21         A       Yes.
22         Q       What makes him a good trainer?
23         A       He's cognizant of the client's
24  movement, he pays attention to what you are
25  doing, he corrects you while you are doing what
```

112

1                             Sanders

2      you're doing.

3                     So he's very attentive to the

4      client.

5                     And, you know, the program was a

6      good program.

7             Q      And as part of your job

8      responsibilities as a general manager, do you

9      endeavor to learn about the training abilities

10     of people you manage?

11            A      I train with other trainers, yes.

12            Q      Have you ever trained with Mr.

13     Diaz?

14            A      Mr. Diaz?

15                    I don't know who you are speaking

16     of.

17            Q      Who's the fitness manager right

18     now?

19            A      Darwin.

20            Q      Darwin.

21                    What's his last name?

22            A      Diaz, right.

23            Q      Have you ever trained with

24     Mr. Diaz?

25            A      No, I haven't.

113

1                          Sanders

2          Q      Do you have an opinion as to

3     whether he's a trainer or not?

4          A      No, I don't.

5          Q      Did you ever ask Mauro whether he

6     was a good trainer?

7          A      No, I haven't.

8          Q      So you don't know?

9          A      No, I'm not sure.

10                    MR. HARMAN:  I would like

11                    to take another short break and

12                    take a lunch break in about an

13                    hour.

14                    Okay.

15                    (Discussion off the record.)

16                    (Whereupon, at 12:16 p.m., a

17                    recess was taken.)

18                    (Whereupon, at 12:32 p.m.,

19                    the deposition resumed with all

20                    parties present.)

21                    MR. HARMAN:  On the

22                    record.

23    BY MR. HARMAN:

24          Q      Mr. Sanders, have you ever had an

25    employee who, other than Ms. Ashdown, who has

114

1                            Sanders

2      been diagnosed with a serious illness?

3            A      Not that I can recall off the top

4      of my head.

5            Q      Have you ever had an employee who

6      has become pregnant?

7            A      Probably, but I can't think of it

8      off the top of my head.

9            Q      Have you ever had an employee who

10     has had an immediate family member who has

11     passed away?

12           A      Yes, I have had that before,

13     yeah.

14           Q      Do you know what the Family

15     Medical Leave Act is?

16           A      The Family Medical Leave Act?

17                       MR. McPARTLAND:  Object to

18                  form.

19                       You can answer.

20           A      Yeah, I have heard of it, yes, of

21     course.

22           Q      Have you ever had any employees

23     who have taken medical leave?

24           A      Not that I recall, no.

25           Q      Have you ever had any employees

                    MCM REPORTING SERVICE
                       (516) 775-5209

115

1                     Sanders

2    take bereavement leave?

3         A     Yes.

4         Q     And today does an employee ask

5    you for permission to take bereavement leave?

6         A     Yes.

7         Q     And do you grant that permission?

8         A     Obviously if they had a

9    bereavement, yes, we would have to grant it.

10        Q     And you do that in conjunction

11   with the human resources department?

12        A     Yes.

13        Q     And does the human resources

14   department have policies and procedures with

15   respect to bereavement leave?

16        A     Yes.

17        Q     And does the human resources

18   department have policies and procedures with

19   respect to leave for medical issues?

20        A     Yes.

21        Q     What are they?

22        A     The Family Medical Leave Act.

23        Q     What is that?

24                    MR. McPARTLAND:  Object to

25                    the form.

116

                                Sanders

1                           You can answer.

2          A       If someone has a medical

3    situation and they can't perform their duties or

4    they need to take time off because of that, they

5    would go through the proper steps, getting

6    doctors' notes, whatever, to take time off.

7                   And I'm pretty sure that there is

8    a time frame that you have to take that time

9    off, and you're ensured to have your job when

10   you come back from that time off, not

11   necessarily the same place, but at least the

12   same job.

13         Q       And have you ever had an employee

14   that has taken medical leave?

15         A       Not that I recall.

16         Q       Let's go back to the situation

17   with the e-mail.

18                 So did you ever confront Mr.

19   Maietta about this accusation that he sent a

20   fake e-mail?

21         A       We might have talked about it,

22   but I don't really remember, to be honest.

23         Q       What makes you think that you

24   might have talked about it?

117

                              Sanders

1

2          A       Because I generally address most

3   issues or at least my style is if something is

4   brought to my attention, I will address it.

5          Q       Well, do you think making up a

6   fake e-mail address to one supervisor is a

7   serious issue?

8          A       Of course that would be a serious

9   issue.

10         Q       And since it was a serious issue,

11  would that warrant a discussion with the

12  employee reporting the accusation?

13                     MR. McPARTLAND:  Objection.

14         A       Yeah.  Yes.

15         Q       But you don't recall whether you

16  had a discussion or not?

17         A       I don't recall.

18         Q       Did you ever see a fake e-mail

19  address?

20         A       I don't recall seeing a fake

21  e-mail address.

22         Q       When you say you don't recall, is

23  it possible that you did?

24         A       I mean, I will say anything is

25  possible, but I don't remember.  I don't

118

1                          Sanders

2      remember seeing a fake e-mail address.

3           Q      Well, that's an unusual

4      circumstance, right, to see a fake e-mail

5      address, right?

6           A      Yeah, it would be unusual.

7           Q      Right.

8           A      So in my memory right now, I

9      don't recall seeing a fake e-mail address.

10          Q      Do you recall going into

11     Ms. Ashdown's and Mr. Maietta's office with

12     Ms. Ashdown around the time that she brought

13     this serious issue to your attention?

14                      MR. McPARTLAND:  Object to

15                 the form.

16          A      We probably did.  I don't

17     remember.

18          Q      What makes you think you probably

19     did?

20          A      If you're saying, if you're

21     asking me the question, maybe we did.  I don't

22     remember.

23          Q      You don't remember going in?

24          A      No.

25                 It was two years ago, I don't

119

1                          Sanders

2    remember everything.

3          Q      I'm only asking you about what

4    you remember.

5          A      Right.

6          Q      I mean, you know, you remember

7    some pretty specific details about other things

8    regarding Ms. Ashdown, so I'm asking you about

9    other situations with employees.

10                        (A document Bates stamped

11                        EQX-6358 was marked as Plaintiff's

12                        Exhibit 3 for identification, as of

13                        this date.)

14   BY MR. HARMAN:

15         Q      I'm handing you what has been

16   marked for identification as Plaintiff's Exhibit

17   3 (handing).

18                        Please take a look at it.

19                        MR. HARMAN:  For the

20                        record, it's an e-mail printout

21                        with Matthew Herbert's name in

22                        the heading, but it is an e-mail

23                        that purports to be from Lawrence

24                        Sanders to Joe Matarazzo and

25                        others dated September 1, 2011.

120

                                    Sanders

1

2    BY MR. HARMAN:

3           Q      Do you recognize this document?

4           A      Yes.

5           Q      Did you draft this document?

6           A      Yes.

7           Q      Did you draft it on September 1,

8    2011?

9           A      Yes.

10          Q      Is there anything in this e-mail

11   that is inaccurate?

12          A      No.

13          Q      And is it true that Ms. Ashdown

14   felt Mauro Maietta had something to do with it?

15          A      That's what I believe, yes.

16          Q      And did you investigate that?

17          A      Yes.

18          Q      So Ms. Ashdown alleges that Mauro

19   Maietta had something to do with the session

20   pulling, right?

21          A      She never said that to me

22   directly, but that's what I believe she --

23          Q      That's what this e-mail says,

24   right?

25          A      That's what I believe she felt.


                        MCM REPORTING SERVICE
                          (516) 775-5209

121

1                           Sanders

2       Basically, she feels, that's what I believe she

3       felt.

4              Q       Did she tell you that or not?

5              A       All she said is, "I know who did

6       this."

7              Q       Did she tell you that she

8       believes Maietta was a part of it?

9              A       She never said specifically to me

10      that she felt he was the one that did this.

11             Q       So you are telling me on the

12      record under oath that she never told you that

13      she felt Mauro Maietta was a part of this?

14                      MR. McPARTLAND:  Objection.

15                      Asked and answered.

16             Q       I want the record to be clear.

17             A       She never said to me according to

18      this situation that she believed Mauro had

19      something to do with it.

20             Q       But you felt in earnest and in

21      your role as the general manager of the whole

22      Soho location that she felt Mauro had something

23      to do with it?

24             A       Yes.

25             Q       And you now are testifying that

122

1                          Sanders

2      you investigated that?

3              A       I'm testifying that, obviously,

4      yes, I looked into it, yes.

5              Q       You investigated it?

6              A       Yes, I investigated it.

7              Q       Does "look into it" and

8      investigate mean the same thing to you?

9              A       To me, yes, it does.

10             Q       So then we'll go with

11     investigate.

12                     What did you do to investigate

13     whether Mauro Maietta had anything to do with

14     this?

15             A       I obviously questioned him about

16     the sessions, questioned him about the pulling

17     of the sessions, you know, the expiring sessions

18     and the reinstatement of the sessions,

19     questioning him about that information.

20             Q       So you questioned Mr. Maietta?

21             A       Yes.

22             Q       Where did that conversation take

23     place?

24             A       In the club, in the office.

25             Q       So you brought him in, you asked

123
```
1                       Sanders
2    him into your office?
3          A      Yeah.
4          Q      And you questioned him?
5          A      We talked about it, yes, we
6    questioned him.
7          Q      Was anybody else present?
8          A      No.
9          Q      But you just said "we questioned
10   him."
11                What do you mean by that?
12         A      I meant me.
13         Q      You questioned him?
14         A      Yes.
15         Q      And what did you say to him?
16         A      I just said, "Did you have
17   anything to do with this?  Did you have anything
18   to do with the pulling of these sessions?"
19         Q      And what did he say?
20         A      He said no.  He said, "That my
21   codes aren't used.  I'm not" -- "I wasn't
22   around.  I wasn't here in the building when they
23   were done, when it was done."
24         Q      And did you corroborate whether
25   or not he was in the building when it was done?
```

124

1                          Sanders

2          A      Yes.

3          Q      You did.

4                 What did you do to do that?

5          A      We have surveillance video in our

6    club.

7          Q      And did you review surveillance

8    video?

9          A      Yes, I did.

10         Q      And when did you do that?

11         A      During the week of investigating

12   this situation.

13         Q      So you reviewed surveillance

14   video?

15         A      Yes.

16                     MR. HARMAN:  We're going

17                to call for the production of the

18                surveillance video that was

19                reviewed during the week of your

20                investigation, as you call it.

21                     For the record, no

22                surveillance video has been

23                identified or produced in this

24                action even though it was clearly

25                called for as part of the --

MCM REPORTING SERVICE
(516) 775-5209

125

1                        Sanders

2        A      Well, part of -- I'm sorry.

3        Q      Please, let me finish.

4               MR. McPARTLAND:  There is

5               no question pending.

6               THE WITNESS:  Okay.

7        Q      Who was present when you

8   purportedly looked at this surveillance video?

9        A      I honestly don't remember who was

10  present, if there was anyone present.  I don't

11  remember.

12       Q      But you remember looking at

13  surveillance video?

14       A      Yes, I do.

15       Q      Where did you look at

16  surveillance video?

17       A      It's in my office.

18       Q      And what did you see, if

19  anything, on the surveillance video?

20       A      To see if Mauro was in the club

21  during the time that the sessions were pulled,

22  if he entered the building or left the building

23  during that time.

24       Q      How much surveillance video did

25  you look at?

126

1                    Sanders

2          A     I looked at the video from the

3    time stamps on, you know, from the time stamps

4    of when the sessions were pulled.

5                    So if they were pulled, again, I

6    don't remember the exact time, but if the

7    sessions were pulled at say 2:00 in the

8    afternoon, I looked at video from before that

9    time all the way up until that time.

10         Q     I see.

11                   So from before that time, what

12   does that mean to you?

13         A     If the sessions were pulled at

14   2:00, I looked at video prior to 2:00 p.m. on

15   the particular day that the sessions were pulled

16   to see if Mauro was in the club.

17         Q     What time does video start?

18         A     It's basically ongoing.

19         Q     So how much video did you look

20   at?

21         A     I looked at the video from the

22   dates of the pulled sessions and the time stamps

23   of those sessions and, again, the amount of time

24   prior to the sessions being pulled.

25         Q     Well, the video is 24-hour video,

127

Sanders

1

2      right?

3              A       Uh-hum.

4              Q       And if the sessions were pulled

5      at 2:00, right, it's your testimony that you

6      looked at all the video on that date before

7      2:00, correct?

8              A       Meaning the hours of that

9      particular day.

10                     So if it was pulled on Saturday

11     at 2:00 in the afternoon, that means the person

12     would have had to have been in the club at 2:00

13     in the afternoon on that Saturday to pull the

14     sessions.

15                     They would have to have been

16     there.

17                     So I'm going to look at the video

18     prior to 2:00 all the way up until 2:00 to see

19     if that individual or who is in the club during

20     that time prior to 2:00, because they would have

21     to have been in the club to pull the session.

22                     So that's the video that I looked

23     at.

24                     Did I look at the last three days

25     worth?

128

1                          Sanders

2                  No, because the club closes every

3       day, so there's no one in the club.  You can't

4       have access to the club.

5                  And, again, the session was

6       pulled on a particular day and time, so I would

7       have to view during that time frame before the

8       sessions were pulled.

9            Q       How much video would you say you

10      looked at?  How much time did you spend looking

11      at video?

12           A       A couple of hours.

13           Q       So if sessions were pulled at

14      2:00 in the afternoon, you looked at a couple of

15      hours of video prior to that session being

16      pulled; is that your testimony?

17           A       Yeah.

18           Q       So you came to the conclusion

19      that there was no way that Mr. Maietta could be

20      involved in this in part because you looked at a

21      couple of hours of video prior to when the

22      session was being pulled?

23           A       Correct.

24           Q       And did you notice whether during

25      this few hours of video that you looked at, did

129

1                        Sanders

2    you notice whether Ms. Ashdown was on the video?

3            A       Yes.

4            Q       So you did see her on that video?

5            A       Yes.

6            Q       I take it this video is pretty

7    important to your investigation, right?

8            A       Yes.

9            Q       Did you show the video to

10   anybody?

11           A       I don't remember.

12           Q       Did you preserve the video?

13           A       No.

14           Q       Did you e-mail anybody about the

15   video?

16           A       I believe it was definitely

17   talked about with Matt Plotkin.

18           Q       Please just answer my question.

19                   Did you e-mail anybody about the

20   video?

21           A       E-mail anybody about the video?

22                   No, I don't believe I e-mailed

23   anyone about the e-mail.

24           Q       Is there any evidence whatsoever

25   as you sit here today about this video?

```
 1                      Sanders
 2          A      No, probably not.
 3          Q      So you destroyed it?
 4          A      No, I didn't destroy it.
 5          Q      But you didn't save it?
 6          A      Didn't save it.
 7          Q      You didn't e-mail anyone about
 8   it?
 9          A      No.
10          Q      Didn't write a memo about it?
11          A      I didn't write a memo about it,
12   no.
13          Q      So you have a video that supports
14   your investigation into someone stealing, but it
15   doesn't exist anymore, right?
16          A      Correct.
17          Q      And how long does the video
18   automatically save itself?
19          A      Probably a month's worth, and it
20   just kind of takes over itself.
21          Q      So it saves itself --
22          A      Like if the video saves on the
23   system for probably like a month --
24          Q      How do you know that?
25          A      Because that's what our video
```

131
1                           Sanders
2      people that set up the cameras told me at the
3      time, that, you know, that's what I knew about
4      the video at the time.
5              Q      So you have gotten some training
6      on the video?
7              A      Yes.
8              Q      Do you know how to save video?
9              A      Yes.
10             Q      But you didn't save this video?
11             A      No.
12             Q      Did you notice whether Ryan was
13     on the video?
14             A      Don't remember.
15             Q      How about Bobby, did you notice
16     whether he was on the video?
17             A      I don't remember.
18             Q      This investigation that you
19     conducted into whether Mauro Maietta was part of
20     this session pulling scheme, you said you talked
21     to him?
22             A      Yes.
23             Q      Did you memorialize that
24     conversation?
25             A      What do you mean?

132

1                            Sanders

2            Q        Did you e-mail anybody about it?

3            A        No.

4            Q        And so there is no record of it,

5    right?

6            A        Probably not.

7            Q        And did you speak with anyone

8    else as part of your investigation into Mr.

9    Maietta?

10           A        Probably Matt Plotkin.

11           Q        Why do you say probably?

12           A        Because that's who my direct boss

13   is, so that's who I usually first talk to.

14           Q        What would he know about whether

15   Mr. Maietta stole the sessions?

16           A        He would know -- you asked about

17   the video, right?

18           Q        Yes.

19           A        He would know when I was, during

20   the investigation into this matter, I believe I

21   did communicate to him that we watched -- I

22   watched the video, not we, I watched the video

23   and Mauro was not in the building as

24   specifically pertains to Mauro, having the

25   belief that he did have something to do with

133

                              Sanders

1

2      this or not.

3                  And I believe I did let Matt know

4      that I watched the video and Mauro wasn't in the

5      club during the time that the sessions were

6      pulled.

7                  So I'm pretty sure that I had

8      that conversation with Matt.

9           Q      Why are you pretty sure about

10     that?

11          A      Because, again, he was involved

12     in, I communicated pretty much everything to him

13     as it relates to this situation.

14                 This wasn't me on an island by

15     myself saying "I'm going to make these

16     decisions.  I'm going to do these different

17     things."

18                 I was definitely communicating to

19     my boss, my direct boss, what I was doing and

20     how I was doing what I was doing.

21                 So I'm pretty confident that I

22     told him about that.

23          Q      How many sessions were involved

24     in this investigation?

25          A      I believe -- I want to say either

134

1                           Sanders

2    18 or 21, something around that number.

3           Q       And you're positive based on your

4    investigation that Mr. Maietta wasn't involved

5    in any of these 17 or 18 sessions?

6           A       Yes.

7           Q       And did you look at video with

8    respect to all 17 or 18 of these sessions?

9           A       Yes.

10          Q       You did?

11          A       To see if he was in the building

12   during the time those sessions were pulled.

13                  Most of them were pulled over a

14   two, maybe three-day period at the most.

15                  So it wasn't like they were

16   pulled individually on multiple days.

17                  They were pulled on Saturdays and

18   it was a group of them that were pulled on

19   Saturday.

20                  So it wasn't like I had to watch

21   18 days' worth of video.

22          Q       Did you watch more than one day

23   of video?

24          A       I watched the days that the

25   sessions were pulled.

135

Sanders

1

2          Q       I'm asking if you watched --

3     because earlier you testified you only watched a

4     couple of hours of video leading up to one

5     session.

6                  So let's talk about what you

7     recall you actually looked at.

8                  Did you look at more than a

9     couple of hours of video leading up to one

10    session?

11         A       It wasn't one session.  It was

12    multiple sessions that were pulled and on the

13    days those sessions were pulled, I looked at

14    video to see if Mauro was in the club on those

15    days that those sessions were pulled.

16                 That's what I looked at.  And I

17    looked at the video prior to the time stamp of

18    when the sessions were pulled.

19         Q       Have you ever used anyone else's

20    login ID to log into someone else's computer?

21         A       No.

22         Q       Are you positive of that?

23         A       I don't use anyone else's ID

24    ever.

25         Q       Ever, in the five years, you

136
1                        Sanders
2    never used anyone's login ID to log into a
3    computer?
4                    MR. McPARTLAND:  Objection.
5                    Asked and answered.
6         A     I don't use anyone else's login.
7    I have my own.  I don't need to use anyone
8    else's.
9         Q     Have you ever been aware of
10   anyplace else using someone else's login ID to
11   log in to a computer?
12        A     Possible, I don't know.
13        Q     I'm not asking about
14   possibilities --
15        A     I don't know.
16        Q     As a manager of a gym, have you
17   ever become aware of anyone using a login ID to
18   log into a computer that wasn't theirs?
19                    MR. McPARTLAND:  Object to
20                    the form.
21        A     I'm not aware of that.
22        Q     So you're not aware of it?
23        A     No.
24        Q     So if someone pulled a session at
25   6:00 in the evening, let's say, how much video

                    MCM REPORTING SERVICE
                       (516) 775-5209

137

1                              Sanders

2      would you have looked at on that day to

3      determine that Mr. Maietta wasn't in the

4      building that day?

5              A     I would look at video for a few

6      hours before 6:00.

7              Q     So what is a few hours in your

8      mind?

9              A     I would look at 3:00 in the

10     afternoon to 6:00 to see if, you know, because

11     you, again, you would have to physically be in

12     the building to pull the session at 6:00.

13                   So I would want to see if prior

14     to 6:00 p.m. if the person is in the building or

15     prior to 6:00 p.m. have they left the building.

16                   So you want to see if they're in

17     there, how long were they in the club, and did

18     they leave.  That's basically what I can see or

19     watch from the video.

20             Q     Earlier I thought you said that

21     you just looked at video leading up to the

22     session.

23                   Are you now telling me you looked

24     at video after the session was pulled?

25             A     What I'm saying is, I'm watching

138
Sanders

1

2      video up until the time that the session is

3      pulled, meaning to see who's in the building or

4      if they've left the building prior to that

5      session being pulled.

6                   So that's all I'm looking at.

7           Q      Okay.

8           A      Because I need to know if they're

9      in the building when that session was pulled.

10                  That's the most important thing.

11          Q      Right.

12                  If a session was pulled at say

13     6:00, you said --

14          A      I'm going to before 6:00 to

15     watch.

16          Q      For three hours, right?

17          A      Right.

18          Q      Like for three hours, but if

19     someone got to the building in the morning and

20     stayed in their office throughout the day, would

21     you know whether or not they were in the

22     building or not?

23          A      If they came in the building

24     early and stayed in the building?

25          Q      If they came into the building at

139

                          Sanders

1

2    8:00 in the morning?

3          A      And didn't leave the building,

4    you are saying?

5          Q      Yes.

6          A      Then obviously if I didn't watch

7    from 8:00 in the morning, then, no, I wouldn't

8    know that they were in the building.

9          Q      Just please answer my question.

10                If they arrived at 8:00 in the

11   morning, you only looked at video from 3:00 to

12   6:00, but they arrived at the building at 8:00

13   and didn't leave, would you know whether or not

14   they were in the building based on your looking

15   at those three hours of video?

16         A      Probably not, if they didn't

17   leave, no.

18         Q      How many cameras are there?

19         A      Nine cameras in the club.

20         Q      Where are the cameras located?

21         A      Front desk, locker rooms,

22   outside, shop, retail place and down the

23   corridor leading into the gym.

24         Q      There is a camera in the locker

25   room?

140

1                            Sanders

2          A       Not in the locker room, outside.

3                  MR. HARMAN:  Could you

4                  read back the list, please?

5                  (Whereupon, the record was

6                  read back by the reporter.)

7          Q       Other than the main entrance to

8    the gym, is there any other way to get into the

9    gym?

10         A       Not to my knowledge, no.

11         Q       And how many cameras in total

12   would you say there are, nine?

13         A       I think it's nine.

14         Q       So you would have to look at nine

15   different sets of video; is that correct?

16         A       I would look at the video from,

17   the video that has everyone -- there's two

18   cameras that everyone has to pass by, which is

19   the front desk, so that's the camera that you're

20   looking at primarily, the front desk camera,

21   because everyone -- no one can get into the club

22   unless they walk past the front desk, so that's

23   the primary camera that you're going to look at.

24         Q       So it's your testimony that you

25   looked at the front desk camera?

141

                              Sanders

1

2          A       And looking at the camera going

3    down the corridor leading into the gym.  That's

4    another camera that 95 percent of the people

5    that are coming in have to go past, and that's

6    the camera that would lead to the gym floor and

7    where the PT manager's office is.

8          Q       So those are two separate

9    cameras?

10         A       Yes.

11         Q       Two separate sets of video?

12         A       Yes.

13         Q       Did you look at them

14   simultaneously?

15         A       Yes.

16         Q       So you were looking at two sets

17   of video at the same time?

18         A       Yes.

19         Q       Did you look at any other video?

20         A       No.

21         Q       And do you recall on how many

22   days you have looked at video?

23         A       How many days?  I don't know the

24   exact number of days.  It was just whatever days

25   were --

142

1                          Sanders

2          Q      Well, I'm not talking about on

3     different days.

4                 How many different days of video

5     did you look at when you conducted your

6     investigation into Mr. Maietta?

7          A      Whatever the days were that the

8     sessions were pulled, that's the days that I

9     looked at on the video.

10         Q      But I'm asking about your

11    recollection.

12                So did you think it was more than

13    two?

14         A      It was at least two.

15         Q      Do you think it was more than

16    five?

17         A      I don't believe so.  I don't know

18    for sure.

19         Q      And what else besides this video

20    that you looked at did you do to conduct an

21    investigation into Mr. Maietta?

22         A      That was probably the primary

23    thing that I did.

24                I don't think there was anything

25    else I did as far as an investigation.

143

1                              Sanders

2           Q       So you didn't do anything else,

3     you just looked at this video for three hours

4     leading up to the sessions that were pulled?

5           A       Yes.

6           Q       And based on what you have

7     testified to today, you determined that there

8     was no way that Mr. Maietta could have been

9     involved in this session pulling?

10          A       Yes.

11          Q       And you didn't speak to any other

12    employee of Equinox regarding whether Mr.

13    Maietta was involved in this?

14          A       No.

15          Q       But you did speak with other

16    employees regarding whether Ms. Ashdown was

17    involved in this, right?

18                       MR. McPARTLAND:  Object to

19                  the form.

20                       You can answer.

21          A       No, I didn't speak to other

22    employees whether she was involved in this or

23    not.

24                       I spoke to trainers with regard

25    to the sessions that were pulled and asked do

144

1                        Sanders

2      they know about these sessions.

3                    I didn't tell these trainers that

4      I think, do you think Kerry is involved in this,

5      that's not what I said.

6           Q      Did you speak with any Equinox

7      employees about whether Ms. Ashdown, other than

8      the corporate employees that you have talked

9      about, whether Ms. Ashdown was involved in the

10     session pulling?

11          A      Not that I recall.

12          Q      When did you conduct this

13     investigation?

14          A      It was in August 2011.

15          Q      Let's turn your attention back to

16     Plaintiff's Exhibit 3.

17          A      (Perusing document.)

18          Q      You testified that you drafted

19     this e-mail and in the last sentence of the

20     first paragraph, would you agree that it says,

21     "She also feels he needs to be investigated in

22     regard to this situation"?

23          A      What about it?

24          Q      Did you write it?

25          A      Yes.

145

1                            Sanders

2              Q       And did you write it on September

3      1, 2011?

4              A       Yes.

5              Q       And had you completed your

6      investigation when you wrote this e-mail?

7              A       Probably, yes.  I'm pretty

8      certain, because I already looked at the video,

9      yes.

10             Q       So you had already completed your

11     investigation?

12             A       I'm just communicating to them

13     what she felt or what I believed she felt, so

14     that they knew, that's all.

15             Q       So you wanted them to know what

16     you thought she felt?

17             A       Yes.

18             Q       But you didn't think it was

19     important to tell them that you had already

20     completed an investigation involving looking at

21     video?

22             A       Again, I'm pretty confident that

23     I had a conversation with Matt Plotkin about

24     what I did prior to sending this e-mail.

25                          (A document Bates stamped

146

```
 1                       Sanders

 2              EQX-6400 was marked as Plaintiff's

 3              Exhibit 4 for identification, as of

 4              this date.)

 5    BY MR. HARMAN:

 6         Q    I'm handing you what's been

 7    marked as Plaintiff's Exhibit 4 (handing).

 8              Please take a look at it.

 9                  MR. McPARTLAND:  Just for

10              the record, we removed the

11              confidentiality designation on

12              this document.

13                  So if you want to produce

14              the unredacted document, which I

15              believe I produced, I used in

16              Ms. Ashdown's deposition, just

17              let me know.

18                  MR. HARMAN:  Okay.

19                  MR. McPARTLAND:  Because I

20              see the member's name is redacted

21              on this document.

22         A    (Perusing document.)

23         Q    Are you done?

24         A    Yes.

25         Q    I take it you as a general
```

147

1                          Sanders

2     manager of the Soho location consider session

3     stealing to be a pretty serious offense?

4              A      Yes.

5              Q      And as part of your investigation

6     into the serious sessions stealing, you

7     determined that Ms. Ashdown had stolen sessions;

8     is that correct?

9              A      Yes.

10             Q      And that Mr. Maietta had not been

11    involved in the session stealing; is that

12    correct?

13             A      Yes.

14             Q      Now, because you have testified

15    it's such a serious offense, did it occur to you

16    that Ms. Ashdown might have been stealing

17    sessions during her entire time there?

18             A      Possibly, yes.

19             Q      And that could mean that members

20    of Equinox would have had sessions taken from

21    them illegally, right?

22             A      Yes.

23             Q      And did you endeavor to determine

24    whether or not Ms. Ashdown had stolen sessions

25    during other periods?

148

                              Sanders

1

2          A        No.

3          Q        That wasn't important?

4                   MR. McPARTLAND:   Object to

5                   form.

6                   You can answer.

7          A        I just didn't do it.

8          Q        All right.

9                   So as you sit here today you have

10    no idea whether any other sessions were stolen

11    even in your club?

12         A        No.

13         Q        Because you didn't look?

14         A        Correct.

15         Q        Drawing your attention to

16    Plaintiff's Exhibit 4 here, this is a

17    spreadsheet that is Bates stamped EQX-6400, and

18    it has the line member name, or membername,

19    redacted, it's subsequently been produced in

20    unredacted form.

21                  Perhaps we will review that

22    document at a later point in the deposition, but

23    for now we are going to discuss this document.

24                  Do you recognize this document,

25    Mr. Sanders?

149

1                          Sanders

2          A      Yes.

3          Q      What is it?

4          A      It was the IT report that they

5   pulled from the database to analyze the sessions

6   that were pulled.

7          Q      When you say "they," who is

8   "they"?

9          A      The IT department.

10          Q      And when you say "analyze," who

11   was analyzing this?

12          A      I was, and I believe Matt looked

13   at it.

14                 I'm not sure who else looked at

15   it.

16          Q      So you analyzed this document?

17          A      Yes.

18          Q      And as part of your analysis,

19   what did you do?

20          A      Just looked at the dates, you

21   know, to perform, the dates, you know, who it

22   went to and who got credit for it and when they

23   were used, reinstated, all of that stuff.

24          Q      Why were they reinstated?

25          A      Because they looked -- well,

150

1                              Sanders

2      the -- when something is reinstated, that means

3      it should not have been used, is one reason for

4      it being reinstated.

5                      And another way, another reason

6      it would be reinstated is if it expired and you

7      actually want to use an expired session, so then

8      it would be reinstated for that purpose.

9                      So that's two reasons why it

10     would be reinstated.

11          Q      Let's look at line one.  Do you

12     know why the session in line one was reinstated?

13          A      Because he should not have been

14     paid for that session, so it got reinstated.

15          Q      And how did you determine that --

16     so it was reinstated when?

17          A      It doesn't have the date on here

18     when it was reinstated, but it was reinstated

19     because it should not have been used.

20          Q      Are you guessing or do you know?

21          A      No, I'm telling you.

22          Q      And what does the date reflect?

23          A      The date reflects the date that

24     it was pulled or performed from the system, the

25     performed date.

151
Sanders

1

2      Q      What does the August 13, 2011

3   date reflect, in your opinion?

4      A      That's the date that reflects

5   when it was pulled, like used in the system.

6      Q      What is August 16th, what is that

7   date?

8      A      That's the date that it was

9   reinstated, because it should not have been

10   used.

11      Q      But you just testified earlier

12   that you didn't know when it was reinstated?

13      A      Well, I made a mistake.

14            MR. McPARTLAND:  Object to

15         the form.

16      Q      Did you testify earlier that you

17   didn't know when it was reinstated?

18      A      I made a mistake.

19      Q      Do you understand this form?

20      A      I have a good understanding of

21   the form, yes.

22      Q      If you go to the third line where

23   it says February 12, 2012, what does that mean?

24      A      That was the expired date.

25   That's what it says.

152

1                         Sanders

2          Q      And if it was, where does it say

3     that it was expired?  Oh, I see.

4                 So it's your testimony that that

5     means that that date reflects when the session

6     was expired?

7          A      Yes.

8          Q      Okay.

9          A      See, the part --

10         Q      Please, please.

11                February 12, 2012, would you

12    agree is a date after August 13, 2011, correct?

13         A      Yes.

14         Q      So that particular session hadn't

15    expired, correct?

16         A      Correct.

17         Q      Is there any session on here that

18    you are aware of that had expired?

19         A      (Perusing document.)  It looks

20    like none of them had expired yet.

21                      MR. HARMAN:  It's 1:10.

22                Why don't we take a lunch break

23                now?

24                      (Whereupon, at 1:10 p.m.,

25                a luncheon recess was taken.)

                    MCM REPORTING SERVICE
                       (516) 775-5209

153

```
1                          Sanders

2                    AFTERNOON SESSION

3                              September 12, 2013

4                              2:06 p.m.

5    L A W R E N C E     S A N D E R S, resumed and

6         testified further as follows:

7    EXAMINATION

8    BY MR. HARMAN

9         Q      Mr. Sanders, while on your break

10   did you speak to anyone about your testimony?

11        A      No.

12        Q      Did you speak to anyone at all?

13        A      No.

14        Q      Did you use your phone?

15        A      No.

16        Q      As part of your investigation

17   into session pulling, did you investigate

18   Cornelia?

19        A      I had a conversation with her,

20   yes.  And also I believe Liz Minton had talked

21   to her about it or spoke to her about the

22   session pulling.

23        Q      So you had a conversation with

24   her and that's it?

25        A      Yes.
```

154

1                           Sanders

2               Q       Did you ever work at the 17th

3      Street location?

4               A       Yes.

5               Q       What was your title there?

6               A       General manager.

7               Q       How long did you hold that title?

8               A       Two years.

9               Q       And what were the years of that?

10              A       2008 to 2010.

11              Q       And you testified that you were

12     able to pull, you as one of the managers are

13     able to pull sessions for trainers, correct?

14              A       Yes.

15              Q       And how do you do that?

16              A       Either the trainer has come to us

17     and said the session forgot to be pulled or

18     there's a book that we have that's called

19     cancellation book slash forgot to pull book.

20                      So when clients forget to pull

21     their sessions, the trainers write the client's

22     name in this book and they write down whether it

23     was a no show, late cancellation or basically

24     forgot to pull.

25                      And then the PT manager or the

155

1                          Sanders

2    fitness manager is responsible for checking this

3    book on a daily basis and pulling whatever

4    sessions need to be pulled.

5                    So if you are not able to do

6    that, then I would potentially be the third

7    person or the AGM would be the fourth person

8    that would be instructed to take care of that.

9         Q       Who is the AGM?

10        A       Currently?

11        Q       Yes.

12        A       Name is Jed Prisby and Jane

13   Montoya.

14        Q       There are two?

15        A       There are two AGMs in my club

16   presently, yes.

17        Q       The first one?

18        A       The name is Jed Prisby, J-E-D

19   P-R-I-S-B-Y.

20        Q       And the second one?

21        A       Jane Montoya, M-O-N-T-O-Y-A.

22        Q       And how long has Jed been an

23   assistant general manager?

24        A       He's been with Equinox for, I

25   believe for a little over two years.

156

1                          Sanders

2          Q        How long has he been at Soho?

3          A        About three, four months.

4          Q        And how many assistant managers

5     were there when Ms. Ashdown was there?

6          A        One.

7          Q        What was that individual's name?

8          A        I believe it was Lauren Buck.

9          Q        And where is Ms. Buck now?

10         A        No longer with Equinox.

11         Q        And how did her employment with

12    Equinox end?

13         A        We decided that she should go a

14    different route in the company, do a different

15    position.

16                  We spoke to her about it and she

17    decided not to want to do that, so she left.

18         Q        And how would you describe the

19    relationship between Lauren Buck and Mauro

20    Maietta?

21         A        I'd guess I would describe it as

22    professional.

23         Q        Did he complain about her?

24         A        No, not to my recollection, no.

25         Q        Would you describe, would you

157

1                          Sanders

2      describe the relationship between Mauro and

3      Ms. Ashdown as professional?

4               A       Mauro and Ms. Ashdown as

5      professional?

6               Q       Yes.

7               A       For the most part, yes, it was

8      professional.

9               Q       Ever identify any unprofessional

10     behavior on the part of Mauro Maietta with

11     respect to their relationship?

12              A       No, I haven't.

13              Q       You trained with Mauro Maietta,

14     right?

15              A       Yes.

16              Q       And there was a time where you

17     trained with him on a regular basis, correct?

18              A       Yes.

19              Q       That would be at least three

20     months, maybe three months, approximately?

21              A       Yes.

22              Q       And that would be a couple of

23     times a week?

24              A       Yes.

25              Q       And you're his direct supervisor,

158
                              Sanders

1

2       correct?

3            A      The PT manager is his direct

4       supervisor.  I'm the supervisor over everyone in

5       the club.

6            Q      So as part of your

7       responsibilities as the supervisor over everyone

8       in the club, do you check in with the personal

9       training manager to see how things are going?

10           A      Yes.

11           Q      And the fitness manager to see

12      how things are going?

13           A      Yes.

14           Q      And I assume you want to know

15      good things about them, right?

16           A      Yes.

17           Q      And did Mr. Maietta ever say

18      anything positive about Ms. Ashdown?

19           A      He thought that she brought a

20      different energy, obviously in the beginning,

21      and she was, like I said, driven and ambitious

22      and motivated and wanted to inspire people in

23      the club.

24                  So that was something that was

25      good that he recognized.

159

1                        Sanders

2          Q       Did he specifically tell you

3    those things or are those your observations?

4          A       Those were my observations of the

5    interactions and based on, you know, again,

6    conversations had with him in the beginning.

7          Q       Now, I'm going to repeat my

8    question so the record is clear.

9          A       Yes.

10         Q       Did Mr. Maietta ever say anything

11   to you that was positive about Ms. Ashdown?

12         A       Specifically I can't recall.

13         Q       Now, when you were working at the

14   17th Street location, did you have a login

15   number to log into your computer?

16         A       Did I?

17         Q       Yes.

18         A       Yeah.

19         Q       And were there occasions when you

20   had to pull sessions?

21         A       Probably very rare, but maybe,

22   but I don't recall.

23         Q       But would you know how to do it

24   if you needed to?

25         A       Of course.

160

                          Sanders

1

2          Q       Did you have an office at 17th

3   Street?

4          A       Yes.

5          Q       Was it enclosed?

6          A       Yes.

7          Q       And I'm not asking for the

8   specific number.  It doesn't really matter.

9                  But I take it you punch in some

10  kind of code to log into the system to pull a

11  session, right?

12         A       Yes, your cashier's code.

13         Q       Your cashier's code.

14                 And that's your own private code,

15  right?

16         A       Yes.

17         Q       No one else has that?

18         A       Correct.

19         Q       No one is supposed to have that,

20  right?

21         A       Yes.

22         Q       Do you have that written down

23  anywhere?

24         A       No.

25         Q       Have you memorized it?

161

                          Sanders

1

2          A      Yes.

3          Q      How long have you had it?

4          A      I have had it probably my entire

5    employment at Equinox.

6          Q      So it doesn't change?

7          A      The only way it would change is

8    if I found out someone had it, then I would have

9    it changed.

10         Q      But it doesn't change when you

11   move from club to club?

12         A      No, it doesn't.

13         Q      And if you wanted to log in to

14   pull a session at another computer, could you do

15   that?

16         A      There's only certain computers

17   designated to pull sessions.

18         Q      What are those?

19         A      The front desk computers, my

20   computer as a general manager.

21         Q      Right.

22         A      And the PT manager's computer,

23   the PT and fitness manager.

24                I believe those are the only

25   computers designated to pull sessions from, like

162

1                           Sanders

2      IT has to set it up so you can pull sessions

3      from those computers.

4                      So it's not any computer in the

5      club that has the ability to pull sessions.

6           Q       Right.

7                      Well, I'm not talking about

8      computers that are out in --

9           A       You are talking specific to the

10     club?

11          Q       I understand.

12                     So you have got the front desk

13     and your computer and the PT and fitness

14     manager's computers, right?

15          A       Right.

16          Q       Now, there are trainers that work

17     at more than one club, right?

18          A       Trainers that work at more than

19     one club?

20          Q       Yes.

21          A       Not, no.

22          Q       That never happens?

23          A       That doesn't happen.

24          Q       You're positive of that?

25          A       It's possible, but that's not

163

1                            Sanders

2       what I'm used to.  That's not what I have

3       experienced.

4            Q      Well, like when a trainer becomes

5       a manager in training, for example, and they

6       move from one club to the other, but they still

7       have a client base at one club, but they're

8       moving to another club to become a manager and

9       they're going through a training program, isn't

10      it possible that they might be training people

11      in two different locations?

12           A      You're saying if I'm -- is the

13      question you're asking, if I'm manager, I have

14      been promoted to a manager?

15           Q      If you are a trainer?

16           A      If you are a trainer, I'm not

17      aware of trainers training multiple people in

18      different locations.

19                  I'm not aware of it.

20           Q      Ever?

21           A      I'm not aware of it.

22           Q      Is it possible?

23           A      Anything is possible, but I'm not

24      aware, that's not the protocol of the standard

25      for how things are supposed to go.

164

Sanders

1

2      Q      Is this protocol written down

3   someplace?

4      A      I'm not aware of that.

5      Q      How do you understand this

6   protocol?

7      A      I understand that if you're a

8   trainer at one location, you train your clients

9   at that location.

10             The only time you would

11   potentially train one of your clients at this

12   location, at another location, is if there's

13   some kind of unforeseen issue at that location

14   where members can't go to it for whatever the

15   reason is, then we may make accommodation for

16   our trainers to train a client at a different

17   location.

18      Q      Let's go back to the computer,

19   the cashier's code.

20      A      Uh-hum.

21      Q      So your cashier's code was the

22   same, but you went to Soho and you could log

23   into the designated computers using the same

24   cashier's code, right?

25      A      Well, logging into the computer

165

1                        Sanders

2     and using the cashier's code are two very

3     different things.

4              Q      But you could use the same

5     cashier's code at Soho that you used at 17th

6     Street, correct?

7              A      Yes.

8              Q      And I take it that Ms. Ashdown

9     had a cashier's code, correct?

10             A      Yes.

11             Q      And that Mr. Maietta had a

12    cashier's code, correct?

13             A      Yes.

14             Q      And that like yours, they could

15    be used at other locations?

16             A      If they were transferred to those

17    locations as managers.

18             Q      I'm not asking if they were

19    transferred.

20             A      No, they can't be used.

21             Q      I'm not asking about policy.

22             A      They would not be able to use the

23    code at the location.  They only can use their

24    code at the location that they work at.

25             Q      How do you know that?

166

1                           Sanders

2          A       Because that's the way our system

3     is set up.

4          Q       How do you know that?

5          A       I have worked for the company for

6     long enough to know how the system is set up.

7          Q       Do you know of any policy that

8     says that a cashier's code can't be used at more

9     than one location?

10         A       I know that when I go to a

11    location that I don't have access to, and I'm

12    not working at, and if I tried to use my

13    cashier's code, it won't work.

14         Q       Have you tried to do that?

15         A       Of course.

16         Q       When?

17         A       Early on in my Equinox career,

18    obviously, to see when I'm at another club

19    trying to do some work because I'm not at my

20    club to try to log into the computer, it won't

21    allow me to do it.

22         Q       So is part of this investigation

23    into Cornelia, you spoke with her?

24         A       Yes.

25         Q       And what did you say to her?

167

                              Sanders

1

2          A      I asked her does she know who

3     these people were and did she, you know, pull

4     sessions for Kerry to, with this client, and,

5     you know, did she pull these sessions.

6          Q      What did she say?

7          A      She didn't know who these people

8     were and she said that, no, she didn't pull the

9     sessions for Kerry.

10         Q      And did you ask her anything

11    else?

12         A      I asked her did Kerry have her

13    cashier's code and she said Kerry was the one

14    that gave it to her.

15         Q      She said that Kerry was the one

16    that gave it to her?

17         A      Her cashier's code.

18         Q      Who issues cashier's codes?

19         A      What?

20         Q      Who issues cashier's codes?

21         A      The managers of the respective

22    departments.  So like if you're the fitness

23    manager or the PT manager and you have a manager

24    in training, they have the ability to issue or

25    let them know what their cashier's codes are

168
1                      Sanders

2     going to be.

3                    So that's who would tell them.

4                    Front desk employees, assistant

5     managers or myself would tell the front desk

6     employees, "This is your cashier's code,

7     obviously don't share it with anyone.  This is

8     what you're going to use to be able to do

9     transactions."

10                    So it depends on the employee

11    that needs the cashier's code and that manager

12    or whoever is directing, managing that employee,

13    will give them the cashier's code.

14          Q     She told you that Kerry issued a

15    cashier's code to her?

16                    She was a manager in training,

17    right?

18          A     She was a manager in training.

19          Q     She wasn't a trainer, right?

20          A     Right.

21          Q     And Kerry would issue -- do

22    trainers get cashier's codes?

23          A     No, not trainers, no.

24          Q     Who issued Kerry's cashier's

25    code?

169

1                           Sanders

2              A       I probably gave Kerry her

3     cashier's code.

4              Q       So you would have known Kerry's

5     cashier's code?

6              A       Yeah.

7              Q       And where would you have kept it?

8              A       I don't keep it anywhere.

9              Q       So you have no idea.

10                      Did you issue Mauro's cashier's

11    code?

12             A       Probably not, because he was a

13    manager before I became a general manager at

14    17th Street.

15                      So I would assume that the PT

16    manager at that club gave him his cashier's

17    code.

18             Q       You would assume?

19             A       I would assume.  I don't know for

20    certain who gave him his cashier's code.

21             Q       And did Cornelia tell you

22    anything else?

23             A       No.

24             Q       Did you talk to Bobby about this

25    session pulling?

170

1                              Sanders

2          A      Yes, I did.

3          Q      Tell me, what benefit would Ms.

4     Ashdown have from giving sessions to Bobby?

5          A      One, I know Bobby was a trainer

6     that was struggling and he was a trainer that

7     was having a difficult time with his business,

8     and these sessions that were pulled for him

9     helped him hit a pay period bonus, which means

10    he gets additional money because of these

11    sessions being pulled for him.

12                 And, you know, I know that Kerry,

13    again, she wanted to take care of her people.

14    And so the benefit would be if she has a trainer

15    on staff that she has helped out to make a

16    little bit more money.

17                 And I know that there was a

18    period of time where, you know, Kerry and I had

19    a conversation about how Bobby was struggling,

20    and, you know, him needing money and confiding

21    in her about some financial stuff that was going

22    on with him.

23         Q      Did he tell you this or did she

24    tell you that?

25         A      She told me that.

171

1                          Sanders

2          Q       So you believe that Ms. Ashdown

3     took sessions and gave them to Bobby because he

4     was struggling financially?

5          A       Possibly, yes.

6          Q       So you believe it's possible or

7     do you believe it's true?

8          A       I believe it's true.

9          Q       So you believe that she stole

10    sessions to give them to Bobby because he was

11    struggling with money, but that these sessions

12    that she stole helped him get a bonus, correct?

13         A       Yes.

14         Q       And that she likes to take care

15    of her people, right?  That's your testimony,

16    correct?

17         A       Yes.

18         Q       And are there any other people

19    that she was taking care of?

20         A       I don't know.

21         Q       Did you conduct any

22    investigations into whether she was taking care

23    of any other of the 35 to 40 people?

24         A       No, I don't.

25         Q       That wasn't important to look at?

172

```
 1                      Sanders
 2                      MR. McPARTLAND:  I object
 3              to the form.
 4         A      I didn't look at it.
 5         Q      Did you interview anyone else --
 6    well, once you terminated Ms. Ashdown for
 7    stealing the $60, did you interview anybody else
 8    for her position?
 9                      MR. McPARTLAND:  I object
10              to the form.
11                      You can answer.
12         A      I believe I answered that.  I
13    don't recall interviewing anyone else.
14         Q      So you just put Mauro in that
15    position, right?
16         A      Yes.
17         Q      And was he excited to have that
18    position?
19         A      I'm not sure.  You would have to
20    ask him that.
21         Q      I'm asking you did he appear to
22    be excited to have that position?
23         A      I'm not certain whether he was
24    excited or not.
25         Q      Did he seem stressed?
```

173

1                       Sanders

2                  MR. McPARTLAND:  Object to

3            the form.

4                  You can answer.

5        A      I don't think he was thrilled the

6   way it came about.  I don't think he was excited

7   about that.

8        Q      Are you speculating again or are

9   you telling what you observed?

10                  I am asking you about your

11   observations, not your speculations.

12        A      My observation is it wasn't the

13   best situation to be in.  That was my

14   observation.

15        Q      So you're positive that Mauro

16   didn't set Ms. Ashdown up for this scheme of

17   session pulling?

18        A      Yes.

19        Q      Are you friendly with Mauro?

20   Would you consider him a friend?

21        A      I consider him a work colleague.

22        Q      That's it?

23        A      As a work colleague.

24        Q      You worked with him for a long

25   time?

174

1                        Sanders

2          A       Yes.

3          Q       Do you feel like you have his

4    back?

5          A       I have his back just as much as I

6    have anyone else's back.

7          Q       So when you are looking at this

8    video for three hours on some days, did you

9    notice whether Cornelia was on any of the

10   videos?

11         A       Yes, I did.

12         Q       And was she?

13         A       She was there.

14         Q       So she was on the video?

15         A       Uh-hum.

16         Q       It's your conclusion that

17   Cornelia had no part of this session stealing

18   scheme solely based on what she told you, that

19   she just didn't do it?

20         A       No, because she wasn't there

21   during -- she had left the club already.

22         Q       So you noticed on the video that

23   she had left the club as part of your video

24   investigation?

25         A       Correct.

175

1                         Sanders

2           Q       I see.

3                   And when had she left the club?

4           A       She left the club approximately

5     around 1:00, 1:30, I believe it was.

6                   I don't remember exactly, but I

7     know she left the club before, because obviously

8     I would have dealt with that.

9           Q       Did you memorialize that

10    anywhere?

11          A       No.

12          Q       And you said she left the club

13    around 1:00.

14                  Was that every day?  You looked

15    at video -- did you look at video for just one

16    day?

17                        MR. McPARTLAND:  Objection.

18                        Asked and answered, but

19                  you can answer.

20          A       I looked at video for the days

21    that the sessions were pulled, and, again, to

22    witness who was in the club during those times.

23          Q       And did she leave the club every

24    day about 1:00?

25          A       She was only in the club one of

176

1                        Sanders

2      the days.

3          Q      And she left at 1:00?

4          A      Approximately.  I don't really

5      recall exactly.

6          Q      But you didn't save the video of

7      her leaving at 1:00?

8                        MR. McPARTLAND:  Objection.

9                        Asked and answered.

10         A      No.

11         Q      You didn't show the video to

12     anybody?

13         A      No.

14         Q      And you didn't memorialize this

15     alleged departure of Cornelia shortly before the

16     session pulling?

17         A      No.

18         Q      Now, there were sessions pulled

19     at other times.

20                I mean, I take it now that you

21     are testifying that she left at 1:00 because

22     some of the sessions were pulled at 2:00,

23     correct?

24         A      I'm just saying based on what I

25     watched.

177

1                        Sanders

2          Q      Well, that's a pretty specific

3     recollection, right?

4                 You said it was a long time ago,

5     but now you're saying you specifically remember

6     her leaving at 1:00, right?

7          A      I said approximately.  I didn't

8     say she specifically left at that time.

9          Q      What makes you think that she

10    approximately left at 1:00?

11         A      Because she left the club, prior

12    to the sessions being pulled, she left the club.

13    I do know that.

14                        MR. HARMAN:  I'm going to

15                 call for the production of all

16                 records concerning any personal

17                 training sessions that Cornelia

18                 performed at the Soho location or

19                 at any other location on

20                 August 13, 2011, July 30, 2011,

21                 July 16, 2011 and that's it.

22                        So it would be any records

23                 concerning sessions that were

24                 pulled or any work-related

25                 activity for Cornelia Hobbie,

MCM REPORTING SERVICE
(516) 775-5209

178

```
1                        Sanders

2              H-O-B-B-I-E, at the Soho location

3              or at any other location,

4              including the location that she

5              had recently transferred from

6              where I understand she was still

7              performing personal training

8              sessions.

9                   MR. McPARTLAND:  We will

10             take that under advisement.

11                  Please put all your

12             requests in writing.

13   BY MR. HARMAN:

14        Q     Do you access your work e-mail

15   from your BlackBerry?

16        A     Yes.

17        Q     And do you access your work

18   e-mail from any other location other than your

19   desk say or your BlackBerry?

20        A     Yes.

21        Q     Where?

22        A     Any computer that I have access

23   to I can access my e-mail.

24        Q     Do you have a computer at home?

25        A     Yes.
```

179

1                          Sanders

2            Q       Do you access your work e-mail

3      from home?

4            A       Sometimes.

5            Q       And did you look for any e-mails

6      concerning Ms. Ashdown on your home computer?

7            A       No.

8            Q       And other than this home computer

9      that you have testified to, is there any other

10     computer that is not an Equinox computer that

11     you used to access your work-related e-mail?

12           A       No.

13           Q       Now, when you were doing this

14     video investigation, did you happen to notice

15     whether Bobby was at the location when the

16     sessions were pulled?

17           A       No.

18           Q       You did or did not?

19           A       I did not notice.

20           Q       And did you happen to know

21     whether Ryan was at the location when the

22     sessions were pulled?

23           A       I did not notice.

24           Q       Did you look?

25           A       No, I didn't look.

180

```
1                        Sanders

2          Q      Did you look for Bobby?

3          A      No, I didn't look for Bobby.

4                 MR. HARMAN:  I'm going to

5          also call for the production of

6          all personal training sessions

7          that were performed by Mauro

8          Maietta on August 13, 2011,

9          July 30, 2011, July 16, 2011, and

10         that's it.

11                So all personal training

12         sessions that were performed by

13         Mr. Maietta on those dates at the

14         Soho location or any other

15         records of any work-related

16         activity of Mr. Maietta on that

17         date.

18                MR. McPARTLAND:  Take it

19         under advisement.

20                Please put all requests

21         into writing.

22    BY MR. HARMAN:

23         Q      Did you ever evaluate Ms.

24    Ashdown's work performance?

25         A      No.
```

MCM REPORTING SERVICE
(516) 775-5209

181

1                          Sanders

2          Q       And how about Mr. Diaz, did you

3     participate in a search for Mr. Maietta's

4     replacement?

5          A       Yes.

6          Q       You did?

7          A       Yes.

8          Q       Was anyone else interviewed

9     besides Mr. Diaz?

10         A       Mr. Diaz is the second fitness

11    manager.  We had one named Lakei who was before

12    him, who was shortly after.

13         Q       And who selected Lakei?

14         A       It was a combination of the PT

15    department, I believe Joe, Liz, Rich, were all

16    involved in that decision-making process, me

17    being included with it also.

18         Q       What's Lakei's last name?

19         A       Herman, H-E-R-M-A-N.

20         Q       Is Lakei a man or woman?

21         A       Man.

22         Q       And how did Mr. Herman and Mr.

23    Maietta get along?

24         A       They got along okay.

25         Q       Okay?

182

1                          Sanders

2          A        Yeah.

3          Q        What happened to Mr. Herman?

4          A        He decided to step down from his

5     position a year after being in the position to

6     pursue his own personal interests.

7          Q        Did he ever complain about Mr.

8     Maietta?

9          A        About him being competitive.

10         Q        Anything else?

11         A        Not to my knowledge.

12         Q        Did he complain that Mr.

13    Maietta's competitiveness was a problem in the

14    workplace?

15         A        He complained that he didn't like

16    it.  He thought that that was not something that

17    be should be doing or that was effective or

18    whatever.

19         Q        And that's also what Ms. Ashdown

20    was complaining about, correct?

21         A        Uh-hum, yes.

22         Q        And have you ever reprimanded Mr.

23    Maietta for his competitiveness?

24         A        I have had conversations with him

25    about it.

183

1                           Sanders

2           Q       I'm asking if you reprimanded

3    him?

4           A       I wouldn't say I've reprimanded

5    him, no.

6           Q       Have you told him to stop it?

7           A       I've told him to cut it out, yes.

8           Q       And has he?

9           A       To a large degree, yes.

10          Q       What does that mean "to a large

11   degree"?

12          A       That means that he is not nearly

13   as competitive as he once was, so he has worked

14   on improving himself in that regard.

15          Q       When you say "competitive," does

16   that mean that he wants to be better than

17   everyone else?

18          A       That means he's a sport person

19   and he's competitive as it relates to sports or

20   as it relates to competition, whether it's

21   weight lifting, whether it's -- whatever, as it

22   relates to sports.  That's what's he's

23   competitive in.

24          Q       Personal training is a type of

25   physical activity, right?

184

1                          Sanders

2           A       Right.

3           Q       And he's competitive in the

4     personal training area, right?

5           A       He's competitive obviously in

6     being the best at whatever it is that he's

7     doing.

8                          (A document Bates stamped

9                          EQX-6397 through EQX-6399 was

10                         marked as Plaintiff's Exhibit 5 for

11                         identification, as of this date.)

12    BY MR. HARMAN:

13          Q       I'm handing you what has been

14    marked as Plaintiff's Exhibit 5 (handing).

15                         Please take a look at it.

16          A       (Perusing document.)  Okay.

17          Q       You testified you had a

18    conversation with Bobby about whether he knew

19    anything about these, the sessions stealing?

20          A       Yes.

21          Q       And that you had, that Ms.

22    Ashdown had confided in you that she was

23    concerned about Bobby's financial condition,

24    correct?

25          A       Yes.

185

1                         Sanders

2          Q      And did you ask Bobby if he was

3   having financial difficulties?

4          A      No.

5          Q      And did you ask if Ms. Ashdown

6   had given him sessions in the past that he had

7   not actually performed?

8          A      No.

9          Q      How about with Ryan, did you ask

10  Ryan if he had been given sessions by Ms.

11  Ashdown in the past that he had not performed?

12         A      No.

13         Q      So as you sit here today, you

14  have no idea whether Ms. Ashdown had given Bobby

15  sessions in the past that he had not performed?

16         A      No.

17         Q      And you have no idea whether Ms.

18  Ashdown had given Ryan sessions in the past that

19  he had not performed?

20         A      No.

21                    MR. McPARTLAND:  Objection

22                    to form.  And please note my

23                    objection to the prior question,

24                    as well.

25         Q      So let's move on.

186

```
 1                        Sanders
 2                   Did you ask whether Cornelia
 3    Hobbie had ever given, just Ryan, whether
 4    Cornelia had ever given him sessions?
 5         A     No.
 6         Q     And how about Bobby, did you ask
 7    Bobby if Cornelia had ever given him sessions?
 8         A     No.
 9         Q     So as you sit here today you have
10    no idea whether Cornelia Hobbie had given Bobby
11    or Ryan sessions in the past?
12         A     No.
13         Q     Now, drawing your attention to
14    Plaintiff's Exhibit 5, are you familiar with
15    this document?
16         A     No.
17         Q     You have never seen this document
18    before?
19         A     No, I haven't.
20         Q     Okay.
21                   MR. HARMAN:  For the
22                   record, this is a document that's
23                   Bates stamped EQX-6397, EQX-6398
24                   and EQX-6399.
25                   It was an internal series
```

187

1                           Sanders

2                 of data produced by Equinox.

3          Q      The second page, drawing your

4     attention to the second page, it says in the

5     center of the page, after a checkmark it says,

6     "Employee was involuntarily terminated."

7                 And then it says, "Who (Name and

8     Title) informed the employee of the termination

9     decision."

10                And it says, "Matt Plotkin,

11    regional manager, and Lawrence Sanders, GM."

12                Have you ever seen an entry like

13    that before with respect to any employee?

14         A      I'm not sure I understand.

15         Q      Do you know what this spreadsheet

16    is?

17                Have you ever seen a spreadsheet

18    like this before?

19                     MR. McPARTLAND:  Objection

20                to form.

21         A      I haven't seen this spreadsheet,

22    but what it looks like is what we internally do

23    when an employee is no longer working with us,

24    we have to submit an EAF.

25         Q      What's an EAF?

188

1                           Sanders

2          A       I believe it's called an

3    employment authorization form which dictates how

4    we hire people and how we terminate people, so

5    we have to go through a system to make sure we

6    hire people properly and we terminate them

7    properly.

8                    So this is what this looks like,

9    but I've never seen it in this format.

10         Q       Did you write this?

11         A       Yes.

12         Q       You did write this?

13         A       Yes.

14         Q       And is this an accurate

15   description of Ms. Ashdown's termination?

16         A       Yes.

17         Q       And is there anything that is

18   inaccurate about this description?

19         A       Not to my knowledge, no.

20         Q       And is this a complete and

21   accurate description of the basis for your

22   termination?

23         A       Yes.

24         Q       Drawing your attention, you

25   testified that you wrote this, right?

189

1                        Sanders

2          A      Yes.

3          Q      It says, "There were 17 total

4    sessions that were pulled for three trainers,

5    Kerry being one of the trainers that four of the

6    17 were pulled for," "four of the 17 sessions

7    were pulled for," sorry.

8                 "Kerry being one of the trainers

9    that four," so does that mean that four were

10   pulled for Kerry?

11         A      Yes.

12         Q      And so is it your belief that Ms.

13   Ashdown pulled all of these sessions -- drawing

14   your attention back to Plaintiff's Exhibit 4.

15                Is it your belief that Ms.

16   Ashdown pulled all of those sessions?

17         A      Yes.

18         Q      And you have no idea whether she

19   pulled any more sessions, you know,

20   fraudulently, than the sessions that are on this

21   spreadsheet?

22         A      Correct.

23         Q      Did you generate the spreadsheet?

24         A      No.

25         Q      Did you ask for it to be

190

```
 1                        Sanders
 2    generated?
 3            A      Yes.
 4                        MR. McPARTLAND:  Objection.
 5                        Asked and answered.
 6            A      Yes.
 7            Q      And when you asked for the
 8    spreadsheet to be generated, what did you ask
 9    for?
10            A      I asked for sessions that were
11    pulled for specific clients on specific dates.
12            Q      And who gave you those clients'
13    names?
14            A      Mauro.
15                        MR. McPARTLAND:  Object to
16                        the form.
17            A      Mauro.
18                        I mean, he showed me the
19    documents and that's when I went to look at the
20    documents.
21            Q      So Mauro gave you some names and
22    then you had IT generate this Plaintiff's
23    Exhibit 4, right?
24            A      Yes.
25            Q      But you didn't look at any other
```

191

```
 1                        Sanders
 2   names other than the names that Mauro gave you,
 3   correct?
 4          A       Correct.
 5                  MR. HARMAN:  Let me just
 6              take a few minutes.
 7                  (Whereupon, at 2:47 p.m., a
 8              recess was taken.)
 9                  (Whereupon, at 2:53 p.m.,
10              the deposition resumed with all
11              parties present.)
12                  MR. HARMAN:  Back on the
13              record.
14   BY MR. HARMAN:
15          Q       Mr. Sanders, do you think that
16   you made the right decision in terminating Ms.
17   Ashdown?
18          A       Yes.
19          Q       And would you have done anything
20   differently?
21          A       I guess given the circumstances I
22   probably would have saved the video.
23          Q       Anything else?
24          A       That's probably it.
25          Q       And would you have asked anyone
```

192

1                          Sanders

2     at corporate whether the company would allow Ms.

3     Ashdown to take a lie detector test?

4              A       I don't know.

5                     No, I don't think I would have

6     asked anyone at the company for that.

7                     I mean, I believe it was Matt,

8     when she said that to us, I believe Matt was

9     present.

10                    So, again, him being my superior,

11    he was present when she said that, so, again, I

12    can't speak definitely, but I believe it was

13    communicated, because they asked, you know, what

14    happened after we had the termination

15    conversation with her and it was told this is

16    what she said, so it was somewhat, I believe

17    there was knowledge of the fact that she

18    volunteered at that point to say, "I'll take a

19    lie detector test."

20                    But I believe that -- I don't

21    think we made a bad decision or a wrong

22    decision.

23             Q      If it had been your decision,

24    would you have allowed her to take a lie

25    detector test?

193

```
 1                        Sanders
 2          A      I'm not sure.
 3          Q      If you were in her shoes, would
 4     you have wanted to take a lie detector test?
 5                        MR. McPARTLAND:  Object to
 6                   the form.
 7                        You can answer.
 8          A      I don't know.  I think I've
 9     communicated in a previous question what I would
10     do if I was in that situation, I would just try
11     to do everything I can to investigate it myself
12     and show my boss what, prove or try to prove to
13     my boss that I didn't do it instead of just
14     saying "I didn't do it."
15                        That's what I would do in that
16     situation and try to do my best to convey that.
17                        That's all I think I would do.
18          Q      I'm asking you whether you would
19     have, had it been your decision, would you have
20     allowed her to take a lie detector test?
21          A      And what I'm saying to you is I
22     don't know.
23          Q      So you just don't know?
24          A      I don't know.
25          Q      Is there anything else that you
```

```
                                                              194
1                          Sanders

2       want to change about your testimony today,

3       anything that you think was inaccurate?

4               A       No.

5               Q       All right.  Thank you.

6                       (Whereupon, at 2:56 p.m.,

7                   the deposition was concluded.)

8

9               _____
                       LAWRENCE SANDERS
10

11      Subscribed and sworn to

12      before me

13      this ▮▮ day of ▮▮, 2013.

14      _____
               NOTARY PUBLIC
15

16

17

18

19

20

21

22

23

24

25
```

195

                    I N D E X    P A G E

Witness              Examination By        Page

Lawrence Sanders     Mr. Harman             4


                        EXHIBITS

Plaintiff's
Exhibits                 Description         Page

  1        Second amended complaint           78

  2        A two-page letter dated            95
           January 9, 2013

  3        A document Bates stamped          119
           EQX-6358

  4        A document Bates stamped          146
           EQX-6400

  5        A document Bates stamped          184
           EQX-6397 through EQX-6399


REQUESTS:

Page 125:  Copy of surveillance videos

Page 180:  All personal training sessions that
           were performed by Mauro Maietta on
           August 13, 2011, July 30, 2011, July
           16, 2011

196

1

2                        C E R T I F I C A T E

3    STATE OF NEW YORK    )

4                         ) ss.

5    COUNTY OF NEW YORK   )

6              I, MARGARET M. HARRIS, a Shorthand

7         (Stenotype) Reporter and Notary Public of

8         the State of New York, do hereby certify

9         that the foregoing Deposition, of the

10        witness, LAWRENCE SANDERS, taken at the

11        time and place aforesaid, is a true and

12        correct transcription of my shorthand

13        notes.

14             I further certify that I am neither

15        counsel for nor related to any party to

16        said action, nor in any wise interested in

17        the result or outcome thereof.

18             IN WITNESS WHEREOF, I have hereunto

19        set my hand this 18th day of September,

20        2013.

21

22        _____

23             MARGARET M. HARRIS

24

25

                    MCM REPORTING SERVICE
                       (516) 775-5209