# EXHIBIT G

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  ----------------------------X

4  KERRY ASHDOWN,                    13CV 1374 (HB)(GWG)

5          Plaintiff,

6     -vs.-

7  EQUINOX, et al.,

8          Defendants.

9  ----------------------------X

10

11                  DEPOSITION

12                    of

13            JOSEPH MATARAZZO

14           NEW YORK, NEW YORK

15           AUGUST 28, 2013

16              1:25 P.M.

17

18

19

20  ATKINSON-BAKER, INC.
    COURT REPORTERS
21  (800) 288-3376
    www.depo.com
22
    Nancy Anne Flynn, RPR
23  FILE NO.:   A70922E

24

25

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------X

4   KERRY ASHDOWN,                   13CV 1374 (HB)(GWG)

5           Plaintiff,

6      -vs.-

7   EQUINOX, et al.,

8           Defendants.

9   ----------------------------X

10

11                    August 28, 2013

12                    200 West 57th Street

13                    New York, New York

14

15       Deposition of EQUINOX, a Defendant herein,

16   by JOSEPH MATARAZZO, taken by the Plaintiffs

17   pursuant to Notice, commencing at 1:25 p.m.,

18   before Nancy Anne Flynn, RPR and Notary Public

19   in and for the State of New York.

20

21

22

23

24

25

```
 1    A P P E A R A N C E S :

 2   ATTORNEYS FOR PLAINTIFF:

 3   THE HARMAN FIRM, P.C.
          200 West 57th Street
 4        Suite 900
          New York, New York 10019
 5        (212)425-2600
     BY:  WALKER HARMAN, ESQ.
 6

 7   ALSO PRESENT:  LUCAS LARSON, ESQ.

 8

 9

10   ATTORNEYS FOR DEFENDANTS:

11   LAROCCA HORNIK ROSEN GREENBERG & BLAHA, LLP
          The Trump Building
12        40 Wall Street, 32nd Floor
          New York, New York 10005
13        (212)530-4837
          pmcpartland@lhrgb.com
14   BY:  PATRICK T. MCPARTLAND, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2  WITNESS:  JOSEPH MATARAZZO                      PAGE

3  EXAMINATION BY MR. HARMAN                         5

4                        E X H I B I T S

5  PLAINTIFF'S          DESCRIPTION               PAGE

6  1  Letter dated January 9, 2013.             31

7  2  Second Amended Complaint.                 73

8  3  April 27, 2010 e-mails EQX-6341.          77

9  4  E-mails, EQX-6344-6345                    79

10 5  E-mail, EQX-6355                          80

11 6  E-mails, EQX-6356-7                       83

12 7  E-mail, EQX-6358.                         85

13 8  E-mails, EQX-6359-6360.                   87

14 9  E-mails, EQX-6361-6363.                   89

15 10 E-mail, EQX-3258.                         90

16 11 E-mails, EQX-3510-3511.                   91

17 12 EQX-3508. (Marked but not used)

18 13 Performance Commission, EQX-6474-77.      92

19 14 Session detail document, EQX-6400.        94

20 15 October 4, 2010 letter in support of      96

21    H-1B application and February 9th letter.

22 16 EQX-6398 Employee Termination record.     101

23    (Exhibits attached)

24

25

1                    I N D E X (Continued)

2    INFORMATION AND DOCUMENTS REQUESTED:        PAGE

3    When change was implemented (Personal        65

4    Training manager would supervise the

5    fitness manager.)

6    Production of Core Values.                    73

7    Production of Zerorisk questions.             79

8    Production of club's budget in place         101

9    At the time.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1       NEW YORK, NEW YORK; WEDNESDAY, AUGUST 28, 2013
 2                    JOSEPH MATARAZZO,
 3            having been duly sworn by a Notary
 4            Public in and for the State of New
 5            York, testified as follows:
 6                    EXAMINATION
 7  EXAMINATION
 8  BY MR. HARMAN:
 9       Q     Please state your name for the record.
10       A     Joseph Matarazzo.
11       Q     Is that your full legal name?
12       A     Patrick is my middle name.
13       Q     And have you ever gone by any other
14  name?
15       A     No.
16       Q     Have you ever been deposed before?
17       A     No.
18       Q     Have you ever been a party to a
19  lawsuit?
20       A     Yes.
21       Q     Since you haven't been deposed before,
22  let me go over a few ground rules of the
23  deposition, it will make it easier for both of us.
24       A     Sure.
25       Q     My name is Walker Harmon.  I represent
```

Joseph Matarazzo

1

2 Kerry Ashdown in the lawsuit she brought against

3 Equinox and certain individuals.  You are

4 appearing here today to answer questions about

5 that lawsuit?

6          A     Um-hm.

7          Q     And your knowledge about the claims and

8 defenses with respect to that lawsuit.  Do you

9 understand that?

10         A     Yes.

11         Q     I'm going to ask you a series of

12 questions today regarding Ms. Ashdown's lawsuit.

13 If you don't understand any questions that I ask,

14 tell me that you don't understand the question and

15 I will endeavor to rephrase it.  The idea being,

16 if you answer the question, the record is going to

17 read as if you understood the question.

18               Do you understand?

19         A     Um-hm.

20               MR. MCPARTLAND:  You have to answer

21         "Yes" or "No," Joe, also.

22         Q     Yes, you have to verbalize your

23 answers.  A shaking of the head or nodding or

24 gestures can't always be taken down by the court

25 reporter, so I would ask you to verbalize your

```
 1                    Joseph Matarazzo
 2  answers to the questions.
 3            Do you understand that?
 4       A    Yes.
 5       Q    During the deposition, if you want to
 6  take a break, you can take a break at any time; I
 7  just ask that you finish any pending question.
 8            Do you understand that?
 9       A    Yes.
10       Q    Are you aware that you are under oath
11  today?
12       A    Yes.
13       Q    And that failing to tell the truth at a
14  deposition is a crime called perjury.  Do you
15  understand that?
16       A    Yes.
17       Q    The questions that I'm going to ask are
18  routine, I ask them of anyone at any deposition.
19  Are you under the influence of alcohol?
20       A    No.
21       Q    What is your address?
22       A    ███████████████████████████████████
23  ████████████████████████████████████████
24       Q    Are you under the influence of any
25  narcotics?
```

1                        Joseph Matarazzo

2        A      No.

3        Q      Are you taking any medication?

4        A      No.

5        Q      Have you been prescribed any medication

6    by a doctor that you have not been taking?

7        A      No.

8        Q      Can you think of any reason why you

9    couldn't provide your best and most truthful and

10   accurate answers here today?

11       A      No.

12       Q      Did anyone tell you not to give

13   truthful answers here today?

14       A      No.

15       Q      Have you ever been accused of lying?

16       A      No.

17       Q      Have you ever been accused of a

18   dishonest act?

19       A      No.

20       Q      Have you ever been arrested?

21       A      No.

22       Q      Have you ever been accused of a crime?

23       A      No.

24       Q      Have you ever been fired from a job?

25       A      No.

                    Joseph Matarazzo

1

2      Q      You stated earlier that you had been a

3   party to a lawsuit.  On how many occasions have

4   you been a party to a lawsuit?

5      A      Just one.

6      Q      Can you tell me about the one instance

7   in which you were a party to a lawsuit?

8      A      I don't know if a mediation is a

9   lawsuit.  I mean, it turned into a mediation, so I

10  don't know what that is.

11     Q      Did you make a claim against someone?

12     A      Yes.

13     Q      Did someone make a claim against you?

14     A      Actually, my wife made a claim against

15  someone and I was part of that.  It wasn't myself

16  directly.

17     Q      What kind of claim was that?

18     A      It was a brokerage firm, it was

19  mishandling of funds kind of thing.

20     Q      What is your wife's name?

21     A      My ex-wife now, but Darlene Masucci.

22     Q      Could you spell her last name?

23     A      M-a-s-u-c-c-i.

24     Q      And it was a claim against a brokerage

25  firm?

```
 1                    Joseph Matarazzo

 2      A      Yes.

 3      Q      What type of claim was that?

 4      A      It's so long ago.  Basically like I

 5 said, mishandling of funds.  It was during the

 6 market crash, the first one.

 7      Q      When did you divorce Ms. Masucci?

 8      A      2005.

 9      Q      And when did this claim against the

10 brokerage firm take place?

11      A      I want to say 2003, maybe.

12      Q      And are you remarried?

13      A      Yes.

14      Q      And have you been remarried more than

15 once since Ms. --

16      A      No.

17      Q      And who is your current spouse?

18      A      First name, last name?

19      Q      Um-hm.

20      A      Lauren, same last name as myself.

21      Q      How long have you been married to

22 Lauren?

23      A      Two years.

24      Q      Have you discussed this lawsuit with

25 Lauren?
```

                         Joseph Matarazzo

1

2       A       Briefly.

3       Q       What have you told her?

4       A       Just that my wife and I lost a lot of

5   money in the market and she went to a mediation

6   and received a settlement.

7       Q       That wasn't my question, but that's

8   fine.  I should have been clearer.  Have you

9   discussed Ms. Ashdown's lawsuit against Equinox

10  with your current wife?

11      A       That was your question?  It didn't come

12  out that way.

13      Q       Sorry.

14      A       No, I have not.

15      Q       Have you discussed Ms. Ashdown on any

16  occasion with Lauren?

17      A       No.

18      Q       Did you do anything to prepare for

19  today's deposition?

20      A       No.

21      Q       Did you meet with a lawyer prior to

22  today's deposition?

23      A       Well, we had a conversation that I was

24  going to be here.

25      Q       I'm not asking about the content of

```
 1                    Joseph Matarazzo
 2  your conversations with your lawyers, I'm not
 3  going to do that.  What I'm going to ask you about
 4  is when you met with your lawyers.  So did you
 5  meet with your lawyers to prepare for today's
 6  deposition?
 7       A    One phone call we had is what I'm
 8  saying, that was it.
 9       Q    When did that phone call take place?
10       A    Several days ago.
11       Q    Approximately how many days?
12       A    Today's Tuesday?  Wednesday?  Monday I
13  believe.
14       Q    How long did that phone call take
15  place?
16       A    How long was the phone call?
17       Q    Um-hm.
18       A    Five minutes, ten minutes.
19       Q    And who was present on the phone call?
20       A    Just Patrick and myself.
21       Q    And have you ever -- when you say
22  Patrick, is that the individual sitting to your
23  right, Mr. McPartland?
24       A    Yes.
25       Q    Have you ever met him before today?
```

1                    Joseph Matarazzo

2      A      No.

3      Q      Other than Patrick, did you speak with

4  anyone else to prepare for today's deposition?

5      A      I did not.

6      Q      What are your regular working hours?

7      A      For the most part, I'm going to say

8  8:30 to 5:30-ish, but it depends on the day.

9      Q      Are you assigned working hours?

10     A      No.

11     Q      Do you have an office?

12     A      Yes.

13     Q      Do you go to the office on a regular

14  basis?

15     A      For the most part.

16     Q      Where is your office located?

17     A      The address from before, ████████████

18     Q      And is it an enclosed space?

19     A      Yes.

20     Q      Do you have an assistant?

21     A      No.

22     Q      Who sits in the space adjacent to your

23  office?

24     A      My vice president, David Harris.

25     Q      Who else?

                        Joseph Matarazzo

1

2       A      That's it.  I'm on the corner.

3       Q      Did you tell Mr. Harris that you were

4  attending this deposition today?

5       A      I did.

6       Q      What did you say to him?

7       A      Just that I was called to a deposition

8  for Kerry .

9       Q      Did he say anything in response?

10      A      Not really.  Just "Good luck, good luck

11  with that."

12      Q      He said "Good luck?"

13      A      Just meaning because he has been to so

14  many, that you've been called instead of me,

15  that's nice to see.

16      Q      So he has been to a lot of depositions?

17      A      Not a lot, but whatever comes up, he

18  has to attend, and he has been to various things,

19  I'm sure.

20      Q      Did he tell you about depositions he

21  has attended?

22      A      No.

23      Q      How did you come to the understanding

24  that he has been through a lot of these?

25      A      Just from his gesture.

                                                        15

```
 1                    Joseph Matarazzo
 2       Q      You derived from his gesture that he
 3  has been to a lot of depositions?
 4       A      Um-hm.
 5       Q      When is the last time you spoke to
 6  Mr. Harris about Ms. Ashdown?
 7       A      I don't think I have actually, just
 8  that I'm going to this.
 9       Q      So from the beginning of time, it's
10  your testimony under oath --
11       A      From the beginning of time?  I mean, we
12  hired her, so we spoke then.
13       Q      So you spoke to Mr. Harris about hiring
14  Ms. Ashdown?  Have you spoken to Mr. Harris since
15  then about Ms. Ashdown?
16       A      I'm sure something must have come up, I
17  don't recall.  I talk about all our managers as
18  they, you know, work.
19       Q      Let's talk about since Ms. Ashdown's
20  termination?
21       A      Hasn't been a topic.
22       Q      Are you friendly with Mr. Harris?
23       A      Yes, we've been working together a long
24  time.
25       Q      How would you describe your working
```

```
 1                    Joseph Matarazzo

 2  relationship?

 3       A      Professional.

 4       Q      Do you ever have lunches with him?

 5       A      Business lunch, very rare, we are busy

 6  people.

 7       Q      How about social events?

 8       A      Not really, unless it's something

 9  planned for work.

10       Q      And do you communicate with Mr. Harris

11  via text?

12       A      No, e-mail or phone or in person.

13       Q      How frequently would you say you talked

14  to Mr. Harris on the phone?

15       A      Well, we work together very closely so

16  I would say, on the phone?  I would say the least

17  on the phone.

18       Q      When was the last time that you had a

19  substantive conversation with Mr. Harris about

20  Kerry Ashdown?

21       A      As I said, I can't recall anything

22  other than when we hired her, there wasn't any

23  detailed conversations about anything, especially

24  about these termination issues.

25       Q      And has Mr. Harris ever told you that
```

                    Joseph Matarazzo

1  he has attended a deposition?

2        A     I know because he would tell me that he

3  has to go to do one here and there, "I won't be in

4  the office today, I have to do a deposition,"

5  something like that.  Nothing in detail.

6        Q     When was the last time he told you he

7  had to attend a deposition?

8        A     I couldn't tell you, probably well over

9  a year I would think.

10       Q     So it's been over a year since he has

11 told you he had to attend a deposition?

12       A     That I remember, yes.  I don't keep his

13 schedule.

14       Q     And you recall him telling you that

15 more than once?

16       A     Probably, over nineteen years together,

17 probably yes.

18       Q     So you worked for him for nineteen

19 years at Equinox?

20       A     Well, it wasn't always in the same

21 roles, but we have been both at Equinox for

22 nineteen years.

23       Q     Other than telling Mr. Harris that you

24 had to attend today's deposition regarding

                                                    18

1                    Joseph Matarazzo

2  Kerry Ashdown, did you speak with anyone else

3  about Kerry Ashdown?

4       A    No.

5       Q    Okay.  Let's speak about the last three

6  months.  Have you spoken with anyone else

7  regarding Kerry Ashdown, other than your

8  attorneys?

9       A    Not that I can recall, no.

10      Q    Do you know who the general counsel of

11  Equinox is?

12      A    You mean Kevin Morris?

13      Q    Yes.

14      A    Yes.

15      Q    Have you spoken with Mr. Morris in the

16  last three months regarding Kerry Ashdown?

17      A    I don't think I have, because I wasn't

18  directly involved in this so.

19      Q    I'm asking you about your specific

20  recollection about conversations --

21      A    I don't have any recollection.

22      Q    You have no recollection.  You don't

23  know whether you did or didn't?

24      A    Correct, and if I did, it was two words

25  maybe so I don't recall.

```
1                    Joseph Matarazzo
2        Q     So you just don't know whether you did
3   or you didn't; is your testimony?
4        A     Correct.
5        Q     How about the last six months?
6        A     Doesn't change.
7        Q     Doesn't change?  You just don't recall
8   whether you spoke with Mr. Morris about
9   Kerry Ashdown?
10       A     About Kerry, I don't.  I may have
11  directed it to others, that's all I can think of.
12  Because I wasn't involved in what occurred, so I
13  didn't get involved in it.
14       Q     When you say you weren't involved in
15  what occurred, what do you mean by that?
16       A     I just mean that you know, I didn't
17  terminate her or have discussions about it, so you
18  have to speak to people who had these
19  conversations, not myself.
20             MR. HARMAN:  Can you read back the
21       answer?
22                   (The answer was read.)
23       Q     So you didn't terminate Kerry Ashdown?
24       A     Not myself, no.
25       Q     Who did?
```

```
 1                    Joseph Matarazzo
 2        A      I wasn't there, I'm not sure actually.
 3        Q      So as you sit here today, you have no
 4   knowledge of who terminated Kerry Ashdown?
 5        A      Specific, no.  I would assume her
 6   general manager.
 7        Q      Who would that be?
 8        A      That would have been Lawrence Sanders.
 9        Q      So you've been at Equinox for a long
10   time, right?  And you're a manager and you
11   understand the roles that various managers have at
12   Equinox, right?
13        A      Right.
14        Q      So do you know specifically who
15   terminated Kerry Ashdown?
16        A      I just gave you my best assumption
17   there.  It could have been HR directly.  I'm not
18   sure.
19        Q      Well, do you oversee Mr. Sanders?
20        A      No.
21        Q      You don't?  Did you oversee Ms.
22   Ashdown?
23        A      Not directly at all, no.
24        Q      Did you have any supervisory
25   responsibilities over her?
```

1                    Joseph Matarazzo

2        A     I oversee the department and I support

3    the clubs at a local level, so managers look to me

4    for support or advice if needed.

5        Q     Have you ever terminated an employee

6    before?

7        A     Sure.

8        Q     When was the last time you terminated

9    an employee?

10        A     I couldn't put a date on it.  I'm not

11    even sure.  But it's probably been a few years

12    that I directly terminated anyone.

13        Q     When is the last time you specifically

14    recall terminating an employee?

15        A     I do not know.

16        Q     You have no recollection?

17        A     I'm not good with time frames, I don't

18    remember.

19        Q     Do you recall the name of anyone that

20    you've ever terminated?

21        A     I'm sure I could come up with one but

22    it's going to take a while.

23        Q     Okay, well under the Rules I have seven

24    hours to depose you and I told your lawyer that I

25    would try to get as much done today, but, you

```
 1                   Joseph Matarazzo
 2  know, if we have to come back on another day we
 3  will come back on another day.
 4       A     I'm just trying to think who I would
 5  have terminated because I would have to be at the
 6  club level to do that probably.
 7       Q     What is your title?
 8       A     National director of personal training
 9  operations.
10       Q     And in your role as the national
11  director of personal training operations, have you
12  ever terminated anyone?
13       A     No.
14       Q     How long have you had that role?
15       A     Probably over three years.
16       Q     Do you oversee anyone in the role as
17  national director of personal training operations,
18  do you oversee anyone directly?
19       A     Yes.
20       Q     Who?
21       A     My area personal training managers.
22       Q     Who are they?
23       A     There's a list of them for different
24  regions.
25       Q     These are regional personal training
```

23

```
 1                    Joseph Matarazzo
 2  managers?
 3       A      That's right.
 4       Q      Other than the regional personal
 5  training managers, do you oversee anyone else?
 6       A      Not directly.
 7       Q      How many regional personal training
 8  managers are there?
 9       A      Seven or eight.
10       Q      At the time of Ms. Ashdown's employment
11  at Equinox, who was the regional personal training
12  manager in charge of the location?
13       A      I believe it was Richard Velasquez.
14       Q      Would Mr. Velasquez have had any
15  supervisory responsibility over Ms. Ashdown?
16       A      It's usually support.  Again, the
17  managers of the club level are overseen by the
18  general manager directly and by the area manager
19  indirectly.
20       Q      Do you understand, as you sit here
21  today, do you understand why Equinox terminated
22  Ms. Ashdown?
23       A      I believe so, not in great detail, but
24  I believe so, yes.
25       Q      Okay.  All I'm asking for you to do is
```

1                    Joseph Matarazzo

2   tell me what you remember or what you know, okay?

3       A      That's I'm trying to do.

4       Q      So what is it that you know about the

5   termination?

6       A      What is it that I know?  Something to

7   do with some sessions from people's accounts that

8   were used, as we would call, inappropriately.

9       Q      What do you mean by inappropriately?

10      A      Outside the scope of our operational

11  standards.  Meaning, taken from members' accounts

12  when they shouldn't have been and provided to

13  trainers for their benefit.

14      Q      So is it your testimony that Ms.

15  Ashdown pulled sessions and provided them to

16  trainers for their benefit?

17      A      To my knowledge, yes.

18      Q      And do you know to which trainers she

19  provided these sessions?

20      A      That I do not know.

21      Q      And you used the word inappropriate.

22  What does that mean?

23      A      That means we have standards as to how

24  accounts are handled and she allegedly did not

25  handle them appropriately.

1                        Joseph Matarazzo

2       Q      When you say accounts, what do you mean

3   by that?

4       A      I mean members who purchased personal

5   training basically were storing their services so

6   they could use them, so it's like a hold in

7   account of their money.

8       Q      And so is it your understanding that

9   Ms. Ashdown pulled sessions and gave them to

10  trainers even though the sessions weren't actually

11  used?

12      A      I think that's correct, yes.

13      Q      And you described that as

14  inappropriate?

15      A      Correct.

16      Q      And you don't know which trainers

17  allegedly received these sessions?

18      A      No, not at my level, I wouldn't get

19  that far into it.

20      Q      I'm just asking if you were ever

21  notified?

22      A      I don't think of the names or I

23  wouldn't remember the names if I --

24      Q      So you weren't?

25      A      Probably not.

1                    Joseph Matarazzo

2        Q      Do you know if an investigation was

3   conducted into --

4        A      Yes.

5               MR. MCPARTLAND:   Let him finish his

6        question.

7               THE WITNESS:   Sorry.

8        Q      How do you know that?

9        A      Because I was asked how to handle if

10  something like that happened, and I advised them

11  to research it with the IT department and to

12  inform HR to do an investigation.

13       Q      Who asked you?

14       A      The managers at the club, I think it

15  was probably Lawrence or might have been Rich.

16       Q      Who is Rich?

17       A      The area manager we mentioned before,

18  Rich Velasquez.  Or it might have been Lawrence's

19  area manager.

20       Q      But you recall someone asking you how

21  to handle an investigation?

22       A      I recall briefly giving them advice on

23  how to go about that.

24       Q      What do you recall about that?

25       A      Just what I mentioned, that I told them

<pre>
 1                    Joseph Matarazzo
 2   to check with IT, get the details, and check with
 3   HR on how to handle it.
 4        Q     Do you recall anything else?
 5        A     No.
 6        Q     Do you recall how that communication
 7   took place?
 8        A     E-mail, I think.
 9        Q     Why do you believe it was e-mail?
10        A     I just do.  I think it was probably
11   e-mail from the club to myself.
12        Q     Why do you think it was probably
13   e-mail?
14        A     Why do I think?
15        Q     Um-hm.
16        A     I just do.  Most of our communication
17   from club to club comes from e-mail.
18        Q     Do you recall specifically that the
19   communication was via e-mail?
20        A     I believe so.  I can't tell you a
21   hundred percent.
22        Q     Why do you believe so?
23        A     Why do I believe so?  You need an
24   answer and I'm giving you one to the best of my
25   knowledge.  I don't recall having any phone
</pre>

```
1                    Joseph Matarazzo

2    conversation about it.  That's why.

3        Q     Do you ever recall any in-person

4    communication regarding the investigation of Ms.

5    Ashdown?

6        A     I do not.

7        Q     And did you ever make any efforts to

8    look for any documents regarding Ms. Ashdown?

9        A     Personally, no.

10       Q     I'm asking about personally.

11       A     I said no.

12       Q     So you have not looked for any

13   documents?

14       A     No.

15       Q     Do you have a computer in your office?

16       A     Of course.

17       Q     What kind of computer is that?

18       A     A Dell computer, desk top.

19       Q     And do you have a phone that you use

20   that's issued by Equinox?

21       A     Yes.

22       Q     Do you have a separate phone?

23       A     Meaning what?

24       Q     Meaning do you maintain two phones or

25   just the one issued by Equinox?
```

```
 1                    Joseph Matarazzo

 2      A     I have a cell phone and a desk top.  Is

 3 that what you mean?

 4      Q     No, I'm talking about cell phones.

 5            MR. MCPARTLAND:  Do you have a personal

 6      phone?

 7            THE WITNESS:  No.

 8      Q     What type of phone do you have that's

 9 been issued to you by Equinox?

10      A     I have an Iphone.

11      Q     How long have you had that Iphone?

12      A     I don't know, 4 then 5 so I don't know,

13 two years, two and a half years.

14      Q     Did you at any point look in your desk

15 top, meaning in your computer, for any information

16 regarding Ms. Ashdown?

17      A     I don't think I did, no.

18      Q     How about your cell phone, did you ever

19 look in your cell phone for any information

20 regarding Ms. Ashdown?

21      A     No.

22      Q     Do you have any knowledge that anybody

23 else looked in your desk top for information

24 regarding Ms. Ashdown?

25      A     No.
```

```
 1                  Joseph Matarazzo
 2      Q     How about your Iphone, did anyone other
 3 than yourself look for any information in your
 4 Iphone regarding Ms. Ashdown?
 5      A     No.
 6            THE WITNESS:  Can I go get some water.
 7            MR. HARMAN:  I just want to remind you
 8       that you are under oath, and while you are
 9       under oath that you are not talking about
10       your testimony while testimony is ongoing.
11            MR. MCPARTLAND:  He is just going to
12       get a cup of water.
13                  (Brief recess.)
14                  (January 9, 2013 letter was
15            marked as Plaintiff's Exhibit 1 for
16            identification.)
17 BY MR. HARMAN:
18      Q     I'm handing you what has been marked as
19 Plaintiff's Exhibit 1 (handing).  Please take a
20 look at it.
21      A     You want me to read this whole thing?
22      Q     I'm going to ask you a couple of
23 questions about it.  So take your time to read it.
24      A     Okay.
25      Q     Do you recognize this document?
```

```
 1                    Joseph Matarazzo

 2       A      Yes.

 3       Q      What is it?

 4       A      What is it?

 5       Q      Um-hm.

 6       A      A letter from your firm about, I guess,

 7  the suit against Equinox and --

 8       Q      Did you receive this?

 9       A      I did.

10       Q      Did you receive it on January 9th or

11  about that time?

12       A      I would assume.

13       Q      Is that your e-mail address that's

14  listed at the bottom of the address?

15       A      Where is that?  Actually it has changed

16  since then, but yes.

17       Q      At the time that this appears to have

18  been sent, early January, was that your e-mail

19  address?

20       A      Yes.

21       Q      And did you read this document in

22  January?

23       A      I did.

24       Q      And you just testified that the letter

25  was about this case, right?
```

```
 1                  Joseph Matarazzo
 2      A      Um-hm.
 3      Q      I'm going to draw your attention down
 4 to the third paragraph that begins "However," --
 5      A      Fourth paragraph?
 6      Q      I'm sorry, the fourth paragraph, you
 7 are right.
 8      A      Okay.
 9      Q      Do you understand what that paragraph
10 means?
11      A      I would assume, yes.
12      Q      What does it mean?
13      A      Not to dispose of anything you have in
14 relation to any of this.
15      Q      Okay.
16      A      Right?
17      Q      I'm asking what your understanding is?
18      A      That's my understanding.
19      Q      So you read that at that time?
20      A      Yes.
21      Q      And you understood what it meant?
22      A      Sure.
23      Q      The paragraph after that that begins,
24 "Equinox must also preserve," if you just take a
25 look at that paragraph.  Do you understand what
```

33

```
 1                    Joseph Matarazzo

 2   that paragraph means?

 3        A     Not exactly, no.

 4        Q     I'm not asking if you understand what

 5   all of the terminology means, but do you

 6   understand generally what it means?

 7              MR. MCPARTLAND:  Objection to the form.

 8        He answered the question.  This is a lot of

 9        legal language.

10              MR. HARMAN:  You objected to the form.

11        Thank you.

12              MR. MCPARTLAND:  Okay.

13        Q     Does your answer change in any way?

14   You testified you don't understand what the

15   paragraph means.  I asked you generally do you

16   understand what it means?

17        A     I think it's basically what I said for

18   the other paragraph, right?  That anything should

19   be preserved.

20        Q     And as far as you know, sitting here

21   today, did you preserve all information related to

22   this lawsuit?

23        A     Absolutely.

24        Q     Do you use your cell phone for work

25   purposes?
```

```
 1                    Joseph Matarazzo

 2       A      Yes.

 3       Q      Do you text people at work?

 4       A      No.

 5       Q      There's never any --

 6       A      There might be one or two employees

 7  here and there, but not really, that's not a means

 8  for work use.

 9       Q      Do you ever initiate texts to people?

10       A      Not that I can recall.

11       Q      Do people text you?

12       A      Not that I can recall much either.

13       Q      When you say much, I'm asking you do

14  you recall anyone ever texting you?

15       A      I'm sure someone has texted me.

16       Q      Do you text, have you ever texted

17  Matthew Herbert?

18       A      No.

19       Q      At the time that you received this,

20  what, if anything, did you do with this letter?

21       A      I basically called HR, said I received

22  it, they said they did as well, and they would

23  handle it.  And that was the extent of my

24  information at that point.

25       Q      Who did you speak with in HR?
```

```
 1                    Joseph Matarazzo

 2      A      I believe Matt Herbert.

 3      Q      And he told you that he would take care

 4 of it?

 5      A      Right, the attorney and him would deal

 6 with it.  Don't worry about it.

 7             MR. MCPARTLAND:  Don't get into

 8      attorney/client privilege, so let's just be

 9      careful here.

10      Q      I'm asking only what Mr. Herbert said.

11 He said that he and the attorney would deal with

12 it, right?

13      A      Yes.

14      Q      Did he say anything else?

15      A      No.

16      Q      Did you have any further communication

17 with him about this letter?

18      A      Not that I recall.

19      Q      Did anyone tell you to say, "I don't

20 recall" today?

21      A      No.

22      Q      Who was general counsel at Equinox

23 prior to Kevin Morris?

24      A      Jason Thaler.

25      Q      How do you spell that?
```

```
 1                    Joseph Matarazzo

 2      A      T-h-a-l-e-r.

 3      Q      How long was he there?

 4      A      I want to say a few years, maybe three,

 5 four years.

 6      Q      Did you ever speak with Mr. Thaler

 7 about Ms. Ashdown?

 8      A      I don't recall that actually.  I don't

 9 know the timing of this and him.

10      Q      I'm not asking you about the timing.

11 I'm asking you about a specific recollection as to

12 whether you had a conversation.  Do you recall

13 having a conversation with Mr. Thaler about Ms.

14 Ashdown?

15      A      No.

16      Q      And do you remember having a

17 conversation with Mr. Morris about Ms. Ashdown?

18      A      No.

19      Q      Do you recall ever receiving an e-mail

20 from Mr. Morris regarding Ms. Ashdown?

21      A      From Mr. Morris?  I'm not sure.  I

22 might have been on an e-mail.  I don't know if

23 there was any directed to me.

24           MR. MCPARTLAND:  He is asking if you

25      specifically recall.  You can say "Yes" or
```

                                                        37

```
 1                    Joseph Matarazzo

 2        "No."  As you sit here today, do you recall.

 3        A     I don't.

 4        Q     How about an e-mail from Mr. Thaler?

 5        A     I do not.

 6        Q     Did anyone ever have a face-to-face

 7   sit-down discussion with you about Ms. Ashdown

 8   after she was terminated?

 9        A     No.

10        Q     Have you ever participated in a meeting

11   about Ms. Ashdown after she was terminated?

12        A     Not that I can recall, no.

13        Q     Have you ever participated in a phone

14   conference about Ms. Ashdown after she was

15   terminated?

16        A     Not that I recall.

17        Q     How about prior to Ms. Ashdown's

18   termination, were you ever interviewed in a

19   face-to-face fashion, in an in-person fashion

20   regarding Ms. Ashdown?

21        A     Interviewed?

22        Q     Yes.

23        A     No.

24        Q     By that I mean, did you have a meeting

25   with somebody in HR?
```

Joseph Matarazzo

2      A      No.

3      Q      Did you have a phone conversation with

4 someone in HR?

5      A      No.

6      Q      Did you have a phone conversation with

7 anyone in the legal department?

8      A      I don't believe so, no.

9      Q      Did you participate in any phone

10 conferences about Ms. Ashdown prior to her

11 termination, I mean in the month or so leading up

12 to her termination?

13      A      Not that I can remember, no.

14      Q      Are you aware of anyone at Equinox

15 other than Ms. Ashdown who has been terminated for

16 the same reason Ms. Ashdown was terminated?

17      A      I want to say there probably has been

18 but I don't recall any specific ones.

19      Q      I'm not asking you to speculate.  In

20 fact, I would prefer you don't speculate.

21      A      Not that I recall, no.

22      Q      So you don't recall?  You don't?

23      A      I couldn't give you a name.  I do know

24 that it's happened.

25      Q      What makes you know that it's happened?

```
 1                    Joseph Matarazzo

 2      A      Because I've seen those scenarios

 3 before occur.

 4      Q      What club?

 5      A      That I don't recall.

 6      Q      Was it a male or a female?

 7      A      In I don't recall the club I don't

 8 recall the name or gender.

 9      Q      Do you recall anything about it?

10      A      I deal with so many things.

11      Q      What makes you recall that it probably

12 happened?

13      A      Because it's not foreign to me that

14 somebody did something with vouchers unethically.

15      Q      But you don't remember any specific

16 incidents about any of it?

17      A      Not at this time, no.

18      Q      So you don't have a specific

19 recollection of anybody being terminated for

20 voucher pulling?

21            MR. MCPARTLAND:  Asked and answered.

22      He can answer, but he has answered a bunch of

23      times already.

24      A      I was going to say the same thing.  I

25 do not recall.  I'm sure other people could answer
```

```
 1                    Joseph Matarazzo
 2   that, but not myself.
 3        Q    I'm just asking, again, about your
 4   recollection.  Have you spoken to, other than the
 5   individuals we discussed, have you spoken to
 6   anybody about this lawsuit?
 7        A    No.
 8        Q    What job title did you hold before the
 9   national director of personal training operations?
10   What title did you hold before your current one?
11        A    Before my current one I was national
12   manager PT operations, actually senior manager
13   personal training operations.
14        Q    What is your educational background?
15        A    B.S. in business from St. John's
16   University.
17        Q    Do you have any other degrees or
18   certificates?  Let's just start with degrees, do
19   you have any other degrees?
20        A    No, that's my highest degree.
21        Q    How about certificates?
22        A    Certificates meaning?
23        Q    Well, if you were a personal trainer --
24        A    I'm not a trainer.
25        Q    I know you are not, but I'm asking you,
```

```
 1                    Joseph Matarazzo
 2   if you have any other types of certified training,
 3   whether it be in human resource, labor relations?
 4        A    Just what's required of the company,
 5   nothing else.
 6        Q    Have you ever been a personal trainer?
 7        A    Yes.
 8        Q    When were you a personal trainer?
 9        A    Back in the late nineties.
10        Q    Were you a personal trainer at Equinox?
11        A    I was.
12        Q    How long did you work as a personal
13   trainer at Equinox?
14        A    Before management?  Less than a year,
15   and then I got into management.
16        Q    You said in your words nothing other
17   than what's required of Equinox.  What is required
18   of Equinox?
19        A    I mean like sexual harassment policies,
20   and things of that nature.
21        Q    Anything else?
22        A    Whatever policies and procedures need
23   to be learned, basically.
24        Q    I'm asking you what those are?
25        A    There are things for all kinds of
```

```
1                    Joseph Matarazzo
2  stuff.
3        Q      Such as?
4        A      They're not certificates of any kind.
5  I'm just talking about how to manage a business
6  basically.
7        Q      I'm asking what that is?
8        A      Standard operating procedures that come
9  out for whatever topic, whether it be expenses,
10 for P&L management, any kind of thing like that.
11       Q      Anything else?
12       A      Not really.
13       Q      So you recall sexual harassment
14 training, standard operating procedures and P&L?
15       A      Pretty much.
16       Q      And you don't recall anything else that
17 Equinox requires?
18       A      No.  I'm sure there are other things
19 I'm not thinking of.
20       Q      Do you want to tell me about them?
21       A      No, no, I'm just saying, whatever
22 policy or thing that comes out, we have to learn
23 it.
24       Q      I'm just asking what you recall?
25       A      I don't recall anything else.
```

```
 1                  Joseph Matarazzo
 2      Q     Tell me about how sessions are pulled?
 3      A     Meaning?
 4      Q     Well, if a personal trainer trains
 5 someone, how do they get paid?
 6      A     By that being taken out of the member's
 7 account from the system either by the member or
 8 the manager, if the member forgets.
 9      Q     Okay.
10      A     So it's reconciled to the schedule and
11 reconciled to the member coming to the club.
12      Q     How does the member pull the session?
13      A     At the front desk, they ask for a
14 voucher.
15      Q     What is a voucher like?
16      A     It's a receipt for one of their
17 package, it will tell them how many they bought
18 and how many are left.
19      Q     So a person has to first pay for a
20 package.
21      A     Yes, for the most part, if it's a paid
22 session.
23      Q     There are such things as nonpaid or
24 unpaid sessions?
25      A     Right.  If you join you get a session
```

1                    Joseph Matarazzo

2    for free with your membership, and we used to have

3    an Amex program in which people would get

4    additional sessions if they joined with their Amex

5    card.  So they would actually pay an initiation

6    fee and get these sessions in conjunction with

7    joining.

8         Q     So a member, I guess, has in their

9    profile -- does a member have a profile?  Is that

10   a word that is used at Equinox?

11        A     Account.

12        Q     So a member has an account and they

13   have certain sessions in their account that they

14   are either given pursuant to a promotion or they

15   buy?

16        A     Yes.

17        Q     And if they train with a trainer they

18   go and pull a session?

19        A     Correct.

20        Q     If they don't pull a session for

21   whatever reason then a manager can pull a session?

22        A     Right.  There's also people who no-show

23   session, we have a cancellation policy, so it

24   would be pulled by the manager.

25        Q     So if they forget or don't show then a

```
 1                    Joseph Matarazzo

 2  manager pulls the session?

 3      A      Yes.

 4      Q      Is that in accordance with Equinox

 5  policy?

 6      A      Yes.

 7      Q      So what managers can pull sessions?

 8      A      Personal training managers, fitness

 9  managers, the general manager would probably not,

10  but could.  That's really it.

11      Q      So you identified three individuals?

12      A      Right.

13      Q      The fitness manager, the personal

14  training manager and the general manager?

15      A      Correct.

16      Q      Those would be individuals who would be

17  authorized to pull sessions in the event someone

18  no-showed or forgot to pull a session?

19      A      Correct.

20      Q      And how do they do that?

21      A      Enter a cashier code in the system when

22  it asks for it and then pull it, so everything is

23  recorded.

24      Q      And so if a trainer has a no-show they

25  have to go to a manager and ask the manager to
```

46

1                      Joseph Matarazzo

2    pull the session for them?

3         A      Correct.

4         Q      They can't pull it themselves?

5         A      Correct.

6         Q      Have you ever been made aware of a

7    situation where a manager gave a trainer access to

8    the system to pull a session?

9         A      They are explicitly told not to.  Every

10   cashier code is given to you and told not to be

11   shared, not to be given to anybody.  You are

12   responsible for your cashier code.

13        Q      So the fitness training manager has a

14   cashier's code, correct?

15        A      Yes.

16        Q      And the personal training manager has a

17   cashier code?

18        A      Correct.

19        Q      Those are separate?

20        A      Correct.

21        Q      And the general manager also has a

22   cashier code that's separate?

23        A      Yes.

24        Q      Do you have a cashier's code?

25        A      Yes.

                         Joseph Matarazzo

1

2       Q       When you log onto the system using,

3  Equinox system, using your cashier's code, what

4  does it allow you access to do?

5       A       Go through a member's account, look at

6  information, pull a session.

7       Q       So could you, using your --

8       A       That's two different things though.

9       Q       Okay.  Using your cashier's code, could

10  you go in and pull a member's session for a

11  trainer?

12       A       Me, personally?

13       Q       Yes.

14       A       I don't know, I actually don't try it

15  from my office.  I believe you would have to be in

16  the club to do that.

17       Q       So say you went into the club?

18       A       Yes.

19       Q       You could pull a session for a trainer?

20       A       Correct.

21       Q       And you could pull a session out of an

22  Equinox member's account for a trainer, correct?

23       A       Correct.

24       Q       That would mean that the trainer would

25  get paid for that session?

```
                        Joseph Matarazzo
```

1                        Joseph Matarazzo

2      A      Correct.

3      Q      And if Mr. Sanders wanted to do the

4 same thing, could he?

5      A      Yes.

6      Q      And was Mr. Sanders the manager of the

7 SoHo location at the time Kerry Ashdown worked at

8 the SoHo location?

9      A      I believe so, yes.

10      Q      Who was the fitness manager?

11      A      Mauro Marieta, I'm not sure how to

12 spell it.

13      Q      If a personal trainer came to a

14 manager, one of the three individuals you spoke

15 to, and said "I have three no-shows from the

16 weekend for this particular member," and there was

17 no reason to disbelieve that was accurate, what

18 would generally happen?

19      A      They would have to stamp it with the

20 proper day and time of the no-show, label it, and

21 pull the voucher.

22      Q      With respect to accessing the system,

23 could Mr. Sanders, the general manager, pull

24 sessions for Ms. Ashdown?

25              MR. MCPARTLAND:  Object to the form.

```
1                    Joseph Matarazzo
2       That were performed by Ms. Ashdown or --
3             MR. HARMAN:  Let me just rephrase the
4       question then.
5       Q     Did Ms. Ashdown work as a personal
6  trainer?
7       A     Yes.
8       Q     Did Mr. Marieta work as a personal
9  trainer?
10      A     Yes.
11      Q     Did Mr. Sanders work as a personal
12 trainer?
13      A     No.
14      Q     When Mr. Marieta worked as a personal
15 trainer, was he paid for that, as far as you know?
16      A     Yes.
17            MR. MCPARTLAND:  Just for record, it's
18      Maietta, not --
19            MR. HARMAN:  I thought it was Maietta
20      too.
21      Q     We will go with your counsel's
22 representation that it is Maietta and not Marieta.
23      A     Okay.
24      Q     Would Mr. Maietta be compensated in the
25 same way as any other trainer who trained an
```

1                     Joseph Matarazzo

2   Equinox member?

3        A     Compensation amount?

4        Q     Not amount, but would a session be

5   pulled for him generally?

6        A     Same way, yes.

7        Q     And how about Ms. Ashdown when she was

8   there?

9        A     Same way.

10        Q     As far as you know, did Ms. Ashdown

11   have access to pull sessions for Mr. Maietta?

12        A     You have access to pull, for anyone who

13   is an eligible trainer, to pull it out, once you

14   use your code.

15        Q     Who is your direct supervisor?

16        A     David Harris.

17        Q     How long has he been your supervisor?

18        A     We've been together nineteen years.

19   I'm going to say at least twelve of them.

20        Q     Do you text Mr. Harris?

21        A     No.

22        Q     Does he text you?

23        A     No.

24        Q     Do you text anyone at work?

25        A     Employees at work?  No.

```
                        Joseph Matarazzo
```

1
2      Q      Anyone who works for Equinox, do you
3  text them?
4      A      Not that I can recall.
5      Q      Do you use the texting feature on your
6  phone?
7      A      For personal reasons, sure.
8      Q      If a personal training manager pulls a
9  session, gives themselves credit for that session,
10  but the session wasn't actually used, you
11  described that conduct I believe as inappropriate,
12  correct?
13      A      Correct.
14      Q      Is it dishonest?
15      A      Absolutely.
16      Q      Would you describe it as stealing?
17      A      Pretty much.
18      Q      If someone at -- if a personal training
19  manager was caught stealing equipment, something
20  that belonged to Equinox, do you believe they
21  should be terminated?
22      A      Yes.
23      Q      And if someone -- would your opinion
24  change if it was just a personal trainer?
25      A      No.

1                    Joseph Matarazzo

2        Q      How about if a personal trainer was

3   caught stealing a session, meaning took credit for

4   it when they didn't actually complete the session,

5   should they be terminated?

6        A      Sure, if they initiated it happening,

7   absolutely.

8        Q      So it is your testimony that anyone who

9   steals sessions should be terminated; is that

10  accurate?

11       A      Sure.

12       Q      Do you consider it a pretty serious act

13  to steal a session without having actually

14  performed the session?

15       A      Or it being legitimate whether it's a

16  no-show or cancellation.

17       Q      Correct, and that's what I mean.  I am

18  not trying to confuse the record.  I mean without

19  actually using it or being authorized to use it in

20  accordance with Equinox policy.  In other words

21  just took it?

22       A      Right.

23       Q      That's pretty serious?

24       A      Yes.

25       Q      All right.  Have you ever been aware of

53

                        Joseph Matarazzo

1   anyone at Equinox -- by that I mean employees,

2   that would be in your general umbrella of

3   awareness, people who work as personal trainers or

4   in personal training management, right, have you

5   ever been aware of anyone who was accused of

6   stealing something?

7        A    Yes.

8        Q    When?

9        A    Timing I couldn't give you but.

10       Q    Do you recall any specific instance

11   where someone was accused of stealing something?

12       A    Sure.

13       Q    What is the first instance in which you

14   recall someone being accused of stealing

15   something?

16       A    First time or any time?  I am thinking

17   of one that sticks out in my head.

18       Q    So tell me.  You remember --

19       A    I am thinking of one at the moment that

20   sticks out in my head when the manager was caught

21   on camera taking one of the televisions out of the

22   club.

23       Q    And when was that?

24       A    Probably five or six years ago at

```
 1                    Joseph Matarazzo

 2   least.

 3        Q      What club was that?

 4        A      Coral Gables, Florida.

 5        Q      And what happened to that individual?

 6        A      He was terminated.

 7        Q      Were you involved in that termination?

 8        A      No.

 9        Q      How did you learn about it?

10        A      Through the management team.

11        Q      Would that be in person?  Was it a team

12   meeting that you learned about it or --

13        A      No, no, it was just probably a phone

14   call or e-mail.  I would think it was probably a

15   phone call because it sounds pretty serious,

16   walking out with a TV on camera.

17        Q      And do you know whether Equinox called

18   the police?

19        A      I do not know.  I think they probably

20   did but I do not know.

21        Q      You think they probably did.  Why do

22   you think they did?

23        A      I'm not sure.  Actually, I don't know.

24   I don't know.

25        Q      Do you think they should have called
```

```
                      Joseph Matarazzo
 1
 2   the police?
 3             MR. MCPARTLAND:  Objection.
 4        Speculative.
 5             But you can answer.
 6        A    I guess it depends on how it went down.
 7   If they caught him, took the TV back, fired him,
 8   maybe we don't need the police.  I don't know.
 9        Q    It's what you recall.  And if you were
10   the direct supervisor of this individual and you
11   had definite proof, video, that they walked out of
12   the club with a TV and it wasn't returned, would
13   you call the police?
14        A    Yes.
15        Q    When was the first time you recall
16   having contact with Ms. Ashdown?
17        A    Interviewing her.
18        Q    Did you interview her along with anyone
19   else?
20        A    I don't recall.
21        Q    Do you recall -- did you interview her
22   on the phone?
23        A    In person and on the phone, both.
24        Q    So you recall interviewing her on the
25   phone?
```

1                    Joseph Matarazzo

2       A       I believe so, or at least initiating a

3  conversation.

4       Q       Do you recall anyone else being

5  involved in that phone interview or phone

6  discussion?

7       A       Not to my recollection.

8       Q       And then did there come a time when you

9  actually met her in person?

10      A       Yes.

11      Q       When was that?

12      A       I couldn't give you dates.

13      Q       Did you interview her in person?

14      A       Yes.

15      Q       What was your impression of her?

16      A       I was the one who actually encouraged

17  us to hire her, so it was a good impression.

18      Q       And was anybody else involved in the

19  interview process?

20      A       I'm sure, but I don't recall the

21  sequence.  Like I say, it's a while ago so I don't

22  know who was involved, but I was myself throughout

23  the whole process, I'm sure.

24      Q       Did you need to get approval to hire

25  someone?

                         Joseph Matarazzo

1

2       A      Yes and no, because I would want the

3   club level managers buy in for the individual they

4   are going to work with every day, but I would

5   recommend that this is a good choice, you should

6   consider it strongly, and usually they take my

7   advice.

8       Q      Did you hire Ms. Ashdown to work at a

9   particular club?

10      A      I do not think so.  I do not recall.

11  At the time we took her on to train her and

12  basically get her up to speed with the company,

13  and I believe SoHo was the opportunity that arose

14  during that time.

15      Q      What type of training?  You say you

16  brought her on to train her.  What type of

17  training did you anticipate requiring of her at

18  the time?

19      A      Management training, Equinox's

20  policies.

21      Q      Anything else?

22      A      She probably attended FTI classes as

23  well, Equinox Fitness Training Institute where

24  they would learn a little more about what the

25  trainers learned.

1                    Joseph Matarazzo

2        Q      Is that a physical location or --

3        A      Not a physical location no.

4        Q      It's a company program?

5        A      (Nod)

6        Q      Someone is in charge of that?

7        A      Yes.

8        Q      Who is that?

9        A      Joan Coopersmith.

10       Q      Do you know whether Ms. Ashdown

11  completed the required management training program

12  you just described?

13       A      The FTI program?  I don't know how far

14  she went with that.

15       Q      As far as you know, did Ms. Ashdown

16  complete the training that she was supposed to

17  complete?

18       A      It's not like a completion type of

19  thing, it's on the job training basically, giving

20  her a period of time to understand how we

21  function, our culture, et cetera, our policies.

22  That's really it.

23       Q      I'm just asking --

24       A      So it's not like there's a start and

25  end point to that.  Development is ongoing.

```
 1                    Joseph Matarazzo
 2       Q     I'm just asking you if you recall any
 3  specific part of this training that Ms. Ashdown
 4  was required to do that she didn't?
 5       A     I do not.
 6       Q     I take it you said you had a good
 7  impression of Ms. Ashdown.  Does that mean you
 8  believe she was qualified for the position of
 9  personal training manager?
10       A     Yes.
11       Q     As you sit here today, do you have any
12  reason to believe that she wasn't qualified for
13  the position of personal training manager?
14       A     On paper she was qualified, yes.
15       Q     And based on the interview process?
16       A     Yes.
17       Q     Have you learned anything since then
18  that would make her unqualified?
19       A     No.  I mean, in terms of qualification
20  or behavior, that's two different things.
21       Q     So let's take qualifications.  Have you
22  learned anything about her qualifications that
23  would make her unqualified for the position you
24  hired her for?
25       A     No.
```

60

Joseph Matarazzo

Q     Have you learned anything about her behavior that would make her unqualified?

A     We did terminate her, right.

Q     So I'm here to ask you?

A     I am not sure I understand your question then.

Q     You don't understand the question?  I'm using your language.  Have you learned anything about Ms. Ashdown's behavior that would make her unqualified for the position that you hired her for?

A     Does that answer your question?

Q     Do you believe Ms. Ashdown stole things from Equinox?

A     Yes.

Q     Why do you believe that?

A     Because of the termination subsequent to the investigation of the inappropriate voucher pulling.

Q     Is it your belief that there was an investigation into inappropriate voucher pulling?

A     Yes.

Q     Have you ever been involved in an investigation into an employee's conduct?

1                    Joseph Matarazzo

2       A      HR handles that.

3       Q      Please just answer my questions.  Have

4  you ever been involved in an investigation

5  regarding an employee's conduct?

6       A      Define investigation.

7       Q      I'm asking, you said she was

8  investigated, okay?

9       A      To my knowledge.

10      Q      You've been a manager at Equinox for a

11 long time; is that true?

12      A      Yes.

13      Q      You told me that she was investigated?

14      A      Yes.

15      Q      What does that mean?

16      A      It means that the records were

17 reviewed, not by myself but the IT department,

18 delivered to the management team and decisions

19 were made from there.

20      Q      Who is Ms. Ashdown's management team?

21      A      I'm referencing Lawrence and Matt

22 Plotkin, who would oversee that club.

23      Q      So it's your testimony that that's,

24 that was Ms. Ashdown's management team, Laurence

25 Sanders and Matt Plotkin?

1                    Joseph Matarazzo

2       A       Management team might be the wrong term

3  because there's seven managers in a club, there

4  are people in other departments that had nothing

5  to do with that.

6       Q       Were you involved in the investigation

7  into Ms. Ashdown?

8       A       No.

9       Q       Did you ever review any records

10 regarding an investigation into Ms. Ashdown?

11      A       No.

12      Q       Did Ms. Ashdown supervise anyone?

13      A       The personal trainers.

14      Q       Did she supervise anyone else?

15      A       Not directly, no.

16      Q       What do you mean not directly?

17      A       I mean if she's the only manager in the

18 club and there's an issue at the front desk, she

19 would help handle that.  But she was not managing

20 the front desk unless she was the only one left

21 there at that moment.

22      Q       Did she supervise the personal fitness

23 manager?

24      A       The reason I am hesitating is because

25 we had that, I'm not sure of the date of the

                        Joseph Matarazzo

1

2   change of that letter.  We had PT managers over

3   supervising fitness managers at that time.  So I'm

4   not a hundred percent sure.

5        Q     Today?

6        A     Today would be yes.

7        Q     Today is yes?  So today personal

8   training managers supervise fitness managers?

9        A     Correct.

10        Q     Is that true of all of the Equinox

11   clubs in New York City?

12        A     Yes.

13        Q     Is that true of the SoHo location?

14        A     Yes.

15        Q     As you sit here today, approximately

16   when did that change take place?

17        A     Two, three years ago, somewhere around

18   there.

19        Q     When that change was implemented, the

20   personal training manager would supervise the

21   fitness manager?

22        A     Yes.

23        Q     That means the personal training

24   manager would be the fitness manager's direct

25   supervisor?

1                    Joseph Matarazzo

2        A      Correct.

3        Q      I'm going to ask you to look in your

4   records for when that change was implemented and

5   provide that information to your lawyer.  We will

6   leave a space in the transcript, if you would

7   please provide that information to your lawyers.

8             MR. MCPARTLAND:  Please direct all

9        requests to counsel in writing and we will

10       respond appropriately.

11       Q      So did Ms. Ashdown supervise

12  Mr. Maietta?

13       A      I guess we will determine that when we

14  see the --

15       Q      I'm asking you what you recall.

16       A      I am going to say I don't recall.  I

17  would think yes, but I don't recall a hundred

18  percent.

19       Q      What would make you think yes?

20       A      I'm just thinking of the approximate

21  date range here.

22       Q      And does a direct supervisor make

23  decisions about scheduling?

24       A      Scheduling of their time at work, you

25  mean?

```
 1                    Joseph Matarazzo
 2       Q     Yes.
 3       A     The general manager does that.
 4       Q     We are talking about the time period
 5  where personal training managers supervise fitness
 6  manager, right?
 7       A     Okay.
 8             MR. MCPARTLAND:  Can you break down the
 9       years?  He might be able to explain it
10       actually.
11             MR. HARMAN:  I just rather let me ask
12       the questions and if he doesn't understand
13       something I will be happy to rephrase it.
14             MR. MCPARTLAND:  Okay.
15       Q     I just want to focus on the period
16  because, you know, Equinox's record will tell us
17  when the policy was changed, there's no reason to
18  argue about it, it will be what it will be?
19       A     Um-hm.
20       Q     But focusing on that time period, if a
21  fitness manager wanted to make a change in his or
22  her schedule, would they get the approval of the
23  personal training manager?
24       A     They would get the agreement as well of
25  the personal training manager and the general
```

1                    Joseph Matarazzo

2   manager, both.

3        Q      So they would need to get the approval

4   of both?

5        A      They would agree at the club level.  We

6   don't have a specific policy for that, it is

7   worked out between the management team at the club

8   level.

9        Q      In what ways under Equinox's policy

10  does the personal training manager supervise the

11  fitness manager?

12       A      Assuring his job description is

13  executed on a daily basis, on a weekly basis, et

14  cetera.

15       Q      And does the personal training manager

16  evaluate the fitness manager's performance?

17       A      No, they advise the general manager who

18  they directly have those type of reviews.

19       Q      Does the personal training manager have

20  the authority to critique the fitness manager's

21  performance?

22       A      Yes.

23       Q      Why was the policy changed?

24       A      Because we just, at the time there

25  needed to be just more chain of command.  Both

                        Joseph Matarazzo

1

2   were reporting to the general manager, the details

3   of the job were not monitored effectively enough

4   from the general manager, so we made the personal

5   training manager, which is the higher position,

6   more in line with watching and reporting back

7   whether the fitness manager's duties were getting

8   executed.

9        Q     So the chain of command under the new

10  policy was at the lowest rung, would be the

11  fitness manager and then above that would be the

12  personal training manager, and above that would be

13  the club's manager?

14       A     Correct.

15       Q     And in your opinion, was that a good

16  change?

17       A     Yes.

18       Q     And have there ever been any problems

19  with that change at the SoHo location?

20       A     Not that I'm aware of.

21       Q     Do you know who the personal training

22  manager is at the SoHo location?

23       A     Currently?

24       Q     Yes.

25       A     Yes.

```
 1                      Joseph Matarazzo

 2        Q      Who is that?

 3        A      Mauro.

 4        Q      Mauro Maietta?

 5        A      Yes.

 6        Q      Is there a fitness training manager?

 7        A      Yes.

 8        Q      Who is that?

 9        A      Darwin Diaz.

10        Q      How long has Darwin Diaz held that

11   position?

12        A      Less than a year.

13        Q      I would take it that -- is Darwin a

14   male?

15        A      Yes.

16        Q      Do you know if Mr. Maietta participated

17   in selecting Mr. Diaz for that position?

18        A      He was probably the last person to

19   interview him.  He was an internal trainer moving

20   up.

21        Q      He was a trainer who moved into the

22   position of fitness manager?

23        A      Right.

24        Q      Do you recall who held the position

25   before that?
```

1                    Joseph Matarazzo

2        A      Right now I do not.

3        Q      Do you evaluate Mr. Mietta's work

4   performance?

5        A      No.

6        Q      Who does?

7        A      His general manager.

8        Q      Have you ever heard about any problems

9   with Mr. Mietta's work performance.

10       Q      You mean --

11       Q      Problems?  Has he had performance

12  problems?

13       A      No.

14       Q      When you say no, you don't know of any

15  or you don't recall or --

16       A      I don't recall any specific problems,

17  no.

18       Q      Ever?  Do you have an opinion as to his

19  work performance?

20       A      I think he is a hard-working

21  individual.

22       Q      Why do you think that?

23       A      Because I've seen him in action.

24       Q      When you say that, do you mean you have

25  gone to the club and seen him working?

1                     Joseph Matarazzo

2        A     Correct.

3        Q     How long a time period would you spend

4   at the club?

5        A     Half a day sometimes.

6        Q     And your opinion is based on spending a

7   half a day at the club?

8        A     And conversations.

9        Q     How frequently would you spend half a

10  day at the club?

11       A     Not very often.

12       Q     Have you ever discussed Ms. Ashdown

13  with Mr. Sanders?

14       A     Not that I recall.

15       Q     So it's your testimony you never had a

16  discussion about Ms. Ashdown with Lawrence

17  Sanders?

18       A     Not that I recall at this point, at

19  this moment, that I could put my finger on.

20       Q     How about Mr. Maietta, have you ever

21  had a discussion with Mr. Sanders about

22  Mr. Maietta?

23       A     Well, I'm just thinking of basic like

24  if I'm in the club I'll ask him how is everything

25  going, that kind of thing, anything you need me to

                                                      71

```
 1                    Joseph Matarazzo
 2   support you on, that kind of stuff.  I am sure we
 3   have had some back and forth conversation.
 4        Q     When is the last time you saw Mr.
 5   Sanders?
 6        A     Probably April or May.
 7        Q     Is that the last time you were at the
 8   SoHo location?
 9        A     No.  I believe he wasn't in the last
10   time I was there.
11        Q     When was the last time you were there?
12        A     I'm going to say two months ago.
13        Q     Does Equinox have a specific policy
14   concerning honesty and integrity?
15        A     Well, it's a part of our core values.
16        Q     What do you mean?
17        A     That would be more of, I guess, an HR
18   question, but we have core values that we post and
19   talk about in terms of integrity and honesty.
20        Q     Are these written down?
21        A     Yes.
22        Q     Where are they located?
23        A     It's for the corporate team more than,
24   I don't know if it's at the field level, but it
25   probably is.
```

```
 1                    Joseph Matarazzo

 2        Q     What are those --

 3        A     I have just seen it, it's not like it's

 4   sitting anywhere.

 5        Q     Do you have access to those in your

 6   office?

 7        A     No.

 8        Q     So other than seeing them in

 9   presentations, have you seen them anywhere else?

10        A     Not that I recall.

11              MR. HARMAN:  I'm going to call for

12        production of the core values that the

13        witness has testified to.

14              MR. MCPARTLAND:  Please put all

15        requests in writing and we will respond as

16        appropriate.

17              MR. HARMAN:  Thank you.

18        Q     Other than core values, can you think

19   of any other written policies or procedures

20   related to honesty and integrity maintained by

21   Equinox?

22        A     No.

23              MR. HARMAN:  Let's take a short

24        five-minute break and I will ask the court

25        reporter to mark a few things.
```

```
 1                    Joseph Matarazzo

 2                 (Exhibits 2 through 15 were marked

 3           for identification.)

 4                 (Brief recess)

 5  BY MR. HARMAN:

 6       Q     Do you know if anyone else was

 7  investigated along with Ms. Ashdown?

 8       A     I do not.

 9       Q     I'm handing you what has been marked

10  for identification as Plaintiff's Exhibit 2.

11  Please take a look at it (handing).

12                 (Second Amended Complaint was

13           marked as Plaintiff's Exhibit 2 for

14           identification.)

15       Q     Mr. Matarazzo, I'm sorry to interrupt,

16  I will let you finish it.  Have you ever seen this

17  document before?

18       A     No.

19       Q     Have you ever seen anything like this

20  before?

21       A     Meaning?

22       Q     Turn to the first page.  There's what

23  we call in the legal world a caption, and it says

24  Kerry Ashdown and then it lists a bunch of other

25  defendants, and it says Second Amended Complaint.
```

```
 1              Joseph Matarazzo
 2  Have you ever seen anything like this in this
 3  case?
 4       A    No.
 5       Q    So you've never seen a version of the
 6  Complaint in this case?
 7       A    No.
 8       Q    Have you ever seen any legal documents
 9  like this in this case?
10       A    No.
11       Q    So having -- you've gotten --
12       A    That's why I'm reading every word.
13  It's very interesting stuff.
14       Q    You see your name in the caption there
15  on the first page?
16       A    Yes, I did.
17       Q    You've never seen that before?
18       A    No.
19       Q    And you've never read these allegations
20  before?
21       A    No.
22       Q    I just have one series of questions for
23  you and I'm going to go ahead and ask you.  If you
24  feel like you need to read --
25       A    I think I'm at the end here anyway.
```

75

1                    Joseph Matarazzo

2   These last few pages are just -- okay, go ahead.

3        Q      Who replaced Ms. Ashdown?

4        A      Mauro.

5        Q      And were you involved in that decision?

6        A      I do not believe so.

7        Q      So the answer is no?

8        A      I would say I'm sure I was aware of it,

9   of course, but I didn't see any reason at the time

10  to rebut it when it was told to me.

11       Q      Are you familiar with -- turning your

12  attention to paragraph 49?

13       A      What page?

14       Q      Page seven.  Prior to reading this

15  document, were you ever told that Maietta had

16  accused Ashdown of getting very drunk with her

17  staff?

18       A      No.

19       Q      Were you ever told that she purportedly

20  favored males over females?

21       A      No.

22       Q      And were you ever told that she,

23  meaning Ms. Ashdown, was purportedly

24  inappropriate, that her behavior was purportedly

25  inappropriate?

1                     Joseph Matarazzo

2        A      Not that I recall, no.

3        Q      And were you ever told that she was

4   purportedly not professional?

5        A      Not that I recall, no.

6        Q      Were you ever told that Maietta was

7   complaining about her?

8        A      Not that I recall, no.

9        Q      You said that you hired Ms. Ashdown,

10  correct?

11       A      Correct.

12       Q      But that someone else selected

13  Mr. Maietta to replace Ms. Ashdown, correct?

14       A      Correct.

15       Q      Do you know who that was?

16       A      Not directly, but it would be the

17  general manager probably, Matthew listen.

18       Q      Any reason why you weren't involved in

19  that decision-making?

20       A      I don't recall, but just because it was

21  an internal move, it wasn't something that I had

22  to get involved in.

23       Q      I'm handing you what's been marked as

24  Plaintiff's Exhibit 3.  Can you please take a look

25  at it (handing).

1               Joseph Matarazzo

2              (E-mails, EQX-6341, were

3         previously marked as Plaintiff's

4         Exhibit 3 for identification.)

5    Q    Do you recognize this document?

6    A    I do now, yes.

7         MR. HARMAN:  For the record, it's an

8    e-mail chain with a date at the top April 27,

9    2010.

10   Q    Did you send the e-mail that begins

11 "Need to discuss with you"?

12   A    It looks like I did, yes.  I'm not sure

13 why Matt Herbert's name is on top of that but.

14   Q    Do you know what that word is in the

15 second part where it's from Elizabeth Minton to

16 you, "I will get the Zerorisk?"

17   A    Zerorisk, yes.

18   Q    What is Zerorisk?

19   A    It's like a personality type of

20 questionnaire that we give candidates and it

21 generates questions you might want to ask.

22   Q    I see, and was she given the Zerorisk

23 questions?

24   A    I would assume so.  It seems that way.

25   Q    Have you ever taken the Zerorisk

1                    Joseph Matarazzo

2  questions?

3       A     Yes.

4       Q     Does everyone who works for Equinox

5  take the Zerorisk questions?

6       A     In our department we do.  It is not

7  company wide.

8       Q     And your department meaning the

9  personal training?

10      A     Yes.

11            MR. HARMAN:  I call for production of

12      the Zerorisk questions.

13            MR. MCPARTLAND:  I'll take it under

14      advisement, if you put it in writing.

15      Q     I'm handing you what has been marked as

16  Plaintiff's Exhibit 4, if you would take a look at

17  it (handing).

18                  (E-mails, EQX-6344-45, were

19            previously marked as Plaintiff's

20            Exhibit 4 for identification.)

21      Q     Let me know when you are ready.  This

22  is an e-mail chain with Joe Matarazzo's name

23  beginning June 14, 2010.  Do you recognize this

24  chain?

25      A     Yes.

Joseph Matarazzo

1

2      Q      Did you send the e-mail portion that

3  begins, "Okay, so we decided we want to hire her?"

4      A      Yes.

5      Q      I'm handing you what has been marked

6  Plaintiff's Exhibit 5 (handing).  Please take a

7  look at it.

8                    (E-mail, EQX-6355, was previously

9              marked as Plaintiff's Exhibit 5 for

10             identification.)

11     A      Okay.

12     Q      Have you ever seen this document

13 before?

14     A      Not that I recall, no.

15     Q      Do you know who Melissa McGregor is?

16     A      Human resource manager, it says here,

17 but I don't recall her personally, no.

18     Q      I'm asking, have you ever met here?

19     A      I may or may not have.  I don't know.

20     Q      I'm just asking.

21     A      There's a lot of HR people.  I'm not

22 sure.

23     Q      It says here that she's a human

24 resources manager and I just wanted to know what--

25     A      It's not ringing a bell.

1                    Joseph Matarazzo

2        Q     Okay.  How many people work at your

3    office location?

4        A     I don't know the count.

5        Q     More than ten?

6        A     Oh, yes.

7        Q     More than fifty?

8        A     Yes.

9        Q     More than a hundred?

10        A     No, probably more than that, close to

11    it.

12        Q     How many people -- what department do

13    you work in?

14        A     Personal training.

15        Q     How many people work in the personal

16    training department at your office location?

17        A     At my office, maybe five.

18        Q     And what are their names?

19        A     Liz Minton, David Harris, Joan

20    Coopersmith, Beth Kirsch and someone fairly new,

21    steven Mitchell.

22        Q     So Elizabeth Minton, she is in an HR

23    role, correct?

24        A     No.

25        Q     What is her role?

                         Joseph Matarazzo

1

2      A      She's in personal training.

3      Q      She's in personal training.  What is

4  her title?

5      A      She is director of personal training

6  development.

7      Q      Is she senior to you or --

8      A      Same.

9      Q      Equal to you?

10      A      Yes.

11      Q      Where is her office located?

12      A      A few doors down from mine.

13      Q      Have you ever discussed Ms. Ashdown

14  with her?

15      A      Sure.

16      Q      When is the last time?

17      A      Probably when she was employed.

18      Q      Since she was employed have you

19  discussed Ms. Ashdown with her?

20      A      No.

21      Q      Does the personal, the five individuals

22  that sit in the Broadway office in the personal

23  training department, do you have team meetings?

24      A      Occasionally.

25      Q      Has Ms. Ashdown ever come up in any of

                    Joseph Matarazzo

1    those team meetings?

2         A     No.

3         Q     I'm handing you what's been marked as

4    Plaintiff's Exhibit 6 (handing).  Please take a

5    look at it.

6                    (E-mails dated April 25, 2011,

7                    EQX-6356-57, were previously marked

8                    as Plaintiff's Exhibit 6 for

9                    identification.)

10        A     Okay.

11        Q     How long have you worked with Liz

12   Minton?

13        A     Probably close to ten years.

14        Q     What is your opinion of her work

15   performance?

16        A     Excellent.

17             MR. HARMAN:  Plaintiff's Exhibit 6, for

18        the record, is an e-mail chain with the name

19        Melissa McGregor at the top, dated August 25,

20        2011.

21        Q     Do you recognize this e-mail chain?

22        A     Just the portion that has my name on it

23   at the bottom.

24        Q     So starting at this, I guess maybe

1                    Joseph Matarazzo

2    those team meetings?

3         A     No.

4         Q     I'm handing you what's been marked as

5    Plaintiff's Exhibit 6 (handing).  Please take a

6    look at it.

7                    (E-mails dated April 25, 2011,

8                    EQX-6356-57, were previously marked

9                    as Plaintiff's Exhibit 6 for

10                   identification.)

11        A     Okay.

12        Q     How long have you worked with Liz

13   Minton?

14        A     Probably close to ten years.

15        Q     What is your opinion of her work

16   performance?

17        A     Excellent.

18             MR. HARMAN:  Plaintiff's Exhibit 6, for

19        the record, is an e-mail chain with the name

20        Melissa McGregor at the top, dated August 25,

21        2011.

22        Q     Do you recognize this e-mail chain?

23        A     Just the portion that has my name on it

24   at the bottom.

25        Q     So starting at this, I guess maybe

```
 1                    Joseph Matarazzo

 2   two-thirds of the way down the page of Equinox

 3   6356, you recognize that person that begins "All -

 4   After speaking with Matt Plotkin yesterday."

 5        A    Um-hm.

 6        Q    And do you recall receiving that e-mail

 7   in August, 2011?

 8        A    I don't recall it, but I see this, so I

 9   probably did.

10        Q    Do you have any reason to believe that

11   you didn't receive it?

12        A    No.

13        Q    Do you recall anything you did in

14   response to receiving this e-mail?

15        A    I didn't do anything.

16        Q    Do you recall having any conversations

17   with anyone in response to receiving this e-mail?

18        A    Not that I recall, no.

19        Q    You don't recall having any

20   conversations with David Harris about Ms. Ashdown

21   at this time?

22        A    No, I wasn't involved in this part.

23        Q    But you agree that you were copied on

24   this e-mail?

25        A    I was copied, yes.
```

                    Joseph Matarazzo

1

2       Q     You have no reason to believe that you

3  didn't receive that e-mail?

4       A     Correct.

5       Q     I'm handing you what's been marked as

6  Plaintiff's Exhibit 7 (handing).  Please take a

7  look at it.

8                (E-mail dated September 1, 2011,

9                EQX-6358, was previously marked as

10               Plaintiff's Exhibit 7 for

11               identification.)

12      A     Okay.

13            MR. HARMAN:  For the record,

14       Plaintiff's Exhibit 7 is an e-mail from

15       Lawrence Sanders to Joe Matarazzo and others

16       dated September 1st, 2011.

17      Q     Do you recognize this document?

18      A     Yes.

19      Q     What is it?

20      A     It's informing us of Kerry's

21  termination.

22      Q     Did you receive this document

23  September 1st, 2011, as far as you know?

24      A     I would assume so, yes.

25      Q     What if anything did you do in response

1                    Joseph Matarazzo

2   to this e-mail?

3        A    I don't recall anything.  Seems like it

4   was all buttoned up.

5        Q    What do you mean by that?

6        A    There's no pending question there for

7   me to get involved in.

8        Q    Anything unusual about this e-mail in

9   your professional opinion as manager?

10       A    No.

11       Q    Were you aware that prior to this

12  e-mail that Mauro Maietta was going to be placed

13  in Ms. Ashdown's role?

14       A    Well, the other e-mail stated that.

15       Q    I'm just asking you from your

16  recollection whether you knew that at that time?

17       A    Probably.

18       Q    So at the time that this e-mail was

19  sent to you, other than to receive this e-mail, do

20  you recall any conversations that you had with

21  Mr. Sanders regarding Ms. Ashdown?

22       A    I do not.

23       Q    How about Elizabeth Minton?

24       A    Not that I recall.

25       Q    How about with Mr. Harris?

```
 1                    Joseph Matarazzo

 2      A     Not that I recall.

 3      Q     Mr. Plotkin?

 4      A     No.

 5      Q     Do you see here where it says that, the

 6  second sentence says "Matt explained to her that

 7  if she would like to be a trainer at another

 8  location, for her to e-mail me tomorrow."

 9            Do you see that?

10      A     I do see it.

11      Q     It was your testimony earlier that you

12  believed Ms. Ashdown had stolen from Equinox; is

13  that correct?

14      A     Correct.

15      Q     And that that was the basis of her

16  termination, correct?

17      A     Yes.

18      Q     In your professional opinion, if

19  someone has stolen from Equinox, should they be

20  invited to work at another location in another

21  role?

22      A     No.  Good point.

23      Q     I'm handing you what has been marked as

24  Plaintiff's Exhibit 8 (handing).  Please take a

25  look at it.
```

```
1                    Joseph Matarazzo

2                    (E-mails, EQX-6359-60, were

3              previously marked as Plaintiff's

4              Exhibit 8 for identification.)

5              MR. HARMAN:  Plaintiff's Exhibit 8, for

6        the record, is an e-mail chain that at the

7        top begins from Melissa McGregor, dated

8        September 2, 2011.

9        Q      Do you recognize this e-mail chain?

10   It's a two-page document, EQX 6359-60.  Do you

11   recognize this e-mail chain?

12       A      Yes.

13       Q      And I believe the bottom portion of the

14   page is the portion that we --

15       A      -- just looked at.

16       Q      -- just looked at.  Now did you receive

17   the top portion?

18       A      You mean this e-mail (indicating)?

19       Q      Yes.

20       A      I would assume so, yes.

21       Q      And did you have any response to it?

22   What, if any, response did you have to it?

23       A      I don't recall.  I would think none.

24       Q      Why would you think that?

25       A      Because that's more of an HR
```

1                       Joseph Matarazzo

2    determination than something I would home in on,

3    the visa and all that is not something --

4         Q     I'm just asking you, you don't recall

5    having any response to it?

6         A     I don't.

7         Q     I'm handing you what has been

8    previously marked as Exhibit 9 (handing).

9               MR. HARMAN:  For the record, this is an

10        e-mail chain that is dated, in the top,

11        September 6, 2011.

12                   (E-mails, EQX-6361-63, were

13             previously marked as Plaintiff's

14             Exhibit 9 for identification.)

15        A     Okay.

16        Q     Drawing your attention to the portion

17   at the bottom of 6361, Equinox 6361, from Lawrence

18   Sanders to Matt Plotkin, Matthew Herbert, Joe

19   Matarazzo and others, it begins, "Guys, don't

20   believe this will even be an issue," and it goes

21   on.  Do you see that portion there?

22        A     Yes.

23        Q     Do you recall that portion?

24        A     I do now, yes.

25        Q     Okay, thank you.  I'm handing you

```
 1                    Joseph Matarazzo
 2  what's previously been marked as Plaintiff's
 3  Exhibit 10.  Please take a look at it (handing).
 4                 (E-mail, EQX-3258, was previously
 5            marked as Plaintiff's Exhibit 10 for
 6            identification.)
 7       A    Okay.
 8            MR. HARMAN:  For the record, this is a
 9       one-page document from Matt Plotkin dated
10       July 25, 2011.
11       Q    Do you recognize this document?
12       A    Yes.
13       Q    Did you receive it on or about July 25,
14  2011?
15       A    I would assume so, yes.
16       Q    Did you have any response to it?
17       A    No.
18       Q    Is there anything within the document
19  that you disagree with?
20            MR. MCPARTLAND:  If you understand it,
21       you can answer it.  I don't understand it.
22       A    I'm not sure I understand what you mean
23  by disagree.
24       Q    Well, I mean I don't really appreciate
25  that.  So all I'm asking you is -- your lawyer can
```

```
 1                    Joseph Matarazzo
 2  make an objection and then, you know, I'm happy to
 3  rephrase.  All I mean is, looking at this
 4  document, is there anything in it that is unusual
 5  to you?
 6            MR. MCPARTLAND:  Again, I object to the
 7       form.
 8            You can answer.
 9            MR. HARMAN:  Your objection is noted.
10       A    Are you waiting on a response?
11       Q    Yes.
12       A    I don't think so.
13       Q    Okay.  I'm handing you Plaintiff's
14  Exhibit 11 (handing).  Please take a look at it.
15                 (E-mails, EQX-3510-11, were
16            previously marked as Plaintiff's
17            Exhibit 11 for identification.)
18            MR. HARMAN:  For the record, I don't
19       have any questions about Plaintiff's Exhibit
20       11, so let's move on.
21            Plaintiff's Exhibit 12, I don't have
22       questions about either, for the record.
23            MR. MCPARTLAND:  Can you identify what
24       it was, Bates stamp numbers?
25            MR. HARMAN:  3508.
```

1                    Joseph Matarazzo

2              MR. MCPARTLAND:  To what?  That's it?

3              MR. HARMAN:  That's right.

4        Q     I'm handing you what has been

5    previously marked, for the record, as Plaintiff's

6    Exhibit 13.  Please take a look at it.

7                    (Performance Commission documents,

8                    EQX-6474-77, were previously marked as

9                    Plaintiff's Exhibit 13 for

10                   identification.)

11             MR. HARMAN:  For the record, this is a

12       document entitled Performance Commission and

13       it's Bates stamped EQX-6474 to 6477.

14       Q     Ready?

15       A     Yes.

16       Q     Do you recognize this document?

17       A     No.  I mean format, yes, but not this

18   document.

19       Q     What is the format?

20       A     It's a commission report.

21       Q     Have you seen these type of reports

22   before?

23       A     I have.

24       Q     You testified earlier that a manager

25   could pull sessions for an individual who had

```
 1                    Joseph Matarazzo

 2  completed sessions; is that correct?

 3       A     Yes.

 4       Q     And would this report reflect what had

 5  been pulled for Atriana?

 6       A     Yes.

 7       Q     Who has access to alter this report?

 8       A     To alter?  One of the managers, we

 9  discussed, with their cashier code.

10       Q     So then Lawrence Sanders could alter

11  the report?

12             MR. MCPARTLAND:  Objection.  Note my

13       objection, please.

14       A     Not alter the report, alter the

15  account.

16             MR. HARMAN:  I ask you not to -- while

17       there are questions pending, to not consult

18       with your lawyer.

19             MR. MCPARTLAND:  He didn't consult with

20       me, just waited to see if I was going to

21       instruct him not to answer or not.

22       Q     With respect to -- would these reports

23  generally be at the date that they are generated,

24  they reflect the activity in a trainer's -- the

25  trainer's activity, correct?
```

```
 1                    Joseph Matarazzo

 2      A     Correct.

 3      Q     And you had testified earlier that the

 4 managers would have, with their cashier codes,

 5 would have access to alter a trainer's activity;

 6 is that correct?

 7            MR. MCPARTLAND:  Objection.

 8      A     A member's account?

 9      Q     A member's account, right, which would

10 then in turn --

11      A     This generates from the members --

12      Q     -- have an impact on a trainer's

13 report, correct?

14      A     Correct.

15      Q     Right.  So if Mr. Sanders pulled a

16 session for client John Doe, and that client

17 trained with trainer Sally Sue, Sally Sue's report

18 would reflect that, correct?

19      A     Correct.

20      Q     So if Mr. Maietta pulled a session for

21 a client who had trained with Kerry Ashdown, this

22 report would reflect that, yes or no?

23            MR. MCPARTLAND:  Objection.

24      A     Yes.

25            MR. MCPARTLAND:  You can answer.
```

                    Joseph Matarazzo

1                        (Session detail document,

2                   EQX-6400, was previously marked

3                   as Plaintiff's Exhibit 14 for

4                   identification.)

5        Q     I'm handing you what's been previously

6   marked as Plaintiff's Exhibit 14.  Please take a

7   look at it.  It's not necessary that you study it,

8   if you are not familiar with the document.

9             My overall question is, have you seen

10  this document before?

11       A     I have not.

12       Q     Do you know who Jacques Levy is?

13       A     Where is that?  I do not.

14       Q     Do you know who Daniel Lyons is?

15       A     I do not.

16       Q     Do you or do you not recognize this

17  format of this form that we marked as Plaintiff's

18  Exhibit 14?

19       A     Yes.

20       Q     Do you recognize the format?  How do

21  you recognize the format?

22       A     It gives details of sessions.

23       Q     I am handing you what's been marked

24  Plaintiff's Exhibit 15 (handing).  Take a look at

```
 1                    Joseph Matarazzo
 2  it (handing).
 3                    (October 4, 2010 letter in support
 4              of H-1B application was previously
 5              marked as Plaintiff's Exhibit 15 for
 6              identification.)
 7       Q      Before we go to 15, how many
 8  individuals do you supervise?  I know I asked this
 9  before and I apologize.  But you supervise
10  regional and --
11       A      Directly?  Area personal training
12  managers.
13       Q      How many area personal training
14  managers are there?
15       A      About seven.
16       Q      How many of the seven are men?
17       A      Currently, I think they all are men.
18  Actually, no, I'm sorry, there's one female.
19       Q      Turning your attention to Plaintiff's
20  Exhibit 15.
21            MR. MCPARTLAND:  I have two separate
22       documents attached.
23            MR. HARMAN:  I am not sure that was
24       intended.  For the record, these are two
25       separate documents, two letters, one dated
```

1              Joseph Matarazzo

2       October 4th and one dated February 9th that

3       have been marked as Plaintiff's Exhibit 15,

4       that are Bates numbered P004 through P007.

5       That's just for the record.

6       Q     If you would take a look, please, at

7    the first two pages of this document?

8            MR. MCPARTLAND:  This is not a complete

9       document either.

10           MR. HARMAN:  My question is not about

11      the entirety of the document.  If you want us

12      to have the whole document pulled, I am happy

13      to have it pulled.  We can do that right now.

14      We can do that.

15           MR. MCPARTLAND:  Ask your question and

16      note my objection.  Just please note my

17      objection.  I will wait until you ask your

18      question.

19           MR. HARMAN:  I appreciate it, I would

20      make the same objection.  But my question

21      relates to what is on the second page.  So

22      while we are doing that, we can remark it as

23      a complete document.

24            Actually, why don't you just set that

25      down and we will have that complete document

1                    Joseph Matarazzo

2        pulled.  Just set that aside and we will

3        remark it as a complete document.

4        Q      Do you know what Ms. Ashdown made per

5   year?

6        A      Not off the top of my head, no.

7        Q      What is the range of salary for a

8   personal training manager?

9        A      Forty to fifty-five thousand, sixty

10  thousand.

11       Q      Do any of them make more than sixty

12  thousand?

13       A      Probably a couple.  Salary, talking

14  about not compensation in total.

15       Q      Salary, base salary, not compensation

16  in total.  What would be the range of overall

17  compensation for a personal training manager?

18       A      Varies on the business and size of the

19  club, but probably in the seventy to a hundred or

20  so range.

21       Q      When you say hundred or so, what do you

22  mean by that?

23       A      Low six figures.

24       Q      Are you aware of anybody who makes more

25  than 120 that's a personal training manager?

```
 1                  Joseph Matarazzo

 2      A      Not off the top of my head, unless they

 3 are way overachieving.

 4      Q      For a club like SoHo, what would be the

 5 appropriate compensation?

 6      A      I couldn't tell you off the top of my

 7 head.

 8      Q      Do you know what Mr. Maietta makes?

 9      A      No.

10      Q      Do you know what Mr. Sanders makes?

11      A      No.

12      Q      Do you know what Mr. Plotkin makes?

13      A      No.

14      Q      Can you give me an estimate of what

15 Mr. Sanders makes?

16      A      Not my department.  They don't discuss

17 that stuff.

18           MR. HARMAN:  Just for the record, we

19      are not in possession of a complete document,

20      the document that's been marked Plaintiff's

21      Exhibit 15.

22      Q      Were you involved in negotiations of

23 Ms. Ashdown's compensation?

24      A      I may have been.  I can't confirm that

25 I was.
```

1                      Joseph Matarazzo

2        Q     Do you know that she needed a visa in

3   order to come to the United States?

4        A     Yes.

5        Q     As you sit here today you are aware

6   that Equinox was involved in helping her to obtain

7   that visa?

8        A     Yes.

9        Q     Do you recall having any discussions

10  with her about her base salary?

11       A     I don't recall, no.

12       Q     Was it your decision to hire her?

13       A     Myself and Liz.

14       Q     Once you and Liz made the decision to

15  hire her, how would that decision have been

16  conveyed to her?

17       A     I'm assuming telephone, because she was

18  in her country at the time.

19       Q     As part of that process, would you

20  offer her a salary?

21       A     Yes.  I mean because of the nature of

22  this with the visa, it may have been done through

23  HR.  I don't recall.

24       Q     How would you, considering that you and

25  Liz were offering her a salary, how would you

1                    Joseph Matarazzo

2   arrive at an appropriate salary for that position?

3        A     It's based off, as I said, the budgeted

4   allotments for the club, and it would be broken

5   into three components.  You have base salary; you

6   have your session commissions allotment; and you

7   have your bonus opportunities.

8        Q     So would the club have had a budget at

9   the time for a personal training manager's salary,

10  base salary?

11       A     Sure.

12            MR. HARMAN:  I call for production of

13        the club's budget that was in place at the

14        time allocating a certain amount of money for

15        the personal training manager's salary.

16            MR. MCPARTLAND:  We'll take it under

17        advisement.  Please put it in writing.

18                 I'm handing you what's been marked

19            as Plaintiff's Exhibit 16 (handing).

20            Please take a look at it.

21                 (Employee termination record was

22            marked as Plaintiff's Exhibit 16 for

23            identification.)

24            MR. HARMAN:  For the record, this is a

25        one-page document that's Bates stamped EQX

```
 1                    Joseph Matarazzo

 2        6390.

 3        Q     Do you recognize this document?

 4        A     I do not.

 5        Q     Have you ever seen anything like this?

 6        A     No.

 7        Q      It states here that, there's a box

 8  that's checked in the middle of the page that says

 9  "Employee was involuntarily terminated," and then

10  it says "One who informed employee of the

11  termination decision," and it says Matt Plotkin,

12  and gives his title, and Mark Sanders.  And then

13  it says, "Please describe the final incident," and

14  goes on.

15            And then it says there are 17 total

16  sessions that were pulled for three trainers,

17  Kerry being one of the trainers that four of the

18  seventeen sessions were pulled for.  Were you

19  aware that other trainers had pulled sessions?

20        A     I was not.

21            MR. MCPARTLAND:  Objection.

22            You can answer.

23            MR. HARMAN:  Just give me a couple of

24        minutes, please.

25            MR. MCPARTLAND:  Sure.
```

1               Joseph Matarazzo

2          (Brief recess)

3      MR. HARMAN:  I don't have any further

4   questions at this time.

5          We will be sending the witness the

6   original copy of the transcript to be signed

7   and notarized and Mr. McPartland and I have

8   agreed to exchange all transcripts in the

9   case so we don't have to order duplicates.

10  That's it.

11               (Whereupon, at 4:25 p.m., the

12          deposition was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2  STATE OF NEW YORK_____)

3  COUNTY OF _____)

4  I, JOSEPH MATARAZZO, declare under penalty of

5  perjury that I have read the foregoing transcript,

6  and I have made any corrections, additions, or

7  deletions that I was desirous of making; that the

8  foregoing is a true and correct transcript of my

9  testimony contained therein.

10 EXECUTED this _____DAY OF_____, _____.

11 _____, _____.

12            (City)              (State)

13                 _____

14                 JOSEPH MATARAZZO

15

16 Subscribed and sworn to before me

17 This ____ day of _____, _____.

18

19

20 _____

21 Notary Public

22

23         (Signature of deponent requested.)

24

25

```
 1
 2                    CERTIFICATION
 3        I, NANCY ANNE FLYNN, Registered Professional
 4   Reporter and a Notary Public in and for the State
 5   of New York, certify;
 6        That the foregoing proceedings were taken
 7   before me at the time and place therein set forth,
 8   at which time the witness was put under oath;
 9        That the testimony of the witness, the
10   questions propounded, and all objections and
11   statements made at the time of the examination
12   were recorded stenographically by me and were
13   thereafter transcribed;
14        That the foregoing is a true and correct
15   transcript of my shorthand notes so taken.
16        I further certify that I am not a relative
17   or employee of any attorney of the parties, nor
18   financially interested in the action.
19        I declare under penalty of perjury that the
20   foregoing is true and correct.
21        Dated this 10th day of September 2013.
22
23
24        _____
25               NANCY ANNE FLYNN, RPR
```