**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
KERRY ASHDOWN,

       *Plaintiff*,

   *v*.
                                      **13 CV 1374 (HB)(GWG)**

EQUINOX *a/k/a*
EQUINOX FITNESS CLUB *and incorporated as*
EQUINOX HOLDINGS, INC.,
MAURO MAIETTA,
LAWRENCE SANDERS,
MATT PLOTKIN *a/k/a* MATTHEW PLOTKIN,

       *Defendants*.
-------------------------------------------------------------X

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

**THE HARMAN FIRM, PC**
*Counsel for Plaintiff*
Walker G. Harman, Jr. [WH-8044]
200 West 57th Street, Suite 900
New York, New York 10019
(212) 425-2600
wharman@theharmanfirm.com

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................................... 1

II.   FACTS ............................................................................................................................ 2

III.   LEGAL ARGUMENT .................................................................................................... 6

   1.   Ms. Ashdown easily shows that her adversarial work environment and termination give rise to an inference of discrimination on the basis of her gender and perceived disability because she was the only female managerial employee of Defendants who had cancer. ...7

   2.   Questions of fact exist as to whether Defendants' reason for Ms. Ashdown's termination was legitimate or pretextual because Defendants' proof of legitimacy is from a video they cannot produce and that they describe with inconsistent testimony. ................................11

      a.   Defendants cannot use testimony describing inadmissible surveillance video as evidence to support Ms. Ashdown's purportedly legitimate termination. ............... 12

      b.   Defendants' testimony regarding the video is inconsistent, and thus even if it were considered, it only creates questions of fact. ............................................................ 14

      c.   Ms. Ashdown's termination was pretextual. ............................................................. 17

   3.   Different people hired Ms. Ashdown than who terminated her and thus no same-actor inference is warranted. ..............................................................................................18

   4.   Ms. Ashdown states *prima facie* claims of hostile work environment because she easily shows that she was treated differently than male employees who did not have cancer. ...19

   5.   Ms. Ashdown has a claim of aiding and abetting against Defendant Sanders as a matter of law. ............................................................................................................................21

   6.   Ms. Ashdown has a claim of tortious inference with a contract and the right to conduct business as a matter of law. ..................................................................................22

IV.   CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Albert v. Loksen*,
    239 F.3d 256 (2d Cir. 2001) ................................................................ 23

*Bernard v. JPMorgan Chase Bank*,
    08 CV 4784 (THK), 2010 WL 423102 (S.D.N.Y. Feb. 5, 2010) ........................... 10

*Caravantes v. 53rd St. Partners*,
    2012 WL 3631276, 2012 U.S. Dist. LEXIS 120182 (S.D.N.Y. Aug. 23, 2012) ..................... 21

*Carlton v. Mystic Transp.*,
    202 F.3d 129 (2d Cir. 2000) ................................................................ 8

*Carroll v. LeBoeuf, Lamb, Greene & MacRae*,
    614 F. Supp. 2d 481 (S.D.N.Y. 2009) .......................................... 12, 13

*Chambers v. TRM Copy Ctrs.*,
    43 F.3d 29 (2nd Cir. 1994) ................................................................ 9

*Cifarelli v. Vill. of Babylon*,
    93 F.3d 47 (2d Cir. 1996) ................................................................ 7

*Cohen v. Davis*,
    926 F. Supp. 399 (S.D.N.Y. 1996) .......................................... 23

*Crews v. Trs. of Columbia Univ.*,
    452 F. Supp. 2d 504 (S.D.N.Y. 2006) .......................................... 17

*Dunson v. TRI-Maint. & Contractors*,
    171 F. Supp. 2d 103 (E.D.N.Y. 2001) .......................................... 21

*EEOC v. Ethan Allen*,
    44 F.3d 116 (2d Cir. 1994) ................................................................ 14

*Ellis v. Century 21*,
    2013 U.S. Dist. LEXIS 140241 (E.D.N.Y. Sept. 28, 2013) ................... 19

*Evans v. Port Authority*,
    192 F. Supp. 2d 247 (S.D.N.Y. 2002) .......................................... 14

*Finley v. Giacobbe*,
    79 F.3d 1285 (2d Cir. 1996) ................................................................ 22

*Gioia v. Forbes Media*,
    501 Fed. App'x 52 (2d Cir. 2012) .......................................... 10

*Gorzkynski v. JetBlue Airways*,
    596 F.3d 93 (2d Cir. 2010) ................................................................ 8

*Graham v. L.I.R.R.*,
    230 F.3d 34 (2d Cir. 2000) ........................................ 9, 17, 18

*Hart v. N.Y.U. Hosp. Ctr.*,
    09 CV 5159 (RWS), 2011 WL 4755368 (S.D.N.Y. Oct. 7, 2011) ........................... 10

*Hollander v. Amer. Cyanamid,*
    172 F.3d 192 (2d Cir. 1999) ............................................................................................ 8

*Holtz v. Rockefeller & Co.,*
    258 F.3d 62 (2d Cir. 2001) .............................................................................................. 6

*Leibowitz v. Cornell Univ.,*
    584 F.3d 487 (2d Cir. 2009) ............................................................................................ 9

*Lott-Coakley v. Ann-Gur Realty Corp.,*
    23 Misc. 3d 1114(A), 886 N.Y.S.2d 67 (N.Y. Sup. Ct. 2009) ................................... 12

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792, 93 S. Ct. 1817 (1973) ......................................................................... 7, 11

*Miloscia v. B.R. Guest Holdings,*
    33 Misc. 3d 466, 928 N.Y.S.2d 905 (N.Y. Sup. Ct. 2011) ......................................... 7

*Montano v. N.Y.C. Dep't of Educ.,*
    2012 NY Slip Op 32283(U) (N.Y. Sup. Ct. Aug. 30, 2012) ................................... 19

*Norville v. S.I. Univ. Hosp.,*
    196 F.3d 89 (2d Cir. 1999) ............................................................................................ 14

*O'Diah v. Oasis,*
    2013 WL 3796619, 2013 U.S. Dist. LEXIS 102461 (S.D.N.Y. July 22, 2013) ....................... 19

*Roge v. NYP Holdings,*
    257 F.3d 164 (2d Cir. 2001) .......................................................................................... 14

*Schnabel v. Abramson,*
    232 F.3d 83 (2d Cir. 2000) .............................................................................................. 8

*Simon DeBartolo Grp. v. Richard E. Jacobs Grp.,*
    186 F.3d 157 (2d Cir. 1999) .......................................................................................... 10

*Slattery v. Swiss Reinsurance Am. Corp.,*
    248 F.3d 87 (2d Cir. 2001) ............................................................................................ 11

*Strauss v. Microsoft,*
    814 F. Supp. 1186 (S.D.N.Y. 1993) ............................................................................... 7

*Thompson v. Bosswick,*
    855 F. Supp. 2d 67 (S.D.N.Y. 2012) ........................................................................... 22

*Truong v. N.Y. Hotel & Motel Trades Council,*
    603 F. Supp. 2d 742 (S.D.N.Y. 2009) ......................................................................... 10

*U.S. v. Codrington,*
    07 MJ 118 (CLP), 2008 WL 1927372 (E.D.N.Y. May 1, 2008) ............................... 12

*Williams v. N.Y.C. Hous. Auth.,*
    61 A.D.3d 62 (N.Y. App. Div. 1st Dep't 2009) ..................................................... 19, 20

*Woodman v. WWOR-TV,*
    411 F.3d 69 (2d Cir. 2005) ............................................................................................ 11

**Statutes**

N.Y.C. ADMIN. CODE § 8-107 ...................................................................................... 7

N.Y.C. ADMIN. CODE § 8-107(6) ................................................................................. 21

N.Y.C. ADMIN. CODE §§ 8-101–31 ........................................................................ 7, 21

**Rules**

FED. R. CIV. P. 56 ....................................................................................................... 12

FED. R. CIV. P. 56(c) ................................................................................................... 6

FED. R. CIV. P. 56(e) ................................................................................................... 12

FED. R. EVID. 1002 ...................................................................................................... 12

## I.      PRELIMINARY STATEMENT

Plaintiff Kerry Ashdown is a British national whom Defendants moved to the U.S. to work as a personal training manager at Defendants' fitness centers.  She alleges claims of gender and perceived disability discrimination, hostile work environment, aiding and abetting discrimination, tortious interference with contract, and tortious interference with the right to conduct business.  She is suing her former employer, Defendant Equinox Holdings, Inc. ("Equinox"); two (2) of her former supervisors, *i.e.* Lawrence Sanders and Matthew Plotkin; and her former staff member, who was the mastermind behind her discriminatory termination, Defendant Mauro Maietta.  Defendants have boldly and frivolously moved to dismiss **all** of Ms. Ashdown's claims.

Defendants' Motion must be denied as follows:

(i)      Ms. Ashdown easily shows that her adversarial work environment and termination gives rise to an inference of discrimination on the basis of her gender and perceived disability because she was the only female employee of Defendants who had cancer;

(ii)      Questions of fact exist as to whether Defendants' purported reason for Ms. Ashdown's termination was legitimate or pretextual because Defendants' proof of legitimacy is from a phantom video that they destroyed and that they describe with inconsistent testimony;

(iii)      Different people hired Ms. Ashdown than those who terminated her, thus no same-actor inference is warranted;

(iv)      Ms. Ashdown sets forth a *prima facie* case of hostile work environment because she easily shows that she was treated differently than male employees who did not have cancer;

1

(v)      Ms. Ashdown sets forth a claim for aiding and abetting discrimination because Defendant Sanders was aware of the discrimination Ms. Ashdown was suffering and failed to even attempt to remedy it;

(vi)     Ms. Ashdown states claims for tortious interference with contract and tortious interference with the right to conduct business because Defendant Maietta made slanderous accusations against Ms. Ashdown causing her to lose her job and the ability to conduct her business.

Defendants' utterly unnecessary and extremely prejudicial Motion for Summary Judgment, on which they cannot seriously imagine they would prevail, is borderline frivolous. Defendants' burden on this Motion is to show an **<u>absence</u>** of disputed facts.  Defendants' own testimony is so inconsistent as to give rise to a dispute of facts *per se*.  Not only is Defendants' own testimony in and of itself disputed, but Plaintiff also disputes each and every fact involved in Defendants' bogus and manufactured reason for her termination.   More alarmingly, Defendants barely offer legal support for their wasteful Motion.  Defendants' Motion is a colossal waste of valuable judicial resources and must be denied.

## II.   <u>FACTS</u>

Ms. Ashdown is thirty-six (36) years old.  *Ashdown Dep*. 6:7–9.  In January 2011, Ms. Ashdown started working at Equinox.  *Matarazzo Dep*. 96:13–18.  After a training period, Ms. Ashdown was placed in Equinox's Soho location as a Personal Training Manager in a male-dominated arena.  *Id*.; *Ashdown Aff*. ¶ 54, n.1.  Since the beginning of her employment, Ms. Ashdown was entirely devoted to building a career at Equinox.  She consistently showed her dedication by regularly working sixteen-hour (16-hour) shifts, and routinely working on her nominal "day off" Friday.  *Ashdown Aff*. ¶ 27.  Ms. Ashdown's performance was exceptional by

all accounts. *Id.* ¶ 53; *Matarazzo Dep.* 57:15–17; 60:21–25; *Sanders Dep.* 57:17–19. Her success was recognized at a company awards presentation, when Equinox's COO, Scott Rosen referred to Ms. Ashdown as a "superstar," and told her to expect to receive awards for her performance.[1] *Ashdown Aff.* ¶ 54, n.1.

Defendant Sanders was Ms. Ashdown's supervisor. *Ashdown Dep.* 45:15–20. He has already been castigated by Equinox for his treatment of women at least once before. *Id.* 8:24–11:19. He sat idly by while Ms. Ashdown was terrorized by Defendant Maietta. *See Sanders Dep.* 66:3–11, 93:11–12, 117:5–9.

Defendant Maietta, who worked under Ms. Ashdown, could not handle her success (of which he was jealous) and her authority (which he resented); he made it his daily mission to sabotage Ms. Ashdown's career at Equinox. Defendant Maietta is overly competitive and instead of acting as Ms. Ashdown's colleague, he acted as her adversary. *Ashdown Dep.* 58:4–11; *Sanders Dep.* 73:14–19. He made preposterous accusations including, but not limited to allegations that Ms. Ashdown was getting very drunk with her staff, that she purportedly favored males over females, and that her behavior with staff was supposedly inappropriate. *Ashdown Aff.* ¶ 39; *Plotkin Dep.* 135:22–25; *Ashdown Dep.* 74:12–20. Defendant Maietta created a dishonest scheme to harm Ms. Ashdown when he complained to Defendant Sanders that she was not responsive to communications, but this was after Defendant Maietta sent her multiple emails to a fake email address, to which she never had access. *Sanders Dep.* 92:11–93:12; *Ashdown Dep.* 74:21–24. Defendant Sanders never investigated this. *Sanders Dep.* 93:11–12.

---

1. Mr. Rosen also referred to Ms. Ashdown as a "stud." She was taken aback and thought the phrase was an Americanism. It was not; Mr. Rosen said that he did in fact mean it as a compliment. This exchange nonetheless underscores the deeply entrenched macho and anti-female character of Equinox and its employees.

Finally, Defendant Maietta falsely accused Ms. Ashdown of conducting improperly "pulling sessions" on company computers in order to credit trainers who had not performed services which they claim were pulled under Ms. Ashdown's employee code. This activity however, was admittedly conducted by her former colleague, Cornelia Hobbie, as well as Defendant Sanders. *Sanders Dep*. 169:2–6. Ms. Ashdown **never** improperly pulled **any** sessions. *Ashdown Dep*. 124:5–19. Defendants admit that Ms. Ashdown was not the only individual with access to other employees' codes used to authenticate session recording. *Sanders Dep*. 169:2–6. Defendants also admit that supervisors have access to these codes, which means that Defendant Sanders, *inter alia*, had access to Plaintiff's code. *Id*. Each employee also has access to their own code. *Id*. Cornelia Hobbie worked under both Ms. Ashdown **and** Defendant Maietta. *Sanders Dep*. 26:4–6. Defendant Sanders swore that "yes, you could believe that Cornelia [Hobbie] stole something for [Ms. Ashdown]." *Sanders Dep*. 28:21–22. Defendants admit that Ms. Hobbie was just as likely to be the perpetrator of the pulled sessions as Ms. Ashdown, but while Ms. Ashdown was unfairly terminated, Ms. Hobbie was promoted. *Sanders Dep*. 27:15–23. Defendants continue to contradict themselves by claiming both that: (i) the sessions were improperly pulled by only Ms. Ashdown; and also that (ii) there were three (3) individuals who pulled sessions, *i.e.*, Defendant Sanders, Ms. Hobbie, and Ms. Ashdown. *Sanders Dep*. 166:16–25, 194:13–17; *Plotkin Dep*. 76:8.

When Ms. Ashdown became aware of these egregious accusations, she reported to her supervisors including Elizabeth Minton (A.K.A. Liz Minton) and Defendant Sanders. *Ashdown Dep*. 77:23–79:8; *Sanders Dep*. 93:8–10. However, no action was taken to investigate. *Sanders Dep*. 72:3–10, 93:11–12. Thereafter, Defendant Maietta continued his vicious attacks against Ms. Ashdown by telling Defendant Sanders that he thought she would "crash and burn" in his

absence. *Ashdown Dep*. 89:9–11.   Ms. Ashdown was subsequently caused to feel severe emotional and financial distress resulting from Defendants' conduct. *Ashdown Aff*. ¶ 58.

Following Defendant Maietta's falsely accusing Ms. Ashdown of improperly pulling sessions, Ms. Ashdown was unlawfully terminated on September 1, 2011. *Ashdown Dep*. 138:25.   Ms. Ashdown was called into Defendant Sanders's office.   Defendant Plotkin informed her that she was being terminated due to Defendants' spurious session-pulling allegations, which were fueled by Defendant Maietta's animosity. *Ashdown Dep*. 139:2–8; *Plotkin Dep*. 97:7–8. Ms. Ashdown offered to take a lie detector test to prove that these allegations were false, but Defendants refused. *Plotkin Dep*. 82:9–13; *Sanders Dep*. 52:5–7.   Worse, Defendant Sanders was well aware of Defendant Maietta's issues with Ms. Ashdown and would eventually apologize for it, but he just sat silently and said nothing in Ms. Ashdown's defense. *Id*.

After Ms. Ashdown was fired, Defendant Plotkin escorted her off the premises and said that he knew Ms. Ashdown needed a job for her visa and that she should contact Defendant Sanders for a job the following day. *Sanders Dep*. 77:22–78:3; *Plotkin Dep*. 95:5–7.   Months later, Defendant Sanders telephoned Ms. Ashdown and admitted that she had not been treated fairly and that he was "sorry for what happened." *Ashdown Aff*. ¶ 53; *Sanders Dep*. 63:10–12. Such contradictory and confusing actions only underscore the illegitimate, unfounded, and pretextual nature of Ms. Ashdown's illegal termination.

Ms. Ashdown's health suffered dramatically due to her ovarian cancer diagnosis, her dedication to her job at Equinox, however, never wavered. *Ashdown Dep*. 98:8–14.   Ms. Ashdown informed only her colleagues—including Defendant Sanders, the Club Manager—about her health condition around August 2011 after she was informed that she would need to

undergo chemotherapy.[2]   *Ashdown Aff.*, *Exs. A–F*; *Ashdown Aff.* ¶ 31; *Ashdown Dep.* 103:2–5. During the course of treatment, her energy dropped and she was exceedingly exhausted, which made it difficult for her to begin her day at 5:00 a.m.   *Ashdown Aff.* ¶ 34.   However, the descriptions that Ms. Ashdown's clients gave of her work during her treatment attest to her resolute dedication and her ability to continue to perform her job successfully.[3]   *Ashdown Aff.* ¶¶ 31, 35; *Id.*, *Exs. A–F*; *Ashdown Dep.* 105:10–12.   However, Defendant Maietta did not think she looked so well and continued his campaign to have her terminated.   *Maietta Dep.* 130:17–21, 131:18–21, 131:11–15.   Thereafter, he was given Ms. Ashdown's former job.   *Maietta Dep.* 40:24–41:2.

### III.   <u>LEGAL ARGUMENT</u>

Defendants' Motion for Summary Judgment could be denied based solely on an examination of Defendants' own testimony.   Summary judgment must be denied unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(c).   Material facts are those that "might affect the outcome of the suit under the governing law."   *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).   A genuine issue exists if a jury could reasonably find in favor of the nonmoving party based on that material fact.   *Id.*   Moreover, the court must construe the

---

2.   Ms. Ashdown only recalls missing a day and a half (1.5 days) of work despite her grueling medical treatment, which included nine (9) weeks of radiation and three (3) cycles of chemotherapy, followed by six (6) months of medication.   *Ashdown Aff.* ¶ 34; *Ashdown Dep.* 101:5–8.

3.   "She was tireless, cheerful and motivating"; "At no time during my training was I aware of her treatment for cancer"; "I began to notice how hard she was working, very often having her first clients at [6:00 a.m.] and finishing her day at [7:00 p.m.]"; "She works ridiculously long hours"; "You would never even know what she was going through"; and even that "She is truly one of the most inspirational individuals I have ever met."   *Ashdown Aff.*, ¶¶ 31, 35; *Id.*, *Exs. A–F*.

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

> With respect to employment discrimination cases, district courts should be especially wary of granting summary judgment. Summary judgment rarely should be granted in "cases alleging employment discrimination because of the special category in which Congress and the Supreme Court visualized these cases." Moreover, where one party's "intent and state of mind are implicated," as often occurs in employment discrimination actions, summary judgment is ordinarily inappropriate.

*Strauss v. Microsoft*, 814 F. Supp. 1186, 1190 (S.D.N.Y. 1993) (citations omitted); *see also Miloscia v. B.R. Guest Holdings*, 33 Misc. 3d 466, 472, 928 N.Y.S.2d 905, 912 (N.Y. Sup. Ct. 2011) ("Courts further urge caution in granting summary judgment in employment discrimination cases, as direct evidence of intentional discrimination is rarely available.").

Here, Defendants have not even come close to meeting their burden on this Motion for Summary Judgment.

**1.    Ms. Ashdown easily shows that her adversarial work environment and termination give rise to an inference of discrimination on the basis of her gender and perceived disability because she was the only female managerial employee of Defendants who had cancer.**

The key issue in determining whether a plaintiff has a gender or perceived disability discrimination claim under § 8-107 of the New York City Human Rights Law ("NYCHRL"), is whether the plaintiff satisfies the *prima facie* elements of the *McDonnell Douglas* burden-shifting formula. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). That is, the employee must show that she (i) is a member of a protected class; (ii) was qualified to hold her position; and (iii) that she suffered an adverse employment action giving rise to an inference of discrimination. *Id*.

The Second Circuit has clarified that " '[t]he burden of proof that must be met to establish a *prima facie* case [of employment discrimination] is minimal.' " *Schnabel v.*

*Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (quoting *Hollander v. Amer. Cyanamid*, 172 F.3d 192, 199 (2d Cir. 1999)). Further, direct evidence of discrimination is not even necessary. *See Carlton v. Mystic Transp.*, 202 F.3d 129 (2d Cir. 2000) (Plaintiffs must rely on the cumulative weight of circumstantial evidence because direct evidence of discrimination is rare; an employer is highly unlikely to leave a 'well-marked' trail of discrimination.); *Gorzkynski v. JetBlue Airways*, 596 F.3d 93, 101 (2d Cir. 2010) ("Where an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.").

Defendants do not dispute that Ms. Ashdown is a woman suffering from cancer and thus a member of two (2) protected classes: gender and disability. Defendants do not dispute that Ms. Ashdown was qualified for her position. She was recruited by Defendants from the U.K.; Defendants sponsored her visa; and she completed Defendants' training program. Defendants also do not dispute that Ms. Ashdown suffered an adverse employment action. She endured an adversarial and contentious work environment and was subsequently disposed of. Defendants contend that Ms. Ashdown cannot show that her adverse employment actions occurred under circumstances giving rise to an inference of discrimination. However, as will be shown below, Ms. Ashdown easily meets her minimal burden.

The Second Circuit makes clear that inferences of discrimination may be drawn in many ways, including, but not limited to:

> [T]he employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position, or the employer's criticism of the plaintiff's performance in ethnically degrading terms, or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group, or the sequence of events leading to the plaintiff's discharge.

*Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs.*, 43 F.3d 29, 37–38 (2nd Cir. 1994) (internal quotation marks omitted)); *see also Graham v. L.I.R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (inference arises when "employer subjected [employee] to disparate treatment, that is, treated [them] less favorably than a similarly situated employee outside [their] protected group").

Ms. Ashdown worked at Equinox's Soho location, where approximately seventy-five percent (75%) of the trainers were male—and none had cancer. Ms. Ashdown was intentionally treated differently because she is a female and because of her cancer. Ms. Ashdown testified that Defendant Maietta continuously harassed her because he could not bear to be supervised by a woman. Defendant Maietta refused to even acknowledge that Ms. Ashdown was his supervisor. *Maietta Dep.* 41:3–10. Defendant Maietta clearly showed discriminatory *animus* against Ms. Ashdown through his behavior and his lack of courtesy, let alone respect, for her as his supervisor. Defendant Maietta's actions towards Ms. Ashdown were not isolated incidents. Rather, they reflected Defendants' sexist pattern of conduct.

Defendant Sanders, who has a documented history of inappropriate conduct towards other female employees, similarly subjected Ms. Ashdown to discrimination based on her gender and cancer. Defendant Sanders was aware of Defendant Maietta's discriminatory conduct towards Ms. Ashdown. He failed to take any course of action to investigate those claims or to stop Defendant Maietta's conduct.

These instances show how Defendants' conduct created a contentious and adversarial work environment for Ms. Ashdown on the basis of her gender and perceived disability from which Ms. Ashdown was ultimately terminated.   Ms. Ashdown's work environment and termination give rise to an inference of discrimination because she was the only female manager of Defendants with cancer and the only person treated so badly by Defendants.   Ms. Ashdown's burden of making her *prima facie* case is "minimal" and accordingly, Defendants' motion should be denied.

Defendants' reliance on *Bernard v. JPMorgan Chase Bank*, 08 CV 4784 (THK), 2010 WL 423102 (S.D.N.Y. Feb. 5, 2010), *Gioia v. Forbes Media*, 501 Fed. App'x 52 (2d Cir. 2012), and *Hart v. N.Y.U. Hosp. Ctr.*, 09 CV 5159 (RWS), 2011 WL 4755368 (S.D.N.Y. Oct. 7, 2011) is misplaced.[4]  In *Bernard*, the plaintiff's immediate supervisor was also a woman and the Court inferred from this fact that it was less likely that the supervisor could be biased against plaintiff because of her gender.   In the instant case, every individual involved in Ms. Ashdown's termination is a man; none had cancer.   In *Gioia*, the plaintiff was one of many employees laid off when Defendants' business prospects were deteriorating.   In the present action, Ms. Ashdown was the only employee terminated and there is no evidence of business deterioration whatsoever. In *Hart*, the plaintiff had a history of disciplinary problems and performance deficits, and thus, the employer had legitimate and documented grounds to terminate the plaintiff.   Conversely, in this action, Ms. Ashdown never had any disciplinary problems and was an exemplary employee. For these reasons, *Bernard*, *Gioia*, and *Hart* are completely irrelevant to this case.

---

4.  Defendants' wholly improper and reckless citations to these cases makes at least part of their Motion entirely frivolous and thus sanctionable.  "The Court of Appeals has stated that in determining whether Rule 11(b)(2) has been violated, district courts should consider 'the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys . . . .' " *Truong v. N.Y. Hotel & Motel Trades Council*, 603 F. Supp. 2d 742, 744 (S.D.N.Y. 2009) (quoting *Simon DeBartolo Grp. v. Richard E. Jacobs Grp.*, 186 F.3d 157, 166 (2d Cir. 1999)).

Ms. Ashdown has made her *prima facie* showing.   Accordingly, Defendants' motion should be denied.

> **2.      Questions of fact exist as to whether Defendants' reason for Ms. Ashdown's termination was legitimate or pretextual because Defendants' proof of legitimacy is from a video they cannot produce and that they describe with inconsistent testimony.**

Once the plaintiff has established a *prima facie* case of discrimination under the *McDonnell Douglass* formula, there is presumption of unlawful discrimination.   That presumption "shifts the burden of production to the [employer], who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001)).   Upon the employers' showing of a legitimate, nondiscriminatory reason, the employee then must show the proffered reason is pretextual.   *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825 (A nondiscriminatory reason given by an employer does not automatically end the process because an employer should not be allowed to use an otherwise legitimate reason as camouflage for discrimination.   The employee must be given "a fair opportunity to show that [the employer's] stated reason for [the employee's] rejection was in fact pretext.")

Defendants' proffered legitimate and non-discriminatory reason for terminating Ms. Ashdown is that she allegedly stole from the company by improperly "pulling" training sessions that had not occurred.   In support of this contention, Defendants have submitted Defendant Sanders's and Defendant Plotkin's testimony regarding a phantom surveillance video that purports to show Ms. Ashdown walking down a hall, but the video cannot be produced.   The testimony is (i) inadmissible and therefore cannot form the basis for a summary judgment motion, further (ii) the testimony regarding the video's contents is inconsistent, and accordingly, (iii) it creates questions of fact as to whether Ms. Ashdown's termination was legitimate or

pretextual such that more issues are raised than solved.  A motion for summary judgment is entirely inappropriate under such circumstances.

        **a.**    **Defendants cannot use testimony describing inadmissible surveillance video as evidence to support Ms. Ashdown's purportedly legitimate termination.**

Pursuant to FED. R. CIV. P. 56, the moving party on a summary judgment motion must present evidence that would otherwise be admissible in court.  *Atronic Int'l, GmbH v. SAI Semispecialists of Am.*, 03 CV 4892 (JFB)(MLO), 2006 WL 2654827, at *6–7 (E.D.N.Y. Sept. 15, 2006).

> "[S]upporting and opposing affidavits [on summary judgment motions] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Were there any doubt as to its meaning, it long ago was eliminated by a parade of decisions making clear that only admissible evidence may be considered in passing on motions for summary judgment.

*Carroll v. LeBoeuf, Lamb, Greene & MacRae*, 614 F. Supp. 2d 481, 483–84 (S.D.N.Y. 2009) (quoting FED. R. CIV. P. 56(e)); *see also Lott-Coakley v. Ann-Gur Realty Corp.*, 23 Misc. 3d 1114(A), 886 N.Y.S.2d 67, at *5 (N.Y. Sup. Ct. 2009) ("the movant's burden [on a summary judgment motion] to proffer evidence in admissible form is absolute . . . .").

Rule 1002 of the FED. R. EVID. sets forth the Best Evidence Rule, which states that "the original writing, recording, or photograph is required" to prove the contents thereof.  Duplicates are permissible only when the contents of the writing are undisputed.[5]  *Carroll*, 614 F. Supp. 2d at 484.  In *Carroll*, the plaintiffs tried to submit two (2) photocopies of letters in opposition to a summary judgment motion.  The originals were not available.  The defendant moved to exclude the photocopies.  *Id.* at 481.  The Court said that "[t]he common law required production of the original of any document offered in evidence in order to ensure that the trier of fact had the 'best

---

[5].  "Writings" include videotapes.  *See U.S. v. Codrington*, 07 MJ 118 (CLP), 2008 WL 1927372, at *12–13 (E.D.N.Y. May 1, 2008).

evidence' of the content of the document, which of course is the document itself." The Court ruled in the defendant's favor and excluded the photocopies because the content of the letters was disputed and therefore photocopies were not permissible. *Id.* at 485.

Defendants rely heavily on testimony from Defendant Sanders and Defendant Plotkin that purport to attest to the contents of a surveillance.[6] Defendants claim the video shows that Ms. Ashdown was walking down some hall at Equinox. They use this idea to mean that she was near her own computer, around the time that Defendants claim that training sessions were pulled. The Defendants claim that this phantom video is proof that Ms. Ashdown must have been the trainer who pulled the sessions, even though Defendant Sanders admits to tweaking such records himself and swore that "you could believe that Cornelia [Hobbie][7] stole something." *Sanders Dep.* 28:21–22. Never deterred, this is Defendants' actual alleged legitimate reason for Ms. Ashdown's termination.

Ms. Ashdown disputes the content of the video. She vehemently denies improperly pulling any training sessions. Defendant Sanders and Defendant Plotkin do not have independent knowledge of anything that the phantom video allegedly shows. They did not personally witness Ms. Ashdown walk down any hall. They testify solely as to what they saw on this unavailable video. Defendants cannot produce the video because it was destroyed,[8] and thus this is not the case were a duplicate could even be used. Absent the surveillance video itself, Defendant Plotkin and Defendant Sanders would have no personal knowledge of Ms. Ashdown's

---

6. Defendants offer no testimony or any evidence demonstrating that this video ever even existed.

7. Defendants also chose to not investigate Ms. Hobbie because she was not Defendant Maietta's supervisor and not the target of his discriminatory attacks. *Sanders Dep.* 153:23–25.

8. Defendant Sanders was asked, "Is there an evidence whatsoever as you sit here today about this video?" In response, he stated, "No, probably not." *Sanders Dep.* 129:24-130:2. Defendant Sanders was also asked, "Did you preserve the video" to which he responded, "No." *Sanders Dep.* 129:12-13. Defendant Sanders also said that he "[d]idn't save [the video]." *Sanders Dep.* 130:5-6.

whereabouts on the day at issue.  The phantom video would have been the only first-hand evidence that suggests Defendants' decision to terminate Ms. Ashdown was anything but discriminatory.  Because the video was not, and cannot be produced, the testimony of Defendant Plotkin and Defendant Sanders is in clear violation of the Best Evidence Rule and therefore cannot be used to support Defendants' Motion.  Defendants' story disappoints in the extreme.  Plaintiff has suffered enough without having to defend against this mess of made up excuses and phantom footage.

Additionally, Defendants' citations to their own hearsay are inadmissible and completely insufficient to form the basis for summary judgment.  *See Evans v. Port Authority*, 192 F. Supp. 2d 247, 273 (S.D.N.Y. 2002).  Defendants cite to the phantom video in a failed effort to conclude that Ms. Hobbie was purportedly not present when the sessions were pulled is just as inadmissible.  *Sanders Dep*. 174:20–25; *see Evans* at 273.

### b.    Defendants' testimony regarding the video is inconsistent, and thus even if it were considered, it only creates questions of fact.

As stated in *Roge v. NYP Holdings*, 257 F.3d 164, 170 (2d Cir. 2001), a "jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff."  *See also Norville v. S.I. Univ. Hosp*., 196 F.3d 89, 97–98 (2d Cir. 1999); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994).  In the instant case, there are blatant inconsistencies in the testimony of several key Defendants regarding the contents of the video that Defendant Sanders "probably destroyed."  *Sanders Dep*. 95:13–14.

Defendant Sanders and Defendant Plotkin have wholly opposite stories regarding who watched the surveillance video.  *Compare, e.g., Sanders Dep*. 124:7–9 with *Plotkin Dep*. 80:16–17.  They both seem to firmly believe that their recollection of the event of watching the

14

surveillance video is the correct one.  However, during their respective testimony they gave two (2) radically different, contradictory, and mutually exclusive versions of the same purported event, which probably never happened anyway.  Defendant Plotkin firmly stated that he watched the video with Defendant Sanders (*Plotkin Dep*. 76:13–16), but Defendant Sanders could not remember whether he watched the video with someone or alone (*Sanders Dep*. 125:7–23).  Defendant Sanders did not watch the video to find out who pulled sessions improperly, but rather "[t]o see if [Defendant Maietta] was in the club during the time that the sessions were pulled, if he entered the building or left the building during that time." *Id*. 125:20–23.  Defendant Sanders was satisfied by purportedly not seeing Defendant Maietta in the phantom video—Defendant Sanders was not trying to find the guilty party, but rather to exonerate Defendant Maietta.

Defendant Sanders and Defendant Plotkin give divergent testimonies as to how much of the phantom video they watched in order to make up their mind that Ms. Ashdown was the one who pulled sessions because she was allegedly in some "hallway that leads to her office . . . [but] not . . . inside her office" around the time when the sessions were to have been improperly pulled. *Plotkin Dep*. 63:8–10.  Defendant Sanders stated that he watched approximately one hundred twenty (120) minutes of footage. *Sanders Dep*. 128:9–12.  Defendant Plotkin watched between thirty (30) and sixty (60) minutes of footage. *Plotkin Dep*. 80:4–11.

The movants fail to even agree with themselves: **Defendants** concede that Ms. Ashdown is not accused of pulling a single session for her own benefit. *Plotkin Dep*. 166:2–25; 194:13–17.  But sometimes they say that she was terminated for stealing "[p]robably about 60 bucks." *Sanders Dep*. 34:23.  Or "somewhere, a hundred bucks, somewhere around there." *Plotkin Dep*. 70:24–25.  Again, these assertions show the existence of a dispute regarding the most important facts of the case—and does not even take into account Ms. Ashdown, who maintains that she

stole nothing.  If Defendants do not even know how much Ms. Ashdown allegedly stole from the company, it is very unlikely that they have any idea about what happened to the sessions and how they were pulled, or if Ms. Ashdown had anything to do with it.

Defendants, when trying to explain their own document production, just fall apart.  Their "smoking gun" disintegrates with Defendant Plotkin's contradictory "understanding" of the Commission Report, which Defendants believe shows proof of improper activity.  Defendant Plotkin issued sworn testimony that the Report constitutes "very, very concrete evidence . . . that Kerry [Ashdown] did this and now she was lying about it."  *Plotkin Dep*. 77:14–17.  When pressed however, Defendant Plotkin got the meanings of the spreadsheet columns as confused as we are about it and then admitted that he only understood it "for the most part," then, only "[t]o my knowledge," and then, "I'm not sure," and finally, when asked "And . . . Ms. Ashdown[] doesn't appear as . . . having pulled . . . sessions, correct?" he answered "Correct."  *Id*. 180:22–181:3.

The final inconsistency brought to light by Defendants' fallacious set of "facts" is that on the same day that Defendant Plotkin and Defendant Sanders terminated Ms. Ashdown for allegedly stealing, they actually offered her another job at Equinox.  *Sanders Dep*. 77:22–78:3; *Plotkin Dep*. 95:5–7.  This very fact shows that not only are they inconsistent with their own decision to terminate Ms. Ashdown for allegedly stealing but also that they are inconsistent with Equinox's policies regarding employees allegedly committing dishonest acts.

Defendants' inconsistencies only underscore that they cannot substantiate Ms. Ashdown's termination with non-refutable, non-discriminatory, evidence.  This shows pretext and—at the very least—creates even more questions of fact as to whether Defendants' alleged

reason for Ms. Ashdown's termination was, in fact, legitimate.  As such, Defendants' Motion for Summary Judgment must be denied.

Defendants' reliance on *Crews v. Trs. of Columbia Univ.*, 452 F. Supp. 2d 504 (S.D.N.Y. 2006), is misplaced.  In *Crews*, an employee was terminated after he admitted to stealing from his employer.  *Id.* at 506.  This is completely different from this case.  Ms. Ashdown consistently testified that she did **not** pull the sessions in question, nor did she steal from Equinox in any way. Therefore, the facts of the case cited by Defendants cannot be applied to the instant case.  Ms. Ashdown is so adamant about not having improperly pulled sessions that she volunteered to take a lie detector test to establish her innocence.  *Ashdown Dep*. 140:17–19.

      **c.**      **Ms. Ashdown's termination was pretextual.**

There are different ways in which a plaintiff can show pretext and that the real reason behind a termination was discrimination.  Pretext is shown through direct evidence of discriminatory *animus* or by showing that similarly situated employees were treated differently. The term "similarly situated" has a specific legal meaning but generally refers to an employee who can be compared to another employee because they hold a similar job classification, comparable duties, skills and training, and are subject to the same performance standards.  It is a "question of fact for the jury" as to whether a person is similarly situated to a plaintiff in a discrimination case.  *Graham v. L.I.R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

In *Graham*, the Second Circuit held that to establish a *prima facie* case of employment discrimination based on disparate treatment, the plaintiff must be able to show that there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases."  The court applied an all-material-respects standard in determining whether two (2) individual employees were similarly situated.  The standard "must be judged based on (1)

17

whether the plaintiff and those [that the plaintiff] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id*. at 40.  In other words, there should be an objectively identifiable basis for comparability.  Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id*. at 39.

In this action, several individuals can be compared to Ms. Ashdown.  First, Defendant Maietta, a fitness manager at the Equinox Soho location, worked with Ms. Ashdown on a daily basis.  It is clear from the facts of the case that as a management-level employee, he was treated differently by Equinox's management.  For example, Defendant Sanders refused to investigate Ms. Ashdown's complaints about Defendant Maietta's dishonest acts towards her.  Conversely, when Defendant Maietta alleged that Ms. Ashdown had stolen sessions, Defendant Sanders swept-in and immediately investigated.  As Ms. Ashdown presents facts that show her termination was pretextual, summary judgment must be denied.

### 3.    Different people hired Ms. Ashdown than who terminated her and thus no same-actor inference is warranted.

Defendants argue that the same-actor doctrine applies in the present case and that it tends to show that Defendants purportedly lacked discriminatory *animus* against Ms. Ashdown.  They claim that the individuals who hired her are the individuals who terminated her.  This is factually inaccurate.

Ms. Ashdown was hired by Joe Matarazzo, Liz Minton and David Harris.  She had a first interview on the phone with Johanna Subotovsky and then flew to New York to be interviewed by Joe Matarazzo and Liz Minton.  *Ashdown Dep*. 35:13–16.  Then, Ms. Ashdown was invited for a second interview in New York where she met with Joe Matarazzo, Liz Minton, David

18

Harris, Rich Velazquez, and Darren Cappetta.  *Ashdown Aff*. ¶ 10.  Ms. Ashdown did not

interview with Defendant Sanders before she was hired by Equinox to work in the United States.

She only met him after she was already employed by Equinox, as part of her placement at the

Equinox Soho location.  At the time the meeting occurred, Ms. Ashdown was already employed

by Equinox (and authorized to work in the United States under a visa sponsored—although not

paid for—by Equinox).  *Ashdown Aff*. ¶ 19.  Defendant Plotkin and Defendant Sanders jointly

terminated Ms. Ashdown after Defendant Maietta harassed her and made false accusations

against her.  *Ashdown Dep*. 138:25–139:8.  Defendants' purported same-actor "defense" fails.

Even assuming that it did not fail, the same-actor inference is only "permissive, not mandatory."

*O'Diah v. Oasis*, 11 CV 309 (FM), 2013 WL 3796619, at *10, 2013 U.S. Dist. LEXIS 102461,

at *29 (S.D.N.Y. July 22, 2013); *see also Ellis v. Century 21*, 2013 U.S. Dist. LEXIS 140241

(E.D.N.Y. Sept. 28, 2013).

> **4.    Ms. Ashdown states *prima facie* claims of hostile work environment because she easily shows that she was treated differently than male employees who did not have cancer.**

*Williams v. N.Y.C. Hous. Auth*., 61 A.D.3d 62 (N.Y. App. Div. 1st Dep't 2009)

established a lower threshold for establishing a hostile work environment claim under the

NYCHRL than under Title VII.  The *Williams* court said that the NYCHRL is "required to be

liberally construed independently from its state and federal counterparts in order to accomplish

the statute's uniquely broad and remedial purposes."  *Montano v. N.Y.C. Dep't of Educ*., 2012

NY Slip Op 32283(U) (N.Y. Sup. Ct. Aug. 30, 2012) (citing *Williams*).  The *Williams* court

stressed that the more restrictive severe-or-pervasive test otherwise applicable to state and

federal hostile work environment claims is no longer applicable to claims under the NYCHRL.

Defendants' liability must rather be determined by the existence of unequal treatment based on

gender.  The severity and pervasiveness of the abuse should be reserved for the consideration of damages.  *Id*.

Here, there are different instances of conduct showing that Defendant Maietta did not want to be supervised by a woman and had a vendetta against Ms. Ashdown from the moment she started supervising him.  First, it is striking to see that Defendant Maietta had a hard time acknowledging the very fact that Ms. Ashdown was his supervisor (*Maietta Dep*. 41:3–10), which led to conflicts in the workplace (*Ashdown Dep*. 57:15–18).  This was part of a pattern of conduct where Defendant Maietta would do everything to undermine Ms. Ashdown's authority and credibility with her supervisors and her employees.  Moreover, Defendant Maietta is very competitive, which Defendant Sanders described as a negative trait.  *Sanders Dep*. 73:14–19; *Maietta Dep*. 114:10–12; *Ashdown Dep*. 58:4–11.  Defendant Maietta also wanted Ms. Ashdown's job.  *Maietta Dep*. 102:1–3.  He even told Ms. Ashdown this as well as Defendant Sanders.  *Maietta Dep*. 59:2–6.  Defendant Maietta would not follow Ms. Ashdown's instructions and was always fighting her decisions even though she was his supervisor. Defendant Maietta had difficulties communicating with Ms. Ashdown even though she went out of her way to open a channel communication in order to work effectively.  For example, Ms. Ashdown invited Defendant Maietta to lunch in order to try to resolve their differences but he did not want to go pretending that he did not feel comfortable meeting outside of Equinox offices. *Ashdown Dep*. 83:19–22; *Maietta Dep*. 161:12–16.

Defendant Maietta's tirade was relentless and Defendant Sanders acknowledged that Defendant Maietta brought outrageous false accusations and rumors regarding Ms. Ashdown to his attention.  *Sanders Dep*. 67:20–22.  Defendant Sanders was well aware of the falsity of the rumors but did not do anything to stop Defendant Maietta from spreading them.  Defendant

Maietta went on to set up a fake email address to which he sent "unanswered" emails. *Ashdown Dep*. 74:21–24. Defendant Sanders had knowledge of this and qualified it as a serious issue. *Sanders Dep*. 117:5–9. He nevertheless unilaterally decided to not investigate it. *Sanders Dep*. 93:11–12. Defendant Maietta also alleged that Ms. Ashdown was drunk with colleagues when she was not even capable of drinking due to her cancer treatment. *Ashdown Dep*. 73:20–74:3.

These facts show that Ms. Ashdown was treated worse by Defendant Maietta because he could not stand the fact that he was supervised by a woman. He even repeatedly stated that he wanted Ms. Ashdown's job. Moreover, His conduct created a hostile work environment. For these reasons, Defendants Motion must be denied.

### 5.     Ms. Ashdown has a claim of aiding and abetting against Defendant Sanders as a matter of law.

Under the NYCHRL, an individual employee may be held liable for aiding and abetting discriminatory conduct, as "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." NYCHRL § 8-107(6). The first step to show that there is a viable claim against an individual for aiding and abetting is to show that an underlying violation has taken place. *Caravantes v. 53rd St. Partners*, 2012 WL 3631276, 2012 U.S. Dist. LEXIS 120182 (S.D.N.Y. Aug. 23, 2012). As already stated, Ms. Ashdown established that she has a *prima facie* case of gender discrimination and perceived disability discrimination claims under the NYCHRL. The next step is to show that the alleged aider and abettor knew of the violation and did not remedy it. An aiding and abetting claim lies if an individual directly participates in the discriminatory acts. *Dunson v. TRI-Maint. & Contractors*, 171 F. Supp. 2d 103, 114 (E.D.N.Y. 2001).

Defendant Sanders was well aware of the difficulties Ms. Ashdown had with Defendant Maietta (*Sanders Dep*. 66:3–11, 117:5–9) but he did not do anything to stop it, even after she

confided in him and complained to him on multiple occasions (*Id*. 93:11–12). Defendant Sanders's passive attitude is shown by his conduct of continuously dismissing Ms. Ashdown's complaints, let alone investigate them. Tellingly, Defendant Sanders did nothing when Ms. Ashdown accused Defendant Maietta of a dishonest act but immediately started an investigation when Defendant Maietta accused Ms. Ashdown of a dishonest act. There is clearly a double standard in the way Defendant Sanders treated his employees and by doing nothing, he aided and abetted discrimination against Ms. Ashdown.

Therefore, the facts the support that Defendant Sanders aided and abetted discrimination against Ms. Ashdown when he decided to not investigated incidents reported to him. As such, Defendants' motion for summary judgment should be denied.

**6.     Ms. Ashdown has a claim of tortious inference with a contract and the right to conduct business as a matter of law.**

Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a "third party" had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff.

"In order to show that a defendant-employee is a 'third party,' a plaintiff must show that the defendant-employee has exceeded the bounds of [their] authority." *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 88 (S.D.N.Y. 2012) (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996). Moreover, under New York, an at-will employee may maintain a tortious interference with contract claim by establishing "that a 'third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice.' " *Albert v.*

*Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (quoting *Cohen v. Davis*, 926 F. Supp. 399, 403 (S.D.N.Y. 1996)).

Defendants argue that Defendant Maietta did not act outside of his scope of employment and purportedly did not interfere with Ms. Ashdown's employment contract with Equinox. However, unless the scope of employment was so broad as to include lying, Defendant Maietta most certainly acted outside that scope. At a minimum, there is a substantial dispute of fact with respect to what Defendant Maietta did or did not do, which simply makes summary judgment on this claim is inappropriate.

Defendants themselves cited *Albert*, which Ms. Ashdown supports. In that case, the plaintiff was fired for endangering the welfare of a patient and neglecting radiation safety procedure, but the plaintiffs sued for *inter alia* tortious interference with claims that defendants sabotaged her by making slanderous comments. The court decided that there was a genuine issue of fact as to whether the defendant acted with common law or "actual" malice in making false and defamatory statements about the plaintiff, and specifically whether defendant was motivated by a desire to undermine the plaintiff.

*Albert* echoes the instant case where Defendant Maietta's actions show a clear desire to destroy Ms. Ashdown's employment at Equinox. Indeed, as already established, by repeatedly spreading rumors and making false accusations, Defendant Maietta acted with malice to undermine Ms. Ashdown on several occasions. *See Ashdown Dep*. 73:20–74:24. As such, Defendants have not met their burden and summary judgment should be denied.

## IV.   CONCLUSION

Defendants' Motion for Summary Judgment is frivolous and wasteful. For these and all the foregoing reasons, Plaintiff respectfully requests that a jury decide her claims and that the

Court deny Defendants' Motion for Summary Judgment in its entirety.


Dated:  New York, New York                  Respectfully submitted by:
        November 8, 2013                     THE HARMAN FIRM, PC
                                             *Counsel for Plaintiff*


                                             _____s/_____
                                             Walker G. Harman, Jr. [WH-8044]
                                             200 West 57th Street, Suite 900
                                             New York, New York 10019
                                             (212) 425-2600
                                             wharman@theharmanfirm.com

24