1

1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
3     ----------------------------------------X
      KERRY ASHDOWN,
4
                        Plaintiff,
5
            -against-
6                           Index No.: 13 CV 1374
                            (HB)(GWG)
7
      EQUINOX, a/k/a EQUINOX FITNESS CLUB and
8      incorporated as EQUINOX HOLDINGS, INC.,
      MAURO MARIETTA, LAWRENCE SANDERS, and MATT
9      PLOTKIN a/k/a MATTHEW PLOTKIN,

10                      Defendants.
      ----------------------------------------X
11

12                      DATE:  August 27, 2013

13                      TIME:  10:10 A.M.

14

15            EXAMINATION BEFORE TRIAL of the

16     Plaintiff, KERRY ASHDOWN, taken by the

17     Defendants, pursuant to an Order, held at

18     the offices of LaRocca Hornik Rosen

19     Greenberg & Blaha, LLP, 40 Wall Street, New

20     York, New York 10005, before May Jean Wu, a

21     Court Reporter and Notary Public of the

22     State of New York.

23

24

25

2

```
 1

 2     A P P E A R A N C E S:

 3

       THE HARMAN FIRM, P.C.
 4            Attorneys for Plaintiff
              200 West 57th Street
 5            New York, New York 10019
              BY:  WALKER G. HARMAN, JR., ESQ.
 6

 7

       LaROCCA HORNIK ROSEN GREENBERG & BLAHA, LLP
 8            Attorneys for Defendants
              40 Wall Street
 9            New York, New York 10005
              BY:  PATRICK T. McPARTLAND, ESQ.
10

11                    and

12                JARED BLUNETTI, ESQ.

13

14            *         *         *

15

16

17

18

19

20

21

22

23

24

25
```

1

2       F E D E R A L    S T I P U L A T I O N S

3

4           IT IS HEREBY STIPULATED AND AGREED by

5       and between the counsel for the respective

6       parties hereto that the filing, sealing and

7       certification of the within deposition

8       shall be and the same are hereby waived;

9

10          IT IS FURTHER STIPULATED AND AGREED

11      that all objections, except as to the form

12      of the question, shall be reserved to the

13      times of the trial.

14

15          IT IS FURTHER STIPULATED AND AGREED

16      that the within deposition may be signed

17      before any Notary Public with the same

18      force and effect as if signed and sworn to

19      before this court.

20

21

22               *    *    *    *    *

23

24

25

```
 1                      ASHDOWN
 2    K E R R Y      A S H D O W N, called as a
 3    witness, having been first duly sworn by a
 4    Notary Public of the State of New York, was
 5    examined and testified as follows:
 6    EXAMINATION BY
 7    MR. McPARTLAND:
 8         Q.    Please state your name for the
 9    record.
10         A.    Kerry Ashdown.
11         Q.    Where do you live?
12         A.    ████████████████████████████
13    ████████████████ New York ███████
14         Q.    Good morning, Ms. Ashdown.
15         A.    Good morning.
16         Q.    My name is Pat McPartland.  I'm
17    an attorney for Equinox.
18               I'm going to ask you some
19    questions today about the lawsuit.  Before
20    we begin, I have some initial instructions.
21         A.    Okay.
22         Q.    The first one is to please wait
23    until I finish asking my question before
24    you begin to answer and I'll wait until you
25    finish speaking before I begin to speak to
```

```
 1                    ASHDOWN
 2     you again.
 3          A.    Okay.
 4          Q.    It's difficult for the court
 5     reporter to take us both down when we're
 6     speaking at the same time.
 7          A.    Yes.
 8          Q.    If at any point you don't
 9     understand the question that I ask you,
10     please just let me know and I'll try to
11     rephrase it in a way that you do understand
12     it.  If you want to take a break to speak
13     to your attorney or to use the restroom,
14     that's not a problem.  It's just if I have
15     a question pending, you will need to answer
16     that question before you take a break,
17     okay?
18          A.    (Nodding head.)
19          Q.    Also please keep all your
20     answers verbal.  The court reporter can't
21     take down nods of the head for yes or
22     shakes for no, okay?
23          A.    Okay.
24          Q.    Have you ever testified before?
25          A.    No.
```

```
 1                      ASHDOWN
 2         Q.    Are you taking any medications
 3   or any other substances that would affect
 4   your ability to testify here today?
 5         A.    No, I've taken two Advils this
 6   morning, but that's it.
 7         Q.    What's your date of birth?
 8         A.    The ███████  oh, it's the other
 9   way around, ████████
10         Q.    That's the European version?
11         A.    It is, yes.
12         Q.    What is your marital status?
13         A.    Single.
14         Q.    Any children?
15         A.    None.
16         Q.    Have you ever been known by any
17   other names other than Kerry Ashdown?
18         A.    No.
19         Q.    Your current address, is that
20   apartment 4N?
21         A.    5N.
22         Q.    For how long have you resided
23   there?
24         A.    Since October of last year.
25         Q.    So that would be 2012?
```

```
 1                    ASHDOWN
 2        A.    Yes.
 3        Q.    With whom do you currently
 4   reside?
 5        A.    I have a house mate.
 6        Q.    Who is that?
 7        A.    Her name is Nisha Inalsingh.
 8   Do you want the spelling?
 9        Q.    Yes, please.
10        A.    N-I-S-H-A I-N-A-L-S-I-N-G-H.
11        Q.    How long have you resided with
12   Ms. Inalsingh?
13        A.    Inalsingh, it's since October
14   of last year, yeah.
15        Q.    With respect to your current
16   residence, is that a condominium, a
17   building, a rental building or something
18   else?
19        A.    Oh, I have no idea.  I'm sorry.
20        Q.    Do you own or rent it?
21        A.    She owns.  I rent with her.
22        Q.    So you rent a room from her?
23        A.    Yes, sir.
24        Q.    Do you have a written lease
25   agreement with her?
```

```
 1                    ASHDOWN
 2        A.     Yes, we do.
 3        Q.     What is your monthly rent?
 4        A.     1,800.
 5        Q.     Your name appears on the lease,
 6   is that correct?
 7        A.     Yes.
 8        Q.     Prior to October of 2012, where
 9   did you reside?
10        A.     In the UK.
11        Q.     For how long were you residing
12   in the UK?
13        A.     From January, 2012.
14        Q.     Where did you reside in the UK?
15        A.     Several places, I was splitting
16   my time between friends.
17        Q.     Okay, so you had no permanent
18   residence there?
19        A.     No.
20        Q.     Now what is your current
21   immigration status?
22        A.     I have an 01-visa.
23        Q.     What type of visa is that?
24        A.     Extraordinary ability in my
25   field.
```

```
 1                        ASHDOWN
 2        Q.      Which field is that?
 3        A.      Health and fitness.
 4        Q.      What was the basis for your
 5    receiving that visa?
 6        A.      I have what I've achieved in my
 7    work with the articles I've written, the
 8    presenting work I used to do, I used to
 9    present at conventions and the experience
10    that I've had in the industry.
11        Q.      Did you present all of that
12    information as part of a visa application?
13        A.      Yes.
14        Q.      It was handled by an attorney?
15        A.      Yes, it was.
16        Q.      Who was it handled by?
17        A.      I have to get you the name and
18    the telephone.
19        Q.      We'll leave a space in the
20    record for you to provide us with the name
21    and address of that attorney, okay?
22        A.      I'll give you the name of the
23    attorney.  I just don't know the name of
24    the firm.
25        Q.      Okay, the name of the attorney
```

```
 1                    ASHDOWN
 2   would be great for now.
 3        A.    Gayle Oshrin, G-A-Y-L-E, and I
 4   believe the last name is O-S-H-R-I-N, I
 5   believe.
 6        Q.    Is Ms. Oshrin an attorney in
 7   New York?
 8        A.    Yes.
 9        Q.    In New York City?
10        A.    Mmhmmm, yes.
11        Q.    Again we'll leave a space in
12   the record, if you can provide the name of
13   the law firm as well as the address, okay?
14        A.    Mmhmmm, yes.
15   _____
16        Q.    When did you receive the visa?
17        A.    October, 2012.
18        Q.    Does that visa permit you to
19   work in the United States?
20        A.    Yes, it does.
21        Q.    Are there any restrictions on
22   the type of work that you can perform?
23        A.    No, I am a free-lance trainer.
24   If I want to do any other work, I have to
25   get another O-1.
```

```
 1                      ASHDOWN
 2         Q.    Prior to October of 2012, what
 3   was your immigration status?
 4         A.    I was in the UK, so I wasn't.
 5   I didn't have any immigration status.
 6         Q.    How about prior to January of
 7   2012?
 8         A.    I had an H-1B with Equinox.
 9         Q.    Other than this January, 2011
10   to October of 2012 stay in the United
11   Kingdom --
12         A.    I think it was January of 2012.
13         Q.    I'm sorry.
14              (Continuing) January of 2012
15   until October of 2012 stay, have you
16   visited or made any trips back to the
17   United Kingdom?
18         A.    I came back to visit in August
19   of 2012.
20         Q.    For how long?
21         A.    I can't recall exactly how long
22   it was for, but I went to stay with my
23   friend in the Hamptons.
24         Q.    Was it more or less than a
25   month?
```

                                                                     12

     1                        ASHDOWN

     2          A.    It was more than a month.

     3          Q.    Was it more than two months?

     4          A.    No, I don't recall that it was.

     5          Q.    What was the purpose for that

     6     trip?

     7          A.    As a trip.

     8          Q.    Are you currently employed?

     9          A.    I'm self-employed.

    10          Q.    What type of business?

    11          A.    Personal trainer.

    12               MR. HARMAN:  Objection.

    13               MR. McPARTLAND:  What's the

    14          objection?

    15               MR. HARMAN:  You can answer the

    16          question.

    17          A.    I'm a personal trainer.

    18          Q.    Do you have any legal entity

    19     set up in the United States?

    20          A.    I don't understand.

    21          Q.    A corporation or a limited

    22     liability corporation?

    23          A.    No.

    24          Q.    No?

    25          A.    No.

```
 1                    ASHDOWN
 2        Q.    So you receive whatever income
 3   you earn from personal training, that is
 4   paid directly to you?
 5        A.    Yes.
 6        Q.    How long have you been
 7   providing personal training sessions on a
 8   self-employed basis?
 9        A.    Since October, 2012.
10        Q.    How many current clients do you
11   have?
12        A.    I have to work that out for
13   you.  I don't have a number off the top of
14   my head.
15        Q.    Is it more than ten?
16        A.    Yes, I think so.
17        Q.    More than twenty?
18        A.    No.
19        Q.    Do you maintain a list of those
20   clients?
21        A.    Do I have a list?
22        Q.    Yes.
23        A.    I think we've provided to you a
24   list.
25        Q.    Did you provide any personal
```

```
 1                    ASHDOWN
 2    training session services on a self-
 3    employed basis in 2011?
 4         A.    No.
 5         Q.    What type of records do you
 6    have regarding your personal training
 7    clients?
 8         A.    I have the contact details.  I
 9    have the body percentages, their height,
10    their weight or their stats.  I have their
11    goals.  I have their medical history, all
12    the information that I require before I
13    start training someone.
14         Q.    Where do you maintain those
15    documents?
16         A.    At my house.
17         Q.    Is it on a computer system?
18         A.    Mmhmmm, yes, sorry.
19         Q.    With respect to the personal
20    training sessions that you provide to them,
21    do you have records reflecting the dates of
22    when those sessions were performed?
23         A.    Yes.
24         Q.    What type of records do you
25    have?
```

15

```
 1                      ASHDOWN
 2        A.    Again from a computer of every
 3   session that I've done I've typed that up.
 4        Q.    With respect to the payments
 5   that you receive for these personal
 6   training sessions, what type of records do
 7   you have?
 8        A.    It's predominantly square
 9   payments, which I've set up, which I
10   believe were from March of this year, and
11   everybody else pays in check.
12        Q.    Nobody pays you in cash?
13        A.    No.
14             MR. McPARTLAND:  Off the
15         record.
16             (Whereupon, the discussion was
17         held off the record.)
18        Q.    Now with respect to the check
19   payments, where do you deposit those
20   payments?
21        A.    Into my bank account.
22        Q.    Where is your bank account
23   located?
24        A.    It's HSBC.
25        Q.    Which branch?
```

16

```
 1                    ASHDOWN
 2          A.    I can't even begin to tell you.
 3     It was one of the ones on Second Avenue.
 4          Q.    Where on Second Avenue?
 5          A.    I don't recall the exact
 6     address.
 7          Q.    How do you physically deposit
 8     your checks?
 9          A.    I can go to any HSBC branch.
10          Q.    Where do you typically go?
11          A.    The one down here in the
12     financial district or the one on 33rd and
13     Park.
14          Q.    That's deposited into a
15     checking account, a savings account or
16     something else?
17          A.    A checking account.
18          Q.    How much do you currently
19     charge for each personal training session?
20          A.    Between ninety to 110 an hour.
21          Q.    Since October, 2012 until date,
22     how frequently do you perform these
23     personal training sessions?
24          A.    It varies on a week-to-week
25     basis.
```

```
 1                    ASHDOWN
 2        Q.    So from the period of October
 3   of 2012 through December of 2012, how often
 4   do --
 5        A.    Very little.
 6        Q.    I'm sorry?
 7        A.    Very little.
 8        Q.    Very little, so is that one
 9   time a week or is that --
10        A.    It was --
11        Q.    (Continuing) one time a month?
12             MR. HARMAN:  Hold on a second.
13        Let him finish the question.
14             THE WITNESS:  Sorry.
15             MR. HARMAN:  Then you may
16        answer.
17             THE WITNESS:  Okay.
18        Q.    So when you say, "Very little,"
19   do you mean one time per week or one time
20   per month?  How many sessions would you
21   have performed in October of 2012, for
22   instance?
23        A.    I don't recall performing any
24   in October.
25        Q.    How about in November of 2012?
```

```
 1                      ASHDOWN
 2          A.    I can't recall an exact figure
 3     for you.
 4          Q.    Do you have records reflecting
 5     that information?
 6          A.    I will have records reflecting
 7     that information.
 8          Q.    You have records reflecting the
 9     information from January of 2013?
10          A.    I do.
11          Q.    Till date, right?
12          A.    Mmhmmm, yes.
13          Q.    Do you advertise your personal
14     training services?
15          A.    No.
16          Q.    Other than personal training
17     sessions, have you earned income from any
18     other sources?
19          A.    No.
20               MR. McPARTLAND:  Let's mark
21          this as Exhibit A.
22               (Whereupon, the aforementioned
23          document was marked as Defendant's
24          Exhibit A for identification, as of
25          this date, by the court reporter.)
```

```
 1                      ASHDOWN
 2       Q.    Ms. Ashdown, I'm going to hand
 3   you a document that's been marked as
 4   Defendant's Exhibit A.  It's a six-page
 5   document with Bates stamp numbers PO15
 6   through PO20 on the bottom right-hand
 7   corner.  I'm going to ask you to take a
 8   look at that document (indicating).
 9       A.    Yes.
10       Q.    Do you recognize this document?
11       A.    Yes.
12       Q.    What is it?
13       A.    It's my square account.
14       Q.    What is a square account?
15       A.    It's a way I would be able to
16   swipe credit cards and take payments.  I
17   can take credit card payments from my
18   clients.
19       Q.    What time periods are reflected
20   in these documents?
21       A.    From March, 2013 until
22   presently.
23       Q.    Okay, so in March of 2013 how
24   much did you receive through square dash
25   payments?
```

```
 1                    ASHDOWN
 2        A.    $600.00.
 3        Q.    How much did you receive
 4   through checks?
 5        A.    I don't have that figure for
 6   you.
 7        Q.    With respect to April of 2013,
 8   how much did you receive?
 9        A.    2001, oh, no, $4,096.00.
10              MR. HARMAN:  Are we talking
11          about April?
12              MR. McPARTLAND:  April.
13        A.    April, that was what I was
14   going to say because it doesn't say here.
15   It's different from here.
16        Q.    Below in the payment section,
17   it only shows a payment for $2,160.00,
18   correct?
19        A.    Yeah.
20        Q.    Why is that?
21        A.    I just don't think it printed
22   them all out.
23        Q.    So this page would be
24   incomplete then?
25        A.    I guess, but it tells you the
```

```
 1                    ASHDOWN
 2    total at the top.
 3         Q.    How much in April of 2013 did
 4    you earn via check payments?
 5         A.    I don't have that answer for
 6    you.
 7         Q.    In May of 2013?
 8         A.    2,460.
 9         Q.    The payment description below
10    only shows one payment of $1,200.00.  Is
11    this also incomplete?
12         A.    I guess it is.
13         Q.    In May of 2013, how much did
14    you receive in check payments?
15         A.    I don't have that answer for
16    you.
17         Q.    Then In June of 2013, how much
18    did you receive?
19         A.    $90.00.
20         Q.    How much did you receive in
21    check payments?
22         A.    I don't have that figure for
23    you.
24         Q.    In July of 2013, how much did
25    you receive in payments?
```

```
 1                    ASHDOWN

 2         A.    4,790.

 3         Q.    It only shows one payment of

 4    $90.00 below, so would that page also be

 5    incomplete?

 6         A.    I guess it would.

 7         Q.    How much did you receive in

 8    check payments in July of 2013?

 9         A.    I don't have that figure for

10    you.

11         Q.    Referring to August of 2013,

12    how much did you receive in square dash

13    payments?

14         A.    1,440.

15         Q.    How much did you receive in

16    check payments?

17         A.    I don't have that figure for

18    you.

19         Q.    You've never accepted any

20    payment in cash?

21         A.    No, I refuse to.

22         Q.    So prior to March of 2013 --

23         A.    It was check form.

24         Q.    When did you commence your

25    employment with Equinox?
```

23

```
 1                    ASHDOWN
 2        A.    The start date?
 3        Q.    Yes.
 4        A.    I believe it was January 17 or
 5   18, 2011.
 6        Q.    Where had you been employed
 7   prior to that?
 8        A.    I was working at Virgin Active.
 9   I was a studio manager and I also was a
10   regional personal training manager for
11   Nuffield Health.
12        Q.    I'm sorry?
13        A.    I was also a regional personal
14   training manager.
15        Q.    I'm sorry.  What were the two
16   employers?  Virgin?
17        A.    Virgin Active.
18        Q.    Virgin Active and?
19        A.    And Nuffield.
20        Q.    How do you spell that?
21        A.    N-U-F-F-I-E-L-D.
22        Q.    I'm sorry.  I missed it.  With
23   Virgin Atlantic your position was?
24        A.    It's Active, not Atlantic.
25        Q.    In Virgin Active what was your
```

```
 1                    ASHDOWN
 2    position?
 3         A.     Studio manager.
 4         Q.     Studio manager?
 5         A.     Mmhmmm, yes.
 6         Q.     What dates were you employed
 7    with Virgin Active?
 8         A.     It was April, 2010 until
 9    December, 2010.  I can't remember the exact
10    dates, but I think those were the correct
11    dates.
12         Q.     What were your duties and
13    responsibilities there?
14         A.     Managing the studio, a team of
15    instructors, arranging the timetable,
16    training and education, I think that was
17    pretty much it.
18         Q.     Did you perform personal
19    training sessions?
20         A.     No.
21         Q.     What type of fitness club is
22    Virgin Active?
23         A.     It's a health club.
24         Q.     Full service health club?
25         A.     Full service health club.
```

```
 1                     ASHDOWN
 2        Q.    What type of activities do they
 3   have there?
 4        A.    They have personal training.
 5   They have swimming lessons.  They have
 6   studio classes.  They have Pilates.
 7        Q.    What was your position with
 8   Nuffield Health?
 9        A.    Regional personal training
10   manager.
11        Q.    What were your dates of
12   employment there?
13        A.    Until December of 2010 too, but
14   I can't recall the start date.  It's on my
15   resume.
16             MR. McPARTLAND:  Okay,
17        plaintiff's counsel has agreed to
18        provide a copy of the resume.  I
19        guess that will be forthcoming.
20             MR. HARMAN:  Yes, I thought it
21        was sent over but yes.
22             MR. McPARTLAND:  It has not
23        been sent over.
24        Q.    At Nuffield Health, what were
25   your duties and responsibilities as a
```

```
 1                    ASHDOWN
 2   regional personal training manager?
 3        A.    I managed the personal training
 4   managers.
 5        Q.    How many managers did you
 6   manage?
 7        A.    I believe it was nine.
 8        Q.    Were they at separate
 9   locations?
10        A.    Yes.
11        Q.    What type of fitness club is
12   Nuffield Health?
13        A.    Full service health club.
14        Q.    Did you perform any personal
15   training sessions?
16        A.    No.
17        Q.    What other background did you
18   have in the fitness industry prior to
19   joining Equinox?
20        A.    I've been in the industry about
21   sixteen years.
22        Q.    So prior to Virgin Active and
23   Nuffield Health, where had you been last
24   employed?
25        A.    I had been employed at David
```

```
 1                    ASHDOWN
 2   Lloyd Leisure at some point.  I had been
 3   with Virgin Active prior to that as a
 4   fitness manager at three locations.  I had
 5   been with Corals Health Club as well.
 6        Q.    At any of those locations, did
 7   you perform personal training sessions?
 8        A.    Yes.
 9        Q.    Which ones?
10        A.    At Virgin Active when I was a
11   fitness manager and when I was at Holmes
12   Place in Epsom.
13        Q.    What was the year that you were
14   the fitness manager at Virgin Active?
15        A.    I couldn't tell you the exact
16   dates.  It's on my resume.
17        Q.    With respect to your duties as
18   a fitness manager, what percentage would
19   you say were administrative versus what
20   percentage was for personal training?
21        A.    There was very little personal
22   training.  It was just one or two hours a
23   week.  The majority of my job was
24   managerial.  It was the manager shift, so I
25   used to have to open the club.  It was
```

```
 1                    ASHDOWN
 2  managing the team, education of the team.
 3        Q.    I'm sorry.  Was it Holmes
 4  Place?
 5        A.    Holmes Place, yes.
 6        Q.    When were you employed there?
 7        A.    Again it's on my resume.  I
 8  can't give you an exact date.
 9        Q.    I'm sorry.  You may have
10  answered already, but what was your
11  position there?
12        A.    Fitness manager.
13        Q.    With respect to your duties as
14  a fitness manager, --
15        A.    Same.
16        Q.    (Continuing) what was the
17  percentage that was administrative versus
18  personal training?
19        A.    About the same, probably about
20  five hours a week.
21        Q.    Prior to commencing your
22  employment with Equinox, did you have any
23  certifications with respect to personal
24  training?
25        A.    I have an NASM certification.
```

```
 1                    ASHDOWN
 2   I have a master's degree in sports medicine
 3   and science.  I have a premiere diploma in
 4   personal training.  I have numerous fitness
 5   certifications in studio classes as well.
 6        Q.    Where did you receive your
 7   master's degree?
 8        A.    Roehampton.
 9        Q.    That's in London?
10        A.    Mmhmmm, yes.
11        Q.    When were you first diagnosed
12   with cancer?
13        A.    Nine years ago.
14        Q.    Where were you employed at the
15   time?
16        A.    Whew, I couldn't even -- I
17   couldn't even tell you.
18        Q.    What type of cancer were you
19   diagnosed with?
20        A.    Ovarian.
21        Q.    Who made the diagnosis?
22        A.    Dr. Griffin.
23        Q.    Where is Dr. Griffin located?
24        A.    He's in London.
25        Q.    What type of treatment did you
```

```
 1                    ASHDOWN
 2   undergo, if any, after you were diagnosed?
 3        A.    I had radiation.
 4        Q.    How many sessions?
 5        A.    Back then I couldn't be sure.
 6        Q.    For how long?  Over what period
 7   of time?
 8        A.    Again I cannot recall the exact
 9   amount of time.
10        Q.    Was it more than a month?  Was
11   it more than a year?
12        A.    It was more than a month.  It
13   was less than a year.  It was more than a
14   month.
15        Q.    Was it less than six months?
16        A.    I don't -- I don't recall.
17        Q.    Did you have any surgeries?
18        A.    I've had surgeries.
19             MR. HARMAN:  Alright, just
20        focussing on the time nine years ago?
21             THE WITNESS:  Mmhmmm, yes.
22        Q.    When were your surgeries?
23        A.    I couldn't tell you the exact
24   dates.
25        Q.    Have there been any in the last
```

31

```
 1                    ASHDOWN
 2     three years?
 3         A.    No.
 4         Q.    Any in the last five years?
 5         A.    Not that I recall, no.
 6         Q.    How soon after your diagnosis
 7     was your first surgery?
 8         A.    I can't -- I can't recall the
 9     date.
10         Q.    Was it within a year or
11     something more?
12         A.    It was the second time I had
13     cancer.
14         Q.    What type of surgery did you
15     have?
16         A.    I had one of my ovaries
17     removed.
18         Q.    Where was that performed?
19         A.    In the hospital.
20         Q.    Where?  In which hospital?
21         A.    It was the Royal Marsden in
22     London.
23         Q.    You mentioned it was the second
24     time you had cancer?
25         A.    Yes.
```

32

```
 1                    ASHDOWN
 2        Q.    Did your original diagnosis of
 3   cancer go into remission at some point?
 4        A.    It went into remission and then
 5   it came back.
 6        Q.    How long after it went into
 7   remission did it come back?
 8        A.    Approximately a year and a
 9   half.
10        Q.    After that second re-diagnosis,
11   did you have any other treatment besides
12   the surgery?
13        A.    I had more radiation.
14        Q.    Approximately how long was your
15   treatment following the second diagnosis?
16        A.    I don't recall exactly how long
17   my treatment was.  It's a long time ago.
18        Q.    Did your cancer again go into
19   remission?
20        A.    It went into remission.
21        Q.    Was there a third diagnosis?
22        A.    There was a third diagnosis.
23        Q.    When was that?
24        A.    I can't give you specific dates
25   on this.
```

33

```
 1                       ASHDOWN
 2          Q.    Was this before or after you
 3   joined Equinox?
 4          A.    Before.
 5          Q.    How many diagnoses have you had
 6   altogether?
 7          A.    Four.
 8          Q.    Four, okay, and were you still
 9   in London when the third diagnosis was
10   made?
11          A.    Mmhmmm, yes.
12          Q.    What type of treatment or
13   surgeries did you have?
14          A.    I had radiation.
15          Q.    Was Dr. Griffin still your
16   doctor?
17          A.    Yes.
18          Q.    For all three of these
19   diagnoses?
20          A.    He's still my doctor.
21          Q.    Following that third diagnosis,
22   did you go into remission at some point?
23          A.    I went into remission.
24          Q.    When approximately was that?
25          A.    I couldn't give you the date.
```

```
 1                      ASHDOWN
 2        Q.    Was that before or after you
 3   began your employment with Equinox?
 4        A.    It was before.
 5        Q.    Your fourth re-diagnosis was
 6   while you were employed at Equinox, is that
 7   correct?
 8        A.    It was.
 9        Q.    When did you first have contact
10   with Equinox?
11        A.    It was, I believe, April, 2010.
12        Q.    Did you contact Equinox or did
13   they contact you?
14        A.    I contacted Equinox.
15        Q.    Who did you contact?
16        A.    Johanna Subotovsky.
17        Q.    Subotovsky?
18        A.    Subotovsky, that's the one.
19        Q.    How did you contact her?
20        A.    Via E-mail.
21        Q.    How did you hear about Equinox
22   and Ms. Subotovsky?
23        A.    I Googled fitness jobs in New
24   York.
25        Q.    Why were you interested in
```

```
 1                    ASHDOWN
 2   becoming employed with Equinox?
 3        A.    I wanted to move to New York
 4   and I was aware that they were one of the
 5   best fitness companies in the city.
 6        Q.    Where were you working at the
 7   time?
 8        A.    Virgin Active and Nuffield
 9   Health, but actually I don't believe I
10   started at Virgin Active yet.
11        Q.    Did you go through an interview
12   process with Equinox?
13        A.    I did a telephone interview
14   with Johanna and I then flew to New York
15   and interviewed with Joe Matarazzo and Liz
16   Minton.
17        Q.    When you interviewed with
18   Equinox, did you disclose any of your prior
19   medical history with respect to your
20   cancer?
21        A.    I don't believe it came up, no.
22        Q.    You were ultimately hired by
23   Equinox, is that correct?
24        A.    I was.
25        Q.    For what position?
```

```
 1                    ASHDOWN
 2        A.    Personal training manager.
 3        Q.    You obtained an H-B1 to work
 4    for Equinox, is that correct?
 5        A.    I did.
 6        Q.    Did you move to New York City
 7    at some point?
 8        A.    I did.
 9        Q.    When?
10        A.    It was Martin Luther King Day.
11        Q.    Which year?
12        A.    2011.
13        Q.    When did you -- I may have
14    asked you this already and I apologize if I
15    did -- when did you officially begin
16    working for Equinox?
17        A.    It was the day after Martin
18    Luther King Day.
19        Q.    At which location?
20        A.    Originally I went for two weeks
21    training and then I started working in
22    SoHo.
23        Q.    Where was your two weeks
24    training?
25        A.    At the head office.
```

37

```
 1                    ASHDOWN
 2        Q.    Did you work at the 19th Street
 3   club at all?
 4        A.    I did do some work at 19th
 5   Street.
 6        Q.    Did you sign any documents in
 7   connection with your employment at Equinox?
 8        A.    At that point I don't remember,
 9   no.  I did when I got to SoHo.
10        Q.    Did you actually interview at
11   the Soho club?
12        A.    I interviewed with Lawrence
13   Sanders.
14        Q.    Anybody else?
15        A.    No.
16        Q.    Did you meet with anybody else?
17        A.    Matt Plotkin before I went to
18   SoHo.
19        Q.    How many interviews did you
20   have with Mr. Sanders?
21        A.    Just one.
22        Q.    You met with him at the club?
23        A.    I met with him at the club.
24        Q.    Matt Plotkin, how many
25   interviews did you have with him?
```

```
 1                    ASHDOWN
 2        A.    Just the one.
 3        Q.    Where did you meet him?
 4        A.    19th Street.
 5              MR. McPARTLAND:  Let's mark
 6         this as Exhibit B.
 7              (Whereupon, the aforementioned
 8         document was marked as Defendant's
 9         Exhibit B for identification, as of
10         this date, by the court reporter.)
11        Q.    Ms. Ashdown, I'm going to show
12   you a five-page document that's been marked
13   as Defendant's Exhibit B.  On the bottom of
14   the document you'll see that it's been
15   marked with Bates stamp numbers EQX-6377
16   through EQX-6381 and I ask you to take a
17   look at that document (indicating).
18        A.    Okay.
19        Q.    Do you recognize that document?
20        A.    Yep.
21        Q.    Referring to the final page of
22   that document, EQX-6381, is that your
23   signature?
24        A.    It is.
25        Q.    Is that your handwriting on the
```

39

```
 1                    ASHDOWN
 2    final page and on the first page?
 3         A.    Yes, it is.
 4              MR. McPARTLAND:  Mark this one
 5         now.
 6              (Whereupon, the aforementioned
 7         document was marked as Defendant's
 8         Exhibit B for identification, as of
 9         this date, by the court reporter.)
10         Q.    Ms. Ashdown, I'm going to show
11    you a two-page document.  It's been marked
12    as Defendant's Exhibit C.  It's got Bates
13    stamp numbers EQX-6382 through EQX-6383.  I
14    want you to take a look at that document as
15    well (indicating).
16         A.    Yeah.
17         Q.    Do you recognize that document?
18         A.    Yeah.
19         Q.    What is it?
20         A.    It's a Harassment Policy.
21         Q.    On the second page, did you
22    sign that document?
23         A.    I did.
24         Q.    Did you date it as well?
25         A.    I did.
```

                                                    40

         1                         ASHDOWN

         2          Q.    What's the date of the

         3    document?

         4          A.    January 19, 2011.

         5                MR. McPARTLAND:  Mark that.

         6                (Whereupon, the aforementioned

         7          document was marked as Defendant's

         8          Exhibit D for identification, as of

         9          this date, by the court reporter.)

        10          Q.    I'm going to show you a

        11    one-page document with Bates stamp number

        12    EQX-6384.  It's been marked as Defendant's

        13    Exhibit D (indicating).

        14          A.    Yeah.

        15          Q.    Do you recognize this document?

        16          A.    I do.

        17          Q.    What is it?

        18          A.    It's a Receipt of Employee

        19    Handbook.

        20          Q.    Is that your signature that

        21    appears on the bottom page of the document?

        22          A.    Yes, it is.

        23          Q.    Is that your handwriting with

        24    the date and the employee name?

        25          A.    Yes, it is.

```
 1                    ASHDOWN
 2        Q.    Did you receive a copy of the
 3   Employee Handbook?
 4        A.    I believe I received it via
 5   E-mail.
 6              MR. McPARTLAND:  Mark that as
 7         Exhibit E.
 8              (Whereupon, the aforementioned
 9          document was marked as Defendant's
10          Exhibit E for identification, as of
11          this date, by the court reporter.)
12        Q.    I'm going to show you a
13   two-page document that's been marked as
14   Defendant's Exhibit E.  It has the Bates
15   stamp numbers P006 and P007.  I ask you to
16   take a look at that document (indicating).
17        A.    Yeah.
18        Q.    Do you recognize that document?
19        A.    I do.
20        Q.    What is it?
21        A.    It's my contract with SoHo or
22   my offer letter from SoHo.
23        Q.    Did you sign that document on
24   the second page?
25        A.    I did.
```

                                                    42

1                          ASHDOWN

2          Q.     Is that your handwriting where

3     the date is located as well?

4          A.     It is.

5          Q.     Referring to Exhibit D, is that

6     your base salary reflected on that

7     document?

8          A.     No.

9          Q.     I refer you to the second

10    paragraph of the first page.  I'm sorry.

11    It's Exhibit E.

12         A.     It is, yes.

13         Q.     What was your base salary?

14         A.     49,000.

15         Q.     In addition to your $49,000.00

16    base salary, did you also receive

17    performance bonuses?

18         A.     Yes.

19         Q.     Were there also to be

20    commissions on personal training sessions?

21         A.     Yes.

22              MR. McPARTLAND:  Mark that as

23           Exhibit F.

24              (Whereupon, the aforementioned

25           document was marked as Defendant's

43

```
 1                        ASHDOWN
 2          Exhibit F for identification, as of
 3          this date, by the court reporter.)
 4          Q.    Ms. Ashdown, I'm going to show
 5     you a three-page document that's marked
 6     with Bates stamp numbers EQX-6392 through
 7     EQX-6394 that's been marked as Defendant's
 8     Exhibit F for identification.  I want you
 9     to take a look at that document
10     (indicating).
11          A.    Thank you, yeah.
12          Q.    Do you recognize this document?
13          A.    I do.
14          Q.    What is it?
15          A.    It's a Compensation Plan.
16          Q.    Does this set forth your
17     compensation for your employment at
18     Equinox?
19          A.    For Soho, yes.
20          Q.    For Soho, yes?
21          A.    Yes.
22          Q.    With respect to your bonuses,
23     what were your bonuses based on?
24          A.    Hitting the target.
25          Q.    When you say, "Hitting the
```

```
 1                    ASHDOWN
 2   target," what target are you referring to?
 3        A.    Personal training sessions.
 4        Q.    That would be the amount of
 5   personal training sessions that were
 6   performed that generated revenues from
 7   those personal training sessions, is that
 8   correct?
 9        A.    Mmhmmm, yes.
10        Q.    With respect to your bonus
11   timing, was that on a monthly basis, a
12   quarterly basis or something else?
13        A.    Some were monthly.  Some were
14   quarterly.
15        Q.    Does this also reflect your
16   payments for your commissions for personal
17   training sessions performed?
18        A.    I have to read the document.
19   Hold on.  Oh, yes, it does.
20        Q.    Where is that reflected?
21        A.    On the last page.
22        Q.    What does it say?
23        A.    It says that I'll be paid a
24   tier three rate at $52.00 per session.
25        Q.    What does tier three refer to?
```

```
 1                    ASHDOWN
 2        A.    The level of training that you
 3   are at.
 4        Q.    How many tiers were there at
 5   Equinox?
 6        A.    Four.
 7        Q.    What were your duties and
 8   responsibilities as a personal training
 9   manager at the SoHo club?
10        A.    I managed all the personal
11   trainers, I trained them on sales,
12   education, I helped generate leads and new
13   business and helped them grow their
14   business.
15        Q.    Who were your supervisors?
16        A.    My superior or somebody
17   supervising me?
18        Q.    Yes, your supervisors
19   supervising you.
20        A.    Lawrence Sanders.
21        Q.    Did you have any other
22   supervisors or any other persons who had
23   supervisory authority over you?
24        A.    Joe Matarazzo,
25   M-A-T-A-R-A-Z-Z-O, I do believe.
```

46

```
 1                    ASHDOWN
 2        Q.     Who was Liz Minton?
 3        A.     Liz Minton was the national
 4   personal training development manager.
 5        Q.     Did she have any oversight with
 6   respect to your position?
 7        A.     She did.  I believe she
 8   focussed more on the fitness managers than
 9   the personal training managers and Joe
10   focussed more on the personal training
11   managers.
12        Q.     So what was your understanding
13   of Liz's duties and responsibilities?
14        A.     Training and development for
15   the personal training department.
16        Q.     How often would you interact
17   with Ms. Minton?
18        A.     Fairly regular.
19        Q.     On a weekly basis, a daily
20   basis or something else?
21        A.     I'll say weekly.
22        Q.     For what reasons would you
23   interact with her?
24        A.     Whether it would be staff
25   members, how they were progressing, manager
```

```
 1                    ASHDOWN
 2    in training, she used to run the manager in
 3    training program, I had a manager in
 4    training at my club and, yeah.
 5         Q.    How would you describe your
 6    working relationship with Ms. Minton?
 7         A.    Good.
 8         Q.    Who was David Harris?
 9         A.    He was the top in the chain in
10    personal training.
11         Q.    What was his position?
12         A.    I couldn't even tell you his
13    exact title.  I don't want to get it wrong.
14         Q.    What was your understanding of
15    his duties and responsibilities?
16         A.    He was in charge of Liz and
17    Joe.
18         Q.    How often would you interact
19    with Mr. Harris, if at all?
20         A.    Very, very, very rarely.
21         Q.    Would that be a monthly basis?
22         A.    It wouldn't even be a monthly
23    basis.
24         Q.    Over the course of your
25    employment, how many times did you interact
```

```
 1                   ASHDOWN
 2   with him, would you say?
 3         A.    I saw him more in my first few
 4   weeks than I did the rest of my employment.
 5         Q.    For what reasons would you
 6   interact with him?
 7         A.    I helped him with information
 8   for the London club.
 9         Q.    Did you interact with him at
10   all for any reason with respect to the SoHo
11   club?
12         A.    Only if he popped in at the
13   club.
14         Q.    You mentioned Joe Matarazzo.
15   What was his role?
16         A.    He was in charge of personal
17   training.
18         Q.    How often would you interact
19   with Mr. Matarazzo?
20         A.    We had conference calls weekly.
21         Q.    What were the purposes of those
22   conference calls?
23         A.    Every personal training manager
24   in his region would get on the phone call
25   and discuss where we're at with the
```

```
 1                    ASHDOWN
 2    training or hitting our targets.
 3         Q.    Were they sales calls?
 4         A.    They were calls we used to
 5    discuss staffing, how many staff we had,
 6    what was in the pipeline, how many sales we
 7    were predicting for the week, how things
 8    were going, et cetera, et cetera.
 9         Q.    Did Mr. Matarazzo oversee the
10    interest of the New York City area or was
11    this a national call?
12         A.    No, it was just on my calls it
13    was just New York City and it wasn't every
14    club in New York City.
15         Q.    Approximately how many other
16    personal training managers --
17         A.    I think there was about nine of
18    us.
19         Q.    (Continuing) would be on the
20    calls?  About nine?
21         A.    Yes.
22         Q.    Other than these weekly phone
23    calls, what other interactions did you have
24    with Mr. Matarazzo?
25         A.    E-mails.
```

```
 1                    ASHDOWN
 2        Q.    What would be the subjects of
 3   those E-mails?
 4        A.    Whether I had a personal
 5   training incentive, what I wanted to do
 6   with my team, whether I had any issues with
 7   my staff, pretty much those kinds of
 8   things.
 9        Q.    How would you describe your
10   working relationship with Mr. Matarazzo?
11        A.    Okay.
12        Q.    Who was Matt Plotkin?
13        A.    He was the regional club
14   manager or area club manager, one of the
15   two.
16        Q.    What was your understanding of
17   his role?
18        A.    He was in charge of Lawrence
19   Sanders.
20        Q.    Would you interact with Mr.
21   Plotkin at all?
22        A.    When he came to the club I did,
23   yes.
24        Q.    How frequently would that be?
25        A.    I would say he was in every
```

 1                        ASHDOWN

 2     month.

 3          Q.    For what reasons would you

 4     interact with him?

 5          A.    It was making pleasant

 6     conversation with him.

 7          Q.    Any business reasons?

 8          A.    It was again about my team.   If

 9     I had an incentive I wanted to incentivize

10     my staff with, I used to run it by him too.

11          Q.    How would you describe your

12     working relationship with Mr. Plotkin?

13          A.    Okay.

14          Q.    At the time that you were hired

15     at the SoHo club, there were other

16     managers, correct?

17          A.    Correct.

18          Q.    For several departments?

19          A.    Yes.

20          Q.    Which other departments were

21     there managers for?

22          A.    Sales and there was a studio

23     manager, there was a spa manager, a

24     maintenance manager and I can't think about

25     anything else.

```
 1                     ASHDOWN
 2          Q.    Who was the group fitness
 3    manager?
 4          A.    Liz Lafleur (phonetically
 5    spelled) if I remember right her last name.
 6          Q.    Who was the maintenance
 7    manager?
 8          A.    Angel, but I can't remember his
 9    last name.
10          Q.    Who was the sales manager?
11          A.    Tessa Spaar, I think it's
12    S-P-A-A-R.
13          Q.    Who was the spa manager?
14          A.    Bobbie Carlson (phonetically
15    spelled) and there was an assistant
16    manager.
17          Q.    Assistant general manager?
18          A.    Uh-huh, yes.
19          Q.    Who was that?
20          A.    Lauren Buck (phonetically
21    spelled), but I can't remember who was
22    there prior to her and obviously a fitness
23    manager, Mauro Maietta, M-A-U-R-O
24    M-A-I-E-T-T-A.
25          Q.    With respect to Mr. Maietta,
```

```
 1                    ASHDOWN
 2    was he employed at the club prior to the
 3    date you joined?
 4         A.    Yes, he was.
 5         Q.    As the fitness manager, what
 6    were his duties and responsibilities?
 7         A.    He was more involved with
 8    training of new employees.
 9         Q.    What would that involve?
10         A.    Helping them go through their
11    education to get their certification.
12         Q.    Did he handle client
13    programming?
14         A.    Yes.
15         Q.    What other duties?
16         A.    Payroll.
17         Q.    What were his duties with
18    respect to payroll?
19         A.    He paid the staff on a biweekly
20    basis.
21         Q.    How did he go about doing that?
22         A.    He had to enter a payroll
23    system.
24         Q.    Did Mr. Maietta have prior
25    experience with Equinox?
```

54

```
 1                    ASHDOWN

 2        A.    Yes.

 3        Q.    Do you know if it was for an

 4   extended period of time or not?

 5        A.    I believe it was around four to

 6   five years, but I couldn't be sure on the

 7   exact dates.

 8        Q.    How closely were you required

 9   to work with Mr. Maietta as the personal

10   training manager and the fitness manager?

11        A.    I was his direct superior so

12   closely.

13        Q.    Did you work together on a

14   daily basis?

15        A.    Yes.

16        Q.    Did you share an office?

17        A.    Yes.

18        Q.    Based on Mr. Maietta's prior

19   experience in Equinox, did you feel that he

20   could assist you in helping to learn the

21   company and the brand at all?

22        A.    I did initially.

23        Q.    Did you have conversations with

24   him about that?

25        A.    I did.
```

55

```
 1                    ASHDOWN
 2        Q.    Did you ever tell Mr. Sanders
 3   that there was nothing that Mr. Maietta
 4   could teach you?
 5        A.    I don't recall saying that.
 6        Q.    Did you ever say that to
 7   anybody else?
 8        A.    I don't recall saying that.
 9        Q.    How many personal trainers ran
10   the staff at the Soho club?
11        A.    It varied approximately between
12   forty to forty-six.  It goes up and down.
13        Q.    Were you responsible for hiring
14   any personal trainers?
15        A.    Yes, we both were.  We
16   interviewed together.
17        Q.    You and Mr. Maietta?
18        A.    Yes.
19        Q.    Approximately how many personal
20   trainers would you say that you hired
21   during the course of your employment?
22        A.    I have no idea.  I have no
23   idea.
24        Q.    Of the personal trainers, what
25   was the percentage of males versus females,
```

56

```
 1                    ASHDOWN
 2    if you recall?
 3         A.    I recall it was around
 4    two-thirds males, two-thirds females, maybe
 5    a little bit more males.  That's an
 6    approximate guess.
 7         Q.    By the way, did the fitness
 8    manager also receive performance bonuses
 9    based on whether the personal training
10    department met its monthly or quarterly
11    sales goals?
12         A.    I believe he did.
13         Q.    What was your work schedule at
14    the club?
15         A.    Mine?
16         Q.    Yes.
17         A.    I got to the club approximately
18    5:30 most days.  I left around about 9:00
19    P.M. most evenings.
20         Q.    Which days of the week were you
21    scheduled to work?
22         A.    Monday through Thursday and
23    Saturday.
24         Q.    Did that remain, more or less,
25    your daily schedule throughout the time of
```

```
 1                    ASHDOWN
 2    your employment?
 3         A.    Yeah, I also worked Friday on
 4    my day off.
 5         Q.    Yes, but your official days at
 6    work during the course of your employment
 7    were Monday through Thursday and Saturday,
 8    correct?
 9         A.    Yes.
10         Q.    What was Mr. Maietta's schedule
11    at the club?
12         A.    Monday through Thursday, no,
13    Monday through Wednesday, Friday and
14    Sunday.
15         Q.    At some point did you and Mr.
16    Maietta begin to have any types of
17    conflicts or issues at work?
18         A.    Yes.
19         Q.    Now when did those issues
20    begin?
21         A.    I can't give you an exact date.
22    I don't recall the exact date.
23         Q.    Was it within the first month
24    of your employment?
25         A.    It was a couple of months in, I
```

1                    ASHDOWN

2   believe.

3        Q.    What were the issues?

4        A.    He's very competitive.  We

5   didn't agree on all things.

6        Q.    When you say that he was very

7   competitive, can you elaborate on that?

8        A.    He didn't like the fact that I

9   got the job over him, it was a competition

10  in popularity and he believed he could do a

11  better job than I could.

12       Q.    When you say that he did not

13  like that you got the job instead of him,

14  do you know whether he applied for that

15  personal training manager position?

16       A.    I'm not a hundred percent sure,

17  no.

18       Q.    Did he ever tell you that he

19  applied for the personal training manager

20  position?

21       A.    No, but I knew he wanted to be

22  a personal training manager.

23       Q.    Did anybody ever tell you that

24  he applied for that position?

25       A.    Not that I'm aware of.

```
 1                    ASHDOWN
 2       Q.    So when you say that you were
 3  aware that he wanted to become a personal
 4  training manager, how did you get that
 5  knowledge?
 6       A.    He told me.
 7       Q.    Do you find it unusual that a
 8  fitness manager would want to advance to
 9  become a personal training manager?
10       A.    Not at all.
11             MR. HARMAN:  Objection.
12             You can answer.
13             THE WITNESS:  I can?
14             MR. HARMAN:  Yes.
15       A.    Not at all.
16       Q.    When you said that there was a
17  competition as to popularity, could you
18  elaborate by what you mean there?
19       A.    Some of the team did not like
20  him so much.  He felt it was a competition
21  of popularity as to who liked me versus who
22  liked him, which we should be working
23  together as a team.  There should not be a
24  competition.
25       Q.    Which members of the team
```

```
 1                    ASHDOWN
 2    didn't like him?
 3         A.    I can't remember off the top of
 4    my head.
 5         Q.    Did they communicate that to
 6    you?
 7         A.    Some did.
 8         Q.    Do you remember the name of
 9    anybody that communicated that to you?
10         A.    Not off the top of my head, no.
11         Q.    When you say that he felt that
12    it was a competition in popularity, what
13    did he do or say to --
14         A.    He told me.
15         Q.    He told you that?
16         A.    Mmhmmm, yes.
17         Q.    Did he do anything that made
18    you come to that conclusion?
19         A.    No, but he was also very
20    competitive with the staff.
21         Q.    In what way was he competitive
22    with the staff?
23         A.    Trying to compete with them in
24    fitness competitions and beating them and
25    putting them down.
```

```
 1                     ASHDOWN
 2        Q.    What type of fitness
 3   competitions?
 4        A.    Just who can lift the most
 5   weight, who can run the hardest, who can
 6   even in team bowling if we went out team
 7   bowling, always competitive.
 8        Q.    What did Mr. Maietta say or do
 9   to make you believe that he felt that he
10   could do a better job as a personal
11   training manager than you could?
12             MR. HARMAN:  Objection.
13             You can answer.
14        A.    Because he had been with the
15   company longer.
16        Q.    Anything else?
17        A.    Not that I can recall.
18        Q.    With respect to the competition
19   with the staff, do you have any other
20   specific examples of things that he said or
21   did?
22        A.    Like I said, it was just after
23   events it was always putting them down.
24        Q.    He was always what?  I'm sorry.
25        A.    Putting them down, so he would
```

62

```
 1                    ASHDOWN
 2    constantly reiterate as to what he had
 3    achieved and what they hadn't achieved.
 4         Q.   Did you participate in any of
 5    these competitions?
 6         A.   Only ten-pin bowling.
 7         Q.   I'm sorry?
 8         A.   Only ten-pin bowling.
 9         Q.   Only in?  Sorry.
10         A.   Bowling.
11         Q.   Bowling, okay.
12         A.   You don't call it ten-pin
13    bowling here?
14         Q.   No.
15         A.   I'm sorry.  It's a British
16    name.
17         Q.   Did you have any other issues
18    with Mr. Maietta besides these three that
19    you have identified?
20         A.   We didn't agree on how to
21    manage the team.
22         Q.   What were your areas of
23    disagreement?
24         A.   He likes disciplining them and
25    writing them all out whereas my management
```

63

```
 1                    ASHDOWN
 2    style is to coach and encourage.
 3        Q.    Anything else that he said or
 4    did that brought you to this conclusion
 5    that he didn't agree with you on how to
 6    manage the team?
 7        A.    We used to just disagree on it
 8    all the time.
 9        Q.    Did you have any other types of
10    issues with Mr. Maietta?
11        A.    Not that I can think of off the
12    top of my head.
13        Q.    What is client programming?
14        A.    So it's the program that you
15    would give over a six-week period and then
16    you go through different phases of
17    training, so you're taking your client
18    through different cycles of training, how
19    to get them to achieve their goal, so he
20    would teach them through that cycle of
21    programming phase and then would audit
22    their program design to make sure that
23    there is consistency to what has been
24    given.
25        Q.    When you say "he", you're
```

```
 1                    ASHDOWN
 2   referring to Mr. Maietta?
 3        A.    Yes.
 4        Q.    So Mr. Maietta was in charge?
 5        A.    He was in charge of training
 6   the new employees on that and then doing
 7   spot checks on their training program.
 8        Q.    Okay, so he would help them
 9   develop their programs for clients, is that
10   correct?
11        A.    Yes.
12        Q.    Then they would actually draw
13   up written programs for their clients?
14        A.    They would.
15        Q.    He would review those and
16   critique them?
17        A.    He would spot-check them.
18        Q.    As the personal training
19   manager providing personal training
20   sessions at the club, were you required to
21   create programs for your clients?
22        A.    I was.
23        Q.    Did you actually create those
24   programs?
25        A.    I did.
```

```
 1                        ASHDOWN
 2         Q.    Where did you store those
 3    programs?
 4         A.    In my folder on the computer.
 5         Q.    I'm sorry.  Where?
 6         A.    In my folder on my computer.
 7         Q.    Was that the name of the actual
 8    computer folder, "my folder"?
 9         A.    It was under my set of
10    documents.  I couldn't tell you the exact
11    name of the folder that I stored them in.
12         Q.    Was Mr. Maietta responsible for
13    reviewing your clients' programs?
14         A.    No, he wasn't required to.
15         Q.    I'm sorry?
16         A.    He wasn't required to.
17         Q.    How would you describe your
18    programming skills at the time?
19         A.    I think I'm good at what I do.
20         Q.    Strong?
21         A.    I think I'm good at what I do.
22         Q.    So during the course of your
23    employment with Equinox, would you say that
24    you wrote good programs for your clients?
25         A.    I did.
```

```
 1                     ASHDOWN
 2        Q.    Would you say it was a tier
 3   three level programming?
 4        A.    I do.
 5        Q.    Were the personal trainers
 6   required to keep their programming in
 7   certain files so that Mr. Maietta could
 8   review them?
 9        A.    They were.
10        Q.    Was that on a shared server?
11        A.    It was.
12        Q.    Was there a reason why you
13   didn't maintain your programming on that
14   shared server?
15        A.    I was never required to.
16        Q.    When you say you were never
17   required to, did you ever have that
18   discussion with anybody?
19        A.    I was asked by Lawrence Sanders
20   to move them there because Mauro had
21   complained about my programming.
22        Q.    When did you have this
23   conversation with Mr. Sanders?
24        A.    I can't recall the date.
25        Q.    When you say that Mauro had
```

```
 1                    ASHDOWN
 2    complained about your programming, what
 3    were you told by Mr. Sanders?
 4         A.    Exactly that.
 5         Q.    Was the complaint that your
 6    programming wasn't available to be viewed
 7    or was it a complaint about your
 8    programming?
 9         A.    No, because no other personal
10    training manager had to have it on a shared
11    server and I had spoken to another personal
12    training manager to see if theirs had been.
13         Q.    Okay, but was he complaining
14    about the fact that your programming wasn't
15    available for him to view or was he
16    complaining about your programming?
17         A.    He was just complaining about
18    me.
19         Q.    About your programming or the
20    fact that he couldn't see it?
21         A.    About my programming.
22         Q.    If he couldn't see your
23    programming, do you know how he made this
24    complaint?
25         A.    No.
```

```
 1                    ASHDOWN
 2        Q.    What did you tell Mr. Sanders
 3   in response?
 4        A.    I told him that I had spoken to
 5   another personal training manager and I
 6   don't understand why.  I will put them in
 7   there if need be, but I don't understand
 8   why I'm being singled out.
 9        Q.    Did you, in fact, move your
10   programming over to the shared server?
11        A.    I can't remember to be honest.
12        Q.    Did Mr. Sanders instruct you to
13   do that?
14        A.    We had a discussion about it.
15        Q.    Did you have any discussions
16   with Liz Minton about it?
17        A.    I met with Liz Minton about my
18   issues regarding Mauro.
19        Q.    Okay, we'll get to that.
20              Did you train with an Equinox
21   trainer?
22        A.    I trained with Ryan Hopkins.
23   In fact, that question, when I first
24   started I trained with pretty much
25   everybody.
```

```
 1                    ASHDOWN
 2       Q.    For your own personal training?
 3       A.    No, because I wanted to find
 4  out all their styles of training so that I
 5  could help with them.
 6       Q.    Did you ever consult Mr.
 7  Maietta about any assistance with creating
 8  programming?
 9       A.    No.
10       Q.    Did Equinox provide training
11  for client programming?
12       A.    My programs had been forwarded
13  before I even got here.  If I remember
14  right, before I got here I forwarded my
15  programs, my current programs, before I
16  even started working here.
17       Q.    No, but my question is did
18  Equinox provide training for client
19  programming?
20       A.    Not that I recall, no.
21       Q.    You trained with Ryan Hopkins
22  for how long and how frequently?
23       A.    I can't remember the exact
24  period of time, but occasionally it was
25  twice a week, not every week though.
```

```
 1                   ASHDOWN
 2        Q.    Was it throughout the course of
 3   your employment or something different?
 4        A.    It wasn't the whole period of
 5   my whole employment, no.
 6        Q.    Why did you train with Mr.
 7   Hopkins?
 8        A.    Because when I initially
 9   started I trained with every single or
10   pretty much every one of my staff and I
11   liked his style of training.
12        Q.    Would you consider it unusual
13   for a personal training manager to need a
14   personal trainer?
15        A.    No, it happens across the
16   board.  The manager at 19th Street also had
17   one.
18        Q.    What was your relationship with
19   Mr. Hopkins?
20        A.    He was my trainer.  He was also
21   my employee.
22        Q.    Did you have any social
23   relationship with him or romantic
24   relationship?
25        A.    No.
```

71

1                    ASHDOWN

2        Q.    Were you ever flirtatious or

3    did you ever do anything inappropriate with

4    him?

5              MR. HARMAN:   Objection.

6        A.    No.

7        Q.    How did you pay Mr. Hopkins for

8    those sessions?

9        A.    Initially one of my clients

10   pulled sessions for him, which was cleared

11   and discussed with Lawrence Sanders, and

12   then I paid for sessions.

13       Q.    You said initially one of your

14   clients pulled sessions?

15       A.    Yes, I can't remember exactly

16   who did it though.  It was somebody, yeah,

17   and Lawrence Sanders agreed to that.

18       Q.    Yes, but can you elaborate?

19   When you say he purchased sessions for you,

20   this club member purchased sessions for you

21   to use?

22       A.    Yes, but he didn't pull them

23   for me.  He pulled them for Ryan, so Ryan

24   got paid for the sessions.

25       Q.    For how many personal training

```
 1                    ASHDOWN
 2    sessions did you have that arrangement?
 3          A.    I can't remember exactly now.
 4          Q.    How much did this member pay
 5    for those personal training sessions?
 6          A.    It would have been a tier three
 7    package.
 8          Q.    How many training sessions?
 9          A.    I can't remember.
10          Q.    Why did the member purchase
11    these for you?
12          A.    To have training sessions with
13    me.
14          Q.    I'm sorry?
15          A.    To have training sessions with
16    me.
17          Q.    Yes, but he purchased them for
18    you to use with Mr. Hopkins, correct?
19          A.    No, he purchased them to train
20    with me, but he used to pull the sessions
21    from Mr. Hopkins so that Ryan got paid and
22    I didn't pay Ryan.
23          Q.    When did you have this
24    discussion with Mr. Sanders?
25          A.    Before the first session even
```

```
 1                    ASHDOWN
 2   got pulled with Ryan, before I started
 3   training with Ryan.
 4       Q.    When did you start training
 5   with Ryan?
 6       A.    I can't remember the exact
 7   date.
 8       Q.    Was it within a month of
 9   commencing your employment?
10       A.    I have no idea.
11       Q.    Was it within two months?
12       A.    I can't give you the exact
13   date.  I don't recall.
14       Q.    Did you ever lend any money to
15   Mr. Hopkins?
16       A.    No.
17       Q.    Did you ever lend any money to
18   any other personal trainers?
19       A.    Yes.
20       Q.    You've alleged in your
21   Complaint that Mr. Maietta falsely stated
22   that you were getting drunk with your
23   staff.  What is the basis for this
24   allegation?
25       A.    Well, I wasn't even allowed to
```

74

```
 1                    ASHDOWN
 2    drink at the time, so I didn't even know
 3    where that came from.
 4         Q.    Yes, but when you say that Mr.
 5    Maietta falsely stated that you were
 6    getting drunk with your staff, how did you
 7    become aware that he said that?
 8         A.    Lawrence Sanders.
 9         Q.    When did Mr. Sanders tell you
10    that?
11         A.    Again I can't recall the date.
12         Q.    What exactly did Mr. Sanders
13    tell you?
14         A.    He told me that it was brought
15    to his attention that I was partying and
16    getting drunk with my staff and that I
17    favored men over women.
18         Q.    He said that Mauro Maietta told
19    him that?
20         A.    He did.
21         Q.    It's also alleged in your
22    Complaint that Mr. Maietta sent E-mails to
23    an incorrect dummy E-mail address?
24         A.    He did.
25         Q.    Can you explain that a little
```

75

```
 1                    ASHDOWN
 2   further?
 3        A.    It first came to my attention
 4   when I first started working there and
 5   Jessica Dart (phonetically spelled) brought
 6   it to my attention who I was taking over
 7   from and then I had asked Mauro to work the
 8   last day of the month to help achieve the
 9   target and he refused and then called
10   Lawrence Sanders to complain that I hadn't
11   returned any of his E-mails, so I had
12   mentioned to Lawrence that this had been
13   brought to my attention before that he had
14   sent E-mails to a fake address, so Lawrence
15   asked him to forward him the E-mails that
16   he had sent.  He said once he sends an
17   E-mail from his Blackberry that it
18   automatically deletes, so Lawrence with me
19   went down to my office, logged onto Mauro's
20   computer, went into his E-mails and saw for
21   himself in black and white that the E-mails
22   had been sent to an address that I didn't
23   even have.
24        Q.    You said that you learned this
25   from Jessica Dart.  What was her
```

```
1                    ASHDOWN
2    involvement?
3              MR. HARMAN:  Objection.  I
4         don't think that's what the testimony
5         was.
6              MR. McPARTLAND:  Okay, I'll
7         rephrase it.
8         Q.    What did Jessica Dart tell you
9    about Mr. Maietta sending E-mails to an
10   incorrect dummy E-mail address?
11        A.    I hadn't received the E-mails.
12   She had.  She replied to all.  We noticed
13   that it wasn't my E-mail address.
14        Q.    How long was Ms. Dart still at
15   the club after you began your employment?
16        A.    We did a four-day hand-over
17   period, a three or four-day hand-over
18   period.
19        Q.    So this was essentially right
20   at the beginning of your employment, is
21   that correct?
22        A.    Yes.
23        Q.    As a personal training manager,
24   did you feel that you had any
25   responsibility to make your relationship
```

```
 1                    ASHDOWN
 2   with Mr. Maietta as the fitness manager
 3   work?
 4        A.    I tried.
 5        Q.    What did you do to repair the
 6   relationship?
 7        A.    I called a meeting with Ms.
 8   Minton to discuss it.  I then took him out
 9   to lunch to try to get out of the building
10   and talk it through with him.
11        Q.    Was that your idea to take him
12   out for lunch --
13        A.    It was.
14        Q.    Continuing or were you
15   instructed to do so?
16             MR. HARMAN:  Let him finish his
17          question and then you can answer.
18             THE WITNESS:  Sorry.
19        Q.    Was it your idea to take him
20   out to lunch or were you instructed to do
21   so?
22        A.    It was my idea.
23        Q.    Did you have any meetings with
24   Lawrence Sanders about any of these issues
25   with Mr. Maietta?
```

78

```
 1                      ASHDOWN
 2          A.    I did.
 3          Q.    When did those meetings occur?
 4          A.    I can't recall the exact dates
 5    for you.
 6          Q.    Approximately how many meetings
 7    or discussions with him did you have?
 8          A.    Several.
 9          Q.    Was anybody else present?
10          A.    No.
11          Q.    During any of them?
12          A.    No.
13          Q.    What did you tell Mr. Sanders?
14          A.    I was obviously concerned of
15    how our work relationship was.
16          Q.    Did you ever tell Mr. Sanders
17    that Mr. Maietta did not like being
18    supervised by a woman?
19          A.    I don't recall that
20    conversation.
21          Q.    Did you ever tell Mr. Sanders
22    that Mr. Maietta wanted to take your
23    position as a personal training manager?
24          A.    I think Lawrence Sanders was
25    aware that he wanted the job.
```

```
 1                    ASHDOWN
 2        Q.    Yes, but my question is did you
 3   ever tell that to Mr. Sanders?
 4        A.    I don't recall saying that.
 5        Q.    You also had meetings and
 6   discussions with Ms. Minton?
 7        A.    I did.  I called a meeting with
 8   her.
 9        Q.    Approximately on how many
10   occasions did you meet with her to discuss
11   these issues with Ms. Minton?
12        A.    One that I recall.
13        Q.    Was anybody else present?
14        A.    No.
15        Q.    What was discussed at that
16   meeting?
17        A.    It was discussed about the
18   E-mails that he had written, the comments
19   that he had made to Lawrence, the false
20   allegations that had been brought up.
21        Q.    Did you ever tell Ms. Minton
22   that Mr. Maietta did not like being
23   supervised by a woman?
24        A.    I don't recall saying that, no.
25        Q.    Did you ever tell Ms. Minton
```

```
 1                     ASHDOWN
 2     that he wanted to take your position as the
 3     personal training manager?
 4          A.    I don't recall saying that, no.
 5               MR. McPARTLAND:  Mark that as
 6          G.
 7               (Whereupon, the aforementioned
 8          document was marked as Defendant's
 9          Exhibit G for identification, as of
10          this date, by the court reporter.)
11          Q.    Other than Ms. Minton and Mr.
12     Sanders, did you have any discussions with
13     any other superiors at Equinox?
14          A.    Not that I recall, no.
15               MR. HARMAN:  Any other
16          discussions about anything?
17          Q.    About Mr. Maietta, your issues
18     with Mr. Maietta at Equinox.
19          A.    Not that I recall.
20          Q.    I'm going to hand you a
21     one-page document, which is an E-mail chain
22     that's been marked as Defendant's Exhibit
23     G.  It has Bates stamp EQX-3258
24     (indicating).
25          A.    Okay.
```

```
 1                      ASHDOWN
 2          Q.    I ask you to take a look at
 3     that.
 4          A.    Thank you, okay.
 5          Q.    Does this now refresh your
 6     recollection as to when you had the meeting
 7     with Ms. Minton?
 8          A.    Well, it's date stamped
 9     clearly.
10          Q.    Was that on July 25, 2011?
11          A.    It is.
12          Q.    Do you recall this discussion
13     referred to by Ms. Minton?
14          A.    I remember the meeting, yeah.
15          Q.    In the E-mail Ms. Minton
16     states, "We spent a few minutes discussing
17     the trainer rumors and ways to change
18     perception."  Do you recall a discussion
19     regarding those issues?
20          A.    I assume she means about
21     favoring the men over the women.  I think
22     that was what it was concerning.
23          Q.    With respect to ways to change
24     that perception, did you have any
25     discussion with Ms. Minton at this meeting
```

82

```
 1                    ASHDOWN
 2    about ways to change the perception that
 3    you were favoring men over women?
 4         A.    I believe we did, but I can't
 5    remember what was said.
 6         Q.    On the second paragraph, Ms.
 7    Minton states that you had a list of
 8    instances involving Mr. Maietta.  Do you
 9    recall telling that to Ms. Minton?
10         A.    Yeah.
11         Q.    Did you actually have a written
12    list?
13         A.    No.
14         Q.    What instances did you explain
15    to Ms. Minton?
16         A.    From what I can recall, it was
17    the E-mails, it was the false allegations,
18    it was about my training and it was about
19    the comments that he had made to Lawrence.
20         Q.    Going down to the third to last
21    paragraph it says, "We discussed her zero
22    risk scores and she would like to retake as
23    she feels some do not reflect how she truly
24    sees things."
25         A.    Mmhmmm, yes.
```

```
 1                      ASHDOWN
 2          Q.    Do you recall the questions in
 3    this regard?
 4          A.    I don't actually, no.
 5          Q.    In the third paragraph it says,
 6    "I gave her," meaning you, "advice on how
 7    to handle the conversation with Mauro
 8    tomorrow and what an optimal PTM/FM
 9    relationship would look like."  Do you
10    recall that part of the conversation?
11          A.    I don't remember what was
12    discussed, no.
13          Q.    What are zero risk scores?
14          A.    I can't remember exactly.  We
15    answer a series of questions and it tells
16    you what kind of manager personality I
17    think you are, I believe.  I can't exactly
18    remember.
19          Q.    Did you eventually have a
20    meeting with Mr. Maietta?
21          A.    I did.  The following day I
22    took him for lunch.
23          Q.    Where did you go?
24          A.    A delicatessen.
25          Q.    Nobody instructed you to go to
```

```
 1                      ASHDOWN
 2    have that meeting, is that correct?
 3         A.    I asked him to have the meeting
 4    and get out of the building.  He didn't
 5    want to, and as I said, I told him Liz told
 6    him that he had to do it.
 7         Q.    Yes, but nobody instructed you
 8    that you should set up a meeting with Mr.
 9    Maietta, is that correct?
10              MR. HARMAN:  Objection for the
11         fourth time.  It was asked and
12         answered.
13         A.    No.
14         Q.    What did you discuss with Mr.
15    Maietta at that meeting?
16         A.    The issues that I had and gave
17    him a chance to bring out any issues he
18    had.
19         Q.    Did he have any complaints
20    about you?
21         A.    He didn't like the way that I
22    employed some staff while he was on
23    vacation.  He didn't like that when my
24    staff told me things in confidence that I
25    didn't share with him.  That's actually all
```

1                    ASHDOWN
2    I can remember.
3         Q.    With respect to his complaint
4    that he did not like that you employed
5    staff while he was on vacation, what did
6    you understand that to mean?
7         A.    He wants to be part of the
8    interview process, but I also had Lawrence
9    Sanders present with me to have my second
10   opinion on who to employ.
11        Q.    Had you not been including Mr.
12   Maietta?
13        A.    When he was there, he was
14   present on every single interview.
15        Q.    Did you, in fact, hire people
16   when he was not there?
17        A.    When he was on his honeymoon,
18   yeah, we needed staff.
19        Q.    At any other time did you hire
20   any personal trainers --
21        A.    Not that I recall.
22        Q.    (Continuing) when he was not
23   present for the interview?
24        A.    Not that I can recall.
25        Q.    With respect to his not liking

1                    ASHDOWN
2      that you did not share confidences, what
3      was that referring to?
4           A.    I had a couple of trainers
5      confide in me about a few things.
6           Q.    Who were they and what did they
7      confide to you about?
8           A.    They were people that had
9      personal issues.
10          Q.    What types of personal issues?
11          A.    Drinking issues.
12          Q.    Who were the trainers?
13          A.    Andrew Speer, S-P-E-E-R, Bobbie
14     Dwyer, Cornelia Hobbie, C-O-R-N-E-L-I-A
15     H-O-B-B-I-E.
16          Q.    Was Ms. Hobbie a trainer?
17          A.    She was my manager in training.
18          Q.    What was her exact title?  Do
19     you recall?
20          A.    Well, she was a personal
21     trainer first and then she was a manager in
22     training and then she went into a fitness
23     manager.
24               MR. HARMAN:  What was her first
25          name again?

87

```
 1                    ASHDOWN
 2           THE WITNESS:  Cornelia, but
 3        everybody called her Corkie.
 4           MR. HARMAN:  I see.
 5      Q.    During your meeting with Mr.
 6   Maietta, did you ever tell him that you
 7   thought he did not like having a woman for
 8   a supervisor?
 9      A.    I can't remember if that was
10   discussed.
11      Q.    Did you ever tell him that on
12   any other occasion?
13      A.    I can't recall.
14      Q.    Was that meeting productive?
15      A.    I thought it was.  I hoped it
16   was.
17      Q.    Did Ms. Minton request that you
18   report back the results of the meeting to
19   her in writing?
20      A.    She did.  We both reported back
21   to her.
22           MR. McPARTLAND:  Mark that as
23        the next exhibit.
24           (Whereupon, the aforementioned
25        document was marked as Defendant's
```

88

```
 1                        ASHDOWN
 2           Exhibit H for identification, as of
 3           this date, by the court reporter.)
 4           Q.    I'm going to show you a
 5      two-page E-mail chain that has been marked
 6      as Defendant's Exhibit H.  It's got Bates
 7      stamp numbers EQX-3150 and EQX-3511 and I'm
 8      going to ask you to take a look at that
 9      document (indicating).
10           A.    Thank you, okay.
11           Q.    Do you recognize this document?
12           A.    I do.  It's my feedback to Liz
13      Minton.
14           Q.    You're referring to the E-mail
15      from you to Liz Minton in the middle of the
16      first page on Saturday, July 30, 2011?
17           A.    Yep.
18           Q.    This your feedback to Ms.
19      Minton about your meeting with Mr. Maietta,
20      correct?
21           A.    It is.
22           Q.    Does this encompass everything
23      that you discussed with Mr. Maietta at the
24      meeting?
25           A.    Reading this now, no, I thought
```

                                                        89

1                    ASHDOWN

2      we discussed more.

3           Q.    What do you think is not

4      included in here?

5           A.    I think we discussed some of

6      the comments that he made to Lawrence, but

7      I don't seem to read it here.

8           Q.    Which comments were those?

9           A.    He told Lawrence that he

10     thought I would crash and burn in his

11     absence.

12          Q.    What was your discussion with

13     Mr. Maietta about that?

14          A.    He couldn't believe Lawrence

15     had told me that.

16          Q.    Anything else?

17          A.    That's all that I can remember.

18     I also think we discussed him bringing up

19     my programming, but again that's not on

20     here either.

21          Q.    Do you feel that you were

22     responsible for any of the communication

23     issues between you and Mr. Maietta?

24          A.    I tried my very best to

25     communicate to him in many ways.

```
 1                    ASHDOWN
 2        Q.    In your opinion, was there
 3   anything that you were doing wrong on your
 4   part in your role as the personal training
 5   manager with respect to your relationship
 6   with Mr. Maietta?
 7              MR. HARMAN:  Objection.
 8              You may answer.
 9        A.    No.
10              THE WITNESS:  Off the record.
11              (Whereupon, the discussion was
12         held off the record.)
13              MR. McPARTLAND:  Mark this as
14         the next exhibit.
15              (Whereupon, the aforementioned
16         document was marked as Defendant's
17         Exhibit I for identification, as of
18         this date, by the court reporter.)
19              MR. McPARTLAND:  We've been
20         provided with a copy of an E-mail
21         from Ms. Ashdown that's Bates stamp
22         PO37 through P042 that's been marked
23         as Defendant's Exhibit I.
24        Q.    Ms. Ashdown, I'm going to give
25   it to you and ask you to take a look at
```

```
 1                    ASHDOWN

 2    that (indicating).

 3         A.     Yep.

 4         Q.     Do you recognize this document?

 5         A.     It's my resume.

 6         Q.     Does this accurately reflect

 7    your employment history?

 8         A.     Yes.

 9               MR. HARMAN:  Can I have a copy

10         of it?

11               MR. McPARTLAND:  I think we

12         only have two copies here.  I only

13         have a couple of questions with

14         respect to that.

15         Q.     With respect to your employment

16    prior to Equinox, can you just briefly

17    identify where you provided personal

18    training sessions to clients, at which

19    employers?

20         A.     It would have been very

21    occasionally Virgin Active.

22         Q.     When you say "very

23    occasionally" --

24         A.     Actually it would be here or

25    there.  If a member of the staff hadn't
```

```
 1                    ASHDOWN
 2    returned back, then I would then fill in at
 3    the session, or if there was an issue with
 4    the training or if there was an unhappy
 5    member, that as compensation I would
 6    provide free training for them.
 7         Q.    That was just as your role as
 8    the fitness manager, correct?
 9         A.    That was something that I chose
10    to do.  It wasn't part of my role, but if
11    there was an unhappy member, that was my
12    way of compensation.
13         Q.    Yes, but you did that while you
14    were the fitness manager?
15         A.    As the fitness manager, it was
16    nothing I earned anything from.  It was
17    something I did if a member of my staff
18    called in sick and the client was there.  I
19    would fill in.
20         Q.    Where else did you provide
21    personal training?
22         A.    LA Fitness I was a trainer,
23    Holmes Place Epsom, LA Fitness, Corals and
24    obviously Equinox.
25              MR. McPARTLAND:  Mark that.
```

```
 1                    ASHDOWN
 2              (Whereupon, the aforementioned
 3          document was marked as Defendant's
 4          Exhibit J for identification, as of
 5          this date, by the court reporter.)
 6       Q.    Do you know if Mr. Maietta ever
 7  wrote back to Ms. Minton?
 8       A.    I believe he did.
 9       Q.    I am going to hand you a
10  document that's been marked as Defendant's
11  Exhibit J.  It's got Bates stamp number
12  EQX-3508 and it's an E-mail chain,
13  including an E-mail from Mauro Maietta to
14  Elizabeth Minton on July 31, 2011
15  (indicating).
16       A.    Okay, thank you, okay.
17       Q.    Just referring to the E-mail,
18  Mr. Maietta states that you and he had a
19  very productive meeting.  Would you agree
20  with that characterization?
21              MR. HARMAN:  Hold on.
22          Objection.
23              You can answer.
24       A.    Yes.
25       Q.    In what ways was it productive?
```

1                    ASHDOWN

2          A.    We agreed to move forward and

3     work together.

4          Q.    Did Mr. Maietta make any

5     agreements during your conversation about

6     your complaint that he was overly

7     competitive?

8          A.    He did.  He realized that the

9     team did not like it and it wasn't working

10    out.

11         Q.    So he had previously engaged in

12    these types of competitive drills or games

13    or however you want to characterize them

14    with prior staff at other clubs?

15         A.    Yes.

16         Q.    Did he discontinue that after

17    this meeting?

18         A.    I think he did, yeah.

19         Q.    He refers to an agreement in

20    the third paragraph that he would be seen

21    as a partner in the process.  Did you have

22    any discussions regarding that?

23         A.    I don't remember discussing

24    that, but I never saw him as a trainer.  He

25    just completes administration duties.

```
 1                      ASHDOWN
 2        Q.    What was that?
 3        A.    I never saw him as a trainer.
 4   He just completes administration duties.
 5        Q.    Then in the same paragraph he
 6   said that he explained his frustration with
 7   the inability for you and he to swap days
 8   when life situations calls for a switch.
 9   Do you recall any conversations regarding
10   that topic?
11        A.    I do remember him asking to
12   switch days on occasion.
13        Q.    Him asking you to switch days?
14        A.    Yeah.
15        Q.    Was this a point of contention
16   with you and he at all?
17        A.    It was never a point of
18   contention.  He wanted us to work a full
19   weekend, which was my point of contention.
20        Q.    I'm sorry?
21        A.    He wanted me to work a whole
22   weekend and then have a whole weekend off
23   and then he would work three days and then
24   I would continue two.
25        Q.    Did he ever send you any
```

```
 1                    ASHDOWN
 2   E-mails requesting that you do that?
 3        A.    I don't remember if it was all
 4   the problem concerned.  I believe it was an
 5   agreement that he had with the previous
 6   manager of his previous club.
 7        Q.    He says on the fifth paragraph,
 8   "As for respectful disagreements, there
 9   were zero major cases."  Do you agree with
10   that?
11        A.    I don't recall to be honest.
12        Q.    He also refers to contrasting
13   management styles.  Would you agree that
14   you had contrasting management styles?
15        A.    I do.
16        Q.    What was your management style
17   versus his management style?
18        A.    I'm more of a people manager.
19   I like to nurture and encourage and grow
20   people's strengths and weaknesses.  He
21   likes to go on it on more power and
22   authority and writing people up.  I do
23   things around trying to teach them how to
24   do things.
25        Q.    Following you and Mr. Maietta
```

```
 1                    ASHDOWN
 2    sending these E-mails back to Liz Minton,
 3    did you have any further discussions with
 4    Liz Minton with respect to this feedback?
 5         A.    Not that I recall now.
 6         Q.    Did you have any other
 7    discussions with Liz Minton up until the
 8    end of your employment about any issues
 9    with Mr. Maietta?
10         A.    Not that I recall.
11         Q.    How about did you have any
12    discussions with Mr. Sanders following your
13    meeting with Mr. Maietta?
14         A.    I do believe we sat down and
15    discussed it, yes.
16         Q.    What did you discuss during
17    that meeting?  What did you tell him and
18    what did he say to you?
19         A.    It's pretty much what I wrote
20    to Liz to be honest.
21         Q.    After that discussion with Mr.
22    Sanders, did you have any other further
23    discussions before the end of your
24    employment with Mr. Sanders about any
25    issues with Mr. Maietta?
```

```
 1                     ASHDOWN
 2        A.    Not that I recall.
 3        Q.    Did your relationship with Mr.
 4   Maietta improve, stay the same, decline or
 5   something different in your own words after
 6   this meeting?
 7              MR. HARMAN:  Hold it.
 8        Objection.
 9              You can answer.
10        A.    Possibly -- I can't recall.  I
11   don't know.
12              MR. HARMAN:  Do you understand
13        the question?
14        A.    Yeah, can you repeat the
15   question?
16        Q.    I'll rephrase it, sure.
17        A.    Thank you.
18        Q.    After your meeting with Mr.
19   Maietta, did your relationship with him
20   improve, worsen, stay the same or something
21   else?
22        A.    We both made an effort.
23        Q.    Did you ever report any issues
24   with respect to Mr. Maietta or any other
25   employee to human resources?
```

99

```
 1                    ASHDOWN
 2        A.    No, just to Liz and to
 3   Lawrence.
 4        Q.    Did you ever call the 1-800
 5   ethics hotline that Equinox maintains for
 6   its employees?
 7        A.    No.
 8        Q.    You were re-diagnosed with
 9   cancer at some point during the course of
10   your employment, correct?
11        A.    I was.
12        Q.    When was that?
13        A.    I can't recall the exact date,
14   but it was around April or May, 2011.
15        Q.    Who made the diagnosis?
16        A.    Actually it was Dr. Griffin.
17        Q.    How did Dr. Griffin make the
18   diagnosis?
19        A.    Because he came to New York to
20   see me.
21        Q.    Where did you meet with him?
22        A.    At Sloan-Kettering.
23        Q.    Why was this appointment
24   scheduled?
25        A.    Because I had to have regular
```

```
 1                    ASHDOWN
 2    checkups.
 3         Q.    How frequently were you having
 4    regular checkups at that point?
 5         A.    At that point every three
 6    months.
 7         Q.    Did Dr. Griffin make any other
 8    trips in New York?
 9         A.    He did while I was in
10    treatment.  He oversaw all of my treatment.
11    In fact, he prescribed it.
12         Q.    Is Dr. Griffin associated with
13    Sloan-Kettering in any way?
14         A.    No, but he made it possible and
15    arranged it to be able to treat me.  He's
16    been my doctor for nine years.
17         Q.    Did you treat with any other
18    doctors at Sloan-Kettering?
19         A.    It was all under his
20    prescription.  I had people give me the
21    medications, but I don't know any doctors'
22    names, no.
23         Q.    Were you feeling ill at all
24    prior to the diagnosis?
25         A.    No.
```

```
 1                    ASHDOWN
 2       Q.    What was the diagnosis?
 3       A.    That it returned, that it was
 4  active after a PET scan.
 5       Q.    Were you prescribed a course of
 6  treatment?
 7       A.    I had nine weeks of radiation
 8  and three cycles of chemotherapy.
 9       Q.    With respect to the nine weeks
10  of radiation, when did that occur?
11       A.    It's every single day Monday
12  through Friday, Saturday and Sunday off.
13       Q.    In terms of your employment,
14  which months did that cover?
15       A.    I'd have to get back to you the
16  exact dates.
17       Q.    With respect to the
18  chemotherapy, what was the schedule of
19  treatment for that?
20       A.    Day one was intravenous and
21  then fourteen days of tablet form followed
22  by seven days off, a twenty-one-day cycle.
23       Q.    Was that before or after the
24  radiation treatment?
25       A.    After.
```

```
 1                    ASHDOWN
 2        Q.    Were the radiation treatment
 3   and the chemotherapy administered at
 4   Sloan-Kettering?
 5        A.    They were.
 6        Q.    Did you treat at any other
 7   locations at any point?
 8        A.    No.
 9        Q.    Other than the radiation and
10   then the chemotherapy, did you have any
11   other treatment?
12        A.    No.
13        Q.    Was there a diagnosis at some
14   point that your cancer had gone back into
15   remission following this?
16        A.    Yes.
17        Q.    How soon after you completed
18   the chemotherapy were you given that
19   diagnosis?
20        A.    I can't be exactly sure.
21        Q.    Prior to this diagnosis during
22   the course of your employment with Equinox,
23   had you told anybody at Equinox about your
24   history with cancer?
25        A.    I can't recall that, no.
```

```
 1                     ASHDOWN
 2        Q.    After the diagnosis, did you
 3   tell anybody?
 4        A.    I did.  I told Lawrence Sanders
 5   and Mauro Maietta.
 6        Q.    Did you tell them each
 7   individually?
 8        A.    Yes.
 9        Q.    Did you tell them in person or
10   via E-mail or something else?
11        A.    In person.
12        Q.    What did you say to them and
13   what did they say to you?
14        A.    I explained the situation.
15        Q.    What did Mr. Sanders say in
16   response?
17        A.    I don't actually recall.
18        Q.    What did Mr. Maietta say in
19   response?
20        A.    I don't recall that either.
21        Q.    Did you ask Mr. Sanders to keep
22   the diagnosis confidential?
23        A.    No.
24        Q.    Did you ask Mr. Maietta to keep
25   the diagnosis confidential?
```

```
 1                     ASHDOWN
 2         A.    I didn't want my staff to know.
 3         Q.    Did you ask him to keep it
 4   confidential or did you tell him that he
 5   could tell people or you didn't say?
 6         A.    I told him not to tell the
 7   team.
 8         Q.    With respect to Mr. Sanders,
 9   what did you ask him?  Who did you ask him
10   not to tell, if anyone?
11         A.    I didn't ask him to not tell
12   anybody.  I just told him what my wishes
13   were.
14         Q.    Are you familiar with Mr.
15   Maietta's family history with cancer?
16         A.    I think he had a dad who had
17   cancer.
18         Q.    Did you have discussions with
19   him about that?
20         A.    Very briefly.
21         Q.    Did you have to miss any work
22   for any treatment or because you weren't
23   feeling well?
24         A.    I only recall taking a couple
25   of days off.  I remember switching a day,
```

```
 1                   ASHDOWN
 2   but I still worked.
 3        Q.    So other than those couple of
 4   days off and switching a day, did you ever
 5   have to alter your schedule in any way?
 6        A.    No.
 7        Q.    Did the treatment affect your
 8   ability to perform your job duties?
 9        A.    I was tired.
10        Q.    Were you able to fully perform
11   your job duties?
12        A.    I was, but it was hard.
13        Q.    Did you ever request any type
14   of accommodation for your treatment other
15   than just to have the schedule changed one
16   day and being ill a couple of days?
17        A.    I tried not to let it affect my
18   job.
19        Q.    Were you successful with that?
20        A.    I believe I was.
21        Q.    Was your appearance affected at
22   all by the treatment?
23        A.    It was.  I looked pale, I had
24   sores on my arms and after chemotherapy I
25   had my arms strapped up and my gums would
```

106

```
 1                    ASHDOWN
 2    bleed from time to time.
 3         Q.    Do you know was this observable
 4    by other people?
 5              MR. HARMAN:  Objection.
 6         A.    Yeah.
 7         Q.    Did anybody ever make any
 8    mention of your appearance?
 9         A.    They mentioned the sores on my
10    arms.
11         Q.    Who did?
12         A.    Some of my staff.
13         Q.    Did Mr. Maietta ever make any
14    mention about your appearance?
15         A.    Not that I can recall.
16         Q.    Did Mr. Sanders ever make any
17    mention of your appearance?
18         A.    Not that I recall, but he did
19    mention how tired I looked from time to
20    time and he actually I do recall him buying
21    some cream for my sores because he noticed
22    it (indicating).
23         Q.    Who did that?
24         A.    Lawrence.
25         Q.    Were you permitted to drink
```

```
 1                  ASHDOWN
 2   alcoholic beverages during your treatment?
 3        A.    No.
 4        Q.    Did you ever drink any
 5   alcoholic beverages during your treatment?
 6        A.    No.
 7              MR. McPARTLAND:  Mark that as
 8        the next exhibit.
 9              (Whereupon, the aforementioned
10        document was marked as Defendant's
11        Exhibit K for identification, as of
12        this date, by the court reporter.)
13        Q.    Ms. Ashdown, I'm going to show
14   you a three-page E-mail chain that's been
15   marked as Defendant's Exhibit K.  It has
16   Bates stamp numbers EQX-5765 through
17   EQX-5767.  Tell me when you've had a chance
18   to read those E-mails (indicating).
19        A.    Yeah.
20        Q.    Do you recognize this document?
21        A.    I guess it's an E-mail from me.
22        Q.    I'm sorry?
23        A.    It's an E-mail from me.
24        Q.    Do you recall this E-mail
25   correspondence with Mr. Sanders?
```

```
 1                     ASHDOWN
 2          A.    I don't recall it, but
 3     obviously I sent it.
 4          Q.    What's the date of your E-mail
 5     to Mr. Sanders?
 6          A.    July 6.
 7          Q.    Were you in treatment at that
 8     point?
 9          A.    Well, obviously I had a two-
10     week break.
11          Q.    Okay, so when you in that
12     statement when you say, "So boss, now I can
13     drink for two weeks when we going for a
14     beer?" what are you referring to?
15          A.    Meaning that I'm allowed to
16     have a drink for two weeks.
17          Q.    So there would have been a
18     two-week break in your treatment at this
19     point?
20          A.    Yes, I remember there was a
21     break between radiation and chemotherapy.
22          Q.    Did you ever socialize with the
23     staff outside of the club?
24          A.    Yes, very occasionally for a
25     staff member's birthday.
```

```
 1                        ASHDOWN
 2         Q.    On which occasions did you
 3    socialize outside the club?
 4         A.    I only remember going out on a
 5    couple of occasions for staff birthdays, we
 6    went to team building, to bowling and there
 7    was actually just before I got terminated
 8    there was an event that we had down by
 9    South Street Seaport, which Lawrence
10    Sanders was also at, which I attended, but
11    I didn't drink when I got there.
12         Q.    Did you attend the bowling
13    event at Bowlmor?
14         A.    Yes, I did.
15         Q.    Were you intoxicated at that
16    event?
17         A.    I don't recall being
18    intoxicated.
19         Q.    Were you intoxicated at any of
20    the events?
21         A.    I had drunk at one of the
22    birthday occasions, yeah.
23         Q.    You were intoxicated on that
24    occasion?
25         A.    I had a few drinks.
```

110

```
 1                    ASHDOWN
 2        Q.    Were you intoxicated?
 3        A.    I don't recall being
 4   intoxicated.
 5        Q.    Do you recall being intoxicated
 6   on any occasions with staff around?
 7        A.    Not with my staff, no.
 8        Q.    Did you ever go with Mr.
 9   Sanders for a beer?
10        A.    We went out for lunch a couple
11   of times.
12        Q.    Did you have any alcoholic
13   beverages during those luncheons?
14        A.    I believe we had a drink but
15   not on that occasion.  It was beforehand.
16        Q.    I may have asked you this
17   already.
18        A.    Sure.
19        Q.    There was some point that your
20   cancer went back into remission, correct?
21        A.    Yes.
22        Q.    When was that?
23        A.    I believe it was around
24   October, but I don't have the exact date
25   with me, the end of October.
```

```
 1                    ASHDOWN
 2        Q.    That would be 2012 or 2011?
 3        A.    Yeah.
 4        Q.    2011?
 5        A.    Mmhmmm, yes.
 6        Q.    When was the last time that you
 7   were treated?
 8        A.    I was treated six months prior
 9   to that diagnosis.
10        Q.    Did you ever hear Mr. Sanders
11   say anything negative about your treatment
12   or your cancer?
13        A.    No.
14        Q.    Did anyone ever tell you that
15   Mr. Sanders said anything negative about
16   your treatment or your cancer?
17        A.    He when I told him that I
18   needed to have a day off to go to the
19   hospital, he wasn't very happy about it.
20        Q.    When was that?
21        A.    Towards the end of my
22   appointment.
23        Q.    What was the purpose of the
24   hospital visit?
25        A.    I couldn't breathe.  I was
```

```
 1                    ASHDOWN
 2   working and I couldn't breathe.
 3        Q.    What did he say to you when you
 4   told him?
 5        A.    He told me to go but wasn't
 6   happy about it.
 7        Q.    Well, what's your basis for the
 8   statement that he wasn't happy?  What did
 9   he say or do that made you believe that?
10        A.    It was the tone of his voice.
11   It was his kind of being frustrated that I
12   had to go.
13        Q.    Anything else that he said or
14   did?
15        A.    No.
16        Q.    Did you ever hear Mr. Maietta
17   say anything negative about your cancer or
18   your treatment?
19        A.    No.
20        Q.    Did anyone ever tell you that
21   Mr. Maietta said anything negative about
22   your cancer or your treatment?
23        A.    No.
24        Q.    Did you ever hear Liz Minton
25   say anything negative about your cancer or
```

113

1                    ASHDOWN

2    your treatment?

3         A.    No.

4         Q.    How about David Harris?

5         A.    I had very little contact with

6    David Harris, no.

7         Q.    How about Joe Matarazzo?

8         A.    No.

9         Q.    How about Matthew Plotkin?

10        A.    No.

11        Q.    Now you've alleged in this

12   lawsuit that Equinox unlawfully terminated

13   you because of your cancer treatment, so

14   what is the factual basis for this belief?

15        A.    Because I didn't do what they

16   accused me of doing and I believe they

17   didn't want someone who looks sick in a

18   health club.

19        Q.    Well, what's the basis for your

20   belief that they didn't want someone who

21   was sick in the health club?

22        A.    Because I did nothing else

23   wrong and that was the only changing factor

24   on how I was.

25        Q.    Anything else that forms the

```
 1                    ASHDOWN
 2    basis of your belief that Equinox
 3    unlawfully terminated you because of your
 4    cancer treatment other than what you said?
 5         A.    Only from Lawrence Sanders'
 6    reaction when I had to take time off to go
 7    to the hospital.
 8         Q.    Did you ever report any
 9    complaints of disability discrimination to
10    anyone at Equinox?
11         A.    No.
12         Q.    Did you ever report it to human
13    resources?
14         A.    No.
15         Q.    Did you ever call the ethics
16    hotline?
17         A.    No.
18              MR. McPARTLAND:  I'm at a good
19         breaking point if you guys want to
20         break for lunch now.
21              MR. HARMAN:  Sure.
22              (Whereupon, at 12:20 P.M., the
23         parties broke for a lunch break until
24         1:05 P.M.)
25    BY MR. McPARTLAND:
```

```
 1                    ASHDOWN
 2        Q.    What does pulling a personal
 3   training session mean?
 4        A.    It means when a client has had
 5   a session and then you pull it from the
 6   actual system to get paid for it.
 7        Q.    Well, can you take me through
 8   what the actual process is?
 9        A.    Well, it's either one of two
10   ways.  The client will go to the front desk
11   and enter the club and they say that they
12   have a session there with the trainer and
13   they sign at the front desk, and
14   alternatively if they forget to pull the
15   session or there's a late cancellation,
16   then we, me and Mauro or Lawrence, could
17   pull it for them.
18        Q.    Is it entered into a computer
19   system?
20        A.    It is entered into a computer
21   system.
22        Q.    What is the name of that
23   system?
24        A.    I could not even begin to
25   remember that.
```

116

```
 1                     ASHDOWN
 2        Q.    How would you enter into the
 3   system?
 4        A.    You would go into whatever
 5   system that was called that I can't
 6   remember.  You look up the person's name.
 7   You, if I remember correctly, you click on
 8   the training sessions and it says "used".
 9        Q.    Okay, but did you need to log
10   into that system?
11        A.    You would have to be logged
12   into a computer and you would have to log
13   in an ID number.
14        Q.    Did you have to be logged in at
15   the club?
16        A.    Yes.
17        Q.    Okay, so you couldn't log in
18   remotely and perform this transaction?
19        A.    No.
20        Q.    Is that correct?
21        A.    Yes.
22        Q.    Did you have certain codes or
23   passwords to log in?
24        A.    Everybody had their own
25   personal code.
```

117

1                    ASHDOWN

2          Q.     Was that called a cashier's

3    code?

4          A.     I believe so, yeah.

5          Q.     Who had a cashier's code at the

6    SoHo branch?

7          A.     Every single person.

8          Q.     The personal trainers had a

9    cashier's code?

10         A.     Every person had a personal

11   code, but I don't know whether everyone

12   could pull a session by using that code.

13         Q.     When you would log in, would

14   you enter in an actual user name and

15   password?

16         A.     To log into the computer?

17         Q.     To log into the system,

18   correct.

19         A.     I believe so, yeah.

20         Q.     Then would you also enter a

21   separate cashier's code?

22         A.     Yes.

23         Q.     Actually perform the

24   transaction?

25         A.     Yes, yes, well, the code is the

```
 1                    ASHDOWN
 2    same as the password that you would use to
 3    log in.
 4         Q.    Did you ever share your
 5    cashier's code with any other employee at
 6    the SoHo branch?
 7         A.    I did with one of the managers
 8    in training.
 9         Q.    Who was that?
10         A.    I think it was Rebecca Ward
11    (spelled phonetically) and I think I -- I'm
12    not sure whether I gave it to Cornelia.  I
13    can't remember.
14         Q.    Who is Cornelia Hobbie?
15         A.    She was one of my personal
16    trainers and was my manager in training.
17         Q.    Did you directly supervise her?
18         A.    I did.
19         Q.    Did she have a cashier's code?
20         A.    She did.
21         Q.    Did you have access to her
22    cashier's code?
23         A.    No.
24         Q.    How did she get her cashier's
25    code?
```

```
 1                    ASHDOWN
 2          A.    It was given to her when she
 3    joined.  It was her normal log in ID code.
 4          Q.    Were these cashier codes
 5    supposed to be kept confidential?
 6          A.    Yes.
 7          Q.    You explained the process a
 8    little bit for me before, so when a
 9    personal training session is performed, the
10    client will go to the front desk and
11    request a voucher, is that right?
12          A.    That's one of the ways, but a
13    lot of them didn't do that.  I tried to
14    instill every single client to do that, but
15    it still didn't happen.
16          Q.    Okay, so let's talk about the
17    scenario when they actually did that.
18          A.    Yeah.
19          Q.    They would pull the voucher?
20          A.    They would.
21          Q.    Then would they do?
22          A.    The front desk would give them
23    the voucher and they would then hand that
24    to the trainer.
25          Q.    Then what would the trainer do
```

```
 1                      ASHDOWN
 2    with the voucher?
 3         A.    They'd probably just throw it
 4    out after it had been written up.
 5         Q.    How did that voucher for the
 6    session get inputted into the system so
 7    that the trainer could receive his
 8    commission?
 9         A.    Now that's the thing.  If they
10    do it at the front desk, it's already been
11    done.
12         Q.    Okay, so when the trainer would
13    come, the front desk associate would enter
14    the --
15         A.    Would pull the session for
16    them.
17         Q.    They would pull the session for
18    them --
19         A.    Yes.
20         Q.    (Continuing) and also make
21    whatever transaction?
22         A.    No, once they pull the session,
23    that is going onto payroll.
24         Q.    Okay, so then you described as
25    a scenario where the member would not go
```

```
 1                    ASHDOWN
 2   and pull the session.  What would happen in
 3   those circumstances?
 4        A.    So the trainer would come and
 5   tell me and we would pull the session for
 6   them.
 7        Q.    When you say "we", who would be
 8   that?
 9        A.    Me, Mauro, Lawrence.
10        Q.    Did the personal training
11   sessions expire after a certain period of
12   time?
13        A.    Yes, they did.
14        Q.    Those sessions, could they be
15   reinstated?
16        A.    Yes, they could.
17        Q.    How would they be reinstated?
18        A.    Exactly the same way that you
19   would pull them.
20        Q.    Who would be responsible for
21   reinstating sessions at the club?
22        A.    Me, Mauro and Lawrence.
23        Q.    What is E tracking?
24        A.    I can't remember what that is.
25        Q.    Was a review done of the
```

```
 1                    ASHDOWN
 2   personal trainer productivity reports to
 3   ensure that the trainers were being
 4   properly paid for their sessions?
 5              MR. HARMAN:  Objection.
 6        A.    Yes.
 7        Q.    Who performed that review?
 8        A.    You used to print the report
 9   out and then you used to put it in their
10   pigeon hole.
11        Q.    Would you or Mr. Maietta review
12   those?
13        A.    No, you put it in their pigeon
14   hole and they would come back to us if
15   there was a problem.
16        Q.    What were AmEx sessions?
17        A.    I believe it's what they got
18   when somebody joined and paid with AmEx.
19        Q.    What type of special benefits
20   did that confer, if any?
21        A.    The only one I know is that
22   they received four personal training
23   sessions a year.
24        Q.    Did AmEx sessions expire as
25   well?
```

123

1                    ASHDOWN

2        A.    I believe they did.

3        Q.    Was any review done of the

4   trainer productivity reports to ensure that

5   AmEx personal training sessions were

6   actually used by the members?

7              MR. HARMAN:  Objection.

8        A.    No.

9        Q.    At some point in August did Mr.

10  Sanders approach you about certain expired

11  sessions that were pulled for personal

12  trainers?

13       A.    He did.

14       Q.    What did he tell you?

15       A.    He asked me if I knew who a

16  member was.

17       Q.    Who was the member?

18       A.    I can't remember.

19       Q.    Did Mr. Sanders give you any

20  type of documentation at that time?

21       A.    No, he showed me on a computer.

22       Q.    What did you understand the

23  issue to be?

24       A.    Sessions had been pulled that

25  shouldn't have been pulled.

```
 1                    ASHDOWN
 2        Q.    Did he ask you to investigate
 3   the issue?
 4        A.    No.
 5        Q.    What did you say when he told
 6   you about the problem?
 7        A.    He told me that he was going to
 8   investigate it.  He asked me if I had done
 9   it.
10        Q.    If you had done the
11   investigation?
12        A.    No, if I had pulled the
13   sessions or knew anything about it.
14        Q.    What did you say to him?
15        A.    No.
16        Q.    Was it a serious offense for an
17   employee to record personal training
18   sessions that wasn't actually performed?
19        A.    Yes.
20        Q.    Did the employee receive a
21   financial benefit from pulling a session
22   that never actually occurred?
23        A.    Yeah.
24             MR. HARMAN:  Objection.
25           Employer or employee?
```

```
 1                    ASHDOWN
 2              MR. McPARTLAND:  The employee,
 3         I'm sorry, yes, thank you.
 4         A.    Yeah.
 5         Q.    How about from a bonus
 6    perspective?  Would that affect the
 7    trainer's bonus?
 8         A.    They had to hit a certain
 9    number of hours to achieve a bonus.
10         Q.    Okay, so that pulled session
11    that wasn't actually performed would be
12    added towards those hours, is that correct?
13         A.    Well, I guess that depends on
14    what we're talking about.
15         Q.    Well, if a session was pulled
16    for a personal trainer that they never
17    actually performed and that wasn't
18    discovered, that session would count
19    towards their bonus requirement?
20         A.    Yes, it would.
21         Q.    Does it also increase the
22    club's revenues for personal training
23    sessions --
24         A.    No.
25         Q.    (Continuing) when a session is
```

```
 1                    ASHDOWN
 2    pulled?
 3         A.    No, I don't believe it does.
 4         Q.    Would you say illegally pulling
 5    sessions is an issue that would warrant the
 6    termination of an employee's employment?
 7              MR. HARMAN:  Objection.
 8         A.    Yeah.
 9         Q.    How many discussions did you
10    have with Mr. Sanders regarding this issue?
11         A.    A couple I can remember.
12         Q.    Over what time period did those
13    discussions occur?
14         A.    I don't know, a week or two.
15         Q.    What did you say to him and
16    what did he say to you, if anything, during
17    these discussions?
18         A.    The first discussion was he
19    made me aware of what happened and told me
20    he was going to investigate it.  The second
21    discussion he said, "If you'd done it, just
22    admit it and we'll say no more about it."
23         Q.    What did you say during those
24    conversations?
25         A.    "I'm not going to admit to
```

127

```
 1                    ASHDOWN
 2    something that I've not done."
 3         Q.    Did you ever get angry with Mr.
 4    Sanders?
 5         A.    No, not that I can recall.
 6         Q.    Did you ever have any
 7    discussions with Matt Plotkin about the
 8    pulled sessions?
 9         A.    Yes.
10         Q.    How many discussions did you
11    have?
12         A.    Two from what I can recall.
13         Q.    When did those discussions
14    occur?
15         A.    I can't remember the exact
16    dates.
17         Q.    Did you meet with him in person
18    or did you talk to him by telephone?
19         A.    No, in person.
20         Q.    Was that at the club?
21         A.    Mmhmmm, yes.
22         Q.    What did he say to you and what
23    did you say to him during these
24    discussions?
25         A.    He asked me about the same
```

```
 1                    ASHDOWN
 2   thing, if I knew what was going on.
 3        Q.    What was your response?
 4        A.    I don't know.  I didn't know
 5   anything about it.
 6        Q.    Did Mr. Plotkin or Mr. Sanders
 7   ever show you any documents?
 8        A.    Not at that time, no.
 9        Q.    At some point they did?
10        A.    Actually I don't recall them
11   showing me any documents.
12        Q.    Did you have any discussions
13   with Liz Minton regarding pulled sessions?
14        A.    I don't recall speaking to her
15   about it.
16        Q.    Did you have any discussions
17   with David Harris about it?
18        A.    I don't recall speaking to him
19   about it.
20        Q.    How about Joe Matarazzo?
21        A.    No, I don't recall speaking to
22   him about it either.
23        Q.    Did you try to provide any
24   explanation as to who may have pulled the
25   sessions?
```

```
 1                     ASHDOWN
 2         A.    No, because, well, I thought in
 3    the end it was Mauro.
 4         Q.    Did you ever communicate that
 5    to anybody?
 6         A.    To Lawrence Sanders and Matt
 7    Plotkin.
 8         Q.    What was the basis for your
 9    belief that Mr. Maietta had pulled the
10    sessions?
11         A.    Because of all the previous
12    activities and false allegations that had
13    come from Mauro.
14         Q.    Did you have any other basis
15    besides that?
16         A.    Lawrence told me that Mauro
17    brought it to his attention.
18              MR. McPARTLAND:  Off the
19         record.
20              (Whereupon, the discussion was
21         held off the record.)
22              MR. McPARTLAND:  Let me have
23         that marked, please.
24              (Whereupon, the aforementioned
25         document was marked as Defendant's
```

```
 1                    ASHDOWN
 2          Exhibit L for identification, as of
 3          this date, by the court reporter.)
 4          Q.    Did you ever perform any
 5   investigation of your own into the pulled
 6   sessions?
 7          A.    I was told that I could
 8   investigate and then they told me I was
 9   terminated.
10          Q.    Who told you that you could
11   investigate?
12          A.    Mat Plotkin and Lawrence
13   Sanders.
14          Q.    When did they communicate that
15   to you?
16          A.    I can't remember a date.
17          Q.    How soon was it prior to the
18   termination of your employment?
19          A.    Pretty quick.
20          Q.    Was it within a week or was it
21   two weeks?
22          A.    Less than a week.
23          Q.    Did you actually perform any
24   investigation?
25          A.    I was off the following day and
```

```
 1                    ASHDOWN
 2    then a couple of days later I was gone.  I
 3    was also a couple of days sick.
 4         Q.    Did you not perform any
 5    investigation?
 6         A.    I started looking into the
 7    sessions and investigated.
 8         Q.    What did you investigate?
 9         A.    I looked into the sessions that
10    had been pulled for and the dates and times
11    they'd been pulled.  I didn't really get
12    too much further than that.  I think I sent
13    an E-mail to IT asking or requesting
14    information, but I can't recall for sure.
15         Q.    So what exactly did you look at
16    to determine this information?
17         A.    I can't remember exactly what I
18    did.
19         Q.    Did you reach any conclusions
20    based upon your investigation?
21         A.    No, like I said, I also had
22    taken off a couple of days sick, and when I
23    came in, I was being terminated.
24         Q.    I'm going to show you a
25    four-page document that's been marked as
```

```
 1                    ASHDOWN
 2    Defendant's Exhibit L (indicating).
 3          A.    Okay.
 4          Q.    It's Bates stamp numbers EQX-
 5    6474 through EQX 6477.  Now there were
 6    previous redactions on this document and
 7    the unredacted copy of this document has
 8    been marked as "confidential, attorney's
 9    eyes only".  For purposes of this document,
10    we're removing that designation.
11          A.    Okay.
12          Q.    Do you recognize this document?
13          A.    I do.
14          Q.    What is it?
15          A.    It's a Performance Commission.
16          Q.    Is it for a certain time
17    period?
18          A.    From the 1st of July until the
19    31st of August.
20          Q.    Does it refer to a certain
21    employee?
22          A.    Yes, to me.
23          Q.    Referring to the first page of
24    that document, there's a member name there,
25    Daniel Lyons.
```

```
 1                    ASHDOWN

 2       A.    Yes.

 3       Q.    Who is that?

 4       A.    I have no idea.

 5       Q.    Did you ever perform any

 6   personal training sessions for Mr. Lyons?

 7       A.    No.

 8       Q.    Do you know if Mr. Lyons was a

 9   member of the Soho club?

10       A.    No.

11       Q.    Do you know why there are

12   personal training sessions on your

13   Performance Commission for Mr. Lyons?

14       A.    No.

15       Q.    Did you receive a commission

16   for those sessions?

17       A.    No, it looks like it's been

18   returned.

19       Q.    Did you initially receive a

20   commission for those sessions?

21       A.    No, it looks like it's been

22   returned.

23       Q.    When you say "it looks like

24   it's been returned", can you refer me to

25   where you're looking at?
```

                                                       134

    1                      ASHDOWN
    2          A.    They were added on and then
    3    minused off.
    4          Q.    Okay, so when were the sessions
    5    entered initially as they were --
    6          A.    Yes.
    7                MR. HARMAN:  Hold on a second.
    8           Finish the question.
    9          Q.    So which dates were the
   10    sessions actually entered into your
   11    account?
   12                MR. HARMAN:  Objection.
   13          A.    The 30th of July.
   14          Q.    When were they reversed out?
   15          A.    The 20th of August.
   16          Q.    Who entered them into your
   17    account on the 30th of July?
   18          A.    I don't know.
   19          Q.    Who reversed them out on the
   20    20th of August?
   21          A.    I don't know.
   22          Q.    Did you review your Performance
   23    Commission Reports at the end of each
   24    month?
   25          A.    Very rarely -- my bonus wasn't

```
 1                   ASHDOWN
 2    affected by this.
 3         Q.    By the way, flipping through
 4    this Performance Commission Report that's
 5    been marked as Exhibit L, have you trained
 6    any of these members since the date of the
 7    termination of your employment with
 8    Equinox?
 9         A.    No.
10         Q.    On any of the pages?
11         A.    No, I referred my clients to
12    other people.
13         Q.    Who did you refer to whom?
14         A.    I can't remember exactly.  I
15    know Carl Johnson went to Jamie.  I also
16    know Ryan Jacoby went to Jamie.
17         Q.    Jamie who?
18         A.    Whitney and Enrico Bonetti
19    trained with Jamie and then Dana and I'm
20    not sure about the others.  I think the
21    rest were actually allocated out.
22         Q.    Who is Jamie?
23         A.    Jamie Whitney, she was another
24    manager in training.  She was another one
25    of my personal trainers and she is now a
```

```
 1                    ASHDOWN
 2    personal training manager at the Printing
 3    House.
 4              MR. BLUNETTI:  You referred to
 5         Dana.  I'm sorry.  Do you know the
 6         last name?
 7              THE WITNESS:  Witdule
 8         (phonetically spelled).
 9              MR. McPARTLAND:  Can I have
10         this marked?
11              (Whereupon, the aforementioned
12         document was marked as Replace
13         Exhibit M for identification, as of
14         this date, by the court reporter.)
15         Q.   Ms. Ashdown, I'm going to show
16    you another document that's been marked as
17    Defendant's Exhibit M.  It's a one-page
18    document with the Bates stamp number EQX-
19    6400.  This document had previously been
20    produced with the designation
21    "confidential, attorney's eyes only" for a
22    certain redaction of member names.  We are
23    removing that designation for purposes of
24    this document only (indicating).
25         A.   Okay, thank you, okay.
```

```
 1                    ASHDOWN
 2      Q.    Do you recognize this document?
 3      A.    No.
 4      Q.    Have you ever seen it before?
 5      A.    No.
 6      Q.    Who is Jacques Levy?
 7      A.    I have no idea.
 8      Q.    Who is Brian Canida?
 9      A.    I have no idea.
10      Q.    Again you don't know who Daniel
11 Lyons is, is that correct?
12      A.    I don't know.
13      Q.    Who is Robert Dwyer?
14      A.    One of my trainers.
15      Q.    Did you ever lend any money to
16 Mr. Dwyer?
17      A.    I did.
18      Q.    How much did you lend him?
19      A.    $200.00.
20      Q.    For what purposes?
21      A.    He didn't have any money to get
22 to work and I needed him to get to work.
23      Q.    Did he pay you back?
24      A.    He did.
25      Q.    How did he pay you?
```

```
 1                        ASHDOWN
 2          A.     Back in cash like I gave it to
 3     him.
 4          Q.     Did you ever lend any money to
 5     any other trainers?
 6          A.     I think I lent money to Corkie
 7     Hobbie.
 8          Q.     How much money did you lend to
 9     Ms. Hobbie?
10          A.     I think it was $50.00.
11          Q.     Did she pay you back?
12          A.     She did.
13          Q.     Did you ever have a social
14     relationship with Mr. Dwyer outside of the
15     club?
16          A.     No, only on the birthday of
17     staff members that I told you about.
18          Q.     Was your employment with
19     Equinox ultimately terminated?
20          A.     (No response.)
21          Q.     Was your employment with
22     Equinox ultimately terminated?
23          A.     Yes.
24          Q.     When did that occur?
25          A.     I believe it was September 1.
```

```
 1                    ASHDOWN
 2         Q.    Who informed you of the
 3    termination?
 4         A.    Matt Plotkin.
 5         Q.    How were you informed?
 6         A.    In person.
 7         Q.    Was there anybody else present?
 8         A.    Lawrence Sanders.
 9         Q.    This was at the club?
10         A.    It was.
11         Q.    Had you been absent from the
12    club in the days prior to that?
13         A.    I was absent a couple of days
14    sick, but I couldn't tell you exactly when
15    those days were leading up to it.
16         Q.    Was that related to your
17    treatment or were you ill in some other
18    way?
19         A.    That's when I told you I
20    couldn't breathe and I had to go to the
21    hospital.
22         Q.    Were you hospitalized at that
23    time?
24         A.    I went into the hospital to the
25    doctor and then I went back to see a
```

1                    ASHDOWN

2    doctor.

3        Q.    Were you admitted to the

4    hospital?

5        A.    I never stayed overnight, no.

6        Q.    Where did you seek treatment?

7        A.    I went to Sloan-Kettering.

8        Q.    During this meeting with Matt

9    Plotkin and Lawrence sanders, what did they

10   tell you and what did you say to them?

11       A.    They told me that they had been

12   pulling my computer and that they believed

13   I had done it.

14       Q.    That you had done what?

15       A.    Pulled the sessions.

16       Q.    What did you say in response?

17       A.    I didn't do it and I even was

18   willing to take a lie detector test to

19   prove it.

20       Q.    Was anything else said during

21   that meeting?

22       A.    Not that I can recall, oh,

23   actually they asked me who I thought had

24   done that and I said that was Mauro.

25       Q.    Did you give them the basis for

```
 1                    ASHDOWN
 2   your belief that it was Mr. Mauro?
 3        A.    It was based on everything that
 4   had happened in the past.
 5        Q.    That's referring to your prior
 6   issues with Mr. Maietta?
 7        A.    My prior issues of false
 8   allegations and fake E-mail addresses and,
 9   yeah.
10        Q.    At any time during that
11   meeting, did you ever complain that you
12   were being unlawfully terminated because of
13   your cancer or your related treatment?
14        A.    No.
15        Q.    Did you ever say that you were
16   being unlawfully terminated because of your
17   gender?
18        A.    No.
19        Q.    Prior to the date of the
20   termination of your employment, did you
21   ever complain to anyone at Equinox that you
22   were being unlawfully discriminated against
23   because of your cancer or your cancer
24   treatment?
25        A.    No.
```

142

1                    ASHDOWN

2        Q.    Did you ever say that you were

3   being unlawfully discriminated against

4   based on your gender at Equinox?

5        A.    I think Mauro didn't like

6   working for a female, yeah.

7        Q.    Did you ever report that to

8   anybody?

9        A.    I think I mentioned it to

10  Lawrence, but I can't recall when.

11       Q.    What exactly did you say to

12  him?

13       A.    I can't recall my exact words.

14       Q.    Following the termination of

15  your employment, did anyone speak to you

16  about remaining as a personal trainer with

17  Equinox?

18       A.    Matt Plotkin offered me a job

19  as he escorted me out of the building.

20       Q.    What did he say to you?

21       A.    He told me to contact Lawrence

22  if I was interested in just having a

23  personal training job.

24       Q.    Did you ever contact Mr.

25  Sanders?

```
 1                    ASHDOWN
 2         A.    No.
 3         Q.    What did you say, if anything,
 4    in response to Mr. Plotkin's offer?
 5         A.    I walked out in tears.
 6         Q.    I'm sorry?
 7         A.    I walked out in tears.
 8         Q.    Did you say anything?
 9         A.    No.
10         Q.    Did you speak with any of the
11    trainers at the club regarding the
12    termination of your employment?
13         A.    I actually texted one of my
14    trainers to tell them that I had left.
15         Q.    What did you say in that text?
16         A.    I actually can't remember.
17         Q.    Do you have a copy of that
18    text?
19         A.    I don't believe I do.
20         Q.    Did you speak with any of the
21    members at the club regarding the
22    termination of your employment?
23         A.    I also let my clients know that
24    I was no longer there.
25         Q.    How did you communicate with
```

```
 1                    ASHDOWN
 2    them?
 3         A.    Via text.
 4         Q.    What exactly did you say in
 5    that text?
 6         A.    I don't recall exactly what I
 7    said.
 8         Q.    Do you have a copy of it?
 9         A.    I don't believe I do.
10         Q.    Since the date of the
11    termination of your employment with
12    Equinox, have you provided personal
13    training sessions to any members or former
14    members of Equinox?
15         A.    No.
16         Q.    Since the date of your
17    termination of your employment, have you
18    had any communications with any other
19    former or current Equinox employees
20    regarding your claims in this action?
21         A.    No.
22         Q.    Have you had any conversations
23    or communications with any former or
24    current members of Equinox regarding any of
25    your claims in this lawsuit?
```

145

```
 1                    ASHDOWN
 2        A.    No.
 3        Q.    Do you meet socially with any
 4   current or former Equinox employees?
 5        A.    Yes, I meet with Bobbie
 6   Carlson, I meet with Jessica Desmond and
 7   Jay Agnelo (phonetically spelled).
 8        Q.    When was the last time you met
 9   with Mr. Agnelo?
10        A.    I saw him around his birthday.
11        Q.    When was that?
12        A.    June.
13        Q.    How many times have you seen
14   him since the termination of your
15   employment?
16        A.    Very few, I would say, three.
17        Q.    When was the last time you met
18   with Jessica Desmond?
19        A.    Two, three months ago.
20        Q.    For what purpose?
21        A.    We had lunch.
22        Q.    How frequently have you met
23   with Ms. Desmond since the date of the
24   termination of your employment?
25        A.    Probably twice, two, three
```

```
 1                    ASHDOWN
 2   times.
 3       Q.    When was the last time you met
 4   with Bobbie Carlson?
 5       A.    Again probably two months ago.
 6       Q.    What was the purpose of that
 7   meeting?
 8       A.    We had lunch.
 9       Q.    Was that with Ms. Desmond?
10       A.    No, it wasn't.  It was with
11   another friend of mine.
12       Q.    How many times have you met or
13   communicated with Mr. Carlson since the
14   date of the termination of your employment?
15       A.    I see him more frequently, but
16   it's probably I see him once every other
17   month.
18       Q.    Other than your self-employment
19   as a personal trainer, have you ever been
20   employed anywhere since your termination of
21   your employment from Equinox?
22       A.    No.
23       Q.    Have you sought employment with
24   anyone?
25       A.    I have.
```

```
 1                    ASHDOWN

 2        Q.    With whom?

 3        A.    Immediately after my

 4   termination I contacted Crunch.  I've also

 5   applied with is it Pro Health or Plus One

 6   and the gym at Credit Suisse.  There are

 7   others, but I can't remember the exact

 8   names of people that I sent my resume off

 9   to.

10        Q.    Were you made any offers of

11   employment?

12        A.    I was at Credit Suisse.

13        Q.    You were offered employment

14   with Credit Suisse?

15        A.    Yes.

16        Q.    Did you accept that employment?

17        A.    I did, but I sought advice from

18   my lawyer and I couldn't do that with my

19   visa.  Actually can I just change that?  I

20   could do that with my visa, but I had to

21   add them on to my visa and they weren't

22   willing to go down that road.

23        Q.    Which visa were you --

24        A.    I only have one.

25        Q.    (Continuing) referring to?
```

```
 1                      ASHDOWN
 2         A.    My only one.
 3         Q.    So you would have to add Credit
 4    Suisse?
 5         A.    I would have to add Credit
 6    Suisse on, which means that they would have
 7    to provide their tax documents and all
 8    their information, and they didn't want to
 9    go down that road.
10         Q.    Did Crunch give you a reason
11    for not accepting your application for
12    employment?
13         A.    In the interview they led me to
14    believe that I had the job.  He said, "If
15    Equinox can do a visa, we can do a visa,"
16    and then they declined saying that that was
17    not possible.
18         Q.    The visa was not possible?
19         A.    The visa application was not
20    possible.
21         Q.    When was that?
22         A.    That was pretty much a few
23    weeks after, maybe two weeks, three weeks.
24    I can't be sure of the exact date.
25         Q.    Just approximately is fine.
```

```
 1                    ASHDOWN
 2              How about Credit Suisse?  When
 3    was that?
 4         A.    Credit Suisse was since I've
 5    been back on my 01 visa.
 6         Q.    How about Plus One?
 7         A.    Plus One I've sent my resume
 8    off to several times and not heard
 9    anything.  The Credit Suisse gym is
10    actually part of Plus One, but it's
11    independent.
12         Q.    Did you file a 2011 tax return?
13         A.    I did.
14              MR. McPARTLAND:  We were
15              supposed to be provided with a copy
16              of that return.  We never received it
17              yet.  Do you have a copy with you?
18              MR. HARMAN:  No, I don't have a
19              copy of it here.
20              MR. McPARTLAND:  We also
21              requested an authorization for the
22              tax returns.  We never received that
23              yet.
24              MR. HARMAN:  Again there is no
25              reason to provide an authorization.
```

```
 1                    ASHDOWN

 2          We can give you the 2011 tax return.

 3          As I said, that's the only tax return

 4          that was filed.  I actually can't

 5          tell you what the status of that is

 6          right now, but I'll look into it this

 7          afternoon and get it to you.

 8              MR. McPARTLAND:  What?  The

 9          status of the 2010 return?

10              MR. HARMAN:  Yes.

11              MR. McPARTLAND:  Yes, but you

12          agreed to provide an authorization as

13          well though.

14              MR. HARMAN:  I did not agree to

15          provide an authorization.

16              MR. McPARTLAND:  So during our

17          phone call you didn't agree to

18          provide an authorization for the

19          returns?

20              MR. HARMAN:  Like I said,

21          there's no reason to provide an

22          authorization, a blank authorization,

23          for tax returns.  The only tax return

24          that my client has filed in the

25          United States is 2011 and I agreed to
```

```
 1                    ASHDOWN
 2          provide that return and I apologize
 3          if it hasn't been provided thus far.
 4          I believe that I have, but as I said,
 5          I'll look into it.
 6   _____
 7          Q.    Did you report any income on
 8   your 2011 tax return other than your income
 9   from Equinox?
10          A.    No.
11          Q.    You have not filed a 2012 tax
12   return?
13          A.    I have sent all the documents
14   off to my accountant and she informed me
15   that I did not need to file a tax return
16   because my relocation costs exceeded the
17   amount of money I earned since staying
18   here.
19          Q.    What documents did you send to
20   your accountant?
21          A.    All my relocation costs, the
22   visa costs, the shipping of all my stuff,
23   the flight costs, I sent all the
24   documentation to them.
25          Q.    Who is your accountant?
```

```
 1                     ASHDOWN
 2        A.    Her name is Barbara Adkins.
 3        Q.    Where is she located?
 4        A.    I can't actually tell you that
 5   because I don't know and I sent them to
 6   her.  I do have her address.  I just don't
 7   have it on me.
 8        Q.    We will leave an open space in
 9   the transcript for you to provide that.
10        A.    Mmhmmm, yes.
11   _____
12        Q.    Have you treated with any
13   mental health providers for any mental
14   anguish --
15        A.    I have.
16        Q.    (Continuing) relating to your
17   termination?
18             MR. HARMAN:  Can you please let
19        him finish the question?
20             THE WITNESS:  Sorry.
21             MR. HARMAN:  Can you read back
22        the question?
23             (Whereupon, the record was read
24        back by the court reporter.)
25        A.    I saw a therapist, what we call
```

```
 1                    ASHDOWN

 2    a counselor in the UK.

 3         Q.    Who is that?

 4         A.    His name is Stephen Islop,

 5    I-S-L-O-P.

 6         Q.    Where is he located?

 7         A.    In Brighton.

 8         Q.    What's the street address?

 9         A.    I would have to get that to

10    you.

11         Q.    Do you have copies of his

12    records?

13         A.    I don't have copies of his

14    records.  I received a bill from him, which

15    is currently in the UK.

16         Q.    The bill, a copy of the bill,

17    is in the UK?

18         A.    Yes.

19         Q.    When did you treat with Mr.

20    Islop?

21         A.    It was in January, February.

22         Q.    For how many sessions?

23         A.    I believe I had ten, twelve.

24         Q.    What were your complaints to

25    him during those sessions?
```

```
 1                    ASHDOWN
 2         A.    I just was miserable.
 3         Q.    During what time period did
 4   these ten to twelve sessions occur?
 5         A.    January, February.
 6         Q.    Of which year?
 7         A.    2012.
 8         Q.    Did you treat with any other
 9   mental health professionals?
10         A.    No.
11               MR. HARMAN:  I just want to
12         resolve something.
13               THE WITNESS:  Of course.
14               MR. HARMAN:  Can we go off the
15         record?
16               (Whereupon, the discussion was
17         held off the record.)
18               MR. HARMAN:  Let the record
19         reflect that the plaintiff has
20         acknowledged that she doesn't have a
21         copy of her 2011 tax return and that
22         I've advised defendant's counsel that
23         we will be providing a tax
24         authorization either today or
25         tomorrow to defendant's counsel for
```

```
 1                    ASHDOWN
 2         the United States tax return.
 3    _____
 4         Q.    Can you describe in your own
 5    words how the termination of your
 6    employment and the alleged discrimination
 7    has caused you mental anguish?
 8         A.    It's horrible.  This was my
 9    dream.  Moving to America was my dream.
10    Not only had it been my dream for ten
11    years, it was my mom's dying wish that I
12    fulfill my dream and I come here.  I pride
13    myself personally on doing the best I can.
14    I work hard.  I would not have jeopardized
15    my job, my life, my dream and especially my
16    mother's wishes on doing something that I
17    didn't do and I don't like being accused of
18    something I did not do.  It's made me
19    miserable.  It's made me financially
20    unstable because I've had to repay all
21    these fees again and I've been unemployed.
22    I feel I'm under a lot of stress and my
23    dream is shattered.  It's not been a
24    pleasant situation or experience in the
25    slightest.
```

```
 1                    ASHDOWN
 2          MR. HARMAN:  Let's go back on
 3     the record for a second.
 4          MR. McPARTLAND:  We've been on
 5     the record.
 6          MR. HARMAN:  If you wouldn't
 7     mind just following up with an E-mail
 8     and telling me exactly what it is
 9     that you're requesting today so that
10     we can be on the same page.
11          MR. McPARTLAND:  Yes, we're
12     going to do that.
13          MR. HARMAN:  Usually I'm a
14     pretty good note taker, but I just
15     want to make sure given the short
16     amount of that time that we have to
17     complete all of this that you and I
18     have the same understanding of what
19     it is in addition to what you've
20     requested and what we've agreed to
21     provide to you or what have you.
22          MR. McPARTLAND:  We'll put all
23     our requests in writing.
24          MR. HARMAN:  Thank you.
25          MR. McPARTLAND:  Off the
```

```
 1                    ASHDOWN
 2        record.
 3              (Whereupon, the discussion was
 4         held off the record.)
 5        Q.    With respect to your clients to
 6   whom you were providing personal training
 7   services, where are you performing those
 8   personal training sessions?
 9        A.    Primarily down here in the
10   financial district.
11        Q.    At which location?
12        A.    It's not in a gym.  It's in
13   gyms in their buildings.
14        Q.    At which buildings?
15        A.    15 Broad Street, 37 Wall
16   Street, 280 Rector Place, now you're asking
17   me and then I train people at the upper
18   east side and I have to come back to you
19   with all the locations.  There's a gym that
20   I take clients to and I pay a fee.
21        Q.    Where is that?
22        A.    It's on 59th between First and
23   Second.
24        Q.    What's the name of it?
25        A.    Strive.
```

```
 1                    ASHDOWN

 2       Q.    Are you a member of it?

 3       A.    You get membership when you

 4  train people there and I have a client on

 5  56th and Sutton Place, but I don't know the

 6  number of the building.  I just know where

 7  it is.  I have a client on 56th and First.

 8  Again I don't know the number of the

 9  building.  I just know where it is.

10       Q.    Do you have a client named

11  Maria Elena?

12       A.    I do.

13       Q.    What is her last name?

14            MR. HARMAN:  Hold on a second

15       because Equinox hasn't provided the

16       last names of any of its clients and

17       Ms. Ashdown is concerned about the

18       confidentiality of her clients, and

19       unless there's any legitimate reason

20       related to this lawsuit, for her to

21       reveal the last names of her clients,

22       we're going to maintain the

23       confidentiality of their last names.

24            MR. McPARTLAND:  So you're

25       letting her answer the question?
```

```
  1                        ASHDOWN
  2              MR. HARMAN:  I'm instructing
  3         her not to answer the question.
  4         That's correct.
  5              MR. McPARTLAND:  You're
  6         instructing her not to answer the
  7         question?
  8              MR. HARMAN:  With respect to
  9         the last names, I believe the first
 10         names of all her clients have been
 11         provided.  If there is some reason
 12         why you would need the last names of
 13         the clients, please let me know and
 14         we can have a discussion about it off
 15         the record and try to resolve it.
 16              MR. McPARTLAND:  Well, we can
 17         call the magistrate because this is
 18         obviously relevant to the litigation.
 19         I mean these are people that have
 20         knowledge regarding what they've paid
 21         her --
 22              MR. HARMAN:  I understand.
 23              MR. McPARTLAND:  (Continuing)
 24         for personal training sessions.
 25              MR. HARMAN:  We've redacted all
```

```
 1                      ASHDOWN

 2        the names of the clients in your

 3        production and maintained a blanket

 4        confidentiality of the last names of

 5        your client's clients for the

 6        purposes of maintaining their

 7        confidentiality.  My client is doing

 8        the exact same thing that your client

 9        is doing.  She's maintaining the

10        privacy and confidentiality of her

11        clients.  If you need additional

12        information, identify that.  Lay a

13        foundation for it.  Let me know and

14        I'll work with you to resolve that.

15        If you intend on serving anybody with

16        Subpoenas, let me know and we'll

17        raise it with the magistrate.

18             MR. McPARTLAND:  Well, we

19        can't.  First of all, we can't serve

20        anybody with a Subpoena without their

21        last name and last known address, so

22        that's impossible.

23             MR. HARMAN:  Are you intending

24        to serve anybody with a Subpoena?

25             MR. McPARTLAND:  I just want
```

```
 1                    ASHDOWN
 2       their names and addresses.
 3            MR. HARMAN:  I am maintaining
 4       the same confidentiality as you
 5       asserted.
 6            MR. McPARTLAND:  Yes, but that
 7       doesn't apply here because this is a
 8       mitigation issue.  The names that
 9       we've redacted, which we've already
10       spoken to, are only members that have
11       nothing to do with this lawsuit, so
12       this goes directly to mitigation.  I
13       mean these people have knowledge as
14       to what they've paid Ms. Ashdown.  I
15       mean we have no records regarding
16       that at this point other than some of
17       these square down records, but there
18       have been other payments as well.
19            MR. HARMAN:  You have all day
20       to ask her questions about what she's
21       been paid, how she's been paid and
22       the names of her clients.
23            MR. McPARTLAND:  Well, she
24       hasn't provided the names of her
25       clients.  That's all I'm looking for.
```

```
 1                    ASHDOWN
 2            MR. HARMAN:  Alright, if you
 3        want to stipulate to keeping these
 4        names confidential for the purposes
 5        of this litigation only and not
 6        revealing them outside of the context
 7        of this litigation and not contacting
 8        them without first contacting my
 9        office and giving my office notice
10        that you intend to contact them, then
11        I will allow her to answer the
12        question.
13            MR. McPARTLAND:  I'm not sure I
14        understand all the conditions.
15            MR. HARMAN:  Can you please
16        read it back?
17            MR. McPARTLAND:  No, no, no, I
18        don't need her to read it back.
19        Let's just talk it out.  So if I plan
20        to subpoena any of these people, I
21        will not disclose these names.  If I
22        plan to subpoena these people, which
23        I have to do under the Federal rules
24        anyway, I'll send the proposed
25        Subpoena to your office and you'll
```

```
 1                    ASHDOWN
 2        have notice and I'll agree not to
 3        serve the Subpoena until you have had
 4        a reasonable opportunity to move to
 5        quash them.
 6             MR. HARMAN:  Well, by that I
 7        mean at least five business days.
 8             MR. McPARTLAND:  Sure, I'm
 9        willing to do that.  I'll do that.
10             MR. HARMAN:  Okay.
11             MR. McPARTLAND:  Okay, but
12        that's the only condition.
13             MR. HARMAN:  If you will
14        contact any of these people, you
15        won't use the information for any
16        other purpose other the defense of
17        this litigation, --
18             MR. McPARTLAND:  Okay.
19             MR. HARMAN:  (Continuing) and
20        if you intend to serve a Subpoena on
21        any of these individuals, you will
22        provide me with a draft copy of it
23        and give me five business days or one
24        week before you've actually served
25        the Subpoena so that I can have an
```

```
 1                        ASHDOWN
 2          opportunity to quash it prior to its
 3          service if I believe it's improper.
 4                  MR. McPARTLAND:  Okay, I'll
 5          agree to that.
 6                  MR. HARMAN:  Okay?
 7                  MR. McPARTLAND:  Sure, okay.
 8          Q.     What is Maria        last
 9    name?
10          A.     English.
11          Q.     Where does she reside?
12          A.     She's the one on 56th and
13    Sutton Place.  I couldn't tell you the name
14    of the building.
15          Q.     Do you have her address in your
16    records?
17          A.     I will, yes.
18          Q.     What is Paris's last name?
19          A.
20          Q.     Where does Ms.        reside?
21          A.     15 Broad Street.
22          Q.     Who is Erica's last name?
23          A.
24          Q.     Where does        reside?
25          A.     37 Wall Street.
```

```
 1                        ASHDOWN

 2        Q.    What is Angeline's last name?

 3        A.    ███████████████

 4        Q.    Where does █████████ reside?

 5        A.    79th between First and Second.

 6        Q.    Do you have her street

 7   address --

 8        A.    No.

 9        Q.    (Continuing) somewhere on your

10   records?

11        A.    Yes, I do.

12        Q.    What is Kelly's last name?

13        A.    ████████ (phonetically

14   spelled).

15        Q.    I'm sorry?

16        A.    ███████████

17        Q.    Where does █████████ reside?

18        A.    On 58th and Sutton Place.

19        Q.    Do you have her street address

20   in your records?

21        A.    Yes.

22        Q.    What is Melissa's last name?

23        A.    ████████ (phonetically spelled).

24        Q.    Where does █████████ reside?

25        A.    56th and Sutton Place.
```

```
1                      ASHDOWN
2          Q.    You have her address in your
3     records?
4          A.    Yes.
5          Q.    What is Tommy last name?
6          A.    ███████ (phonetically spelled).
7          Q.    Where does ████████ reside?
8          A.    London Terrace.
9          Q.    Where?
10         A.    23rd between Ninth and Tenth,
11    it takes up the whole block.
12         Q.    That's the street address
13    though?
14         A.    Yes.
15         Q.    What is Carlos's last name?
16         A.    ██████ he's actually a friend
17    of mine.
18         Q.    Where does ███████ reside?
19         A.    Harlem somewhere.
20         Q.    Do you have his address?
21         A.    No, he's a friend of mine.  I
22    just train him.  He's a friend of mine.
23    I've been training him free.
24         Q.    Does he compensate you?
25         A.    He pays the fee to get into the
```

```
 1                         ASHDOWN
 2      gym.  I pay them and he pays me.
 3             Q.    What is Nadia's last name?
 4             A.    Nadia.
 5             Q.    Nadia?
 6             A.    Yes, it's ███████
 7             Q.    Where does she reside?
 8             A.    8 Spruce Street.
 9             Q.    What is Rick's last name?
10             A.    Oh, ██████
11             Q.    I'm sorry?
12             A.    ████████████
13             Q.    Where does ██████ reside?
14             A.    Morton Street, I think it's
15      number 1 Morton Street, Morton Square.
16             Q.    What is Mona's last name?
17             A.    Now that's ██████ I think.
18             Q.    Is that ████████
19             A.    Yeah.
20             Q.    Do you have the correct
21      spelling of her last name and her address?
22             A.    In my records, yes.
23             Q.    What is Christina's last name?
24             A.    ████████ (phonetically
25      spelled).
```

```
 1                          ASHDOWN
 2          Q.      Where does ████████ reside?
 3          A.      77th between Second and Third,
 4     77th.
 5          Q.      Do you have her street address
 6     in your records?
 7          A.      I do.
 8          Q.      Other than this list of names
 9     that we've just gone through, have you
10     trained any other clients since the date of
11     the termination of your employment with
12     Equinox?
13          A.      No.
14          Q.      With respect to Maria ████
15     how frequently have you trained her?
16          A.      I used to see her twice a week.
17     I don't train her anymore.
18          Q.      During what time period would
19     you see her two times a week?
20          A.      I saw her for twelve weeks.
21          Q.      During what time period?
22          A.      She stopped training with me
23     the end of July.
24          Q.      How did she pay you?
25          A.      She paid by square.
```

```
 1                    ASHDOWN
 2       Q.    What did she pay you?
 3       A.    She paid a hundred dollars a
 4  session, so she bought two packets of
 5  twelve.
 6       Q.    With respect to Cara, with what
 7  frequency have you trained her?
 8       A.    I see her twice a week.
 9       Q.    For how long have you been
10  doing that?
11       A.    A while, I couldn't give you an
12  exact time frame.
13       Q.    Has it been more than a month?
14       A.    Yeah, it has been much longer
15  than a month.  She has bought like four
16  courses.
17       Q.    Are you currently training her?
18       A.    Not right now, she's having a
19  break until the 10th.
20       Q.    What does she pay for personal
21  training sessions?
22       A.    Actually Cara I only charge
23  $45.00 a session because she's a friend of
24  mine.
25       Q.    How does she pay you?
```

```
 1                      ASHDOWN
 2        A.     She pays by check.
 3        Q.     Erica, how frequently have you
 4   trained her since the termination of your
 5   employment?
 6        A.     That was once a week
 7   infrequently.  She used to pay by square
 8   and her dad has just paid for her to have
 9   twelve sessions.
10        Q.     How much did he pay for that?
11        A.     I think it was eighty-five or
12   ninety a session and now she's training
13   three times a week.
14        Q.     Has she paid $85.00 to $90.00 a
15   week a session for all of her sessions?
16        A.     Yes.
17              MR. BLUNETTI:  So we're up to
18         Cara?
19              THE WITNESS:  We've done her.
20         We've done her.
21              MR. McPARTLAND:  I'm sorry?
22              MR. BLUNETTI:  What about
23         Angeline?
24        Q.     What about Angeline?
25        A.     Angeline's so infrequent, I
```

```
 1                    ASHDOWN
 2   don't know from one week to the next when
 3   the next time is I'm seeing her.  She
 4   cancels all the time every single week.
 5        Q.    How long have you been training
 6   her?
 7        A.    Not very long, well, the first
 8   time was three months ago.  I've probably
 9   seen her five times since.  She is the most
10   infrequent person I've ever had.
11        Q.    How much does she pay per
12   session?
13        A.    The same ninety.
14        Q.    How about Kelly?
15        A.    Ninety.
16        Q.    How long have you been training
17   her?
18        A.    Pretty much since I think I
19   started training her in January, February.
20        Q.    Of 2013?
21        A.    Yeah, I haven't seen her the
22   whole summer.  She's in London.
23        Q.    How frequently did you train
24   her prior to that?
25        A.    She was sporadic too, sometimes
```

172

```
 1                    ASHDOWN
 2     twice a week, sometimes once a week,
 3     sometimes none, sometimes three.  It
 4     depended on whether she was around and what
 5     she was doing with work.
 6          Q.    How about Melissa?
 7          A.    Melissa, I haven't seen her the
 8     whole summer again.  She's away.  She was
 9     twice a week.
10          Q.    For how long?
11          A.    She did one course of twelve.
12     She'll start again in a couple of weeks.
13          Q.    How much does she pay?
14          A.    She pays $90.00 a session.
15          Q.    How does she pay?
16          A.    She pays per square.
17          Q.    How does Kelly pay for hers?
18          A.    She pays by check.
19          Q.    Just in case I didn't ask,
20     Angeline?
21          A.    Angeline is check.
22          Q.    Angeline is check?
23          A.    Mmhmmm, yes.
24          Q.    Tommy?
25          A.    Tommy pays by check.
```

```
 1                         ASHDOWN

 2        Q.     How much does he pay?

 3        A.     He's a new client.  I've only

 4   had three sessions with him, four sessions

 5   with him.  He's new and he's also very

 6   sporadic, so I don't see him from one week

 7   to the next.

 8        Q.     How long ago have you been

 9   training with him the first time?

10        A.     The first time must have been a

11   couple of months ago and it's been so

12   sporadic.  It's I never know.

13        Q.     How about Carlos?

14        A.     Carlos I'll see two, three

15   times a week for an eight-week period.

16   He's also currently away.  I'm not sure

17   whether he's going to stop or continue

18   training when he gets back.

19        Q.     What do you charge him?

20        A.     Again he is my friend.  He pays

21   $60.00 an hour.

22        Q.     How does he pay?

23        A.     He pays by check.

24        Q.     How about Nadia?

25        A.     Nadia?
```

```
 1                    ASHDOWN

 2        Q.     Nadia rather.

 3        A.     She pays by square.

 4        Q.     How long have you been training

 5   her?

 6        A.     She is also new.  She is on her

 7   second session of twelve.

 8        Q.     What does she pay per session?

 9        A.     Ninety.

10        Q.     How about Rick?

11        A.     Rick is also new.  He pays by

12   square.  He pays individual sessions of

13   ninety.

14        Q.     How long have you been training

15   him and how frequently?

16        A.     Again it's very sporadic.  We

17   go on a weekly basis.  There is no set

18   schedule with him.  It's as and when he

19   fits in and I've pretty much done about

20   three or four sessions with him and that's

21   it.

22        Q.     How about Mona?

23        A.     Mona is I train her with her

24   friend, the two of them together, but don't

25   ask me to pronounce the other girl's name.
```

```
 1                    ASHDOWN
 2     I can't pronounce it myself, Anyona, Anjona
 3     (phonetically spelled).
 4          Q.    So it's somebody that's not on
 5     this list?
 6          A.    Huh?
 7          Q.    It's somebody that's not on
 8     this list?
 9          A.    Actually Mona is the one that
10     pays me.
11          Q.    Yes, but she pays you for two
12     people?
13          A.    Yeah, they split it so Anyona.
14          Q.    How much does Mona pay you for
15     her and her friend?
16          A.    Ninety.
17          Q.    Ninety each?
18          A.    No, ninety between them because
19     I train them outside.
20          Q.    How frequently do they train?
21          A.    Ideally twice a week but with
22     vacation it's been once.
23          Q.    How long have they been
24     training with you?
25          A.    A few weeks.
```

```
 1                    ASHDOWN
 2       Q.    How about Christina?
 3       A.    Christina is twice a week when
 4  she's around and that's been a few months.
 5       Q.    How does Christina pay you?
 6       A.    She pays by square.
 7       Q.    How does Mona pay you?
 8       A.    She pays by square.
 9       Q.    You've never taken any cash
10  payments from any of these people for any
11  personal training sessions?
12       A.    No.
13       Q.    This is the entire list of
14  persons that you've been training since
15  your termination of your employment at
16  Equinox?
17       A.    I believe so.  Can I take a
18  look at that list?
19       Q.    Sure, I think I have a copy
20  here.
21            MR. BLUNETTI:  The amended, yes
22         (indicating).
23            MR. McPARTLAND:  We might as
24         well mark this actually.
25            (Whereupon, the aforementioned
```

```
 1                        ASHDOWN
 2          document was marked as Defendant's
 3          Exhibit N for identification, as of
 4          this date, by the court reporter.)
 5          Q.    Ms. Ashdown, I'm going to hand
 6     you an eight-page document that has been
 7     marked as Defendant's Exhibit N.  It's got
 8     the caption of the case.  It's entitled
 9     Plaintiff's Amended Responses to
10     Defendants' First Request for the
11     Production of Documents and Defendants'
12     First Set of Interrogatories and I'm going
13     to ask you to review the amended
14     interrogatories on the beginning of page 6
15     until the end of that document
16     (indicating).
17          A.    Okay, I don't know what the
18     questions are, so --
19               MR. HARMAN:  Just review the
20          interrogatories response from page 6
21          to the end and then he'll ask you
22          whatever question he wants to ask
23          you.
24               THE WITNESS:  Okay, sorry,
25          okay.
```

```
 1                    ASHDOWN
 2        Q.    Have you ever seen those
 3   responses before?
 4        A.    I have.
 5        Q.    When did you last see them?
 6        A.    Yesterday.
 7        Q.    Did you see them at any time
 8   prior to that?
 9        A.    Not that I recall.
10        Q.    Have you ever signed a
11   Verification swearing that they're true and
12   correct?
13        A.    I have.
14             MR. McPARTLAND:  We have not
15         received that Verification.  Do you
16         have a copy with you?
17             MR. HARMAN:  Well, I'll have it
18         sent to you.
19   _____
20        Q.    When did you sign that
21   Verification?
22        A.    Last week, I believe.
23        Q.    Referring to the response to
24   interrogatory number nineteen on page 8,
25   there are a number of individuals listed
```

```
 1                    ASHDOWN
 2    there?
 3         A.    Yeah.
 4         Q.    Is that a full and complete
 5    list of every single person you provided
 6    personal training services to since the
 7    date of the termination of your employment
 8    with Equinox?
 9         A.    I'm trying to think of my
10    schedule.  Can we add Anyona on with Mona?
11    I'm sorry.  I'm just trying to think of my
12    schedule in my head.  I believe it is.  I'm
13    sorry.  I do believe it is.
14         Q.    How did you come up with this
15    list?
16         A.    I originally went off the top
17    of my head.
18         Q.    Did you ever look at your
19    contacts?
20         A.    Not at the time, no.
21         Q.    Did you do any other
22    investigation other than just coming up
23    with this list off the top of your head and
24    looking at your records?
25         A.    No, but I can forward you any
```

```
 1                    ASHDOWN

 2    additional people.

 3         Q.    We'll leave a space in the

 4    record.

 5         A.    Okay.

 6         Q.    So you'll review your records?

 7         A.    I will review my schedule and I

 8    can forward you any records of anybody that

 9    is missing.  I don't believe there is, but

10    I will look again.

11    _____

12         Q.    Who is Whitney Arnold?

13         A.    She's a friend of mine.

14         Q.    Do you have any business

15    relationship with her ever?

16         A.    No, she's a friend of mine for

17    years.

18         Q.    Who is Martha █████?

19         A.    She used to be a client.

20         Q.    Where?

21         A.    In Equinox.

22         Q.    Have you had any contact with

23    her since the date of your termination of

24    your employment?

25         A.    Yes, I asked her to write that
```

```
 1                      ASHDOWN
 2    letter.
 3         Q.    Did you provide her with any
 4    personal training sessions?
 5         A.    No.
 6         Q.    Who is Michelle Harding?
 7         A.    She used to be a friend of mine
 8    who used to live here in New York.  She
 9    moved now back to the UK.
10         Q.    She currently resides in the
11    UK?
12         A.    She does.
13         Q.    Have you ever provided her with
14    any personal training sessions?
15         A.    No.
16         Q.    Who is Enrico ███████?
17         A.    A previous client of mine.
18         Q.    Where?
19         A.    At Equinox.
20         Q.    Have you been in contact with
21    ███████████ since your termination at
22    Equinox?
23         A.    Yes.
24         Q.    For what purpose?
25         A.    He's my friend.
```

```
 1                        ASHDOWN
 2          Q.    Do you provide him with any
 3    personal training sessions?
 4          A.    No, he trains with Jenelle
 5    Stevens (phonetically spelled) who used to
 6    work at Equinox.
 7          Q.    Who is Dean Williams?
 8          A.    He's a friend.
 9          Q.    Do you have any business
10    relationship with him?
11          A.    No.
12          Q.    Have you ever provided him with
13    personal training services?
14          A.    No.
15          Q.    Who is Ceirin?
16          A.    Ceirin.
17          Q.    Cassel?
18          A.    Cassel.
19          Q.    Who is she?
20          A.    It's a he.
21          Q.    He, I'm sorry, who is he?
22          A.    He's a friend of mine.
23          Q.    Have you ever provided him with
24    any personal training sessions?
25          A.    No.
```

```
 1                    ASHDOWN
 2        Q.    Are any in this list former
 3   members of Equinox?
 4        A.    No.
 5              MR. McPARTLAND:  Can we have
 6         this marked, please?
 7              (Whereupon, the aforementioned
 8         document was marked as Defendant's
 9         Exhibit O for identification, as of
10         this date, by the court reporter.)
11        Q.    Ms. Ashdown, I'm going to show
12   you an eight-page document dated August 2,
13   2013 entitled Plaintiff's Response to
14   Defendants' First Set of Interrogatories
15   and it has the caption in this case and
16   I'll ask you to take a look at this
17   document (indicating).
18        A.    Okay, you want me to read the
19   whole thing?
20        Q.    Sure.
21        A.    Okay.
22        Q.    Have you ever seen this
23   document before?
24        A.    Yeah.
25        Q.    When did you first see this
```

184

```
 1                    ASHDOWN
 2   document?
 3        A.    I can't give you an exact date.
 4        Q.    Was it before August 2 of 2013?
 5        A.    I couldn't tell you.
 6        Q.    Did you send a Verification --
 7        A.    Yes, I did.
 8        Q.    (Continuing) for this
 9   particular document?
10        A.    Mmhmmm, yes.
11        Q.    When did you sign that
12   Verification?
13        A.    Last Thursday, I believe, last
14   Wednesday, last Thursday.
15             MR. McPARTLAND:  Have you
16        forwarded that to us?
17             MR. HARMAN:  Can we go off the
18        record?
19             (Whereupon, the discussion was
20        held off the record.)
21        Q.    To your recollection, did you
22   sign one or more than one Verification?
23        A.    I've signed one.
24        Q.    One?
25        A.    Yeah.
```

```
 1                   ASHDOWN
 2        Q.    When was that?
 3        A.    I believe the one I signed was
 4   last week.
 5        Q.    Didn't you previously testify
 6   that you signed one yesterday as well?
 7        A.    I don't remember signing one
 8   yesterday.  Maybe I did.
 9             MR. HARMAN:  I think her
10        previous testimony was that she
11        signed one last week, but the record
12        will be what it will be.
13             MR. McPARTLAND:  Okay.
14        Q.    I am going to refer you to item
15   number twenty-one on this document.
16        A.    Okay.
17        Q.    Response number twenty-one,
18   which is a list of purported damages.
19        A.    Yes.
20        Q.    I'm going to refer you to item
21   two, which is physical therapy sessions for
22   $48,051.00.
23        A.    No, that's personal training
24   sessions, but I am right as to PT, meaning
25   personal training.  Here PT means physical
```

```
 1                    ASHDOWN
 2    therapy, so that's just a miscommunication.
 3         Q.    So $48,051.00 is how much
 4    you've earned?
 5         A.    How much I, no, how much I
 6    would have earned in personal training
 7    sessions.
 8         Q.    Did you build this list on your
 9    own?
10         A.    Huh?
11         Q.    Did you build this list?
12         A.    Yes.
13         Q.    How did you calculate that
14    number?
15         A.    It would have been between when
16    I left till when I came back on what I
17    would have earned, on what I was delivering
18    as opposed to what I would have been paid
19    per session per hour.
20         Q.    What records did you rely on to
21    build this number?
22              MR. HARMAN:  Objection.
23         Q.    If any.
24         A.    What I knew I delivered on a
25    monthly basis.
```

```
 1                      ASHDOWN
 2         Q.    Did you look at any documents
 3    to figure that out?
 4         A.    No, but I was targeted to train
 5    on ten hours a week and I think that's what
 6    I based it on.
 7         Q.    With respect to your bonus, how
 8    is this number calculated?
 9         A.    Again that was the smallest
10    amount of bonus I could have achieved on
11    hitting the target.
12         Q.    Did you rely on any documents
13    to calculate that figure?
14         A.    I actually took the figures off
15    the document you showed me earlier, which
16    is the compensation document.
17         Q.    With respect to your quarterly
18    bonus, how is that calculated?
19         A.    Again off that same document.
20         Q.    With respect to the medical
21    bills since April of 2010?
22         A.    I have copies of the medical
23    bills and that's me converting it from
24    pounds into dollars, so that was from the
25    conversion rate at that time.
```

```
 1                    ASHDOWN
 2        Q.    What time period are these
 3   medical bills?  These medical bills are
 4   from April of 2010?
 5        A.    Yes.
 6        Q.    Who has paid these bills?
 7        A.    Me and a friend of my friend's
 8   dad paid some of them for me and I borrowed
 9   some money from a friend.  I've also
10   re-mortgaged my house in the UK.
11        Q.    Where are these medical bills?
12        A.    I can get copies of those.
13        Q.    Where are they currently
14   located?
15        A.    In the UK.
16            MR. McPARTLAND:  We'll put that
17         request in writing.
18   _____
19        Q.    Relocating, what does this
20   number represent?
21        A.    It's the cost of moving,
22   shipping all my belongings over here.
23        Q.    From which time period?
24        A.    This is initially.
25        Q.    So to join Equinox?
```

```
 1                    ASHDOWN
 2        A.    Mmhmmm, yes.
 3        Q.    Your relocating costs to join
 4   Equinox?
 5        A.    Yes.
 6        Q.    What documents do you base that
 7   number on?
 8        A.    That I can't recall what I
 9   based it on.
10        Q.    Do you have any documents?
11        A.    I can go back and get that
12   information.
13        Q.    What is the new visa item?
14        A.    It is what had to be paid to
15   apply for a new visa.
16        Q.    What documents do you have to
17   support that number?
18        A.    I can get a bill from my
19   lawyer.
20        Q.    What is new relocation?
21        A.    That's the cost of moving back
22   here.
23        Q.    What documents do you have to
24   prove that?
25        A.    I have shipping costs.  I have
```

```
 1                     ASHDOWN
 2    a receipt from the shipper.
 3         Q.    When was that move to come back
 4    here?
 5         A.    October.
 6         Q.    Of 2012?
 7         A.    It is, yeah.
 8         Q.    What are counseling and therapy
 9    bills?
10         A.    That's what was discussed
11    earlier, which was the counselor that I had
12    to go through.
13         Q.    Where are those documents
14    located?
15         A.    In the UK.
16         Q.    Do you have them in your
17    personal possession?
18         A.    I don't know.
19         Q.    What is the storage in London?
20         A.    That's actually storage here
21    for some of the belongings that I put in
22    storage here while I was in London.  That
23    was at Manhattan Mini Storage.
24         Q.    Do you have copies of those
25    bills?
```

```
 1                        ASHDOWN
 2         A.     I can get a copy of the bill.
 3                MR. McPARTLAND:  Off the
 4         record.
 5                (Whereupon, the discussion was
 6         held off the record.)
 7                MR. McPARTLAND:  I don't have
 8         anything further.
 9                (Whereupon, at 2:40 P.M., the
10         examination of this witness was
11         concluded.)
12
13
14                _____
                         KERRY ASHDOWN
15
       Subscribed and sworn to before me
16
       this _____ day of _____, 20__.
17
18     _____
            NOTARY PUBLIC
19
20
21
22
23
24
25
```

```
 1                       ASHDOWN
 2                 E X H I B I T S
 3    DEFENDANT'S EXHIBITS:
 4    EXHIBIT    EXHIBIT                    PAGE
 5    NUMBER     DESCRIPTION
 6    A          Square Dashboard
 7               Payments                   18
 8    B          Employment Agreement       38
 9    C          Harassment Policy          39
10    D          Receipt of Employee
11               Handbook                   40
12    E          Letter dated February 9,
13               2011                       41
14    F          Compensation Plan -
15               Kerry Ashdown              42
16    G          E-mail dated July 25,
17               2011                       80
18    H          E-mails dated August 1,
19               2011 and July 29, 2011     87
20    I          Resume                     90
21    J          E-mail dated August 1,
22               2011                       93
23    K          E-mails dated July 6,
24               2011 and July 5, 2011      107
25    L          Performance Commission     129
```

```
 1                        ASHDOWN

 2                   E X H I B I T S

 3   DEFENDANT'S EXHIBITS:

 4   EXHIBIT    EXHIBIT                    PAGE

 5   NUMBER     DESCRIPTION

 6   M          Pulled Sessions Report    136

 7   N          Plaintiff's Amended

 8              Responses to Defendants'

 9              First Request for the

10              Production of Documents

11              and Defendants' First

12              Set of Interrogatories    176

13   O          Plaintiff's Response to

14              Defendants' First Set of

15              Interrogatories           183

16

17

18

19

20

21

22

23

24

25
```

```
 1                    ASHDOWN

 2      INFORMATION AND/OR DOCUMENTS REQUESTED

 3    INFORMATION AND/OR DOCUMENTS         PAGE

 4    Name of Gayle Oshrin's law firm

 5    and address                         10

 6    2011 tax return                     151

 7    Barbara Adkins' address`            152

 8    Tax authorization for the United

 9    States tax return                   155

10    Signed Verification                 178

11    List of any other persons that were

12    provided personal training services

13    since the date of the termination

14    of employment with Equinox          180

15    Medical bills                       188

16

17

18

19

20

21

22

23

24

25
```

```
 1                      ASHDOWN
 2              C E R T I F I C A T E
 3
 4    STATE OF NEW YORK          )
                          :  SS.:
 5    COUNTY OF KINGS            )
 6
 7         I, MAY JEAN WU, a Notary Public for
 8    and within the State of New York, do hereby
 9    certify:
10         That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14         I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 30th day of August, 2013.
21
22
23    _____
24                 MAY JEAN WU
25
```