```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  -------------------------------------------------x

 3  KERRY ASHDOWN,
                        Plaintiff,
 4
          -against-          Case No.
 5                           13 CV 1374 (HB)(GWG)

 6  EQUINOX a/k/a EQUINOX FITNESS CLUB and incorporated
    as EQUINOX HOLDINGS,  INC., JOE MATARAZZO a/k/a
 7  JOSEPH MATARAZZO, MAURO MAIETTA, LAWRENCE SANDERS,
    MATT PLOTKIN a/k/a MATTHEW PLOTKIN, AND MATT HERBERT
 8  a/k/a MATTHEW HERBERT,
                        Defendants.
 9  -------------------------------------------------x

10

11                DEPOSITION OF

12                MAURO MAIETTA

13             NEW YORK, NEW YORK

14             SEPTEMBER 10, 2013

15

16

17

18

19

    ATKINSON-BAKER, INC.
20    COURT REPORTERS

21    (800) 288-3376
      www.depo.com
22
    REPORTED BY:  RENATE REID, RPR
23  FILE NO. A70997F

24

25
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------------x

 3   KERRY ASHDOWN,
                          Plaintiff,
 4
          -against-           Case No.
 5                            13 CV 1374 (HB)(GWG)

 6   EQUINOX a/k/a EQUINOX FITNESS CLUB and incorporated
     as EQUINOX HOLDINGS,  INC., JOE MATARAZZO a/k/a
 7   JOSEPH MATARAZZO, MAURO MAIETTA, LAWRENCE SANDERS,
     MATT PLOTKIN a/k/a MATTHEW PLOTKIN, AND MATT HERBERT
 8   a/k/a MATTHEW HERBERT,
                          Defendants.
 9   ----------------------------------------x

10                          September 10, 2013

11                          10:04 a.m.

12

13     Deposition of MAURO MAIETTA, held at The Harman

14   Firm, PC, 200 West 57th Street, New York, New York,

15   before Renate Reid, Registered Professional Reporter

16   and Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25
```

```
1    A P P E A R A N C E S:

2

3      THE HARMAN FIRM, PC

4      Attorneys for Plaintiff

5           200 West 57th Street

6           Suite 900

7           New York, N.Y. 10019

8      BY:  WALKER G. HARMAN, JR., Esq.

9

10

11     LAROCCA HORNIK ROSEN GREENBERG & BLAHA, LLP

12     Attorneys for Defendants

13          40 Wall Street, 32nd Floor

14          New York, N.Y. 10005

15     BY:  PATRICK T. MCPARTLAND, Esq.

16

17

18

19

20

21

22

23

24

25
```

```
1                    IT IS HEREBY STIPULATED AND AGREED, by and
2             between counsel for the respective parties
3       hereto, that the filing, sealing and certification of
4       the within deposition shall be and the same are
5       hereby waived;
6                    IT IS FURTHER STIPULATED AND AGREED that
7       all objections, except as to the form of the
8       question, shall be reserved to the time of the trial;
9                    IT IS FURTHER STIPULATED AND AGREED that
10      the within deposition may be signed before any Notary
11      Public with the same force and effect as if signed
12      and sworn to before the Court.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    M A U R O   M A I E T T A, called as a witness,

 2    having been first duly sworn by the Notary Public, was

 3    examined and testified as follows:

 4

 5    EXAMINATION BY

 6    BY MR. HARMAN:

 7              Q.  Good morning.

 8              A.  Good morning.

 9              Q.  Could you please state your name and

10         address for the record?

11              A.  Mauro Maietta, ███████████████

12         ██████████████████████████████████████

13              Q.  And have you ever gone by any other

14         name?

15              A.  No.

16              Q.  How long have you lived at that

17         address?

18              A.  Since February of 2013.

19              Q.  And is Mauro Maietta your full legal

20         name?

21              A.  Yes.  My middle name is Salvatore.

22              Q.  Have you ever been deposed before?

23              A.  No, I have not.

24              Q.  Have you ever been a party to a lawsuit

25         before?
```

```
 1                A.  No.

 2                Q.  And just to be clear, you've never sued

 3        anyone?

 4                A.  No.

 5                Q.  And no one has ever sued you?

 6                A.  No.

 7                Q.  All right.  Let me go over a few of the

 8        ground rules because you've never been deposed

 9        before.  My name is Walker Harman.  I'm a lawyer.

10        I represent Kerry Ashdown in a lawsuit that she

11        brought against Equinox and others in their

12        individual capacity.

13                   Do you understand that?

14                A.  Yes.

15                Q.  And do you understand that you have

16        been named as an individual defendant in Kerry

17        Ashdown's lawsuit?

18                A.  Yes.

19                Q.  I'm going to ask you a series of

20        questions today concerning Ms. Ashdown's lawsuit.

21        If you don't understand a question I ask you,

22        please ask me to repeat it or rephrase it, I'll

23        endeavor to do either or both.  In other words, if

24        you answer the question, the transcript is going

25        to read as you understood the question.  So make
```

```
 1              sure that you understand what I'm saying.  I want

 2              you to understand what I'm saying.

 3                      Do you understand that?

 4              A.  Thank you.  Yes.

 5              Q.  During the deposition today, you can

 6         take a break at any time.  I'm not sure how long

 7         we're going to go today.  We could go into the

 8         afternoon.  We'll certainly take a lunch break and

 9         other short breaks throughout the day.

10                 Let me know if you need to take a break,

11         use the bathroom, to get some water or whatever.

12         The only request I have of you is that you answer

13         any pending question.  So if I've asked a

14         question, you need to provide an answer before you

15         take a break.

16                      Do you understand that?

17              A.  Yes.

18              Q.  Are you aware that you're under oath

19         today?

20              A.  Yes.

21              Q.  And that failing to tell the truth

22         under oath is a crime called perjury?

23              A.  Yes.

24              Q.  You're under the same oath as if you

25         were appearing in court.
```

```
 1                    Do you understand that?

 2               A.  Yes.

 3               Q.  While your deposition is ongoing, I'm

 4          going to ask you not to talk about your testimony

 5          with anyone.

 6                    Do you understand that?

 7               A.  Yes.

 8               Q.  I don't think we're going to have a

 9          problem, but you also need to verbalize your

10          answers to any questions.  So a gesture, the

11          nodding of the head, or some other physical

12          response can't always be taken down by the court

13          reporter.  So I would ask you to just verbalize

14          your answers to any questions.

15                    Do you understand that?

16               A.  Yes.

17               Q.  Along those same lines -- and it's a

18          two-way street -- we need to try not to interrupt

19          one another.  So let me finish my question, you

20          can then provide a response.  There might be

21          occasions where your lawyer may object or make an

22          instruction and you can answer, so let's try not

23          to cut one another off because it makes it

24          difficult for the court reporter.

25                    Do you understand that?
```

```
 1                  A.  Yes.

 2                  Q.  The questions I'm going to ask you are

 3          routine questions I would ask anyone at a

 4          deposition.

 5                     Can I have your date of birth?

 6                  A.  August 31, ███████

 7                  Q.  And have you had any alcohol in the

 8          last 24 hours?

 9                  A.  No.

10                  Q.  Have you taken any medications in the

11          last 24 hours?

12                  A.  Just Advil yesterday.

13                  Q.  Have you been prescribed any

14          medications that you were not taking?

15                  A.  No.

16                  Q.  And are you currently employed?

17                  A.  Yes.

18                  Q.  Where?

19                  A.  Equinox Fitness.  I work at the Soho

20          location.

21                  Q.  What is your job title?

22                  A.  Personal training manager.

23                  Q.  How long have you held that title?

24                  A.  Since 2011, I believe, September.

25                  Q.  Can you think of any reason why you
```

```
 1          couldn't provide your best and truthful answers

 2          here today during the deposition?

 3               A.  Can you say that again, please?

 4               Q.  Can you think of any reason why you

 5          could not provide your best and most truthful

 6          answers here today?

 7               A.  No.

 8               Q.  Has anyone told you to provide

 9          dishonest answers today?

10               A.  No.

11               Q.  Have you ever been arrested?

12               A.  No.

13               Q.  Have you ever been accused of a crime?

14               A.  No.

15               Q.  Have you ever been accused of lying?

16               A.  No.

17               Q.  Have you ever been accused of a

18          dishonest act?

19               A.  No.

20               Q.  Have you ever been terminated from a

21          job?

22               A.  No.

23               Q.  What, if anything, did you do to

24          prepare for today's deposition?

25               A.  Met with this gentleman on the right.
```

```
 1              MR. MCPARTLAND:  To put it on the
 2              record, there's an attorney-client
 3              privilege, so don't disclose the nature of
 4              any communications.  I don't think that
 5              Mr. Harman is going to ask any questions
 6              like that, but just so that you're aware of
 7              that.
 8              THE WITNESS:  Okay.  Thank you.
 9         Q.  Certainly.  So the record is crystal
10    clear, I am not going to ask you about the content
11    of your communications with Mr. McPartland or any
12    other lawyer you've spoken to regarding this
13    matter.
14              Are you represented by counsel in this
15    case?
16         A.  Yes.
17         Q.  Who is your counsel?
18         A.  The gentleman to my right.
19         Q.  What is his name?
20         A.  Can't remember his last name off the
21    top of my head, but I know his first name is Pat,
22    so I've been calling him Pat.
23         Q.  How long has he been your lawyer?
24         A.  I believe, June of this year.
25         Q.  And are you compensating your lawyer
```

```
1          for his time?

2                    MR. MCPARTLAND:  Objection.

3               You can answer.

4               A.  No.

5               Q.  And did you sign a retainer agreement

6          to retain your lawyer?

7               A.  I don't believe so.

8               Q.  And other than Pat, are you represented

9          by any other lawyer?

10              A.  No.

11                   MR. MCPARTLAND:  By counsel, he's

12              represented by our law firm.  There are

13              other lawyers at our firm, so I'll clarify

14              that.

15                   MR. HARMAN:  I would ask you not to

16              make speaking objections, please.

17                   MR. MCPARTLAND:  That was just a

18              statement for the record.

19                   MR. HARMAN:  I'm seeking the witness's

20              understanding; not counsel's.

21                   MR. MCPARTLAND:  Okay.

22            BY MR. HARMAN:

23              Q.  Have you met with anyone, any other

24          lawyer other than Pat, regarding Ms. Ashdown's

25          lawsuit?
```

```
1                  A.  I met with one of his colleagues.  I
2          don't remember his name.
3                  Q.  When was that?
4                  A.  Did you say when was that or what was
5          that?
6                  Q.  When was that?
7                  A.  I believe it was June of this year.
8                  Q.  Where did that take place?
9                  A.  At their law offices.
10                 Q.  Was that in lower Manhattan?
11                 A.  I don't remember the address.
12                 Q.  And was anyone else present at that
13         meeting?
14                 A.  Just myself, Pat and his colleague.
15                 Q.  And did you review any documents during
16         that meeting?
17                 A.  Yes.
18                 Q.  What documents did you review?
19                 A.  E-mails, stuff relating to my job.
20                 Q.  Anything else?
21                 A.  No.  I believe that was the nature of
22         the documents.
23                 Q.  What e-mails did you look at?
24                 A.  When you say, "what e-mails," you want
25         to know the nature of the e-mails?
```

```
1                    Q.  I want to know what e-mails you looked
2           at.
3                    A.  They were correspondence that I was
4           involved in.
5                    Q.  What type of correspondence?
6                    A.  Some of them were between me and my
7           supervisor, some were between myself and Kerry
8           Ashdown.  I think that was all the e-mails.
9                    Q.  And when you say your supervisor, who
10          do you mean by that?
11                   A.  Lawrence Sanders, my general manager.
12                   Q.  So it's your recollection that you
13          looked at e-mails between you and Mr. Sanders; yes
14          or no?
15                   A.  Yes.
16                   Q.  And then you looked at e-mails between
17          you and Ms. Ashdown?
18                   A.  Yes.
19                   Q.  And did you look at any other e-mails?
20                   A.  I don't recall.
21   REQ           MR. HARMAN:  I'm just going to call for the
22   production of all e-mails that were reviewed by
23   Mr. Maietta during the June meeting, and we will follow
24   up in writing, and that would be true with respect to any
25   additional requests made on the record today.
```

```
 1                    MR. McPARTLAND:  Okay.

 2   BY MR. HARMAN:

 3              Q.  And then you also testified, in

 4         addition to the e-mails, that you looked at stuff

 5         related to the job?

 6              Is that a fair recollection?

 7              A.  Stuff related to my job, yes.

 8              Q.  What do you mean by that?

 9              A.  There's a report called the performance

10         commission, and we took a look at one of those.

11              Q.  And which one did you look at?

12              A.  I don't know the specific dates of it,

13         but it involved sessions from a member.  I don't

14         remember the member's name.  The performance

15         commission goes over pay period reports for

16         trainers, so I don't remember the dates of this

17         particular one.

18              Q.  Was this report for you?  Was it

19         generated for your -- was it a performance

20         commission report for you?

21              A.  No.

22                    MR. McPARTLAND:  Object to the form.

23              Q.  Whose performance commission report was

24         it?

25              A.  I don't remember the trainer's name on
```

```
 1            this one.  I think it was one of the trainers that

 2            I was in charge of at that time.  It's a report

 3            that I run for all the trainers, including myself.

 4                    Q.  Was there some inaccuracy contained

 5            within the report?

 6                    A.  Define "inaccuracy."

 7                    Q.  Well, was the report related to

 8            Ms. Ashdown?

 9                    MR. McPARTLAND:  Object to the form.

10                    A.  I don't remember which trainer report

11            it was run for.  The way the report works is it's

12            a system that the personal training manager and

13            fitness manager have access to.  And during the

14            course of any pay period, you run this report to

15            make sure the trainers are properly compensated

16            for sessions, the correct sessions were pulled,

17            following up to make sure training clients are

18            utilizing their sessions.  So it's something that

19            the managers are very intimate with in relation to

20            the PT business.

21                    Q.  But you looked at the report?

22                    A.  Yes.  Part of my job is I have to look

23            at the report on a daily basis.

24                    Q.  But in June, in your lawyer's office,

25            you looked at a performance commission report?
```

```
 1                    A.  That's correct.

 2                    Q.  Did you look at more than one?

 3                    A.  No.  It was the same report.

 4   DIR              Q.  And without delving into conversations

 5        you had with your lawyer, what was your understanding

 6        of the purpose of looking at the report?

 7                        MR. MCPARTLAND:  Objection. Don't

 8                    answer that.  You're going into

 9                    communications now. You can ask him what he

10                    looked at.

11   RUL              Q.  I'm not asking you about your

12   communications with your lawyer.  I'm asking you about

13   whether you have any independent understanding as to why

14   you were looking at that report.

15                        MR. McPARTLAND:  Objection.  It's

16                    privileged.

17                      I'm instructing you not to answer.

18                        MR. HARMAN:  Mark it for a ruling,

19                    please.

20                    Q.  Do you remember any names on the

21        report?

22                    A.  No.  As I said, I don't remember the

23        names of the clients that we were looking at.

24        There's a lot of clients that appear normally on

25        these reports.
```

```
1                    Q.  And you don't remember what trainer it
2         was for?
3                    A.  I don't want to tell you the wrong
4         name.
5                    Q.  Do you remember anything about the name
6         of the trainer?
7                    A.  If I don't remember the name, I don't
8         know if I would remember --
9                    Q.  Just so the record is clear, this was
10        in June this year, three months or so ago?
11                   A.  Yes.  We were looking at performance
12        commissions, and that's one of the reports you're
13        asking me that I looked at, and I'm trying to give
14        you the most truthful answer.
15                   Q.  Did you look at more than one report?
16                   MR. McPARTLAND:  Asked and answered.
17                    You can answer.
18                   A.  No.  I just looked at one performance
19        commission.
20                   Q.  But you don't remember the name of the
21        trainer?
22                   A.  No.
23                   Q.  And do you remember whether this was a
24        man?
25                   A.  Yes.  It could have either been Ryan
```

```
 1        Hopkins or Bobby Dwyer.
 2             Q.  Why do you believe it was either Ryan
 3        Hopkins or Bobby Dwyer?
 4             A.  These are the trainers that were
 5        involved, I believe, in what we're speaking about
 6        today.
 7             Q.  Well, what do you mean by "what we are
 8        speaking about today"?
 9             A.  Well, the performance commission that
10        we're looking over -- I don't know if I'm
11        answering you incorrectly -- it was in relation to
12        sessions that shouldn't have been on the
13        performance commission.  And these are the two
14        trainers that were involved.  And when I answer
15        you that I don't remember which trainer, I don't
16        remember if we were looking at Bobby's specific
17        performance commission or Ryan's.  So I don't want
18        to answer you inaccurately.
19             Q.  Is Ryan still employed at Equinox?
20             A.  No.
21             Q.  And when was the last time that he was
22        employed by Equinox?
23             A.  I believe it was June of this year.
24        June of 2013.
25             Q.  And how did his employment end with
```

1        Equinox?

2              A.  He voluntarily resigned for another

3        position.

4              Q.  Another position where?

5              A.  I believe he's currently working in

6        Soho, at another -- his own practice, his own

7        fitness center.

8              Q.  And, again, when you say, "what we are

9        speaking about today," I don't know what that

10        means exactly.  So you're going to have to work

11        with me.

12              What is -- what did you mean when you

13        said, "what we're speaking about today"?

14              MR. McPARTLAND:  Asked and answered.

15              You can answer.

16              A.  I was speaking about the performance

17        commissions.  You asked me what I looked at, and I

18        told you I looked at performance commissions and

19        e-mails.

20              Q.  So let's stick with the performance

21        commissions.

22              And you believe it was either for Ryan or

23        Bobby; right?

24              A.  That's correct.

25              Q.  What do you recall about the

```
1          performance commission?
2               A.  There were sessions, but that's what's
3          on performance commissions; either Equifits, free
4          PTs, tiered sessions, AmEx sessions.  So what I
5          remember specifically about that one, is we were
6          looking at AmEx PT sessions from an expired
7          member -- or excuse me, a cancelled member.
8               Q.  You were looking at expired AmEx PT
9          sessions?
10              A.  No.  I was looking at AmEx PT sessions
11         for a cancelled member.
12              MR. McPARTLAND:  I'm going to object to
13              this line of questioning.  We're delving
14              into what was happening during an
15              attorney-client meeting and it's
16              inappropriate.  You have copies of the
17              commission reports.  Put them in front of
18              him and ask him questions about it.
19              But you have to stop asking him questions
20              about the meeting or I will instruct him
21              not to answer.  I don't want to interrupt
22              the deposition, but this is an odd way to
23              go about this.
24              MR. HARMAN:  I have a right to ask him
25              about everything he looked at.
```

```
 1                    MR. McPARTLAND:  You can ask him what
 2               he looked at, but you can't ask him why it
 3               was shown to him or what he understood --
 4                    MR. HARMAN:  I didn't ask him why it
 5               was shown to him.  If you continue these
 6               kinds of speaking objections in the
 7               presence of your client, we're --
 8                    MR. MCPARTLAND:  It's not a speaking
 9               objection.  It's an attorney-client
10               privilege.
11                    MR. HARMAN:  You have made your
12               objection known.  So far he's not testified
13               to any communications between an attorney
14               and client.
15                 Can I move on, please?
16                    MR. McPARTLAND:  Sure.
17     BY MR. HARMAN:
18                    Q.  With respect to the document that you
19          looked at, you recall that there were AmEx
20          personal training sessions from a cancelled
21          member; is that correct?
22                    A.  Yes.
23                    Q.  What was the significance, if anything,
24          about that?
25                    A.  The significance of sessions pulled for
```

1          a cancelled member are just inherent in the

2          phrase.  Sessions should be pulled for members who

3          are no longer utilizing the gym unless there is an

4          extenuating circumstance, or note in their account

5          as to why these sessions should be pulled.

6                   And at the time, I was a fitness manager,

7          and one of the jobs of the fitness manager is to

8          do the payroll, do the pay period ending.  So I

9          was reviewing the performance commission, like I

10         do every pay period, to make sure sessions were

11         properly pulled for trainers, to make sure the

12         trainers were properly compensated for their time.

13                  And you become quite familiar with the

14         reports in making sure that everything is in its

15         proper order.  And what I had noticed on this

16         particular report were there were three or four

17         sessions pulled on the same date for a member.

18         Part of my job is to actually go into the system,

19         check the member's account, make sure the sessions

20         were properly pulled, to see if there were any

21         notes on the sessions.

22                  There are occasions where multiple

23         sessions are pulled on the same day, but there are

24         notes indicating that the session is from another

25         day.  Either the training client late-cancelled or

1        no-showed; there was an issue at the front desk.

2        These particular sessions, there weren't any

3        notes.  They were just all pulled on the same day,

4        and it turned out that that member had not even

5        utilized the club in quite some time.

6             Q.  And were these conclusions that you

7        came to in June of this year?

8             A.  No.  This was a performance commission,

9        I believe, when I was the fitness manager of Soho,

10       which was in 2011.

11            Q.  So these are conclusions you reached in

12       2011?

13            A.  Yes, when I was running the reports.

14       Like I told you, it's something that on a daily

15       basis, you run it.  During that time in 2011, when

16       we used a system called eTrac there was a

17       spreadsheet that we developed to make sure that

18       new members had utilized their Equifits and their

19       free PTs.

20             There's also a type of member in 2011

21       that had American Express sessions.  These were

22       the type of leads that we wanted to make sure we

23       made priority for the fact that trainers had

24       additional times to train them based on the

25       American Express sessions.

```
 1                    So the job of the fitness manager is to
 2          track that on the spreadsheet, make sure the
 3          sessions were utilized by the right trainer, in
 4          the proper time frame, and then we want to check
 5          up with the trainer to make sure that the client
 6          was converted into an actual purchasing training
 7          member.
 8                 Q.   Is the eTrac system still utilized
 9          today?
10                 A.   No.  We've moved to a different system.
11          It's a little more automated.
12                 Q.   What is the system?
13                 A.   It's called Blue Sky.  It's an ESP
14          pipeline.
15                 Q.   When did you start using Blue Sky?
16                 A.   Blue Sky was rolled down -- we've been
17          using Blue Sky for other programs, but now, as far
18          as the tracking of leads and notes, that started
19          in 2012.
20                 Q.   So it's your recollection that you
21          noticed the three or four sessions on the
22          performance commission report back in 2011?
23                 A.   Yes.
24                 Q.   And when in 2011 did you notice that?
25                 A.   I don't remember the exact monthly time
```

```
 1          frame, but the performance commission that you're

 2          speaking about, I think, was the second time that

 3          I had noticed an aberration on the report.  And

 4          after the first occasion, I just made a note of it

 5          just to see if maybe it was something that might

 6          have happened, computer error.  And it wasn't

 7          until I noticed it this time, the second time,

 8          that it didn't seem right to me.

 9               Q.  When you say you noticed it on two

10          different occasions, was that on the -- a

11          performance commission report with the same

12          trainer?

13               A.  I believe so, yes.

14               Q.  And when was the first time that you

15          noticed it?

16               A.  I don't remember the exact dates, but

17          it was after February, in 2011.  That's when I

18          started at the Soho location as a fitness manager.

19               Q.  And you say on the first occasion, you

20          noticed what?

21               A.  On the first occasion, I believe it was

22          one or two sessions that didn't coincide with the

23          trainer's active client roster.  So I didn't know

24          if it was maybe a training client who trained as a

25          one-off.  It wasn't until the second time, where I
```

```
 1          believe it was three or four sessions, that I

 2          decided I needed to look further and make sure

 3          this was actually a training client for that

 4          particular trainer.

 5                    Q.  And you said you made a note the first

 6          time?

 7                    A.  Mental note.  Mental note.

 8                    Q.  You didn't speak to anyone about it?

 9                    A.  No.  I just went home and I spoke to my

10          wife about it.  I said, "Hey, I noticed this at

11          work today."

12                    Q.  And what is your wife's name?

13                    A.  Sheila Maietta.

14                    Q.  And how long have you been married to

15          Sheila?

16                    A.  Since April 8, 2011.

17                    Q.  And does your wife work at Equinox?

18                    A.  No.

19                    Q.  Is she a personal trainer?

20                    A.  No.

21                    Q.  What does she do for a living?

22                    A.  She works for North Shore Hospital.

23          She's involved in third-party billing.

24                    Q.  So you didn't speak to Mr. Sanders

25          about it?
```

```
1                  A.  No.
2                  Q.  And you didn't speak to Ms. Ashdown
3         about it?
4                  A.  No.
5                  Q.  And at that time, it was your -- who
6         was your direct supervisor?
7                  A.  Lawrence Sanders.
8                  Q.  And you didn't speak to the particular
9         trainer about it?
10                 A.  No.
11                 Q.  What did you say to your wife?
12                 A.  I told my wife that I noticed some
13        sessions that were pulled for a trainer for a
14        client that was not his.  I just want to keep my
15        eye on it.
16                 Q.  Now, earlier, you testified that you
17        noticed that it was a client that was not on his
18        roster.  So at the time of the first incident, did
19        you know for sure whether or not the client was
20        the personal trainer or not?
21                    MR. McPARTLAND:  Object to the form.
22                  You can answer.
23                 A.  The first time, I believe, was one or
24        two sessions.  We have, on any given month,
25        anywhere from 400 to 500 active clients.  It's
```

```
 1              hard to remember all their names.  So generally,

 2              in a day, I want to utilize my energies for either

 3              big inaccuracies or things that really require my

 4              attention.

 5                   So this first case where it was just one

 6              or two sessions, I assumed that it could have been

 7              a member that the trainer met on the floor, met

 8              through a referral and they just pulled the

 9              session for either an hour on the floor, something

10              of that nature.

11                   When I saw it the second time and it was

12              four sessions on the same day, that's something

13              that is a little more glaring that you're going to

14              have to look a little further into.

15                   Q.  It would be helpful if you just

16              focus -- just in terms of time efficiency, if you

17              just answer my questions.

18                   So on that particular day, when you

19              noticed the one or two, what was alarming about

20              it, specifically?

21                   A.  That they were American Express

22              sessions.

23                   Q.  And what was alarming about American

24              Express sessions?

25                   A.  As a fitness manager, I'm responsible
```

```
 1            for the leads that are given out to the trainers.

 2            So the American Express leads, specifically, they

 3            are few and far between, and those are names that

 4            I generally have a better time recalling or

 5            knowing who I gave that lead to.

 6                  This particular member was not a lead

 7            that I gave to that trainer.  So I was -- just

 8            made a mental note to see if maybe the person

 9            might have met that client on the floor, and if I

10            saw it again, I was going to look into it a little

11            further.

12                  Q.  And I believe I already asked this, but

13            what did you say to your wife?

14                  A.  I went home, I told her that I noticed

15            sessions that were pulled for a trainer that may

16            not be his training client, and something I wanted

17            to keep an eye on.

18                  Q.  And you didn't talk to the trainer at

19            that time?

20                  A.  No.

21                  Q.  You didn't think to just go and ask

22            him?

23                  A.  No, because it was just one or two.

24            Like I told you, it's something where part of what

25            the trainer needs to do is generate business for
```

```
 1              themselves.  The trainer could have very well been

 2              on the floor, engaged the member.

 3                   Q.  You didn't talk to the trainer; yes or

 4              no?

 5                   A.  No, not for the one session.

 6                   Q.  Who was the trainer's direct supervisor

 7              at that time?

 8                   A.  At that time, it would be myself, Mauro

 9              Maietta, and Kerry Ashdown, the personal training

10              manager.

11                   Q.  Are you testifying today that you were

12              the trainer's direct supervisor?

13                   A.  Yes, one of them.

14                   Q.  And the trainer had another direct

15              supervisor?

16                   A.  Yes.  The way the personal training

17              department works --

18                   Q.  Answer the question, yes or no; there

19              was another direct supervisor?

20                   A.  Yes.

21                   Q.  Who was that?

22                   A.  Kerry Ashdown, the personal training

23              manager.

24                   Q.  And you didn't think to go speak to

25              Ms. Ashdown about it?
```

```
 1                A.  It's not something that --
 2                Q.  Just answer the question, please.  Just
 3        answer the question; you didn't think to speak to
 4        Ms. Ashdown about it?
 5                    MR. McPARTLAND:  Object to the form.
 6                  You can answer.
 7                A.  No.
 8                Q.  So there was a second time where you
 9        noticed three or four sessions; yes?
10                A.  That's correct, yes.
11                Q.  And at that time, what, if anything,
12        did you do about it?
13                A.  At the time of when I noticed the
14        sessions?
15                Q.  Correct.  This is the same personal
16        trainer?
17                A.  On that report, yes.
18                Q.  And this time there are three or four
19        sessions?
20                A.  Yes.  So what -- part of the daily
21        tasks I have to go through, like I told you, is
22        track, and what I did that time -- because I
23        noticed it again for the same trainer with the
24        same type of sessions, I looked into the member's
25        account, noticed the member was a cancelled
```

```
 1          member.  The member hadn't even used the Soho
 2          location.
 3                  If I remember correctly, that member was
 4          using one of our Florida clubs.  And I noticed
 5          there were no notes as to why the sessions were
 6          pulled.  I noticed who pulled the sessions.  And I
 7          printed out the report just to verify with my
 8          eTrac.  And then, it was really something where I
 9          had to decide what to do in relation to it in our
10          department, and I felt the best course of action
11          was to speak with my supervisor, Lawrence Sanders,
12          somebody that I've known for the entire time that
13          I was in the company.
14                  I went to Lawrence and I asked him for
15          advice on what I should do with this particular
16          situation.  He's somebody that I trust to ask
17          advice.  He's been my general manager now two
18          locations, and I asked him how I should handle the
19          situation because I wanted to ask Kerry about it,
20          but I did not know how to ask her because I was
21          always very fearful of how she would respond when
22          I would bring up things in the office.
23                  We didn't have the best communication in
24          the PT office.  Any time she didn't like my
25          opinion on something, she had a tendency to raise
```

```
 1        her voice --
 2              Q.  I haven't asked you about your
 3        relationship with Ms. Ashdown.  I want you to
 4        answer my questions.  It's going to be a lot
 5        easier.
 6                I just asked you, what, if anything, you
 7        did about the second incident when you noticed the
 8        three or four sessions?
 9                MR. McPARTLAND:  He is answering the
10                question.
11              A.  I just wanted to give you a --
12              Q.  So you spoke to Mr. Sanders; yes or no?
13              A.  Yes.
14              Q.  And you chose not to speak to
15        Ms. Ashdown; yes or no?
16              A.  Not until I -- after I spoke with
17        Lawrence because I was asking his advice on how to
18        speak with her.
19              Q.  So you noticed these three or four
20        sessions for this personal trainer, and you did
21        not speak to Ms. Ashdown?
22              A.  No.
23              Q.  And you never spoke to Ms. Ashdown
24        prior to reporting the session pulls to
25        Mr. Sanders; correct?
```

```
 1                  A.  About the sessions or spoke to her in
 2          general?
 3                  Q.  About the sessions.
 4                  A.  No, I didn't speak to her about the
 5          sessions.
 6                  Q.  And the personal trainer, did you ever
 7          speak to him about the sessions?
 8                  A.  No.
 9                  Q.  And so you went and spoke to
10          Mr. Sanders.
11                    Did you go and speak to him on that day?
12                  A.  I told him that day that I wanted to
13          speak with him.  I don't remember if I spoke to
14          him later that day or the next day.
15                  Q.  What did you say to him?
16                  A.  I told him I needed to speak to him
17          about sessions that I noticed were pulled, and I
18          wanted his advice on how to handle it and how to
19          approach Kerry with the information.
20                  Q.  And what did he say?
21                  A.  I showed him the forms commission.  I
22          think he was in a little bit of disbelief.  He
23          said, "Okay.  I'll handle it from here.  No need
24          for you to make a big deal about it."
25                    I don't remember his exact verbiage, but
```

```
 1              he told me he was going to handle the situation

 2              from that moment forward.

 3                   Q.  Did he say anything else?

 4                   A.  No.

 5                   Q.  Did you say anything to him?

 6                   A.  Just in relation to the performance

 7              commission.  I told him what I had told you about

 8              what I determined about the sessions; they were

 9              for a cancelled member.  There were no notes as to

10              why the sessions were pulled.  The member wasn't

11              utilizing our club.  And he said, "Okay.  I'll

12              take care of it from here."

13                   Q.  Did the performance commission report

14              indicate who had pulled the sessions?

15                   A.  The report doesn't tell you who pulled

16              the sessions, but when you go into the member's

17              account to look at the sessions pulled, it does

18              have an initial system of the individual who

19              pulled the sessions.

20                   Q.  And when you first noticed -- during

21              the first incident, when you first noticed the two

22              sessions, did you go into the account to see who

23              had initialed it?

24                   MR. McPARTLAND:  Object to the form.

25                   You can answer.
```

```
 1                    A.  When I first went in, I don't remember
 2          if I looked at the initials, no.
 3                    Q.  And how about the second time?
 4                    A.  Yes.  Like I told you, I went in to
 5          look because it was three or more sessions.  When
 6          I went into the account, and you pull it up to see
 7          if there are notes, that's right there on the same
 8          line item.  It's notes and then the initials of
 9          the person who pulled it.
10                    Q.  And what notes were there?
11                    A.  There were no notes for any of the
12          three or four sessions pulled, and the initials
13          were KA.
14                    Q.  When you say "initials," what do you
15          mean by that?
16                    A.  Well, the way the system works is they
17          take the first letter of the first name, first
18          letter of your last name, and they put that -- I
19          guess, associated with the individual who pulled
20          the sessions.
21                    Q.  So by the second time, was it your
22          belief that -- what does "KA" stand for, if you
23          know?
24                    A.  KA, in relation to that performance
25          commission, would be Kerry Ashdown.
```

1           Q.  And so after your review of the second

2      situation that you've testified to, was it your

3      belief that Kerry Ashdown had pulled these

4      sessions?

5           A.  Based on the initials, I would believe

6      that she pulled them, yes.

7           Q.  You tell Lawrence Sanders that Kerry

8      Ashdown had pulled these sessions?

9           A.  No.  I just told him that her initials

10      were on the report, so it looks as if Kerry had

11      pulled the sessions.

12           Q.  So you did tell him that it looks as if

13      Kerry had pulled the sessions?

14           A.  Well, yes, because I told him that the

15      information on the sessions, they were AmEx

16      sessions for a cancelled member.  And when I

17      looked in to make sure, to see the notes, the

18      initials I saw were KA.

19           Q.  And you never spoke to the trainer to

20      ask the trainer whether Kerry had pulled the

21      sessions for him?

22           A.  No.

23           Q.  You never asked Kerry if she had pulled

24      the sessions?

25           A.  No.

```
 1                    Q.  Do you ever pull sessions for anyone?

 2                    A.  All the time.  The training manager,

 3          the personal training manager, fitness manager, we

 4          have to pull sessions on a daily basis.

 5                    Q.  So is it fair to say, then, that the

 6          initials KA would appear on a lot of commission

 7          reports?

 8                    A.  Yes.

 9                    Q.  At the time that Ms. Ashdown was

10          working as the personal trainer -- please let me

11          finish the question --

12                    MR. HARMAN:  Could you repeat --

13                    Q.  As the personal training manager, is it

14          fair to say that her initials would have appeared

15          on a lot of the reports that you review?

16                    A.  They wouldn't appear on the commission

17          reports.  They would appear in the system, in the

18          E-club system, where we would go in and look or

19          pull the sessions from.  The report just gives you

20          the member ID number, the date they were pulled,

21          the member's name.  And then on that corresponding

22          page, which trainer they were pulled for.

23                    Q.  And can a trainer pull sessions him or

24          herself?

25                    A.  No.
```

```
 1                   Q.  So a manager has to pull a session for
 2          a trainer?
 3                   A.  Managers can pull the sessions, or the
 4          front desk when the member signs into the club.
 5                   Q.  So let's set the -- there's two ways,
 6          then.  You either pull a session when you check in
 7          at the club; right?
 8                   A.  Yes.
 9                   Q.  Or a manager has to pull the session
10          for the trainer and the member?
11                   A.  Yes.
12                      MR. McPARTLAND:  Objection to the form.
13                   You can answer.
14                   A.  It's what's called a forget-to-pull.
15          So the training client didn't pull it at the front
16          desk, and then the manager would pull the session
17          to make sure the trainer is properly compensated.
18                   Q.  And it's your testimony that you have
19          to do that all the time?
20                   A.  On a daily basis, yes.
21                   Q.  Is it fair to say that Ms. Ashdown
22          would have done that on a daily basis?
23                   A.  Absolutely.
24                   Q.  And you have Ms. Ashdown's former
25          position; is that correct?
```

```
 1                    A.  Yes.  I'm now the personal training

 2          manager of Equinox.

 3                    Q.  And it's your testimony that she was

 4          never your supervisor?

 5                    A.  No.  We worked together in the same

 6          department.

 7                    Q.  Just answer the question.  Was she your

 8          supervisor or not?

 9                    A.  Can you define "supervisor"?  I'm not

10          trying to be --

11                    Q.  I'm asking you -- you worked at Equinox

12          for a while.  How long have you worked at the Soho

13          location?

14                    A.  Since 2011; February 2011.

15                    Q.  Okay.  And during that time, was

16          Ms. Ashdown ever your supervisor?

17                    A.  Yes.

18                    Q.  And when did she first become your

19          supervisor?

20                    A.  I believe it was the end of the month

21          of February.  When I originally started, I was

22          working with Jessica Dart, who was the personal

23          training manager.  I worked with her, I think, for

24          less than two weeks.

25                    Q.  Is there a fitness manager at the Soho
```

1           location now?

2                   A.  Yes.

3                   Q.  Who is that?

4                   A.  Darwin Diaz.

5                   Q.  Do you supervise -- is that a man or a

6           woman?

7                   A.  That's a man.

8                   Q.  And Mr. Diaz, do you supervise

9           Mr. Diaz?

10                  A.  Yes.

11                  Q.  How long have you supervised Mr. Diaz?

12                  A.  I believe he started October 2012.

13                  Q.  So it's fair to say, then, that any

14          time you -- when you look at commission --

15          performance commission reports, there's always

16          going to be a manager's initials beside a

17          forget-to-pull?

18                  A.  Not on the report.  There are no

19          managerial initials on the report.

20                      MR. McPARTLAND:  Object to form.

21                  A.  There are always going to be initials

22          next to a session that is pulled inside of E-club,

23          but not on the commission report.

24                  Q.  And how do you get into E-club?

25                  A.  On the Equinox computers, they're

```
1          already set up.  There's an icon on the desktop.

2          You click on it, and it asks you for a user name

3          and password.

4                Q.  How long does that process take?

5                A.  You have to click the desktop icon.  If

6          the computer is loading quickly that day, it's

7          pretty quick.  It asks you for your user name, you

8          put the user name, put the password, and you're in

9          the E-club.  And you have sorted options on the

10         screen.

11               Q.  And how frequently do you go into

12         E-club to check the initials of a session?

13               A.  You're not going into E-club to check

14         initials.  You're going into E-club to check the

15         sessions are pulled, pulled for the right trainer,

16         pulled on the right dates, checking notes, getting

17         member contact information.  That's where their

18         e-mail address and phone numbers are stored.  So

19         you have to go into E-club for that, to run the

20         performance commissions through E-club.  To run

21         first-time buyer reports is through E-club.  We

22         run a number of reports through that.  And that

23         program is pretty much open throughout the day.

24               Q.  Had you ever had a discussion with

25         Ms. Ashdown, prior to this conversation you had
```

```
 1        with Mr. Sanders, about why she pulled a session
 2        for a trainer?
 3             A.  We've had discussions in relation to --
 4        the main thing that I would probably ask questions
 5        about are comp PTs and the free PTs that you would
 6        find on the commission report.  One of the things
 7        we never want trainers to do is pull these
 8        sessions on the same day.  Part of the Equinox
 9        brand is they meet first for an equal fit, and on
10        a separate day, they're supposed to meet for the
11        free PT.  Gives the trainer time to develop a
12        program.
13             So part of the relationship with PTM and
14        FM is to follow up with leads.  If a session was
15        pulled, just update the eTrac at that time to make
16        sure that it wasn't done on the same day.  So
17        there are probably numerous occasions where PTM
18        and FM would have to speak about sessions being
19        pulled.
20             Q.  And do you believe that Ms. Ashdown had
21        improperly pulled sessions for this particular
22        trainer?
23             A.  Yes.  Those sessions on the performance
24        commission, those three or four, what was most --
25        what made it feel as if they were improperly
```

```
 1            pulled was the fact that the member was cancelled,

 2            that the member never used the Soho location on

 3            that year, primarily used one of our Florida

 4            locations.

 5                   So those are the type of warning signs

 6            that would make you think a session wasn't pulled

 7            correctly.  You know, if a session was pulled for

 8            a member who utilizes our club, who is an active

 9            training client of the trainer, that really

10            doesn't set off any alarms.

11                   Q.  When you say "cancelled," what do you

12            mean by that?

13                   A.  Meaning you're no longer a member of

14            Equinox.  After a member's membership is

15            cancelled, what is in their inventory stays, it

16            persists in E-club.  I don't know how long it

17            persists, but if I were to be a member of Equinox

18            and cancelled my membership, anything I had in my

19            inventory would still be there.  Even after the

20            membership was cancelled.

21                   Q.  But you testified that the member was

22            using a location in Florida; correct?

23                   A.  At the time, where their membership was

24            active, I believe it was a 2009 cancellation, and

25            that's when they were using the Florida location.
```

```
 1              Q.  So they were using the Florida location
 2         and then the membership was cancelled?
 3              A.  Yes.  They were a Florida Equinox
 4         member with a cancelled membership with sessions
 5         pulled at the Soho location in a time where they
 6         didn't have an active membership.
 7              Q.  Had sessions ever been pulled at the
 8         Soho location?
 9              A.  No.
10              MR. McPARTLAND:  Objection to the form.
11              Q.  And for how long a period was this
12         report, this commission report?
13              A.  This one we're speaking about,
14         generally we process reports for the pay period,
15         which is a two-week period.  So this one was
16         either for a two-week period, or it was from the
17         day prior to when I was running it.
18              Because at the time, like I told you,
19         with eTrac, I would come in and run the report
20         from the day before to make sure that Equifits
21         were pulled, free PTs were pulled; and then in
22         that eTrac, AmEx clients, to make sure they were
23         utilizing their American Express sessions.
24              So at the time we were using eTrac,
25         performance commission was run every day by the
```

```
1        fitness manager.

2               Q.  And at the time that you went to

3        Mr. Sanders, I take it that you thought there was

4        a real problem?

5               A.  Yes.

6               Q.  And you thought that Ms. Ashdown caused

7        the problem?

8               A.  In the nature of the fact that when I

9        looked into the account, her initials were next to

10       it, yes.

11              Q.  And you had this confidential with

12       Mr. Sanders that you described.

13                  Did you ever have another conversation

14       with him about this particular issue?

15              A.  No.  That was the first time I spoke to

16       him about it, and then that day he told me, "I'll

17       take care of it from here."

18              Q.  Did you ever speak to him about the

19       situation involving the session pulls and

20       Ms. Ashdown at any other time?

21              A.  After that period of time, no.  He

22       said, "I'll take it from here," so it was out of

23       my hands at that point.

24              Q.  Did he ever report anything back to

25       you?
```

```
 1                    A.  No.
 2                    Q.  So as you sit here today, do you have
 3          any idea whether the trainer was involved in
 4          pulling the sessions?
 5                         MR. McPARTLAND:  Object to the form.
 6                    A.  Repeat.  You want to know if the
 7          trainer knew about the sessions being pulled?  Is
 8          that your question?
 9                    Q.  Yes.
10                    A.  I don't know if the trainer was
11          involved, no.
12                    Q.  But this was a trainer that you
13          supervised?
14                    A.  That's correct.
15                    Q.  And at that time, around that time
16          period, you never learned whether or not this
17          particular trainer was involved in pulling the
18          sessions?
19                    A.  No.  After I spoke with Lawrence, he
20          told me he would take it from there, so I didn't
21          want to get involved in the situation.  I was just
22          listening to what he instructed me to do.
23                    Q.  And what did he instruct you to do?
24                    A.  That he would handle it from here.
25                    Q.  Did he give you any other instructions?
```

```
 1                A.  No.  I just went about business as

 2          usual every day after that, continued to run the

 3          report, continued to deal with the trainers,

 4          continued to work with Kerry.

 5                Q.  Did you apply for Ms. Ashdown's

 6          position when it was vacant?

 7                A.  No.

 8                Q.  And what I mean by that is, prior to

 9          Ms. Ashdown joining Equinox, did you apply for her

10          position?

11                A.  No.  I was at the -- I don't

12          remember -- I don't know when she was hired by

13          Equinox.  I was working at the Chelsea location as

14          the fitness manager.  That was around -- I worked

15          there since the Chelsea location opened.  I

16          started there as a trainer, I then moved up into

17          the manager and training program.  They approached

18          me, the company did, my supervisor at the time,

19          Rich Velasquez, said, "We would love you to be a

20          manager, would you like to?"  I said,

21          "Absolutely."  That was early in 2008.

22                   By June of 2008, I was promoted as

23          fitness manager of the Chelsea location.  I was

24          fitness manager there for about three-and-a-half

25          years.  And the natural progression at Equinox is
```

```
 1            you go, generally, from manager in the training

 2            program to fitness manager, and then eventually to

 3            personal training manager.

 4                      Every year at Equinox we have

 5            professional meetings.  Your general manager calls

 6            you into the office, you speak about your career

 7            growth, things you're looking for yourself, where

 8            you stand on a personal level.  It's one of those

 9            things where they always coach you as to where

10            your career can go, options that you have.

11                      And one of the things we spoke about

12            towards the end of my 10-year fitness manager is

13            where did I see my career going.  And I said I

14            loved the fitness manager position it, I've been

15            doing it for a long time, I'm looking for the next

16            step.  I want to develop my career with the

17            company.  I'm ready, one day, for the personal

18            training manager position of a club, wherever that

19            might be.

20                 Q.  When did that conversation take place?

21                 A.  That happens yearly, so I had one in

22            2008, one in 2009, 2010.  My 2011 one, I don't

23            remember the exact date.  I had one in 2012.  I'll

24            probably have one this year, also, in 2013.

25                 Q.  But you became the personal training
```

```
1          manager in September of 2011?

2               A.   That's correct.

3               Q.   When would your personal development

4          meeting have taken place in 2011?

5               A.   In 2011, they either happen at the

6          start of the year or they happened at the end of

7          the year.  That year, I don't remember which one

8          it was.

9               Q.   Were you working at Soho at the end of

10         2010?

11              A.   No.  I was at the Chelsea location as

12         the fitness manager.

13              Q.   When did you start working in Soho?

14              A.   February 2011.

15              Q.   What is your understanding of the

16         circumstances that led to Ms. Ashdown's departure

17         from Equinox?

18              A.   All I know is that she was terminated

19         from her position.  No one ever told me the

20         reason.  And I asked what I should instruct the

21         trainers, and they said, "It's not really for them

22         to know why, it's just she's no longer a member of

23         the Equinox staff."  And I understood it as such

24         and I didn't press the matter.

25              Q.   So as you sit here today, do you have
```

```
1          an understanding of why she was terminated?

2                A.  No.  They never -- my supervisor,

3          Lawrence Sanders, nor anyone else, ever told me

4          why.

5                Q.  Just so the record is clear -- and I'm

6          reminding you you're under oath -- you never had a

7          conversation with anybody regarding why

8          Ms. Ashdown was terminated?

9                A.  No.

10                    MR. McPARTLAND:  Objection.

11               Q.  Did you have a conversation with your

12         wife about why Ms. Ashdown was terminated?

13               A.  I spoke with my wife about it.

14               Q.  So your early testimony wasn't

15         accurate?

16                    MR. McPARTLAND:  Objection.  What

17                testimony are we referring to?

18               Q.  You just testified, under oath, that

19         you haven't spoken to anybody about why

20         Ms. Ashdown was terminated.  Then I asked you if

21         you had spoken to your wife about it, and you said

22         yes?

23                    MR. McPARTLAND:  Objection.  Objection

24                to form.  Please don't harass the witness.

25                If you want to read back your question, I
```

```
1                don't know -- note my objection.  That's

2                all.

3                   You can answer.

4                   MR. HARMAN:  Your objection is noted.

5              Q.  So let's go back.  Tell me who you've

6         spoken to about Ms. Ashdown's termination.

7              A.  I speak to my wife.  I don't list my

8         wife when I say someone or anybody.  To me she's

9         my wife, she's my partner.  So it's something

10        where when I speak to her, it's not as if I'm

11        speaking to anybody in this room, you know.

12               So I spoke to her about it.  I got a

13        phone call when I was home on my day off to say

14        that Kerry was no longer the PTM.  My wife was

15        sitting next to me on the couch, I told her what

16        had happened.  She said, "Why?"  I said, "They

17        didn't tell me."  That's it.  And I reported to

18        work the next day as the fitness manager of the

19        club.

20             Q.  When were you made the personal

21        training manager?

22             A.  I don't know if it was two or three

23        weeks after she was terminated.  I was doing -- I

24        was running the whole department for about a two-,

25        three-week period on my own, and they approached
```

```
1              me and said, "Based on how long you've been with

2              the company, based on your hard work and things

3              that you've done, we think that you would be a

4              good fit for this role."

5                      Q.  Were you pleased to see Ms. Ashdown

6              leave Equinox?

7                      A.  No.  I wouldn't say I was pleased.

8                      Q.  Now, you said, you spoke to your wife.

9                          Did you speak with anyone else

10             regarding -- have you, at any other time?

11                     A.  I don't recall, no.

12                     Q.  You don't recall or you haven't?

13                     A.  I don't believe I have.

14                     MR. McPARTLAND:  Other than counsel,

15             obviously.

16                     Q.  Other than counsel, obviously.

17                     A.  No, just my wife.

18                     Q.  And you said you spoke to her when you

19             received a phone call?

20                     A.  Yes.  We were on the couch in our

21             apartment.

22                     Q.  Have you spoken to her at any other

23             time?

24                     A.  To my wife?

25                     Q.  About Ms. Ashdown's termination?
```

```
 1                    A.  No.  It was just back in 2011.
 2                    Q.  And have you read the complaint in this
 3         lawsuit?
 4                    A.  I read it.  I wouldn't say I digested
 5         everything, no.  It was quite wordy.
 6                    Q.  Did you read it or not?
 7                    A.  Yes, I read it.
 8                    Q.  And were you served a hard copy of it?
 9                    A.  Yes.  I believe I have the --
10                    MR. McPARTLAND:  Object to the form.
11                    Q.  Did someone hand you a hard copy of the
12         complaint at Soho Equinox?
13                    A.  No.
14                    Q.  Were you given a hard copy of the
15         complaint?
16                    A.  Yes.  I think I actually printed it
17         out.  I think I might have received it via e-mail.
18                    Q.  And you read it?
19                    A.  Yes.
20                    Q.  And after having read it, do you have
21         an understanding of why Equinox claims Ms. Ashdown
22         was terminated?
23                    A.  I don't remember even reading it, if it
24         was listed as to why she was terminated.
25                    Q.  As you sit here today, under oath, do
```

1          you know why Ms. Ashdown was terminated?

2              A.  I can't say I know.  I can only assume.

3              Q.  I'm not asking you to assume anything.

4                 I'm asking you, as you sit here today, do

5          you know why she was terminated?

6              A.  The reason why I'm wording it that way

7          is I misunderstood you earlier with the

8          who-I-spoke-to question.  So I want to make sure

9          I'm not misleading you again.  I can assume as to

10         why, but no one has clearly told me this is why

11         she was terminated from Equinox.

12             Q.  Does Ms. Ashdown have a -- any kind of

13         personnel profile at Equinox?

14             A.  Personnel profile?

15             Q.  You testified to a Mr. Diaz; correct?

16             A.  Darwin Diaz, yes, my fitness manager.

17             Q.  Does he have a profile as an employee?

18             A.  When you say "profile," I don't

19         understand what you mean.

20             Q.  Some type of computerized profile that

21         identifies him and that would track his

22         performance.

23             A.  Well, we would all be on the

24         performance commission, because not only managers,

25         we also have training clients.

1           Q.  Let's take it one step at a time.

2           A.  I want to make sure I understand you.

3      Like a Facebook profile?  I don't understand what

4      you mean.  Similar to that?

5           Q.  I'm going to try to make it clear,

6      then.

7               How many personal trainers do you manage?

8           A.  Currently, 37.

9           Q.  And of those 37, how many of them are

10     men?

11          A.  I would say, I think that's 22.  We

12     have a pretty good split over there.  We have

13     quite a few female trainers.

14          Q.  And can you give me the name of one of

15     your female trainers?

16          A.  Sure.  Danielle Vetrano.

17          Q.  Danielle.  Did Danielle have an

18     employee profile on Equinox's Intranet?  And do

19     you know what I mean by that?

20          A.  No.  Are you asking if it's similar to

21     member?

22          Q.  Correct.

23          A.  When we go into the system, we -- or it

24     can be found in E-club also.  Just like I

25     explained to you, you can find a member's contact

```
1              info and e-mail address.  Employees are also
2              entered, but we have a different ID number.  It's
3              an employee number.  It starts with an "S."
4              That's how you know, and it generally tells you
5              underneath whether they're a manager of the club,
6              trainer, what department they're working in.
7                   Q.  What is the name of the system that you
8              access for employees?
9                   A.  There is no separate one for employees.
10             This is just E-club.  An E-club is -- like I told
11             you earlier, we access a lot of different
12             information through E-club.  We can -- on
13             performance commission, first-time buyer report,
14             member information.  We can also -- we purchase
15             packages through that system.  It's pretty much
16             our whole encompassing system.
17                  Q.  And if there is negative feedback on
18             Danielle, could that be entered into the E-club
19             system?
20                  A.  The only way it would be able -- it
21             couldn't be entered by a member.  A member
22             wouldn't be able to enter that.  In the notes of a
23             session, I guess if you wanted to write something
24             negative, you could, about the trainer, but that's
25             not what E-club is used for.
```

```
 1            Q.  What about managers; could they enter
 2      something negative?
 3            A.  Can a manager enter something about
 4      another manager?
 5            Q.  About a trainer.
 6            MR. McPARTLAND:  Object to the form.
 7            He can answer.
 8            A.  The only way to enter it about the
 9      trainer is if the trainer had sessions.  Because
10      you can't go into a profile and just make a
11      comment about somebody.  You would have to be
12      making a note in reference to a -- something of
13      inventory in the system.
14            Q.  If the trainer was terminated, would
15      that be -- would it indicate that a trainer was
16      terminated in the E-club system?
17            A.  I don't believe they would be in E-club
18      anymore once they terminate.  IT, I think, goes
19      through occasionally and removes terminated
20      employees from the system.
21            Q.  Occasionally.  So there would be a
22      period of time where you could still access an
23      E-club profile after the employee is terminated?
24            A.  I don't know what that window is.  I've
25      never looked into a terminated employee's report.
```

```
 1              The only reason why you would go into E-club to
 2         bring up an employee's profile, as you call it, is
 3         if they have sessions that I need to pull.
 4                   There are some employees throughout the
 5         company that purchase training, Pilates, and then
 6         you would go in there.  There would be no other
 7         reason to bring up an employee unless you were
 8         pulling a session from their inventory.
 9              Q.  Do you have an E-club profile?
10              A.  I believe so.
11              Q.  And did Ms. Ashdown have an E-club
12         profile?
13              A.  I believe so, yes.
14              Q.  And did you ever access her E-club
15         profile?
16              A.  She had purchased sessions, and she
17         would buy one pack for Ryan, because she was
18         training with Ryan.  I don't know if she ever
19         asked me to pull a session for her.
20              Q.  Did you access her E-club profile; yes
21         or no?
22                   MR. McPARTLAND:  Object to the form.
23              A.  I don't remember if I ever accessed it.
24         I'm sure there would be an occasion where I would
25         need to if she asked me to pull a session.  But
```

1          like I told you earlier, you don't pull up an

2          E-club profile unless you're trying to pull a

3          session from inventory.

4               Q.  I'm not asking what the protocol is.

5          I'm asking if you recall ever accessing her E-club

6          profile.

7               A.  To answer your question, I don't recall

8          if I ever accessed it.

9               Q.  But you testified that you would pull

10         sessions for Ryan for her; is that correct?

11              A.  No.  I said to you -- I never said that

12         I pulled sessions for Ryan for her.  You asked me

13         if I had accessed it.  I told you I don't remember

14         if I would have ever had to pull a session for

15         Ryan for her.

16              Q.  Could she have pulled the session

17         herself?

18              A.  Yes.

19              Q.  Why would she have had to pull that?

20              A.  Could be she had a day off from the

21         club, the pay period was going to end, and she

22         reaches out to me and says, "Hey, I forgot to pull

23         the session for Ryan."  Ryan could have come into

24         the office and say, "I trained Kerry on Thursday,

25         pay period's going to end, can you pull up the

```
 1              session for me," something that like that could

 2              have occurred.

 3                     At that point, Kerry would have been

 4              considered an active client of Ryan's, so there

 5              could very well be a session that needs to be

 6              pulled so that it shows on the performance

 7              commission.  That's how the trainers get pulled.

 8                     If the session's not pulled from

 9              inventory and it doesn't appear on the performance

10              commission, technically they wouldn't be paid for

11              that session on the paycheck.

12                  Q.  So you testified earlier about a

13              commission, a performance commission that was

14              covering about a two-week period.

15                     And as you sit here now, you still don't

16              know whether it was Ryan or Bobby?

17                  A.  I don't want to answer you

18              untruthfully.  That's why I'm telling you I don't

19              know.

20                  Q.  And this commission report, the second

21              time had three or four AmEx sessions, and you've

22              testified why that caused you concern; correct?

23                  A.  Yes.

24                  Q.  And that you believe that Ms. Ashdown

25              improperly pulled these sessions; correct?
```

```
 1              A.  Yes.
 2              Q.  And do you believe that she should have
 3         been terminated for improperly pulling sessions?
 4              A.  You're asking me my opinion?
 5              Q.  Yes.
 6              A.  I think there's more context to that.
 7         It would have to do in relation to the whole
 8         individual, what's going on.  But that's
 9         technically stealing from the company, so if you
10         pull things inappropriately, I guess termination
11         can happen.
12              Q.  So the answer is "yes"?
13                  MR. McPARTLAND:  Object to the form.
14              He answered the question.
15              A.  Yes.
16              Q.  So you believe that Ms. Ashdown stole
17         from the company?
18              A.  With these performance commissions,
19         sort of why flags can go up with them also is
20         trainers are always training on a two-week period
21         to hit what's called pay period bonus.
22                  So in a pay period bonus, you'll always
23         hear talk around the club, especially coming close
24         on Saturdays, Fridays, that they need to get to
25         42.  If a trainer only trains 41 sessions, they
```

```
1              would only be paid a certain amount of money for

2              the sessions.  For instance, they'll take $10 for

3              all 41 of those sessions, so it would be ten times

4              41.  If they make it to 42, it deems them for

5              bonus possibilities.  Which means retroactively,

6              for all those sessions, they would be paid more.

7                    So instead of ten, they would be paid $5

8              for every session.  So these sessions that I

9              noticed, they also brought the trainer to over 42.

10             So technically, there's additional bonus monies

11             that were taken from the company because the

12             trainer didn't earn 42, which would have been

13             bonus.

14                    Q.  But you never spoke to the trainer

15             about it?

16                    A.  No.

17                    Q.  And the trainer remained employed there

18             up until recently?

19                    A.  Yes.

20                    Q.  And was the trainer ever disciplined?

21                    A.  For the sessions?

22                    Q.  Um-hum.

23                    A.  I didn't discipline the trainer, no.

24                    Q.  Were you aware of any discipline?

25                    A.  No.
```

```
 1                Q.  Is it your responsibility to provide

 2        performance feedback to trainers?

 3                A.  No.  We have business meetings, we talk

 4        about leads.  You know, in the course of these

 5        discussions, you can speak about how their

 6        training is going, how their programming is

 7        progressing.

 8                Q.  Did you ever write a written

 9        performance review of your trainers?

10                A.  No.

11                Q.  If a trainer was disciplined, would you

12        be aware of it?

13                A.  If it was something where they lost

14        privilege or they were suspended, yes.

15                Q.  And so, again, I'm going to ask you the

16        same question.  I'm going to ask you to answer the

17        question this time.

18                   So you believe Ms. Ashdown stole sessions

19        from Equinox?

20                      MR. McPARTLAND:  Object to the form.

21                A.  I wouldn't say it was sessions; it

22        would be money.

23                Q.  So do you believe Ms. Ashdown stole

24        money from Equinox?

25                A.  By pulling extra sessions, yes.
```

```
 1                Q.  And I take it you believe that's a
 2        pretty serious act; correct?
 3                A.  Yes.
 4                Q.  And someone who steals from Equinox, do
 5        you believe they should be terminated?
 6                A.  Like I told you earlier, I would want
 7        to understand the context.  I don't think that
 8        would be black and white.  I would want to
 9        understand the situation, what caused it.  That
10        would make me make a full decision.
11                Q.  If someone stole sessions from Equinox
12        without any justification whatsoever, do you
13        believe that that employee should be terminated?
14                    MR. McPARTLAND:  Objection.
15                  You can answer.
16                A.  If it was intentionally and
17        maliciously, yes.
18                Q.  And do you believe that Ms. Ashdown
19        intentionally and maliciously stole sessions from
20        Equinox?
21                    MR. McPARTLAND:  Objection.
22                  You can answer.
23                A.  I never spoke to her or had discussions
24        with her.  I was instructed not to, so I don't
25        even know what her mindset to pulling the sessions
```

```
 1          was.  So I don't want to speculate as to what she

 2          was thinking when she did it.

 3                 Q.  But you believed she committed a

 4          serious offense; correct?

 5                 A.  I believe she pulled sessions for a

 6          trainer that shouldn't have been pulled.

 7                 Q.  And that was during a two-week period;

 8          correct?

 9                 A.  When the sessions were pulled?

10                 Q.  Yes.

11                 A.  Well, the performance commission is

12          during a two-week period, so those sessions would

13          have been pulled during said period of the report.

14          These particular sessions were all pulled on the

15          same day.

16                 Q.  But you testified it concerned you

17          enough to go to the location manager, Mr. Sanders;

18          right?

19                 A.  Yes.

20                 Q.  And did you look at the report for the

21          two weeks prior to that?

22                 A.  I definitely did my due diligence and

23          looked back to see if there was personal --

24                 Q.  Just, did you look at the report for

25          the two weeks prior to that?
```

```
1              A.  I looked at every report, so I probably
2         looked at that one, two weeks prior, the one
3         after, the one before that.
4              Q.  And did you see any other AmEx sessions
5         on the other reports?
6              A.  There were AmEx sessions on all
7         reports.
8              Q.  Did you see any improper AmEx sessions?
9              A.  Just the one or two that we spoke about
10        earlier, and I don't know which pay period was in
11        conjunction --
12             Q.  Did you physically show the report to
13        Mr. Sanders?
14             A.  Which report?  The one with the three
15        or four --
16             Q.  Yes.  The one with the three or four
17        sessions.
18             A.  Yes.
19             Q.  So you printed it out?
20             A.  That's correct.
21             Q.  And you walked it -- you physically
22        handed it to him?
23             A.  Yes.
24             Q.  Did you have any -- did you mark any
25        hand notations on it?
```

```
 1              A.  I don't believe so.  I think I might
 2         have circled the four AmEx sessions.
 3              Q.  Did you make a copy of it?
 4              A.  No.  Just the one that I printed out.
 5    REQ        MR. HARMAN:  We're going to call for the
 6      production of the report that was handed to Mr. Sanders
 7      by Mr. Maietta.
 8                  MR. McPARTLAND:  Take it under
 9              advisement.
10              Q.  You testified that you looked at other
11         periods; right?  So did you look at other periods
12         -- on that day, you were concerned; correct?
13              A.  On the day where I noticed those AmEx
14         sessions pulled, yes.
15              Q.  And so, what else, if anything, did you
16         do to complete your investigation?
17              A.  I looked in eTrac to make sure that the
18         client was not an active client of the trainer.
19         Also, went into E-club, used a member ID number
20         that's on the performance commission to look up
21         the member.  Then I went into their inventory to
22         look at the sessions.  I looked to see if there
23         were any notes.
24              The sessions are generally pulled the
25         same day.  I want to make sure if they were
```

```
 1          forgot-to-pulls, are they going to have notes for
 2          these sessions from earlier in the week, earlier
 3          in the pay period, earlier in the month, that just
 4          were owed to the trainer.
 5                  I looked to see who the member was, to
 6          see if it was one of our active clients.  When I
 7          realized that it was a cancelled member, who, when
 8          they were a member, was using a Florida club and
 9          wasn't an active client of the trainer, that's
10          when I noticed that it was a problem.
11          Q.  And as part of this investigation, did
12          you look at the trainer's -- any other commission
13          reports for any other periods for this particular
14          trainer?
15          A.  I think that day, I tried to remember
16          when I noticed the other discrepancy.  And I think
17          I went back to look and see if it was either the
18          same client, if they were notes or if they were
19          pulled by the same individual.
20          Q.  So you did look at other periods of
21          time, other than this two-week period?
22          A.  I believe so, yes.
23          Q.  What other periods of time did you look
24          at?
25          A.  I don't remember the exact dates of
```

```
1            them.  I looked at the report, I told you, in 2011

2            on a daily basis for the pay period.

3                    Q.  I'm not asking you what you did on a

4            daily basis.  I'm asking you what you did as part

5            of this investigation into Ms. Ashdown.

6                    So what other periods of time do you

7            recall looking at, if any --

8                    A.  I don't recall the exact dates.

9                    MR. MCPARTLAND:  Object to the form.

10                   You can answer.  I'm sorry.

11           A.  And I wouldn't call it an investigation

12           into Ms. Ashdown.  I would call it an

13           investigation into the sessions that were pulled.

14           I wanted to see why they were pulled for this

15           trainer.

16                   Q.  As part of your investigation, what

17           other time periods, if any, do you recall looking

18           at?

19                   MR. MCPARTLAND:  Object to the form.

20           A.  I don't know the exact dates, but I

21           tried to find the initial discrepancies, and I

22           believe I found in that report it was a different

23           member.  But I don't know the time period of that

24           report.

25                   Q.  As part of this investigation, did you
```

```
 1            find that any other sessions were improperly

 2            pulled other than the one you testified to?

 3                      MR. McPARTLAND:  Object to the form.

 4                 A.  No, I don't remember finding any other

 5            ones.

 6                 Q.  Why do you believe that Bobby Dwyer

 7            might have been the individual whose name was on

 8            the commission report?

 9                 A.  That's why earlier I told you I didn't

10            want to answer you untruthfully.  I don't remember

11            if the first one was Bobby's, the second one was

12            Ryan.  But Kerry was very close with those two

13            trainers.  She trained with Ryan three days a

14            week, and I think she had a more personal

15            relationship with Bobby.  I don't know how

16            personal.

17                 So these were two trainers that were most

18            associated with her.  That's why -- and I didn't

19            remember which one because I didn't want to give

20            you misinformation.

21                 Q.  So is it your testimony -- is your

22            testimony that Ryan was involved in -- that the

23            first two sessions were pulled for either Bobby or

24            Ryan?

25                 A.  As we're speaking today, I don't
```

```
 1          remember if the first one or two were pulled for

 2          Bobby or Ryan.  I'm leaning towards Bobby, and the

 3          three or four AmEx PTs, I believe, were pulled for

 4          Ryan.  But I don't remember --

 5               Q.  But both of them were involved?

 6               A.  Both names were involved.  I don't know

 7          if the trainers were involved in the sessions

 8          being pulled --

 9               Q.  Both names were involved?

10               MR. McPARTLAND:  Object to the form.

11               A.  If I remember correctly, yes.

12               MR. HARMAN:  What's the nature of the

13          objection?

14               MR. McPARTLAND:  Involved in what?

15          Both the names were involved in what?  I

16          don't understand.

17               MR. HARMAN:  It's not for you to

18          understand.  You made your objection.

19               MR. MCPARTLAND:  You asked me a

20          question.

21               Q.  And is Bobby still working at Equinox?

22               A.  No.

23               Q.  And what was the nature of his

24          departure from Equinox, from an employment

25          standpoint?
```

```
1                    A.  He voluntarily resigned, I think, for

2           another position in Jersey closer to home.

3                    Q.  When was that?

4                    A.  I believe it was in 2011.  I don't

5           remember the exact date.

6    REQ                MR. HARMAN:  I'm going to call for the

7           last known address of Bobby Dwyer.

8                       MR. McPARTLAND:  Take that under

9                    advisement.

10   REQ                MR. HARMAN:  Also call for the last

11            known address of Ryan Hopkins.

12                      MR. McPARTLAND:  We'll take that under

13                   advisement.

14                   Q.  And Ryan Hopkins, you said he

15          voluntarily resigned recently, in June?

16                   A.  Yes, that's correct.

17                   Q.  Did you ever discipline Ryan Hopkins?

18                   A.  In what instance?

19                   Q.  In any instance.

20                   A.  Like any trainer, if he didn't have his

21          name tag on, I told him to put his name tag on.

22                   Q.  Any other reason?

23                   A.  Not that I can remember, no.  I had a

24          good staff.  They're generally not troublemakers.

25                   Q.  Do you use a cell phone?
```

```
1              A.  Yes, I do.

2              Q.  What type of cell phone do you use?

3              A.  I'm using an iPhone 4S.

4              Q.  And what's your cell provider?

5              A.  Currently, Verizon.

6              Q.  And what is your cell phone number?

7              A.  ███████████████

8              MR. McPARTLAND:  Note my objection.

9              Q.  How long have you used that number?

10             A.  Let's say, at least 10 years.

11             Q.  And how long have you used Verizon as a

12     provider?

13             A.  I don't know if it's two or three years

14     now.

15             Q.  Who was your provider before Verizon?

16             A.  AT&T.

17             Q.  And do you use your iPhone 4S for work

18     purposes?

19             A.  Yes.

20             Q.  Do you access work e-mail through your

21     iPhone?

22             A.  Yes.

23             Q.  And do you use your texting feature?

24     Just in general, do you use your texting feature?

25     Do you text?
```

```
1                 A.   Yes.

2                 Q.   And do you text employees at Equinox?

3                 A.   Yes.

4                 Q.   Do you text on a daily basis?

5                 A.   Do I text on a daily basis --

6                 Q.   With employees of Equinox.

7                 A.   Yes.

8                 Q.   And how long have you been texting

9       employees of Equinox?

10                A.   Since I have been an employee at

11      Equinox.

12                Q.   And that was in 2008?

13                A.   End of 2007.

14                Q.   Did you ever text Ms. Ashdown?

15                A.   I think so, yes.

16                Q.   And did you ever text Ryan Hopkins?

17                A.   I have, yes.

18                Q.   And have you ever texted Bobby Dwyer?

19                A.   I don't remember texting him.  I don't

20      believe so.

21                Q.   And how about Lawrence Sanders; have

22      you ever texted him?

23                A.   Yes.

24                Q.   When is the last time you remember

25      texting him?
```

```
1              A.  Lawrence?

2              Q.  Yes.

3              A.  On my birthday, he texted me to wish me

4        happy birthday, and I responded, "Thank you, sir."

5              Q.  And that was recently?

6              A.  Yes.  I just turned 30 on August 31st.

7              Q.  Congratulations.

8              A.  Thank you.

9              Q.  How frequently would you say that you

10       text Lawrence Sanders?

11             A.  Very infrequently.

12             Q.  How frequently do you text Mr. Diaz?

13             A.  More frequently.

14             Q.  How frequently?

15             A.  I wouldn't say once a day, but I would

16       say a couple of times a week.

17             Q.  How frequently would you say you

18       interact via text with the 37 trainers that you

19       oversee?

20             A.  Very infrequently.  Only if they texted

21       me because they're going to be running late for a

22       shift.  One or two of them texted me for my

23       birthday, but I'm primarily an e-mail individual

24       when it comes to work.

25             Q.  So most work is conducted via e-mail?
```

```
 1                    A.  For me, yes.

 2                    Q.  Do you use one e-mail account for work?

 3                    A.  Yes.  I use the Equinox provided e-mail

 4           address for work.

 5                    Q.  And what e-mail address is that?

 6                    A.  ███████████████████████████

 7                    Q.  And is that one continuous --

 8                    A.  Yes.  ██████████████████████████

 9           ████████████████████████████████████████████

10                    Q.  And do you use any other accounts for

11           work purposes?

12                    A.  Not for work purposes, no.

13                    Q.  And your interaction with trainers in

14           terms of scheduling and routine sort of matters

15           would be done by e-mail?

16                    A.  Yes.  Anything that is business related

17           is e-mail.

18                    Q.  And do trainers use -- are trainers

19           obligated to use an Equinox e-mail address?

20                    A.   For anything involving their clients,

21           the company prefers they use the company-issued

22           e-mail address.  They recently issued e-mail

23           addresses for personal trainers.  I don't remember

24           when.  In recent history it was.  I don't remember

25           if it was end of 2011, beginning of 2012, but they
```

```
1           recently gave them e-mail addresses.  We feel it's
2           just more professional to contact members.
3                     MR. HARMAN:  Let's take a break for a
4                few minutes.  Let's take 10 minutes.
5                     (Recess taken).
6
7   CONTINUED EXAMINATION
8   BY MR. HARMAN:
9                Q.  Mr. Maietta, you testified earlier to
10          an employee ID number beginning with an "S"; is
11          that correct?
12               A.  Yes.
13               Q.  What is your employee ID number?
14               A.  I don't know it.
15               Q.  And how do you use it?  Do you have it
16          written down somewhere?
17               A.  No.  I don't really need it for
18          anything.
19               Q.  Why is that?
20               A.  I don't utilize it.  I don't have a
21          trainer, so I would never have to go into my --
22          this account to purchase something.
23               Q.  When is the last time you recall using
24          it?
25               A.  When I probably signed up for --
```

```
 1          through PT on the Net, we have this site where we

 2          could sign up for education and for certificates,

 3          so I probably needed that number to make sure that

 4          the course was deducted from my paycheck.

 5                 Q.  And when was that?

 6                 A.  The last course I signed up for was

 7          sometime in 2012.  They required payroll

 8          deduction.

 9                 Q.  If you want to use your payroll

10          identification number, where would you find it?

11                 A.  In E-club.

12                 Q.  So you could find it if you wanted to?

13                 A.  Yes.

14                 Q.  When you went to work and used the

15          computers at work?

16                 A.  Yes.

17                 Q.  Do you have a computer at work?

18                 A.  I do.

19                 Q.  And is it solely for your use, or do

20          you share it?

21                 A.  My computer can be used by numerous

22          people.  Just when I utilize it for my work, I

23          have to sign in with my code to start the day.

24                 Q.  Where is the computer located?

25                 A.  It's in the personal training office.
```

```
 1              It's right off the training floor right next to

 2          the cardio area.

 3                   Q.  And how -- are there desks in the

 4          office?

 5                   A.  It's not desks.  I don't know what you

 6          call it when it's attached to the wall.  It's like

 7          a slab of wood attached to the wall.  So it's one

 8          long -- I guess you call it a conference desk

 9          against the wall, and there's two computers on it.

10                   Q.  And do you use one of those computers

11          as --

12                   A.  Primarily, I use the one on the left.

13                   Q.  And in order to use it, you have to

14          sign in with a log-in ID?

15                   A.  Your user name, and then it asks you

16          for your password.

17                   Q.  What is your user name?

18                   A.  My first initial and my last name.

19  DIR          Q.  What is your password?

20                   MR. McPARTLAND:  Objection.

21                I'm instructing you not to answer.

22                I think -- you can, if you have a good

23                reason for asking for it, write to me

24                afterwards and I'll let you know about it.

25                   Q.  Has your user name ever changed during
```

```
 1          your tenure at Soho?

 2               A.  My user name, no.

 3               Q.  Has your password ever changed?

 4               A.  Yes.  We have to change the password to

 5          log on, I think, every month or two.  The system

 6          just notifies you.

 7               Q.  Have you ever given your log-in

 8          information to any other Equinox employee?

 9               A.  No.

10               Q.  Have you ever given your log-in

11          information to anyone?

12               A.  No.

13               Q.  And when you are logged into the

14          computer, using it in the personal training

15          office, do you log out at the end of your work

16          time on the computer?

17               A.  No.  I just lock my computer.

18               Q.  How do you do that?

19               A.  Well, I hit "control alt delete."  It

20          asks you whether you want to restart the computer,

21          lock it, shut it down.  I just click "lock."

22               Q.  When it is locked, can someone else

23          then log on?

24               A.  They wouldn't be able to log on using

25          my interface on the computer.  You wouldn't be
```

```
 1          able to -- you would only be able to kick me off

 2          if you were an administrator, but then you

 3          wouldn't be able to access my files.

 4               Q.  On a typical day, you've gone in,

 5          you've logged in to your computer.

 6                  The one on the right or the left?

 7               A.  Left.

 8               Q.  So you typically work on the computer

 9          on the left.

10                  Do other people use that computer?

11               A.  They do, but not when it's logged on to

12          my name.  Whenever I leave the office, I lock it.

13               Q.  When you're present at the Soho

14          location, are you always logged in to that

15          computer?

16               A.  Yes.

17               Q.  And when you're present at the Soho

18          location, does anyone else use that computer?

19               A.  No.

20               Q.  And when Ms. Ashdown was the personal

21          training manager, did she have that same computer?

22               A.  Yes.  She had the one on the left that

23          I'm using now.  It was the same area, but the

24          computers have since been upgraded, so it's not

25          the same motherboard.
```

```
 1              Q.   When were they upgraded?

 2              A.   I think they did them in July of this

 3         year.  They came in and they gave us new memory

 4         cards, made them faster.  They gave use more RAM.

 5         I'm not very computer literate, but that's what

 6         they did.

 7              Q.   What type of computers are they?

 8              A.   Dell computers.

 9              Q.   So the Dell computer, the monitor, and

10         the actual plastic box that contains the

11         components that make the computer function, is

12         that still the same?

13              A.   I don't know.  I wasn't there when IT

14         switched them out, so I don't know whether they

15         took the entire motherboard out when they added

16         things in.

17              Q.   Does the monitor look the same?

18              A.   Yes.

19              Q.   Does it look new?

20              A.   The monitor doesn't -- define "new."

21              Q.   Do you believe it's the same monitor

22         that's been there since Ms. Ashdown was there?

23              A.   I think so, yes.

24              Q.   Do you believe the computer is the same

25         computer that was there since Ms. Ashdown was
```

```
 1          there?

 2                  A.  You mean like the motherboard and all

 3          that stuff?

 4                  Q.  I mean the box that's underneath the

 5          desk.

 6                      MR. McPARTLAND:  Object to the form.

 7                  A.  I don't know.

 8                  Q.  Do you know what I'm talking about?

 9                  A.  You're talking about where the memory

10          and everything is stored --

11                  Q.  Correct.

12                  A.  -- the monitor.

13                  Q.  Yes.

14                  A.  I believe they replaced those out.

15                  Q.  Okay.  You testified earlier that you

16          text for work.

17                  Did you ever look for any text messages

18          concerning Ms. Ashdown?

19                  A.  Earlier I told you I e-mail for work.

20                  Q.  But you also said that you had texted

21          Ms. Ashdown.

22                  A.  That we have texted, yes.

23                  Q.  Did you ever conduct a search for any

24          text messages with Ms. Ashdown?

25                  A.  Like, you mean, Kerry, did we look
```

```
 1          for --
 2                  Q.  Did you ever look for any text messages
 3          that you exchanged with Ms. Ashdown?
 4                  A.  No.
 5                  Q.  Never at any time?
 6                  MR. McPARTLAND:  Object to the form.
 7                  A.  No.
 8                  Q.  And did you ever look for any text
 9          messages exchanged with Mr. Sanders that concerned
10          Ms. Ashdown?
11                  MR. MCPARTLAND:  Object to the form.
12                  A.  No.
13                  Q.  Have you ever texted with Mr.
14          Matarazzo?
15                  A.  No.
16                  Q.  How about with Mr. Plotkin?
17                  A.  No.
18                  Q.  Earlier you testified that you met with
19          your attorney to prepare for today's deposition
20          and that you looked at some e-mails, and that you
21          looked at a performance commission report.
22                  Did you do anything else to prepare for
23          today's deposition?
24                  A.  No.
25                  Q.  And other than Pat, did you speak with
```

```
 1           anyone else to prepare for today's deposition?

 2                A.  No.

 3                Q.  Is today a normal workday for you?

 4                A.  Yes.

 5                Q.  So can you take the day off?

 6                A.  No.  I'll be going in to work later

 7           today.

 8                Q.  What are your normal work hours?  What

 9           were you scheduled to work today?

10                A.  I start at 8:30 and I go till about

11           8:00 tonight.

12                Q.  And so on Tuesdays, you normally start

13           at 8:30?

14                A.  Yes.

15                Q.  And did you tell anyone at work that

16           you would be in at a different time?

17                A.  I let my trainers know this morning

18           that I would be in a meeting, and I would be in

19           later in the afternoon.  And I reminded my

20           supervisor, Lawrence, that I would be coming into

21           the deposition today and I wouldn't be in until

22           later.

23                Q.  How did you do that?

24                A.  Told him in person.  We have a

25           manager's meeting on Monday.  I went to the
```

```
1          manager's meeting and said, "I'm not going to be

2          here at the beginning of the day.  I have a court

3          deposition.  I'll be in later."

4               Q.  Did he have a response?

5               A.  He said, "Okay."

6               Q.  Now, you testified that you printed out

7          and read the complaint in this case; is that

8          correct?

9               A.  Yes.

10               Q.  And did you ever discuss that complaint

11          with Mr. Sanders?

12               A.  I told him that I read it and that I

13          noticed that I was named, but we didn't speak in

14          depth about what it was about.

15               Q.  And when did that conversation take

16          place?

17               A.  I believe it was June of this year.

18          May or June.  I don't remember exactly when I

19          found out that I was named.

20               Q.  And what did you say to him?

21               A.  I don't remember the exact words, but I

22          told him I couldn't believe I was being sued and

23          what do we do now.

24               Q.  What did he say in response that?

25               A.  He said, "I don't know.  Let me speak
```

```
 1            to my boss, because Equinox was named in it, and

 2            you're an Equinox employee, and let me get back to

 3            you."  And that's when I found out we were being

 4            defended by Pat and his law firm.

 5                 Q.  And did you say anything else to

 6       Mr. Sanders?

 7                 A.  In relation to being sued?

 8                 Q.  Well, you said you went to him and you

 9       had a conversation with him and you said you can't

10       believe that you were being sued, and he said he

11       would get back to you.

12                 My question to you was, did you say

13       anything else to him?

14                 A.  No, not that day.  Just briefly, we

15       were at work, and then we haven't been discussing

16       the case since.

17                 Q.  So that day, you had a conversation

18       with him and I've asked you about it.

19                 Is there anything else about the

20       conversation that you remember?

21                 A.  No, sir.

22                 Q.  Did he say anything other than that

23       he'll get back to you?

24                 A.  No.  That's all I remember that he

25       said.
```

```
1                Q.  And did he get back to you?

2                A.  No.  We then found out we were being

3        defended, we were told about the nature of the

4        case --

5                    MR. McPARTLAND:  I'm going to object.

6                 Anything, even an attorney within

7                 Equinox, just don't disclose any attorney

8                 communications.  You can answer the

9                 question, but don't discuss anything you

10                discussed with me or with counsel at

11                Equinox.  Okay?  I just want you to

12                understand that.

13                    THE WITNESS:  Okay.

14               Q.  Do you know whether Equinox has

15        in-house counsel?

16               A.  I believe they do.  I don't know the

17        name.

18               Q.  What makes you believe that they do?

19               A.  I believe from an e-mail I read.  I

20        think it might have said, I think, general counsel

21        and the person's signature.

22               Q.  And have you ever spoken to the

23        individual who signed the e-mail, general counsel?

24               A.  I don't remember his name, so I don't

25        remember if I spoke to that person.  We never had
```

```
 1        a conversation face to face.

 2             Q.  Have you ever had -- other than with

 3        your lawyers, have you ever had a meeting with any

 4        of the corporate employees of Equinox concerning

 5        this lawsuit?

 6             A.  When you say I've had a meeting with

 7        the corporate employees, what do you mean?

 8             Q.  Anyone ever talk to you about this

 9        lawsuit?

10             A.  No.  It was just to explain to us that

11        there was a lawsuit over the phone, and what the

12        next steps would be, and we would be reached out

13        to if we were needed, and I was reached out to for

14        a deposition.

15                  MR. McPARTLAND:  Objection.  Again, no

16             attorney communications.

17             Q.  So you said Sanders would get back to

18        you, and did Sanders get back to you or not?

19             A.  No.

20             Q.  And did you ever discuss the complaint

21        with him again?

22             A.  No.

23             Q.  You said you printed out a physical

24        copy; correct?

25             A.  Yes.
```

```
1                    Q.  What did you do with it?

2                    A.  It was in either one of my files.  I

3            brought it home, I was going to read it, I never

4            really read it fully again.  I just read it when I

5            first printed it out.  I perused the first few

6            pages, and I have the hard copy somewhere.  It

7            hasn't really been the focus of my mind over the

8            last couple of months.

9   REQ               MR. HARMAN:  I'm going to call for

10     production of the hard copy that Mr. Maietta has

11     testified he has in his possession at home or

12     elsewhere.

13                    MR. McPARTLAND:  Taken under

14            advisement.

15                    Q.  You said you have a file.

16              Do you have a file on Ms. Ashdown?

17                    A.  No.  I put it in one of those folders

18            so it doesn't get bent or ruined.  I'm very

19            regimented that way.  I don't like wrinkles.

20                    Q.  Is there anything else that you put in

21            the file?

22                    A.  No.

23                    Q.  Do you maintain any other documents on

24            Ms. Ashdown?

25                    A.  No.
```

```
1              Q.  You said at some point someone reached

2      out to you regarding this lawsuit.

3              Who is that?  Again, I'm not asking you

4      about content of conversations with a lawyer.  I'm

5      asking you, who reached out to you?

6              You had this conversation with Lawrence

7      Sanders, then someone reached out to you by

8      telephone.  Who was that?

9              A.  It was a member of Pat's office just

10     explaining to me the --

11             MR. McPARTLAND:  Not what we spoke

12             about; just who it was.  That's all.

13             A.  Just a member of Pat's office.

14             Q.  And other than a member -- other than

15     Pat or a member of Pat's office, did anyone else

16     reach out to you regarding this lawsuit?

17             A.  No.

18             Q.  And did you ever have any other

19     conversations with Mr. Sanders about this lawsuit

20     after that first conversation?

21             A.  Just that he was being deposed and that

22     I was being deposed, but we didn't speak about the

23     content of it.

24             Q.  When did those conversations take

25     place?
```

```
1                    A.  Yesterday, when I told him that I was
2          coming in for a deposition.  And he said, "I go in
3          on Thursday," and that was it.
4                    Q.  So what did you -- where did this
5          conversation take place?
6                    A.  It's on the gym floor on the way to the
7          managers' meeting.
8                    Q.  What did you say?
9                    A.  "Hey, I'll be in late tomorrow.  I have
10         my deposition."  He said, "Okay.  I have mine on
11         Thursday."  And then we went to the managers'
12         meeting.
13                   Q.  That's the only conversation you've had
14         with him about this lawsuit since you spoke to him
15         about the complaint?
16                   A.  Yes.
17                   Q.  And how would you describe your
18         relationship with Mr. Sanders?
19                   A.  I don't know --
20                   Q.  Let's take, professionally, how would
21         you describe your relationship with Mr. Sanders?
22                   A.  I think it's very good.  We've been --
23         he's been my general manager at two locations.  He
24         was my general manager at the Chelsea location.
25         He became my general manager at the Soho location.
```

```
 1              After he moved to that area, he realized that the
 2              personal training department needed some help,
 3              needed some fixing.
 4                   So he reached out to my general manager
 5              at the Chelsea location at the time and said,
 6              "Listen, I would like to bring Mauro over here to
 7              be my fitness manager and help run the
 8              department."
 9                   Q.  So you'd describe the relationship as
10              very good?
11                   A.  Yes.  We get along well.
12                   Q.  And do you have a social relationship
13              with him?
14                   A.  No.  Just work relationship.
15                   Q.  Have you ever interacted with him
16              outside of the Soho Equinox location?
17                   A.  Yes.  We -- every year we play an
18              Equinox softball league.  He plays on the softball
19              team.  I'm usually the captain, so we play
20              softball together.  Occasionally we play
21              basketball with the trainers.  We go to the courts
22              and he plays basketball also, so he joins us.
23                   Q.  Other than an Equinox-sponsored event,
24              have there been any other occasions where you've
25              interacted with him outside of Equinox?
```

```
 1                   A.  No.  It's always been Equinox events.
 2                   Q.  Do you talk to him about personal
 3          things?
 4                   A.  Yes.
 5                   Q.  On a regular basis?
 6                   A.  Not on a regular basis.  Just when --
 7          if it's something that is going to affect work,
 8          I'll bring it up to him.
 9                   Q.  Can you give me an example?  I'm not
10          trying to pry into your personal life, but can you
11          give me an example of what you mean by that?
12                   A.  Yes.  He's known me for the past
13          six years since I've been an employee in 2009.  My
14          father passed away from lung cancer, and, you
15          know, there were days when I had a tough time at
16          work or I needed time to leave early, and I would
17          go to him and I would say, "Listen, this is what
18          I'm going through, is it all right if I leave
19          early?  This is how I'm feeling."  And he would
20          sit there and he'd listen, give me some advice,
21          because he knows I was very close to my father.
22                   Q.  So he was helpful to you during that
23          period?
24                   A.  Helpful in that he was very
25          understanding and he was just somebody -- he would
```

```
 1          listen when I was having a tough time at work.
 2          I'm very family-oriented.  When my father passed
 3          away from lung cancer, it hit me pretty hard.
 4          There are days when you're at work and you think
 5          about it, or something reminds you and you -- who
 6          can you go to?  It's somebody I can trust to speak
 7          to about it.
 8                  Q.  Did you take time off from work during
 9          that period?
10                  A.  When my father was sick, I was still
11          working.  Just on my days off I would, of course,
12          go visit him.  On days when I was working and he
13          needed a ride to chemo, I would drive him to chemo
14          and then come back after I dropped him back home.
15          And then after he passed away, I was off for about
16          three or five days, help my mother plan the
17          funeral, the wake, and just getting the house in
18          order.  But I came back to work pretty quickly.  I
19          needed something to take my mind off of what had
20          just happened.
21                  Q.  How much time in total would you say
22          that you took off during that time period?
23                  A.  I was in the hospital the day my father
24          died, and I think the next three to four days I
25          wasn't at work.  I think I was fortunate to -- one
```

```
1          or two of those days were days that I was -- were
2          my normal scheduled days off.
3                 Q.  Did you take personal days on the other
4          days that you were scheduled?
5                 A.  Yes.  They're called bereavement days.
6          Equinox gives you three bereavement days.
7                 Q.  Other than bereavement days, did you
8          take any other types of leave from Equinox during
9          that period?
10                A.  No.  I think it was three bereavement
11         days and two of my normal days off.
12                Q.  Were you aware that Ms. Ashdown had
13         health issues?
14                A.  Yes.
15                Q.  When did you become aware of that?
16                A.  When she told me about them.
17                Q.  When did she tell you about them?
18                A.  When we first started working together,
19         I think she had told me that she recovered from
20         cancer.  I don't remember which type she told me
21         she recovered from.  And I think we had some good
22         conversations on that, because cancer is -- it was
23         a big thing in my family, so I -- of course, I
24         understood what she went through personally, but I
25         know how that can affect you.
```

```
 1                  My mother beat breast cancer twice, my
 2          aunt beat breast cancer.  Both my grandparents, my
 3          female grandparents, died from breast cancer.  And
 4          my father had died from lung cancer, so we had
 5          good conversations about that, and I understood.
 6                  And then, when she told me it had come
 7          back -- I believe it was ovarian cancer, I don't
 8          remember correctly what she told me -- I told her,
 9          "Listen, you have to take care of yourself, take
10          care of your body.  Take as much time as you need.
11          I'm here, I'll hold it down."
12                  But she was very, very diligent with
13          scheduling her treatments early in the morning.
14          She would come to work, she would still put in
15          long days, and I said, "Listen, work will always
16          be here, but you have to make sure you take care
17          of yourself."  Because I know how important it is
18          to rest.
19                  I mean, my mother did the same thing.
20          She kept teaching while she was doing treatment,
21          and I think she needed that, so maybe Kerry needed
22          to work also just to help her feel strong so the
23          body would stay strong.
24              Q.  I'm going to stop you there.
25                  You said you had good conversations with
```

```
 1          Ms. Ashdown regarding cancer.

 2                  Did you have good conversations with

 3          Ms. Ashdown regarding anything else?

 4                  A.  Yes.  We -- it was -- we had -- I would

 5          say -- I don't know what -- the word I want to use

 6          to describe it.  The relationship in the office,

 7          there were days where it was tense, and there were

 8          days where everything was fine.

 9                  You can't really have a good conversation

10          about cancer, but what I meant by that is we found

11          common ground on it, and we were able to discuss

12          it openly.  And neither one of us would really --

13          you can't really find a negative in the other

14          person when you're having that kind of

15          conversation.

16                  There were some days in the office

17          where --

18                  Q.  I understand that.

19                  Is there any other topic that you share

20          that commonality with her on, other than cancer?

21                  A.  I think leading the team.  We had good

22          conversations on leading the team.

23                  Q.  Anything else other than leading the

24          team?

25                  A.  I can't remember other specific
```

```
 1        categories.
 2             Q.  So you had commonality on leading the
 3        team and you had commonality on cancer.
 4                 Was there anything else that you had
 5        commonality on?
 6                 MR. McPARTLAND:  Object to the form.
 7             A.  Not that I remember.
 8             Q.  Describe to me your commonality on
 9        leading the team.
10             A.  Well, she came over from the UK where
11        she was in charge of trainers in departments.
12        Part of why I became a manager at Equinox is
13        because I like to teach, I like to work with other
14        trainers, see them be successful.  So whereas
15        she's been a manager before, I've been a manager
16        before -- (interruption).
17             Q.  I'm sorry.  Go ahead.
18             A.  You know, we had commonality on that
19        based on the fact that we led teams before, we've
20        been doing it for a period of time.  You know,
21        being a manager is something where you hire a
22        trainer and you see them go from either a
23        different career to becoming a successful trainer.
24        It's a rewarding experience.
25             Q.  Did you want her job?
```

```
 1              A.  Did I want -- eventually I wanted to be
 2       a personal training manager.  Not necessarily her
 3       job, but at Equinox Soho.
 4              Q.  Was there another location that you
 5       would rather have been at?
 6              A.  It's not a question of rather.  I told
 7       you earlier in the day that's the natural
 8       progression of --
 9              Q.  Did you want her job; yes or no?
10              MR. McPARTLAND:  Objection.  It's been
11              asked and answered.
12              A.  No, I didn't want her job.
13              Q.  You didn't want her job.
14               So did you ever volunteer to cover shifts
15       for her?
16              A.  We don't really work in shifts.  It
17       would be fitness manager and personal training
18       manager work together Monday through Wednesday.
19              Q.  So you didn't.
20               Did you ever volunteer to cover days for
21       her?
22              MR. McPARTLAND:  Objection.
23              You can continue.
24              MR. HARMAN:  I'm going to start moving
25              to strike as nonresponsive.
```

```
1              Q.  I just want you to answer the
2         questions.  I'm not trying to be difficult.
3                   MR. MCPARTLAND:  He answered your
4         question.
5              A.  I'm answering them.  I'm trying to --
6              Q.  So did you ever volunteer to cover days
7         for her?
8              A.  I told her once she told me that she
9         was sick, that I would be here and I would be able
10        to hold down the team, take whatever time she
11        needed.
12             Q.  I understand your statement, hold down
13        the team.
14               I'm asking if you ever volunteered to
15        cover a day for her?
16             A.  If it was necessary, absolutely.
17             Q.  Did you volunteer to cover a day for
18        her?
19             A.  I don't remember ever phrasing a
20        sentence like it.  That's not how the PTM and FM
21        would really speak about -- it's not a matter of
22        covering.  It's a matter of we have to make
23        sure -- the reason why there is two of us is that
24        everything is available to the team.
25                 So if there was ever a day or time where
```

```
 1          she couldn't get something done, absolutely, I

 2          would step in.  Vice-versa, where if there is

 3          something I couldn't get to or I couldn't do --

 4               Q.  I'm asking about your specific

 5          recollection.  I'm not asking you about

 6          generalities.

 7               I'm asking you about if you specifically

 8          recall making an adjustment in your schedule

 9          because Ms. Ashdown had cancer?

10               MR. McPARTLAND:  Object to the form.

11               A.  No.

12               Q.  I'm handing you what's been marked for

13          identification as Exhibit 1.  Please take a look

14          at it.

15               (Plaintiff's Exhibit 1, second

16               amended complaint between Kerry Ashdown

17               and Equinox, et. al., was marked for

18               identification.)

19               A.  (Witness reviews document.)

20               MR. HARMAN:  For the record,

21               Plaintiff's Exhibit 1 is the second amended

22               complaint between Kerry Ashdown and Equinox

23               et. al.  It's a 20-page document dated

24               May 24, 2013.

25
```

```
1    BY MR. HARMAN:

2              Q.  Let me know when you're ready.  Take as

3         much time as you need.

4              A.  (Witness reviews document.) I finished

5         reading it.

6                  Am I able to use the restroom now, or was

7         there a question you asked me before you handed it

8         to me?

9                  MR. McPARTLAND:  I don't think there's

10                a question pending, is there?

11                MR. HARMAN:  No, there's no question.

12                (Recess taken).

13   BY MR. HARMAN:

14             Q.  Have you ever terminated anyone in your

15        tenure as personal training manager?

16             A.  Yes.

17             Q.  Who did you terminate?

18             A.  David Buklas, Jessica Desmond.  I think

19        that's it, as personal training manager.

20             Q.  Why did you terminate David?

21             A.  I remember he didn't show up to

22        numerous floor shifts, and he had been late to a

23        number of client sessions.

24             Q.  And did you give him any written

25        warnings prior to terminating him?
```

```
 1                A.  I think they were primarily verbal with

 2          David.  We had a number of meetings in the office.

 3          I don't remember if I had a written verbal in his

 4          file.

 5                Q.  But do you recall giving him warnings?

 6                A.  Yes.

 7                Q.  And you maintained a file on him?

 8                A.  All employees have files.  So we keep

 9          their certification, their CPR card --

10                Q.  Where is that file located?

11                A.  In the PT office, in the filing

12          cabinet.

13                Q.  And is it locked?

14                A.  No.

15                Q.  So anybody can access a file?

16                A.  Yes.

17                Q.  So if you put a -- if you put a written

18          warning in someone's file, that would be available

19          to any personal trainer?

20                A.  Well, the personal trainer shouldn't

21          know where the files are.  They don't really make

22          it public knowledge.  But yes, if no one was in

23          the office, someone could go into the file cabinet

24          and disrupt the files if they chose.

25                Q.  I'm not asking about disrupting the
```

```
 1           files.

 2                   If you gave someone a verbal warning for

 3           no-showing however many times, and you

 4           memorialized that on a piece of paper and put that

 5           in the employee's file, according to your

 6           testimony, that would be available to anyone who

 7           wanted to access it, who could go into the office;

 8           is that correct?

 9                A.  That's correct.

10                   MR. MCPARTLAND:  Over my objection.

11                Q.  There are files for all 37,

12           approximate, personal trainers?

13                A.  Yes.

14                Q.  Is there a file on you?

15                A.  No.

16                Q.  Is there a file on Mr. Diaz?

17                A.  No.

18                Q.  And do you have a personnel file, if

19           you know?

20                A.  I believe I do.  I believe Lawrence

21           Sanders has that one.  He has the managers' files.

22                Q.  And Lawrence Sanders has an office?

23                A.  Yes.

24                Q.  Where is that located?

25                A.  It's behind the front desk in the gym.
```

1              Q.  And have you ever seen your file?

2              A.  I've seen him take it out.  I've never

3         seen what's in the file.

4              Q.  And have you ever seen Ms. Ashdown's

5         file?

6              A.  No.

7              Q.  Can you describe the circumstances when

8         Mr. Sanders took your personnel file out?

9              A.  When we have our professional

10        development meetings, copies, I think, of recent

11        ones are in there.  And when I was hired to be the

12        fitness manager, I believe they put a copy of my

13        contract in my file.

14             Q.  So you have an employment contract?

15             A.  Yes.  It stipulates what my bonus

16        structure is and what my salary structure is and

17        what the position is.

18             Q.  Did you physically see it put in there?

19             A.  I didn't see it put into the file.

20             Q.  But you know the document was

21        generated.

22                 Did you countersign it?

23             A.  Yes, I signed it.

24             Q.  And was there any reason, other than

25        what you testified to, that you terminated David?

```
1              A.  No.  He was also an underperforming
2         trainer, but I don't generally terminate or want
3         to get rid of trainers for underperformance.  It's
4         generally when they do things that take away from
5         the team that I really find it for grounds for
6         termination.
7              Q.  Why did you terminate Jessica?
8              A.  I found out that she was training in
9         another location, and that a lot of the times,
10        when she couldn't train leads or clients who we're
11        giving her here, she was either turning them down
12        or rescheduling them for the other position.
13             Q.  When did you terminate David?
14             A.  When did I terminate David?  It was
15        sometime in 2011.
16             Q.  How about Jessica?
17             A.  If it wasn't -- I think it might have
18        been early 2012 or late 2011.
19             Q.  And other than David and Jessica, have
20        you terminated anybody else?
21             A.  Not as a personal training manager.
22             Q.  How about a fitness manager?
23             A.  At Soho, I don't think I terminated
24        anybody in -- at Chelsea, I had to terminate a
25        trainer who was working the floor.  I don't
```

```
 1        remember his name.  He got into an altercation

 2        with one of the other trainers in front of the

 3        members during prime time, and it was a pretty

 4        aggressive occasion, so I had to terminate him

 5        on-site.

 6               Q.  And do you remember that individual's

 7        name?

 8               A.  I don't.  I think his name was -- I

 9        think his first name was Nakia.  I think it's

10        Blair.  N-a-k-i-a, Blair.

11               Q.  Have you ever given a trainer a written

12        warning?

13               A.  Yes.

14               Q.  And when is the last time you gave a

15        trainer a written warning?

16               A.  Sometime in 2012.

17               Q.  So this year you haven't given a

18        trainer a written warning?

19               A.  No written warnings, no.

20               Q.  Not in the last nine months?

21               A.  No.  It's --

22               Q.  Just --

23               A.  No.

24               Q.  How many written warnings do you think

25        you issued in 2012?
```

1          A.  Less than 15.

2          Q.  And when you issue a written warning,

3     do you physically hand the written warning to the

4     employee?

5          A.  I call him into the office.  Generally,

6     I already have the written warning written up.  We

7     speak about what actions led to it, allow them to

8     read it.  If they understand what further

9     disciplinary actions will happen if the situation

10    happens again, I sign and date it, then I give it

11    to them to sign and date it.  They sign and date

12    it and I put it in their file.

13         Q.  How about verbal warnings; when is the

14    last time you gave a verbal warning?

15         A.  I don't want to use verbal warning.  I

16    want to use it more as a coaching.  I don't go up

17    to the trainers and scold them.  It's not -- I

18    want to give them best practices.  So it can be as

19    simple as if a trainer doesn't have their name tag

20    on, I'll go up and say, "Sam, where's your name

21    tag?"

22              "It's in my backpack."

23              "Next time you have a break with a

24    client, please go and get it."

25              If they don't have their program out

```
1              visible during the session, I could say, "Andy,

2              where's your program today?"  He'll say, "Sorry,"

3              takes it out of his folder.

4                    So it could either be in passing on the

5              gym floor, or if it's something -- it's the second

6              time they don't have a name tag on, maybe I'll

7              call them into the office and I'll say, "Theo, how

8              come you don't have your name tag on?  Again, do

9              you need me to print another one for you?"

10                   So it can happen either on the floor, in

11             the office.  The situation dictates where it

12             happens.

13                   Q.  When you were the fitness training

14             manager, were you responsible for supervising the

15             trainers?

16                   A.  Yes.

17                   Q.  And did you issue any written warnings

18             during that period?

19                   A.  I may have, but it probably wasn't

20             many.

21                   Q.  Did you terminate anyone during that

22             period?

23                   A.  No.

24                   Q.  And did you ever issue any written

25             warnings in conjunction with Ms. Ashdown?  In
```

```
1              other words, did you ever decide with her that

2              someone should be given a written warning?

3                   A.  I don't believe so.

4                   Q.  While you were the fitness training

5              manager, were you aware of any trainers with

6              problems with substance abuse problems?

7                   A.  Meaning, did the trainers have,

8              currently, substance abuse problems?

9                   Q.  Yes.

10                  A.  No.

11                  Q.  How about trainers who had, in the

12             past, had substance abuse problems?

13                  A.  Yes.  One trainer, you know, in a

14             business meeting, let me know a little bit about

15             her past, and that she turned her life around when

16             she found training.

17                  Q.  What is her name?

18                  A.  Danielle Vetrano.

19                  Q.  And other than Danielle, are you aware

20             of any other trainers who had substance abuse

21             problems?

22                  A.  No.  Just trainers, like a lot of

23             people, they go out and drink Friday nights,

24             Saturday nights, but I wouldn't quantify that as a

25             substance abuse problem.
```

```
 1              Q.  Did you ever observe any behavior of

 2         any trainers, while working at Equinox, that would

 3         lead you to believe that they had substance abuse

 4         problems?

 5              A.  No.

 6              Q.  Did Ms. Ashdown ever tell you that she

 7         was concerned about the behavior of any of the

 8         trainers with respect to substance abuse?

 9              A.  No.

10              Q.  Do you consider yourself a competitive

11         person?

12              A.  Yes.

13              Q.  And do you recognize what's been marked

14         for identification as Plaintiff's Exhibit 1?

15              A.  Yes.

16              Q.  Have you read this document?

17              A.  Just now, I perused it all the way to

18         page 20.  The first few pages, I read more in

19         depth than the others.

20              Q.  Have you read this document prior to

21         today?

22              A.  Yes.

23              Q.  When did you read it?

24              A.  I don't remember the exact dates, but

25         when I first heard about it.  And I don't
```

```
 1        remember, like I told you earlier, if I received
 2        it via e-mail or if I got a hard copy, but I
 3        believe I printed it out of an e-mail, and I did
 4        read the first few pages.
 5             Q.  Is it your understanding that this is
 6        the same document that you have in your possession
 7        in some location?
 8             A.  Before when you said, let the record
 9        show that it was the second amended, I don't know
10        what that means.  So, I don't know if it was --
11        there's a first amended, I would guess, if there's
12        a second.  So I don't know whether the one I have
13        is the first or second.
14             Q.  Fair enough.  Is that your name in the
15        caption?
16             A.  Yes, sir.
17             Q.  The copy that you have of the
18        complaint, whether it's the first amended or
19        second amended, did you show it to anyone?
20             A.  No.  After I read it, I printed it, I
21        put it in the manila folder, I put it in one of my
22        backpacks.  And a lot of other things have been
23        going on in my life.  I haven't gone back to it.
24             Q.  Do you train at Equinox?
25             A.  Yes, I do.
```

```
 1                     Q.  When I [sic] mean train, I mean, do you
 2          yourself train?
 3                     A.  You mean, do I work out?
 4                     Q.  Yes.
 5                     A.  Yes, I work out there.
 6                     Q.  Do you have a regimen?
 7                     A.  Yes.
 8                     Q.  And do you work out with anyone?
 9                     A.  Generally, I work out on my own, but
10          there are times that I work out with some of my
11          trainers in a group workout as a fitness manager.
12          I arrange workouts, so I've worked out with some
13          of my trainers.  I've worked out with my brother
14          when he comes, I work out with my wife.
15                     I generally work out on my own, but there
16          are times when I've worked out with other people.
17                     Q.  Is your wife a member?
18                     A.  No.
19                     Q.  And is your brother a member?
20                     A.  Yes.
21                     Q.  And what is your brother's name?
22                     A.  Joseph Maietta.
23                     Q.  And does he work for Equinox?
24                     A.  No.
25                     Q.  And have you discussed this lawsuit
```

```
 1          with him?

 2                  A.  No.

 3                  Q.  Have you ever worked out with Lawrence

 4          Sanders?

 5                  A.  Yes.  I used to train Lawrence Sanders.

 6                  Q.  How frequently would you train Lawrence

 7          Sanders?

 8                  A.  It was supposed to be twice a week of

 9          training.  Very often, more often than not, it

10          wasn't.  Because of his duties there, there were

11          whole weeks that he couldn't. There were times

12          where he didn't have a package.  But there were

13          times where I had a program for him and I trained

14          him as a trainer.  I didn't work out in

15          conjunction with him.  I was training him.

16                  Q.  So you trained him as a personal

17          trainer?

18                  A.  Yes.

19                  Q.  And do you train anybody now as a

20          professional trainer?

21                  A.  Yes.  I have about six or seven clients

22          now.

23                  Q.  Who are your clients?

24                  A.  You want to know the names?

25                  Q.  Um-hum.
```

1      A.  ████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4            MR. McPARTLAND:  Note for the record, I

5       believe with personal training clients'

6       names, we've had an agreement of

7       confidentiality, the way it's going to be

8       shared.  They'll apply equally to this

9       list.

10            MR. HARMAN:  I understand and agree.

11       Q.  For what period of time were you

12  training Lawrence Sanders?

13       A.  I trained him sporadically at the

14  Chelsea location.  I was there for

15  three-and-a-half years.  I didn't train him for

16  the entire three-and-a-half years.  There were

17  just periods where we would train, and then I

18  trained him when I first came on to the Soho

19  location.  He was looking for a trainer.  He had

20  been training with somebody else, then -- he

21  bounces back and forth.  He likes to train with a

22  few of the trainers every so often, and we

23  trained, I think, for about the first three,

24  four months that I was at the location in Soho.

25       Q.  Was that during the time that

```
1              Ms. Ashdown was working at the Soho location?

2              A.  Yes.  And then he stopped training with

3       me for a little bit.  He worked on his own, and

4       then he started training again with one of our

5       trainers, Pagan Jordan, and he trained with her

6       for all of 2012.

7              Q.  Focusing on the time that -- in 2011,

8       when Ms. Ashdown was the personal training

9       manager, there was a time where you were regularly

10      training Mr. Sanders; is that correct?

11             A.  Yes.  It was about -- it was probably a

12      package or package and a half that we trained, I

13      would say, during that time.  Maybe we had about

14      10 to 12 sessions.  It wasn't as frequent as when

15      it was in Chelsea.

16             Q.  And during the sessions, did you

17      discuss personal matters with him?

18             A.  Most times, it was just sports.  We

19      would talk -- as far as personal matters, it was

20      mostly sports.  It was -- during my sessions, I

21      don't really speak too much, especially when the

22      client is actually involved in the movement.  Just

23      normally during the break periods.

24                 And he -- I didn't give him any break

25      periods.  His goals didn't really allow for
```

```
 1          extensive break periods, but we talked sports, we
 2          would talk about MMA, boxing, you know, just
 3          normal client-trainer chitchat.  It was never one
 4          specific topic that --
 5               Q.  How about work-related topics; did you
 6          discuss work-related topics while you were
 7          training with him?
 8               A.  Yes.  Maybe he would ask me about
 9          program compliance.  He would ask me about how the
10          new trainers that we hired are doing.  You know,
11          the role of the general manager is oversee all the
12          departments, so he's always been very good at
13          speaking with his managers about what is actually
14          going on in your department.
15               Q.  So you talk about work?
16               A.  Yes.  We talk about everything.
17               Q.  Did you talk about Kerry Ashdown?
18               A.  She came up in conversation.  Most
19          times, if we spoke -- and I don't know if they're
20          exclusive to the sessions, but I would ask hum,
21          you know, how to handle certain conversations with
22          her.  You know, for advice on how maybe to speak
23          to her and some of the tensions that were going on
24          in the office.
25                    But it has been like that for the
```

```
 1          six years that I've been a manager.  It's

 2          always -- you're able to speak with all the

 3          different people you work with.  I mean, we have a

 4          manager's meeting every week.

 5               Q.  You said that you spoke with Lawrence

 6          Sanders about how to handle Ms. Ashdown.

 7                    So you were having problems handling

 8          Ms. Ashdown?

 9               A.  No.  If you want to say "handle" in

10          that regard --

11               Q.  I'm using your words.  I'm asking you,

12          how --

13               A.  More along the lines of how to

14          communicate with her.

15               Q.  So you didn't have a problem handling

16          her?

17               A.  Handling is more -- what I mean by

18          handling is, in our day-to-day interactions, how

19          we would communicate, how I would get her to see

20          my point of view on certain matters about the

21          business.  She has her point of view, I have my

22          point of view, but we're both responsible for

23          running the department.  And us working as a

24          cohesive pair is really something that's important

25          to the success of a PT department.
```

```
 1              And I had very open lines of
 2      communications with the PTMs that I worked with
 3      before, so I would ask him for advice on either
 4      how to open up those lines with Kerry, how to make
 5      them more smooth.
 6              Q.  So there were times where she didn't
 7      see your point of view; yes or no?
 8              A.  There were frequent times where she
 9      didn't see my point of view.
10              Q.  When you say "frequent," do you mean
11      every day?
12              A.  Every week.
13              Q.  And did you ever tell anyone that
14      Ms. Ashdown drank excessively at work?
15              A.  I never told anyone that she drank at
16      work.
17              Q.  Did you ever tell anyone that she drank
18      with her staff?  Did you ever tell anyone that she
19      was getting drunk with her staff?
20                  MR. McPARTLAND:  Objection to the form.
21              There's two questions there.
22              Q.  Can you answer?
23              A.  You want to repeat the question?
24                  MR. HARMAN:  She can read it back.
25                  (Record was read back.)
```

```
1                    MR. McPARTLAND:  Which question is the
2            real one?
3                    MR. HARMAN:  The second.
4            A.  I never used the word "drunk."  I did
5       speak to Lawrence that trainers had come up to me,
6       that at a few social functions, that she was
7       drinking with them.
8            Q.  What do you mean by "drinking"?
9            A.  Alcoholic beverages.
10           Q.  So you told Sanders that Ashdown was
11      drinking with trainers?
12           A.  Yes.  We have a managers' meeting once
13      a week, and Lawrence also, for all his managers.
14      He has manager 101s.  So he calls you into the
15      office, you speak about how the department is
16      going from your point of view, how are you doing
17      on a personal level, how are you feeling.  Just
18      anything that's going on.
19               So part of my asking him for advice, I
20      said, "Some of the trainers are giving me
21      feedback, that she's a little close with some of
22      them, and there have been times when she goes out
23      and drinks with them."
24           Q.  You oversee 37 trainers; right?
25           A.  Currently, yes.
```

```
1                 Q.  I would imagine some of them drink;
2        right?
3                 A.  Yes.
4                 Q.  I would imagine some of them drink
5        together; right?
6                 A.  Yes.
7                 Q.  Have you ever had a beer with one of
8        your trainers?
9                 A.  Yes.
10                Q.  Did you ever complain to Sanders that
11       Ms. Ashdown favored males over females?
12                A.  I didn't complain to him.  I told him
13       it was around the time that me and her were
14       discussing certain things, and she said she was
15       hearing from the staff that I favor the females,
16       and I said, you know, they're coming to me saying
17       that she's favoring the male trainers because
18       she's training with one of them, she's close with
19       another.
20                Q.  Who told you that?
21                A.  Who told me she was close?  A few of my
22       female trainers at the time.  One of them was
23       Danielle Vetrano, another one is Nicole Hummel.  I
24       think those are the only two.
25                Q.  Did you believe that Ms. Ashdown was
```

```
 1            favoring males over females?

 2                 A.  No.  It's just -- just like I didn't

 3            believe that I was favoring females, one of the

 4            things that we deal with as managers, is there's

 5            always going to be this perceived favoritism, and

 6            it's our job to make them all feel equally

 7            represented by the department, especially us.  So

 8            it is a challenge.

 9                 Q.  Did you ever tell Sanders that

10            Ashdown -- Ms. Ashdown wasn't responding to your

11            e-mails?

12                 A.  Yes.  Once I had -- it was a closeout

13            period, and --

14                 Q.  So you did?

15                 A.  Yes.

16                 Q.  And have you ever set up a fake e-mail

17            address at Equinox?

18                 A.  No.

19                 Q.  And did you speak to Ms. Ashdown

20            directly about her not, according to you,

21            responding to e-mails?

22                 A.  We spoke about it in the office, I

23            think, after that event.

24                 Q.  But you went to Sanders first; right?

25                 A.  No.  It was during a closeout period of
```

```
 1          time.
 2                    Q.  Well, just, let's --
 3                    A.  I would like to answer the question for
 4          you.
 5                    Q.  I want you to answer the question.
 6                    MR. McPARTLAND:  "No" is good enough.
 7          That's what he's looking for.
 8                    Q.  Did you speak with Ms. Ashdown prior to
 9          your complaint to Mr. Sanders?
10                    MR. McPARTLAND:  Object to the form.
11                    A.  I didn't complain to Lawrence, but I
12          spoke to Lawrence before.
13                    Q.  You spoke to Lawrence.  We established
14          that.  You spoke to Lawrence about your belief
15          that Ms. Ashdown didn't respond to your e-mail.
16          Okay.  We've established that.  That's correct.
17          We understand that.
18                       Is that correct?
19                    A.  I spoke to him because I wanted to get
20          in touch with Kerry in response to my e-mail.
21                    Q.  But you couldn't text her?
22                    A.  No.  I was e-mailing her.
23                    Q.  Did you have her phone number?
24                    A.  I did.
25                    Q.  You could text her; right?
```

```
1                A.  I could have texted her, right.

2                Q.  But you chose not to; right?

3                A.  I don't know when I received her phone

4       number in relation to her e-mail address.

5                Q.  You don't recall texting her, do you?

6                A.  I believe I texted her, but I didn't

7       text her --

8                Q.  Did you text her at that time?

9                   MR. MCPARTLAND:  I'm going to object.

10                Can you let him finish as well, instead of

11                talking over each other?

12                A.  What I do with -- deal with business, I

13       always -- like I told you earlier, I go through

14       e-mail.

15                Q.  But this was another manager at the

16       Soho location; right?

17                A.  Who was another?

18                Q.  Ms. Ashdown.

19                A.  Kerry?

20                Q.  Yes.  And you could have texted her;

21       right?

22                A.  What I did instead was I called.  I

23       called, asking for Kerry.  I called the front desk

24       and I said, "Is Kerry in the office," and they

25       said, "No, Kerry is not in the PT office."  I
```

1           said, "Okay, then let me talk to Lawrence," and

2           they transferred me to Lawrence's office.

3                It just so happened that Kerry was in

4           Lawrence's office, and I said, "Hey, is Kerry at

5           work today?  I sent her an e-mail about some" -- I

6           don't remember what it was related to in the

7           business, "but I want to make sure it went

8           through.  I'm not getting a response."

9                And that's how --

10               Q.  What did Sanders say in response to

11          that?

12               A.  He said -- I think he told me that

13          Kerry was actually in the room, and that she would

14          check the e-mails.  What I did was I told him the

15          nature of it.  I believe it was just a member

16          wanted to purchase a package, so he relayed the

17          information and the package was purchased and

18          everything was fine.

19               Q.  And for how long a period did you

20          believe that Ms. Ashdown wasn't responding to your

21          e-mails?

22               A.  It was just that day.  It was during

23          one of the -- I think it was probably the last day

24          of closeout in the month.  Closeout is the final

25          four days of the month where we're -- really

```
 1            buckle down for budgets.  In the PT department, we
 2            alternate the days.  So I was there on the day
 3            before, she was here on this last day, and I sent
 4            her an e-mail about it in the morning.  I didn't
 5            get a response in the afternoon.  I believe I sent
 6            another one, and I wanted to make sure we got a
 7            process, so I called Equinox looking for her, but
 8            she wasn't in the office.  She was in Lawrence's
 9            office.
10                 Q.  So your testimony is that you sent her
11            several e-mails and she didn't respond to them?
12                 A.  Not several.  Just, probably, two.
13                 Q.  Two.
14  REQ            MR. HARMAN:  We're going to call for
15     production of the e-mails that were sent to Kerry
16     Ashdown that the witness claims he didn't get a
17     response to.
18                 MR. McPARTLAND:  I take that under
19            advisement.
20                 Q.  Was there any other time that
21            Ms. Ashdown, according to your recollection,
22            didn't respond to e-mails?
23                 A.  Not that I remember.
24                 Q.  Did you ever tell Mr. Sanders that you
25            thought that Ms. Ashdown would crash and burn?
```

```
1                  A.  No.

2                  Q.  Did you ever tell Mr. Sanders that

3          Ms. Ashdown wasn't doing her job?

4                  A.  No.

5                  Q.  Did you ever tell Mr. Sanders

6          Ms. Ashdown didn't look well?

7                  A.  No.  When she didn't look well, I would

8          turn to her, because she would sit right next to

9          me, and I would tell her, I would say, "Listen,

10         why don't you leave early, I'll be here."

11                 Q.  Did you ever tell Mr. Sanders that,

12         though?

13                 A.  No.

14                 Q.  Did you ever tell anybody, other than

15         Ms. Ashdown directly, that Ms. Ashdown didn't look

16         well?

17                 A.  Well, when I would go home and I would

18         talk to my wife, I would say, "I think her

19         treatment is really affecting her.  I could see it

20         today."  It's something that I'm very sensitive

21         to.

22                 Q.  Other than your wife, did you talk with

23         anyone else?

24                 A.  No.

25                 Q.  How about any of the trainers?
```

```
1              A.  No.  It's not their business to know.

2              Q.  Did anyone ask you?

3              A.  They would ask, and if they did ask, I

4         would always say, "Speak to her about it," or "I

5         don't know about the situation."

6              Q.  Who asked you?

7              A.  I don't know specifically.  I was more

8         answering if the trainers were to ask, and I know

9         that would be my default answer.  It's not their

10        business to know what's going on with Kerry.

11             Q.  Do you believe that Ms. Ashdown's

12        cancer treatments affected her ability to perform

13        her job duties?

14             A.  No.  I think they affected her

15        physically, like I told you earlier.

16             Q.  I'd like for you to just answer the

17        question.

18               Do you believe that Ms. Ashdown's cancer

19        treatments affected her ability to perform her job

20        duties?

21             A.  No.

22             Q.  So do you believe that there were --

23        from your professional opinion, that Ms. Ashdown

24        had any performance issues?

25               MR. McPARTLAND:  Objection --
```

```
 1                 A.   Performance issues, as far as what?

 2                 MR. McPARTLAND:  -- to form.

 3                 MR. HARMAN:  I'm sorry.  Is there

 4           something that you'd like to say?

 5                 MR. McPARTLAND:  I just objected to the

 6           form.  Do you want me to clarify it?

 7                 MR. HARMAN:  No.

 8                 MR. McPARTLAND:  Okay.

 9           Q.   You've worked at Equinox for

10      five years; right?

11           A.   Since November 2007.

12           Q.   Six years?

13           A.   Almost six, yes.

14           Q.   And you've worked as a manager for

15      about half that, a little more?

16           A.   No.  Probably about 90 percent of it.

17           Q.   90 percent of it you worked as a

18      manager.

19               And you're now functioning in

20      Ms. Ashdown's former position; correct?

21           A.   That's correct.

22           Q.   And you've been in lots of manager

23      meetings; correct?

24           A.   Yes.

25           Q.   And you've had manager training;
```

```
 1          correct?

 2                  A.  Yes.

 3                  Q.  Do you consider yourself a good

 4          manager?

 5                  A.  Yes, I do.

 6                  Q.  Are you as knowledgeable as you could

 7          be of Equinox's requirements of you as a personal

 8          training manager?

 9                  A.  Say that one more time, please.

10                  Q.  Are you as knowledgeable as you could

11          be of Equinox's requirements for you as a personal

12          training manager?

13                  A.  On a day-to-day basis, absolutely.  I

14          always want to learn more on a daily basis.  I

15          think there's always something to learn.

16                  Q.  I'm talking about today, though.  I'm

17          not talking about the future.

18                     Have you done everything you're supposed

19          to do to learn your job?

20                  A.  Yes.

21                  Q.  Are you good at it?

22                  A.  Yes.

23                  Q.  Was Ms. Ashdown good at her job?

24                  A.  Yes.

25                  Q.  And did you ever identify any
```

```
 1          performance issues with Ms. Ashdown?

 2                A.  Yes, I did.

 3                Q.  What were those?

 4                A.  Part of the job as the fitness manager

 5          is I'm involved with the brand.  So sort of how

 6          our jobs break down is she's the business -- the

 7          personal training manager's business numbers, the

 8          fitness manager is brand.  So what I'm responsible

 9          for is program design, program design compliance

10          with the trainers.

11               So one of the things, when I came over to

12          the Soho location, as a team, they weren't very

13          programming compliant.  We had a program

14          compliance spreadsheet, and at the time when I

15          first got there, I noticed that they were -- less

16          than 20 percent of the staff was utilizing the

17          programs correctly.

18               So one of my tasks coming in there was to

19          make sure that more of the trainers were

20          programming with the eventual goal of being at a

21          hundred percent compliance.  And one of the things

22          that I noticed and made that job difficult is that

23          Kerry didn't actually utilize programs with her

24          training clients.  They weren't visible when she's

25          on the floor, which is a requirement of the
```

```
 1          trainer.
 2                  And they weren't -- they weren't in the
 3          share drive.  They would be easily accessible.
 4          Like all the other trainers and managers need to
 5          have them on the share drive.  So it made my
 6          ability to get trainer buy-in less effective
 7          because there could be easily something where they
 8          could say, "Well, why do I need the program if the
 9          personal training manager doesn't have the
10          program?"
11                  Q.  So did you complain about that?
12                  A.  I didn't complain about it.  I spoke to
13          Lawrence in my one-on-one and said, "Hey, listen,
14          you guys have me in here to improve our
15          programming complaints.  Kerry doesn't use
16          programs, nor does she have them visible during
17          the training sessions.  It's something that I've
18          told her that I can help her with, programming,
19          because that's one of the things that I'm good at.
20          She doesn't really want my help, so it's going to
21          be difficult for me to improve the program
22          compliance of the staff if she's not open to me
23          assisting her with the programming or actually
24          having programs with her clients."
25                  Q.  Is it a requirement at Equinox that you
```

1     have programs visible on the floor?

2          A.  Yes.

3          Q.  Where is that?  Is that written down

4     somewhere?

5          A.  I believe it's part of our EFTI

6     curriculum.  I don't know where it is written

7     down, but it's something that we educate and tell

8     the trainers when we hire them.  We're -- part of

9     the Equinox programming system is we program

10    six weeks in advance on our programming template.

11    And how the managers are coached and all the

12    trainers are coached needs to be visible during

13    the session.

14          In our complimentary services, we

15    actually show the program to the training client

16    when we first start training them.  So after we

17    meet for the Equifit assessment, where we meet for

18    that first training session, what we're supposed

19    to do as trainers at Equinox is show them the

20    program, explain to them what they can expect in

21    this fitness program.

22          Q.  So if I went to an Equinox location,

23    according to Equinox's policy, if I see a trainer,

24    I should see them with some kind of piece of paper

25    or something like that?

1          A.  You will see them either with our

2      branded, six-week program on a clipboard, either

3      attached to a notebook, or very recently trainers

4      have moved over to the digital version of the

5      template, which you can find it on there, on the

6      iPad or any other type of tablet.  But it should

7      always be present during the session.

8          Q.  And if it's not, they're violating

9      Equinox's policy, according to your testimony?

10          A.  If it's not there, it's the job of

11      either the fitness manager to either ask them why

12      it's not there, ask to see their program, see what

13      the reason is.  It could be the trainer forgot it

14      and they go get it during the rest period.

15          Q.  And it's your testimony that

16      Ms. Ashdown didn't use programs at all?

17          A.  In the beginning of her tenure there,

18      she didn't have programs visible during the

19      sessions.

20          Q.  How long a period would you consider to

21      be the beginning?

22          A.  I would say, at least the first

23      two months.  Then Lawrence is always very good

24      about that in their one-on-one.  He addressed it

25      with her and said, "Hey, let me see your

```
1              programs."  From that point forward, there were
2              programs visible during sessions.
3                   Q.  So she only didn't use programs in the
4              very beginning?
5                   A.  Yes.
6                   Q.  But -- and she hadn't worked at Equinox
7              prior to that first beginning period that you're
8              talking about; correct?
9                   A.  No.  It's my understanding she was
10             hired in the beginning of 2011.  She used to work
11             in the United Kingdom.
12                  Q.  And then she started using programs
13             after that beginning period?
14                  A.  After Lawrence spoke with her about
15             having programs during sessions, yes.
16                  Q.  How do you know Lawrence spoke to her?
17                  A.  He told me in his -- in our one-on-one
18             that "I'll speak to Kerry about there being
19             programs visible during the training sessions."
20                  Q.  So he talked to you about his
21             conversations with Ms. Ashdown?
22                  A.  No.  He told me what he would do in
23             response to my conversation with him.
24                  Q.  Did you ever bring any other concerns
25             to Mr. Sanders about Ms. Ashdown?
```

```
 1              A.  No.  The only concerns were the

 2         inability to communicate, something where we had a

 3         different opinion.  She was often condescending.

 4         She would speak to me like I was a child, so I

 5         never was the -- the office is visible to the

 6         training floor.  I never wanted us to get into a

 7         back-and-forth, and there was one specific

 8         occasion where she was yelling at me.  I don't

 9         remember what the topic was, and I left the

10         office.

11              Then I went to Lawrence.  I said, "You

12         need to talk to Kerry.  She's raising her voice to

13         me, and I would rather not have the whole training

14         staff see it."

15              Q.  So it's your testimony that she yelled

16         at you?

17              A.  She has yelled at me, yes.

18              Q.  Yell at you about what?

19              A.  I don't remember the topics.  It was us

20         just -- disagreements we were having.

21              Q.  And was she yelling at you in front of

22         anybody?

23              A.  You could say the whole gym floor

24         because our window, behind us in the office -- our

25         office is only about three-and-a-half feet wide,
```

```
1              and it's -- the whole gym floor can be seen right

2         into our windows.

3              Q.  So it's your testimony that she yelled

4         at you in front of the whole gym floor?

5              MR. McPARTLAND:  Objection.

6         A.  She yelled at me in my office.  She was

7         yelling at me, and we were visible from the gym

8         floor.

9              Q.  And so you went to Sanders and you said

10        that Ashdown was yelling at you?

11             A.  That's correct.

12             Q.  What did he say?

13             A.  He said, "I will speak with her."

14             Q.  And did he?

15             A.  I believe so.  I didn't see the

16        conversation.

17             Q.  What happened after that?  Did you go

18        back to the office?

19             A.  I went back to the office, and probably

20        for the next week, we barely said a word to each

21        other.  And there was a noticeable tension when

22        you would come into the office.

23             Q.  And do you recall what the dispute was

24        about?

25             A.  No, I do not.
```

```
 1                    Q.  And you said she was condescending to

 2         you?

 3                    A.  Yes.

 4                    Q.  What do you mean by that?

 5                    A.  I'm always looking to learn, I also

 6         like to teach.  So in our beginning conversations,

 7         when she first started, she let me know a little

 8         bit about her background, what she would do in the

 9         UK.  I definitely took it as something where I

10         could learn how to manage business from a member's

11         prospective well from her, because she definitely

12         had a talent for that.  She was very organized

13         with how she had the trainers -- (cross talk)

14                    Q.  In what ways was she condescending to

15         you?

16                    A.  I was trying to finish the question

17         that you asked me.  And I would respond with

18         trying to give her some ways of -- like you said

19         earlier, she had never worked at Equinox before,

20         so I was trying to explain to her the brand.  It

21         was obvious when she came in that she didn't --

22         she wanted to run it the way it was run in the UK.

23         Every business is different, every even department

24         within Equinox is different, different culture.

25                         So when I would try to give my opinion or
```

```
 1            my advice, she didn't really care to hear it, and

 2            that's when she would be condescending.

 3                 Q.  So it's your testimony that she didn't

 4            want your advice?

 5                 A.  I don't think she felt she could learn

 6            anything from me.

 7                 Q.  So it's your testimony that you don't

 8            think that she felt that she could learn anything

 9            from you?

10                 A.  That's correct.

11                 Q.  And did she tell you that?

12                 A.  No.  That's how I felt.

13                 Q.  And did you complain to Lawrence

14            Sanders that she -- that you didn't think that she

15            could learn anything from you?

16                 A.  In our one-on-one, I would say to him,

17            you know, we're supposed to be working as a team,

18            PTM and FMs are supposed to feed off of each

19            other.  I've had two very productive relationships

20            with other PTMs in my tenure.  And I said for us

21            to turn around Soho like they're expecting us to

22            turn around Soho, it's not going to work unless we

23            work together.

24                 Q.  If you have a disagreement with

25            Mr. Diaz over a work-related issue, who makes the
```

1           final decision about what to do?

2                A.  I would make the final decision, but we

3           always want to go after everything as a

4           partnership.  It's definitely something where I

5           value his feedback and what his opinion would be.

6           Unless it was grossly inaccurate, I would

7           definitely take what he said into consideration.

8                Q.  But you have the final decision?

9                A.  Final decision, but we make it as a

10          team.  It's all relationships with PTMs and FMs.

11          We work as a team.

12                Q.  Were there other occasions where you

13          allege that Ms. Ashdown yelled at you?

14                A.  There were frequent times where she

15          would raise her voice.  In my opinion, when two

16          people are working together, we should be speaking

17          to each other like we're speaking right now.  It

18          should never -- in a business setting, especially

19          one where it's so visible to all the members and

20          trainers walking by, that it should never look

21          like we're being verbally aggressive or animated.

22          It should be a very professional demeanor whenever

23          you're speaking in the office.

24                Q.  So she was verbally aggressive with

25          you?

```
 1              A.  Yes.  The tone and the volume, there
 2         were times where -- were inappropriate for the
 3         situation.
 4              Q.  And you said "frequent."  How
 5         frequently was she being verbally aggressive with
 6         you?
 7              A.  More than once.  It was frequent in the
 8         workplace.
 9              Q.  You said "frequent."  Does that mean
10         once a week?
11              A.  More than once is my answer.
12              Q.  More than five?
13              A.  I believe so.
14              Q.  More than ten?
15              A.  Where she raised her voice?  Probably
16         not more than ten where she was condescending,
17         absolutely.
18              Q.  So there is more than five, but not
19         more than ten times that she was verbally
20         aggressive with you.  And then there was more than
21         ten times where she was condescending toward you?
22              A.  I would say almost every situation
23         where we had a difference in opinion, she had a
24         condescending tone in her voice.
25              Q.  And did you ever call anyone in the HR
```

```
1          department about Ms. Ashdown?

2               A.  I don't remember.  I don't think I

3          have.

4               Q.  And did you e-mail anyone in the HR

5          department about Ms. Ashdown?

6               A.  No, I don't believe so.

7               Q.  Has Mr. Sanders ever yelled at you?

8               A.  No.

9               Q.  And if Mr. Sanders yelled at you

10         between five and ten times in front of others at

11         Equinox, would you talk to someone about it?

12              A.  Absolutely.

13              Q.  Who would you talk to?

14              A.  It would depend on which club we're at,

15         who is superior -- I would talk to my wife first

16         and see how she would -- "what do you think I

17         should do," and then I would probably speak to my

18         area personal training manager, Rich Velasquez.

19              Q.  But you would speak to someone about

20         it?

21              A.  Absolutely.

22              Q.  And did you speak to Mr. Sanders about

23         all these instances of yelling with Ms. Ashdown?

24              A.  In our one-on-ones, I would speak about

25         the nature of our relationship in the PT office.
```

```
1              Q.  Did you speak to Mr. Sanders about all

2         these instances of yelling?

3              A.  I wouldn't speak to him after every

4         single instance, but once I felt like it was too

5         much, there would be times where I would go speak

6         to him in the one-on-one.

7              Q.  So you did --

8              A.  I wasn't the type that I would

9         tattletale after every -- oh, she yelled at me.

10        But after she would yell, it would be

11        condescending and I would speak to her and say, "I

12        don't appreciate the way you're speaking to me."

13        And it wouldn't change.  Then I would speak to

14        Lawrence.  I would address it with Kerry also,

15        that I didn't like the way she spoke to me.

16             Q.  Is it your testimony that you directly

17        addressed it with Kerry and then you spoke to

18        Mr. Sanders?

19             A.  Absolutely.  The first event we were

20        talking about before, where she was yelling, was

21        after I had spoken to her on another occasion.

22        And I said, "Listen, there's no reason for us to

23        be yelling.  I don't appreciate the way you're

24        speaking to me," and it didn't change.

25                  And that day, when she was yelling,
```

```
 1              that's when I left the office, because I didn't
 2              want to respond in kind.  I wanted to keep even
 3              tone, so I left the office, because I felt that
 4              was appropriate, and went to Lawrence.  I said,
 5              "She's yelling at me in the office.  I need you to
 6              speak to her."
 7                   Q.  And did he report back to you after
 8              that?
 9                   A.  No.  He didn't report back to me, but
10              like I told you, for at least that week, it was
11              pretty much a "hi" and "bye" with me and her.  It
12              was very, very tense in the office.
13                   Q.  Did you ever observe Ms. Ashdown, as
14              you say, allegedly yelling at anyone else?
15                   A.  I never told you I saw her yelling at
16              somebody else.
17                   Q.  Well, I'm asking you, did you ever
18              observe her yelling at anyone else?
19                   A.  No.
20                   Q.  Did you ever observe her being
21              condescending to anyone else?
22                   A.  There could be times in the office
23              where something she could say to the trainer in
24              relation to the business could be condescending
25              but that would be about it.
```

```
 1              MR. McPARTLAND:  Let me interrupt.

 2              (Recess taken)

 3              MR. HARMAN:  We're going to break now

 4         for lunch.

 5           I'm going to remind the witness that

 6         you're still under oath and instruct you

 7         not to discuss your testimony with anybody

 8         during the break.

 9           Do you understand that?

10             THE WITNESS:  Okay.  Can I check with

11         my wife to let her know that I'm still

12         here?

13             MR. HARMAN:  Sure.  I'm talking about

14         the content and the substance of your

15         testimony; not your whereabouts.

16

17           (Luncheon recess taken at:  1:16 p.m.)

18

19

20

21

22

23

24

25
```

```
 1              A F T E R N O O N   S E S S I O N

 2                      (2:04 p.m.)

 3   CONTINUED EXAMINATION

 4   BY MR. HARMAN:

 5              Q.  Did you discuss your testimony while we

 6         were on lunch break today?

 7              A.  No.

 8              Q.  And is there any portion of the

 9         testimony that you gave earlier in the day that

10         you want to change?

11              A.  No.

12              Q.  Is there any testimony that you

13         provided earlier in the day that you believe to be

14         inaccurate?

15              A.  No.

16              Q.  We had some discussions earlier about

17         the computer that's in your office.

18                 Did you ever, at any point, conduct a

19         search of your computer for information regarding

20         Ms. Ashdown?

21              A.  Which computer; the one on the left or

22         the one on the right?

23              Q.  Let's talk about the computer that you

24         had before it was changed by the IT department.

25                 So I take it that you took over
```

```
 1              Ms. Ashdown's computer; is that correct?
 2                   A.  Yes.  The way the office is set up, PTM
 3              is historically always set on left, the FM is
 4              always set on the right.
 5                   Q.  After Ms. Ashdown's departure, isn't it
 6              true you were almost immediately placed in the
 7              interim position of personal training manager?
 8                   A.  No.  I just did both tasks for about
 9              two or three weeks, but I stayed on the computer
10              on the right.
11                   Q.  And when did you move to the computer
12              on the left?
13                   A.  Once they found the fitness manager to
14              work with me at the location.
15                   Q.  That was about three weeks?
16                   A.  Yes.  It was sometime in October.
17                   Q.  October 2011?
18                   A.  That's correct.
19                   Q.  And at any point after that -- and you
20              started to use the same computer that Ms. Ashdown
21              was using in October of 2011?
22                   A.  Yes.  After they brought in someone to
23              work, I moved to the computer on the left, that
24              Kerry had used, yes.
25                   Q.  At any point after October 11th, did
```

```
1            you conduct any search for any information

2            regarding Ms. Ashdown?

3                    A.  No.

4                    Q.  How about within the physical office

5            itself; have you ever conducted a search for

6            information regarding Ms. Ashdown?

7                    A.  No.

8                    Q.  I'm handing you what's been marked as

9            Plaintiff's Exhibit 2.  Please take a look at it.

10                   (Plaintiff's Exhibit 2, two-page

11                   document dated January 9th to Joseph

12                   Matarazzo from Walker G. Harman, Junior,

13                   was marked for identification.)

14                   A.  (Witness reviews document.)

15                   MR. HARMAN:  For the record, this is a

16                   two-page document dated January 9th to

17                   Joseph Matarazzo from Walker G. Harman,

18                   Junior.

19                   Q.  Have you had an opportunity to read

20           Plaintiff's Exhibit 2?

21                   A.  Yes.

22                   Q.  Do you recognize this document?

23                   A.  No.

24                   Q.  Have you ever seen this document

25           before?
```

```
1               A.  No.
2               Q.  Do you have any understanding of what
3          it means?
4               A.  I believe it's your firm letting Joe
5          Matarazzo know that Kerry Ashdown has brought a
6          legal disagreement against Equinox.
7               Q.  And as you sit here today, after having
8          read it, is there any other purpose to the letter?
9               A.  If I'm understanding correctly, it's
10         preparing Equinox that there's a potential legal
11         matter, and that anything in relation to the case
12         should be retained as such.
13              Q.  And do you see your name there in the
14         Re line?
15              A.  Yes.
16              Q.  But you never received a copy of this
17         letter?
18              A.  No.
19              Q.  And did you interview Mr. Diaz?
20              A.  Yes, I did.
21              Q.  And was he an internal hire?
22              A.  Yes, he was.
23              Q.  And was he at the Soho location?
24              A.  No.  He was in a midtown location.  I
25         don't remember if it was our Graybar location.  He
```

```
 1          was a manager in training.

 2                  Q.  Did you interview anyone else?

 3                  A.  We had just met with -- once the

 4          interview gets to my hands, it's less a matter of

 5          me picking the candidate.  More of just making

 6          sure I vibed with the candidate.  So he was pretty

 7          much our option, or the option the company had.

 8          And I met with him just to make sure -- he had,

 9          like, some of the answers to my questions.  I

10          thought he was a positive candidate, and that's

11          pretty much my involvement as hiring.

12                  Q.  How many times did you meet with him

13          before he was hired?

14                  A.  I believe it was two times.

15                  Q.  Did you train with him?

16                  A.  No.

17                  Q.  And what would have happened if you

18          didn't vibe with him?

19                  A.  I guess -- I'm sure Lawrence and my

20          area personal training manager, Rich, would have

21          asked me why.  I guess if there were tangible

22          reasons, they would have looked for another

23          candidate, or they would have tried to find ways

24          for the match to work.

25                  Q.  And was there anybody else that you met
```

```
 1            with that was a candidate for that position?
 2                 A.  I don't believe so.  I think people --
 3            like Lawrence and Rich were, I think, discussing
 4            other candidates, but Darwin was the only one
 5            brought to my attention.
 6                 Q.  Do you remember any other candidates
 7            that were being discussed?
 8                 A.  No.
 9                 Q.  And can you tell me other supervisors
10            that you had other than Mr. Sanders, other
11            supervisors you've had at Equinox?
12                 A.  I've had -- currently, now, I have Jed
13            Prisby, who's an assistant general manager; Jane
14            Montoya, who's an assistant general manager;
15            Lauren Buck, who's an assistant general manager;
16            Michelle -- I can't remember her last name.  She's
17            an assistant general manager now, the general
18            manager at a location in Chicago.
19                  Morgan Zamorra, she was an AGM, and now
20            she's a general manager at the Chelsea location.
21                 Q.  Anybody else?
22                 A.  There was another gentleman, but I
23            can't remember his name.  He was there earlier in
24            my tenure.  That's an assistant general manager.
25            And then Nick Aliferis was an assistant general
```

```
 1          manager, and then he became the general manager of

 2          Chelsea, and now he's the general manager of

 3          Columbus Circle.

 4               Q.  So these are managers that you've had

 5          during your time at Chelsea and Soho at Equinox?

 6               A.  Correct.

 7               Q.  And of these individuals that you

 8          named, were you supervised directly by any of

 9          them?

10               A.  They're involved in our PT meetings.

11          It's direct supervision.  It's not as if I just

12          answer to them.  We kind of all work together as a

13          team.  It's not something where I would just speak

14          to one of them.  You know, I would speak to the

15          AGMs, too, at bigger clubs, they have the same

16          title, but they may be responsible for different

17          duties.  I may have to go to one for something

18          involving towels, some involving equipment, it

19          depends on the role and the nature of the

20          question.

21               Q.  Well, you would consider the

22          personal -- you would consider yourself to be the

23          direct supervisor of the personal trainers;

24          correct?

25               A.  That's correct.
```

1          Q.  And would you consider Lawrence Sanders

2      to be your direct supervisor?

3          A.  Yes.

4          Q.  Tell me other direct supervisors that

5      you've had.

6          A.  The people that I listed on that --

7          Q.  All these individuals were your direct

8      supervisors?

9          A.  Yes.  The AGMs work under the general

10     managers, and they, on a more specific level, deal

11     with things at the club level.

12         Q.  Are you aware of any employee at

13     Equinox ever being terminated for, allegedly,

14     improperly pulling sessions?

15         A.  Yes.

16         Q.  Can you tell me who, please?

17         A.  I know the Brooklyn personal training

18     manager, I forget his name, I think it was -- I

19     know the Brooklyn training personal training

20     manager, and I had heard of another personal

21     training manager, but I don't know which location

22     and which name.

23         Q.  When did you hear this, about the

24     Brooklyn personal training manager?

25         A.  I would say, it's sometime in 2012.  I

```
1               didn't hear about it this year.

2                    Q.  And what did you hear?

3                    A.  That he was pulling sessions

4               inappropriately for himself and for another

5               trainer, and he was discovered and he was

6               terminated.

7                    Q.  And did you hear anything else?

8                    A.  No.

9                    Q.  Who told you this?

10                   A.  I think I might have actually heard it

11              from Darwin because Darwin used to know people at

12              the Brooklyn Equinox, and then he has friends in

13              some other locations.

14                   Q.  And then you recall another instance in

15              which an employee was terminated for improper

16              session pulling?

17                   A.  Yes.  I remember hearing it.  I don't

18              remember the -- I don't know which location it

19              was.

20                   Q.  You don't remember any specific

21              details?

22                   A.  No, sir.

23                   Q.  What is your educational background?

24                   A.  I attended a four-year private

25              university, Hofstra University.  I have a BA in
```

```
1          biology and psychology.
2                  Q.  And beyond your combined bachelor's
3          degree, do you have any other degrees?
4                  A.  No.  I would like to go back to school,
5          but I don't.
6                  Q.  What would you like to go back to
7          school for?
8                  A.  I want to get a master's in sports
9          nutrition.
10                 Q.  Do you hold any certificates?
11                 A.  What type of certificates?
12                 Q.  Any kind of certificates related to
13         your job?
14                 A.  Yes.  I have my national certification
15         through the Aerobics Fitness Association of
16         America, I'm TRX certified, Kettlebell certified.
17         I was certified using the biker through Equinox,
18         pre- and postnatal certified.
19                 Q.  Anything else?
20                 A.  That's all I can remember off the top
21         of my head.
22                 MR. HARMAN:  I'm handing you what has
23              been marked as Plaintiff's Exhibit 3.
24              Please take a look at it.
25                 (Plaintiff's Exhibit 3, Defendants'
```

```
 1              responses to initial discovery dated

 2              June 17, 2013, was marked for

 3              identification.)

 4                  THE WITNESS:  (Witness reviews

 5              document.)

 6                  MR. HARMAN:  For the record, this is

 7              Defendants' responses to initial discovery

 8              protocols, with this matter's CIV number,

 9              dated June 17, 2013.

10              Q.  Have you seen this document before?

11              A.  No, sir.

12              Q.  Do you know who David Harris is?

13              A.  Yes, I do.

14              Q.  Who is he?

15              A.  He's one of the heads of the personal

16         training department for Equinox.

17              Q.  And have you ever discussed Kerry

18         Ashdown with him?

19              A.  No.

20              Q.  And how about Elizabeth Minton; who is

21         she?

22              A.  She's, I think, senior director for

23         development for personal training for Equinox.  I

24         don't know her exact title.

25              Q.  Have you ever discussed Kerry Ashdown
```

```
 1        with Elizabeth Minton?

 2             A.  I have spoken with Liz about my

 3        relationship with Kerry while we were working

 4        together, and ways to improve it.

 5             Q.  What about -- we've talked about

 6        Lawrence Sanders.

 7             This document is entitled, "Defendants'

 8        responses to initial discovery protocols."  And

 9        with respect to 3, 3 is, "Identify person the

10        defendant believes to have knowledge of facts

11        concerning the claims or defenses at issue in this

12        lawsuit and a brief description of that

13        knowledge."  And then "Defendants in this case,"

14        and that includes you, "provided the following

15        response."  And there are individuals listed, and

16        Lawrence Sanders is listed there.

17             And my question to you is, other than

18        what we've already spoken about, do you have any

19        specific knowledge about your interactions with

20        Lawrence Sanders -- and I'm sorry about the

21        convoluted question, but I think it will be clear.

22             Other than what you've already testified

23        to, did you have any other interactions with

24        Lawrence Sanders regarding Kerry Ashdown that you

25        can think of?
```

```
1                    A.  No, sir.

2                    Q.  And do you know who Matthew Plotkin is?

3                    A.  Yes, I do.

4                    Q.  And have you ever had any decisions

5            with -- and by "discussions," I mean, e-mail,

6            text, phone, in person, with Matthew Plotkin

7            regarding Ms. Ashdown?

8                    A.  No.  After she was let go, he just said

9            that he and Lawrence made the decision, and we

10           moved on from there.

11                   Q.  And you're also identified here as

12           having knowledge or information regarding

13           Plaintiff's employment with Equinox, as well as

14           other facts and circumstances related to the

15           claims and defenses in this lawsuit.

16                       Do you have any reason to disagree with

17           that statement?

18                   A.  If this is saying that I was there

19           during the time, that's all I would really say I

20           know about.  I wasn't involved in the decision nor

21           do I know how they came to the decision or what

22           the decision was actually made off of.  I just

23           know my relationship with Kerry while we worked

24           together.

25                   Q.  Other than what you've testified to
```

```
 1          today regarding Ms. Ashdown's employment with

 2          Equinox, do you have anything to add that you

 3          haven't already testified to, with respect to your

 4          knowledge regarding Ms. Ashdown's employment with

 5          Equinox?

 6                    MR. MCPARTLAND:  Note my objection to

 7               form.

 8               A.  No.

 9               Q.  How about Matthew Herbert; do you know

10          who he is?

11               A.  Yes.  I believe the head of -- or he

12          works in the Human Resources department.

13               Q.  Have you discussed Ms. Ashdown with

14          him?

15               A.  No.

16               Q.  How about Joseph Matarazzo?

17               A.  No, sir.

18               Q.  Do you know who he is?

19               A.  I know who he is.  I thought you meant

20          having discussions with him.

21               Q.  Yes.  Did you ever have discussions

22          with him about Ms. Ashdown?

23               A.  No, sir.

24               Q.  Let's go back to Liz Minton.

25                  When is the first time that you had a
```

```
 1              discussion with Ms. Minton regarding Ms. Ashdown?

 2                   A.  I think it was around the time where I

 3              was speaking to Lawrence for advice.  I think Liz

 4              was speaking to -- Kerry was speaking to Liz about

 5              advice on how to work on our relationship.  I

 6              think after Liz and Kerry spoke, Liz reached out

 7              to me and said that Kerry and I should get

 8              together at an off-site location just to talk

 9              about my wants and desires, Kerry's wants and

10              desires, in ways that we can meet and come up with

11              a compromise and move forward.

12                   Q.  Did you refuse to meet with her

13              off-site?

14                   A.  I didn't feel comfortable about meeting

15              off-site.  I wanted to have the meeting either in

16              our office or somewhere in Equinox Soho.  Just

17              because in the past, in how she's spoken to me, I

18              didn't want there to be any possible way or

19              inference that anything less than positive or

20              negative on my end came out.

21                   So I expressed to Liz that I would rather

22              meet with Kerry at the gym in our office on the

23              mezzanine, and both Kerry and Liz said it would

24              probably be best if we met at a neutral location.

25                   Q.  Where did you meet?
```

```
 1              A.  We met across the street from the gym
 2         at a delicatessen.  It's a restaurant on the
 3         corner of Prince.
 4              Q.  Did she yell at you during that
 5         meeting?
 6              A.  No.  The meeting was -- of course we
 7         were in a restaurant.  I spoke for the majority in
 8         the beginning because Kerry gave me the floor.  I
 9         spoke about ways for us to improve, just things
10         that I felt slighted on or not involved in.
11              One of my main bones of contention was
12         that there was a time where on my day off, she
13         interviewed some training candidates and hired
14         them without my knowledge or even me meeting them.
15         When I came in to work that next day, she said,
16         "Oh, by the way, your two new trainers you need to
17         train, they start on Monday."
18              So I told her that -- in this meeting,
19         that I wanted to be involved in things like that,
20         that for us to -- for us to be successful in the
21         department, we need to work together.  I conceded
22         a lot of -- I told her that we would speak more
23         amongst ourselves.  She agreed we should speak to
24         each other when there was an issue, and she would
25         try to work better on how she spoke to me.
```

```
1                     So she didn't yell during that time.  But

2            the meeting felt as if we both spoke to each

3            other, and then from that meeting, I didn't really

4            see much of a change in our interactions.

5                     Q.  But you took the reigns at the

6            beginning of the meeting?

7                     A.  No, Kerry started it.

8                     Q.  But --

9                     A.  One of the things that Liz and Lawrence

10           told her is that as the personal training manager,

11           she needs to work the hardest to repair our

12           fractured relationship, so she started the lunch

13           by saying, you know, "Why don't you start and let

14           me know how you're feeling."  So I started.

15                    It's not that I took the reigns.  She had

16           asked me to start speaking, so I started speaking.

17                    Q.  How do you know that Liz and Larry had

18           told her that?

19                    A.  She had told me and said that, you

20           know, "I need to work towards doing this."  And I

21           believe when I spoke to Liz on the phone, she said

22           that she had the personal training manager, so, go

23           to a neutral site, that's where she'd like to go,

24           allow her to take the lead on repairing the

25           relationship.  And I said, "Okay."  And I trust
```

```
 1          Liz.  I've known Liz since I've been employed, and

 2          that's why I felt okay with going to an off-site

 3          meeting spot.

 4               Q.  Where were you when Ms. Ashdown hired

 5          these trainers?

 6               A.  I was probably home.  It was my day

 7          off.

 8               Q.  Hadn't you taken some time off during

 9          that period?

10               A.  No.  Not when these trainers were

11          hired.

12               Q.  You weren't on your honeymoon?

13               A.  That was in April.  If it was

14          concurrent, I would imagine that I was around

15          for -- the way we do an interview process is a

16          phone screen in person.

17               Q.  I'm not asking about the interview

18          process.  I'm asking you about whether you took a

19          honeymoon or not.

20               A.  The first question was where was I.

21               Q.  All right.  So you didn't know where

22          you were, so I'm asking you if you took a

23          honeymoon.

24               MR. MCPARTLAND:  Over my objection.

25               A.  My response to your question, that I
```

```
1              was home on my day off, and then as I was

2              answering, you said, "Did you take a honeymoon?"

3                   Yes, I took a honeymoon.

4              Q.  How long did you take?

5              A.  A week.

6              Q.  How many personal trainers have you

7         hired since Ms. Ashdown departed Equinox?

8              A.  Over 20.

9              Q.  And has Mr. Diaz been present at every

10        single one of those interviews?

11             A.  Diaz -- Darwin Diaz meets all the

12        candidates before we hire them.

13             Q.  I understand that's your testimony,

14        that that's your policy.  I'm asking you if he's

15        been present at every single interview that you've

16        conducted for personal trainers?

17             A.  He's not been to every interview, but

18        he meets them at one of our interview stages

19        before the hiring process is complete.

20             Q.  And that's the procedure and that's

21        what you and Ms. Ashdown had utilized when you

22        were working together as well; correct?

23             A.  In this case, with these two trainers,

24        we didn't utilize that procedure.

25             Q.  And has Mr. Diaz ever taken vacation?
```

```
 1                    A.  Yes.

 2                    Q.  And has he ever taken any other types

 3          of leaves?  Has he ever been ill?

 4                    A.  I think since we've worked together, he

 5          has only taken one sick day.

 6                    Q.  But he's taken vacation?

 7                    A.  He's on vacation now.  This is his

 8          first vacation since we started.

 9                    Q.  How long is that vacation for?

10                    A.  One week.

11                    Q.  I'm handing you what's been marked for

12          identification as Plaintiff's Exhibit 4.  Please

13          take a look at it.

14                         (Plaintiff's Exhibit 4, Defendants'

15                         responses to Plaintiff's first set of

16                         interrogatories dated June 10, 2013, was

17                         marked for identification.)

18                    A.  (Witness reviews document.)

19                         MR. HARMAN:  For the record, this is

20                         Defendants' responses to Plaintiff's first

21                         set of interrogatories.  It's dated

22                         June 10, 2013.

23                    A.  To be honest with you, I'm reading it,

24          but I don't understand it.  I know science; I

25          don't know legalese.
```

1            Q.  Okay.  Do you recognize your name there

2       on the caption on the first page?

3            A.  Yes, sir.

4            Q.  And could you please turn your

5       attention to Interrogatory Number 16.  And just so

6       that we are clear on what these are -- because I'm

7       not -- this is not an argument, nobody is trying

8       to trick anybody.

9                 To take the legalese out of it, these are

10      questions that have to be answered; right?  So,

11      for instance, if you turn to Number 5 on Page 4.

12                Number 5 on Page 4 says, "Identify each

13      and every person with knowledge or information

14      regarding Defendants' policies and/or procedures

15      concerning hostile work environment."  And the

16      response there is "Equinox identifies Matthew

17      Herbert."

18                So there are questions and there are

19      answers.  If you'll turn your attention to

20      Interrogatory 16, Interrogatory 16 states,

21      "Identify each and every person who, in any

22      manner, participated in the answers of these

23      interrogatories."  And the response is "Equinox

24      identifies Patrick McPartland, Lawrence Rosen,

25      Lawrence Sanders, Elizabeth Minton, Matthew

```
 1              Plotkin, Joseph Matarazzo and Matthew Herbert."

 2                   Is it an accurate statement that you did

 3        not provide any information in response to any of

 4        these interrogatories?

 5                   MR. MCPARTLAND:  Object to the form.

 6              You can answer.

 7              A.  I don't know what the questions are.

 8              Q.  Well, you don't see your name there;

 9        right?

10              A.  That's correct.

11              Q.  And do you have any reason to believe

12        that that response provided by Equinox is

13        inaccurate?

14              A.  I don't understand the rest of these

15        questions that need to be answered.  So isn't that

16        what I'm doing right now; I'm answering your

17        questions?

18              Q.  I'm asking you if you believe that --

19        you're not identified as having provided any

20        information in response to these interrogatories.

21                   Do you believe that you did?  Did anyone

22        ever go over any interrogatory questions with you?

23              A.  No.

24              Q.  Okay.  That's all I wanted to know.

25        It's not a trick question.  I just wanted to know
```

```
 1        whether --

 2              A.  Okay.

 3              Q.  I'm handing you what has been marked as

 4        Plaintiff's Exhibit 5.  Please take a look at it.

 5                  (Plaintiff's Exhibit 5, Defendants'

 6              responses to Plaintiff's first request

 7              for the production of documents dated

 8              June 10, 2013, was marked for

 9              identification.)

10              Q.  You don't need to read the entire

11        document.  It's similar in its nature in that it's

12        in legal format, and it contains a lot of

13        legalese, but I'll explain to you -- I just have a

14        few questions.

15                  So take a moment to generally peruse it.

16        If you need further time to read it, you're

17        certainly entitled to that, whatever time you

18        need.

19              A.  (Witness reviews document.)

20              MR. HARMAN:  For the record, this is

21              Defendants' responses to Plaintiff's first

22              request for the production of documents

23              saying caption and CIV number is this

24              action, and it's dated June 10, 2013.

25              A.  I'm looking at it, but it's just words
```

```
1        on a page to me.

2             Q.  Okay.  Similar in nature, these are

3        requests that the plaintiff, Ms. Ashdown, made of

4        defendants in this action, which include you.  But

5        where these are -- the previous exhibit,

6        Plaintiff's 4, were requests for written

7        responses, Plaintiff's 5 is a request for

8        documents, which includes documents and

9        information, which is anything, really.

10            So I'm going to ask you to turn your

11       attention to Number 29 on Page 16.  29 states,

12       "All communications, all documents, and all

13       electronically-memorialized information sent to or

14       from Defendant Maietta via text message concerning

15       Plaintiff wherein Plaintiff is referenced.  Such

16       references include, but are not limited to,

17       Plaintiff's first name, last name, full name,

18       initials, nickname, or any variation of her name."

19            My question to you is, have you ever seen

20       this before?

21            A.  This response sheet?

22            Q.  This question.

23            MR. MCPARTLAND:  Object to the form.

24            A.  I don't remember reading a document

25       like this, no.
```

```
 1              MR. HARMAN:  Okay.  Give me a few
 2         minutes.  You can set that down for the
 3         court reporter.  The exhibits with the
 4         green tabs go to the court reporter.
 5           Give me a few minutes.  I think I may be
 6         wrapping up.  Give me a few minutes to
 7         review my notes.
 8           (Recess taken)
 9              MR. HARMAN:  I don't have any further
10         questions.
11           Mr. Maietta, unless you have anything to
12         add to today's testimony -- there might be
13         additional questions for you, but I'll take
14         that up with your lawyer.  There might be
15         additional legal issues or questions, but
16         I'll take it up with your lawyer, and you
17         will certainly hear through him if there
18         are any additional discovery issues that
19         arise.
20           Thank you very much for your time.
21              THE WITNESS:  Thank you.
22
23              (Time noted 2:57 p.m.)
24
25
```

```
1                    I N D E X

2

3   WITNESS: Mauro Maietta

4   EXAMINATION BY:                         PAGE

5   Mr. Harman                               5

6

7      DIRECTION NOT TO ANSWER              PAGE

8       DIR                                 17

9       DIR                                 81

10

11     PLAINTIFF EXHIBITS                    PAGE

12        1, second amended complaint between    104

13       Kerry Ashdown and Equinox, et. Al.

14        2, two-page document dated January 9th    151

15       to Joseph Matarazzo from Walker G.

16       Harman, Junior

17        3, Defendants' responses to initial    158

18       discovery dated June 17, 2013

19        4, Defendants' responses to Plaintiff's   168

20       first set of interrogatories dated

21       June 10, 2013

22        5, Defendants' responses to Plaintiff's   171

23       first request for the production of

24       documents dated June 10, 2013

25
```

| | RULING | PAGE |
|---|---|---|
| 1 | | |
| 2 | RUL | 17 |
| 3 | | |
| 4 | REQUESTS | PAGE |
| 5 | REQ | 14 |
| 6 | REQ | 69 |
| 7 | REQ | 74 |
| 8 | REQ | 74 |
| 9 | REQ | 92 |
| 10 | REQ | 129 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
2

3     I, MAURO MAIETTA, do hereby acknowledge I have

4   read and examined the foregoing pages of testimony,

5   and the same is a true, correct and complete

6   transcription of the testimony given by me, and any

7   changes or corrections, if any, appear in the

8   attached errata sheet signed by me.

9

10

11

12  _____     _____

13  Date         MAURO MAIETTA

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2         I, RENATE REID, the officer before whom the
 3    foregoing deposition was taken, do hereby certify
 4    that the witness, MAURO MAIETTA, whose testimony
 5    appears in the foregoing deposition, was duly sworn
 6    by me; that the testimony of said witness was taken
 7    by me in stenotypy and thereafter reduced to
 8    typewriting under my direction; that said deposition
 9    is a true record of the testimony given by said
10    witness;
11         That I am neither counsel for, related to,
12    nor employed by and of the parties to the action in
13    which this deposition was taken; and, further, that I
14    am not a relative or employee of any counsel or
15    attorney employed by the parties hereto, nor
16    financially or otherwise interested in the outcome of
17    this action. The witness will sign.
18            IN WITNESS WHEREOF, I have hereunto set
19    my hand this 23rd day of September, 2013.
20
21
22                   RENATE REID
23                Notary Public in and for
24                 The State of New York
25
```