1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK
     - - - - - - - - - - - - - - - - - - - - -x
4
     KERRY ASHDOWN,
5
                    Plaintiff,
6
                    -against-                13-CV-1374
7                                             (HB)(GWG)
     EQUINOX a/k/a
8    EQUINOX FITNESS CLUB and incorporated as
     EQUINOX HOLDINGS, INC.,
9    JOE MATARAZZO, a/k/a JOSEPH MATARAZZO,
     MAURO MAIETTA, LAWRENCE SANDERS,
10   MATT PLOTKIN, a/k/a MATTHEW PLOTKIN, and
     MATT HERBERT, a/k/a MATTHEW HERBERT,
11
                    Defendants.
12
     - - - - - - - - - - - - - - - - - - - - -x
13

14           DEPOSITION of LAWRENCE SANDERS, taken by

15   Plaintiffs, pursuant to Stipulation, held at 200

16   West 57th Street, New York, New York, on

17   Thursday, September 12, 2013, commencing at

18   10:00 a.m., before Margaret M. Harris, a

19   Shorthand (Stenotype) Reporter and Notary Public

20   within and for the State of New York.

21

22

23

24

25

                      MCM REPORTING SERVICE
                        (516) 775-5209

2

1

2      A P P E A R A N C E S:

3

4              THE HARMAN FIRM, P.C.
                      Attorneys for Plaintiffs
                      200 West 57th Street
5                     Suite 900
                      New York, New York  10019

6

7          BY:  WALKER HARMAN, ESQ.

8

9              LAROCCA HORNIK ROSEN GREENBERG &
                BLAHA, LLP
                      Attorneys for Defendants
10                    40 Broadway
                      New York, New York  10005

11

           BY:  PATRICK McPARTLAND, ESQ.

12

13

14     P R E S E N T:

15             Lucas Larson

16             Kerry Ashdown (A.M. only)

17

18

19

20

21

22

23

24

25

                    MCM REPORTING SERVICE
                      (516) 775-5209

3

```
 1
 2              IT IS HEREBY STIPULATED AND
 3       AGREED that the filing and sealing of
 4       the within deposition be, and the same
 5       are hereby waived;
 6              IT IS FURTHER STIPULATED AND
 7       AGREED that all objections, except as
 8       to the form of the question, be and
 9       the same are hereby reserved to the
10       time of the trial;
11              IT IS FURTHER STIPULATED AND
12       AGREED that the within deposition may
13       be sworn to before any Notary Public
14       with the same force and effect as if
15       sworn to before a Judge of this Court;
16              IT IS FURTHER STIPULATED that
17       the transcript is to be certified by
18       the reporter.
19
20
21
22
23
24
25
```

```
                                                      4
 1                        Sanders
 2     L A W R E N C E    S A N D E R S,   called as a
 3          witness, having been first duly
 4          sworn/affirmed by Margaret M. Harris, a
 5          Notary Public within and for the State of
 6          New York, was examined and testified as
 7          follows:
 8     EXAMINATION
 9     BY MR. HARMAN:
10          Q     Would you please state your full
11     name for the record.
12          A     Lawrence Sanders.
13          Q     And is that your legal name?
14          A     Yes.
15          Q     And have you gone by any other
16     name?
17          A     No.
18          Q     And what is your address?
19          A     ███████████████████████
20          Q     Is that --
21          A     ████████████ New York.
22          Q     And your zip?
23          A     ██████████
24          Q     And how long have you lived at
25     that address?
```

5

```
 1                        Sanders
 2          A     A week, I just moved there.
 3          Q     What was your prior address?
 4          A     ███████████████████████
 5          Q     Is there an apartment number?
 6          A     ████████████████████ New York ██████
 7          Q     ████████
 8          A     ███████
 9          Q     And how long did you live there?
10          A     Five years.
11          Q     Have you ever been deposed
12     before?
13          A     Yes.
14          Q     How many times?
15          A     Once.
16          Q     Under what circumstances were you
17     deposed?
18          A     A case against Equinox.
19          Q     What type of case was it?
20          A     A member against Equinox.
21          Q     A member had sued Equinox?
22          A     I guess she was trying, I'm
23     assuming.
24          Q     What was she suing Equinox for?
25          A     She fell off a moving treadmill,
```

MCM REPORTING SERVICE
(516) 775-5209

6

1                          Sanders

2      she stepped onto a moving treadmill.

3           Q      So did you attend a deposition

4      like this in a conference room with a court

5      reporter?

6           A      Yes.

7           Q      And were you a defendant in the

8      case?

9           A      No.

10          Q      What was the member's name?

11          A      I believe it was Collette Malouf.

12          Q      And were you a witness in the

13     case?  In other words, did you witness anything

14     happen?

15          A      No.

16          Q      Did this incident allegedly occur

17     at the Soho location?

18          A      Yes.

19          Q      And about how long ago did this

20     deposition take place?

21          A      Approximately two years ago,

22     maybe between a year to two years, I'm not sure

23     exactly.

24          Q      So that's the only time that you

25     have been deposed?

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 8 of 197

```
                                                      7
1                          Sanders
2              A      Yes.
3              Q      And were you represented by
4     counsel at that deposition?
5              A      Yes.
6              Q      Who was your lawyer?
7              A      LaRocco, the same firm.
8              Q      Did you work with any individual
9     lawyer or lawyers?
10             A      No.
11             Q      When you say "the same firm,"
12    what do you mean by that?
13             A      The firm that's representing
14    Equinox.
15             Q      The firm that's representing
16    Equinox.
17                    And do you mean the firm that's
18    representing Equinox in this case?
19             A      Yes, it's the same firm.
20             Q      And are you represented by
21    counsel today?
22             A      Yes.
23             Q      And who is your lawyer today?
24             A      Patrick McPartland.
25             Q      And have you worked with any
```

8

```
 1                        Sanders
 2    other lawyers with respect to this matter?
 3           A      With respect to which matter?
 4           Q      This matter?
 5           A      No.
 6           Q      Have you ever been a party to a
 7    lawsuit?
 8           A      No.
 9           Q      And just so the record is clear,
10    you have never sued anyone before?
11           A      No.
12           Q      And has anyone ever sued you
13    before?
14           A      No.
15           Q      Has anyone ever made any
16    work-related claims against you?
17           A      Yes.
18           Q      How many times have work-related
19    claims been made against you?
20           A      Once.
21           Q      When was that?
22           A      2009, I believe.
23           Q      And what happened in 2009?
24           A      I made some comments that made
25    someone feel uncomfortable.
```

9

```
 1                          Sanders
 2              Q       What comments were those?
 3              A       Comments about how someone
 4     looked.
 5              Q       What did you say?
 6              A       I said that what she was wearing
 7     was very nice, and, you know, she looked nice in
 8     this, what she was wearing, she had a nice
 9     bottom in what she was wearing.
10              Q       A nice bottom?
11              A       Yeah, a nice butt.
12              Q       So you used the word "butt"?
13              A       I don't recall exactly, but I
14     know that's what I made reference to.
15              Q       So you stated that someone looked
16     nice and they had a nice butt?
17              A       Yes.
18              Q       And who did you make that comment
19     to?
20              A       Another manager in the club.
21              Q       What was that manager's name?
22              A       Elizabeth Lefrois.
23              Q       And she then brought a claim
24     against you related to the comments?
25              A       She spoke to someone who
```

MCM REPORTING SERVICE
(516) 775-5209

10

1                          Sanders

2      basically spoke to someone else, so I guess you

3      could say yes.

4              Q      Who did she speak to?

5              A      She spoke to her boss, her

6      superior.

7              Q      Who was her boss?

8              A      Rachel Siboney.

9              Q      What was your job?  Was this at

10     the Equinox location?

11             A      Yes.

12             Q      And in 2009 when this incident

13     occurred, what was your title?

14             A      General manager.

15             Q      And what was her title?

16             A      Group fitness manager.

17             Q      Were you her direct superior?

18             A      Yes.

19             Q      And she spoke with Rachel

20     Siboney.

21                    What was Rachel Siboney's role at

22     the time?

23             A      Director of the group fitness

24     managers for New York.

25             Q      And what happened, if anything,

MCM REPORTING SERVICE
(516) 775-5209

11

```
1                              Sanders
2      after that?
3            A       I was brought in to the HR
4      department's office and they had a conversation
5      with me about the situation and I had corrective
6      action done.
7            Q       What was the corrective action?
8            A       That I obviously made someone
9      feel uncomfortable in my club and to obviously
10     not do that.
11           Q       Were you given anything in
12     writing?
13           A       I had something that I signed.
14           Q       So you did --
15           A       In writing --
16           Q       So you did -- you were given
17     something to --
18           A       There was something that they
19     wrote up and I signed the document.
20           Q       And have you ever been given
21     corrective action on any other occasion?
22           A       No.
23           Q       And is Ms. Lefrois still the
24     group fitness manager?
25           A       No.
```

                                                                    12
1                          Sanders

2          Q        How long after that incident did

3     she remain the group fitness manager?

4          A        For a few years.

5          Q        And do you know where Ms. Lefrois

6     is now?

7          A        She's an instructor at Equinox.

8          Q        At what location?

9          A        She teaches all over.

10         Q        So she no longer works in a

11    managerial capacity?

12         A        No.

13         Q        And is that the only incident in

14    which a work-related claim has been brought

15    against you?

16         A        Yes.

17         Q        I know you have been deposed

18    before, but just so the record is clear and so

19    that you and I can work as efficiently as

20    possible today together, I'm going to go over or

21    give you a little background and go over a few

22    rules.

23               My name is Walker Harman.  I'm a

24    lawyer.  I'm part of the Harman Firm that

25    represents Kerry Ashdown in a lawsuit that she

                     MCM REPORTING SERVICE
                        (516) 775-5209

13

                              Sanders

2    has brought against Equinox and individuals

3    related to her job there.

4              Do you understand that?

5         A    Yes.

6         Q    I'm going to ask you a series of

7    questions today regarding that lawsuit.

8              If you don't understand a

9    question that I ask you, tell me that you don't

10   understand it and I will endeavor to rephrase

11   it, but the idea will be that if you answer the

12   question the record is going to read as though

13   you understood the question.

14             Do you understand that?

15        A    Yes.

16        Q    During the deposition today you

17   can take a break at any time you would like to

18   except when there is a question pending.  If you

19   need to use the restroom, get something to

20   drink.

21        A    Okay.

22        Q    I would just ask that you finish

23   any pending question.

24             Along those same lines, after you

25   were sworn in this morning, you are under oath

                    MCM REPORTING SERVICE
                       (516) 775-5209

14

                            Sanders

1

2     and that continues throughout the day, whether

3     you're on a break, whether you go to lunch, et

4     cetera.  And the rules state that you are not to

5     talk about your testimony to anyone while you're

6     under oath and while the deposition is ongoing.

7                    Do you understand that?

8          A     Yes.

9          Q     You have to verbalize, well, you

10    don't have to, it's helpful if you verbalize

11    your answers to questions because the court

12    reporter can't always take down gestures or, you

13    know, things like "yeah," you know, so --

14                    MR. HARMAN:  I don't even

15                    know if you got that.

16         A     Understood.

17         Q     So do your best to give specific

18    verbal answers to questions.

19                    Also along those same lines, in

20    terms of the clarification of the record, try to

21    let me finish my question and I will in turn

22    allow you to finish your answer so that we are

23    not interrupting each other.

24                    Do you understand that?

25         A     Yes.


                    MCM REPORTING SERVICE
                      (516) 775-5209

```
                                                          15
 1                         Sanders
 2          Q       Are you aware that you're under
 3   oath today?
 4          A       Yes.
 5          Q       And that failing to tell the
 6   truth under oath is a crime called perjury?
 7          A       Yes.
 8          Q       And that you are appearing at a
 9   deposition today before a court reporter and it
10   is the same oath that you would take as though
11   you were appearing in Federal Court as part of
12   this action.
13                  Do you understand that?
14          A       Yes.
15          Q       Do you live alone?
16          A       No.
17          Q       Who did you live with?
18          A       My children.
19          Q       Are you married?
20          A       No.
21          Q       Do you have a domestic partner?
22          A       Yes.
23          Q       Do you live with your domestic
24   partner?
25          A       Yes.
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 17 of 197

```
                                                               16
 1                          Sanders
 2            Q       Who is that?
 3            A       Shelley.
 4            Q       And Shelley's last name?
 5            A       Springer.
 6            Q       And then you also live with
 7   children?
 8            A       Yes.
 9            Q       And how old are your children?
10            A       ████████████
11            Q       And have you discussed this
12   matter with any of your children?
13            A       No.
14            Q       And have you discussed this
15   matter with Ms. Springer?
16            A       No.
17            Q       What's your date of birth?
18            A       ██████████
19            Q       And what's your cell phone
20   number?
21            A       █████████████
22            Q       And your cell phone provider?
23            A       T-Mobile.
24            Q       And how long have you used
25   T-Mobile?
```

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 18 of 197

17

```
1                         Sanders
2          A      A long time.  I'm not sure how
3     many years, at least over five, six years.
4          Q      During that time using T-Mobile,
5     have you always maintained the same cell phone
6     number?
7          A      Uh-hum, yes.
8          Q      Have you had any alcohol in the
9     last 24 hours?
10         A      No.
11         Q      Have you taken any drugs or
12    narcotics in the last 24 hours?
13         A      No.
14         Q      Are you currently taking any
15    prescription medications?
16         A      No.
17         Q      Can you think of any reason why
18    you could not provide your best and truthful
19    answers today?
20         A      No.
21         Q      Did anyone tell you to make
22    dishonest statements today?
23         A      No.
24         Q      Have you ever been arrested?
25         A      No.
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 19 of 197

```
                                                           18
 1                      Sanders
 2          Q      Have you ever been accused of a
 3    crime?
 4          A      In college, just criminal
 5    destruction to property.
 6          Q      How old were you?
 7          A      18, 19.
 8          Q      And what was the resolution on
 9    that accusation of criminal destruction of
10    property?
11          A      Probation.
12          Q      Did you plead guilty to any kind
13    of offense?
14          A      I guess criminal destruction of
15    property.
16          Q      So you pled guilty to criminal
17    destruction of property and you were given a
18    sentence of probation?
19          A      And paid for court costs.
20          Q      And where did that take place?
21          A      In college.
22          Q      Where did you go to college?
23          A      Western Illinois University.
24          Q      West Illinois?
25          A      Western Illinois University.
```

```
                                                              19
 1                        Sanders

 2          Q       And any other instances in which

 3     you have been accused of criminal activity?

 4          A       No.

 5          Q       Have you ever been fired from a

 6     job?

 7          A       No.

 8          Q       What, if anything, did you do to

 9     prepare for today's deposition?

10          A       Met with Patrick and talked to

11     Patrick over the phone.

12          Q       When is the first time that you

13     met with Patrick to prepare for today's

14     deposition?

15          A       Approximately two months ago.

16          Q       And where did that meeting take

17     place?

18          A       At his office.

19          Q       Was anybody else present?

20          A       I don't recall.

21          Q       Did you review any documents

22     during that meeting?

23          A       Yes.

24          Q       What documents did you review?

25          A       Documents in regards to pulling
```

20

1                           Sanders

2      up sessions, like a computer document.

3             Q      Was there more than one document

4      that you reviewed that date two months ago?

5             A      I think I might have reviewed

6      some e-mails, copies of e-mails.

7             Q      Anything else?

8             A      No.

9             Q      So let's start with the computer

10     documents regarding pulling of sessions.

11                   What do you recall about those

12     documents?

13            A      They just had names on them,

14     dates.

15                   That's it.

16            Q      Anything else?

17            A      No.

18            Q      And I'm not asking about the

19     substance of the communications that you had

20     with your lawyer or the conversation with your

21     lawyer --

22            A      I understand.

23            Q      What I want to know is what you

24     know about the document.

25                   Had you seen the document before

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 22 of 197

```
                                                          21
1                        Sanders

2    that day?

3              A      Oh, yes.

4              Q      And how does that document, if it

5    does, how does that document relate to this

6    lawsuit?

7              A      It relates because that was the

8    documentation of when vouchers were pulled and

9    when vouchers were reinstated, when vouchers

10   expired and who they were pulled for and who

11   they were pulled by.

12                    That's what the report was.

13             Q      What's the report called?

14             A      It was an IT report, so it was

15   the IT department pulling the report, so I'm not

16   sure if it has a name.

17             Q      Did you ask the IT department to

18   pull that report?

19             A      Yes, I did.

20             Q      When did you do that?

21             A      Approximately sometime in August

22   of 2011.

23             Q      And was the report that you are

24   looking at in your lawyer's office two months

25   ago the same document that you asked the IT
```

22

                              Sanders

1

2    department to pull in August of 2011?

3         A     Yes.

4         Q     And why in August of 2011 did you

5    ask the IT department to pull a report?

6         A     Because there was some

7    accusations of misappropriating vouchers of

8    sessions, people being paid for sessions that

9    they didn't do.

10        Q     And who made these accusations?

11        A     Mauro.

12        Q     And is this Mauro Maietta?

13        A     Yes.

14        Q     And to whom did he make these

15   accusations?

16        A     He brought it to my attention.

17        Q     And when did he do that?

18        A     Did you say when?

19        Q     Yes.

20        A     Sometime between July and August

21   of 2011.

22              I can't remember the exact date

23   or time.

24        Q     So with respect to the IT

25   document, you stated that the document evidenced

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 24 of 197

23

```
1                          Sanders

2      when sessions were pulled?

3              A      Yes.

4              Q      What does that mean?

5              A      The personal trainers do sessions

6      and the clients must sign for the session before

7      they do the session or after they do the

8      session, so we term that as pulling the session.

9                     So what that means is -- that's

10     how the personal trainer gets paid for doing

11     that session, is when the session is actually

12     signed for or pulled by the client or a manager.

13             Q      Well, let's go back.

14                    So Mauro accused -- who did Mauro

15     accuse of pulling, what did Mauro accuse, what

16     was the basis of the accusation that Mauro made?

17             A      Mauro didn't accuse anyone.

18     Mauro just said "You need to take a look at

19     this."

20             Q      Sir, I'm using your word.

21                    So are you retracting your word,

22     because you used the word "accusation."

23                    So what did you mean by

24     accusation when you used it earlier in your

25     testimony?
```

```
                                                      24
1                        Sanders
2         A      He was making an accusation that
3    there was something going on with the sessions
4    that were being pulled for particular
5    individuals, and that's all he did, he said,
6    "There's something going on and you need to look
7    at this."
8         Q      And did he accuse anyone of
9    wrongdoing?
10        A      No.
11        Q      Why was he bringing this to your
12   attention?
13        A      Because it's part of his job to
14   manage the sessions that are being pulled
15   specifically as it relates to AMEX and it
16   relates to certain types of sessions being
17   pulled with trainers and he prints out reports
18   for his staff as it relates to their commission,
19   so if he sees something that is not right, his
20   job is to either bring it to my attention or
21   bring it to his boss, the PT manager's
22   attention.
23        Q      So it's his job to bring issues
24   to the PT manager's attention?
25                      MR. McPARTLAND:  Objection
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 26 of 197

25

Sanders

1

2          to form.

3       A       Or my attention.

4       Q       You can answer.

5       A       It's his job to bring issues to

6   either the PT manager or myself as the general

7   manager.

8       Q       At this time in 2011, who was

9   Mauro's direct supervisor?

10      A       Kerry Ashdown.

11      Q       And you said that he brought

12  something to your attention that was not right?

13      A       Yes.

14      Q       What was not right?

15      A       That sessions were being

16  reinstated and sessions were, expired sessions

17  were being reinstated, and the sessions were

18  getting pulled for particular clients that had

19  no usage in our facility during the time that

20  these sessions were being pulled for, and for

21  these particular trainers.

22          So he wanted me to look into it.

23      Q       Who was pulling sessions?

24      A       Kerry Ashdown pulled some of them

25  and -- according to the codes that were used,

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 27 of 197

26

                          Sanders

 1

 2     and the other codes that we used was Cornelia

 3     Hobbie.

 4          Q     Who is Cornelia Hobbie?

 5          A     At the time she was a manager in

 6     training working under Kerry and Mauro.

 7          Q     Just so the record is clear, did

 8     Mr. Maietta accuse Ms. Ashdown of improperly

 9     pulling sessions?

10               MR. McPARTLAND:  Object to

11               the form.

12               You can answer if you

13               understand.

14          A     No, he didn't accuse her.

15          Q     Did he claim that Ms. Ashdown

16     improperly pulled sessions?

17          A     He claimed that there was

18     obviously something wrong going on, that's what

19     he claimed, and he wanted me to look into it.

20          Q     And did he claim that there was

21     something wrong going on and that Ms. Ashdown

22     was responsible for it?

23          A     No, he never said Ms. Ashdown was

24     responsible for it.

25          Q     Is Ms. Hobbie still working at

27

1                          Sanders

2    Equinox?

3            A     I don't believe so.

4            Q     And how long after the summer of

5    2011 did Ms. Hobbie remain employed at Equinox?

6            A     I don't know the answer to that

7    question.

8            Q     Can you give me a guess -- well,

9    you terminated Ms. Ashdown, right?

10           A     Yes.

11           Q     So when did you do that?

12           A     I believe it was the first couple

13   of days of September, within the first couple of

14   days of September.

15           Q     And how long after you terminated

16   Ms. Ashdown did Ms. Hobbie remain employed at

17   the Soho Equinox location?

18           A     She was there for probably a

19   couple of months and then she was promoted to be

20   a fitness manager at one of the clubs, I believe

21   43rd Street.

22           Q     She was promoted?

23           A     Yes.

24           Q     Now, as you sit here today, is it

25   your belief that Ms. Ashdown improperly took

MCM REPORTING SERVICE
(516) 775-5209

28

```
 1                          Sanders
 2      sessions at Equinox?
 3              A       Yes.
 4              Q       And did she steal them?
 5              A       I would say, yes.
 6              Q       So it's your testimony that
 7      Ms. Ashdown stole sessions at Equinox?
 8              A       Yes.
 9              Q       Now, when you came to this
10      belief, did you call the police?
11              A       No.
12              Q       And did you come to the
13      conclusion that Ms. Hobbie stole sessions at
14      Equinox?
15              A       A possibility.
16              Q       How was it a possibility?
17              A       Because at the time there were
18      codes that were used to pull sessions, there
19      were sessions that were pulled for Kerry Ashdown
20      to get paid on that were used by Cornelia's
21      code, so, yes, you could believe that Cornelia
22      stole something for Kerry.
23              Q       And did you try to terminate her?
24              A       There was a full investigation of
25      the whole situation.
```

MCM REPORTING SERVICE
(516) 775-5209

```
                                                        29
 1                         Sanders

 2           Q      Please just answer my question.

 3                  Did you terminate Ms. Hobbie?

 4           A      No, I didn't.

 5           Q      Did anyone else try to terminate

 6      Ms. Hobbie?

 7           A      No, they didn't.

 8           Q      And other than Ms. Hobbie and

 9      Ms. Ashdown, were any other individuals involved

10      in this session pulling incident in the summer

11      of 2011?

12           A      No.

13           Q      And can you explain to me how you

14      formed the belief that Ms. Ashdown stole

15      sessions at Equinox?

16           A      Because her codes were used,

17      because she was the one in the club during the

18      time of the sessions being pulled from her

19      computer, and then there was no one else in the

20      club that would have access to her code or --

21      and she had access to Cornelia's code, because

22      she had to give Cornelia her code in order to be

23      able to teach her and train her on how to do

24      part of the job, so Kerry had access to

25      Cornelia's code.
```

30

1                          Sanders

2                    So, again, you know, that's what

3       led us to believe, led me to believe that she

4       pulled the sessions and she, you know, she

5       benefitted from the sessions by being paid for

6       sessions that she didn't do and then there were

7       two trainers that got paid for sessions that

8       they had no idea that these clients were even on

9       their rosters and they weren't using the

10      facility.

11                   One of the trainers that got paid

12      for the sessions was her personal trainer and

13      another one was a trainer that she was very, you

14      know, close to.

15            Q     What were those trainers' names?

16            A     Ryan Hopkins and Bobby O'Dwyer.

17            Q     Have you ever terminated, other

18      than Ms. Ashdown, have you ever terminated

19      anyone for pulling sessions improperly?

20            A     No, I haven't.

21            Q     And have you ever terminated

22      anyone for stealing?

23            A     Yes, I have.

24            Q     Who did you terminate for

25      stealing other than Ms. Ashdown?

                                                                31
1                           Sanders

2            A      I don't remember the employees'

3    names, but there were two employees that a

4    deposit went missing, and I terminated both of

5    them, but it happened a while ago, so I don't

6    really remember their names.

7                   I had another employee that was

8    witnessed stealing something out of the locker,

9    and I terminated him, actually had him arrested,

10   and those are the only three that I can think of

11   off the top of my head right now.

12           Q      What is alleged to have been

13   stolen out of a locker?

14           A      A wallet.

15           Q      Do you have any idea what was in

16   the wallet?

17           A      I'm not sure.

18           Q      So you don't know the value of

19   the contents of the wallet?

20           A      No, I don't.

21           Q      But you called the police on that

22   incident?

23           A      Yes.

24           Q      And what was the employee's name

25   that was involved in that stealing incident?

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 33 of 197

```
                                                          32
 1                         Sanders

 2         A      I believe his name was Ramon.  I

 3    don't remember his last name.

 4         Q      Did Mr. Maietta ever accuse

 5    Ms. Ashdown of any other illegal conduct?

 6                     MR. McPARTLAND:  Object to

 7               the form.

 8                     You can answer.

 9         A      No.

10         Q      Did Mr. Maietta ever accuse

11    Ms. Ashdown of any other improper conduct?

12                     MR. McPARTLAND:  Object to

13               the form.

14                     You can answer.

15         A      No.

16         Q      Did you ever have any discussions

17    with Cornelia Hobbie about sessions that were

18    associated with her name?

19         A      Yes.

20         Q      And what did she say?

21         A      She had no knowledge of,

22    obviously, what I was asking her about, and she,

23    again, wasn't in the building or around the club

24    at the time that the sessions were pulled.

25         Q      When did this conversation take
```

33

1                          Sanders

2     place?

3          A       Probably in August of 2011.  I

4     don't remember the exact date.

5          Q       And where did the conversation

6     take place?

7          A       The conversation happened in the

8     gym at the club.

9          Q       In June?

10         A       In the gym, in the club.

11         Q       Oh, in the gym.

12                 And what did you say to her?

13         A       I asked her does she know who

14    these people are or why these things were

15    pulled.

16         Q       And what did she say?

17         A       And she had no knowledge of any

18    of what I was asking her.

19         Q       You know she had no knowledge?

20         A       That's what she said.

21         Q       And these were sessions that were

22    pulled under her code?

23         A       Yes.

24         Q       And they were pulled under her

25    code for other trainers?

34

                              Sanders

1

2          A       For Kerry Ashdown.

3          Q       They were pulled under her code

4     for Kerry Ashdown?

5          A       Yes.

6          Q       How many sessions?

7          A       I believe it was at least four I

8     know of, but I don't remember exactly how many.

9          Q       And so there were sessions pulled

10    for Kerry Ashdown for a training session that

11    you believe never took place?

12         A       Yes.

13         Q       And you believe that Ms. Ashdown

14    deliberately did that to gain money?

15         A       Yes.

16         Q       And that she did it dishonestly?

17         A       Yes.

18         Q       Was she paid for the four

19    sessions?

20         A       Yes.

21         Q       How much was she paid for those

22    sessions?

23         A       Probably about 60 bucks.

24         Q       So it's your testimony as you sit

25    here today that Ms. Ashdown engaged in this

                        MCM REPORTING SERVICE
                          (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 36 of 197

35

```
1                         Sanders
2    conduct in order to gain 60 bucks?
3           A      I don't know why she --
4           Q      I'm asking you --
5                  MR. McPARTLAND:  Please
6                  don't interrupt him.  Let him
7                  answer your question.
8           A      I'm not sure what the question
9    is.
10          Q      So it's your testimony that
11   Ms. Ashdown engaged in this activity that you
12   have described in order to gain 60 bucks?
13          A      I don't know why she would engage
14   in that activity, so I don't know.
15          Q      Well, would she gain anything
16   else?
17          A      I don't think I'm the person to
18   judge why --
19          Q      You managed the club, right?
20          A      I'm not the person to judge why
21   someone would do something.
22          Q      Let me keep it simple for you.
23                 I'm talking about economics.  I'm
24   talking about dollars, right?
25                 MR. McPARTLAND:  Objection.
```

36

1              Sanders

2                    Please don't harass the

3              witness.

4                    It's just improper.  You

5              can ask him direct questions.

6                    MR. HARMAN:  I am not

7              harassing the witness.  And I

8              would appreciate you keeping your

9              comments to speaking, to not

10             doing speaking objections.

11                   MR. McPARTLAND:  It's not

12             a speaking objection to tell you

13             not to harass the witness.

14                   MR. HARMAN:  You are

15             speaking now.

16                   MR. McPARTLAND:  I'm

17             allowed to speak if you're

18             harassing the witness.

19                   MR. HARMAN:  I am not

20             harassing the witness.

21                   MR. McPARTLAND:  That's

22             not a speaking objection.

23                   MR. HARMAN:  Are you done?

24                   MR. McPARTLAND:  Ask him a

25             question.

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 38 of 197

```
                                                      37
 1                      Sanders
 2                 MR. HARMAN:  Are you done?
 3                 MR. McPARTLAND:  Are you
 4            done?
 5                 MR. HARMAN:  No.  It's my
 6            deposition.
 7                 MR. McPARTLAND:  So ask
 8            him a question.
 9                 MR. HARMAN:  Can you read
10            back the last question?
11                 (Whereupon, the record was
12            read back by the reporter.)
13   BY MR. HARMAN:
14        Q     That's the question.  Yes or no?
15        A     I guess yes.
16        Q     And were there sessions pulled
17   for Cornelia Hobbie where she would have gained
18   an economic advantage?
19        A     No.
20        Q     Were there sessions pulled for
21   anyone else where that person could have gained
22   an economic advantage?
23        A     Ryan Hopkins and Bobby O'Dwyer.
24        Q     So did you speak to Ryan Hopkins
25   about the sessions that were pulled for him?
```

38

Sanders

1

2    A     Yes.

3    Q     And what did he say?

4    A     He said he didn't know what --

5    who those people were, or who that person was,

6    he said he doesn't know why those sessions were

7    pulled for him, because those are not clients of

8    his.

9              And he said that he knew that

10   there were times when Kerry would train with him

11   and she wouldn't pay for sessions with him, so

12   she would pull sessions from her clients and he

13   said maybe that's what those were.

14   Q     So Ryan told you that Kerry would

15   pull sessions from other clients and give them

16   to him?

17   A     Yes.

18   Q     And does that violate Equinox's

19   policy?

20   A     Yes, it would.

21   Q     So sessions were taken from

22   clients' accounts that they hadn't used?

23   A     Sessions were taken --

24   Q     Well, you just told me that Kerry

25   would -- so how does it violate Equinox's

39

```
1                          Sanders
2      policy?
3           A      How does it violate Equinox's
4      policy --
5           Q      Yes.
6           A      -- to pull sessions for trainers
7      who haven't performed those sessions?
8           Q      Well, your testimony is that Ryan
9      told you that sessions were pulled and given to
10     him?
11                      MR. McPARTLAND:  Object to
12                 the form.
13                      You can answer.
14          Q      I'm just trying to understand
15     what Ryan told you.
16                      So Ryan told you, Ryan said, you
17     asked him about the sessions that were in his,
18     that were on his --
19          A      Commission report.
20          Q      -- his commission report.
21                      And he said he didn't recognize
22     the names?
23          A      He said they weren't clients of
24     his.  He didn't know who they were.
25          Q      Not clients of his.
```

40

1                          Sanders

2                And what else did he say?

3          A        And I said to him, I said, "You

4     didn't recognize the sessions that were pulled

5     for you that you don't train these people?"

6                And he proceeded to say there

7     were times when Kerry would train with him and

8     pull sessions through her clients, her clients,

9     so that Ryan would get paid.

10               So she wouldn't get paid for her

11    clients during the session she was doing with

12    her clients, but she would pull it for Ryan so

13    he could get paid so he wasn't training her for

14    free.  That's what he said she told him.

15               So there would be names on his

16    report sometimes that were not his clients, but

17    he just assumed that these were clients that

18    were possibly Kerry's that she was pulling for

19    him.

20         Q        But as I understand your

21    testimony, the client was getting trained,

22    correct?

23         A        No, the client was not.

24         Q        How do you know?

25         A        Because there was no usage in our

                    MCM REPORTING SERVICE
                      (516) 775-5209

41

1                          Sanders

2     facility.

3           Q       And how do you know that?

4           A       Because I look in our system and

5     see if the person was using the club.

6           Q       You said that Ryan told you that

7     there were times where Kerry pulled sessions for

8     her clients and gave them to him?

9           A       Uh-hum.

10          Q       Did you investigate that?

11          A       Did I investigate?

12          Q       That accusation?

13          A       No, I didn't.

14          Q       So as you sit here today Ryan

15    told you something that violated Equinox's

16    policy, but you didn't investigate it?

17          A       Because that was all a part of

18    this investigation.

19          Q       Just tell me whether you

20    investigated it or not.

21                      MR. McPARTLAND:  Object to

22              the form.

23                      You can answer.

24          A       I didn't.

25          Q       Did you look at any of Ryan's

MCM REPORTING SERVICE
(516) 775-5209

```
                                                        42
 1                        Sanders
 2     other commission reports?
 3          A     I looked at commission reports
 4     probably for a couple of pay periods.
 5          Q     How many pay periods?
 6          A     A couple in July.
 7          Q     Is that it?
 8          A     Yes.
 9          Q     And did you ask Ryan how long he
10     alleged that Kerry had been pulling sessions for
11     her clients and giving them to him?
12          A     No, I didn't.
13          Q     So it's your testimony as you sit
14     here today that Kerry was also stealing sessions
15     from her clients and giving them to Ryan?
16                     MR. McPARTLAND:  Object to
17                the form.
18          A     I don't understand the question.
19          Q     Well, you just told me, didn't
20     you, that Ryan told you that Kerry was just
21     taking sessions from clients' accounts and
22     giving them to him, correct?
23          A     Kerry was performing the sessions
24     for her clients, so she was performing work that
25     she voluntarily decided not to get paid for and
```

MCM REPORTING SERVICE
(516) 775-5209

```
                                                      43
 1                         Sanders

 2     paid Ryan instead by pulling those sessions for

 3     him instead of herself.

 4              Q      Oh, I see.

 5                     But you approved that, didn't

 6     you?

 7              A      No, I didn't.

 8              Q      You know that you are under oath

 9     today?

10              A      I'm very much aware of that.

11              Q      And you never approved that?

12              A      I did not approve that.

13              Q      You never told Kerry for any

14     period of time that you would give her

15     authorization for that?

16              A      Nope.

17              Q      All right.

18                     So let's talk about Bobby.

19                     Did you speak with Bobby?

20              A      Yes.

21              Q      What did Bobby have to say?

22              A      He didn't know who the people

23     were.

24              Q      When you say "the people," who

25     are the people?
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 45 of 197

44

1                          Sanders

2          A       The members, the clients, the

3     clients that were pulled, the sessions.

4          Q       Who was that?

5          A       Who is what?

6          Q       Who were the clients?

7          A       I don't remember all their names.

8          Q       Do you remember any names?

9          A       I think one was Daniel Levy.  One

10    might have been Brian Candida, C-A-N-D-I-D-A, I

11    believe.

12         Q       Anybody else?

13         A       I believe another one was Jacques

14    Levy.

15         Q       So it was Daniel Levy and Jacques

16    Levy?

17         A       I'm not sure.  I think Jacques

18    was definitely one of the names, I'm pretty

19    sure, but I don't remember the last name.

20    Sorry.

21         Q       You said that you met with your

22    lawyer a couple of months ago and you reviewed

23    some documents and you don't recall whether

24    anyone was present; is that correct?

25         A       Correct.

45

1                          Sanders

2          Q      And did you do anything to

3     prepare for your deposition today?

4          A      No.  I mean, I talked to him on

5     the phone.  That's about it.

6          Q      When did you talk to your lawyer

7     on the phone?

8          A      Yesterday.

9          Q      And when did that conversation

10    take place?

11         A      Late afternoon.

12         Q      And how long did that

13    conversation last?

14         A      Twenty minutes maybe.

15         Q      And was anybody else on that

16    call?

17         A      Not to my knowledge.

18         Q      And where were you when the

19    conversation took place?

20         A      At work.

21         Q      When you say "at work"?

22         A      At Equinox.

23         Q      Where were you physically located

24    at work?

25         A      In my office in Soho in Equinox.

```
                                                      46
 1                      Sanders
 2          Q      Is that a closed office?
 3          A      Yes.
 4          Q      Was your door closed?
 5          A      Yes.
 6          Q      And did you talk to Mr. Maietta
 7   yesterday?
 8          A      I mean, I talked to him for
 9   business, yeah.  We work together.
10          Q      I'm asking you whether you talked
11   to Mr. Maietta.
12          A      Yeah, I talked to him yesterday.
13          Q      When did you talk to Mr. Maietta?
14          A      Late afternoon.
15          Q      And what did he say to you
16   yesterday, late afternoon?
17          A      He told me that he needed to
18   leave work a little early because he had to go
19   to Lamaze with his wife, because his wife was
20   pregnant.
21          Q      Did he tell you anything else?
22          A      No.
23          Q      That's the only thing he told you
24   yesterday?
25          A      Yes.
```

47

1                       Sanders

2          Q      And did you ask Mr. Maietta

3    anything yesterday?

4          A      No.

5          Q      Did you tell Mr. Maietta anything

6    yesterday?

7          A      No.

8          Q      And when is the last time you

9    discussed this case with Mr. Maietta?

10         A      Don't know.

11         Q      What do you mean by that?

12         A      I don't recall when I have

13   discussed this case with him, outside of getting

14   e-mails that we had to talk to attorneys or

15   whatever.

16                Outside of that, we haven't, I

17   haven't talked to him.

18                So I don't remember when that was

19   when we started getting e-mails about, oh, we

20   have got to have these depositions or whatever

21   and we all were part of these e-mails.

22                So that's not the only time that

23   we have talked about it.

24         Q      When you say "we talked about

25   it," what do you mean by that?

48

```
1                        Sanders
2          A       Meaning all of us that, you know,
3     have to be a part of this.
4          Q       Who are "all of us"?
5          A       Me, Matt and Mauro.
6          Q       Anybody else?
7          A       No.
8          Q       So have you ever had a
9     conversation with Mauro about this case?
10         A       No.
11         Q       Never?
12         A       No.
13         Q       And have you ever had a
14    conversation with Matt about this case?
15         A       No.
16         Q       Have you ever exchanged an e-mail
17    with Mauro about this case?
18         A       No.
19         Q       Have you ever exchanged text
20    messages with Mauro about this case?
21         A       No.
22         Q       How about with Matt, have you
23    ever exchanged an e-mail with Matt about this
24    case?
25         A       No.
```

49

1                           Sanders

2           Q       And text message with --

3           A       No.

4           Q       And what type of phone do you

5      have?

6           A       A BlackBerry.

7           Q       And do you text with your

8      BlackBerry?

9           A       Occasionally.

10           Q       And do you text with Mauro?

11           A       Not really.

12           Q       When you say "not really"?

13           A       Once every six months, maybe,

14      once every year.  Not really.

15           Q       So you're not a big texter?

16           A       Not on business, no.

17           Q       And so that would include Matt,

18      too, you don't text with him?

19           A       No.

20           Q       On a regular basis you don't text

21      with him?

22           A       No.

23           Q       And would that include any other

24      Equinox employee?  You are not a big texter?

25           A       No.


                        MCM REPORTING SERVICE
                           (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 51 of 197

50

1                          Sanders

2          Q      And other than this meeting that

3    you had two months ago where you looked at these

4    two documents, we are talking about the second

5    set of documents and the telephone call that you

6    had yesterday, did you do anything to prepare

7    for today's deposition?

8          A      No.

9          Q      Did you speak to anyone else

10   about today's deposition?

11         A      No.

12         Q      Is this a regular workday for

13   you?

14         A      Yes, sir.

15         Q      And did you tell anyone that you

16   would be away from work today?

17         A      I told my assistant general

18   manager that I would be away from work, yes.

19         Q      Did you give her a reason why?

20         A      Just told her that I had to do

21   some business outside of the club.

22         Q      Do you have an Equinox-issued

23   cell phone?

24         A      Yes.

25         Q      And who is issued cell phones at

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 52 of 197

51

1                          Sanders

2      Equinox?

3              A      Who what?

4              Q      At the location level, other than

5      the general manager of a location, is anyone

6      else issued cell phones?

7              A      Outside of the general managers,

8      you said is anyone else in the club issued cell

9      phones?

10             Q      Yes.

11             A      Not to my knowledge.

12             Q      So just the general manager?

13             A      Yes.  And I mean regional

14     managers or whatever, they're not in the clubs.

15             Q      Did you talk to Ms. Ashdown when

16     -- well, you terminated her, right?

17             A      Yes.

18             Q      And you terminated her because

19     you thought she was stealing?

20             A      Uh-hum.

21                    MR. McPARTLAND:  Please

22                    keep your answers verbal,

23                    Lawrence, yes.

24             A      Yes, I'm sorry.

25             Q      Did she admit to stealing?

52

1                          Sanders

2            A     No.

3            Q     Did she deny it?

4            A     Yes.

5            Q     Did she offer to take a lie

6      detector test?

7            A     Yes.

8            Q     And did you make any arrangement

9      to have her take a lie detector test?

10           A     No.

11           Q     Did you tell anyone that she

12     offered to take a lie detector test?

13           A     I believe so.  I'm not 100

14     percent certain though.

15           Q     You're an ambitious person, would

16     you say?

17           A     Yes.

18           Q     And being a general manager at

19     the Soho Equinox is a lofty achievement in your

20     field, would you say that?

21           A     I guess so, yeah.

22           Q     And you worked with Ms. Ashdown

23     for a period of time --

24           A     Yes.

25           Q     -- correct?

53

                              Sanders

1

2                   And would you consider her, based

3       on your observations of her only, would you

4       consider her to be an ambitious person?

5               A       Yes.

6               Q       And by that I mean in the field

7       of fitness and fitness management, that's what I

8       mean.

9               A       Yes.

10              Q       And I take it if you had an

11      opportunity to advance in your field that you

12      would want to do that, correct?

13              A       Yes.

14              Q       Can you give me an example of how

15      you might advance in your field?

16              A       Get a bigger club, become an area

17      manager, regional manager.

18              Q       By the way, what's a bigger club?

19      I'm not being a jerk, I just don't know.

20              A       Meaning a larger club that has

21      more employees, more revenue going through it,

22      it's a larger club in the Equinox brand as far

23      as maybe it's a flagship location or something

24      like that, more members, busier.

25              Q       And what would be an advancement

54

1                         Sanders

2    for someone who is a personal training manager?

3              A       What would be an advancement for

4    a training manager?

5              Q       Yes.

6              A       Along the same lines, you know,

7    starting at a smaller club, going to a bigger

8    club that's busier, larger staff, becoming an

9    area manager, you know, doing something, you

10   know, that's bigger than just managing one

11   location.

12             Q       And based on your observation,

13   did Ms. Ashdown appear to be someone who would

14   want to advance in that way?

15             A       Yes.

16             Q       Are you aware that other

17   depositions have taken place in this case?

18             A       Yes.

19             Q       And are you aware that I've taken

20   those depositions?

21             A       I'm not aware of that.

22             Q       I will tell you that I have.

23                     And it's my understanding, and

24   please correct me if I've misunderstood, that

25   managers at a location can pull sessions if the

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 56 of 197

```
                                                              55
 1                            Sanders
 2      client doesn't pull them from the front desk,
 3      correct?
 4              A       Yes.
 5              Q       And a manager would include the
 6      general manager?
 7              A       Yes.
 8              Q       Which in this case would be you,
 9      correct?
10              A       Yes.
11              Q       And the personal training
12      manager?
13              A       Yes.
14              Q       And the fitness manager?
15              A       Yes.
16              Q       And a general, assistant general
17      manager?
18              A       Yes.
19              Q       And in order to do that, you need
20      a code, correct?
21              A       Yes.
22              Q       And if someone came to you and
23      accused you of using your code to improperly
24      pull sessions, and you hadn't done it, would you
25      want the opportunity to prove that you hadn't
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 57 of 197

56

1                         Sanders

2      done it?

3            A      Of course.

4            Q      Right.  Would you volunteer to

5      take a lie detector test?

6            A      I would just do everything in my

7      power to prove that it wasn't me as opposed to

8      just saying it wasn't me.

9            Q      And you don't think that

10     Ms. Ashdown did everything in her power?

11           A      I don't think so.

12           Q      What else could she have done?

13           A      I think there are multiple things

14     that could be done.

15           Q      Let's start with the first one

16     then.

17           A      If I'm being accused of doing

18     something that's inappropriate and the

19     documentation is given to me of this is what

20     was, what I'm being accused of, I'm going to do

21     my own investigation and I am going to bring it

22     back to my superiors and say, "This is what I

23     found out, this is what I've investigated, this

24     is what I've done and this is what I believe has

25     happened."

57

```
1                        Sanders
2              I gave Kerry that opportunity.
3    When I first brought it to Kerry's attention, I
4    didn't say, "Kerry, you did something wrong."
5              I said, "Kerry, this is what was
6    brought to my attention.  I need you to explain
7    this for me."
8              All Kerry said to me was "I
9    didn't do it.  I don't care what you have, I
10   didn't do it and I know I didn't do it," and
11   that was it.
12             And I said, "You've got to
13   explain this for me."
14             This was before I went to the
15   bosses and said, "Hey, I've got a situation.
16   What are we going to do about this?"
17             So I gave her that opportunity.
18   I presented it to her.  I hired her.  I like
19   her.  She was a good employee.  She was someone
20   that, you know, I thought we were close, you
21   know, and so I wanted to give her that
22   opportunity to show me that she would
23   investigate it.
24             I didn't investigate it right
25   away.  I wanted her to show me, let her go do
```

58

1                          Sanders

2     her homework.  Let her go do her research.  Let

3     her go and question Ryan, question Bobby,

4     question Cornelia.

5                    That's part of, if I'm the person

6     being accused of something and they are giving

7     me, you know, the documents, that's what I would

8     do, I would at least try to do that to show,

9     "Look, I'm investigating this, I'm looking into

10    this, I'm going to get to the bottom of it,

11    because it's not me and I'm going to show you

12    it's not me and why it's not me."

13                    That didn't happen.

14         Q     Did you ever sit down and talk

15    with Kerry and Mauro at the same time about this

16    issue?

17         A     No.

18         Q     Did you ever sit down and talk

19    with Kerry and Ryan together about this issue?

20         A     No.

21         Q     Did you ever sit down and talk

22    with Kerry and Bobby about this issue?

23         A     No.

24         Q     Tell me when you first approached

25    Ms. Ashdown about this issue.

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 60 of 197

                                                                    59
1                           Sanders

2          A        What do you mean?

3          Q        Well, I mean, you said you gave

4     her the opportunity.

5                   I mean, how long was that?

6          A        At least a week.

7          Q        So it's your testimony as you sit

8     here today that you gave her a week to

9     investigate this issue before you mentioned it

10    to anyone else?

11         A        Before I got others involved to

12    the point of "What are we going to do about

13    this?"

14         Q        When did you come to the

15    conclusion that she in your mind had stolen

16    something from Equinox?

17         A        I don't remember the exact date.

18    I mean ...

19         Q        Well, there's a week, right?

20                  Was it during that week?

21         A        I would say when there was no

22    information from her as it relates to how this

23    happened and why this happened and who is

24    responsible for this, and then after speaking

25    with the individuals that I spoke with, it led

60

1                           Sanders

2      me to believe that she could definitely have

3      done this.

4            Q     So during this week you were

5      conducting your own investigation?

6            A     Yes.

7            Q     But you weren't communicating

8      with her about that?

9            A     No.

10           Q     Then when she volunteered to take

11     a lie detector test, you didn't pursue that

12     avenue?

13           A     No.

14           Q     Now, isn't it true that initially

15     Ms. Ashdown wasn't allowed to conduct her own

16     investigation?

17           A     I don't believe that to be the

18     case.

19           Q     So as the club manager, you, it's

20     your testimony that you had -- did you instruct

21     Ms. Ashdown to conduct her own investigation?

22           A     I specifically asked her or said

23     to her, "This is what the situation is.  I need

24     you to explain this for me."

25                 So to me that means her figuring

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 62 of 197

61
```
1                           Sanders
2      out how she's going to explain to me this
3      situation.
4                   And forgive me for assuming, it's
5      wrong to assume, but I would, again, assume that
6      if I'm telling her, "I need you to explain this
7      for me," that she is going to be able to try to
8      explain it to me or for me.
9                   She did not do that.  She just
10     said, "I didn't do anything wrong."  That's it.
11          Q     Did you ever tell her to conduct
12     her own investigation?
13          A     No.
14          Q     Did you ever tell her to speak to
15     Ryan?
16          A     No.
17          Q     Did you ever tell her to speak to
18     Bobby?
19          A     No.
20          Q     Did you ever tell her to speak to
21     Mauro?
22          A     No.
23          Q     Did Mauro ever complain about
24     Ms. Ashdown?
25          A     He voiced concerns about how she
```

62

1                          Sanders

2     spoke to him and how he felt she didn't respect

3     him.

4              Q     Ms. Ashdown was his superior,

5     correct?

6              A     She was his boss.  But in the PT

7     world, the PT manager and fitness manager need

8     to work closely together as a team even though

9     the PT manager --

10                        MR. HARMAN:  Move to

11                  strike as nonresponsive.

12                        I'm going to take a break

13                  now.

14                        Thank you.

15                        (Whereupon, at 11:13 a.m., a

16                  recess was taken.)

17                        (Whereupon, at 11:22 a.m.,

18                  the deposition resumed with all

19                  parties present.)

20                        MR. HARMAN:  Back on the

21                  record.

22     BY MR. HARMAN:

23              Q     Mr. Sanders, have you made any

24     false statements today on the record?

25              A     No.


                       MCM REPORTING SERVICE
                          (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 64 of 197

63

```
                           Sanders
 1
 2            Q      I'm sorry.  I didn't hear you.
 3            A      No.
 4            Q      Are you positive of that?
 5            A      Yes.
 6            Q      I take it if you had made any
 7     false statements on the record that you would
 8     tell me?
 9            A      Yes.
10            Q      Isn't it true that you called
11     Ms. Ashdown after you terminated her?
12            A      Yes.
13            Q      And why did you do that?
14            A      Because I'm a human being first
15     and foremost, and, like I said, I thought we had
16     a, somewhat of a friendship, I guess a work
17     friendship, and I knew what she was going
18     through, obviously, and I heard that she was
19     doing better, so just as a human being, I do
20     care about people, so I made a call to her to
21     just let her know that I was glad she was doing
22     better.
23                   My mistake if that was taken any
24     way out of context.
25                   But I am a human being first and
```

64

```
1                         Sanders
2      foremost.
3                    And, again, regardless of a
4      business relationship or a business situation,
5      business and personal are two very different
6      things.
7                    I was just trying to, again, let
8      her know that I'm glad that she was doing
9      better.
10          Q      And that was after you had
11     accused her of stealing?
12          A      Yes.
13          Q      And you believed that she had
14     stolen?
15          A      Yes.
16          Q      And that she had stolen $60?
17                    MR. McPARTLAND:  Object to
18                 the form.
19                    You can answer.
20          A      Yes.
21          Q      Do you understand the question?
22          A      Yes.
23          Q      How long have you been a manager
24     at Equinox?
25          A      About five years probably.
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 66 of 197

65

```
1                           Sanders
2            Q       And during that time you have
3    never terminated anyone for stealing sessions?
4            A       No.
5            Q       Have you investigated anyone for
6    stealing sessions during that time, other than
7    Ms. Ashdown?
8            A       Not that I'm aware of, no, not
9    that I recall.
10           Q       Mr. Maietta didn't like
11   Ms. Ashdown, did he?
12           A       I don't think I would say that.
13           Q       Did he like her?
14           A       Like her as a person or like her
15   as a boss?  I mean, he didn't dislike her --
16           Q       Well, let's be --
17           A       He didn't dislike her.  I can --
18   he didn't dislike her.
19           Q       You're positive of that?
20           A       I'm pretty certain that he did
21   not dislike her.
22           Q       Didn't he accuse her of drinking
23   with employees?
24           A       He didn't accuse her of that.
25           Q       Oh, he didn't?
```

MCM REPORTING SERVICE
(516) 775-5209

66

                              Sanders

1

2          A      No.

3          Q      You have no recollection as you

4    sit here today of Mauro Maietta accusing

5    Ms. Ashdown of improper behavior and drinking

6    with other trainers?

7          A      I think -- he -- he said others

8    were accusing her of that, not him.

9          Q      But he brought that to your

10   attention, right?

11         A      Yeah.

12         Q      And he liked to bring negative

13   things about Ms. Ashdown to your attention,

14   right?

15                      MR. McPARTLAND:  Object to

16              the form.

17         A      I wouldn't say that, no.

18         Q      Was there more than one occasion

19   on which Mr. Maietta brought negative things

20   regarding Ms. Ashdown to your attention?

21                      MR. McPARTLAND:  Object to

22              the form.

23                      You can answer.

24         A      Again, like I said earlier, he

25   didn't like how she spoke to him or he felt that

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 68 of 197

67

1                          Sanders

2     she talked down to him and he felt she didn't

3     have respect for him.

4                     MR. HARMAN:  Move to

5                strike as nonresponsive.

6                     Would you please repeat

7                the question?

8                     MR. McPARTLAND:  He

9                answered the question.

10                    MR. HARMAN:  Could you

11               please repeat the question?

12                    (Whereupon, the record was

13               read back by the reporter.)

14        Q     That's a yes or no question.

15                    MR. McPARTLAND:  Object to

16               the question.

17                    Asked and answered.

18                    You can answer.

19        A     Again, as I stated, he --

20        Q     Was there more than one, yes or

21     no?

22        A     More than one?  Yes.

23        Q     And so he brought a drinking

24     accusation to your attention, right?

25                    MR. McPARTLAND:  Object to


                    MCM REPORTING SERVICE
                      (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 69 of 197

68

```
 1                        Sanders

 2                the form.

 3                        Asked and answered.

 4          A      Yes.

 5          Q      And isn't it true that

 6   Ms. Ashdown wanted to investigate that

 7   particular accusation?

 8          A      Yes.

 9          Q      And isn't it true that you

10   wouldn't let her?

11          A      No, I didn't not let her.

12          Q      Did you allow her to go and speak

13   with the individuals that were allegedly

14   involved in the incident?

15          A      She could have done that if she

16   wanted to.

17          Q      Did you speak with them?

18          A      I told her that it was something

19   that I was not concerned about.

20          Q      You were not concerned about?

21          A      I was not concerned about

22   something that, again, there was no substance

23   behind it, there was no reason to investigate

24   it.

25          Q      Why did you bring it to her
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 70 of 197

69

                            Sanders

1

2     attention in the first place?

3          A      Because I think it's important

4     for her to know or a manager to know what things

5     are being said about them that could be, that

6     can put them in a position where they need to be

7     mindful of whatever it is they're doing or not

8     doing and how, because, again, people look at us

9     as the managers, as the leaders, and regardless

10    of whether accusations are true or not, we

11    should be aware of them and her job wasn't in

12    jeopardy for that accusation, her job wasn't at

13    risk for that accusation, so it wasn't something

14    that needed to be investigated from that

15    perspective, whether it was true or not true.

16         Q      What do you mean "it"?  What's

17    "it"?

18         A      Issues of drinking with employees

19    or drinking with staff.

20         Q      Have you ever had, have you ever

21    gone drinking with staff?

22         A      Yes.

23         Q      Anyone ever talk to you about --

24    what kind of alcoholic beverages do you like to

25    drink?

70

1                          Sanders

2          A      Vodka.

3          Q      Have you ever had a vodka with a

4    staff member of Equinox?

5          A      Yes.

6          Q      Anyone ever discuss that conduct

7    with you about being a problem at work?

8          A      No.

9          Q      But Maietta thought it was a

10   problem, right?

11                      MR. McPARTLAND:  Object to

12                the form.

13         A      Maietta thought that the people,

14   that whoever it was that brought it to his

15   attention, it was a problem.

16                People brought it to his

17   attention and he thought it might be a problem,

18   so he brought it to my attention.

19                When I had a conversation with

20   her I just said, "I'm just making you aware that

21   this is what people are saying."

22                Again, I don't think it's that

23   big a deal, we don't need to do anything, but if

24   she wanted to investigate it, she could have

25   investigated, but it wasn't like there was any

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 72 of 197

71

```
1                          Sanders
2      risk in her position or jeopardy in her
3      position.
4                    So if someone came to me and
5      said, "Lawrence, I heard that you were out
6      drinking with your staff and it's not cool," or
7      "this is what people are saying," I would either
8      say, "Do you know what, I didn't do this
9      particular incident," or I would take heed to if
10     I did do it, say, you know, what I'm going to
11     make sure, I'm going to be mindful not to do it
12     again.
13                   That's the point in bringing it
14     up.
15                   If I felt that it was a threat to
16     her or a threat to her situation or jeopardizing
17     her situation, then we would have done a full
18     investigation.
19                   So that's why I didn't deem it
20     necessary to do a full investigation.
21                   Because, again, I'm just making
22     her aware of what people are possibly saying
23     about her so that she could be mindful of it
24     when she's managing her people.
25                   That's the only reason I brought
```

72

1                           Sanders

2     it to her attention.

3          Q      So did you ever go and speak to

4     any of the individuals who had brought this --

5          A      No, I didn't.

6          Q      So you don't know whether it was

7     true or not?

8          A      No, I don't know if it was true

9     or not.

10            To be very honest, it didn't

11    matter to me whether it was true or not, because

12    it wasn't, again, something that was going to

13    jeopardize her employment with Equinox.

14         Q      It didn't matter whether it was

15    true or not?

16            Okay.

17            So Maietta also brought the

18    allegation to your attention that Ms. Ashdown

19    favored men over women, is that true?

20         A      There were some of the female

21    trainers that felt that way.

22            You know, again, it's another bit

23    of information that if I'm a manager I would

24    want to know what people are saying about me,

25    and it was, you know, something that the female,

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 74 of 197

73

1                        Sanders

2    some of the female trainers felt.

3              Whether it was true or not, I'm

4    not managing her on a day-to-day -- I'm not

5    micromanaging her on a day-to-day, I'm not

6    micromanaging everything she does in the club

7    every day.

8         Q    You didn't investigate that?

9         A    Again, that's not something that

10   would cause her to lose her employment.

11             If I don't have the substance

12   that I need where there's a lot of people are

13   coming to me complaining about that situation.

14        Q    Has anybody ever told you

15   anything negative about Mauro Maietta?

16        A    Of course.

17        Q    Like what?

18        A    That he's competitive, he's very

19   competitive.

20        Q    Anything else?

21        A    That's about it.

22        Q    That's the only negative thing

23   that anyone's ever told you about Mr. Maietta?

24        A    Yeah.

25        Q    How long have you been working

MCM REPORTING SERVICE
(516) 775-5209

74

1                          Sanders

2    with Mr. Maietta?

3         A     I worked with him for a period of

4    two years, then I didn't work with him for two

5    more years, then we have now been working

6    together again for about, I guess, two years.

7         Q     And that includes during the time

8    that Mr. Maietta was supervised by Ms. Ashdown,

9    that's the only thing that was ever brought to

10   your attention about Mr. Maietta, that he's

11   competitive?

12        A     Yes.

13        Q     And I asked you about negative

14   things that were brought to your attention.

15        A     Uh-hum.

16        Q     In what way was it brought to

17   your attention in a negative way that Mr.

18   Maietta is competitive?

19        A     Kerry specifically said to me

20   that she hates that he's so competitive.

21        Q     Anybody else?

22        A     I can't recall, to be honest.

23        Q     So sitting here today the only

24   negative thing that anyone has ever told you

25   about Mauro Maietta was by Ms. Ashdown, and it

75
1                          Sanders

2    was that he was competitive?

3         A      I mean, I think it's, you know,

4    if you were to ask me who specifically said

5    this, who said that, I think that it's kind of

6    known that Mauro is a competitive person.

7                It's -- but it's -- has someone

8    specifically come to me and said, "Hey, I want

9    to complain about the fact that he's

10   competitive"?  No one has really done that, but

11   I think I'm aware of how he is, so I know that

12   he's competitive.  So I don't really need -- I

13   know that that can be viewed sometimes as a

14   negative thing when you're, you know, managing

15   people.

16               I have had conversations with him

17   about it, of course.

18        Q      My question to you was, other

19   than Ms. Ashdown telling you that she thought

20   that Mr. Maietta was competitive, has anyone

21   ever said anything negative to you about Mr.

22   Maietta?

23        A      Not that I can remember.

24        Q      Did Mr. Maietta want

25   Ms. Ashdown's job?

76

1                           Sanders

2           A       No.

3           Q       And what's the basis of your

4    statement?

5           A       The basis of my statement is that

6    if he wanted her job when prior to us bringing

7    her on board, he would have tried to get the job

8    and he didn't do that, because when the prior PT

9    manager was let go, he was there as the fitness

10   manager and he never approached me, he never

11   came to me and said, "Do you know what, since we

12   are now in this change and we have got to get a

13   new PT manager," he never came to me and said,

14   "I want to be the PT manager."

15                  It was known, obviously, he wants

16   to grow and he wants to, you know, that's

17   something that we promote, we encourage in our

18   company, for people to grow and develop.

19                  So he was definitely on track to

20   wanting to be a PT manager, but at that point he

21   could have definitely come to me and said, "Do

22   you know what, I want this job."

23                  He never came to me and said, "I

24   want this job."

25                  He never came to me and said, "I

77

                          Sanders

 1

 2     want her gone, because I want her job."

 3                    He never did that.

 4          Q      Do you believe that Mr. Maietta

 5     wanted to be a personal training manager?

 6          A      I think in his long-term goals,

 7     yes.

 8          Q      And isn't it true that Mr.

 9     Maietta had just moved over from another

10     location at the time that Ms. Ashdown came on

11     board at Soho?

12          A      Yes, fairly soon, yes.

13          Q      So he had just been there only a

14     couple of weeks, right?

15          A      He had been there, yeah, he would

16     have been there probably a couple of weeks.

17          Q      When Mr. Maietta was moved into

18     Ms. Ashdown's position, did you interview anyone

19     else for Ms. Ashdown's position?

20          A      At that time I don't believe so,

21     don't recall.  But I don't believe so.

22          Q      Are you aware that Ms. Ashdown

23     was invited to return as a personal trainer?

24          A      Yes.

25          Q      And did you support that

78

```
 1                         Sanders
 2      invitation?
 3             A      Yes.
 4             Q      How many personal trainers are
 5      there at the Soho Equinox?
 6             A      Thirty-five to 40.
 7             Q      And if any of those 35 to 40
 8      personal trainers had sessions improperly
 9      pulled, i.e., they had stolen sessions, do you
10      believe that they should have been terminated?
11             A      If any of the trainers had
12      sessions pulled improperly, do I believe they
13      should be terminated?
14             Q      As the general manager of the
15      Equinox, if any of the personal trainers at Soho
16      stole sessions, do you think they should have
17      been terminated?
18             A      Yes.
19                           (Second amended complaint
20                           was marked as Plaintiff's Exhibit 1
21                           for identification, as of this
22                           date.)
23      BY MR. HARMAN:
24             Q      I'm handing you what's been
25      marked as Plaintiff's Exhibit 1 (handing).
```

79

```
 1                      Sanders
 2              MR. HARMAN:  And we have
 3              individually marked, just for the
 4              record, exhibits beginning with
 5              one for each deposition.
 6                   So, for example, in the
 7              Maietta deposition we began with
 8              1 and we rebegan with 1 in the
 9              Sanders deposition and so forth,
10              just for the record.
11    BY MR. HARMAN:
12         Q     If you would please take a look
13    at this document and let me know when you're
14    done.
15         A     (Perusing document.)  What do you
16    want me to look at, just the first page?
17         Q     Have you seen this document
18    before?
19         A     Yes, I believe so.
20         Q     When did you first see the
21    document?
22         A     When it was communicated that
23    this lawsuit was happening.
24         Q     I'm not asking you about any
25    communications with lawyers, but when did you
```

80

```
 1                        Sanders
 2     first learn that this lawsuit was happening?
 3          A      When it was communicated by
 4     Equinox's attorney.
 5          Q      And were you ever served with a
 6     copy of this complaint?
 7          A      I believe I did have a copy sent
 8     to me.
 9          Q      Were you physically handed a
10     copy?
11          A      I don't recall how, if I was
12     handed a copy or if it was sent in an e-mail
13     document.
14                 I don't remember.
15          Q      And when do you recall first
16     receiving a copy of this document?
17          A      Probably a few months ago.  I
18     don't remember exactly.
19          Q      A few months ago.
20                 Are you aware that you are named
21     as an individual defendant in this action?
22          A      Yes.
23          Q      And what's your understanding of
24     that?
25          A      That I'm being, I guess, sued
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 82 of 197

81

1                         Sanders

2     individually.

3              Q      For what?

4              A      For I'm assuming wrongful

5     termination.  I don't know.  I'm not sure, I

6     guess.

7              Q      Again, I'm not asking you about

8     the conversations you had with your lawyer.

9                      Did you read this document?

10             A      I looked through it, yes.

11             Q      And did you consider being sued a

12    serious issue?

13             A      Of course.

14             Q      And you don't recall whether you

15    read the document or not?

16                      MR. McPARTLAND:  Object to

17                   the question.

18                      Asked and answered.

19             A      No, I said I looked through it.

20             Q      You did read it?

21             A      I did say I looked through it.

22             Q      And you said you recall reading,

23    you said you recall looking through it a couple

24    of months ago?

25             A      Probably.  I don't remember the

MCM REPORTING SERVICE
(516) 775-5209

82

```
 1                         Sanders
 2      exact date or time.
 3             Q      Did you read a paper copy like
 4      this (indicating), or did you read it on your
 5      computer?
 6             A      I read a paper copy.
 7             Q      Where did you do that?
 8             A      In my office with the door
 9      closed.
10             Q      And what did you do with that
11      paper copy?
12             A      It's locked away.
13             Q      Where is it now?
14             A      In a file locked away.
15             Q      And do you have a file on this
16      case?
17             A      No.
18             Q      You don't?
19             A      I have a file for my personal
20      stuff that I don't want anyone else to obviously
21      see.
22             Q      Where is that located?
23             A      In my office.
24             Q      And it's locked?
25             A      Uh-hum.
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 84 of 197

```
                                                              83
 1                          Sanders
 2              Q       And it has a copy of this
 3      complaint in it?
 4              A       Probably.
 5              Q       Does it have anything else
 6      related to this case?
 7              A       No.
 8              Q       Is it a drawer?
 9              A       A file cabinet.
10              Q       It's a file cabinet.
11                      You put the complaint there?
12              A       Yes.
13              Q       And when you were reading it, did
14      you mark up anything?
15              A       No.
16              Q       And have you ever received any
17      other documentation related to this case?
18              A       No.
19              Q       Ever search for documents related
20      to this case?
21              A       No.
22              Q       Ever searched, do you have a
23      computer at work?
24              A       Yes.
25              Q       What kind of computer do you
```

                                                            84
1                       Sanders

2    have?

3           A      I guess a desktop.

4           Q      A desktop.

5                  How long have you had that

6    computer?

7           A      Since I have been working at

8    Equinox Soho.

9           Q      How long is that?

10          A      Three years.

11          Q      And has the computer ever

12   changed?

13          A      I think it, I think we have

14   updated our systems probably a few months ago.

15          Q      How about the hardware, did you

16   have the same hardware, the same physical

17   computer?

18          A      It might be new, because IT was

19   upgrading all the computers.

20          Q      Why did you say it might be new?

21          A      Like the physical -- are you

22   talking about the physical computer?

23                 I think it's a new physical

24   computer.

25          Q      And when did that take place?


                    MCM REPORTING SERVICE
                      (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 86 of 197

85

1                              Sanders

2              A        Within the last few months.

3              Q        Within the last few months?

4              A        Yeah.

5              Q        Prior to that, were there any

6       other replacements of your computer?

7              A        No.

8              Q        So if I understand your testimony

9       correctly, you had a computer at the time that

10      you were supervising Ms. Ashdown?

11             A        Uh-hum.

12             Q        And you maintained that same

13      computer up until a few months ago?

14             A        Yes.

15             Q        And did you ever search that

16      computer for any documents related to

17      Ms. Ashdown?

18             A        Did I ever search my computer

19      for -- I'm not sure I understand what --

20             Q        Did you ever look for documents

21      in your computer related to Ms. Ashdown?

22             A        I may have looked for old e-mails

23      when this all came up to see if I had the

24      e-mails or whatever.

25             Q        I'm asking about, I'm really not

                        MCM REPORTING SERVICE
                          (516) 775-5209

Case 1:13-cv-01374-HB-GWG    Document 31-5    Filed 10/25/13    Page 87 of 197

```
                                                               86
 1                          Sanders

 2    asking you to speculate.

 3                   I'm asking you if you conducted a

 4    search in your computer for anything related to

 5    Ms. Ashdown?

 6           A      Yes.

 7           Q      When?

 8           A      When this came up, we had to go

 9    back and obviously secure whatever documents we

10    may have had.

11           Q      When did this come up?

12           A      Again, I don't remember the exact

13    date.  Whenever we got contacted that we had a

14    lawsuit against us, we needed to make sure all

15    of the documents that we have as it relates to

16    this are saved and not destroyed.

17           Q      And when was that?

18           A      Whenever, again, I don't remember

19    the exact date, whenever a few months ago was.

20           Q      So it's your recollection that

21    that was a few months ago?

22           A      Yes.

23           Q      So you searched your new computer

24    then?

25           A      I didn't have a new computer
```

87

1                        Sanders

2      then.

3                        MR. McPARTLAND:   Objection

4              to form.

5          Q       So you searched your old

6      computer?

7          A       Yes.

8          Q       How do you know that it was your

9      old computer?

10         A       Because I know my computer.

11         Q       How do you know your computer?

12         A       Because I have been working there

13     for three years.

14         Q       How did you search your old

15     computer?

16         A       Searched my e-mails and searched

17     our shared folder, which is a folder that's on

18     our shared -- on our server at corporate, so no

19     matter what computer you have, you have access

20     to that document, to that folder.

21         Q       So you searched your e-mail and

22     shared folder.

23                 Anything else?

24         A       No.

25         Q       And did you instruct anyone else

88

```
 1                         Sanders
 2    to search their computers?
 3            A      No.
 4            Q      Did you have any conversations
 5    with Mauro Maietta about preserving information?
 6            A      No.
 7            Q      Did you search anywhere else at
 8    the Soho Equinox for information related to
 9    Ms. Ashdown?
10            A      No.
11            Q      Did you search her former office?
12            A      No.
13            Q      Did you ask anyone to search her
14    former office?
15            A      No.
16            Q      Did you search your office?
17            A      No.
18            Q      So you said you searched for
19    e-mails.
20                   Did you find any e-mails?
21            A      I found some, yeah.
22            Q      And what did you do with them?
23            A      Sent them to the attorneys.
24            Q      What did those e-mails say?
25            A      They were about the investigation
```

89

1                        Sanders

2    into the sessions and about, you know, what we

3    were doing.

4              Basically most of the e-mail

5    exchange was about that, and the conversations

6    that were being had.

7         Q    Who were the e-mails from?

8         A    I believe that all parties on

9    the -- Joe, Liz, Minton, David Harris, Matt

10   Plotkin.  I believe they were all copied on most

11   of those e-mails.

12        Q    So you found e-mails concerning

13   an investigation and what was going on?

14        A    Yes.

15             MR. McPARTLAND:  Object to

16             the form.

17        Q    And a conversation.

18             I'm just trying to understand.

19             And approximately how many

20   e-mails did you find?

21        A    Going back and forth probably, I

22   mean, probably five to 10.

23             I'm not sure exactly.

24        Q    Did you keep copies of those?

25        A    No.

                   MCM REPORTING SERVICE
                      (516) 775-5209

90

1                      Sanders

2          Q       How did you forward them to your

3    attorneys?

4          A       Forwarded it to their e-mail.

5          Q       So you clicked forward and

6    forwarded the e-mails that you found to the

7    attorneys?

8          A       Or the HR department, you know,

9    or both parties.

10         Q       Did the instruction to preserve

11   e-mails or information come from the HR

12   department?

13                     MR. McPARTLAND:   Objection.

14         Q       You can answer.

15         A       I believe so.

16         Q       And who in the HR department

17   instructed you to preserve information?

18         A       Probably, I'm thinking Matt

19   Herbert.  I believe it was from him.

20         Q       And it's your recollection that

21   that took place a few months ago?

22         A       Yes.

23         Q       And how did he convey that

24   instruction to you?

25         A       I believe we had a conference

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 92 of 197

91

1                        Sanders

2    call, if I'm not mistaken.  We had a conference

3    call with the attorneys and all of us on it to

4    discuss --

5                        MR. McPARTLAND:  Nothing

6                        about what was discussed on the

7                        call.

8         A       Right.

9                No, just told us to preserve.

10        Q       Outside of conversations that you

11   have had with your attorneys, and that would

12   include any person or over the phone or even

13   e-mails with your attorneys.

14                Did Matt Herbert independently

15   discuss the preservation of information

16   regarding this case with you?

17        A       I don't recall that.

18        Q       But it was your understanding

19   that you needed to preserve information?

20        A       Yes.

21        Q       And you told me what you did and

22   what you didn't do, right?

23        A       Yes.

24        Q       Who else was on that call?

25        A       Which call?

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 93 of 197

92

1                         Sanders

2          Q       The call that you just described.

3          A       Joe, Matt Plotkin, Matt Herbert

4     and Mauro, I believe, and Joe and myself.

5          Q       We talked about some of the other

6     things that Mauro raised with you concerning

7     Ms. Ashdown.  We talked about several of those.

8                  Did Mauro Maietta ever accuse

9     Ms. Ashdown of not responding to his e-mails?

10         A       Not that I recall.

11         Q       And did Ms. Ashdown ever tell you

12    that Mauro had made up a fake e-mail address?

13         A       Yes, she did.

14         Q       She did?

15         A       Yeah, she said that.

16         Q       Okay.

17                 What did she say?  How did that

18    come up?

19         A       It came up because there was some

20    miscommunication about something.  I don't

21    recall what it was specifically.

22                 And I think she was looking for

23    communication from him or he was looking for

24    communication from her and they both were

25    expecting some form of communication, and he

93

1                           Sanders

2      said he sent it to her, I think, and she said

3      she never received it.

4                     And then she said that she felt

5      that he was sending whatever he was trying to

6      communicate to her to some e-mail that was not

7      her e-mail.

8           Q       So she accused him of making up a

9      fraudulent e-mail?

10          A       Something along those lines, yes.

11          Q       And did you investigate that?

12          A       No.

13                  MR. HARMAN:  For the

14                  record, Plaintiff's Exhibit 1 is

15                  the second amended complaint in

16                  this action, with this action Civ

17                  number 13 CV 1374, and it's dated

18                  May 24, 2013.

19          Q       Do you have the ability to log

20     onto Mauro Maietta's computer?

21          A       Under my own name, yes, but not

22     under his login.

23          Q       Could you access his login if you

24     wanted to?

25          A       No.


                    MCM REPORTING SERVICE
                        (516) 775-5209

94

                            Sanders

1

2          Q      And when Ms. Ashdown accused Mr.

3   Maietta of making up a fraudulent e-mail

4   address, did you ever sit with her and look at

5   Mr. Maietta's computer?

6                      MR. McPARTLAND:   Object to

7               the form.

8                      You can answer.

9          A      I don't recall.

10         Q      When Mr. Maietta made these

11   accusations of session stealing to you, did he

12   bring a piece of paper to you?

13                     MR. McPARTLAND:   Object to

14              the form.

15         A      No, I'm not -- no -- what do you

16   mean?

17         Q      Well, I mean you described this

18   whole scheme where you believe that Ms. Ashdown

19   stole this money from Equinox and so forth and

20   that that was brought to your attention by Mr.

21   Maietta, right?

22                     MR. McPARTLAND:   Object to

23              the form.

24         Q      How did he bring that to your

25   attention?  He obviously had a discussion with

95

```
1                           Sanders
2      you, correct?
3            A      With commission reports.
4            Q      So he brought commission reports
5      to you?
6            A      Yes.
7            Q      And what did you do with those?
8      Did you take them from him?
9            A      I probably did at the time, yes.
10           Q      And what did you do with them?
11           A      Looked them over.
12           Q      Where are they now?
13           A      I have no idea.  I probably
14     destroyed them.
15           Q      You probably destroyed them?
16           A      I don't know.  I don't know.  I
17     didn't keep them.
18           Q      Did you ever show them to
19     Ms. Ashdown?
20           A      I don't remember.
21                        (A two-page letter dated
22                        January 9, 2013 was marked as
23                        Plaintiff's Exhibit 2 for
24                        identification, as of this date.)
25
```

96

1                              Sanders

2      BY MR. HARMAN:

3              Q      I'm handing you what has been

4      marked as Plaintiff's 2.

5                              MR. HARMAN:  For the

6                              record, it's a January 9th letter

7                              from my office to Joseph

8                              Matarazzo referencing Kerry

9                              Ashdown and others.

10             Q      (Handing.)

11             A      (Perusing document.)  Okay.

12             Q      Have you seen this document

13     before?

14             A      I'm not sure.  I'm not sure.

15             Q      Have you had an opportunity to

16     read the document?

17             A      I've glanced through it.  I

18     didn't read the whole thing.

19             Q      Do you understand what the

20     document means?

21             A      You are notifying Joe Matarazzo

22     that you are representing Kerry Ashdown and she

23     obviously has a claim or is about to pursue a

24     claim against Equinox.

25                            And, you know, and these people

97

                              Sanders

1

2    are, I guess, the people listed, and make sure

3    that things are preserved.

4            Q       And you see that day, January 9,

5    2013?

6            A       Yes.

7            Q       And do you have any recollection

8    as to whether you received this document or not?

9            A       I don't recall if I got this

10   document or not.

11           Q       Do you recall having any

12   conversations with Joseph Matarazzo in January

13   of this year regarding Ms. Ashdown?

14           A       Not that I recall, no.

15           Q       And do you recall having any

16   conversation with the human resources department

17   in January 2013 regarding Ms. Ashdown?

18           A       Nothing I can recall.

19           Q       And have you ever conducted a

20   search of your BlackBerry for any information

21   regarding Ms. Ashdown?

22           A       No.

23           Q       And how long have you had the

24   BlackBerry?

25           A       Since 2008.

98

```
1                           Sanders
2          Q      Since you terminated Ms. Ashdown,
3    have you had any conversations with anyone
4    regarding Ms. Ashdown?
5          A      No.
6          Q      Other than lawyers, obviously?
7          A      No.
8          Q      Not at all?
9          A      No.
10         Q      And you testified that you phoned
11   Ms. Ashdown after you terminated her, correct?
12         A      Yes.
13         Q      And did you have any
14   conversations with anyone around that time about
15   that phone conversation?
16         A      Yes.
17         Q      So you did speak with someone
18   about Ms. Ashdown?
19         A      Right after that phone
20   conversation, yes.
21         Q      So do you want to correct your
22   earlier testimony?
23                You did, in fact, speak with
24   somebody about Ms. Ashdown, correct, after you
25   terminated her?
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 100 of 197

99

1                              Sanders

2           A       Oh, yes.

3           Q       Who did you speak with?

4           A       Candra.

5           Q       And what did you say?

6           A       Actually, Candra was the one who

7    told me about her being better, and I said that

8    I just called and reached out to Kerry, but she

9    didn't obviously respond to me, and I said what

10   I said and, you know, I hung up the phone.

11          Q       And did you speak with anyone

12   else regarding Ms. Ashdown after you terminated

13   her?

14          A       I don't recall.

15          Q       Did you text anyone regarding

16   Ms. Ashdown after you terminated her?

17          A       No.

18          Q       Did you e-mail anyone regarding

19   Ms. Ashdown after you terminated her?

20          A       No.

21          Q       After you terminated Ms. Ashdown,

22   did you speak with any trainers?

23          A       Speak with any trainers?

24          Q       About Ms. Ashdown?

25          A       I don't believe so, no.

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 101 of 197

100

Sanders

1

2      Q      Did you give them any

3   instructions regarding Ms. Ashdown?

4      A      No, I don't believe I gave them

5   any instructions.

6      Q      Did anyone ever ask you where

7   Ms. Ashdown is?

8      A      I don't remember if anyone ever

9   asked me that.

10     Q      So you terminated Ms. Ashdown,

11   right?

12     A      Uh-hum.

13     Q      And she was escorted out of the

14   club, right?

15     A      Uh-hum.

16     Q      Abruptly, right?

17            MR. McPARTLAND:  Object to

18            the form.

19     A      I wouldn't say abruptly, but,

20   yes, she was escorted out of the club.

21     Q      Before the day ended, right,

22   right after you terminated her?

23     A      Yes.

24     Q      In front of everyone?

25     A      Yes.

101
1                            Sanders
2            Q      Now, if that happened to you, how
3      would you feel?
4            A      Of course it's not --
5                     MR. McPARTLAND:  Objection
6                  to form.
7                     You can answer.
8            Q      I'm asking you.
9                     THE WITNESS:  What?
10                    MR. McPARTLAND:  Object to
11                 the form, but you can answer I
12                 said.
13           Q      How would you feel?
14           A      Of course it's not a good
15     feeling.
16           Q      Would you consider it a
17     humiliating experience if you were escorted out
18     of the club?
19           A      It wouldn't be a good feeling.
20           Q      Do you believe that that
21     termination was handled properly?
22           A      Do I believe what?
23           Q      That that termination was handled
24     properly?
25           A      Yes, I do.

102

1                          Sanders

2          Q      Isn't it true that you told

3    trainers not to give references for Ms. Ashdown?

4          A      It was told -- I wasn't the one

5    that told someone that.  It was the human

6    resources, probably, department, I believe, that

7    said, you know, we shouldn't do that.

8          Q      Did you instruct any trainers not

9    to give references for Ms. Ashdown?

10         A      I don't recall giving

11   instructions specifically to someone to not give

12   them.

13         Q      Did you tell any trainer not to

14   give a reference to Ms. Ashdown?

15         A      Again, I don't recall that.

16         Q      Did you e-mail any trainers and

17   tell them not to give references for

18   Ms. Ashdown?

19         A      I don't recall.

20         Q      Were you aware that during

21   Ms. Ashdown's tenure at Equinox that she became

22   ill?

23         A      Yes.

24         Q      When did you become aware of

25   that?

103

1                          Sanders

2          A      When she told me.

3          Q      When did she tell you that?

4          A      I'm guessing maybe June 2011.

5          Q      And how did she tell you?

6          A      She told me in my office.  She

7    came in my office and had a conversation with

8    me.

9          Q      What did she say?

10         A      That she's got to go to the

11   doctor and she's got to get treatment and, you

12   know, so she was going to beat, you know, deal

13   with what she's got to deal with and, you know,

14   she told me not to share with anyone, because

15   she didn't want me to tell anyone, and I

16   respected her wishes and I didn't tell anyone,

17   didn't talk to anyone.

18                She said, "I don't want my staff

19   to know.  I don't want anyone to know."

20                And she said, "You," I think she

21   may have told Mauro and possibly Liz Minton, so

22   she told me that, you know, she was going to get

23   treated and it wouldn't affect her work and she

24   would beat this, you know, and I supported that.

25         Q      Did she say anything else?

104

1                          Sanders

2          A      I don't recall anything else.

3          Q      Were you ever aware of any

4    conflict between the scheduling of days for Mr.

5    Maietta versus Ms. Ashdown?

6          A      I think they might have had some

7    scheduling conflicts where they covered for each

8    other, you know, because there always has to be

9    one of them in the club.

10                 So I don't recall exactly what

11   the issue was, I mean how the issue came about,

12   but I do recall something along those lines,

13   that there was some scheduling issues where they

14   seemed not to be on the same page.

15         Q      Now, if there is a conflict

16   between scheduling, I take it there always has

17   to be a manager in the club, is that correct,

18   when the club is open?

19         A      Yes.

20         Q      And you are not always in the

21   club, correct?

22         A      Correct.

23         Q      And if there's a conflict

24   between, a scheduling conflict between you and

25   Mauro, who has the final say?

105

1                        Sanders

2          A      A scheduling conflict between me

3     and Mauro?

4          Q      Yes.

5          A      I probably would have the final

6     say.

7          Q      And prior to June, when did

8     Ms. Ashdown start working at Equinox?

9          A      I believe February 2011.

10         Q      So she had been working there

11    approximately five months or so before you

12    learned that she had cancer?

13         A      Yeah, I guess.

14         Q      Did she tell you what type of

15    cancer she had?

16         A      I believe she did at the time,

17    but I don't recall exactly what it is or what it

18    was.

19         Q      Go ahead.

20         A      What?

21         Q      Go ahead.

22         A      I mean, again, I believe she did

23    tell me at the time specifically what it was,

24    but I don't remember asking in depth or, you

25    know.

MCM REPORTING SERVICE
(516) 775-5209

106

1                           Sanders

2          Q       As you sit here today, do you

3     know what type of cancer?

4          A       No, I don't.

5          Q       And prior to June of 2011, did

6     anyone express any concerns about, to you, about

7     Ms. Ashdown's health?

8          A       No.

9          Q       Did anyone express any concerns

10    to you about Ms. Ashdown's appearance?

11         A       No.

12         Q       Did Mr. Maietta ever tell you

13    that he didn't think Ms. Ashdown was up for the

14    job?

15         A       No.

16         Q       Did you notice a change in

17    Ms. Ashdown's appearance during her employment?

18         A       I mean, outside of her being

19    maybe tired, no.

20         Q       So you noticed her being tired?

21         A       She looked a little tired

22    sometimes.

23         Q       And when was that?

24         A       When she started getting

25    treatment again.


                       MCM REPORTING SERVICE
                         (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 108 of 197

107

1                          Sanders

2          Q     So that was after June of 2011?

3          A     Yes.

4          Q     And did you approach her about

5    that?

6          A     No, I don't think so.  I don't

7    recall.

8          Q     Did you express any concern?

9          A     No, I didn't express any concern.

10         Q     Okay.

11               Did you ask her if she needed

12   some time off?

13         A     I don't recall if I asked her

14   that, no.

15         Q     Did you ever ask her if she

16   needed to leave work, get some rest?

17         A     I don't recall ever asking her

18   that either.

19         Q     Did you make any other

20   observations about Ms. Ashdown's physical

21   appearance?

22         A     No.

23         Q     And were you aware that she was

24   undergoing chemotherapy?

25         A     Yes.

108
1                        Sanders
2         Q      And were you aware that she was
3    undergoing radiation?
4         A      Yes.
5         Q      And what were Ms. Ashdown's
6    working hours?
7         A      Three days a week, probably the
8    expectation is maybe ten hours a day, you know,
9    three days a week and then two days a week
10   probably like eight to nine hours.
11               So probably 45 hours, maybe 50.
12        Q      And was Ms. Ashdown working those
13   amount of hours?
14        A      She worked, yes.
15        Q      Was she working longer than that?
16        A      I don't know if she worked longer
17   than that.
18               I know she worked, she told me
19   that she was going to work and this was not
20   going to stop her from working and she was going
21   to do what she needed to do, and, you know,
22   that's what she wanted to do.
23        Q      Did she arrive to work before
24   you?
25        A      Sometimes.


                    MCM REPORTING SERVICE
                       (516) 775-5209

109

1                          Sanders

2          Q       Sometimes.  What does that mean?

3          A       When I get to the club, she's

4    there, you know.  If she's there, that means she

5    arrived before me.

6          Q       What are your working hours?

7          A       My working hours are usually 9:00

8    to 8:00, 9:00 to 9:00.

9                  I work anywhere from 11 to 12

10   hours a day, Monday, Tuesday, Wednesday;

11   Thursdays I put in that same thing, about 11

12   hours, 9:00 to 8:00, you know.  Saturdays I

13   work, you know, probably 9:00 to about 6:00, so

14   I'm working about 50 hours a week.

15         Q       So you don't work on Fridays or

16   Sundays?

17         A       Correct, unless it's needed.

18         Q       Did Mr. Maietta ever express any

19   concerns about Ms. Ashdown's physical

20   appearance?

21         A       Not to me.

22         Q       Did any trainers ever express

23   concern about Ms. Ashdown's physical appearance?

24         A       Not to me.

25         Q       Did they ever express any

MCM REPORTING SERVICE
(516) 775-5209

110

1                          Sanders

2      concerns about Ms. Ashdown's ability to, and I'm

3      talking about the trainers now, Ms. Ashdown's

4      ability to perform her job?

5              A       Not that I'm aware of, no.

6              Q       Did any clients or members, I

7      guess you call them, any members of Equinox ever

8      complain about Ms. Ashdown?

9              A       Not that I'm aware of.

10             Q       Do you think Ms. Ashdown was a

11     good trainer?

12             A       I guess.

13             Q       You guess.

14                     Did she ever train you?

15             A       No.

16             Q       Did you ever ask Ryan about her

17     training ability?

18             A       Did I ever ask Ryan?  No.

19                     About her training abilities?

20             Q       Yes.

21             A       No.

22             Q       Did Mauro think that Ms. Ashdown

23     was a good trainer?

24                          MR. McPARTLAND:  Object to

25                     the form.


                     MCM REPORTING SERVICE
                       (516) 775-5209

                                                              111
1                        Sanders

2                        You can answer.

3          Q       Do you understand the question?

4                  It's a pretty simple question.

5    Do you understand it?

6          A       Of course.

7                  We never really talked about it,

8    to be honest.

9          Q       You never talked with Mauro about

10   how --

11         A       About how she was as a trainer?

12   No.  We never really talked about that.

13         Q       Ever?

14         A       About how she was as a trainer?

15   No.

16                 If she was a good trainer or not

17   a good trainer, no.

18         Q       Did you ever train with Mauro?

19         A       Yes.

20         Q       Is he a good trainer?

21         A       Yes.

22         Q       What makes him a good trainer?

23         A       He's cognizant of the client's

24   movement, he pays attention to what you are

25   doing, he corrects you while you are doing what

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 113 of 197

112

```
 1                      Sanders
 2   you're doing.
 3                So he's very attentive to the
 4   client.
 5                And, you know, the program was a
 6   good program.
 7        Q    And as part of your job
 8   responsibilities as a general manager, do you
 9   endeavor to learn about the training abilities
10   of people you manage?
11        A    I train with other trainers, yes.
12        Q    Have you ever trained with Mr.
13   Diaz?
14        A    Mr. Diaz?
15                I don't know who you are speaking
16   of.
17        Q    Who's the fitness manager right
18   now?
19        A    Darwin.
20        Q    Darwin.
21                What's his last name?
22        A    Diaz, right.
23        Q    Have you ever trained with
24   Mr. Diaz?
25        A    No, I haven't.
```

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 114 of 197

113

```
1                        Sanders
2         Q     Do you have an opinion as to
3    whether he's a trainer or not?
4         A     No, I don't.
5         Q     Did you ever ask Mauro whether he
6    was a good trainer?
7         A     No, I haven't.
8         Q     So you don't know?
9         A     No, I'm not sure.
10              MR. HARMAN:  I would like
11              to take another short break and
12              take a lunch break in about an
13              hour.
14                   Okay.
15                   (Discussion off the record.)
16                   (Whereupon, at 12:16 p.m., a
17              recess was taken.)
18                   (Whereupon, at 12:32 p.m.,
19              the deposition resumed with all
20              parties present.)
21              MR. HARMAN:  On the
22              record.
23    BY MR. HARMAN:
24         Q     Mr. Sanders, have you ever had an
25    employee who, other than Ms. Ashdown, who has
```

114

```
1                          Sanders
2      been diagnosed with a serious illness?
3              A      Not that I can recall off the top
4      of my head.
5              Q      Have you ever had an employee who
6      has become pregnant?
7              A      Probably, but I can't think of it
8      off the top of my head.
9              Q      Have you ever had an employee who
10     has had an immediate family member who has
11     passed away?
12             A      Yes, I have had that before,
13     yeah.
14             Q      Do you know what the Family
15     Medical Leave Act is?
16             A      The Family Medical Leave Act?
17                        MR. McPARTLAND:  Object to
18                    form.
19                        You can answer.
20             A      Yeah, I have heard of it, yes, of
21     course.
22             Q      Have you ever had any employees
23     who have taken medical leave?
24             A      Not that I recall, no.
25             Q      Have you ever had any employees
```

                                                          115
1                        Sanders

2      take bereavement leave?

3              A      Yes.

4              Q      And today does an employee ask

5      you for permission to take bereavement leave?

6              A      Yes.

7              Q      And do you grant that permission?

8              A      Obviously if they had a

9      bereavement, yes, we would have to grant it.

10             Q      And you do that in conjunction

11     with the human resources department?

12             A      Yes.

13             Q      And does the human resources

14     department have policies and procedures with

15     respect to bereavement leave?

16             A      Yes.

17             Q      And does the human resources

18     department have policies and procedures with

19     respect to leave for medical issues?

20             A      Yes.

21             Q      What are they?

22             A      The Family Medical Leave Act.

23             Q      What is that?

24                        MR. McPARTLAND:  Object to

25                    the form.



                  MCM REPORTING SERVICE
                    (516) 775-5209

116

1                         Sanders

2                    You can answer.

3         A      If someone has a medical

4    situation and they can't perform their duties or

5    they need to take time off because of that, they

6    would go through the proper steps, getting

7    doctors' notes, whatever, to take time off.

8                    And I'm pretty sure that there is

9    a time frame that you have to take that time

10   off, and you're ensured to have your job when

11   you come back from that time off, not

12   necessarily the same place, but at least the

13   same job.

14        Q      And have you ever had an employee

15   that has taken medical leave?

16        A      Not that I recall.

17        Q      Let's go back to the situation

18   with the e-mail.

19                   So did you ever confront Mr.

20   Maietta about this accusation that he sent a

21   fake e-mail?

22        A      We might have talked about it,

23   but I don't really remember, to be honest.

24        Q      What makes you think that you

25   might have talked about it?

                      MCM REPORTING SERVICE
                        (516) 775-5209

117
Sanders

1

2          A       Because I generally address most

3     issues or at least my style is if something is

4     brought to my attention, I will address it.

5          Q       Well, do you think making up a

6     fake e-mail address to one supervisor is a

7     serious issue?

8          A       Of course that would be a serious

9     issue.

10          Q       And since it was a serious issue,

11     would that warrant a discussion with the

12     employee reporting the accusation?

13                    MR. McPARTLAND:  Objection.

14          A       Yeah.  Yes.

15          Q       But you don't recall whether you

16     had a discussion or not?

17          A       I don't recall.

18          Q       Did you ever see a fake e-mail

19     address?

20          A       I don't recall seeing a fake

21     e-mail address.

22          Q       When you say you don't recall, is

23     it possible that you did?

24          A       I mean, I will say anything is

25     possible, but I don't remember.  I don't

                                              118
1                        Sanders

2     remember seeing a fake e-mail address.

3          Q     Well, that's an unusual

4     circumstance, right, to see a fake e-mail

5     address, right?

6          A     Yeah, it would be unusual.

7          Q     Right.

8          A     So in my memory right now, I

9     don't recall seeing a fake e-mail address.

10         Q     Do you recall going into

11    Ms. Ashdown's and Mr. Maietta's office with

12    Ms. Ashdown around the time that she brought

13    this serious issue to your attention?

14                    MR. McPARTLAND:  Object to

15              the form.

16         A     We probably did.  I don't

17    remember.

18         Q     What makes you think you probably

19    did?

20         A     If you're saying, if you're

21    asking me the question, maybe we did.  I don't

22    remember.

23         Q     You don't remember going in?

24         A     No.

25                    It was two years ago, I don't

                                                        119
1                        Sanders

2     remember everything.

3          Q     I'm only asking you about what

4     you remember.

5          A     Right.

6          Q     I mean, you know, you remember

7     some pretty specific details about other things

8     regarding Ms. Ashdown, so I'm asking you about

9     other situations with employees.

10                        (A document Bates stamped

11                        EQX-6358 was marked as Plaintiff's

12                        Exhibit 3 for identification, as of

13                        this date.)

14     BY MR. HARMAN:

15          Q     I'm handing you what has been

16     marked for identification as Plaintiff's Exhibit

17     3 (handing).

18                        Please take a look at it.

19                        MR. HARMAN:  For the

20                        record, it's an e-mail printout

21                        with Matthew Herbert's name in

22                        the heading, but it is an e-mail

23                        that purports to be from Lawrence

24                        Sanders to Joe Matarazzo and

25                        others dated September 1, 2011.

120

1                        Sanders

2    BY MR. HARMAN:

3           Q      Do you recognize this document?

4           A      Yes.

5           Q      Did you draft this document?

6           A      Yes.

7           Q      Did you draft it on September 1,

8    2011?

9           A      Yes.

10          Q      Is there anything in this e-mail

11   that is inaccurate?

12          A      No.

13          Q      And is it true that Ms. Ashdown

14   felt Mauro Maietta had something to do with it?

15          A      That's what I believe, yes.

16          Q      And did you investigate that?

17          A      Yes.

18          Q      So Ms. Ashdown alleges that Mauro

19   Maietta had something to do with the session

20   pulling, right?

21          A      She never said that to me

22   directly, but that's what I believe she --

23          Q      That's what this e-mail says,

24   right?

25          A      That's what I believe she felt.


                     MCM REPORTING SERVICE
                       (516) 775-5209

121

1                        Sanders

2     Basically, she feels, that's what I believe she

3     felt.

4            Q      Did she tell you that or not?

5            A      All she said is, "I know who did

6     this."

7            Q      Did she tell you that she

8     believes Maietta was a part of it?

9            A      She never said specifically to me

10    that she felt he was the one that did this.

11           Q      So you are telling me on the

12    record under oath that she never told you that

13    she felt Mauro Maietta was a part of this?

14                       MR. McPARTLAND:  Objection.

15                       Asked and answered.

16           Q      I want the record to be clear.

17           A      She never said to me according to

18    this situation that she believed Mauro had

19    something to do with it.

20           Q      But you felt in earnest and in

21    your role as the general manager of the whole

22    Soho location that she felt Mauro had something

23    to do with it?

24           A      Yes.

25           Q      And you now are testifying that

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 123 of 197

122

                              Sanders

1

2      you investigated that?

3           A      I'm testifying that, obviously,

4      yes, I looked into it, yes.

5           Q      You investigated it?

6           A      Yes, I investigated it.

7           Q      Does "look into it" and

8      investigate mean the same thing to you?

9           A      To me, yes, it does.

10          Q      So then we'll go with

11     investigate.

12                 What did you do to investigate

13     whether Mauro Maietta had anything to do with

14     this?

15          A      I obviously questioned him about

16     the sessions, questioned him about the pulling

17     of the sessions, you know, the expiring sessions

18     and the reinstatement of the sessions,

19     questioning him about that information.

20          Q      So you questioned Mr. Maietta?

21          A      Yes.

22          Q      Where did that conversation take

23     place?

24          A      In the club, in the office.

25          Q      So you brought him in, you asked

                    MCM REPORTING SERVICE
                      (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 124 of 197

123

                              Sanders

1
2      him into your office?

3              A      Yeah.

4              Q      And you questioned him?

5              A      We talked about it, yes, we

6      questioned him.

7              Q      Was anybody else present?

8              A      No.

9              Q      But you just said "we questioned

10     him."

11                    What do you mean by that?

12             A      I meant me.

13             Q      You questioned him?

14             A      Yes.

15             Q      And what did you say to him?

16             A      I just said, "Did you have

17     anything to do with this?  Did you have anything

18     to do with the pulling of these sessions?"

19             Q      And what did he say?

20             A      He said no.  He said, "That my

21     codes aren't used.  I'm not" -- "I wasn't

22     around.  I wasn't here in the building when they

23     were done, when it was done."

24             Q      And did you corroborate whether

25     or not he was in the building when it was done?

                                                        124
 1                          Sanders

 2              A     Yes.

 3              Q     You did.

 4                    What did you do to do that?

 5              A     We have surveillance video in our

 6       club.

 7              Q     And did you review surveillance

 8       video?

 9              A     Yes, I did.

10              Q     And when did you do that?

11              A     During the week of investigating

12       this situation.

13              Q     So you reviewed surveillance

14       video?

15              A     Yes.

16                    MR. HARMAN:  We're going

17                    to call for the production of the

18                    surveillance video that was

19                    reviewed during the week of your

20                    investigation, as you call it.

21                    For the record, no

22                    surveillance video has been

23                    identified or produced in this

24                    action even though it was clearly

25                    called for as part of the --


                     MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 126 of 197

125

1                        Sanders

2          A      Well, part of -- I'm sorry.

3          Q      Please, let me finish.

4                        MR. McPARTLAND:  There is

5                 no question pending.

6                        THE WITNESS:  Okay.

7          Q      Who was present when you

8    purportedly looked at this surveillance video?

9          A      I honestly don't remember who was

10   present, if there was anyone present.  I don't

11   remember.

12         Q      But you remember looking at

13   surveillance video?

14         A      Yes, I do.

15         Q      Where did you look at

16   surveillance video?

17         A      It's in my office.

18         Q      And what did you see, if

19   anything, on the surveillance video?

20         A      To see if Mauro was in the club

21   during the time that the sessions were pulled,

22   if he entered the building or left the building

23   during that time.

24         Q      How much surveillance video did

25   you look at?

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 127 of 197

126

1                         Sanders

2          A       I looked at the video from the

3    time stamps on, you know, from the time stamps

4    of when the sessions were pulled.

5                   So if they were pulled, again, I

6    don't remember the exact time, but if the

7    sessions were pulled at say 2:00 in the

8    afternoon, I looked at video from before that

9    time all the way up until that time.

10         Q       I see.

11                  So from before that time, what

12   does that mean to you?

13         A       If the sessions were pulled at

14   2:00, I looked at video prior to 2:00 p.m. on

15   the particular day that the sessions were pulled

16   to see if Mauro was in the club.

17         Q       What time does video start?

18         A       It's basically ongoing.

19         Q       So how much video did you look

20   at?

21         A       I looked at the video from the

22   dates of the pulled sessions and the time stamps

23   of those sessions and, again, the amount of time

24   prior to the sessions being pulled.

25         Q       Well, the video is 24-hour video,

127
```
 1                      Sanders
 2    right?
 3            A       Uh-hum.
 4            Q       And if the sessions were pulled
 5    at 2:00, right, it's your testimony that you
 6    looked at all the video on that date before
 7    2:00, correct?
 8            A       Meaning the hours of that
 9    particular day.
10                    So if it was pulled on Saturday
11    at 2:00 in the afternoon, that means the person
12    would have had to have been in the club at 2:00
13    in the afternoon on that Saturday to pull the
14    sessions.
15                    They would have to have been
16    there.
17                    So I'm going to look at the video
18    prior to 2:00 all the way up until 2:00 to see
19    if that individual or who is in the club during
20    that time prior to 2:00, because they would have
21    to have been in the club to pull the session.
22                    So that's the video that I looked
23    at.
24                    Did I look at the last three days
25    worth?
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 129 of 197

                                                          128
1                          Sanders

2                No, because the club closes every

3      day, so there's no one in the club.  You can't

4      have access to the club.

5                And, again, the session was

6      pulled on a particular day and time, so I would

7      have to view during that time frame before the

8      sessions were pulled.

9           Q      How much video would you say you

10     looked at?  How much time did you spend looking

11     at video?

12          A      A couple of hours.

13          Q      So if sessions were pulled at

14     2:00 in the afternoon, you looked at a couple of

15     hours of video prior to that session being

16     pulled; is that your testimony?

17          A      Yeah.

18          Q      So you came to the conclusion

19     that there was no way that Mr. Maietta could be

20     involved in this in part because you looked at a

21     couple of hours of video prior to when the

22     session was being pulled?

23          A      Correct.

24          Q      And did you notice whether during

25     this few hours of video that you looked at, did

129
1                         Sanders
2      you notice whether Ms. Ashdown was on the video?
3              A     Yes.
4              Q     So you did see her on that video?
5              A     Yes.
6              Q     I take it this video is pretty
7      important to your investigation, right?
8              A     Yes.
9              Q     Did you show the video to
10     anybody?
11             A     I don't remember.
12             Q     Did you preserve the video?
13             A     No.
14             Q     Did you e-mail anybody about the
15     video?
16             A     I believe it was definitely
17     talked about with Matt Plotkin.
18             Q     Please just answer my question.
19                   Did you e-mail anybody about the
20     video?
21             A     E-mail anybody about the video?
22                   No, I don't believe I e-mailed
23     anyone about the e-mail.
24             Q     Is there any evidence whatsoever
25     as you sit here today about this video?

```
                                                           130
 1                          Sanders

 2           A       No, probably not.

 3           Q       So you destroyed it?

 4           A       No, I didn't destroy it.

 5           Q       But you didn't save it?

 6           A       Didn't save it.

 7           Q       You didn't e-mail anyone about

 8    it?

 9           A       No.

10           Q       Didn't write a memo about it?

11           A       I didn't write a memo about it,

12    no.

13           Q       So you have a video that supports

14    your investigation into someone stealing, but it

15    doesn't exist anymore, right?

16           A       Correct.

17           Q       And how long does the video

18    automatically save itself?

19           A       Probably a month's worth, and it

20    just kind of takes over itself.

21           Q       So it saves itself --

22           A       Like if the video saves on the

23    system for probably like a month --

24           Q       How do you know that?

25           A       Because that's what our video
```

131

1                          Sanders

2      people that set up the cameras told me at the

3      time, that, you know, that's what I knew about

4      the video at the time.

5              Q      So you have gotten some training

6      on the video?

7              A      Yes.

8              Q      Do you know how to save video?

9              A      Yes.

10             Q      But you didn't save this video?

11             A      No.

12             Q      Did you notice whether Ryan was

13     on the video?

14             A      Don't remember.

15             Q      How about Bobby, did you notice

16     whether he was on the video?

17             A      I don't remember.

18             Q      This investigation that you

19     conducted into whether Mauro Maietta was part of

20     this session pulling scheme, you said you talked

21     to him?

22             A      Yes.

23             Q      Did you memorialize that

24     conversation?

25             A      What do you mean?

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 133 of 197

132

1                           Sanders

2            Q       Did you e-mail anybody about it?

3            A       No.

4            Q       And so there is no record of it,

5     right?

6            A       Probably not.

7            Q       And did you speak with anyone

8     else as part of your investigation into Mr.

9     Maietta?

10           A       Probably Matt Plotkin.

11           Q       Why do you say probably?

12           A       Because that's who my direct boss

13    is, so that's who I usually first talk to.

14           Q       What would he know about whether

15    Mr. Maietta stole the sessions?

16           A       He would know -- you asked about

17    the video, right?

18           Q       Yes.

19           A       He would know when I was, during

20    the investigation into this matter, I believe I

21    did communicate to him that we watched -- I

22    watched the video, not we, I watched the video

23    and Mauro was not in the building as

24    specifically pertains to Mauro, having the

25    belief that he did have something to do with

133

```
1                          Sanders
2    this or not.
3                  And I believe I did let Matt know
4    that I watched the video and Mauro wasn't in the
5    club during the time that the sessions were
6    pulled.
7                  So I'm pretty sure that I had
8    that conversation with Matt.
9         Q     Why are you pretty sure about
10   that?
11        A     Because, again, he was involved
12   in, I communicated pretty much everything to him
13   as it relates to this situation.
14                 This wasn't me on an island by
15   myself saying "I'm going to make these
16   decisions.  I'm going to do these different
17   things."
18                 I was definitely communicating to
19   my boss, my direct boss, what I was doing and
20   how I was doing what I was doing.
21                 So I'm pretty confident that I
22   told him about that.
23        Q     How many sessions were involved
24   in this investigation?
25        A     I believe -- I want to say either
```

134

1                          Sanders

2      18 or 21, something around that number.

3             Q      And you're positive based on your

4      investigation that Mr. Maietta wasn't involved

5      in any of these 17 or 18 sessions?

6             A      Yes.

7             Q      And did you look at video with

8      respect to all 17 or 18 of these sessions?

9             A      Yes.

10            Q      You did?

11            A      To see if he was in the building

12     during the time those sessions were pulled.

13                   Most of them were pulled over a

14     two, maybe three-day period at the most.

15                   So it wasn't like they were

16     pulled individually on multiple days.

17                   They were pulled on Saturdays and

18     it was a group of them that were pulled on

19     Saturday.

20                   So it wasn't like I had to watch

21     18 days' worth of video.

22            Q      Did you watch more than one day

23     of video?

24            A      I watched the days that the

25     sessions were pulled.


                    MCM REPORTING SERVICE
                       (516) 775-5209

135

                              Sanders

1

2       Q       I'm asking if you watched --

3    because earlier you testified you only watched a

4    couple of hours of video leading up to one

5    session.

6                So let's talk about what you

7    recall you actually looked at.

8                Did you look at more than a

9    couple of hours of video leading up to one

10   session?

11      A       It wasn't one session.  It was

12   multiple sessions that were pulled and on the

13   days those sessions were pulled, I looked at

14   video to see if Mauro was in the club on those

15   days that those sessions were pulled.

16               That's what I looked at.  And I

17   looked at the video prior to the time stamp of

18   when the sessions were pulled.

19      Q       Have you ever used anyone else's

20   login ID to log into someone else's computer?

21      A       No.

22      Q       Are you positive of that?

23      A       I don't use anyone else's ID

24   ever.

25      Q       Ever, in the five years, you

                    MCM REPORTING SERVICE
                       (516) 775-5209

136

1                      Sanders

2      never used anyone's login ID to log into a

3      computer?

4                      MR. McPARTLAND:  Objection.

5                      Asked and answered.

6          A     I don't use anyone else's login.

7      I have my own.  I don't need to use anyone

8      else's.

9          Q     Have you ever been aware of

10     anyplace else using someone else's login ID to

11     log in to a computer?

12         A     Possible, I don't know.

13         Q     I'm not asking about

14     possibilities --

15         A     I don't know.

16         Q     As a manager of a gym, have you

17     ever become aware of anyone using a login ID to

18     log into a computer that wasn't theirs?

19                      MR. McPARTLAND:  Object to

20                      the form.

21         A     I'm not aware of that.

22         Q     So you're not aware of it?

23         A     No.

24         Q     So if someone pulled a session at

25     6:00 in the evening, let's say, how much video

MCM REPORTING SERVICE
(516) 775-5209

137

1                         Sanders

2    would you have looked at on that day to

3    determine that Mr. Maietta wasn't in the

4    building that day?

5            A      I would look at video for a few

6    hours before 6:00.

7            Q      So what is a few hours in your

8    mind?

9            A      I would look at 3:00 in the

10   afternoon to 6:00 to see if, you know, because

11   you, again, you would have to physically be in

12   the building to pull the session at 6:00.

13                  So I would want to see if prior

14   to 6:00 p.m. if the person is in the building or

15   prior to 6:00 p.m. have they left the building.

16                  So you want to see if they're in

17   there, how long were they in the club, and did

18   they leave.  That's basically what I can see or

19   watch from the video.

20           Q      Earlier I thought you said that

21   you just looked at video leading up to the

22   session.

23                  Are you now telling me you looked

24   at video after the session was pulled?

25           A      What I'm saying is, I'm watching

138

1                        Sanders

2     video up until the time that the session is

3     pulled, meaning to see who's in the building or

4     if they've left the building prior to that

5     session being pulled.

6              So that's all I'm looking at.

7         Q    Okay.

8         A    Because I need to know if they're

9     in the building when that session was pulled.

10             That's the most important thing.

11        Q    Right.

12             If a session was pulled at say

13    6:00, you said --

14        A    I'm going to before 6:00 to

15    watch.

16        Q    For three hours, right?

17        A    Right.

18        Q    Like for three hours, but if

19    someone got to the building in the morning and

20    stayed in their office throughout the day, would

21    you know whether or not they were in the

22    building or not?

23        A    If they came in the building

24    early and stayed in the building?

25        Q    If they came into the building at

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 140 of 197

139

```
1                      Sanders
2    8:00 in the morning?
3         A      And didn't leave the building,
4    you are saying?
5         Q      Yes.
6         A      Then obviously if I didn't watch
7    from 8:00 in the morning, then, no, I wouldn't
8    know that they were in the building.
9         Q      Just please answer my question.
10               If they arrived at 8:00 in the
11   morning, you only looked at video from 3:00 to
12   6:00, but they arrived at the building at 8:00
13   and didn't leave, would you know whether or not
14   they were in the building based on your looking
15   at those three hours of video?
16        A      Probably not, if they didn't
17   leave, no.
18        Q      How many cameras are there?
19        A      Nine cameras in the club.
20        Q      Where are the cameras located?
21        A      Front desk, locker rooms,
22   outside, shop, retail place and down the
23   corridor leading into the gym.
24        Q      There is a camera in the locker
25   room?
```

140

Sanders

1

2          A        Not in the locker room, outside.

3                   MR. HARMAN:  Could you

4                   read back the list, please?

5                        (Whereupon, the record was

6                   read back by the reporter.)

7          Q        Other than the main entrance to

8     the gym, is there any other way to get into the

9     gym?

10         A        Not to my knowledge, no.

11         Q        And how many cameras in total

12    would you say there are, nine?

13         A        I think it's nine.

14         Q        So you would have to look at nine

15    different sets of video; is that correct?

16         A        I would look at the video from,

17    the video that has everyone -- there's two

18    cameras that everyone has to pass by, which is

19    the front desk, so that's the camera that you're

20    looking at primarily, the front desk camera,

21    because everyone -- no one can get into the club

22    unless they walk past the front desk, so that's

23    the primary camera that you're going to look at.

24         Q        So it's your testimony that you

25    looked at the front desk camera?

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 142 of 197

141

Sanders

1

2          A      And looking at the camera going

3     down the corridor leading into the gym.  That's

4     another camera that 95 percent of the people

5     that are coming in have to go past, and that's

6     the camera that would lead to the gym floor and

7     where the PT manager's office is.

8          Q      So those are two separate

9     cameras?

10         A      Yes.

11         Q      Two separate sets of video?

12         A      Yes.

13         Q      Did you look at them

14    simultaneously?

15         A      Yes.

16         Q      So you were looking at two sets

17    of video at the same time?

18         A      Yes.

19         Q      Did you look at any other video?

20         A      No.

21         Q      And do you recall on how many

22    days you have looked at video?

23         A      How many days?  I don't know the

24    exact number of days.  It was just whatever days

25    were --

142

1                          Sanders

2          Q      Well, I'm not talking about on

3     different days.

4                 How many different days of video

5     did you look at when you conducted your

6     investigation into Mr. Maietta?

7          A      Whatever the days were that the

8     sessions were pulled, that's the days that I

9     looked at on the video.

10         Q      But I'm asking about your

11    recollection.

12                So did you think it was more than

13    two?

14         A      It was at least two.

15         Q      Do you think it was more than

16    five?

17         A      I don't believe so.  I don't know

18    for sure.

19         Q      And what else besides this video

20    that you looked at did you do to conduct an

21    investigation into Mr. Maietta?

22         A      That was probably the primary

23    thing that I did.

24                I don't think there was anything

25    else I did as far as an investigation.

143

1                          Sanders

2          Q      So you didn't do anything else,

3    you just looked at this video for three hours

4    leading up to the sessions that were pulled?

5          A      Yes.

6          Q      And based on what you have

7    testified to today, you determined that there

8    was no way that Mr. Maietta could have been

9    involved in this session pulling?

10         A      Yes.

11         Q      And you didn't speak to any other

12   employee of Equinox regarding whether Mr.

13   Maietta was involved in this?

14         A      No.

15         Q      But you did speak with other

16   employees regarding whether Ms. Ashdown was

17   involved in this, right?

18                      MR. McPARTLAND:  Object to

19              the form.

20                      You can answer.

21         A      No, I didn't speak to other

22   employees whether she was involved in this or

23   not.

24                I spoke to trainers with regard

25   to the sessions that were pulled and asked do

144

1                       Sanders

2    they know about these sessions.

3              I didn't tell these trainers that

4    I think, do you think Kerry is involved in this,

5    that's not what I said.

6         Q    Did you speak with any Equinox

7    employees about whether Ms. Ashdown, other than

8    the corporate employees that you have talked

9    about, whether Ms. Ashdown was involved in the

10   session pulling?

11        A    Not that I recall.

12        Q    When did you conduct this

13   investigation?

14        A    It was in August 2011.

15        Q    Let's turn your attention back to

16   Plaintiff's Exhibit 3.

17        A    (Perusing document.)

18        Q    You testified that you drafted

19   this e-mail and in the last sentence of the

20   first paragraph, would you agree that it says,

21   "She also feels he needs to be investigated in

22   regard to this situation"?

23        A    What about it?

24        Q    Did you write it?

25        A    Yes.


                    MCM REPORTING SERVICE
                       (516) 775-5209

145

```
 1                       Sanders
 2          Q       And did you write it on September
 3     1, 2011?
 4          A       Yes.
 5          Q       And had you completed your
 6     investigation when you wrote this e-mail?
 7          A       Probably, yes.  I'm pretty
 8     certain, because I already looked at the video,
 9     yes.
10          Q       So you had already completed your
11     investigation?
12          A       I'm just communicating to them
13     what she felt or what I believed she felt, so
14     that they knew, that's all.
15          Q       So you wanted them to know what
16     you thought she felt?
17          A       Yes.
18          Q       But you didn't think it was
19     important to tell them that you had already
20     completed an investigation involving looking at
21     video?
22          A       Again, I'm pretty confident that
23     I had a conversation with Matt Plotkin about
24     what I did prior to sending this e-mail.
25                         (A document Bates stamped
```

146

```
 1                         Sanders
 2              EQX-6400 was marked as Plaintiff's
 3              Exhibit 4 for identification, as of
 4              this date.)
 5    BY MR. HARMAN:
 6         Q    I'm handing you what's been
 7    marked as Plaintiff's Exhibit 4 (handing).
 8              Please take a look at it.
 9                   MR. McPARTLAND:  Just for
10              the record, we removed the
11              confidentiality designation on
12              this document.
13                   So if you want to produce
14              the unredacted document, which I
15              believe I produced, I used in
16              Ms. Ashdown's deposition, just
17              let me know.
18                   MR. HARMAN:  Okay.
19                   MR. McPARTLAND:  Because I
20              see the member's name is redacted
21              on this document.
22         A    (Perusing document.)
23         Q    Are you done?
24         A    Yes.
25         Q    I take it you as a general
```

147

1                          Sanders

2      manager of the Soho location consider session

3      stealing to be a pretty serious offense?

4            A     Yes.

5            Q     And as part of your investigation

6      into the serious sessions stealing, you

7      determined that Ms. Ashdown had stolen sessions;

8      is that correct?

9            A     Yes.

10           Q     And that Mr. Maietta had not been

11     involved in the session stealing; is that

12     correct?

13           A     Yes.

14           Q     Now, because you have testified

15     it's such a serious offense, did it occur to you

16     that Ms. Ashdown might have been stealing

17     sessions during her entire time there?

18           A     Possibly, yes.

19           Q     And that could mean that members

20     of Equinox would have had sessions taken from

21     them illegally, right?

22           A     Yes.

23           Q     And did you endeavor to determine

24     whether or not Ms. Ashdown had stolen sessions

25     during other periods?

                     MCM REPORTING SERVICE
                       (516) 775-5209

148

```
 1                        Sanders
 2         A       No.
 3         Q       That wasn't important?
 4                        MR. McPARTLAND:  Object to
 5                 form.
 6                        You can answer.
 7         A       I just didn't do it.
 8         Q       All right.
 9                 So as you sit here today you have
10    no idea whether any other sessions were stolen
11    even in your club?
12         A       No.
13         Q       Because you didn't look?
14         A       Correct.
15         Q       Drawing your attention to
16    Plaintiff's Exhibit 4 here, this is a
17    spreadsheet that is Bates stamped EQX-6400, and
18    it has the line member name, or membername,
19    redacted, it's subsequently been produced in
20    unredacted form.
21                 Perhaps we will review that
22    document at a later point in the deposition, but
23    for now we are going to discuss this document.
24                 Do you recognize this document,
25    Mr. Sanders?
```

149

```
1                         Sanders
2          A       Yes.
3          Q       What is it?
4          A       It was the IT report that they
5    pulled from the database to analyze the sessions
6    that were pulled.
7          Q       When you say "they," who is
8    "they"?
9          A       The IT department.
10         Q       And when you say "analyze," who
11   was analyzing this?
12         A       I was, and I believe Matt looked
13   at it.
14                 I'm not sure who else looked at
15   it.
16         Q       So you analyzed this document?
17         A       Yes.
18         Q       And as part of your analysis,
19   what did you do?
20         A       Just looked at the dates, you
21   know, to perform, the dates, you know, who it
22   went to and who got credit for it and when they
23   were used, reinstated, all of that stuff.
24         Q       Why were they reinstated?
25         A       Because they looked -- well,
```

MCM REPORTING SERVICE
(516) 775-5209

150

1                          Sanders

2     the -- when something is reinstated, that means

3     it should not have been used, is one reason for

4     it being reinstated.

5                     And another way, another reason

6     it would be reinstated is if it expired and you

7     actually want to use an expired session, so then

8     it would be reinstated for that purpose.

9                     So that's two reasons why it

10    would be reinstated.

11          Q     Let's look at line one.  Do you

12    know why the session in line one was reinstated?

13          A     Because he should not have been

14    paid for that session, so it got reinstated.

15          Q     And how did you determine that --

16    so it was reinstated when?

17          A     It doesn't have the date on here

18    when it was reinstated, but it was reinstated

19    because it should not have been used.

20          Q     Are you guessing or do you know?

21          A     No, I'm telling you.

22          Q     And what does the date reflect?

23          A     The date reflects the date that

24    it was pulled or performed from the system, the

25    performed date.


                    MCM REPORTING SERVICE
                       (516) 775-5209

                                                              151
1                          Sanders

2          Q        What does the August 13, 2011

3     date reflect, in your opinion?

4          A        That's the date that reflects

5     when it was pulled, like used in the system.

6          Q        What is August 16th, what is that

7     date?

8          A        That's the date that it was

9     reinstated, because it should not have been

10    used.

11         Q        But you just testified earlier

12    that you didn't know when it was reinstated?

13         A        Well, I made a mistake.

14                      MR. McPARTLAND:  Object to

15                  the form.

16         Q        Did you testify earlier that you

17    didn't know when it was reinstated?

18         A        I made a mistake.

19         Q        Do you understand this form?

20         A        I have a good understanding of

21    the form, yes.

22         Q        If you go to the third line where

23    it says February 12, 2012, what does that mean?

24         A        That was the expired date.

25    That's what it says.


                        MCM REPORTING SERVICE
                          (516) 775-5209

152

1                        Sanders

2          Q      And if it was, where does it say

3     that it was expired?  Oh, I see.

4                 So it's your testimony that that

5     means that that date reflects when the session

6     was expired?

7          A      Yes.

8          Q      Okay.

9          A      See, the part --

10         Q      Please, please.

11                February 12, 2012, would you

12    agree is a date after August 13, 2011, correct?

13         A      Yes.

14         Q      So that particular session hadn't

15    expired, correct?

16         A      Correct.

17         Q      Is there any session on here that

18    you are aware of that had expired?

19         A      (Perusing document.)  It looks

20    like none of them had expired yet.

21                    MR. HARMAN:  It's 1:10.

22                    Why don't we take a lunch break

23                    now?

24                        (Whereupon, at 1:10 p.m.,

25                        a luncheon recess was taken.)


                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 154 of 197

```
                                                            153
 1                          Sanders

 2                     AFTERNOON SESSION

 3                              September 12, 2013

 4                              2:06 p.m.

 5     L A W R E N C E     S A N D E R S, resumed and

 6          testified further as follows:

 7     EXAMINATION

 8     BY MR. HARMAN

 9          Q      Mr. Sanders, while on your break

10     did you speak to anyone about your testimony?

11          A      No.

12          Q      Did you speak to anyone at all?

13          A      No.

14          Q      Did you use your phone?

15          A      No.

16          Q      As part of your investigation

17     into session pulling, did you investigate

18     Cornelia?

19          A      I had a conversation with her,

20     yes.  And also I believe Liz Minton had talked

21     to her about it or spoke to her about the

22     session pulling.

23          Q      So you had a conversation with

24     her and that's it?

25          A      Yes.
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 155 of 197

154

1                          Sanders

2          Q       Did you ever work at the 17th

3    Street location?

4          A       Yes.

5          Q       What was your title there?

6          A       General manager.

7          Q       How long did you hold that title?

8          A       Two years.

9          Q       And what were the years of that?

10         A       2008 to 2010.

11         Q       And you testified that you were

12   able to pull, you as one of the managers are

13   able to pull sessions for trainers, correct?

14         A       Yes.

15         Q       And how do you do that?

16         A       Either the trainer has come to us

17   and said the session forgot to be pulled or

18   there's a book that we have that's called

19   cancellation book slash forgot to pull book.

20                 So when clients forget to pull

21   their sessions, the trainers write the client's

22   name in this book and they write down whether it

23   was a no show, late cancellation or basically

24   forgot to pull.

25                 And then the PT manager or the

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 156 of 197

155

1                          Sanders

2     fitness manager is responsible for checking this

3     book on a daily basis and pulling whatever

4     sessions need to be pulled.

5                    So if you are not able to do

6     that, then I would potentially be the third

7     person or the AGM would be the fourth person

8     that would be instructed to take care of that.

9           Q      Who is the AGM?

10          A      Currently?

11          Q      Yes.

12          A      Name is Jed Prisby and Jane

13    Montoya.

14          Q      There are two?

15          A      There are two AGMs in my club

16    presently, yes.

17          Q      The first one?

18          A      The name is Jed Prisby, J-E-D

19    P-R-I-S-B-Y.

20          Q      And the second one?

21          A      Jane Montoya, M-O-N-T-O-Y-A.

22          Q      And how long has Jed been an

23    assistant general manager?

24          A      He's been with Equinox for, I

25    believe for a little over two years.

156
1                             Sanders

2              Q      How long has he been at Soho?

3              A      About three, four months.

4              Q      And how many assistant managers

5     were there when Ms. Ashdown was there?

6              A      One.

7              Q      What was that individual's name?

8              A      I believe it was Lauren Buck.

9              Q      And where is Ms. Buck now?

10             A      No longer with Equinox.

11             Q      And how did her employment with

12    Equinox end?

13             A      We decided that she should go a

14    different route in the company, do a different

15    position.

16                    We spoke to her about it and she

17    decided not to want to do that, so she left.

18             Q      And how would you describe the

19    relationship between Lauren Buck and Mauro

20    Maietta?

21             A      I'd guess I would describe it as

22    professional.

23             Q      Did he complain about her?

24             A      No, not to my recollection, no.

25             Q      Would you describe, would you

157

1                         Sanders

2      describe the relationship between Mauro and

3      Ms. Ashdown as professional?

4             A      Mauro and Ms. Ashdown as

5      professional?

6             Q      Yes.

7             A      For the most part, yes, it was

8      professional.

9             Q      Ever identify any unprofessional

10     behavior on the part of Mauro Maietta with

11     respect to their relationship?

12            A      No, I haven't.

13            Q      You trained with Mauro Maietta,

14     right?

15            A      Yes.

16            Q      And there was a time where you

17     trained with him on a regular basis, correct?

18            A      Yes.

19            Q      That would be at least three

20     months, maybe three months, approximately?

21            A      Yes.

22            Q      And that would be a couple of

23     times a week?

24            A      Yes.

25            Q      And you're his direct supervisor,

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 159 of 197

158

1                         Sanders

2    correct?

3         A      The PT manager is his direct

4    supervisor.  I'm the supervisor over everyone in

5    the club.

6         Q      So as part of your

7    responsibilities as the supervisor over everyone

8    in the club, do you check in with the personal

9    training manager to see how things are going?

10        A      Yes.

11        Q      And the fitness manager to see

12   how things are going?

13        A      Yes.

14        Q      And I assume you want to know

15   good things about them, right?

16        A      Yes.

17        Q      And did Mr. Maietta ever say

18   anything positive about Ms. Ashdown?

19        A      He thought that she brought a

20   different energy, obviously in the beginning,

21   and she was, like I said, driven and ambitious

22   and motivated and wanted to inspire people in

23   the club.

24              So that was something that was

25   good that he recognized.

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 160 of 197

159

1                         Sanders

2          Q      Did he specifically tell you

3    those things or are those your observations?

4          A      Those were my observations of the

5    interactions and based on, you know, again,

6    conversations had with him in the beginning.

7          Q      Now, I'm going to repeat my

8    question so the record is clear.

9          A      Yes.

10         Q      Did Mr. Maietta ever say anything

11   to you that was positive about Ms. Ashdown?

12         A      Specifically I can't recall.

13         Q      Now, when you were working at the

14   17th Street location, did you have a login

15   number to log into your computer?

16         A      Did I?

17         Q      Yes.

18         A      Yeah.

19         Q      And were there occasions when you

20   had to pull sessions?

21         A      Probably very rare, but maybe,

22   but I don't recall.

23         Q      But would you know how to do it

24   if you needed to?

25         A      Of course.

160

```
 1                         Sanders
 2          Q      Did you have an office at 17th
 3    Street?
 4          A      Yes.
 5          Q      Was it enclosed?
 6          A      Yes.
 7          Q      And I'm not asking for the
 8    specific number.  It doesn't really matter.
 9                 But I take it you punch in some
10    kind of code to log into the system to pull a
11    session, right?
12          A      Yes, your cashier's code.
13          Q      Your cashier's code.
14                 And that's your own private code,
15    right?
16          A      Yes.
17          Q      No one else has that?
18          A      Correct.
19          Q      No one is supposed to have that,
20    right?
21          A      Yes.
22          Q      Do you have that written down
23    anywhere?
24          A      No.
25          Q      Have you memorized it?
```

161
1                      Sanders

2            A       Yes.

3            Q       How long have you had it?

4            A       I have had it probably my entire

5     employment at Equinox.

6            Q       So it doesn't change?

7            A       The only way it would change is

8     if I found out someone had it, then I would have

9     it changed.

10           Q       But it doesn't change when you

11    move from club to club?

12           A       No, it doesn't.

13           Q       And if you wanted to log in to

14    pull a session at another computer, could you do

15    that?

16           A       There's only certain computers

17    designated to pull sessions.

18           Q       What are those?

19           A       The front desk computers, my

20    computer as a general manager.

21           Q       Right.

22           A       And the PT manager's computer,

23    the PT and fitness manager.

24                   I believe those are the only

25    computers designated to pull sessions from, like

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 163 of 197

162

1                    Sanders

2    IT has to set it up so you can pull sessions

3    from those computers.

4              So it's not any computer in the

5    club that has the ability to pull sessions.

6         Q    Right.

7              Well, I'm not talking about

8    computers that are out in --

9         A    You are talking specific to the

10   club?

11        Q    I understand.

12             So you have got the front desk

13   and your computer and the PT and fitness

14   manager's computers, right?

15        A    Right.

16        Q    Now, there are trainers that work

17   at more than one club, right?

18        A    Trainers that work at more than

19   one club?

20        Q    Yes.

21        A    Not, no.

22        Q    That never happens?

23        A    That doesn't happen.

24        Q    You're positive of that?

25        A    It's possible, but that's not

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 164 of 197

163

1                          Sanders

2      what I'm used to.  That's not what I have

3      experienced.

4           Q      Well, like when a trainer becomes

5      a manager in training, for example, and they

6      move from one club to the other, but they still

7      have a client base at one club, but they're

8      moving to another club to become a manager and

9      they're going through a training program, isn't

10     it possible that they might be training people

11     in two different locations?

12          A      You're saying if I'm -- is the

13     question you're asking, if I'm manager, I have

14     been promoted to a manager?

15          Q      If you are a trainer?

16          A      If you are a trainer, I'm not

17     aware of trainers training multiple people in

18     different locations.

19                 I'm not aware of it.

20          Q      Ever?

21          A      I'm not aware of it.

22          Q      Is it possible?

23          A      Anything is possible, but I'm not

24     aware, that's not the protocol of the standard

25     for how things are supposed to go.

                    MCM REPORTING SERVICE
                       (516) 775-5209

164

```
 1                        Sanders
 2           Q        Is this protocol written down
 3      someplace?
 4           A        I'm not aware of that.
 5           Q        How do you understand this
 6      protocol?
 7           A        I understand that if you're a
 8      trainer at one location, you train your clients
 9      at that location.
10                    The only time you would
11      potentially train one of your clients at this
12      location, at another location, is if there's
13      some kind of unforeseen issue at that location
14      where members can't go to it for whatever the
15      reason is, then we may make accommodation for
16      our trainers to train a client at a different
17      location.
18           Q        Let's go back to the computer,
19      the cashier's code.
20           A        Uh-hum.
21           Q        So your cashier's code was the
22      same, but you went to Soho and you could log
23      into the designated computers using the same
24      cashier's code, right?
25           A        Well, logging into the computer
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 166 of 197

165

1                         Sanders

2    and using the cashier's code are two very

3    different things.

4         Q      But you could use the same

5    cashier's code at Soho that you used at 17th

6    Street, correct?

7         A      Yes.

8         Q      And I take it that Ms. Ashdown

9    had a cashier's code, correct?

10        A      Yes.

11        Q      And that Mr. Maietta had a

12   cashier's code, correct?

13        A      Yes.

14        Q      And that like yours, they could

15   be used at other locations?

16        A      If they were transferred to those

17   locations as managers.

18        Q      I'm not asking if they were

19   transferred.

20        A      No, they can't be used.

21        Q      I'm not asking about policy.

22        A      They would not be able to use the

23   code at the location.  They only can use their

24   code at the location that they work at.

25        Q      How do you know that?

166

1                         Sanders

2         A       Because that's the way our system

3    is set up.

4         Q       How do you know that?

5         A       I have worked for the company for

6    long enough to know how the system is set up.

7         Q       Do you know of any policy that

8    says that a cashier's code can't be used at more

9    than one location?

10        A       I know that when I go to a

11   location that I don't have access to, and I'm

12   not working at, and if I tried to use my

13   cashier's code, it won't work.

14        Q       Have you tried to do that?

15        A       Of course.

16        Q       When?

17        A       Early on in my Equinox career,

18   obviously, to see when I'm at another club

19   trying to do some work because I'm not at my

20   club to try to log into the computer, it won't

21   allow me to do it.

22        Q       So is part of this investigation

23   into Cornelia, you spoke with her?

24        A       Yes.

25        Q       And what did you say to her?

167

1                              Sanders

2          A       I asked her does she know who

3    these people were and did she, you know, pull

4    sessions for Kerry to, with this client, and,

5    you know, did she pull these sessions.

6          Q       What did she say?

7          A       She didn't know who these people

8    were and she said that, no, she didn't pull the

9    sessions for Kerry.

10         Q       And did you ask her anything

11   else?

12         A       I asked her did Kerry have her

13   cashier's code and she said Kerry was the one

14   that gave it to her.

15         Q       She said that Kerry was the one

16   that gave it to her?

17         A       Her cashier's code.

18         Q       Who issues cashier's codes?

19         A       What?

20         Q       Who issues cashier's codes?

21         A       The managers of the respective

22   departments.  So like if you're the fitness

23   manager or the PT manager and you have a manager

24   in training, they have the ability to issue or

25   let them know what their cashier's codes are

168

1                       Sanders

2    going to be.

3                   So that's who would tell them.

4                   Front desk employees, assistant

5    managers or myself would tell the front desk

6    employees, "This is your cashier's code,

7    obviously don't share it with anyone.  This is

8    what you're going to use to be able to do

9    transactions."

10                  So it depends on the employee

11   that needs the cashier's code and that manager

12   or whoever is directing, managing that employee,

13   will give them the cashier's code.

14         Q     She told you that Kerry issued a

15   cashier's code to her?

16                  She was a manager in training,

17   right?

18         A     She was a manager in training.

19         Q     She wasn't a trainer, right?

20         A     Right.

21         Q     And Kerry would issue -- do

22   trainers get cashier's codes?

23         A     No, not trainers, no.

24         Q     Who issued Kerry's cashier's

25   code?

MCM REPORTING SERVICE
(516) 775-5209

169

```
 1                          Sanders
 2           A      I probably gave Kerry her
 3     cashier's code.
 4           Q      So you would have known Kerry's
 5     cashier's code?
 6           A      Yeah.
 7           Q      And where would you have kept it?
 8           A      I don't keep it anywhere.
 9           Q      So you have no idea.
10                  Did you issue Mauro's cashier's
11     code?
12           A      Probably not, because he was a
13     manager before I became a general manager at
14     17th Street.
15                  So I would assume that the PT
16     manager at that club gave him his cashier's
17     code.
18           Q      You would assume?
19           A      I would assume.  I don't know for
20     certain who gave him his cashier's code.
21           Q      And did Cornelia tell you
22     anything else?
23           A      No.
24           Q      Did you talk to Bobby about this
25     session pulling?
```

Case 1:13-cv-01374-HB-GWG  Document 31-5  Filed 10/25/13  Page 171 of 197

170

```
                              Sanders
1
2          A       Yes, I did.
3          Q       Tell me, what benefit would Ms.
4    Ashdown have from giving sessions to Bobby?
5          A       One, I know Bobby was a trainer
6    that was struggling and he was a trainer that
7    was having a difficult time with his business,
8    and these sessions that were pulled for him
9    helped him hit a pay period bonus, which means
10   he gets additional money because of these
11   sessions being pulled for him.
12                 And, you know, I know that Kerry,
13   again, she wanted to take care of her people.
14   And so the benefit would be if she has a trainer
15   on staff that she has helped out to make a
16   little bit more money.
17                 And I know that there was a
18   period of time where, you know, Kerry and I had
19   a conversation about how Bobby was struggling,
20   and, you know, him needing money and confiding
21   in her about some financial stuff that was going
22   on with him.
23         Q       Did he tell you this or did she
24   tell you that?
25         A       She told me that.
```

171

1                              Sanders

2          Q       So you believe that Ms. Ashdown

3    took sessions and gave them to Bobby because he

4    was struggling financially?

5          A       Possibly, yes.

6          Q       So you believe it's possible or

7    do you believe it's true?

8          A       I believe it's true.

9          Q       So you believe that she stole

10   sessions to give them to Bobby because he was

11   struggling with money, but that these sessions

12   that she stole helped him get a bonus, correct?

13         A       Yes.

14         Q       And that she likes to take care

15   of her people, right?  That's your testimony,

16   correct?

17         A       Yes.

18         Q       And are there any other people

19   that she was taking care of?

20         A       I don't know.

21         Q       Did you conduct any

22   investigations into whether she was taking care

23   of any other of the 35 to 40 people?

24         A       No, I don't.

25         Q       That wasn't important to look at?


                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 173 of 197

172

```
 1                      Sanders
 2              MR. McPARTLAND:  I object
 3          to the form.
 4      A      I didn't look at it.
 5      Q      Did you interview anyone else --
 6  well, once you terminated Ms. Ashdown for
 7  stealing the $60, did you interview anybody else
 8  for her position?
 9              MR. McPARTLAND:  I object
10          to the form.
11              You can answer.
12      A      I believe I answered that.  I
13  don't recall interviewing anyone else.
14      Q      So you just put Mauro in that
15  position, right?
16      A      Yes.
17      Q      And was he excited to have that
18  position?
19      A      I'm not sure.  You would have to
20  ask him that.
21      Q      I'm asking you did he appear to
22  be excited to have that position?
23      A      I'm not certain whether he was
24  excited or not.
25      Q      Did he seem stressed?
```

MCM REPORTING SERVICE
(516) 775-5209

173
1                         Sanders

2                         MR. McPARTLAND:  Object to

3                    the form.

4                         You can answer.

5           A      I don't think he was thrilled the

6      way it came about.  I don't think he was excited

7      about that.

8           Q      Are you speculating again or are

9      you telling what you observed?

10                      I am asking you about your

11      observations, not your speculations.

12          A      My observation is it wasn't the

13      best situation to be in.  That was my

14      observation.

15          Q      So you're positive that Mauro

16      didn't set Ms. Ashdown up for this scheme of

17      session pulling?

18          A      Yes.

19          Q      Are you friendly with Mauro?

20      Would you consider him a friend?

21          A      I consider him a work colleague.

22          Q      That's it?

23          A      As a work colleague.

24          Q      You worked with him for a long

25      time?

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 175 of 197

174

                              Sanders

1

2          A       Yes.

3          Q       Do you feel like you have his

4    back?

5          A       I have his back just as much as I

6    have anyone else's back.

7          Q       So when you are looking at this

8    video for three hours on some days, did you

9    notice whether Cornelia was on any of the

10   videos?

11         A       Yes, I did.

12         Q       And was she?

13         A       She was there.

14         Q       So she was on the video.

15         A       Uh-hum.

16         Q       It's your conclusion that

17   Cornelia had no part of this session stealing

18   scheme solely based on what she told you, that

19   she just didn't do it?

20         A       No, because she wasn't there

21   during -- she had left the club already.

22         Q       So you noticed on the video that

23   she had left the club as part of your video

24   investigation?

25         A       Correct.

175

                              Sanders

1

2          Q      I see.

3                 And when had she left the club?

4          A      She left the club approximately

5      around 1:00, 1:30, I believe it was.

6                 I don't remember exactly, but I

7      know she left the club before, because obviously

8      I would have dealt with that.

9          Q      Did you memorialize that

10     anywhere?

11         A      No.

12         Q      And you said she left the club

13     around 1:00.

14                Was that every day?  You looked

15     at video -- did you look at video for just one

16     day?

17                      MR. McPARTLAND:  Objection.

18                      Asked and answered, but

19                you can answer.

20         A      I looked at video for the days

21     that the sessions were pulled, and, again, to

22     witness who was in the club during those times.

23         Q      And did she leave the club every

24     day about 1:00?

25         A      She was only in the club one of

                                                      176
1                          Sanders

2     the days.

3           Q     And she left at 1:00?

4           A     Approximately.  I don't really

5     recall exactly.

6           Q     But you didn't save the video of

7     her leaving at 1:00?

8                       MR. McPARTLAND:  Objection.

9                       Asked and answered.

10          A     No.

11          Q     You didn't show the video to

12    anybody?

13          A     No.

14          Q     And you didn't memorialize this

15    alleged departure of Cornelia shortly before the

16    session pulling?

17          A     No.

18          Q     Now, there were sessions pulled

19    at other times.

20                I mean, I take it now that you

21    are testifying that she left at 1:00 because

22    some of the sessions were pulled at 2:00,

23    correct?

24          A     I'm just saying based on what I

25    watched.

                    MCM REPORTING SERVICE
                      (516) 775-5209

177

1                          Sanders

2          Q      Well, that's a pretty specific

3     recollection, right?

4                  You said it was a long time ago,

5     but now you're saying you specifically remember

6     her leaving at 1:00, right?

7          A      I said approximately.  I didn't

8     say she specifically left at that time.

9          Q      What makes you think that she

10    approximately left at 1:00?

11         A      Because she left the club, prior

12    to the sessions being pulled, she left the club.

13    I do know that.

14                      MR. HARMAN:  I'm going to

15                  call for the production of all

16                  records concerning any personal

17                  training sessions that Cornelia

18                  performed at the Soho location or

19                  at any other location on

20                  August 13, 2011, July 30, 2011,

21                  July 16, 2011 and that's it.

22                      So it would be any records

23                  concerning sessions that were

24                  pulled or any work-related

25                  activity for Cornelia Hobbie,

MCM REPORTING SERVICE
(516) 775-5209

178

1                        Sanders

2              H-O-B-B-I-E, at the Soho location

3              or at any other location,

4              including the location that she

5              had recently transferred from

6              where I understand she was still

7              performing personal training

8              sessions.

9                     MR. McPARTLAND:  We will

10             take that under advisement.

11                    Please put all your

12             requests in writing.

13   BY MR. HARMAN:

14        Q     Do you access your work e-mail

15   from your BlackBerry?

16        A     Yes.

17        Q     And do you access your work

18   e-mail from any other location other than your

19   desk say or your BlackBerry?

20        A     Yes.

21        Q     Where?

22        A     Any computer that I have access

23   to I can access my e-mail.

24        Q     Do you have a computer at home?

25        A     Yes.

179

1                         Sanders

2          Q      Do you access your work e-mail

3    from home?

4          A      Sometimes.

5          Q      And did you look for any e-mails

6    concerning Ms. Ashdown on your home computer?

7          A      No.

8          Q      And other than this home computer

9    that you have testified to, is there any other

10   computer that is not an Equinox computer that

11   you used to access your work-related e-mail?

12         A      No.

13         Q      Now, when you were doing this

14   video investigation, did you happen to notice

15   whether Bobby was at the location when the

16   sessions were pulled?

17         A      No.

18         Q      You did or did not?

19         A      I did not notice.

20         Q      And did you happen to know

21   whether Ryan was at the location when the

22   sessions were pulled?

23         A      I did not notice.

24         Q      Did you look?

25         A      No, I didn't look.

```
                                                        180
 1                          Sanders
 2          Q      Did you look for Bobby?
 3          A      No, I didn't look for Bobby.
 4                      MR. HARMAN:  I'm going to
 5                 also call for the production of
 6                 all personal training sessions
 7                 that were performed by Mauro
 8                 Maietta on August 13, 2011,
 9                 July 30, 2011, July 16, 2011, and
10                 that's it.
11                      So all personal training
12                 sessions that were performed by
13                 Mr. Maietta on those dates at the
14                 Soho location or any other
15                 records of any work-related
16                 activity of Mr. Maietta on that
17                 date.
18                      MR. McPARTLAND:  Take it
19                 under advisement.
20                      Please put all requests
21                 into writing.
22      BY MR. HARMAN:
23          Q      Did you ever evaluate Ms.
24      Ashdown's work performance?
25          A      No.
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 182 of 197

```
                                                        181
 1                        Sanders
 2          Q      And how about Mr. Diaz, did you
 3   participate in a search for Mr. Maietta's
 4   replacement?
 5          A      Yes.
 6          Q      You did?
 7          A      Yes.
 8          Q      Was anyone else interviewed
 9   besides Mr. Diaz?
10          A      Mr. Diaz is the second fitness
11   manager.  We had one named Lakei who was before
12   him, who was shortly after.
13          Q      And who selected Lakei?
14          A      It was a combination of the PT
15   department, I believe Joe, Liz, Rich, were all
16   involved in that decision-making process, me
17   being included with it also.
18          Q      What's Lakei's last name?
19          A      Herman, H-E-R-M-A-N.
20          Q      Is Lakei a man or woman?
21          A      Man.
22          Q      And how did Mr. Herman and Mr.
23   Maietta get along?
24          A      They got along okay.
25          Q      Okay?
```

                                                            182
1                            Sanders

2           A       Yeah.

3           Q       What happened to Mr. Herman?

4           A       He decided to step down from his

5    position a year after being in the position to

6    pursue his own personal interests.

7           Q       Did he ever complain about Mr.

8    Maietta?

9           A       About him being competitive.

10          Q       Anything else?

11          A       Not to my knowledge.

12          Q       Did he complain that Mr.

13   Maietta's competitiveness was a problem in the

14   workplace?

15          A       He complained that he didn't like

16   it.  He thought that that was not something that

17   be should be doing or that was effective or

18   whatever.

19          Q       And that's also what Ms. Ashdown

20   was complaining about, correct?

21          A       Uh-hum, yes.

22          Q       And have you ever reprimanded Mr.

23   Maietta for his competitiveness?

24          A       I have had conversations with him

25   about it.


                      MCM REPORTING SERVICE
                        (516) 775-5209

183

1                          Sanders

2          Q      I'm asking if you reprimanded

3    him?

4          A      I wouldn't say I've reprimanded

5    him, no.

6          Q      Have you told him to stop it?

7          A      I've told him to cut it out, yes.

8          Q      And has he?

9          A      To a large degree, yes.

10         Q      What does that mean "to a large

11   degree"?

12         A      That means that he is not nearly

13   as competitive as he once was, so he has worked

14   on improving himself in that regard.

15         Q      When you say "competitive," does

16   that mean that he wants to be better than

17   everyone else?

18         A      That means he's a sport person

19   and he's competitive as it relates to sports or

20   as it relates to competition, whether it's

21   weight lifting, whether it's -- whatever, as it

22   relates to sports.  That's what's he's

23   competitive in.

24         Q      Personal training is a type of

25   physical activity, right?

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 185 of 197

184

1                          Sanders

2          A       Right.

3          Q       And he's competitive in the

4    personal training area, right?

5          A       He's competitive obviously in

6    being the best at whatever it is that he's

7    doing.

8                          (A document Bates stamped

9                          EQX-6397 through EQX-6399 was

10                         marked as Plaintiff's Exhibit 5 for

11                         identification, as of this date.)

12   BY MR. HARMAN:

13         Q       I'm handing you what has been

14   marked as Plaintiff's Exhibit 5 (handing).

15                 Please take a look at it.

16         A       (Perusing document.)  Okay.

17         Q       You testified you had a

18   conversation with Bobby about whether he knew

19   anything about these, the sessions stealing?

20         A       Yes.

21         Q       And that you had, that Ms.

22   Ashdown had confided in you that she was

23   concerned about Bobby's financial condition,

24   correct?

25         A       Yes.

```
                                                      185
1                          Sanders
2          Q      And did you ask Bobby if he was
3     having financial difficulties?
4          A      No.
5          Q      And did you ask if Ms. Ashdown
6     had given him sessions in the past that he had
7     not actually performed?
8          A      No.
9          Q      How about with Ryan, did you ask
10    Ryan if he had been given sessions by Ms.
11    Ashdown in the past that he had not performed?
12         A      No.
13         Q      So as you sit here today, you
14    have no idea whether Ms. Ashdown had given Bobby
15    sessions in the past that he had not performed?
16         A      No.
17         Q      And you have no idea whether Ms.
18    Ashdown had given Ryan sessions in the past that
19    he had not performed?
20         A      No.
21                     MR. McPARTLAND:  Objection
22                to form.  And please note my
23                objection to the prior question,
24                as well.
25         Q      So let's move on.
```

                                                                    186
1                          Sanders

2                     Did you ask whether Cornelia

3      Hobbie had ever given, just Ryan, whether

4      Cornelia had ever given him sessions?

5            A     No.

6            Q     And how about Bobby, did you ask

7      Bobby if Cornelia had ever given him sessions?

8            A     No.

9            Q     So as you sit here today you have

10     no idea whether Cornelia Hobbie had given Bobby

11     or Ryan sessions in the past?

12           A     No.

13           Q     Now, drawing your attention to

14     Plaintiff's Exhibit 5, are you familiar with

15     this document?

16           A     No.

17           Q     You have never seen this document

18     before?

19           A     No, I haven't.

20           Q     Okay.

21                      MR. HARMAN:  For the

22                 record, this is a document that's

23                 Bates stamped EQX-6397, EQX-6398

24                 and EQX-6399.

25                      It was an internal series


                         MCM REPORTING SERVICE
                            (516) 775-5209

187

1                          Sanders

2                  of data produced by Equinox.

3          Q      The second page, drawing your

4    attention to the second page, it says in the

5    center of the page, after a checkmark it says,

6    "Employee was involuntarily terminated."

7                  And then it says, "Who (Name and

8    Title) informed the employee of the termination

9    decision."

10                 And it says, "Matt Plotkin,

11   regional manager, and Lawrence Sanders, GM."

12                 Have you ever seen an entry like

13   that before with respect to any employee?

14         A      I'm not sure I understand.

15         Q      Do you know what this spreadsheet

16   is?

17                 Have you ever seen a spreadsheet

18   like this before?

19                      MR. McPARTLAND:  Objection

20                 to form.

21         A      I haven't seen this spreadsheet,

22   but what it looks like is what we internally do

23   when an employee is no longer working with us,

24   we have to submit an EAF.

25         Q      What's an EAF?


                     MCM REPORTING SERVICE
                        (516) 775-5209

188

1                          Sanders

2          A        I believe it's called an

3    employment authorization form which dictates how

4    we hire people and how we terminate people, so

5    we have to go through a system to make sure we

6    hire people properly and we terminate them

7    properly.

8                    So this is what this looks like,

9    but I've never seen it in this format.

10         Q        Did you write this?

11         A        Yes.

12         Q        You did write this?

13         A        Yes.

14         Q        And is this an accurate

15   description of Ms. Ashdown's termination?

16         A        Yes.

17         Q        And is there anything that is

18   inaccurate about this description?

19         A        Not to my knowledge, no.

20         Q        And is this a complete and

21   accurate description of the basis for your

22   termination?

23         A        Yes.

24         Q        Drawing your attention, you

25   testified that you wrote this, right?

189

1                             Sanders

2          A     Yes.

3          Q     It says, "There were 17 total

4    sessions that were pulled for three trainers,

5    Kerry being one of the trainers that four of the

6    17 were pulled for," "four of the 17 sessions

7    were pulled for," sorry.

8                "Kerry being one of the trainers

9    that four," so does that mean that four were

10   pulled for Kerry?

11         A     Yes.

12         Q     And so is it your belief that Ms.

13   Ashdown pulled all of these sessions -- drawing

14   your attention back to Plaintiff's Exhibit 4.

15               Is it your belief that Ms.

16   Ashdown pulled all of those sessions?

17         A     Yes.

18         Q     And you have no idea whether she

19   pulled any more sessions, you know,

20   fraudulently, than the sessions that are on this

21   spreadsheet?

22         A     Correct.

23         Q     Did you generate the spreadsheet?

24         A     No.

25         Q     Did you ask for it to be

```
                                                      190
 1                       Sanders

 2   generated?

 3           A      Yes.

 4                       MR. McPARTLAND:  Objection.

 5                       Asked and answered.

 6           A      Yes.

 7           Q      And when you asked for the

 8   spreadsheet to be generated, what did you ask

 9   for?

10           A      I asked for sessions that were

11   pulled for specific clients on specific dates.

12           Q      And who gave you those clients'

13   names?

14           A      Mauro.

15                       MR. McPARTLAND:  Object to

16                       the form.

17           A      Mauro.

18                       I mean, he showed me the

19   documents and that's when I went to look at the

20   documents.

21           Q      So Mauro gave you some names and

22   then you had IT generate this Plaintiff's

23   Exhibit 4, right?

24           A      Yes.

25           Q      But you didn't look at any other
```

191
1                          Sanders
2    names other than the names that Mauro gave you,
3    correct?
4          A      Correct.
5                 MR. HARMAN:  Let me just
6                 take a few minutes.
7                     (Whereupon, at 2:47 p.m., a
8                 recess was taken.)
9                     (Whereupon, at 2:53 p.m.,
10                 the deposition resumed with all
11                 parties present.)
12                 MR. HARMAN:  Back on the
13                 record.
14   BY MR. HARMAN:
15         Q      Mr. Sanders, do you think that
16   you made the right decision in terminating Ms.
17   Ashdown?
18         A      Yes.
19         Q      And would you have done anything
20   differently?
21         A      I guess given the circumstances I
22   probably would have saved the video.
23         Q      Anything else?
24         A      That's probably it.
25         Q      And would you have asked anyone

192

                           Sanders

1

2      at corporate whether the company would allow Ms.

3      Ashdown to take a lie detector test?

4              A      I don't know.

5                     No, I don't think I would have

6      asked anyone at the company for that.

7                     I mean, I believe it was Matt,

8      when she said that to us, I believe Matt was

9      present.

10                    So, again, him being my superior,

11     he was present when she said that, so, again, I

12     can't speak definitely, but I believe it was

13     communicated, because they asked, you know, what

14     happened after we had the termination

15     conversation with her and it was told this is

16     what she said, so it was somewhat, I believe

17     there was knowledge of the fact that she

18     volunteered at that point to say, "I'll take a

19     lie detector test."

20                    But I believe that -- I don't

21     think we made a bad decision or a wrong

22     decision.

23              Q      If it had been your decision,

24     would you have allowed her to take a lie

25     detector test?

                       MCM REPORTING SERVICE
                          (516) 775-5209

```
                                                      193
 1                        Sanders
 2          A      I'm not sure.
 3          Q      If you were in her shoes, would
 4   you have wanted to take a lie detector test?
 5                      MR. McPARTLAND:  Object to
 6                 the form.
 7                      You can answer.
 8          A      I don't know.  I think I've
 9   communicated in a previous question what I would
10   do if I was in that situation, I would just try
11   to do everything I can to investigate it myself
12   and show my boss what, prove or try to prove to
13   my boss that I didn't do it instead of just
14   saying "I didn't do it."
15                      That's what I would do in that
16   situation and try to do my best to convey that.
17                      That's all I think I would do.
18          Q      I'm asking you whether you would
19   have, had it been your decision, would you have
20   allowed her to take a lie detector test?
21          A      And what I'm saying to you is I
22   don't know.
23          Q      So you just don't know?
24          A      I don't know.
25          Q      Is there anything else that you
```

Case 1:13-cv-01374-HB-GWG   Document 31-5   Filed 10/25/13   Page 195 of 197

```
                                                      194
 1                         Sanders

 2      want to change about your testimony today,

 3      anything that you think was inaccurate?

 4              A      No.

 5              Q      All right.  Thank you.

 6                     (Whereupon, at 2:56 p.m.,

 7                 the deposition was concluded.)

 8

 9                 _____

10                     LAWRENCE SANDERS

11      Subscribed and sworn to

12      before me

13      this        day of        , 2013.

14      _____

15               NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25


                      MCM REPORTING SERVICE
                        (516) 775-5209
```

195

I N D E X     P A G E

Witness                    Examination By          Page

Lawrence Sanders    Mr. Harman              4


                           EXHIBITS

Plaintiff's
Exhibits                   Description             Page

  1        Second amended complaint          78

  2        A two-page letter dated           95
           January 9, 2013

  3        A document Bates stamped         119
           EQX-6358

  4        A document Bates stamped         146
           EQX-6400

  5        A document Bates stamped         184
           EQX-6397 through EQX-6399


REQUESTS:

Page 125:  Copy of surveillance videos

Page 180:  All personal training sessions that
           were performed by Mauro Maietta on
           August 13, 2011, July 30, 2011, July
           16, 2011


                    MCM REPORTING SERVICE
                      (516) 775-5209

```
                                                          196
 1
 2                    C E R T I F I C A T E
 3   STATE OF NEW YORK  )
 4                      ) ss.
 5   COUNTY OF NEW YORK )
 6              I, MARGARET M. HARRIS, a Shorthand
 7         (Stenotype) Reporter and Notary Public of
 8         the State of New York, do hereby certify
 9         that the foregoing Deposition, of the
10         witness, LAWRENCE SANDERS, taken at the
11         time and place aforesaid, is a true and
12         correct transcription of my shorthand
13         notes.
14              I further certify that I am neither
15         counsel for nor related to any party to
16         said action, nor in any wise interested in
17         the result or outcome thereof.
18              IN WITNESS WHEREOF, I have hereunto
19         set my hand this 18th day of September,
20         2013.
21
22
23              _____
                   MARGARET M. HARRIS
24
25
```