1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK
     - - - - - - - - - - - - - - - - - - - - -x
4
     KERRY ASHDOWN,
5
                   Plaintiff,
6
                   -against-                    13-CV-1374
7                                                (HB)(GWG)
     EQUINOX A/K/A
8    EQUINOX FITNESS CLUB and incorporated as
     EQUINOX HOLDINGS, INC.,
9    JOE MATARAZZO a/k/a JOSEPH MATARAZZO,
     MAURO MAIETTA,
10   LAWRENCE SANDERS,
     MATT PLOTKIN a/k/a MATTHEW PLOTKIN, and
11   MATT HERBERT a/k/a MATTHEW HERBERT,

12                 Defendants.

13   - - - - - - - - - - - - - - - - - - - - -x

14

15            DEPOSITION of MATTHEW PLOTKIN, taken by

16   Plaintiffs, pursuant to Stipulation, held at 200

17   West 57th Street, New York, New York, on

18   Tuesday, October 8, 2013, commencing at 10:00

19   a.m., before Margaret M. Harris, a Shorthand

20   (Stenotype) Reporter and Notary Public within

21   and for the State of New York.

22

23

24

25

                         MCM REPORTING SERVICE
                            (516) 775-5209

2

A P P E A R A N C E S:

          THE HARMAN FIRM, P.C.
                    Attorneys for Plaintiffs
                    200 West 57th Street
                    Suite 900
                    New York, New York  10019

               BY:  WALKER HARMAN, ESQ.


          LAROCCA HORNIK ROSEN GREENBERG &
            BLAHA, LLP
                    Attorneys for Defendants
                    40 Wall Street
                    New York, New York  10005

               BY:  PATRICK MCPARTLAND, ESQ.



P R E S E N T:

          Lucas Larson

MCM REPORTING SERVICE
(516) 775-5209

3

1

2          IT IS HEREBY STIPULATED AND

3     AGREED that the filing and sealing of

4     the within deposition be, and the same

5     are hereby waived;

6          IT IS FURTHER STIPULATED AND

7     AGREED that all objections, except as

8     to the form of the question, be and

9     the same are hereby reserved to the

10    time of the trial;

11         IT IS FURTHER STIPULATED AND

12    AGREED that the within deposition may

13    be sworn to before any Notary Public

14    with the same force and effect as if

15    sworn to before a Judge of this Court;

16         IT IS FURTHER STIPULATED that

17    the transcript is to be certified by

18    the reporter.

19

20

21

22

23

24

25

4

```
1                        Plotkin
2    M A T T H E W        P L O T K I N, called as a
3           witness, having been first duly
4           sworn/affirmed by Margaret M. Harris, a
5           Notary Public within and for the State of
6           New York, was examined and testified as
7           follows:
8    EXAMINATION
9    BY MR. HARMAN:
10          Q      Could you please state your name
11   for the record?
12          A      Matthew Plotkin.
13          Q      And do you have a middle name?
14          A      Evan.
15          Q      How do you spell that?
16          A      E-V-A-N.
17          Q      And Matthew Evan, Matthew Evan
18   Plotkin, is that your full legal name?
19          A      Yes, it is.
20          Q      And have you ever gone by any
21   other name?
22          A      No.
23          Q      And could you please give me your
24   address?
25          A      ████████████████████████████████
```

5

```
 1                    Plotkin
 2    ███████████████████████████████████████
 3          Q      How long have you lived at that
 4    address?
 5          A      About three and a half years.
 6          Q      Do you live alone?
 7          A      I live with my wife.
 8          Q      And how long have you lived with
 9    your wife?
10          A      About two years.
11          Q      And have you been married for
12    about two years?
13          A      No, I've been married for about
14    four months.  Prior to our wedding we lived
15    together though.
16          Q      Congratulations.
17          A      Thank you.
18          Q      Can you please give me your
19    wife's name?
20          A      Sure.  Danielle Giordano,
21    G-I-O-R-D-A-N-O, Plotkin.
22          Q      What's your date of birth?
23          A      ████████████
24          Q      Have you ever been deposed
25    before?
```

MCM REPORTING SERVICE
(516) 775-5209

6

1                          Plotkin

2          A      I don't believe so.  I was

3    supposed to be deposed for a few other reasons,

4    but it never occurred.

5          Q      When you say you don't believe

6    so, have you ever sat in a room before a court

7    reporter like this?

8          A      No.

9          Q      Under any circumstances?

10         A      Not that I can recall.  I know I

11   was supposed to and it got canceled a few times

12   for other reasons.

13         Q      What do you recall about the

14   times that you were supposed to be deposed?

15         A      I sat in a law office and

16   everything was set up and the other attorney

17   didn't show up.  And then another time they just

18   canceled it last minute.

19              I think I even got sworn in and

20   then they canceled it because the other attorney

21   didn't show up.

22              That's all I can recall.

23         Q      So these are two separate

24   instances?

25         A      Yes.


                    MCM REPORTING SERVICE
                      (516) 775-5209

7

                          Plotkin

1

2          Q       Can you tell me about the first

3     one, the most recent one in time that you recall

4     where you were supposed to be deposed but you

5     were not?

6          A       Two members got into a fight in

7     the club and they were in a legal dispute.  One

8     was suing the other because he got hit.

9          Q       And what club was this?

10         A       Our 19th Street location.  It was

11    years ago.

12         Q       And were you named in the

13    lawsuit?

14         A       No, I don't believe so.  I was

15    just a witness.

16         Q       You saw the fight?

17         A       I saw the end of the fight, yeah.

18         Q       And what about the second one?

19         A       That was the second one.  The

20    first one before that, I don't even remember.

21    It was 15 years ago.  I just remember I had to

22    show up and give testimony, which I never gave.

23         Q       Have you ever been a party to a

24    lawsuit?

25         A       What does a party mean?

8

1                        Plotkin

2           Q      It means a plaintiff or a

3      defendant?

4           A      Yeah, when I was seven years old

5      I got hit by a car.

6           Q      And you were a plaintiff in a

7      lawsuit involving that accident?

8           A      Yeah.

9           Q      And how about on any other

10     occasion?

11          A      I don't know if I was, I guess

12     through my divorce, which was about four years

13     ago.

14          Q      And who were you married to?

15          A      Gina, G-I-N-A, Plotkin.

16          Q      Were you a plaintiff or a

17     defendant?

18          A      I think I was the defendant.

19          Q      And how about on any other

20     occasion, have you been a plaintiff or a

21     defendant in a lawsuit?

22          A      (Gesturing.)

23                      MR. McPARTLAND:  You have

24                 to answer verbally, Matt.  It's a

25                 yes or no.

MCM REPORTING SERVICE
(516) 775-5209

9

```
                              Plotkin
 1
 2         A      I can't recall, but I don't
 3    believe so.
 4         Q      Well, we'll come back to it.
 5                I'm primarily interested in
 6    instances where you have been a plaintiff in a
 7    lawsuit in a matter related to work or to
 8    business, but if you think of anything, you will
 9    let me know, I might circle back in a little bit
10    just to see if your memory has been refreshed in
11    any way.
12                Since you haven't actually been
13    deposed, I'm going to go over a few ground
14    rules.
15                My name is Walker Harman.  I'm a
16    lawyer, I'm an employment lawyer.  I represent
17    plaintiffs.  I represent Kerry Ashdown in a
18    lawsuit that she has brought against Equinox and
19    other individuals, yourself included.
20                Do you understand that?
21         A      I do.
22         Q      And do you understand that you
23    are a defendant in this lawsuit?
24         A      I do.
25         Q      And that you are here today to
```

MCM REPORTING SERVICE
(516) 775-5209

10

                            Plotkin

1

2      answer questions about that lawsuit?

3              A     I do.

4              Q     Are you represented by counsel

5      today?

6              A     I am (indicating).

7              Q     Who is your attorney?

8              A     Patrick McPartland.

9              Q     And how long has Mr. McPartland

10     been your lawyer?

11             A     I'd say about six months.

12             Q     I'm going to ask you a series of

13     questions today concerning this lawsuit.  If you

14     don't understand any questions that I ask, you

15     tell me that you don't understand and I will

16     endeavor to rephrase it, the idea being that if

17     you answer the question the record is going to

18     read as though you understood the question.

19                  Do you understand that?

20             A     I do.

21             Q     And in keeping with what your

22     attorney just told you, you have to verbalize or

23     we have asked that you verbalize any answers to

24     any questions that I ask you.  The court

25     reporter can't always take down a gesture or a

                     MCM REPORTING SERVICE
                        (516) 775-5209

11

1                            Plotkin

2      nodding of the head or something like that.  So

3      try to verbalize your answers.

4                    Do you understand that?

5           A      Yes, I do.

6           Q      And this is a challenge for both

7      of us, but let's try not to interrupt one

8      another.  Sometimes it gets a little difficult,

9      but it's helpful for me to remind you at the

10     beginning and for us to remind each other.  Your

11     attorney might chime in on this issue, too.

12                    Let me finish my question and

13     then you can provide your answer and we will

14     endeavor not to interrupt one other.

15                    Do you understand that?

16          A      Yes, I do.

17          Q      During the deposition you can

18     take a break at any time so long as you have

19     provided an answer to any pending question.

20                    However, while you are under oath

21     during a deposition I would ask that you not

22     talk to anyone about your testimony.

23                    Do you understand that?

24          A      I do.

25          Q      Are you aware that you are under

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 13 of 214

12

```
 1                        Plotkin
 2    oath today?
 3            A      I am.
 4            Q      And that failing to tell the
 5    truth under oath is a crime called perjury?
 6            A      Absolutely.
 7            Q      This is the same oath that you
 8    would be in if you met me at federal court
 9    downtown and you had been sworn in before a
10    jury.
11                   Do you understand that?
12            A      I do.
13            Q      The questions I am about to ask
14    you are routine questions that I would ask
15    anyone at any other deposition.
16                   Are you under the influence of
17    any narcotics?
18            A      I am not.
19            Q      Have you taken any medication in
20    the last 24 hours that could impede your ability
21    to testify today?
22            A      No.
23            Q      Are you under the influence of
24    alcohol?
25            A      No.
```

13

```
1                        Plotkin
2            Q       Can you think of any reason why
3    you can't provide your best and most truthful
4    answers here today?
5            A       I can't.
6            Q       Did anyone tell you to provide
7    inaccurate information today?
8            A       No.
9            Q       Are you currently employed?
10           A       Yes.
11           Q       Where?
12           A       Equinox Fitness Clubs.
13           Q       And how long have you been
14   employed there?
15           A       Approximately 16 years.
16           Q       What is your job title, if you
17   have one?
18           A       My job title right now is senior
19   regional director.
20           Q       And how long have you had that
21   title?
22           A       About six months.
23           Q       What region does that cover?
24           A       The west side of Manhattan and
25   Brooklyn.
```

14

1                    Plotkin

2        Q       And do you have an office as part

3    of your --

4        A       I do not.

5        Q       So is there any particular place

6    where you report to work on a regular basis?

7        A       I have ten clubs.  I spend

8    one-tenth of my time at each of my clubs.

9        Q       What are the ten clubs?

10       A       We will go south to north.

11               Brooklyn, in Brooklyn Heights,

12   Tribeca, Soho, Printing House, Greenwich

13   Village, 19th Street, 17th Street, Columbus

14   Circle, 76th Street and 92nd Street.  I believe

15   that's ten.

16       Q       And as part of your job

17   responsibilities as the senior regional

18   director, what do you do?

19       A       I oversee the general managers

20   and my regional staff to help support the clubs.

21   I make sure the clubs are operating correctly,

22   are selling our programming correctly, are

23   helping recruiting and hiring, as well as many

24   other assorted things.  Anything my managers are

25   struggling with, I support them.

15

1                              Plotkin

2              Q      Do you supervise the GMs?

3              A      I do.

4              Q      And do you provide performance

5     evaluations for GMs?

6              A      I do.

7              Q      How frequently do you give

8     performance evaluations?

9              A      Our standard performance

10    evaluations are done once a year.

11             Q      And when are those completed?

12             A      Usually by the end of April.

13             Q      How are those completed?

14             A      We have a standard template for

15    general managers that we use.  Most, about half

16    of the grading is on really simple financial

17    results, and the other half is, you know, less

18    tangible soft skills, leadership, things like

19    that.

20                    And we go through the format, I

21    fill it out on my own, and then I sit down with

22    the general manager and go through it with them

23    and they get graded on it.

24             Q      Before having this position as

25    regional manager, what was your position?

16

1                          Plotkin

2          A      Before senior regional director I

3     was a regional director.

4          Q      I'm sorry, senior regional

5     director.

6                 So the promotion was to senior

7     regional director from regional director?

8          A      That is correct.

9          Q      Did the clubs that you oversee

10    change when you were promoted to senior regional

11    director?

12         A      Yeah.  They added in Brooklyn and

13    the two most northern clubs.

14         Q      76th and 92nd?

15         A      Correct.

16         Q      But overall is it fair to say

17    that your day-to-day duties didn't change other

18    than you were given more clubs to oversee?

19         A      Correct.

20         Q      And do you also, if necessary,

21    discipline general managers?

22         A      Yes.

23         Q      Have you ever disciplined a

24    general manager?

25         A      Yes.


                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 18 of 214

17

```
 1                        Plotkin
 2          Q      When is the last time that you
 3   disciplined a general manager?
 4          A      Define "discipline."
 5          Q      Well, I asked you and you
 6   answered the question, you said yes.  So I
 7   really would prefer for you to define it,
 8   because it's your work environment and I'm not
 9   trying to be difficult.
10             It's just if you are
11   uncomfortable with the term and there is another
12   term that you use or that Equinox uses in its
13   vernacular, then you tell me.
14          A      Okay.
15             I look at discipline as the term,
16   it's a wide term.  If I document a discipline,
17   we call it a writeup, or, you know, an employee,
18   I forget the exact item we used, an employee
19   performance report, and if that's documented,
20   that's like, I guess the real label of
21   discipline, but often I go into clubs and I say,
22   "hey," I give strong feedback, someone might
23   call that disciplining where I don't like what's
24   going on here, "You need to fix this," or "You
25   are not being consistent with your work
```

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 19 of 214

18

1                          Plotkin

2      schedule."

3                       For me, there are all different

4      gradations of discipline.

5                       I guess the real one that we

6      should talk about is when I document it and it

7      actually is written up and it goes into the

8      employee file.

9           Q     If you provide someone verbal

10     feedback or, as you say, strong feedback, you

11     provide strong feedback and you provide it

12     verbally, do you document that anywhere?

13          A     Sometimes.  Sometimes I don't.

14     We have something called a verbal warning, which

15     would be documented and put into their file, but

16     they don't necessarily have to sign it

17     themselves.  It's just saying I had this

18     conversation with this employee or general

19     manager, it was about such and such, and it's

20     documented and in their file.

21          Q     Do they see it?

22          A     Not necessarily.  Often they do

23     not.  But I use the terminology, "This is a

24     verbal warning."

25          Q     If you use that terminology,

19

Plotkin

1   "This is a verbal warning," and you write

2   something up and you put it in a file, I take it

3   we are talking about general managers, right?

4           A       Often I help general managers

5   write other people up, but in this scenario,

6   sure.

7           Q       I'm not talking about anyone in

8   particular, so let's just keep it general for

9   now.

10                  So in the event you were to give

11  someone a verbal warning and you were to

12  memorialize it and put it in their file, what

13  does that actually mean to you physically, what

14  do you do?  Where are these files?

15          A       I have employee files on all my

16  general managers and my regional staff.

17          Q       Where are they located?

18          A       They are located in my boss'

19  office.

20          Q       Who is your boss?

21          A       My boss is John Pozzolini.  He's

22  the vice president of operations.

23  P-O-Z-Z-O-L-I-N-I.

24          Q       P-O-Z-Z-O-L-I-N-I?

25

20

1                         Plotkin

2            A      Correct.

3            Q      And he's the VP of operations?

4            A      Yes.

5            Q      And where is his office located?

6            A      895 Broadway.

7            Q      And there are files on all

8     general managers in Mr. Pozzolini's office?

9            A      For my region, yes.

10           Q      For your region?

11           A      I don't know what my counterparts

12    do with their files.

13           Q      Are these actual physical files?

14           A      Yes.

15           Q      And are they in a cabinet, a

16    filing cabinet of some sort?

17           A      Yes, a locked filing cabinet.

18           Q      Have you ever memorialized a

19    verbal warning that you have given to a general

20    manager?

21           A      Sure.

22           Q      When is the last time that you

23    did that?

24           A      I believe I did it a year and a

25    half to two years ago to one of my general

```
                                                    21
 1                   Plotkin

 2     managers that worked at our 17th Street

 3     location.

 4             Q      What's that person's name?

 5             A      I'm searching through my memory

 6     now.

 7                    I can't recall his name right

 8     now.

 9             Q      Do you recall anything about him?

10             A      Sure.  He wasn't doing well and I

11     had to write him up several times and it led to

12     his termination.

13                    The name will come to me.

14             Q      So you provided verbal warnings

15     to this individual or a verbal warning to this

16     individual and you memorialized it?

17             A      Yes.

18             Q      How did you memorialize it?

19             A      I wrote it up on an employee

20     writeup form.

21             Q      Where are those forms located?

22             A      In the filing cabinet in my

23     office.  We have a database we can just get

24     blank forms from.

25             Q      So would you have done that at
```

22

1                          Plotkin

2      the 17th Street location or where would you have

3      done that?

4              A      I believe I did it at the 17th

5      Street location.

6              Q      Walk me through, what did you do?

7                     So you gave him the verbal

8      warning and then what happened?

9              A      I said, "Do you understand what

10     I'm talking about?  Do you understand what you

11     are not doing correctly and what you need to

12     do," made him recite it back to me.

13                    When he left, I documented it.  I

14     did not have him sign it.  I documented it and

15     put it in his file.

16             Q      Did you show it to him?

17             A      No, I did not.

18             Q      Does this form have a name?

19             A      I believe it's called an employee

20     performance sheet.

21                    So we document things --

22             Q      And it's something that you can

23     print out from Equinox's database?

24             A      Yeah.  Yes.

25             Q      And who has access to these

23

                              Plotkin

1

2      employee performance sheets?

3                     MR. McPARTLAND:  Object to

4              the form, but you can answer.

5              A       All managers, it's on our

6      database throughout the company.  I'm not sure I

7      have the exact wording of the name of the form

8      correctly, but it will come to me.

9              Q       Is this employee performance

10     sheet, is this related to verbal warnings only

11     or does it relate to other things?

12             A       Other things, too, you could do

13     written warnings on there and final warnings.

14             Q       So this sheet is for all three

15     types of warnings, verbal, written and final?

16             A       And sometimes you can use it for

17     terminations, as well.

18             Q       Why would someone be given a

19     written warning as opposed to a verbal warning?

20             A       Our standard operating procedure,

21     when you start documenting with an employee, you

22     usually start with a verbal warning, then the

23     next step would be a written warning, then the

24     next step would be a final warning and then a

25     termination.

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 25 of 214

24

1                         Plotkin

2              That's generally how we do it.

3         Q     So somebody would get a verbal

4    warning, for instance, for the same conduct

5    after they had been given a verbal warning?

6         A     Generally speaking, or it just

7    might be their first documented piece of

8    behavior, and then if another behavior comes up,

9    you usually go from verbal to written.  It

10   doesn't have to be the same exact behavior, it

11   might be in the same genre of behaviors, but,

12   yeah, there are kind of steps that we take.

13        Q     And does Equinox have a term for

14   this type of discipline?

15        A     They do.

16        Q     What is that term?

17        A     I'm trying to -- I have lost the

18   term, but it's basically, you know, the

19   systematic process of writing up an employee,

20   documenting it due to poor performance.

21        Q     But is that what it's called?

22        A     No, that's not what it's called.

23        Q     So right now you don't recall the

24   phrase?

25        A     No, I don't.  I'm sorry.

25

1                          Plotkin

2           Q      That's all right.

3                  Are all managers trained on this

4    procedure?

5           A      For the most part, yes.

6           Q      Have you been trained on this

7    procedure?

8           A      Yes.

9           Q      The general managers that you

10   oversee, do you believe as you sit here today

11   that they have been trained on this procedure?

12          A      For the most part, yes.

13          Q      And are they, as far as you know,

14   and, again, for the purpose of today's

15   conversation, I'm just asking you about what you

16   know, not about the other guy or gal or whomever

17   oversees other regions or other areas throughout

18   the country or whatever.

19          A      Okay.

20          Q      Do you require your general

21   managers to follow this procedure?

22          A      I do.

23                      MR. McPARTLAND:  Objection

24                 to form.

25          Q      If a general manager was not


                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 27 of 214

26

1                    Plotkin

2    following this procedure, what would you do?

3         A     I would talk to him and sit down

4    probably with someone from HR, because these are

5    procedures that, you know, that come from our

6    human resources department.  The genesis of them

7    is always from our human resources department.

8                 But there are times where you go

9    out of order in these processes, of course.  If

10   one of my employees decided to, excuse the

11   expression, punch a member in the face, we don't

12   give him a verbal warning for that, he's most

13   likely going to be terminated.

14                There's times where we, naturally

15   when the behavior becomes way outside of the

16   norm that we don't take all of these steps into

17   consideration and we might just go directly to

18   termination.

19        Q     Have you ever had an employee

20   punch a member in the face?

21        A     I have not.  I was using it as an

22   example.

23        Q     So way outside of the norm.  Can

24   you give me examples of behavior that is way

25   outside of the norm where the procedure is not

27

```
 1                        Plotkin

 2      followed?

 3              A      Any violent behavior, any racial

 4      slandering, any theft, perhaps abandonment of

 5      duties, if someone doesn't show up for work for

 6      a week or two, we're not just going to give him

 7      a verbal warning, he'll probably be terminated.

 8              Q      Anything else that you can think

 9      of?

10              A      Not right now.

11              Q      So you have listed violent

12      behavior and this is behavior that you have

13      described as being outside the norm, meaning

14      that you would not normally follow Equinox's

15      procedures, disciplinary procedures, correct?

16              A      Correct.

17              Q      And you have listed violent

18      behavior, racial slandering, theft and

19      abandonment of duties.

20                     Let's start with violent

21      behavior.

22                     What do you mean by violent

23      behavior?

24              A      In my past, I have had two

25      employees get into a fistfight.  Often we work
```

28

1                         Plotkin

2    with --

3            Q       Were they terminated?

4            A       They were.

5            Q       What other examples, if you

6    recall any, of employees that have engaged in

7    violent behavior?

8            A       I have had employees damage,

9    because they can't control their emotions and

10   they get violent, they have damaged equipment in

11   the club from outbursts, violent outbursts.

12           Q       And did that result in

13   termination?

14           A       It did.

15           Q       Any other examples of violent

16   behavior?

17           A       No.

18           Q       How about racial slandering, what

19   do you mean by that?

20           A       We have zero tolerance for any,

21   you know, racial slurs or anything of the norm

22   -- outside the norm, I mean.  We just won't

23   tolerate it.

24           Q       What does outside of the norm

25   mean to you?

29

```
1                    Plotkin
2        A     Well, if you use, we don't allow
3   certain words to be used, words I would rather
4   not repeat here, but racial slurs, stuff like
5   that.
6        Q     Well, I actually don't know, so
7   you are going to have to tell me.
8        A     I am going to have to say those
9   words.
10              The word --
11              MR. McPARTLAND:  Note my
12              objection, but you can answer.
13        A     The word "nigger," we would
14   never, ever tolerate.  Spic, faggot, anything
15   like that.
16        Q     And so if someone used these
17   words that you described, would that result in
18   an immediate termination?
19        A     Most likely, yes.  Unless they
20   worked for us for ten years and they have an
21   impeccable record and it was said as a joke
22   rather than in anger, perhaps they would keep
23   their job on a final warning.
24        Q     And so when you use these words
25   that you just described, I take it that you mean
```

```
                                                      30
1                          Plotkin

2      any other examples of words that demean certain

3      categories of people?

4              A       Absolutely.

5              Q       Any categories of people?

6              A       Absolutely.

7              Q       And what about comments related

8      to people's physicality, such as calling someone

9      fat or --

10             A       It's definitely something that we

11     frown upon, we don't accept it, but we might not

12     terminate them for that.

13                     It's not as heinous to us.

14             Q       So these extreme words, I just

15     used that because I'm trying to draw a line

16     between what you are describing as terminology

17     or terms that Equinox says are not acceptable,

18     will terminate an employee for using, right, and

19     other terminology that employees, that Equinox

20     might, for instance, walk someone through the

21     disciplinary procedure that you described.

22             A       If you called someone fat, like

23     you said, I don't think they would get

24     terminated for that, but we would start the

25     disciplinary process.
```

31

1                          Plotkin

2          Q      What about an employee yelling at

3     another employee in the gym in front of clients?

4          A      We would at minimum start the

5     disciplinary process.  If there is cursing

6     involved, if there is any physical, you know,

7     gestures or aggressiveness, we would get deeper

8     into the disciplinary, we might do a final

9     warning.  We might even do, depending, a

10    termination on cursing and yelling and getting

11    in someone's face in front of members on the gym

12    floor.

13         Q      I didn't say cursing, I just

14    asked you about yelling.

15               Let's stick with yelling for a

16    second.

17         A      Okay.

18         Q      If you have two employees who are

19    on the floor in front of members of the gym who

20    are working out and they are yelling at one

21    another, raising their voices so that the

22    members can hear it, would that result in the

23    employees being taken through the disciplinary

24    process or at least having the disciplinary

25    process begun?

MCM REPORTING SERVICE
(516) 775-5209

32

                              Plotkin

1

2          A       Yes, most likely.

3          Q       Well, as the supervisor of a

4    general manager, would you expect a general

5    manager to begin the disciplinary procedure with

6    respect to those two employees, if that's all

7    you heard?

8          A       Yes.

9          Q       And then obviously you would want

10   to know more?  You would want to know more,

11   right?

12         A       Yes.

13         Q       With respect to whatever type of

14   discipline, if any, was given to the employee,

15   correct?

16         A       Agreed.  The details matter.

17         Q       But the process would be started?

18         A       Yes.

19         Q       So the conduct of yelling openly

20   in the gym gives rise to the inference of

21   discipline, correct?

22         A       Correct.

23                      MR. McPARTLAND:  Just note

24                 my objection to form.

25         Q       Have you terminated anyone or

33

                          Plotkin

1

2      been part of a termination of anyone for racial

3      slandering?  And I use that phrase because

4      that's the phrase you used.

5                     But I think we clearly understand

6      what you mean by that, for the second category?

7               A       I don't recall any.

8               Q       You don't recall terminating

9      anyone?

10              A       No.

11              Q       And you do recall terminating --

12     when I say "terminating," I mean either you

13     terminated someone or you worked with a general

14     manager to terminate someone, that's what I mean

15     when I ask you today whether you terminated

16     anyone.

17              A       Okay.

18              Q       Whether you were a part of the

19     process, whether it involved HR or a general

20     manager, even if you were sort of cc'd on the

21     e-mails for the team, that you were part of it.

22                     Do you understand?

23              A       I do.

24              Q       How about for this first

25     category, violent outbursts, have you terminated

                   MCM REPORTING SERVICE
                      (516) 775-5209

34

Plotkin

1      anyone for violent outbursts?

2             A      Yes, I told you I did already.

3             Q      Do you recall more than one?

4             You said two employees got in a

5      fight, right, and you terminated them.

6             Any other instances?

7             A      There was a time when an employee

8      like punched a window in an emotional outburst

9      many years ago and we terminated him, as well.

10            Q      Any other instances?

11            A      Not that I can remember.

12            Q      This third category, theft, what

13     do you mean by that?

14            A      Any taking of actual funds,

15     services, gift cards, other people's property,

16     theft of time, you said you worked, but you

17     didn't, or where you say you did a service, got

18     paid for it and you didn't, for oneself or for

19     others.

20            Q      Anything else?

21            A      There have been times where we

22     have terminated employees for theft because they

23     incorrectly sold something for the incorrect

24     price and therefore got paid for it.

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 36 of 214

35

1                          Plotkin

2                  So if you manipulate pricing or

3     our offers so you can then go ahead and get paid

4     for it and get bonused on it, we are going to go

5     ahead and say that's theft of services and just

6     theft, in general.

7           Q       Can you give me an example of

8     that?

9           A       Sure.

10                 We can have the membership

11    advisor, one of our salespeople who sell

12    memberships, manipulate the system and use gift

13    cards or change the promotion, the monthly

14    promotion, so they could sell more memberships

15    and therefore make more money and not only sell

16    more units, but get paid more for each

17    individual unit because they manipulated our

18    sales, our pricing structure.

19          Q       And have you terminated someone

20    for that?

21          A       Sure.

22          Q       Who did you terminate for that?

23          A       Most recently a membership

24    advisor named Jessica.

25          Q       Jessica.  What was Jessica's last

36

1                          Plotkin

2      name?

3           A      Last name, names are losing me

4      today.

5           Q      When did you terminate Jessica?

6           A      About six to eight months ago.

7                  I don't remember her last name

8      right now.

9           Q      Where did Jessica work?

10          A      She worked at our printing house

11     location.

12          Q      And what was Jessica's title?

13          A      Membership advisor.

14          Q      And she was manipulating pricing

15     to give herself an economic advantage?

16          A      Correct.

17          Q      And anybody else other than

18     Jessica that you terminated for this pricing

19     manipulation?

20          A      I was involved in some of them,

21     but didn't do it myself.  There was a membership

22     advisor that worked at 85th Street and I found

23     some information on how he was manipulating the

24     system.  His name was George.  I don't remember

25     his last name.

37

                              Plotkin

1

2        Q      What role, if any, did you play

3   in overseeing anyone at 85th Street?  That is

4   not part of your region, is it?

5        A      No, but when you have members

6   come to you and call you up and say, "Hey, I'm

7   supposed to get a free month, an extra referral

8   gift card and two personal training sessions, I

9   want it right now," and then you look into it

10  and you realize that membership advisor had no

11  justification or right to offer those services,

12  then you go to their boss and tell him what you

13  found, and then you help sometimes their boss do

14  research to see what else they have given away

15  and that's how I was involved with that one.

16       Q      Have you ever been arrested?

17       A      I have.

18       Q      Were you arrested more than once?

19       A      I have been.

20       Q      When was the first time that you

21  were arrested?

22       A      It was probably, I believe I was

23  around 18, about 22 years ago.  My friends were

24  writing graffiti and I was with them.

25       Q      Where were you arrested?


                      MCM REPORTING SERVICE
                        (516) 775-5209

38

1                       Plotkin

2          A      In Brooklyn.

3          Q      And what were you arrested for,

4    if you know?

5          A      I believe graffiti writing.

6          Q      And were you charged with

7    anything?

8          A      No, it was dismissed.

9          Q      So just so that the record is

10   clear, did you plead to anything?

11                     MR. McPARTLAND:  Note my

12                objection to form, but you can

13                answer.

14         A      I don't think so, but I don't

15   exactly remember.

16         Q      Did you take an ACD?

17         A      I'm sorry?

18         Q      Did you take an ACD?  Do you know

19   what an ACD is?

20         A      I do not.

21         Q      But you don't recall whether you

22   pled guilty to anything?

23         A      I don't think I did.

24         Q      When you say "dismissed," do you

25   have a specific recollection of the charges

39

1                        Plotkin

2    being dismissed against you?

3            A     Yes.

4            Q     What makes you think that?

5            A     I didn't have to do any community

6    service.  There was no punishment.

7            Q     And did there come a time when

8    you were arrested again?

9            A     Yes.

10           Q     And when was that?

11           A     It was a couple of years after

12   that.  I can't recall exactly when.  Police

13   officers caught me on the street smoking

14   marijuana.

15           Q     And where did that occur?

16           A     In Manhattan.

17           Q     And you were physically arrested?

18           A     I was.

19           Q     And were you charged with a

20   crime?

21           A     I was charged with a crime, but

22   it was dismissed.  There was no punishment

23   involved.

24           Q     And when you say "dismissed," do

25   you have any recollection as to why it was

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 41 of 214

40

```
 1                       Plotkin

 2    dismissed?

 3           A      It's 20 years ago, 22 years ago.

 4                  I definitely don't remember

 5    pleading to it.  There was no punishment.

 6                  I don't remember.  Sorry.

 7           Q      Did you spend time being detained

 8    by the NYPD?

 9           A      Yes.

10           Q      For how long?

11           A      I went through the system on both

12    occasions.

13           Q      So in lower Manhattan, you went

14    through the system in lower Manhattan?

15           A      Yes.  And the first time the

16    system in Brooklyn.

17           Q      And you were arraigned?

18           A      I believe so.  I went before a

19    judge.

20           Q      Was there another time?  You

21    mentioned two instances.

22                  Was there a third time when you

23    were arrested?

24           A      No.

25           Q      We talked about arrests and you
```

41

1                        Plotkin

2     described them.

3                    Have you ever been accused of a

4     crime other than what you have mentioned?

5                    And I'm not characterizing what

6     you talked about, I'm just asking you that in

7     addition to what you have already testified to,

8     have you ever been accused of a crime?

9                    MR. McPARTLAND:  Note my

10                   objection to form.

11         A        Not that I recall, anything else

12    but those.

13         Q        Have you ever been fired from a

14    job?

15         A        No, I haven't.

16         Q        Where did you work before

17    Equinox?

18         A        I worked at a company called

19    Aramark, they are a public company.  I worked

20    there for three years.  I worked from 2003 to

21    2006 and prior to that I worked for Equinox, as

22    well.

23         Q        What does Aramark do?

24         A        They are managed services, so

25    they do food for colleges and, you know,

42

                          Plotkin

1

2    cafeterias.

3                   They do the food at Shea Stadium.

4    They do the food at Giants Stadium.

5                   I worked in the uniform division,

6    and we did uniforms for companies like General

7    Motors, we did uniforms for NYU, Columbia.

8         Q         And then before Aramark, you

9    worked at Equinox?

10        A         Correct, since 1995, from 1995 to

11   2003.

12        Q         Why did you leave Equinox in

13   2003?

14        A         After I believe it was nine years

15   working for the company, it was kind of all I

16   knew and I wanted to experience something else,

17   so I went and I worked for a public company.

18                  All I knew was fitness.  Before

19   Equinox, I worked for Bally's Jack LaLanne, I

20   wanted to experience something else.  I wanted

21   to see what else was out there.

22        Q         What position did you take at

23   Aramark?

24        A         I started out being a district

25   manager and Manhattan was my district, and then

43

```
 1                         Plotkin
 2     I got promoted to be assistant general manager.
 3           Q      What position did you have at
 4     Equinox when you left in 2003?
 5           A      General manager.
 6           Q      You were general manager of a
 7     club?
 8           A      Yes.
 9           Q      Which club?
10           A      19th Street.
11           Q      How long were you the GM of 19th
12     Street?
13           A      About a year and a half.
14           Q      What, if anything, did you do to
15     prepare for today's deposition?
16           A      I had a few words with my
17     attorney, he told me what I can expect and
18     that's it.
19                       MR. McPARTLAND:  You
20                  shouldn't discuss anything that I
21                  told you.
22                       THE WITNESS:  All right.
23                       MR. McPARTLAND:  That's
24                  privileged.
25           Q      I'm going to agree with your
```

MCM REPORTING SERVICE
(516) 775-5209

44

1                          Plotkin

2      attorney in that.  I'm not allowed under the

3      rules to ask you about the content you have had

4      with, the content of the conversations that you

5      have had with your lawyers, Mr. McPartland or

6      his associates.

7                     However, I can ask you about

8      other things such as the times that you met with

9      him, not what you talked about, but the times

10     that you met with him and what you looked at and

11     so forth and he will make his objections and we

12     will deal with that in time.

13                    You said that you had some words

14     with Mr. McPartland?

15            A       Correct.

16            Q       To prepare for today's

17     deposition, correct?

18            A       Correct.

19            Q       When is the first time you did

20     that?

21            A       I will say about five months ago.

22            Q       And where did that occur?

23            A       At his office.

24            Q       In lower Manhattan?

25            A       Correct.

MCM REPORTING SERVICE
(516) 775-5209

45

```
 1                        Plotkin

 2           Q      And was anyone else present?

 3           A      I believe he had a paralegal

 4    there or another attorney.  I can't remember

 5    exactly who it was.

 6           Q      Was it a man or a woman?

 7           A      A man.

 8           Q      What do you recall about this

 9    man?

10           A      Nothing special.

11           Q      Do you recall the age,

12    approximately?

13           A      Middle age, probably the same age

14    as Pat.

15           Q      And was anyone else present?

16           A      Not that I can remember.

17           Q      Did you review any documents

18    during this meeting five months ago?

19           A      I think so.  I think we looked at

20    some e-mails.

21           Q      Anything else?

22           A      Not that I can remember offhand.

23           Q      Have you separately retained Mr.

24    McPartland's firm?

25                         MR. McPARTLAND:  Object to
```

                                                            46
1                         Plotkin

2                  the form.

3          Q      Are you paying for the legal

4    services?

5          A      No, Equinox is.

6          Q      And did you sign a separate

7    retainer agreement with Mr. McPartland's firm?

8          A      No.

9          Q      Has Equinox made any

10   representations to you about liability in this

11   matter?

12                     MR. McPARTLAND:  Objection.

13         A      Be more specific.  What does that

14   mean?

15         Q      If you are found to be liable in

16   this case and you owe money, is Equinox going to

17   pay that for you?

18         A      That has not been discussed with

19   me in any way, shape or form.

20         Q      What has been discussed?  Again,

21   I'm not asking you about your conversations that

22   you had with your attorneys, but what has been

23   discussed with you about what Equinox is willing

24   to do with respect to representing you in this

25   matter.

47

```
 1                      Plotkin
 2                      MR. McPARTLAND:  Object to
 3              the form.
 4                      And I also, just to advise
 5              you, this is, again, no
 6              communications between general
 7              counsel at Equinox and you,
 8              between me, any attorneys, no
 9              communications should be
10              disclosed.
11                      Just so you are clear.
12                      THE WITNESS:  Okay.
13         A      Ask the question again.  I'm
14    sorry.
15         Q      What has been conveyed to you by
16    Equinox with respect to Equinox's support of you
17    as a defendant in this action?
18                      MR. McPARTLAND:  Same
19              objection to form.
20         A      Nothing other than -- really
21    nothing, just documents sent to me.  We saw the
22    documentation that you sent out, we all got
23    served with it, and just some of my meetings
24    with Pat.
25                      Other than that, it's not a big
```

48

1                         Plotkin

2     talk of the town.  We are pretty confident in

3     what we did and we know we did the right thing.

4                         MR. HARMAN:  Move to

5                  strike as not responsive.

6          Q      I'm not asking you, all I'm

7     asking you is you are an individual defendant in

8     this case.

9                  Do you understand that?

10         A      I do.

11         Q      And that you are not a defendant

12    as an employee of a corporation.

13                 Do you understand that?

14         A      I thought I was both.

15         Q      The corporation has been sued,

16    right, and you have also been sued in your

17    individual capacity.

18                 I have asked you that now three

19    or four times.  Do you understand that?

20         A      I do.

21         Q      And do you understand that you

22    could be found to be responsible legally for

23    something in your individual capacity?

24         A      I believe that could happen, but

25    I don't believe it will.

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 50 of 214

49

```
1                        Plotkin
2          Q      I'm not asking you to speculate,
3     I'm asking if you understand legally what's
4     going on right now?
5          A      I do.
6          Q      Then I ask you what
7     representations, if any, have been made to you
8     by Equinox about your individual liability in
9     this matter?
10                       MR. McPARTLAND:   Other
11                 than by counsel.
12         A      Nothing other than by counsel.
13         Q      Nothing?
14         A      Yes.
15         Q      Have you ever been sued by Chase
16    Bank?
17         A      Have I ever been sued by Chase
18    Bank?
19                 Not that I know of.
20         Q      Have you ever had a dispute with
21    Chase Bank?
22         A      I have.
23         Q      Involving money?
24         A      I have.
25         Q      And that was resolved?
```

50

1                        Plotkin

2          A     Yes, it was.

3          Q     And if I told you that there is a

4     record of a proceeding in Richmond County

5     involving you and Chase Bank, would that refresh

6     your recollection as to whether you had been

7     sued involving Chase Bank?

8          A     No, it wouldn't.

9          Q     But you did have a dispute with

10    Chase Bank?

11         A     I did.  It did not, it never went

12    to the courts.

13         Q     And did that dispute involve an

14    amount of money in five figures?

15         A     Yes, it did, but it was paid

16    back.

17         Q     Did it involve an amount of

18    approximately $26,000?

19         A     Yes, it did.  But it was paid

20    back in full.

21         Q     You described, when I asked you

22    about theft, the first thing you said is the

23    taking of actual funds, and you emphasized the

24    word "actual."

25               Do you recall that?

51

Plotkin

1    A    I do.

2    Q    Do you agree with me that you

3    emphasized the word "actual"?

4    A    I do.

5    Q    Why did you do that?

6    A    Because sometimes theft is

7    defined as someone actually taking money out of

8    a safe and then sometimes it's taking funds via

9    other resources, so it's two different types of

10   theft.

11   Q    Do both types of theft result in

12   termination at Equinox?

13   A    Yes.

14   Q    So whether it's taking actual

15   funds, money out of the safe, or whether it's

16   taking something through manipulating the

17   system?

18   A    Correct.

19   Q    And both types of theft result in

20   termination?

21   A    Yeah.  Yes.

22   Q    In every single instance?

23   A    I can't remember an instance

24   right now where it didn't.

52

1                        Plotkin

2          Q        Tell me every time you have

3     terminated someone for theft.

4          A        I'll do my best to recite all of

5     this.

6          Q        Let's talk about the most recent

7     ones in time, sometimes it's easier to say let's

8     look at the last three years or five years

9     because our recollections are fresher during

10    those periods of time.

11                   So let's talk about the last five

12    years.

13         A        Okay.

14                   I told you about the time with

15    the membership advisor, Jessica.

16         Q        And you characterized that as

17    theft?

18         A        Yes.

19         Q        And how much money was involved

20    in that?

21         A        A couple of thousand dollars.

22         Q        2,000 --

23         A        About 2,000.

24         Q        -- or more than 10,000?

25         A        About 2,000.

53

                              Plotkin

1

2          Q       Okay.

3                  And tell me about the second one.

4          A       They are popping into my head, so

5     I can't do it in any real time order, but we let

6     a general manager go who was actually taking

7     money out of the safe.

8          Q       And what location was that?

9          A       The 19th Street location.

10         Q       What was the individual's name?

11         A       Leo Perez.

12         Q       And how did you catch Mr. Perez

13    taking money from a cash register?

14         A       It was pretty cut and dry.  It

15    was actually out of a safe.

16                 He wasn't depositing the money

17    into the bank, he was depositing it into his own

18    pocket and accounting called me up and my boss

19    up and said, "We are missing a lot of money on a

20    weekly basis.  What's going on?"

21                 And when we spoke to him he

22    admitted to taking the money.

23         Q       How much money?

24         A       I don't remember exactly, but,

25    again, it probably added up to be two or $3,000.


                        MCM REPORTING SERVICE
                          (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 55 of 214

54

```
 1                         Plotkin
 2          Q     When did this occur?
 3          A     Probably about three to four
 4    years ago.
 5          Q     Did he return the money?
 6          A     I don't believe so.
 7          Q     Did you call the police?
 8          A     I believe my boss did.
 9          Q     I take it Mr. Perez was
10    terminated?
11          A     Yes.
12          Q     Any other instances in which
13    employees were terminated for theft?
14          A     Just give me a minute so I can
15    recollect.
16                We had a number of maintenance
17    associates, I don't remember their names, caught
18    stealing an iPod here or there from another
19    employee and/or a member.
20          Q     Anything else?
21          A     Sure.
22                I have had a personal training
23    manager get caught for not properly handling
24    voucher pulling, so when vouchers would be, when
25    they would expire, he was going ahead and paying
```

55

                              Plotkin

1
2       the trainers for them and then getting credit

3       for those sessions towards his bonus.  That was

4       a very long time ago.

5              Q       These maintenance individuals, do

6       you recall any of their names?

7              A       I don't.

8              Q       Location?

9              A       One at Soho, one at Greenwich.

10             Q       These are maintenance employees?

11             A       That's correct.

12             Q       Not managers?

13             A       Correct.

14             Q       And then you had a personal

15      training manager who was improperly pulling

16      vouchers?

17             A       Correct.  And he was getting

18      credit for them for his bonus and then paying

19      the trainers on them, so they were getting paid

20      for services that they weren't providing.

21             Q       And you said this was a very long

22      time ago?

23             A       Yeah.  That was a good eight to

24      ten years ago.

25             Q       And do you recall the


                      MCM REPORTING SERVICE
                        (516) 775-5209

56

1                          Plotkin

2        individual's name?

3                A      Adam Cronin.

4                Q      Was Adam terminated?

5                A      Yes, he was.

6                Q      How do you spell Adam's last

7        name?

8                A      C-R-O-N-I-N.

9                Q      What location did Adam work at?

10               A      Greenwich.

11                      Then there was a maintenance

12       manager who was terminating employees, but

13       leaving them on payroll, paying them hours on

14       their checks and then using the former employee

15       to cash the checks and keep the money for

16       himself.

17               Q      What location was that?

18               A      Greenwich.

19               Q      The individual's name?

20               A      Giovanni Iboquinto.

21               Q      Any other instances of employee

22       theft?

23               A      Let me search through my mind.

24                      That's all I can remember right

25       now.  And then naturally -- I'm sorry, naturally


                        MCM REPORTING SERVICE
                          (516) 775-5209

57

Plotkin

1    the situation with Kerry Ashdown.

2

3         Q     When you say "Ashdown," do you

4    know mean Ashdown?

5         A     I do.

6         Q     When you say "naturally," what

7    does that mean?

8         A     That means that's what we are

9    here for right now.

10        Q     I'm not sure what you mean by

11   that.

12        A     That's why we terminated Kerry.

13        Q     You terminated Ms. Ashdown for

14   theft?

15        A     That is correct.

16        Q     Do you believe that she stole

17   from Equinox?

18        A     100 percent.

19        Q     And why do you believe that?

20        A     Because she pulled vouchers for

21   herself and for other employees using her

22   computer, her log-in to get on the computer, her

23   cashier code to pull those vouchers and to

24   reinstate them at a time that we know she was

25   next to or in her office and there is nobody

58

1                          Plotkin

2      else that could have done it other than her.

3          Q     So you said that you know that

4      she was in her office.

5                 How do you know that?

6          A     We knew she was in or near her

7      office.

8          Q     How do you know she was in or

9      near her office?

10         A     We saw her walking in that

11     direction one to two minutes before those

12     vouchers were reinstated and pulled.

13         Q     When you say "we," did you

14     physically see her, you physically saw her one

15     to two minutes before the vouchers were pulled?

16         A     Myself and Lawrence Sanders saw

17     her on a camera walking towards her office one

18     to two minutes prior to when those vouchers were

19     pulled.

20                 So even if she didn't pull them,

21     she would have seen someone in her office for a

22     considerable amount of time pulling them.

23         Q     So you are testifying that you

24     and Mr. Sanders saw her on a camera?

25         A     That's correct.

59

                              Plotkin

1

2        Q       Where did that occur?

3        A       In his office.

4        Q       And when you say no one else

5    could have done that, what do you mean by that?

6        A       I mean it was her computer, in

7    her office, her log-in code, her cashier code,

8    at her desk, at the time she was in the

9    vicinity.

10               No one else there would have

11    known how to do it and if they did do it, she

12    would have seen them do it, and when we spoke to

13    her, she said she didn't see someone at her

14    computer during that time period.

15        Q       How do you know that it was at

16    her desk?

17        A       IT sends us a report about when

18    the vouchers are pulled, what actual terminal

19    it's done in, what cashier codes are used.

20        Q       So you had a report that showed

21    that the sessions were pulled at Ms. Ashdown's

22    actual desk?

23        A       At her actual terminal, correct,

24    I had that.

25        Q       Has that report been produced in

MCM REPORTING SERVICE
(516) 775-5209

60

1                          Plotkin

2    this action?

3            A      I believe so.

4            Q      I'm asking you.

5            A      I believe so.

6            Q      So as part of your basis for

7    terminating her, you concluded that the sessions

8    had been pulled at her actual desk?

9            A      They were reinstated and pulled

10   at her actual desk, correct.

11           Q      You know that for a fact?

12           A      Yes, and using her cashier code.

13           Q      Now, you testified that you

14   looked on a camera and that you saw what on a

15   camera?

16           A      I saw her walking toward her

17   office.

18           Q      Yeah, you saw her walking toward

19   her office?

20           A      A couple of minutes before these

21   sessions were reinstated and pulled.

22           Q      So tell me what else you saw.

23           A      That's all we saw on the camera.

24   It was -- there were members around, naturally,

25   but our whole thought process was if Kerry

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 62 of 214

61

1                            Plotkin

2    didn't do it, who did do it, and if there was

3    someone in her office doing this, using her

4    codes to pull and reinstate these vouchers, it

5    would have taken a considerable amount of time

6    and she would have seen them do it.  The office

7    is all glass.

8              So if she was anywhere in the

9    vicinity, she would have saw this.  When we

10   asked her about it, she would have said, "Oh, my

11   God, Doug was in my office at that time."

12             She told us she didn't know,

13   nobody was in her office.  And it just didn't

14   make sense.  The only thing that actually made

15   sense and all the facts pointed to was that she

16   did it.

17        Q        I see.  Now, was anybody else in

18   the office?

19        A        Not that I know of, no, not at

20   that time.

21        Q        How do you know that?

22        A        That's what Ms. Ashdown told us.

23        Q        So Ms. Ashdown told you that no

24   one else was in the office?

25        A        Uh-hum.

                    MCM REPORTING SERVICE
                      (516) 775-5209

                                                              62
1                         Plotkin

2            Q       You asked her about that specific

3    time?

4            A       Sure.

5            Q       You did?

6            A       Sure.

7            Q       Did you show her the video?

8            A       I don't believe we showed her the

9    video.

10           Q       And you recall as you sit here

11   today under oath asking her if she was in her

12   office at a specific time?

13           A       Yes, absolutely.

14           Q       Did you ask her if anybody else

15   was in the office?

16           A       Yes.

17           Q       And what was your recollection of

18   her response?

19           A       She said, "No one was in my

20   office.  I wasn't in my office, but I was around

21   my office.  I might have popped in or out, but I

22   wasn't in there for any considerable amount of

23   time."

24           Q       And you are testifying today that

25   you were watching a camera at that time of her

                     MCM REPORTING SERVICE
                       (516) 775-5209

                                                              63
1                          Plotkin

2     office?

3          A      No, I'm testifying today that I

4     saw her walking toward her office in the camera

5     at about that time.

6          Q      Is there a camera -- what camera

7     are you talking about?

8          A      There is a camera in the hallway

9     that leads to her office.  It does not point

10    inside her office.

11         Q      Oh, I see.

12                So there is a camera that is in a

13    hallway that leads to her office?

14         A      That's correct.

15         Q      And you looked at that camera?

16         A      Yes.

17         Q      Have you spoken to Mr. Sanders

18    about this lawsuit?

19         A      We have made it a point not to.

20         Q      Have you spoken to Mr. Sanders

21    about this lawsuit?  Yes or no.

22         A      No.

23         Q      Have you read any transcripts of

24    any deposition testimony in this lawsuit?

25         A      No.


                    MCM REPORTING SERVICE
                       (516) 775-5209

64

```
1                        Plotkin

2          Q      Have you read the complaint in

3    this lawsuit?

4          A      What is that?

5          Q      The legal document that names you

6    as a defendant?

7          A      Yes, I have.

8          Q      So it's your testimony today that

9    you looked at a camera of Ms. Ashdown going down

10   a hallway?

11         A      That's part of it.  The other

12   part of it is it was her cashier code in her

13   office and her --

14         Q      Please just answer my questions,

15   okay?

16         A      I am.

17         Q      Then answer them.

18                It's your testimony that you saw

19   Ms. Ashdown walking down a hallway in a camera?

20         A      That is part of it, yes.

21         Q      Yes or no, did you see

22   Ms. Ashdown walking down a hallway on a camera?

23         A      Yes.

24         Q      And where is this camera exactly

25   located?
```

MCM REPORTING SERVICE
(516) 775-5209

```
                                                       65
1                        Plotkin
2          A      The camera -- I'm not exactly
3     sure.  We have multiple cameras in the club.
4     None of them are pointing in the office.
5          Q      Just answer the question.
6                 So you don't know where the
7     camera is located?
8          A      The exact location, I do not
9     know.
10                     MR. HARMAN:  How long do
11                you have today?
12                     MR. McPARTLAND:  We are
13                here to finish Mr. Plotkin's
14                deposition one or another.
15                     MR. HARMAN:  Okay, so a
16                full seven hours.
17                     Let's take a break then.
18                     MR. McPARTLAND:  Mr.
19                Plotkin does have a meeting that
20                he would like to make at 1:00 --
21                     MR. HARMAN:  If you want
22                to come back --
23                     MR. McPARTLAND:  -- but we
24                are not coming back, so we are
25                here to finish today.
```

66

```
 1                      Plotkin
 2                      (Whereupon, at 11:28 a.m., a
 3                  recess was taken.)
 4                      (Whereupon, at 11:41 a.m.,
 5                  the deposition resumed with all
 6                  parties present.)
 7    BY MR. HARMAN:
 8            Q      Mr. Plotkin, you said that you
 9    made a point not to talk Mr. Sanders about this
10    lawsuit.
11                  Did you have that agreement with
12    him?
13            A      I think, I wouldn't say an
14    agreement, I think we in passing, we were just
15    like we can't talk about it, you know.  It
16    wasn't a handshake or an agreement, per se.
17            Q      When is the last time that you
18    had that type of interaction with him?
19            A      I think a couple of days before
20    we were supposed to have the deposition and it
21    was canceled.
22            Q      And what did you say to him?
23            A      I don't remember exactly.  It's
24    probably like, he asked me if I can be somewhere
25    at a specific time, and I said, "No, I have a
```

67

1                          Plotkin

2      deposition, but we can't talk about it," and

3      that was it.

4              Q      And how long ago would you say

5      that was?

6              A      I don't know.  A month, perhaps.

7              Q      And what did he say to you?

8              A      I think he just nodded his head.

9              Q      So this was a conversation in

10     person?

11             A      Yes.

12             Q      And what other interactions have

13     you had with him about this lawsuit?

14             A      I believe when we first got

15     served the papers, we discussed it, and then

16     after that pretty much didn't discuss it much.

17             Q      When you say "pretty much didn't

18     discuss it much," what does that mean?

19             A      I don't recall any other time

20     that we discussed it.

21             Q      You recall no other discussing

22     this lawsuit once you got served with the

23     complaint?

24             A      After our initial discussion

25     about it, naturally we were like "What is this?"

68

```
1                      Plotkin
2     We were perplexed by it, and we have not had any
3     conversations since other than, "Oh, yeah, we
4     can't talk about it."
5            Q      So you had an initial discussion
6     where you were perplexed by it?
7            A      Yes.
8            Q      Can you tell me about that?
9            A      Yeah.  Like what?
10           Q      Where did this discussion take
11    place?
12           A      I think it was in his office in
13    Soho.
14           Q      Was anyone else present?
15           A      No.
16           Q      And approximately when did this
17    conversation take place?
18           A      I'm not exactly sure.  It was
19    right after we got served the papers, so I guess
20    six, eight months ago.
21           Q      When you say when papers were
22    delivered to the Soho location, is that what you
23    mean by served?
24           A      Yes.
25           Q      And you had a conversation in Mr.
```

MCM REPORTING SERVICE
(516) 775-5209

69

1                          Plotkin

2     Sanders' office?

3              A      Yes.

4              Q      What did you say to him?

5              A      I believe -- I'll paraphrase.

6              Q      I don't want you to paraphrase, I

7     want you to tell me what you said to him.

8              A      Then I don't remember exactly

9     what I said.

10             Q      Okay.  Then tell me what you

11    recall about the conversation.

12             A      I recall us being perplexed and

13    being "What are we getting sued for?  Kerry

14    stole from us.  Why would she then go ahead and

15    sue us.  It makes absolutely no sense.

16                    "She was dishonest and now she's

17    going ahead and being dishonest again."

18                    We couldn't believe that she

19    couldn't let it rest and learn from her mistakes

20    and move on.

21             Q      Are these things that you said to

22    Mr. Sanders?

23             A      Paraphrased, yes.

24             Q      And what did he say to you?

25             A      He was perplexed, as well and

70

Plotkin

1    scratching his head.  Usually when you get

2    caught stealing, you don't go ahead and sue for

3    your mistake.

4             So he was perplexed about it, I

5    don't remember exactly what he said, but it was

6    in and around the comments that I just made to

7    you.

8         Q     So I take it from your testimony

9    that you believe that Ms. Ashdown stole from

10   Equinox?

11        A     I do.

12        Q     And that she was dishonest?

13        A     I do.

14        Q     And what did she steal from

15   Equinox?

16        A     She reinstated and pulled

17   vouchers for herself and for other trainers and

18   then was not honest about it when we asked her

19   about it.

20        Q     And how much money would this

21   have benefited her, this alleged stealing?

22        A     I don't recall exactly, but it

23   was somewhere, a hundred bucks, somewhere around

24   there, for her, and then probably a hundred or a

71

1                           Plotkin

2      couple of hundred bucks for I believe the two

3      trainers that she pulled vouchers for.

4             Q       And would you place Ms. Ashdown's

5      conduct in the category that you mentioned

6      earlier, the theft category?

7             A       Yes, I would.

8             Q       And that requires a termination,

9      correct?

10            A       In most cases, absolutely.

11            Q       Give me an example where it

12     wouldn't require immediate termination.

13            A       Let's say if she stole a pen a

14     she said, "I'm sorry, I took a pen home."

15            Q       Give me another example.

16            A       Perhaps a bottle of water.  But

17     in this case she stole services, benefitted for

18     herself, the trainers that she was close with

19     benefitted from it, and then she wasn't honest

20     about it.

21            Q       What would have happened if she

22     had been honest about it?

23                    I'm asking questions based on

24     your allegations.  You alleged that she stole

25     something?

                                                        72
1                        Plotkin

2          A      Uh-hum.

3          Q      If she, in fact, had stolen

4    something, according to you, and she had been

5    honest about it, what would have happened?

6          A      You know, it depends.  If she

7    said, "Oh, my God, I didn't realize I couldn't

8    do this, I was just trying to help out these

9    trainers and they were going to render services

10   anyway and so was I, we just all needed the

11   money, but I promise we are going to render

12   services and we're never going to do it again,"

13   it might have been a different conversation, we

14   definitely would have documented it and given

15   her a final warning, but maybe we would not have

16   terminated her.

17         Q      Well, this situation involved

18   expired sessions, right?

19         A      Uh-hum.

20         Q      Can expired sessions be

21   performed?

22         A      What happens with expired

23   sessions is the member would call us up and say,

24   "Listen, my sessions expired, can you reinstate

25   them?"

73

```
 1                        Plotkin

 2                 Then we would reinstate them for

 3     the member and then they have a certain amount

 4     of time again to go ahead and use them.  So it

 5     is our practice to reinstate expired sessions

 6     for members.

 7           Q     So if this was a pen or a bottle

 8     of water, it would have been a different

 9     conversation?

10           A     Yeah.

11           Q     Was that because it was sessions

12     you believed that it was an offense that

13     required termination?

14           A     Along with the lying, absolutely.

15           Q     And you believe that she lied

16     about the session pulling?

17           A     Absolutely.

18           Q     Did you conduct an investigation

19     into Ms. Ashdown?

20           A     Yes.  A group of us did.

21           Q     Who was in that group?

22           A     Lawrence Sanders, myself, and

23     then conversations around it.  Discussing it was

24     Elizabeth Minton, Joe Matarazzo and David

25     Harris.
```

74

Plotkin

1          Q        So you and Sanders conducted the

2    investigation and Minton, Matarazzo and Harris

3    had conversations around it?

4          A        That's correct.

5                   And I believe Elizabeth Minton

6    helped out with some of the investigation.

7          Q        How did she help out?

8          A        She spoke to some other employees

9    about it, she looked at the IT-generated report,

10   which showed the reinstatement and the pulling

11   of sessions for the benefit of Ms. Ashdown and

12   the other trainers.

13         Q        So is your testimony that if

14   Ms. Ashdown had been, assuming what you are

15   saying is true regarding Ms. Ashdown, that if

16   Ms. Ashdown had been honest about it, it might

17   have been a different conversation?

18         A        It might have been.  I'm not

19   sure.

20         Q        What makes you not sure?

21         A        It depends what her reasoning

22   was, her thinking, as to why she thought she

23   could conduct such behavior.

24         Q        And you believe she wanted to

75

1                          Plotkin

2      steal money from Equinox?

3              A     I do.

4              Q     You believe she actively stole

5      money from Equinox?

6              A     I do.

7              Q     You believe that she was

8      dishonest about it?

9              A     Absolutely.

10             Q     Did you call the police?

11             A     No, we did not.

12             Q     Did Mr. Sanders call the police?

13             A     I do not think so.

14             Q     What else did you do?

15                   You said you conducted an

16     investigation with Mr. Sanders?

17             A     Correct.

18             Q     Tell me about that investigation.

19     When did that start?

20             A     I don't know the exact date.

21     Lawrence brought it to my attention maybe a week

22     after the vouchers were pulled, a week or two

23     after the vouchers were pulled, and we started

24     looking at it.

25                   He tried to have a conversation

76

Plotkin

1     with her about it.

2                 She said, "I didn't do anything,

3     I don't know what happened."  She was very

4     defensive.  She didn't help in the

5     investigation, which was very telling to us

6     since it did happen in her office, at her

7     computer, with her cashier code, with her log-in

8     code and it did get her paid, we were very

9     suspicious as to why she didn't help in the

10    investigation, why she didn't volunteer in any

11    way, shape or form to help.

12                So Lawrence headed up talking to

13    employees about it to see if certain employees

14    were around the office that day.  We both looked

15    at the videotape together.

16                We spoke to both employees, other

17    than Mrs. Ashdown that the vouchers were pulled

18    for, and both of them claimed they didn't know

19    anything about it, but yet they got overpaid and

20    they didn't question it.  When they get

21    underpaid, they very much question it.

22                Lawrence and I had IT pull the

23    report to show when the vouchers were pulled,

24    who pulled them, at what terminal they were

77

                              Plotkin

1

2     pulled, and we looked at that in detail.

3              We shared it with the rest of the

4     group, David, Liz, Joe, myself and Lawrence.  We

5     went to have one more sit-down with Kerry where

6     she told us she knew nothing about it, she was

7     defensive again and she didn't step up and say,

8     "Let me help you with the investigation."  She

9     didn't look into the matter at all, knowing that

10    someone might have pulled vouchers and

11    reinstated them at her desk, using her code, at

12    her terminal, and she didn't even try to find

13    out who did it, led me and the group to believe

14    along with the, you know, very, very concrete

15    evidence on the report that IT provided for us

16    that Kerry did this and now she was lying about

17    it, and it's not an insane amount of money, so

18    we couldn't figure it out.

19         Q      It's your testimony that

20    Ms. Ashdown, that you know for a fact that

21    Ms. Ashdown didn't do anything whatsoever to

22    investigate these allegations?

23         A      If she did, she didn't tell us

24    about it.

25         Q      She didn't tell you about it?

                    MCM REPORTING SERVICE
                       (516) 775-5209

78
1                          Plotkin

2          A      Uh-hum.

3          Q      Okay.

4                 And did she tell you that she

5    believed Mr. Maietta was responsible?

6          A      Mauro.  Not until we were

7    terminating her.

8                 My recollection is --

9          Q      So your testimony is she didn't

10   tell you that until you were terminating her?

11         A      That is my recollection, yes.

12         Q      Did anyone else tell you that she

13   believed Mr. Maietta was involved?

14         A      Lawrence might have told me

15   that --

16         Q      Prior to her termination or --

17                MR. McPARTLAND:  Can you

18                let him finish his answer?

19         A      I don't remember.

20         Q      Did you investigate Mr. Maietta?

21         A      He wasn't there that day when all

22   the vouchers were pulled.

23         Q      He wasn't there that day?

24         A      No.  He was nowhere, he wasn't in

25   the building.


                    MCM REPORTING SERVICE
                       (516) 775-5209

79

                           Plotkin

1

2          Q       How do you know that?

3          A       We checked the tape, we checked

4    his e-mails.  He was nowhere in the building.

5          Q       When you say you checked the

6    tape, what does that mean?

7          A       We looked at the camera.

8          Q       When you say you looked at the

9    camera, what does that mean?

10         A       That means you can see people on

11   the camera, they are easily identifiable.

12                 We saw Kerry there that day, she

13   was on schedule to work.  It was Mauro's day off

14   and he was not in the building.  We did not see

15   him on the camera.

16         Q       So I take it that you looked, I

17   take it that you looked at some video footage

18   with Mr. Sanders.

19                 That's your testimony?

20         A       It is.

21         Q       How long a time did you spend

22   looking at video footage?

23         A       I don't remember.  It was

24   probably -- I don't remember exactly.

25         Q       Would you say it was more than 15

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 81 of 214

80

```
1                         Plotkin

2       minutes?

3              A       Yes.

4              Q       Would you say it was more than 30

5       minutes?

6              A       Probably.

7              Q       Was it more than an hour?

8              A       Probably not.

9              Q       So you think it was probably not

10      more than an hour?

11             A       Uh-hum.

12             Q       And you looked at this video

13      footage in Mr. Sanders' office?

14             A       Yes.

15             Q       And can you describe to me how

16      you looked at this video footage?

17             A       We sat in front of the monitor

18      and we used the rewind and fast forward button a

19      lot to speed up the process.

20                     We identified her walking towards

21      the vicinity of her office during the time when

22      the sessions were reinstated and pulled and we

23      did not see Mauro on the camera at all.

24             Q       And you did not see Mauro on the

25      camera at the same time that you saw
```

81

1                         Plotkin

2      Ms. Ashdown, that's your testimony?

3              A      That is my testimony.

4              Q      And did you look at, you have

5      testified to looking at a camera.

6                      Did you look at just one camera?

7              A      I believe we only looked at one

8      camera.

9              Q      So it's your testimony that you

10     looked at one camera, and you spent less than a

11     hour doing this?

12             A      I think so.

13             Q      And it's also your testimony that

14     you looked at Mr. Maietta's, Mauro's e-mails?

15             A      I believe so.

16                      MR. HARMAN:  I'm going to

17                      call for the production of Mauro

18                      Maietta's e-mail communications

19                      for the day that his e-mails were

20                      reviewed by Mr. Plotkin as part

21                      of his investigation.

22                      MR. McPARTLAND:  We will

23                      take it under advisement.

24                      Please put it in writing.

25                      That applies for all requests.

82

                             Plotkin

1

2   BY MR. HARMAN:

3        Q       Did you maintain a copy of

4   whatever it is that you reviewed that day in Mr.

5   Sanders' office?

6                        MR. McPARTLAND:  Object to

7                the form.

8        A       I don't remember.

9        Q       Did Ms. Ashdown volunteer to give

10  a lie detector test with respect to these

11  allegations of theft?

12       A       I believe at her termination she

13  did.

14       Q       You believe at her termination?

15       A       Uh-hum.

16       Q       And what was your response?  Can

17  you tell me what she said?

18       A       I don't remember exactly.  I

19  remember her saying, she was emotional at the

20  time, "Give me a lie detector test," but at that

21  point the investigation was already finished.

22  We don't do lie detector tests, it's just not a

23  process that we use.

24                        And to us it didn't matter,

25  everything pointed at Kerry.  It just didn't


                    MCM REPORTING SERVICE
                        (516) 775-5209

83

                              Plotkin

1

2      matter.

3            Q     So just so the record is clear,

4      the fact that Ms. Ashdown had volunteered to

5      take a lie detector test didn't matter to you?

6            A     At her termination, after she

7      didn't help us with the investigation.

8                  If she maybe had said it when we

9      first brought it up to her, maybe we would have

10     considered it, I don't know, I would have

11     brought it to HR, human resources, "Is this

12     something that we can do?"

13                 But after she didn't help us with

14     the investigation at all, it just didn't seem

15     right.

16           Q     Let me ask, did you sit down with

17     Ms. Ashdown and ask her to do anything with

18     respect to this investigation?

19           A     I believe we did.

20           Q     I'm not asking about what you

21     believe, I'm asking what you recall.

22                 Tell me exactly what you told

23     Ms. Ashdown to do with respect --

24           A     I can't recall.

25           Q     You can't recall anything?

84

                              Plotkin

1

2          A      I can't.

3          Q      So then it's fair to say that you

4    have no idea what she did or didn't do?

5          A      Well --

6                 MR. McPARTLAND:  Object to

7                 the form.

8          A      Her supervisor told me that she

9    didn't do anything, that he followed up with her

10   and said, "Did you think about this?  What's

11   going on?"

12         Q      I'm not asking you about that.

13   I'm asking you, you and Mr. Sanders conducted an

14   investigation?

15         A      Uh-hum.

16         Q      You have told me elaborately and

17   repeatedly that she didn't do anything

18   whatsoever.

19                I now just asked you what you

20   asked her to do and you said you can't recall a

21   single thing.  Okay?

22                So my next question to you then

23   is, if you didn't ask her, if you can't recall a

24   single thing that you asked her to do, how is it

25   that you possibly could know personally that she

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 86 of 214

85

1                         Plotkin

2     didn't do anything?

3          A     Because I asked her, "What have

4     you done?"

5                I didn't ask her to do anything.

6     I asked her what --

7          Q     I see, you asked her what she

8     did.

9          A     Yes.

10          Q     And what did she say?

11          A     She said nothing.

12          Q     She told you she did nothing?

13          A     Yeah.

14          Q     When did this conversation take

15     place?

16          A     It was after -- it was my first

17     conversation with her in and around, when we

18     found out about these sessions that were pulled

19     and reinstated and, you know, she denied it

20     again, she said she didn't do anything looking

21     into them, so that's what I remember.

22          Q     Where did this conversation take

23     place?

24          A     In Mr. Sanders' office.

25          Q     Who was present?

86

                              Plotkin

1

2          A       Me and Lawrence.

3          Q       And what did you say to her?

4          A       Again, I'll paraphrase.  I asked

5    her first point blank, "Did you reinstate and

6    pull these sessions?"  She denied it.

7                  And then I said, "What have you

8    done to investigate it or to figure out what did

9    happen."

10                 She said, "Nothing."  She said,

11   "I haven't done anything."

12         Q       When was this conversation?  How

13   long after Mr. Sanders brought this to your

14   attention did this conversation take place?

15         A       A week or two.

16         Q       And what was your response, if

17   any, to Ms. Ashdown's comment that she did

18   nothing?

19         A       I don't remember exactly.

20         Q       Did you ask her to do anything?

21         A       I don't remember exactly.  I do

22   not believe so.

23         Q       Does Equinox have a policy that

24   the employee is supposed to conduct an

25   investigation of any incidents that they are

87

1                          Plotkin

2      involved in?

3              A      No, we do not.

4              Q      Mr. Sanders was accused of making

5      an inappropriate comment of a sexual nature; is

6      that correct?

7                          MR. McPARTLAND:  I am

8                   going to object to the form.

9              A      That is correct.

10             Q      And who accused him of that?

11             A      At the time it was his group

12     fitness manager.

13             Q      And what's her name?

14             A      You have to excuse me with names.

15     I have over 1,000 employees.

16                   I don't remember her name.

17             Q      And was he investigated as part

18     of that accusation?

19             A      Yes, he was.

20             Q      And who investigated him?

21             A      I did, along with human

22     resources.

23             Q      And who at HR?

24             A      I believe it was Matthew Herbert.

25             Q      And did Mr. Sanders conduct his


                    MCM REPORTING SERVICE
                       (516) 775-5209

88

```
1                        Plotkin

2     own investigation of that incident?

3            A      He didn't have to.

4            Q      I'm just asking, if you just tell

5     me yes or no.

6                   Did he or did he not conduct his

7     own investigation?

8                   Yes or no.

9            A      He admitted to it.  Why would he

10    have to investigate something he was honest

11    about?

12           Q      What did he admit to?

13           A      He stepped out of the boundaries

14    of appropriate business language with one of his

15    employees.

16           Q      How did he do that?

17           A      I don't remember exactly what he

18    said, but it was inappropriate, it was

19    documented and he was given a warning that that

20    can never happen again.

21           Q      How about with respect to these

22    other employees?

23                  Were other employees involved in

24    the Ashdown voucher pulling investigation?

25                       MR. McPARTLAND:  Object to
```

89

1                          Plotkin

2            the form.

3       A      I don't remember.  I don't

4  remember.  I do recall there was another

5  employee where Kerry knew her code, I don't

6  remember her name, and used her code to pull

7  some of those vouchers.

8       Q      How do you know that Kerry knew

9  her code?

10      A      Kerry admitted to it.

11      Q      When did Kerry admit to knowing

12 someone's code?

13      A      I don't recall exactly.  I

14 believe when we sat down with her, in our first

15 conversation with her.

16      Q      And what did you say to her and

17 what did she say to you?

18      A      I don't remember exactly.  Sorry,

19 I can't recall.

20      Q      How did this come up?

21      A      There was a number of vouchers

22 that were pulled by Kerry's code, if I can

23 remember correctly, and there were a couple of

24 vouchers that were pulled by using this other

25 employee's code.

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 91 of 214

90

1                            Plotkin

2          Q      Did Kerry admit to pulling the

3    sessions involving the other employee's code?

4          A      I do not believe so.

5          Q      But it's your recollection that

6    Kerry, and I guess we'll just use first names,

7    it seems more comfortable to you, and that's

8    fine with me.

9                 Did Kerry admit to using the

10   other employee's code?

11         A      I do not believe so.  I just

12   believe that she admitted to knowing it.

13         Q      Is there anything wrong with

14   knowing someone's code?

15         A      Yeah.

16         Q      Why?

17         A      Your code is generally for you.

18   You shouldn't necessarily know and use someone

19   else's code.  In certain examples --

20         Q      Move to strike.

21                I didn't, I asked you if she

22   admitted to knowing someone's code and you said

23   yes.  I asked you if she admitted to using the

24   code.

25         A      I do not believe she admitted

                    MCM REPORTING SERVICE
                       (516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 92 of 214

91

                          Plotkin

1

2    that.

3         Q      How would Ms. Ashdown have been

4    given her code?

5         A      Back then I don't recall.  Either

6    it would go through, either she would get an

7    e-mail with it or sometimes it does go through

8    your supervisor.

9         Q      So your supervisor could give you

10   a code?

11        A      Yes.

12        Q      And how would that happen, would

13   it be physically written on a piece of paper or

14   would it be printed out in some way?

15        A      It could be, if that person took

16   the liberty of taking it off of an e-mail and

17   writing on it and handing it to someone else, I

18   guess it could happen like that.

19        Q      If it happened like that, would

20   that be against Equinox's policy?

21        A      I'm not sure.  I'm not sure.

22        Q      Have you ever done that?

23        A      I have not.

24        Q      Do you have a code?

25        A      I do.

```
                                                          92
 1                      Plotkin

 2           Q      Did you ever share it with

 3    anyone?

 4           A      No.

 5           Q      Have you ever let anyone use it?

 6           A      My cashier code?

 7                  No.

 8           Q      And are you aware of anyone else

 9    sharing codes?

10           A      It has happened.

11           Q      And have people been terminated

12    for sharing codes?

13           A      They have.

14           Q      Who has been terminated for

15    sharing codes?

16           A      I can't remember offhand, but I

17    know it's happened.

18           Q      How do you know it's happened?

19           A      I just remember it happening.  I

20    don't remember the exact example.

21           Q      Do you remember any details?

22           A      No.

23           Q      Not a single one?

24           A      Give me a minute.

25                  I can't recall right now.  I'm
```

93
1                          Plotkin

2     sorry.

3          Q      Did you escort Ms. Ashdown out of

4     the Soho location?

5          A      I don't remember if it was me or

6     Lawrence, but probably one of us did.

7          Q      When you say "probably," why do

8     you say that?

9          A      Because we usually do that.

10         Q      You usually do what?

11         A      We usually would escort a

12    terminated employee, walk them to the door, make

13    sure they get all their stuff and walk them to

14    the door.

15         Q      You don't have any recollection

16    of physically walking Ms. Ashdown out of the

17    Soho location?

18         A      I don't.  I don't.

19         Q      Do you have a recollection of

20    walking anyone out of a location to terminate

21    them?

22         A      Yeah.

23         Q      When?

24         A      Let's see.  Recently I did it

25    with a maintenance manager that got terminated

94

Plotkin

1      for poor performance, I brought him to his

2      locker, he emptied his locker, and then I showed

3      him to the door respectfully.

4              Q      How did you do that respectfully?

5              A      Just said, "Good luck to you,

6      you're a good person.  I wish you all the luck

7      in the world."

8              Q      Do you believe that Ms. Ashdown

9      was escorted out of the Soho location in a

10     respectful manner?

11             A      I do.

12             Q      Why do you believe that?

13             A      Because that's generally how we

14     conduct ourselves.

15             Q      So it's based on a general

16     belief, you don't have any specific

17     recollection?

18             A      I don't.

19             Q      You don't know who walked her

20     out?

21             A      I forgot.

22             Q      Did you tell Ms. Ashdown that she

23     could come back as a personal trainer?

24             A      I didn't, but we made a

MCM REPORTING SERVICE
(516) 775-5209

95

1                        Plotkin

2      decision --

3              Q      Just please answer the question.

4              A      I didn't.

5              Q      Was Ms. Ashdown told that she

6      could come back as a personal trainer?

7              A      Yes.

8              Q      Who told her that?

9              A      I believe Lawrence, but possibly

10     Liz Minton told her that.  I'm not sure.

11             Q      Why do you believe that Lawrence

12     told her that?

13             A      Because I believe they spoke

14     after the termination.  I'm not sure.

15             Q      And did you work closely with

16     Lawrence on the investigation?

17             A      Yeah.

18             Q      And did you agree with him on

19     every aspect of the investigation?

20             A      Yes.

21             Q      And did you disagree with

22     Lawrence on any aspect of the investigation?

23             A      Not that I can remember.

24             Q      And what was the conclusion of

25     the investigation?

96

1                          Plotkin

2          A       The conclusion of the

3     investigation was that Kerry was dishonest, that

4     she reinstated and pulled those sessions for her

5     benefit, as well as other trainers' benefits.

6          Q       Who recommended first termination

7     of Ms. Ashdown?

8          A       I don't remember exactly.  I

9     think we all agreed to it.

10          Q       Did you have private discussions

11     with Lawrence about what you should do with

12     Ms. Ashdown?

13          A       I don't remember any.

14          Q       But you sat in an office looking

15     at a camera with him, right?

16          A       That is correct.

17          Q       And you looked at some e-mails

18     and you had some discussions about Ms. Ashdown?

19          A       Uh-hum.

20          Q       And then you met with her, right?

21          A       Uh-hum.

22          Q       How many times did you meet with

23     her?

24          A       Just once.

25          Q       So you just met with her once.

97

```
1                          Plotkin
2                 And after that meeting, did you
3     make a decision to terminate her?
4          A      No.  We all got on a conference
5     call together, discussed it, and we all made the
6     determination that it was the right thing to do.
7          Q      And who terminated her?
8          A      Myself and Lawrence.
9          Q      And that was done where?
10         A      In Lawrence's office.
11         Q      Was she allowed to get her
12    things?
13         A      I believe so.
14         Q      Did the termination cause her to
15    be emotionally upset?
16         A      I do remember her being
17    emotional.
18         Q      Do you recall her tearing up?
19         A      Yes.
20         Q      And she was escorted out that
21    day?
22         A      I believe so.  I don't remember
23    that part.
24         Q      Was it in the middle of the day?
25         A      I don't remember the time.
```

MCM REPORTING SERVICE
(516) 775-5209

98

1                      Plotkin

2          Q      Do you recall when you decided
3     she had stolen from Equinox?

4          A      I don't.  It was also a process
5     that led us to believe that.

6          Q      It was a process that led you to
7     believe that?

8          A      Yeah, throughout the
9     investigation.

10         Q      And as you sit here today, you
11    still believe that?

12         A      Absolutely.

13         Q      And you believe that someone who
14    would volunteer to take a lie detector test
15    would have stolen something?

16         A      At the point of termination, the
17    worst possible punishment, then you come out and
18    say it.  She didn't say that in our first
19    initial conversation with her.

20         Q      I'm just asking you, she
21    volunteered to take a lie detector test, yes or
22    no?

23         A      She did.

24         Q      Do you think she was being
25    dishonest then, as well?

```
                                                    99
1                         Plotkin

2            A      Yes.

3            Q      And I take it as Mr. Sanders'

4     supervisor, Larry's supervisor, that you had

5     knowledge of Ms. Ashdown's overall performance;

6     is that correct?

7            A      Yes.

8            Q      And performance history; is that

9     correct?

10           A      Yes.

11           Q      Had she ever been accused of

12    dishonesty before?

13           A      No, she hadn't.

14           Q      Had she ever been accused of

15    stealing before?

16           A      No, she hadn't.

17           Q      Did you find anything in her

18    record prior to this incident that she is a

19    dishonest person?

20           A      No.

21           Q      Did anyone accuse her of being

22    dishonest?

23           A      No.

24           Q      Had she been given any written

25    warnings?
```

100

1                           Plotkin

2          A      I don't believe so.

3          Q      Had she been given any verbal

4    warnings?

5          A      I don't believe so.

6          Q      And so it's your belief based on

7    your personal knowledge that Ms. Ashdown would

8    have risked ruining her career by stealing $100

9    from Equinox?

10                     MR. McPARTLAND:  Object to

11                the form.

12         A      I don't know why people do the

13   things they do.

14         Q      I'm asking you based on your

15   observation.  You believe she took that risk?

16                     MR. McPARTLAND:  Object to

17                the form.

18         A      I absolutely do believe she took

19   that risk.

20                     I don't know why she did it, but

21   I believe it.

22         Q      And you believe that after she

23   stole money from or stole from Equinox, I guess

24   not money, actual money, but after she stole

25   from Equinox, at some point she was offered a

101

1                         Plotkin

2     position as a personal trainer; is that correct?

3          A     That is correct.

4          Q     And did you support that

5     decision?

6          A     I didn't love it.  But she wasn't

7     in a position any longer where she would be able

8     to steal or manipulate the system, so I didn't

9     think that her behavior would be able to repeat

10    itself.

11         Q     So as a personal trainer, you

12    wouldn't be able to steal?

13         A     Yeah.  I mean, you don't have

14    your codes or anything like that.  You can't go

15    into the computer and manipulate things, so she

16    would never be able to repeat her behavior.

17                         (Letter dated January 9,

18                         2013 to Joseph Matarazzo from The

19                         Harman Firm was marked as

20                         Plaintiff's Exhibit 1 for

21                         identification, as of this date.)

22    BY MR. HARMAN:

23         Q     I'm handing you what has been

24    marked for identification as Plaintiff's Exhibit

25    1.  Please take a look at it.


                    MCM REPORTING SERVICE
                       (516) 775-5209

102
1                        Plotkin

2              This is the January 9th letter

3     from my office to Joseph Matarazzo.

4              Please take a look at it

5     (handing).

6         A     (Perusing document.)  Do you want

7     me to read this whole thing?

8         Q     Have you seen this document

9     before?

10        A     I believe so.

11        Q     And when did you see this

12    document?

13        A     I believe when we first got

14    served with the papers.

15        Q     Well, this document is dated

16    January 9, 2013.

17        A     So then maybe I didn't see this.

18    I thought this was one of the original

19    documents.

20        Q     Do you recall seeing this

21    document in January of 2013?

22        A     I don't know.  I might be getting

23    my documents confused.

24        Q     Did you ever, do you recall

25    receiving a -- by the way, the re: line, this is

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 104 of 214

103

1                       Plotkin

2      a letter, a January 9th letter addressed to

3      Joseph Matarazzo.

4                     The re: line, Kerry

5      Ashdown/Equinox et al.

6                     Prior to being served with the

7      lawsuit, you described that you were at the club

8      that day?

9            A      I believe so.

10           Q      When the lawsuit was served on

11     the Soho location?

12           A      Uh-hum.

13           Q      Prior to being served with the

14     lawsuit, did you ever make any efforts to

15     preserve any information related to Kerry

16     Ashdown?

17           A      I don't remember.

18           Q      So you have no recollection of

19     preserving any documentation?

20           A      I don't.  I don't.

21           Q      Now, you have testified that

22     there are occasions where codes are shared with

23     other employees, correct?

24           A      Usually just --

25           Q      Just please answer my question.

104

1                            Plotkin

2     Are you aware of codes being shared?  Yes or no.

3              A     Yes.

4                         MR. McPARTLAND:  Object to

5                    the form.

6              Q     And there are, in addition to

7     managers at locations, there are also assistant

8     managers, correct?

9              A     Correct.

10             Q     And do assistant managers have

11    their own codes?

12             A     Yes.

13             Q     And isn't it true that there were

14    two personal trainers who were given credit for

15    sessions as part of the Ashdown investigation,

16    correct?

17             A     Correct.

18             Q     And do you recall the names of

19    the personal trainers?

20             A     Offhand, no.

21             Q     Were they terminated?

22             A     No, they were not.

23             Q     Did you believe that those two

24    trainers had engaged in stealing?

25             A     They didn't have the power to

105

1                          Plotkin

2      steal.  If someone put money in their paycheck

3      and they didn't say anything, I don't know if we

4      call that stealing.  Their boss had done it, so

5      they might have just turned a cheek to it and

6      enjoyed the resources that were given to them.

7                    I don't think we would call that

8      stealing.

9                    Anytime your boss gives you money

10     or resources, I don't think you can blame that

11     person that receives it if they don't personally

12     believe that it was theft themselves.

13          Q     I'm not really sure I'm following

14     you, but if someone pulls a session,

15     participates in pulling a session that they did

16     not conduct, is that stealing?

17                    MR. McPARTLAND:  Object to

18                    the form.

19          A     Repeat the question.

20          Q     If a trainer --

21          A     Uh-hum.

22          Q     -- has a session pulled that he

23     did not complete and he knows he didn't complete

24     it, is that stealing?

25                    MR. McPARTLAND:  Object to

MCM REPORTING SERVICE
(516) 775-5209

106

```
1                      Plotkin
2              the form.
3         A      It would be, but the
4    trainer can't pull that session.
5         Q      Please just answer my question.
6                Is it stealing?
7         A      Yes.
8         Q      Did you maintain a file on
9    Ms. Ashdown?
10        A      Did I maintain a file?  I did
11   not.  That would have been Lawrence's job as her
12   general manager.
13        Q      And where would he keep that
14   file?
15        A      In his locked filing cabinet in
16   his office.
17        Q      Did you communicate with Larry by
18   e-mail about Ms. Ashdown?
19        A      I believe I did.
20        Q      And how about by text message?
21        A      No, probably not.  I don't text.
22        Q      So you personally don't have any
23   recollection of any efforts to look for any
24   information about Ms. Ashdown?
25        A      What do you mean?
```

107

1                           Plotkin

2           Q       Well, I asked you if you had ever

3    made any efforts to look for any information

4    about Ms. Ashdown in response to Plaintiff's

5    Exhibit 1, and you said you don't recall.  Okay?

6                   And I just want the record to be

7    clear, have you ever engaged in any efforts to

8    look for any information regarding Ms. Ashdown

9    after, anytime after January 2013?

10          A       You mean to look for e-mails and

11   stuff like that?

12          Q       Anything?

13          A       Our legal team sent me --

14          Q       Please just answer the question.

15          A       There was a point where I did

16   look for e-mails and other communications about

17   her.

18          Q       When did you do that?

19          A       I don't remember exactly, but I

20   did send them to our general counsel.

21          Q       You said you looked for e-mails?

22          A       That's correct.

23          Q       Did you look for anything else?

24          A       E-mails, documents.  I believe

25   just e-mails and documents.

MCM REPORTING SERVICE
(516) 775-5209

108

1                          Plotkin

2          Q        Did you look for anything other

3     than e-mails and documents?

4          A        I do not believe so.

5          Q        Did you look for any information

6     related to this camera that you have testified

7     about?

8          A        No.  And we knew that the camera

9     would have been erased by a certain time.

10         Q        So you didn't look for it?

11         A        We would have liked to have

12    gotten it, but we didn't.

13         Q        Did you look for any information

14    related to the camera?

15         A        No.

16         Q        Did you have any conversations

17    with Mr. Sanders about the camera?

18         A        Yeah.

19         Q        When?

20         A        After we were served?

21         Q        Yes.

22         A        We both said we wish we still had

23    that camera, but it loops and it runs over

24    itself.

25         Q        So earlier you testified that you

109

1                         Plotkin

2      didn't have any conversations with Mr. Sanders

3      after you were served.

4           A      No.  I said we had a particular

5      conversation right after we were served.

6           Q      Okay.

7                  And during that conversation, you

8      discussed the camera, right?

9           A      Yeah.  We discussed a bunch of

10     things.

11          Q      Well, let's talk about what you

12     discussed during that conversation.

13                 So you discussed the camera and

14     you said you wished you still had it?

15          A      Yes.

16          Q      Did you say anything else?

17          A      We just went over this before.

18     We discussed --

19          Q      You didn't mention the camera,

20     sir, when we went over it before.

21                 So what else do you now recall

22     that you discussed that you didn't testify to

23     earlier?

24          A      Memory works in funny ways.  We

25     were both perplexed, as I mentioned before, we

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 111 of 214

110

1                          Plotkin

2       both couldn't believe that she was suing us

3       after stealing from us.

4            Q      I'm asking you what you

5       discussed.  You didn't say you discussed a

6       camera earlier.

7                   Is there anything else that you

8       recall that you discussed that you haven't

9       testified to other than this camera?

10           A      I can't recall anything, but

11      maybe something more will come up.

12           Q      You said you told him you wished

13      you had the camera?

14           A      Sure.

15           Q      What did he say, if anything, in

16      response?

17           A      I don't remember, but I'm pretty

18      sure he agreed with me.

19           Q      You're pretty sure he agreed?

20           A      Yes.

21           Q      Why are you pretty sure?

22           A      Because it was one of those

23      pieces of evidence to us that we were like,

24      "Wow, she was right there at the time, you know,

25      if somebody else was in her office, she would

MCM REPORTING SERVICE
(516) 775-5209

111

1                              Plotkin

2     have seen them."

3                   It made sense that all of these

4     transactions were taking place in her office at

5     her desk using her code and she was right there,

6     it must have been her.

7                   It was a pretty important piece

8     of evidence at the time.

9           Q      So you testified earlier that she

10    had someone else's code, correct?

11          A      I believe so.

12          Q      And you also testified that as a

13    personal trainer she couldn't have stolen

14    anymore, correct?

15          A      Correct.

16          Q      What was your opinion about her

17    returning to work as a personal trainer?

18          A      I wasn't 100 percent for it, but

19    I understood why some of my colleagues wanted it

20    to happen, so I was accepting.

21          Q      What percentage would you place

22    on your support for her returning to work as a

23    personal trainer?

24          A      I was probably 50/50 with it.

25          Q      Who supported that decision?

112

1                          Plotkin

2          A       I believe Lawrence.  I believe

3     Elizabeth Minton.  And that's all I could

4     testify to.

5          Q       So you believe that Larry and

6     Elizabeth supported her returning to work as a

7     personal trainer and you were 50/50 on it?

8          A       Yeah, I believe so.

9          Q       And do you recall having a

10    conversation with Mr. Sanders about Ms. Ashdown

11    returning to work as a personal trainer?

12         A       Convoluted, but I believe I

13    remember some conversation that we had over the

14    phone about it.

15         Q       Tell me, this is a conversation

16    with Larry?

17         A       Yeah.

18         Q       Over the phone?

19         A       Yes.

20         Q       And was this prior to the

21    termination or after the termination?

22         A       After.

23         Q       It was after the termination?

24         A       Yes.

25         Q       Did you have any conversations

113

1                          Plotkin

2     with Larry prior to the termination about

3     Ms. Ashdown remaining on as a personal trainer?

4              A      I do not believe so.

5              Q      And you recall having a

6     conversation with Larry after the termination?

7              A      Yes.

8              Q      Over the phone?

9              A      Yes.

10             Q      More than one conversation or

11    just one?

12             A      I believe just one.

13             Q      What did Larry say to you

14    regarding her returning to work?

15             A      I recall that he wanted her, he

16    wanted, he was very empathetic, you know,

17    towards her and wanted her to be able to still

18    make a living.

19                    I believe he said he did not want

20    her in his club, because it wouldn't be proper

21    after she was a manager there, but perhaps she

22    could be a trainer somewhere else in the

23    company.

24             Q      And what, if anything, did you

25    say in response to that?

114

1                          Plotkin

2          A       I don't remember.  I think I

3     accepted it, I said okay, and we moved on.

4                   I certainly remember I wasn't 100

5     percent for it, but I would support him in that

6     decision.

7                        MR. HARMAN:  I'm sorry,

8                   what was that answer?

9                        (Whereupon, the record was

10                  read back by the reporter.)

11         Q       And did Ms. Minton weigh in on

12    that decision?

13         A       Not that I could testify to, but

14    I believe at some point Lawrence and her had a

15    conversation around it and they both agreed to

16    it.

17         Q       Did you ever have a conversation

18    at all with Ms. Ashdown regarding returning as a

19    personal trainer?

20         A       I do not recall a conversation.

21    After the termination I do not believe we ever

22    spoke to each other.

23         Q       But prior to the termination?

24         A       I do not remember that.

25         Q       During the termination?

MCM REPORTING SERVICE
(516) 775-5209

115

```
 1                          Plotkin
 2           A      I do not remember that.
 3           Q      Would you have told her that she
 4    could return to Equinox as a personal trainer?
 5           A      I probably would not have made
 6    that decision on my own.
 7           Q      I'm asking if you would have told
 8    her that?
 9           A      My answer is no then.
10           Q      So you would not have told her
11    that?
12           A      No.
13                       MR. McPARTLAND:  Just note
14                  my objection to form.
15           Q      And as you sit here today, would
16    you support Ms. Ashdown returning to Equinox as
17    a personal trainer?
18           A      At this point in time?
19           Q      Yes.
20           A      No.
21           Q      Why not?
22           A      Because, once again, she is not
23    taking responsibility for her actions and she's
24    being even more dishonest about other things,
25    and my personal feeling on it is, you know, it's
```

116

1                          Plotkin

2      consistent lies over and over and over again.  I

3      would think even, I would think after what she

4      has been through, she would have learned from it

5      moved on, but being where we are right now, I'm

6      embarrassed for her.  I really am.

7              Q      I'm not asking you about your

8      feelings, you know, whether you are embarrassed.

9              A      You asked me why. I'll tell you

10     my feelings are involved.

11             Q      I'm asking you as a professional.

12             A      As a professional?

13             Q      You said that Larry wanted to

14     invite her to return to work at another location

15     as a personal trainer, okay?

16                    And that you supported that

17     50/50.

18             A      Uh-hum.

19             Q      Okay.

20                    And I'm asking you as you sit

21     here today, has your opinion on that

22     professionally, has that changed?

23                         MR. McPARTLAND:  Object to

24                    the form.

25             A      It hasn't changed about the

117

1                         Plotkin

2     decision back then, but now we generally don't

3     let people come back or hire people that are in

4     lawsuits with us.

5              Q       So you wouldn't hire her because

6     she's in a lawsuit with you?

7              A       It's pretty much company policy.

8              Q       There is a company policy that

9     says you don't hire someone --

10             A       I think so.  I believe so.

11             Q       Why do you believe so?

12             A       I mean, we don't allow members

13    who are suing us to continue being members.

14             Q       I'm not asking about members, I'm

15    asking you about employees.

16             A       I guess I'm making an assumption.

17             Q       So you are assuming that there is

18    a company policy, but you are not sure?

19             A       I'm not sure.

20             Q       You said something about more

21    lies.

22                     What do you mean by more lies?

23             A       It's again, there is a lot of my

24    personal feelings built up in this.  I believe

25    this whole lawsuit is a lie.  She stole, she was

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 119 of 214

118

1                          Plotkin

2      dishonest, and now she's suing us saying we are

3      discriminating against her, and naturally we

4      take that very seriously and it's, for me, it's

5      a bunch of lies and I make it a point not to

6      discriminate against anyone, let alone people

7      that might be ill or sick.

8                   I take it very seriously.

9           Q      Did you know that Ms. Ashdown

10     was ill?

11          A      I do not believe I knew that, no.

12          Q      That never came up in your

13     conversations with Mr. Sanders?

14          A      No.

15          Q      Did that ever come up in your

16     conversations with Ms. Minton?

17          A      No.

18          Q      Did you know that she was

19     undergoing chemotherapy?

20          A      I did not.

21          Q      Did you know that she was

22     undergoing radiation?

23          A      No.

24          Q      Did you look into her employment

25     history?

119

1                              Plotkin

2          A     I did not.

3          Q     Ms. Minton never mentioned to you

4    that she was undergoing treatment for cancer?

5          A     I do not recall anything like

6    that.

7                          (Document Bates stamped

8                          EQX-6359 and EQX-6360 was marked as

9                          Plaintiff's Exhibit 2 for

10                         identification, as of this date.)

11   BY MR. HARMAN:

12         Q     I'm handing you what has been

13   marked as Plaintiff's Exhibit 2.  It's an e-mail

14   chain with Matthew Herbert at the top that

15   begins with an e-mail from Melissa McGregor to

16   Lawrence Sanders and others dated September 2,

17   2011.

18               Please take a look at it

19   (handing).

20         A     Sure. (Perusing document.)

21               MR. McPARTLAND:  Just for

22               clarification on the record, it

23               has Bates stamp Nos. EQX-6359

24               through EQX-6360.

25         Q     It's a two-page document.  The

MCM REPORTING SERVICE
(516) 775-5209

120

1                        Plotkin

2      second page doesn't appear to have much, does

3      not have much text on it other than a phone

4      number and what looks like a web address.

5                       There are two e-mails on the

6      first page.

7                       Tell me when you're ready.

8             A      Okay.  (Perusing document.)

9                    Okay, I'm ready.

10            Q      Drawing your attention to the

11     second e-mail from Larry Sanders to Joe

12     Matarazzo, Elizabeth Minton, David Harris,

13     copied to Matt Plotkin and others.

14                      Did you receive this e-mail?

15            A      Yes, I must have.

16            Q      Did you receive it in September

17     of 2011?

18            A      Yeah, I must have.  I don't

19     remember it.

20            Q      Is the e-mail an accurate

21     description of what took place?

22            A      It must be.

23            Q      You said you looked at, in

24     preparation for this lawsuit that you met with

25     your lawyer five months ago.

MCM REPORTING SERVICE
(516) 775-5209

121

1                          Plotkin

2                   Did you meet with your lawyer at

3      any other time?

4           A      I don't believe so.

5           Q      So you haven't met with Mr.

6      McPartland since five months ago?

7           A      It was about five months ago.

8           Q      You met with him five months ago,

9      correct, approximately?

10          A      Approximately, yes.

11          Q      Have you met with him since then?

12          A      No.

13          Q      Have you met with any of his

14     associates?

15          A      No.

16          Q      Anyone who works with him?

17          A      No.

18          Q      Have you met with the general

19     counsel of Equinox since then?

20          A      Not about this matter.

21          Q      And did you speak with Mr.

22     McPartland on the phone to prepare for your

23     deposition?

24          A      We spoke shortly, just about

25     address, time, stuff like that.

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 123 of 214

122

1                          Plotkin

2          Q         Anything other than general

3     information about address and time?

4                    I mean, I'm asking about the

5     content.

6                    In other words, did you have a

7     substantive conversation with him to prepare for

8     today's deposition over the telephone?

9          A         We discussed some other things

10    and I think they are subject to my client

11    privilege.

12         Q         I understand.

13                   And was anyone else on the phone?

14         A         No.

15         Q         And did you review any documents

16    during those phone conversations?

17         A         I do not believe so.

18         Q         Did you have more than one phone

19    conversation?

20         A         We might have had two.

21         Q         When was the last conversation

22    that you had that was more than just --

23         A         The last conversation was when

24    you guys canceled and I was in front of the

25    building and he called me up and apologized that

123

1                          Plotkin

2      you guys canceled.

3                    Other than that --

4                          MR. McPARTLAND:  None of

5                    our communications other than

6                    that.

7                          That's okay, what you just

8                    said, but nothing that I said to

9                    you or you said to me, okay?

10                         THE WITNESS:  Okay.

11     BY MR. HARMAN:

12           Q      So you had a conversation in

13     front of the building?

14           A      Yeah.

15           Q      How long did that last?

16           A      Three minutes.

17           Q      And prior to that, did you have a

18     phone conversation?

19           A      I believe so.

20           Q      And prior to that, did you have a

21     phone conversation?

22           A      I do not think so.

23           Q      So the conversation that you had

24     before the deposition, before the one that took

25     place in front of the building, how long did

MCM REPORTING SERVICE
(516) 775-5209

124

1                          Plotkin

2     that last?

3            A      I just said, three minutes.

4            Q      You told me the one in front of

5     the building lasted three minutes.  I'm talking

6     about the conversation before that.

7            A      I don't recall exactly.  Maybe

8     five minutes.

9            Q      And during that conversation, did

10    you look at any documents?

11           A      I do not believe so.

12           Q      So we are talking about two phone

13    conversations and an in-person meeting; is that

14    correct?

15           A      I believe so, yes.

16           Q      What do you recall reviewing at

17    Mr. McPartland's office?

18                        MR. McPARTLAND:  Objection.

19                        Asked and answered.

20                        THE WITNESS:  Do I have to

21                answer?

22                        MR. McPARTLAND:  Yes, I'm

23                sorry, you can answer.

24           A      Just what I said before, we

25    reviewed some e-mails and that's, I think that's

MCM REPORTING SERVICE
(516) 775-5209

125

1                       Plotkin

2      all I can remember.

3            Q      Just some e-mails, that's all you

4      remember?

5            A      Yes.

6            Q      Do you remember anything about

7      the e-mails?

8            A      It was various e-mails that went

9      back and forth between various people.  I don't

10     remember them.  I don't even remember seeing

11     this one before.

12           Q      So you don't remember anything

13     about the e-mails that you reviewed?

14           A      Only that they were about this

15     case.

16           Q      And you don't remember reviewing

17     anything else other than e-mails?

18           A      No.

19           Q      Okay.

20                  And how about, you said at some

21     point you were asked to look for information

22     regarding Ms. Ashdown.  And you testified that

23     you looked for e-mails and you testified that

24     you looked for documents, correct?

25           A      Uh-hum.

126

1                              Plotkin

2          Q      Did you look for anything else?

3          A      You asked me that already.

4                 I do not believe so.

5          Q      I have seven hours under the

6    rules to talk to you and sometimes I am going to

7    ask you questions that are similar to questions

8    that I have asked you before.

9                 You are going to have to do your

10   best to answer the questions and we'll move on.

11   My intent is not to harass you, my intent is to

12   gather information, okay?

13         A      Uh-hum.

14         Q      So you looked for e-mails and you

15   looked for documents and you don't recall

16   looking for anything else?

17         A      I do not.

18         Q      And where did you look for

19   e-mails?

20         A      In my old e-mail, sent e-mails,

21   received e-mails.

22         Q      And did you locate anything?

23         A      I did.

24         Q      And what did you do with them?

25         A      I sent them to our general

127

1                          Plotkin

2      counsel.

3            Q      How did you do that?

4            A      I believe I put them all in a

5      file or a couple of files and I forwarded them

6      along.

7            Q      Electronically?

8            A      Uh-hum.

9            Q      So you put them all as part of

10     one e-mail and forwarded the e-mail on to your

11     general counsel?

12           A      I believe it was a few e-mails,

13     but yes.

14           Q      And you said you searched for

15     documents?

16           A      I did.

17           Q      And where did you do that?

18           A      Again, old e-mail files that I

19     have that would have contained documents.  I

20     have my document, which is a couple of folders

21     that I have on our, one of our drives, I looked

22     through that, and I don't believe I found any

23     documents, only e-mails.

24           Q      What drive did you look at?

25           A      I have a drive that I can go to

128

1                              Plotkin

2       any computer at any club and I have all my

3       documents in it.  The drive is called Matthew

4       Plotkin's documents.

5              Q       And that allows you to go to any

6       computer at any club?

7              A       Any of my clubs, yes.

8              Q       And you maintain documents?

9              A       Yes.

10             Q       As part of this investigation,

11      did you generate a document?

12                     In other words, was there an

13      investigation memo?

14             A       The only memo I received was from

15      general counsel saying find documents.  I did

16      not make a memo of any sort.

17             Q       Did Larry make a memo?

18             A       Not that I know of.

19             Q       Did Liz Minton make a memo?

20             A       Not that I know of.

21             Q       Did anyone memorialize this

22      investigation, as far as you know?

23             A       Not that I know of.  Other than

24      general counsel asking us to send us documents,

25      that would be the only memorialization that I

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 130 of 214

```
                                                    129
 1                       Plotkin
 2    know of.
 3               Q      Okay.
 4                      But that was after litigation had
 5    commenced, correct?
 6               A      Yes.
 7               Q      Or after legal issues had been
 8    raised?
 9               A      Yes.
10               Q      Prior to legal issues being
11    raised, are you aware of anyone gathering any
12    information in one spot regarding the Ashdown
13    incident?
14               A      I'm not aware.
15                      MR. McPARTLAND:  Note my
16                      objection to the form.
17               Q      And you didn't gather any
18    information in one spot regarding the Ashdown
19    investigation?
20               A      No.
21               Q      And are you aware of Ms. Minton
22    gathering any information in one spot
23    regarding --
24               A      I am not aware of that.
25               Q      Are you aware of Mr. Sanders
```

130

1                        Plotkin

2      gathering any information?

3              A       No.

4              Q       Do you need to take a break?

5              A       No, I just wanted to get a piece

6      of gum.

7                      Is that okay?

8              Q       Sure.  Drawing your attention

9      back to Plaintiff's Exhibit 2 in front of you,

10     the second e-mail, the second sentence of the

11     second e-mail says, "Matt explained to her that

12     if she would like to be a trainer at another

13     location for her to e-mail me tomorrow."

14                     Do you have any reason to believe

15     that that's inaccurate?

16             A       I do not.  I forgot about it, but

17     I do not.

18             Q       And it says, "She was still stuck

19     on she did not do this.  Basically she feels

20     that Mauro had something to do with it."

21                     Were you aware that she believed

22     Mauro had something to do with it?

23             A       She mentioned it in her

24     termination, yes.

25             Q       But it's your testimony as you

131
                              Plotkin
1

2    sit here today that prior to her termination she

3    never mentioned that Mauro had anything to do

4    with it?

5              A      I don't believe so.  I can't

6    remember.

7                         MR. McPARTLAND:  Objection

8              to form.

9                         MR. HARMAN:  Is there an

10             objection?

11                        MR. McPARTLAND:  Yes,

12             there is an objection to form.

13             Q      When you say you don't believe

14   so, is that "I don't recall" or you are

15   confident that she never mentioned Mauro?

16             A      I don't recall.

17             Q      Did you ever speak with Mauro?

18             A      About this?

19             Q      Yes.

20             A      No.

21             Q      Did you speak with anyone about

22   this, other than Mr. Sanders and the individuals

23   that you have mentioned?

24             A      While we were conducting the

25   investigation?

                        MCM REPORTING SERVICE
                           (516) 775-5209

132

1                          Plotkin

2          Q      Correct.

3          A      Myself and Liz Minton might have

4    had a conversation around it outside of the

5    group, I don't remember the exact content, but

6    that might have happened.

7                 I don't recall exactly when or

8    the content, but mostly it was me and Lawrence

9    and then the whole group together making the

10   final decision.

11         Q      I'm just asking you whether you

12   spoke with any other employee regarding the

13   allegations made against Kerry Ashdown?

14         A      Other than the people on this

15   e-mail, no.

16         Q      Who is Gian Pozzolini, is that

17   who you spoke about earlier?

18         A      Yes, that's my boss.

19         Q      And Melissa McGregor?

20         A      Human resources.

21         Q      When you were conducting your

22   investigation with Mr. Sanders, did Mauro

23   Maietta come up?

24         A      I don't recall.

25         Q      Did you discuss Kerry Ashdown's,

MCM REPORTING SERVICE
(516) 775-5209

133

Plotkin

1

2    Kerry's performance history with Larry?

3        A    I believe we had a discussion

4    that, you know, I'm paraphrasing actually, it's

5    over two years ago, that there was not

6    necessarily anything wrong with her performance,

7    that this is an unfortunate situation, and it

8    was a choice that she made and it was outside of

9    her performance.

10        Q    What do you mean "outside of her

11    performance"?

12        A    I mean, you have, you know, two

13    separate things, you have an employee's

14    performance and then their integrity and how

15    they make choices in the workplace.

16        You can have great performance or

17    mediocre performance and lack the integrity and

18    make poor choices.

19        They are two separate things that

20    sometimes you have to separate.

21        Q    Do you have any professional

22    opinion about Ms. Ashdown's performance leading

23    up to the investigation?

24        A    Yeah.  I mean, honestly, when we

25    first hired her, we were very excited.  We

MCM REPORTING SERVICE
(516) 775-5209

134

1                              Plotkin

2     thought her performance was great, she blew me

3     away in the interview.  We look for talent, we

4     love talent.

5                      Losing her was, we can't find

6     great people.  Our people are our currency, they

7     are our commodity.  The fact that we had to

8     terminate her hurt us.

9                      Her performance was, well, she

10    had a couple of hiccups in there, I'm not saying

11    she was amazing and hit every single month, but

12    I believe, if I can remember correctly, her

13    performance, she did well, she was doing okay.

14           Q      What were her hiccups?

15           A      I don't recall exactly.  She

16    didn't hit every month, she didn't hit her goals

17    every month.

18                      She did have a situation where

19    she was, I can't recall all the details

20    perfectly, whether she was fraternizing with

21    some of the employees and going out with them

22    and spending time outside of work with her

23    employees and we got some complaints from some

24    other of her employees about favoritism, which I

25    believe Lawrence and Elizabeth Minton spoke to

MCM REPORTING SERVICE
(516) 775-5209

135

1                         Plotkin

2   her about.  I was not involved with that.

3                    Other than that though, she was

4   not a poor performer.

5          Q      Is there a company policy

6   against, you used the word "fraternizing."

7                    I'm not really sure what that

8   means.

9                    Why don't you tell me what

10  fraternizing means?

11         A      To me it means spending time

12  outside of work with employees that you manage

13  in a friendly setting and which might lead to,

14  in certain situations, a more than friendly

15  relationship.

16                   So, you know, allegations I

17  believe from other employees were that she had

18  strong relationships with certain employees and

19  maybe even a romantic relationship with another

20  employee and that they accused her of favoritism

21  and favoring certain employees.

22         Q      So it's your testimony that she

23  was accused of maybe having a romantic

24  relationship with another employee?

25         A      If I remember correctly, yes.

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 137 of 214

136
```
 1                        Plotkin
 2            Q       Is that against company policy?
 3            A       Yes.
 4            Q       What's the company policy with
 5    respect to romantic relationships?
 6            A       I don't know it for word for
 7    word, but we are not to have romantic
 8    relationships with our subordinates.
 9            Q       That's a company policy?
10            A       It's not word for word, but, yes,
11    in and around that.
12            Q       What does romantic relationship
13    mean?
14            A       Good question.
15                    Meaning anything where the
16    employee exceeds or crosses over the line of
17    just a normal work relationship or perhaps a
18    normal friendship.
19            Q       I don't know what normal
20    friendship means.  You have to tell me.  It's
21    your company, your company policy.
22                    So the company has a policy that
23    prohibits romantic relationships between a
24    supervisor and someone who is being supervised
25    by that person?
```

137
1                           Plotkin

2          A      Correct.

3          Q      And what is a romantic

4    relationship under the company's policies?

5          A      Under the company policy, it

6    might entail those two people having a physical

7    relationship of some sort.  I think that's the

8    extent of it.

9                 I would have to check our

10   employee handbook and bylaws, but generally when

11   that happens, it comes out in the workplace and

12   it affects things.  People find out about it and

13   they accuse you of favoritism.

14                Now, this was just an accusation.

15   I'm not saying it actually happened.  And this

16   was one of the hiccups perhaps in Kerry's

17   performance, but she was spoken to about this

18   and we moved on, we moved past it.

19         Q      How do you know that she was

20   spoken to?

21         A      I was told by Lawrence and

22   Elizabeth Minton that they spoke to her about

23   this.

24         Q      About accusations of a romantic

25   relationship?

```
                                                           138
 1                       Plotkin

 2          A       Right.

 3          Q       And do you recall what the

 4   response was?

 5          A       I don't.

 6          Q       And have you ever given anyone a

 7   verbal warning for engaging in a romantic

 8   relationship?

 9          A       I have terminated people for

10   doing it.  I don't remember a verbal warning.

11          Q       You have terminated someone for

12   being involved in a romantic relationship?

13          A       Uh-hum.

14          Q       Who did you terminate for being

15   in a romantic relationship?

16          A       It was a general manager at the

17   time and he was in a relationship with someone

18   on staff.

19          Q       Who did you terminate?

20          A       His name was ███████ McBride.  He

21   was one of our general managers.

22          Q       For what location?

23          A       92nd Street.

24          Q       And he was involved in a romantic

25   relationship with someone he supervised?
```

MCM REPORTING SERVICE
(516) 775-5209

139
```
 1                     Plotkin

 2          A      If I can remember, it was more

 3     than one.  It was multiple.

 4          Q      So he had romantic relationships

 5     with more than one employee that he supervised?

 6          A      Yes.

 7          Q      And you terminated him for what

 8     exactly?

 9          A      For breaking our employee

10     romantic relationship rule, I forgot the exact

11     wording, where a supervisor cannot romantically

12     be involved with another employee, and I believe

13     one after the employee, after the relationship

14     stopped and he started dating someone else on

15     staff, I believe one of them said she was being

16     sexually harassed by him, so I believe we

17     terminated him for both sexual harassment and

18     having a romantic relationship.

19          Q      So Mr. McBride was accused of

20     sexual harassment?

21          A      I believe so, yes.

22          Q      Prior to his termination?

23          A      Yes.

24          Q      Was Ms. Ashdown investigated for

25     being in a romantic relationship?
```

MCM REPORTING SERVICE
(516) 775-5209

140

1                         Plotkin

2         A      I don't remember.  I don't know

3    how serious we took it at the time.

4              I know she was approached about

5    it, spoken to about it, and also, you know, I

6    remember that they spoke to her about a group of

7    trainers, that she was just getting really close

8    with, as well, and another group of trainers

9    thought that she was favoring.

10             I wasn't involved in the

11   conversation, so I do not have a detailed memory

12   of it.

13                  (Whereupon, at 1:05 p.m., a

14                  luncheon recess was taken.)

15

16

17

18

19

20

21

22

23

24

25

141

```
 1                         Plotkin

 2                  AFTERNOON SESSION

 3                      October 8, 2013

 4                      1:40 p.m.

 5    M A T T H E W     P L O T K I N, resumed and

 6         testified further as follows:

 7                         MR. HARMAN:  Back on the

 8              record.

 9    CONTINUED EXAMINATION

10    BY MR. HARMAN:

11         Q      Mr. Plotkin, during the break did

12    you discuss your testimony with anyone?

13         A      No.

14         Q      And have you discussed this

15    lawsuit with anyone outside of work?

16         A      I believe I told my wife that I

17    had to go to a deposition today.

18         Q      What did you say to her?

19         A      I said I had to go to a

20    deposition today, don't try to call me, I'll be

21    busy.

22                    She asked me some questions, I

23    said "I can't answer," and that was pretty much

24    that.

25         Q      Have you had any other
```

MCM REPORTING SERVICE
(516) 775-5209

142

1                           Plotkin

2      discussions with your wife about the lawsuit?

3              A       No.

4              Q       How about with anyone else?

5              A       No.

6              Q       You haven't had any discussions

7      about the lawsuit with any of your family

8      members?

9              A       No.

10             Q       With any of your friends?

11             A       No.

12             Q       You testified earlier that as

13     part of that investigation that you conducted

14     with Mr. Sanders that you had observed Ms.

15     Ashdown on the premises on a camera; is that

16     correct?

17             A       That's correct.

18             Q       And in your mind that was at the

19     same time that she had stolen things?

20             A       Correct.

21             Q       Was that the only time that she

22     had stolen something?

23             A       To my knowledge, yes.

24             Q       Did you investigate as to whether

25     she had stolen something on any other occasion?

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 144 of 214

143

                              Plotkin

1

2          A      I cannot remember.  I only

3     remember that occasion.

4          Q      But it was clear in your mind

5     that she had stolen something at that particular

6     moment?

7          A      Yes.

8          Q      And did you investigate anyone

9     else for stealing at that particular time?

10          A      Not that I can remember.

11          Q      Do you recall what documents you

12     reviewed, if any, as part of your investigation?

13          A      There was a document that was

14     printed out by IT that showed what vouchers were

15     reinstated, then pulled and at what time, I

16     believe, it happened and which user pulled them.

17          Q      Anything else?

18          A      That's all I can remember.

19                         (A document Bates stamped

20                         EQX-6397 through EQX-6399 was

21                         marked as Plaintiff's Exhibit 3 for

22                         identification, as of this date.)

23     BY MR. HARMAN:

24          Q      I'm handing you what has been

25     marked as Plaintiff's Exhibit 3 (handing).

144

```
 1                       Plotkin
 2                 Please take a look at it.
 3        A       (Perusing document.)
 4                 MR. HARMAN:  For the
 5                 record, this is a two-page -- I'm
 6                 sorry, it's a three-page
 7                 document.  It's Bates stamped
 8                 EQX-6397 to 6399.
 9                      The first page has a title
10                 "New Record" on it.
11                      Okay.
12    BY MR. HARMAN:
13        Q       Do you recognize this document?
14        A       I have never seen it in this
15    format.  It's usually up on a computer screen
16    and it's our EAF system.
17        Q       Did you make the decision to
18    terminate Kerry, Kerry Ashdown?
19        A       I made it with a group of people.
20        Q       So you have seen this up on a
21    computer screen; is that correct?
22        A       This is the system we use on a
23    computer screen.  Lawrence filled this out, I
24    did not help him fill this out.
25                 I did not see this particular
```

145

1                          Plotkin

2     termination EAF on a computer screen, no.

3              Q      So it's your testimony that

4     Lawrence filled this out?

5              A      Yes, to my knowledge.

6              Q      And you did not help him fill

7     this out?

8              A      Yes, to my knowledge.

9              Q      Is there anything on here that

10    would be in your mind inaccurate?

11             A      Let me read through it again.

12    (Perusing document.)

13                    It looks to be accurate.

14             Q      Do you believe that anything is

15    missing from this?

16             A      I do not.

17             Q      And you have testified to looking

18    at, with Mr. Sanders, looking at a camera.

19                    How many meetings did you have

20    with Mr. Sanders, Larry, Lawrence?

21             A      When we looked at the camera?

22    One.

23             Q      And how many meetings did you

24    have with Lawrence regarding the investigation?

25             A      I can't recall exactly.  It was

MCM REPORTING SERVICE
(516) 775-5209

146

Plotkin

1    mostly that one where we looked at the camera

2    and we discussed it.

3           We might have had some

4    conversations over the phone, as well, before we

5    all got on the phone together.

6       Q    How long did the meeting take

7    place where you met with Mr. Sanders?

8       A    Again, probably less than an

9    hour, more than 15 minutes.

10      Q    And during that meeting, what

11   portion of the meeting was spent looking at the

12   camera?

13      A    I can't tell you for sure.

14   Probably the greater part of that meeting.

15      Q    And other than that meeting, can

16   you recall sitting down with him at any other

17   time as part of your investigation?

18      A    No.  We probably did some over

19   the phone though.

20      Q    I understand you spoke over the

21   phone.

22           I'm talking about in person.

23      A    Just when we questioned Kerry

24   outside of that.

147

1                          Plotkin

2          Q      You recall looking at one camera?

3          A      Uh-hum.

4          Q      Did you look at anything else

5    that day, during that meeting with Lawrence?

6          A      I believe we looked at the

7    computer-generated sheet when all the sessions

8    were pulled as well.

9          Q      And did you look at anything

10   else?

11         A      Not that I know of.

12         Q      So you looked at the camera and

13   you looked at the computer-generated sheet and

14   you don't recall looking at anything else?

15         A      No.

16         Q      And did you speak with anyone

17   else that day?

18         A      Not that I can recall.

19         Q      Did that happen to be a day where

20   you were at the Soho location for the day?

21         A      I don't remember how long I was

22   there.  I'm sorry.

23         Q      And do you recall, as you sit

24   here do you recall the names of anyone else who

25   was involved in the pulled sessions

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 149 of 214

148

1                        Plotkin

2    investigation?

3         A     Other than the trainers here?

4    No.

5         Q     Well, I'm asking you.

6         A     I don't -- nobody else was

7    involved, to my knowledge, other than the people

8    that are written here, the trainers that the

9    sessions were actually pulled for.

10        Q     Who are those people?

11        A     I forgot their names, but this

12   refreshed me.

13              One of them was named Ryan.

14        Q     Anybody else?

15        A     (Perusing document.)  A trainer

16   named Bobby.

17        Q     And did you speak with Ryan?

18        A     I did not.

19        Q     And did you speak with Bobby?

20        A     I did not.

21        Q     Is it your testimony that these

22   sessions were all pulled under Ms. Ashdown's

23   code?

24        A     All but Bobby's sessions, which

25   were pulled under our MITs code at the time.

149

1                          Plotkin

2          Q       What is MIT?

3          A       Manager in training.

4          Q       And who is the manager in

5   training?

6          A       I forgot her name.

7                  I forgot her name.

8          Q       And did you speak with her?

9          A       No, Lawrence and Liz spoke with

10  her.

11         Q       And what was the outcome of that

12  conversation?

13         A       They all said they knew nothing

14  about, the trainers said they knew nothing about

15  it, although their paychecks reflected more

16  income than it should have.

17                 I believe one of the trainers hit

18  a bonus threshold because of the extra sessions

19  pulled.  So it's hundreds of dollars different,

20  and that trainer never came forward and said,

21  "You guys paid me too much.  Somebody pulled

22  sessions for a person that I never trained.

23  Wait, there's a mistake."

24         Q       So were those trainers

25  disciplined?

MCM REPORTING SERVICE
(516) 775-5209

150

                              Plotkin

1

2        A        They were not.  To my knowledge,

3    they were not.

4        Q        And how about the manager in

5    training, whose code was used, she like Ms.

6    Ashdown denied any knowledge of her code being

7    used, correct?

8        A        Correct.

9        Q        And was she investigated?

10       A        I believe they did investigate

11   her, yes.

12       Q        How do you believe that?

13       A        They told me they did.  They

14   looked at when she was in the club, they spoke

15   with her.  We knew that Kerry had access to her

16   code, but she did not have access to Kerry's

17   code.

18                Therefore, you know --

19       Q        How did you know that?

20       A        Well, Kerry told us that she had

21   access to her code when we sat down with her,

22   and she told us that she didn't have access to

23   Kerry's code.

24                Again, when we looked at the

25   camera, she was no where near the office when

151

1                            Plotkin

2      this took place.

3              Q      What is this woman's name?

4              A      I forgot.  I remember her

5      nickname, it was Corky.

6              Q      What did she look like?

7              A      Kind of dirty blond hair, spunky

8      gal, pleasant.

9              Q      So you were able to determine in

10     this meeting that took place less than a hour

11     but more than 15 minutes, that Spunky was no

12     near anyplace where she could have stolen from

13     Equinox?

14             A      At the time that it was stolen,

15     correct.

16                        MR. McPARTLAND:  Note my

17                    objection to the form.

18             Q      And you don't believe that Spunky

19     stole anything?

20             A      I do not.

21             Q      And that is based on your review

22     of this camera with Lawrence?

23             A      That's correct.

24             Q      And did you discuss the camera

25     with anyone?

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 153 of 214

152

1                         Plotkin

2          A       I believe when we all got on the

3    phone together and had a conversation, me and

4    Lawrence discussed it with them, yes.

5          Q       And you have since discussed the

6    camera with Lawrence?

7          A       When we were looking at the

8    camera, sure.

9          Q       And then after that you discussed

10   it?

11         A       We must have.  We must have.

12                 And we did with, you know, with

13   the group, as well, before we made the decision

14   to go ahead and terminate her.

15         Q       Tell me how the camera was

16   discussed in the group.

17         A       I don't remember.  It was just

18   one of the pieces of evidence.  I don't remember

19   the whole conversation.

20         Q       And since you had the group

21   discussion, you have discussed the camera with

22   Lawrence, right?

23         A       I don't remember.

24         Q       You don't remember?

25         A       No.

153
1                           Plotkin
2           Q       But in your mind it's a key piece
3     of evidence, correct?
4           A       Yeah.
5           Q       It was pretty important?
6           A       Yes.
7           Q       And you wish you still had that
8     camera?
9           A       Yes.
10          Q       Because that would prove that Ms.
11    Ashdown was a liar?
12                       MR. McPARTLAND:  Object to
13                  the form.
14          A       To me, if we didn't have the
15    camera, too, everything points to her as well.
16    It's key, but everything is still pointing.
17          Q       Well, you've spoken a lot about
18    the camera today and you told me that you
19    discussed with Lawrence that you wished you
20    still had it, right?
21          A       Yeah, sure.
22          Q       Because that would have been
23    helpful to prove that in your mind that she's
24    still lying, right?
25          A       Not to terminate her, but for

                    MCM REPORTING SERVICE
                       (516) 775-5209

154

1                              Plotkin

2       here, yeah.

3              Q       You believe she was a liar?

4              A       Yeah.

5              Q       And did you believe that she was

6       a liar at the time that you asked her to come

7       back as a personal trainer?

8              A       I did, I did.  I believe she was

9       lying to save herself, yeah.

10             Q       What is your educational

11      background?

12             A       I graduated Kingsborough

13      Community College and then I graduated from

14      Hunter College with a bachelor's of science in

15      physical education.

16             Q       And do you have any other

17      degrees?

18             A       No.

19             Q       And how about any training

20      certificates related to your work?

21             A       I was a certified personal

22      trainer for a while, CPR certified.

23             Q       Anything else?

24             A       No.

25             Q       Do you have any degrees in human

155

1                          Plotkin

2       resources?

3               A       No, I do not.

4               Q       Have you ever attended any

5       classes in human resources?

6               A       No, I have not.

7               Q       Have you taken any classes in

8       personnel management?

9               A       Some that the company has

10      provided.

11              Q       Other than what the company has

12      provided, have you taken any classes?

13              A       No.

14              Q       Have you ever been disciplined at

15      Equinox?

16              A       No.

17              Q       Have you ever been given a verbal

18      warning?

19              A       No.

20              Q       What classes has Equinox provided

21      for you?

22              A       We have had management training,

23      leadership training, sales training, financials,

24      training on how to read the financials, and when

25      I was a personal trainer, we had training, you

156

1                          Plotkin

2     know, on how to be a personal trainer.

3          Q      You said you were aware of people

4     having possession of other people's log-in

5     codes.

6                  Tell me about your awareness of

7     that.

8                  Other than what we have discussed

9     today with Ms. Ashdown and Spunky or whatever

10    her name is, who else has someone else's code?

11         A      Sometimes a supervisor might have

12    a subordinate's code.

13         Q      So that's not uncommon?

14         A      That's not uncommon.

15         Q      Give me examples of a supervisor

16    having a subordinate's code.

17         A      Like Kerry might have been given

18    the code of her MIT.

19         Q      Whose name is?

20         A      Corky is what we called her.  I'm

21    sorry that I don't know her real name.

22         Q      I apologize, Corky.

23                What is her name?  Because we do

24    know her name.  I think it's just more

25    appropriate to find out what her name is.

157

```
 1                         Plotkin

 2                    MR. McPARTLAND:  Cornelia

 3             Hobbie.

 4        Q      Cornelia, Ms. Hobbie, does that

 5    refresh your recollection?

 6        A      Yes, it does.  Thank you.

 7        Q      So other than what took place

 8    with Ms. Hobbie and Ms. Ashdown, can you think

 9    of other examples where supervisors had their

10    subordinates --

11        A      Yeah, it might happen,

12    particularly if the subordinate doesn't have a

13    computer and IT can't send the code to them

14    directly, the supervisor would get it and give

15    it to them.

16        Q      And that would be typical of a

17    manager in training, correct?

18        A      Yeah, I think so.

19        Q      The manager in training might not

20    have a place to sit yet or might be moving from

21    club to club during the training process,

22    correct?

23        A      Correct.

24        Q      And they might not ever be given

25    a station until they land in a permanent spot,
```

158

```
1                        Plotkin
2    correct?
3            A      Correct.
4            Q      So there might be many instances,
5    more than one instance where a supervisor would
6    have a subordinate's pass code or access code?
7            A      I think that's fair to say.
8            Q      What's the Equinox professional
9    term for the code?
10           A      Cashier code.
11           Q      Cashier code.
12                  So then is it fair to say that
13   there is nothing inappropriate about having a
14   subordinate's cashier code?
15           A      You should have it and give it to
16   them and then you shouldn't use it, you should
17   use yours.  Once you use it --
18           Q      Did Ms. Ashdown tell you that she
19   had used her subordinate's cashier code?
20           A      No, she didn't.
21           Q      And all she told you is that she
22   had it, correct?
23           A      Correct.
24           Q      And you have just told me that
25   that's not uncommon in that situation?
```

159

1                          Plotkin

2          A      Correct.

3          Q      And that Cornelia Hobbie was, in

4    fact, a manager in training, correct?

5          A      Correct.

6          Q      And you never sat down with Ms.

7    Hobbie and asked her about whether she had used

8    her code to pull any of these sessions?

9          A      I did not.

10          Q      Who did sit down with her?

11          A      I believe Lawrence and Elizabeth

12    Minton.

13          Q      Do you know that Lawrence and

14    Elizabeth Minton sat down with her?

15          A      They told me they did, and I

16    believe their word.

17          Q      And she denied that she pulled

18    the sessions, correct?

19          A      That's correct.

20          Q      And you looked for her on this

21    camera and you didn't see her, correct?

22          A      That's correct.

23          Q      Was it her day off, too?

24          A      I don't remember.

25          Q      But you're confident it was

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 161 of 214

160

1                          Plotkin

2     Mauro's day off?

3          A     Yes.

4          Q     Are you and Mauro friendly?

5          A     Only business.

6          Q     Do you ever socialize with him

7     outside of work?

8          A     No.

9          Q     When is the last time you spoke

10    with him?

11         A     I think I saw him last week in

12    the club.

13         Q     And did this lawsuit come up?

14         A     No.

15         Q     Have you ever spoken with him

16    about this lawsuit?

17         A     Maybe when we first got served.

18         Q     Let's talk about that

19    conversation.

20               When did that conversation take

21    place?

22         A     Whenever the date was that we got

23    served.  I don't remember what the exact

24    conversation was around it.

25               And I don't remember what was

161

1                        Plotkin

2    conversed, but it's very possible that we had

3    some conversations.

4              Q      Why do you say that?

5              A      I was at the club at the time.  I

6    remember him being there.

7                    And that's the extent to my

8    memory.

9              Q      How is it that you recall that it

10   was Mauro's day off?

11             A      Two reasons.  One, generally

12   speaking, the way we set up the management

13   schedule is the personal training manager works

14   on Saturday and the fitness manager is off, and

15   the fitness manager works on Sunday and the

16   personal training manager is off.

17                   They take turns having a day off

18   and working in the club by themselves in that

19   department.

20                   So that particular day Mauro

21   would have been off.  We didn't see him on the

22   camera and I believe Lawrence checked the

23   schedule and he did have the day off.

24             Q      Why do you believe that Lawrence

25   checked the schedule?

162

```
 1                        Plotkin

 2          A      I believe he told me that.

 3          Q      And you believe this was one of

 4   those Saturdays or Sundays?

 5          A      Yes.

 6          Q      Why do you believe that?

 7          A      I remember it being one of the

 8   facts of the case.

 9                        (A one-page document Bates

10                        stamped EQX-6400 was marked as

11                        Plaintiff's Exhibit 4 for

12                        identification, as of this date.)

13   BY MR. HARMAN:

14          Q      There is nothing that prevents a

15   manager from coming and going from a club at

16   their leisure, correct?

17          A      Correct.

18          Q      I'm handing you what has been

19   marked as Plaintiff's Exhibit 4.

20                        Please take a look at it

21   (handing).

22          A      (Perusing document.)

23                        MR. HARMAN:  For the

24                        record, this is a document

25                        entitled "Confidential,
```

MCM REPORTING SERVICE
(516) 775-5209

163

1          Plotkin

2          Attorneys' Eyes Only."  It's a

3          spreadsheet with a Bates stamp

4          EQX-6400.

5                This is the unredacted

6          version that the attorneys have

7          agreed will only be used for the

8          purposes of this litigation.

9                Okay.

10   BY MR. HARMAN:

11          Q     Do you recognize this document?

12          A     I do.

13          Q     What is it?

14          A     This was the document that we

15   looked at that IT generated for us that showed

16   the sessions being reinstated and pulled.

17          Q     And do you understand the content

18   of this document?

19          A     It's hard to read, but for the

20   most part, yes.

21          Q     Other than it could be brighter,

22   and we can always print out a better version of

23   it if that would be helpful, but other than

24   that, do you understand what the categories of

25   information mean?

164

1                         Plotkin

2          A      For the most part, yes.

3          Q      But do you believe that this is

4    the document that you used as part of your

5    investigation?

6          A      Yes.

7          Q      So when you testified that you

8    reviewed a camera and you reviewed a document

9    with Lawrence during that meeting that day, that

10   this was the document that you reviewed?

11         A      Yes.

12         Q      And tell me what you believe this

13   shows Ms. Ashdown did with respect to stealing.

14         A      Focus your attention on the

15   sessions in the third column that say "used."

16                So those sessions were pulled for

17   someone to get paid for and they should not have

18   been pulled.

19                So you can see the first grouping

20   were pulled by Cornelia Hobbie, the bottom

21   grouping were pulled by Kerry.

22         Q      So the bottom, you're talking

23   about the, there is a section, if you look at

24   the third line, right, the third column rather,

25   and you go one, two, three, four, five, six,

165

1                          Plotkin

2      seven, eight, nine down, it begins "three used"?

3              A       Correct.

4              Q       Is that what you're talking

5      about?

6              A       Yes.

7              Q       And then there is one, two,

8      three, four, five, six, seven, eight, nine, ten,

9      eleven, there is twelve of those?

10             A       And then five more on the bottom.

11             Q       And then five more on the bottom.

12                     What is your understanding of

13     that column, of those entries in that column

14     rather?

15             A       Those sessions were marked or

16     pulled to be paid to the trainer where it says

17     "performed by," on the one, two, three, four,

18     five, six, seventh, I'm sorry, eighth column,

19     those sessions were now pulled or marked to pay

20     those trainers for the services, marked to pay

21     the person where it says "performed," the

22     commission for services, and we found out these

23     services were never rendered.

24             Q       So when you say the eighth

25     column, do you mean "entered by"?

166

1                            Plotkin

2            A      No, I mean "performed by."  Those

3     would be the trainers who would get paid for the

4     services, who actually pulled them.

5            Q      And I asked you what about this

6     indicated that Ms. Ashdown had stolen something

7     and you said that these first, this first

8     section of used entries in the third column

9     indicated that Ms. Ashdown had stolen something,

10    correct?

11           A      Yes.  And the bottom five.

12           Q      And the bottom five.

13                  So the first twelve and the

14    bottom five?

15           A      Yes.

16           Q      And if you go to the column that

17    says "entered by," the first twelve were entered

18    by Cornelia Hobbie, correct?

19           A      Correct.

20           Q      Because that's what this sheet

21    shows, correct?

22           A      Correct.

23           Q      And the bottom five show they

24    were entered by Kerry Ashdown?

25           A      Correct.


                      MCM REPORTING SERVICE
                        (516) 775-5209

167

                              Plotkin
1

2          Q      Correct?

3          A      Yes.

4          Q      And if you go to, just sticking

5    with, I'm just sticking with your numbers.

6                 The fourth column says

7    "performance date"?

8          A      Uh-hum.

9          Q      What does that mean?

10         A      That's actually when the sessions

11   were performed or supposedly performed,

12   allegedly performed.

13         Q      And then what is the second

14   column -- I'm sorry -- what is next column over,

15   so that would be the fifth column, what does

16   that mean?

17         A      "Created date," let's see.

18                I'm not exactly sure.

19         Q      And then the next column over,

20   what does that mean?

21         A      That's the expiration date of the

22   sessions.  All of our sessions have a designated

23   expiration date.

24         Q      So you are not certain what

25   this --

                    MCM REPORTING SERVICE
                       (516) 775-5209

168

1                          Plotkin

2          A       "Created date" is, no.

3          Q       And the "perform date" would have

4    been when this session was performed?

5          A       Yes.

6          Q       Is there anything on this chart

7    that indicates when the sessions were pulled?

8          A       (Perusing document.)   The perform

9    date.

10         Q       How does that indicate when the

11   sessions were pulled?

12         A       When you pull the session, that

13   turns out to be, if a member goes up to the desk

14   and says, "Hey, I did a session," and you pull

15   the session for that particular member with a

16   trainer, the perform date is the exact time the

17   session was pulled.

18         Q       So the performed date is always

19   the same time the session is pulled?

20         A       To my knowledge, yes.

21         Q       So what did this, what does this

22   fourth column indicate?  Does this fourth column

23   indicate in your mind that that's when the

24   individual session was pulled by Ms. Ashdown?

25         A       Yes.


                     MCM REPORTING SERVICE
                        (516) 775-5209

169

1                          Plotkin

2          Q       So starting with the three used

3     in the third column, it's your belief that Ms.

4     Ashdown at 2:12 on 8/13 pulled sessions, three?

5          A       That's correct.

6          Q       And going down a few lines, that

7     on July 30th at 10:13 in the morning that she

8     pulled sessions?

9          A       That's correct.

10         Q       And that going down, within the

11    same column, that on July 16th at 12:33 p.m. she

12    pulled sessions?

13         A       That's correct.

14         Q       And that on 8/13/11 at 10:53 a.m.

15    that she pulled sessions?

16         A       That's correct.

17         Q       And that on 11/16 at 12:33 p.m.

18    that she pulled sessions?

19         A       I don't see 11/16.

20         Q       I'm sorry, 7/16.

21         A       At 12:33, yup, correct.

22         Q       Just give me a few minutes.  If

23    you want to use the restroom, but I just need a

24    few minutes.

25                 I'm not quite ready to wrap up.

170

```
 1                      Plotkin

 2   But give me a few minutes.

 3                      (Whereupon, at 2:19 p.m., a

 4                 recess was taken.)

 5                      (Whereupon, at 2:21 p.m.,

 6                 the deposition resumed with all

 7                 parties present.)

 8                      MR. HARMAN:  Back on the

 9                 record.

10   BY MR. HARMAN:

11        Q     Who was Ms. Ashdown's direct

12   supervisor?

13        A     Lawrence Sanders.

14        Q     And other than what you have

15   testified to, did you ever discuss any problems

16   with her performance?

17        A     No, not that I can remember.

18        Q     Did he ever tell you that she

19   yelled at anyone?

20        A     Not that I can remember.

21        Q     How about Mauro Maietta, have you

22   ever heard any reports about his performance

23   issues?

24        A     No.

25        Q     What is your overall
```

171

1                            Plotkin

2     understanding of his performance?

3          A     Mauro has an impeccable service

4     record with the company.  He worked at another

5     one of my clubs prior to going to Soho as a

6     fitness manager, solid performer.

7          Q     Did Ms. Ashdown ever accuse Mauro

8     Maietta of any misconduct?

9          A     Not that I can remember.

10          Q     Were you ever told that Ms.

11    Ashdown accused Mr. Maietta of any misconduct?

12          A     Not that I can recall, no.

13          Q     Is that the kind of information

14    that you would want to know?

15          A     Always, sure.

16          Q     But you weren't told?

17          A     Not that I can recall, no.

18          Q     If one of your managers at a club

19    accused another manager of making up a fake

20    e-mail address regarding a scheduling issue, is

21    that something that you would want to know

22    about?

23          A     That's pretty vague, but, yes.

24          Q     Dishonesty is what I'm talking

25    about.

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 173 of 214

172

                         Plotkin

1

2          A       Absolutely.

3          Q       If one manager accused another

4    manager of a dishonest act, I'm not trying to

5    trick you, I really am not, I'm just saying it

6    seems like to me that your overall job is to

7    make sure that the general managers of the clubs

8    are doing the best job they can to manage the

9    clubs that they manage and part of that is

10   dealing with overseeing a lot of people.

11         A       Agreed.

12         Q       And that dishonesty in the

13   workplace is not tolerated.

14         A       Agreed.

15         Q       And that there are varying levels

16   of dishonesty in the workplace and some give

17   rise to termination, correct?

18         A       Agreed.

19         Q       Some might give rise to

20   discipline, some might just be insignificant.

21         A       Agreed.

22         Q       Like don't take a pen anymore, go

23   buy your own pen?

24         A       Agreed.

25         Q       But if a manager had accused

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 174 of 214

173

Plotkin

1    another manager of a dishonest act involving

2    regular work duties, not a pen, but something

3    that was important enough that it would have

4    impacted other people, would you want to know

5    about it?

6    

7            A       Yes.

8            Q       And do you think that that person

9    should be spoken to?

10           A       Yes.

11           Q       And if there was a way to

12   investigate that allegation, do you think that

13   allegation should be investigated?

14           A       Yes.

15           Q       Did Ms. Ashdown supervise anyone?

16           A       She was Mauro's supervisor, and

17   the rest of the trainers in the group, probably

18   about 30 personal trainers.

19           Q       And as Mauro's supervisor, would

20   she have had the final say, for example, in a

21   decision about scheduling?

22           A       For the most part, yeah, unless

23   it was totally outlandish and then the general

24   manager might step in.

25           Q       Of course, I agree with that, if

174

1                          Plotkin

2     it was something out of the ordinary.

3                    But, in general, on a day-to-day

4     scheduling issue, what trainers should be

5     scheduled or what program should be implemented,

6     as part of their relationship, would Ms. Ashdown

7     have had the final say in a routine scheduling

8     matter?

9              A     Yes.

10                   MR. McPARTLAND:  Note my

11                   objection to form.

12             A     Yes.

13             Q     Does the fitness manager play any

14    role in hiring personal trainers?

15             A     Sure.

16             Q     And does a fitness manager have

17    to sign off on the hiring of a personal manager?

18                   MR. McPARTLAND:  Object to

19                   the form.

20                   You can answer.

21                   THE WITNESS:  Can I

22                   answer?

23                   MR. McPARTLAND:  You can

24                   answer, yes.

25             A     I would say they should both

MCM REPORTING SERVICE
(516) 775-5209

175

Plotkin

1   agree.  Our general structure is personal

2   training manager and fitness manager both agree

3   on a hire before they go ahead and hire.

4                I would say that the personal

5   training manager and the fitness manager both

6   agree on the hiring and then they go ahead and

7   hire.

8                If one of them doesn't agree that

9   person should probably not be hired or should be

10  elevated to the general manager for a decision.

11           Q     I see.

12               And you said you don't text?

13           A     Very rarely.  In business, no.

14           Q     Not at all?

15           A     In business, no.

16           Q     Do you have any recollection of

17  ever texting about Ms. Ashdown?

18           A     I have no recollection of it.

19           Q     Did you look for text messages?

20           A     I did.

21           Q     And how long have you -- do you

22  have a smart phone?

23           A     Back then?  Yeah, I had a

24  BlackBerry back then.

176

1                          Plotkin

2          Q       And what kind of phone do you

3    have now?

4          A       I have an iPhone.

5          Q       What happened to the BlackBerry

6    that you had back then?

7          A       I think it got destroyed.

8          Q       How did it get destroyed?

9          A       I believe it just stopped

10   working.  I dropped it a few times and it

11   stopped working.

12         Q       Drawing your attention back to

13   Plaintiff's Exhibit 4.

14         A       (Perusing document.)

15         Q       Can you explain to me what is

16   meant by the entries that begin, looking at

17   line, column one, "1000498717," about

18   three-fourths of the way down, there are one,

19   two, three, four, five entries.

20                 Can you explain to me what those

21   mean?

22         A       May I point to what I think

23   you're talking about?

24         Q       Sure.

25         A       You're talking about this column

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 178 of 214

177

```
1                        Plotkin
2      here (indicating)?
3            Q      Yes.
4            A      I believe that's the membership
5      ID.
6            Q      Okay.
7                   And then the next column is an
8      individual's name and then the number 44 and
9      then reinstated, and then a date.
10                  We have discussed what the next
11     column means, right, that's when they expired;
12     is that correct?
13           A      Yup.
14           Q      Okay.
15                  And the next column is Kerry
16     Ashdown's name, correct?
17           A      "Performed by" column?
18           Q      Yes.
19           A      Yes.
20           Q      So is it your understanding that
21     with respect to these five entries that Kerry
22     Ashdown reinstated these sessions?
23           A      Which sessions are you exactly
24     talking about?
25           Q      Well, I'm trying to understand
```

178

1                          Plotkin

2      what this is.  This is part of your

3      investigation.  I just want to understand what

4      this document means.

5                     There are five sessions listed

6      there, correct?

7             A      The first five?

8             Q      Not the first five, the ones that

9      I pointed to you that begin --

10            A      Oh, okay.

11            Q      The member's ID, Daniel Lyons,

12     about three-fourths of the way down, starting on

13     July 16th?

14            A      Okay.

15            Q      At 12:32?

16            A      Okay.  I've got it.

17            Q      Okay.

18                   What in your opinion does this

19     mean, that these sessions were reinstated?

20            A      They were once expired and then

21     by reinstating them you make them active again

22     so they can be pulled so the member can use them

23     and the trainer can get paid for them.

24            Q      How is it that they were -- well,

25     what does the fifth column mean then?

179

1                          Plotkin

2          A      (Perusing document.)  The created

3    date?

4          Q      No, the next column over.

5          A      Expiration date.

6          Q      So that's the date that the

7    sessions expire?

8          A      Yes.

9          Q      Well, according to that column,

10   the sessions hadn't expired yet, correct?

11         A      (Perusing document.)  I'm not

12   sure.

13         Q      So you're not sure whether they

14   had expired yet or you're not sure what the

15   column means?

16         A      Oh, I see what you mean.

17                Once they were reinstated, that

18   would be their new expiration date.

19         Q      Okay.

20                So they get reinstated for a

21   period of time?

22         A      Yes.

23         Q      And how long is that?

24         A      It depends on the type of

25   service.

MCM REPORTING SERVICE
(516) 775-5209

180

1                        Plotkin

2                Generally speaking, about six

3      months.

4            Q        So there are only five

5      indications on this sheet of Ms. Ashdown pulling

6      sessions, correct?

7            A        With her own code, correct.

8            Q        Right.

9                And it's your understanding that

10     she reinstated expired sessions and then pulled

11     them, correct?

12           A        Correct.

13           Q        And would you agree that this

14     sheet says that that was done on two separate

15     days approximately one month apart?

16           A        Correct, with this five, yes.

17           Q        And it involved one individual,

18     Ryan Hopkins?

19           A        Correct.

20           Q        An individual trainer?

21           A        Correct.

22           Q        And that other than with respect

23     to those five entries for sessions being pulled

24     and the reinstatement of those sessions, that

25     Ms. Ashdown's name doesn't appear as someone

181

1                        Plotkin

2      having pulled other sessions, correct?

3              A      Correct.

4              Q      Do you have any recollection, do

5      you have any recollection of whether Ryan

6      Hopkins was disciplined for not bringing the

7      additional sessions to anyone's attention?

8              A      I don't recall.

9              Q      And Bobby Dwyer?

10             A      I don't recall.

11             Q      And we have talked about Cornelia

12     Hobbie.

13                    Is there any additional

14     recollections you have other than what you have

15     already testified to?

16             A      No, sir.

17             Q      Other than what you have

18     testified to, have you ever terminated anyone

19     for doing what you allege Ms. Ashdown did?

20             A      The exact same thing?

21                    No.

22             Q      Have you ever investigated anyone

23     for doing what, other than what you have

24     testified to, for doing what Ms. Ashdown did?

25             A      Exactly what she did?

182

1                       Plotkin

2                  No.

3          Q      You testified today using some

4    pretty strong words that Ms. Ashdown stole and

5    that she is dishonest and that she continues to

6    be dishonest, correct?

7          A      Correct.

8          Q      And you have now testified having

9    had your recollection refreshed that you did

10   invite her to come back as a personal trainer,

11   correct?

12         A      Correct.

13         Q      You have testified that Ms.

14   Ashdown didn't do her own investigation,

15   correct?

16         A      Correct.

17         Q      And that's part of the basis for

18   the termination, right?

19                And you expected her to do her

20   own investigation, correct?

21         A      I wouldn't say it's part of the

22   basis.

23                It's one of the things that made

24   it look really not kosher.

25         Q      It's part of what led to your

183

1                            Plotkin

2      conclusion to terminate, right?

3              A       Perhaps.

4              Q       Well, perhaps or not, I mean, you

5      testified that it did.

6                      So did it or did it not?

7                      MR. McPARTLAND:  Object to

8                      the form.

9                      You can answer.

10     A       I don't remember exactly what I

11     was thinking then, but let's say it added to the

12     reason we terminated her, absolutely.

13             Q       So we will just use your wording.

14                     It added to the reason, her

15     failure to conduct her own investigation added

16     to your conclusion to terminate her?

17             A       Yeah.

18             Q       And how would you, you said it

19     was too late for her to take a lie detector

20     test.

21                     How would you have expected her

22     to conduct her own investigation?

23             A       At a minimum I would have

24     expected her to partner up with Lawrence and

25     say, "Lawrence, we have to figure this out.

MCM REPORTING SERVICE
(516) 775-5209

184

Plotkin

1   Somebody used my code to pull sessions for other

2   people and myself.  Somehow I missed it on my

3   own paycheck, shame on me.  We've got to figure

4   this out.  This looks bad for me.  Let's sit

5   down.  Let's figure it out.  Let's look at the

6   tape together.  Let's look at the computer

7   generation together."

8                    She did none of that.

9        Q       Are you saying she was told about

10   the tape?

11       A       She knows there's cameras

12   everywhere.

13       Q       So you're saying she knows

14   there's cameras and she should have looked at a

15   tape?

16       A       She should have been proactive

17   with her boss and said, "Let's figure this out.

18   I didn't do this, so let's figure this out

19   together."

20       Q       So you're saying she wasn't

21   proactive?

22       A       No.

23       Q       And that she didn't look at the

24   tape?

MCM REPORTING SERVICE
(516) 775-5209

185

                              Plotkin

1

2          A       Correct.

3          Q       And do you know whether Lawrence

4     asked to sit down with her and look at a tape?

5          A       I don't believe Lawrence asked

6     her to sit down with him and specifically look

7     at anything.

8                  He asked her to look, and this is

9     his words, he asked her to look into it and she

10    never did.

11                 I was not there for that

12    conversation, but she never did.

13         Q       So you would have expected her to

14    ask to look at a tape, to ask to look at the

15    records and to sit down with Lawrence and go

16    over all the evidence?

17         A       If she didn't do what we're

18    saying she did, yes, but she didn't because she

19    knew the answer, she knew she did it, that's why

20    she didn't look into it.

21         Q       So in your mind she refused to

22    conduct her own investigation because she's a

23    liar.  I understand what you believe.

24                 I'm asking you what you as an

25    experienced senior-level manager expected her to

186

1                              Plotkin

2       do with respect to her own investigation.

3                       So you expected that she would

4       ask to see all the evidence, look at the video,

5       sit down and look at the video.

6                       Anything else?

7            A       Maybe ask around her employees,

8       "Do you know if anyone was in my office at this

9       time?  Did you see anyone in there?"

10                      Our knowledge is she didn't do

11      any of this.

12           Q       So she didn't speak with any of

13      the other employees and she should have?

14           A       Yeah, she should have tried to

15      figure out who was -- what type of conspiracy

16      this was that someone was trying to frame her

17      and pay her money that she didn't deserve

18      herself and use her own codes.  Yeah, she should

19      have looked into it.  I would have.  I'm sure

20      you would have, too.

21                      I think any of us would have.

22           Q       It doesn't really matter what I

23      would or wouldn't have done and probably at this

24      point what you would or wouldn't have done.

25           A       Okay.

MCM REPORTING SERVICE
(516) 775-5209

187

Plotkin

1          Q      We are talking about Ms. Ashdown

2    and your knowledge of the situation and your

3    experience as a manager.

4          A      Understood.

5          Q      And there's been some testimony

6    in the case, and I'm not going to get into an

7    argument with you, it doesn't matter, that Ms.

8    Ashdown accused Mauro Maietta of having been

9    involved in this.

10          And your testimony is she never

11   made that accusation until she was terminated;

12   is that correct?

13          A      That is correct.

14          Q      Now, would you agree that with

15   respect to Plaintiff's Exhibit 2, that it says

16   that basically, and this is from Lawrence

17   Sanders, your partner in the investigation,

18   "Basically she feels Mauro had something to do

19   with it.  She's still stuck on that she did not

20   do this.  Basically she feels Mauro had

21   something to do with it.  She alluded to the

22   fact that she believes he was working with

23   another person on staff."  Okay?

24          Did Lawrence ask who?

188

1                          Plotkin

2         A      Again, I don't remember that part

3    of the conversation.

4         Q      Do you think it would have been

5    important to know who she believed Mauro was

6    working with?

7         A      Sure.

8         Q      And do you know whether he asked?

9         A      Lawrence told me he asked, yes.

10        Q      And what was her response?

11        A      She wouldn't tell him.

12        Q      So it's your testimony that she

13   said there was another person involved, but she

14   wouldn't tell him?

15        A      From my recollection, yes.

16        Q      Okay.

17               And that was, is that the full

18   extent of the investigation into her allegations

19   that Mauro Maietta was, in fact, the one

20   involved in the conspiracy?

21        A      From what I understand, yes.  I

22   mean, think about it --

23        Q      No, I don't want you to tell me

24   to think about it.

25        A      Okay.

189

1                        Plotkin

2           Q       What I want you to do is just

3    answer my questions and we will be here a lot

4    less time.  Really, it will be better for

5    everyone.  Okay?

6           A       You've got it.

7           Q       Her story is Mauro Maietta was

8    the perpetrator of the conspiracy.

9                   My question to you, and it's a

10   little bit redundant, but just so the record is

11   clear, do you have any specific recollection of

12   Lawrence doing anything to investigate, setting

13   aside when it was revealed, and I'll tell you

14   that the testimony varies on that, okay?

15          A       Okay.

16          Q       Do you have any specific

17   recollection of Lawrence doing anything to

18   investigate the allegations that, in fact, Mauro

19   Maietta was behind the conspiracy to set Kerry

20   Ashdown up for the session pulling?

21                       MR. McPARTLAND:  Note my

22               objection to form.

23          Q       You can answer.

24          A       Other than us realizing that

25   Mauro was nowhere present that day and these

MCM REPORTING SERVICE
(516) 775-5209

190

1                                    Plotkin

2       times when these vouchers were pulled, I don't

3       think we looked any deeper into it, because

4       someone physically had to do this work, someone

5       physically had to do this.

6                   If Mauro wasn't around to do it

7       at these particular times, on this particular

8       day, we saw no point to look deeper into a

9       conspiracy led by Mauro about pulling these

10      vouchers.

11           Q     So is it your testimony then that

12      Mr. Maietta wasn't interviewed?

13           A     No, I think Lawrence spoke to him

14      about it, but nothing pointed to him.  He wasn't

15      present.

16           Q     I just want the record to be

17      clear now.

18                  So you're saying that based on

19      your review of the camera that day in the office

20      for less than an hour, you were able to conclude

21      that there was no reason to investigate Mr.

22      Maietta any further?

23           A     Yes, I believe so.

24           Q     And that's because you didn't see

25      him on the camera?

191
Plotkin

1          A       Right.

2          Q       But this camera, this footage

3     related to this camera hasn't been maintained?

4          A       It has not.

5          Q       And it wasn't shown to anybody

6     else?

7          A       Just me and Lawrence.

8          Q       And so if -- does this camera

9     look directly into the office?

10          A       No.

11          Q       Can you even see the office from

12     this camera?

13          A       No.

14          Q       And so if, for example, Mr.

15     Maietta was sitting in the office for an hour

16     and a half prior to the time that many of these

17     sessions were pulled at 2:14 on August 13th, you

18     wouldn't know, right, whether he was present in

19     the club, correct?

20          A       Well, Kerry told us he wasn't, he

21     wasn't in the office.

22               I specifically asked her as well,

23     "Was Mauro in the office?  Who was in the

24     office?  You were the only one who was walking

192

1                          Plotkin

2      towards the office.  Tell us, please, help us

3      out, tell us who else was in the office."

4                    She said she didn't recall anyone

5      else in the office.

6                    If Mauro was in the office, she

7      would have seen him herself.

8           Q      It's your testimony that Ms.

9      Ashdown said that Mauro was not in the office

10     during these time periods?

11          A      Yes.

12          Q      That you confronted her with each

13     of these different time periods and dates and

14     that she said that no one -- strike that -- she

15     said that Mauro was not in the office?

16          A      Correct.

17          Q      Did you ask if anybody else was

18     in the office?

19          A      Yes.

20          Q      And what did she say?

21          A      She said nobody else was in the

22     office.

23          Q      So under oath here today you have

24     a specific recollection of her telling you that

25     no one else was in the office during the

193

```
 1                          Plotkin
 2      specific times that these sessions were pulled?
 3              A      That's correct.
 4                       MR. McPARTLAND:  Objection.
 5                       Asked and answered.
 6              Q      Is that office the only place
 7      where these sessions could have been pulled?
 8              A      No, but --
 9              Q      Just please answer my questions.
10                     Is that office the only place
11      where these sessions could have been pulled?
12              A      No.  But this computer generation
13      tells us what computer these were pulled at.
14              Q      Where does it say that?
15              A      Do you see where it says, one,
16      two, three, four, five, six, seven, the seventh
17      column, "114 GM"?
18              Q      Yes.
19              A      That's the GM's computer.
20                     "114 PTM"?
21              Q      Yes.
22              A      That's the personal training
23      manager's at the time, Terry Ashdown's computer.
24                     They were pulled from her
25      computer with her code.
```

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 195 of 214

194

1                          Plotkin

2          Q      Well, some of them were --

3          A      Some of them were, some were

4    Cornelia's code.

5          Q      -- with her code and some of them

6    were pulled with Cornelia's code?

7          A      Correct.  I stand corrected.

8                 As a matter of fact, she doesn't

9    even remember seeing Cornelia in the office.

10         Q      You have a specific recollection

11   of her telling you that?

12         A      Yes, I do.

13         Q      What is your understanding of the

14   first seven or so entries, seven or eight

15   entries that were entered by Lawrence Sanders?

16         A      That's just him reinstating

17   vouchers.

18         Q      What does that mean?

19         A      That means those members might

20   have called him up and said, "Listen, I want to

21   start using my sessions again.  I know they are

22   expired.  Can you reinstate them for me?"

23                Nobody gets paid from that.

24   Nobody gets bonused on that.  It just allows

25   them to be reused.

195

                          Plotkin

1

2        Q      I see.

3               So that line indicates that Mr.

4    Sanders had reinstated members' sessions?

5        A      Correct.

6        Q      And is it fair to say that it

7    just so happened that he reinstated members'

8    sessions during the exact same

9    two-to-three-minute period that you are alleging

10   that Kerry Ashdown pulled sessions?

11       A      That's correct.

12       Q      And so is it your belief that Mr.

13   Sanders was in the gym on that day at that time?

14       A      Yes.

15                      MR. HARMAN:  Let me just

16              take a few minutes.

17                      (Whereupon, at 2:51 p.m., a

18              recess was taken.)

19                      (Whereupon, at 2:55 p.m.,

20              the deposition resumed with all

21              parties present.)

22                      MR. HARMAN:  Back on the

23              record.

24                      (Second amended complaint

25              was marked as Plaintiff's Exhibit 5

```
                                                     196
 1                       Plotkin

 2                  for identification, as of this

 3                  date.)

 4   BY MR. HARMAN:

 5        Q     I'm handing you what was marked

 6   as Plaintiff's Exhibit 5 (handing).

 7                  Please take a look at it.

 8                  MR. HARMAN:  For the

 9                  record, this document is entitled

10                  "Second Amended Complaint."

11        A     (Perusing document.)  Do you want

12   me to read this entire document?

13        Q     I just want to know if you

14   recognize this document.

15        A     I believe this was one of the

16   documents that you served us with.

17        Q     I'm not going to ask any specific

18   questions.

19                  I just want to know if you are

20   aware of the document and if you've read it

21   before?

22        A     I believe so, yes.

23                  (Defendants' responses to

24                  plaintiff's first set of

25                  interrogatories was marked as
```

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 198 of 214

197

```
                              Plotkin
 1
 2                   Plaintiff's Exhibit 6 for
 3                   identification, as of this date.)
 4     BY MR. HARMAN:
 5          Q      I'm handing you what's been
 6     marked as Plaintiff's Exhibit 6.
 7                   This is defendants' responses to
 8     plaintiff's first set of interrogatories
 9     (handing).
10          A      (Perusing document.)  Okay.
11          Q      Have you seen this document
12     before?
13          A      I don't believe so.
14          Q      Can you turn your attention to
15     Page 7?
16          A      (Perusing document.)
17          Q      Page 7, interrogatory number 13
18     says, "Identify each and every individual with
19     information or knowledge concerning plaintiff's
20     work performance while employed with
21     defendants."
22                   Response, "Equinox identifies
23     Lawrence Sanders, Elizabeth Minton and Matthew
24     Plotkin."
25                   Is that a complete and accurate
```

```
                                                        198
1                        Plotkin

2     list?

3              A      Yes.

4              Q      Within the region that you

5     oversee, if someone has a complaint of gender

6     discrimination, how would they raise that?

7              A      There's a couple of avenues.

8                    We have a hot line, a human

9     resources hot line that they could go to, they

10    could call directly to human resources, pick up

11    the phone, they can e-mail human resources in an

12    e-mail, or they could go above the person's head

13    that is discriminating against them.

14                   We don't have a strong

15    paramilitary type structure where you can't go

16    over your boss' head.

17                   We believe in communication and

18    anyone can go to anyone.

19                   I could go to my boss' boss and

20    talk to him and talk to him about my boss, and

21    it would never be held against me.

22             Q      When was the last time that

23    someone raised an allegation with you about any

24    type of conduct that could be illegal?

25                   And by that, I don't mean someone
```

199

1                          Plotkin

2      was rude, I mean, you know, he called so and so,

3      you know, the N word or faggot or something, you

4      know, something that fell within your category

5      that you testified to earlier, when was the last

6      time that someone brought something like that to

7      your attention?

8              A      I can't remember.

9              Q      You can't remember anything?

10             A      No.

11             Q      What about an allegation of

12     disability discrimination?

13             A      I can't remember.

14             Q      A sick employee, has a general

15     manager ever brought an issue to you with

16     respect to a sick employee?

17             A      No.

18             Q      Other than this issue with Ms.

19     Ashdown and this issue that we discussed with

20     the comment that Lawrence made, can you think of

21     any other instance in which you have been made

22     aware of a workplace issue with an employee?

23                     MR. McPARTLAND:  Note my

24                 objection to form.

25                     Go ahead, you can answer.

200

1                          Plotkin

2          A       Mr. McBride that I explained to

3     you was one example.

4          Q       He was terminated?

5          A       He was terminated.

6          Q       Because he was alleged to have

7     sexually harassed someone after engaging in

8     multiple romantic relationships with employees

9     that he supervised?

10         A       Correct.

11         Q       Any other?

12         A       Not that I can think of.

13         Q       Do you have a file on Lawrence

14    Sanders?

15         A       I do.

16         Q       And is the written warning that

17    was given to him, is that in his file?

18         A       It's either in there, but I also

19    sent it to human resources, so human resources

20    might have the hard copy, but I would imagine

21    it's in the file as well.

22         Q       Why would you send it to human

23    resources?

24         A       It's our policy when someone has

25    an allegation that, that serious, that human

                                                        201
1                        Plotkin

2    resources gets the documentation behind it.

3         Q      And in documentation, would that

4    include an e-mail or anything in writing?

5         A      Well, I sent him the writeup

6    form, the employee performance form to them, a

7    hard copy of it, and they put it in his file and

8    I confirmed it with him.

9                It's -- the blank form is taken

10   out of our database and then you fill it out by

11   hand.

12        Q      So when that form is filled out,

13   is it Equinox' policy that a copy of that form

14   always be sent to human resources?

15        A      A verbal warning, no, but a

16   written warning where someone was harassed, yes.

17   Yes.

18                If it's someone who came in late

19   to work five days in a row and you give them a

20   written warning, no.

21        Q      No, I'm not talking about late to

22   work.

23                I'm talking about, I want to try

24   to draw the line for you, because I really want

25   to understand.

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 203 of 214

202

1                          Plotkin

2                 I'm not trying to argue with you

3      at all.

4                 But if an employee says, "I think

5      that," and I'm just making this up, by the way,

6      because I think it's easier, "I think that I'm

7      being treated differently because of my age."

8      Okay?

9            A      Uh-hum.

10           Q      A personal trainer, "I'm older

11     and I'm not being given some of the same

12     opportunities as the younger trainers."

13                 And that's being voiced, and it's

14     being voiced to the personal training manager

15     team.  Okay?

16           A      Yes.

17           Q      How would that situation be

18     handled?

19           A      For the most part I would

20     encourage and strictly force any one of my

21     managers that I had a complaint like that to

22     bring it to human resources right away.

23           Q      And human resources is what

24     specifically?  Is that corporate human

25     resources?

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 204 of 214

203

```
                              Plotkin
 1
 2          A      Yes.
 3          Q      So that's located at 895 --
 4          A      No.  They have a different office
 5    on Park Avenue.
 6          Q      So there is an office on Park
 7    Avenue and a phone number to call and e-mails
 8    and I guess access perhaps is on the web site
 9    somewhere?
10          A      Absolutely, and a hot line.
11          Q      And a hot line.
12                 Does the hot line go to the human
13    resources department?
14          A      Yes.
15          Q      And would you encourage the
16    managers to bring that to HR's attention as soon
17    as it's raised?
18          A      Yes.
19          Q      And have you ever participated in
20    any kind of training involving HR and processing
21    complaints of discrimination?
22          A      Yes.
23                 They have an on-line training
24    that they make us do once a year for harassment
25    and how to go to HR and who to go to and all
```

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 205 of 214

204

1                      Plotkin

2    that kind of stuff.

3          Q      So is it fair to say that anytime

4    you've heard about any allegations of

5    discrimination, and I use that term broadly, but

6    any employee who is saying they have been

7    mistreated, it could be that it's not

8    discrimination, but it sounds like

9    discrimination, but as soon as you as a, again,

10   as an experienced manager, as soon as you hear

11   that, you would recommend that that person be

12   sent to the human resources department?

13         A      Absolutely.

14         Q      And do you always make that

15   recommendation?

16         A      Absolutely.

17         Q      And what is your understanding of

18   what, if anything, human resources does when and

19   if they are contacted?

20         A      When they are contacted about

21   discrimination from what I understand, is they

22   do an investigation, they talk to the managers

23   involved and then sometimes, often they bring

24   all parties together, depending on the

25   situation, and they do the investigation and

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 206 of 214

205

1                         Plotkin

2      they figure out to how to handle it, whether the

3      manager has been discriminating against the

4      employee or not, and steps after that should be

5      taken.

6                    Maybe the employee needs to be

7      transferred to another location, maybe the

8      manager wasn't doing the right thing and he

9      needs to be terminated or transferred.

10                   I can't think of any instances

11     where that happened.

12                   But, you know, human resources is

13     the focal point of that investigation and they

14     bring the managers into it.

15          Q      And is that a process that has

16     been described to you by your superiors at

17     Equinox, in other words, have you been trained

18     on that process?

19          A      Yes.

20          Q      And have you been involved in

21     that process?

22          A      Yes.

23          Q      And do you believe it works?

24          A      Yes.

25          Q      And do you believe that that

206

1                        Plotkin

2      process generally is implemented in the region

3      that you oversee?

4           A     Yes.

5           Q     Can you think of examples where

6      it has not been implemented?

7           A     The only -- I can't think of any

8      examples where it wasn't implemented, because

9      the second it would hit my ears or my team's

10     ears, we would bring it to HR and the process

11     would start.

12                Any inkling of it, we bring it to

13     HR.  It's wise to do so.

14          Q     And in your professional

15     experience, would HR maintain some sort of

16     records on that complaint?

17          A     Absolutely.

18          Q     And do you have any, based on the

19     training and the information that you have been

20     given, do you have any knowledge as to what, if

21     anything, would end up in an employee's file?

22          A     To my knowledge, any complaints

23     against an employee in a discriminatory fashion

24     would end up in their file, even if we found it

25     wasn't discrimination, we probably would leave

MCM REPORTING SERVICE
(516) 775-5209

207

1                           Plotkin

2      it in the file anyway, because those types of

3      situations tend to repeat themselves.

4                   Any write-ups because of

5      discrimination or other would be in someone's

6      file.

7                   So basically, you know, anything

8      that is documented we put in an employee's file,

9      we send them to HR and a hard copy is put in

10     their file.

11          Q      And what about the employee

12     making the allegation?

13          A      What about it?

14          Q      Well, if an employee makes an

15     allegation, in your experience, as you have just

16     described the process and what happens with the

17     person who is alleged to have done something

18     wrong, right?

19          A      Right.

20          Q      What happens, if anything, to

21     documents related to the individual who is

22     making the claim?

23          A      From what I understand, nothing

24     is documented in their particular file.

25                  Their complaint would be

208

1                          Plotkin

2     documented in the person who they're complaining

3     about's file.

4                     Does that make sense?

5          Q      Yes, it does.

6                     I don't really know.  So I'm

7     asking.

8                     So even if it was

9     unsubstantiated, in your professional experience

10    at Equinox, if there was a complaint about an

11    individual, it would likely be in that

12    individual's file?

13         A      Correct.

14         Q      And who maintains files on,

15    formal personnel files on personal trainers?

16         A      That would be the personal

17    training manager and the fitness manager.

18         Q      And what happens when the

19    employees are terminated?

20         A      When those managers are

21    terminated?

22         Q      What happens when a personal

23    trainer is separated from the company, what

24    happens to their file?

25         A      We usually send them to HR.

MCM REPORTING SERVICE
(516) 775-5209

209

Plotkin

2      Q      So HR has all the files?

3      A      They should.  They should.

4             We send them, like with the

5      manila folder, the whole thing to HR.

6      Q      And is that true of any

7      terminated employee?

8      A      Should be.  Should be.

9             When I was a personal training

10     manager, that's what I did.  I waited, you know,

11     three months until after the person was no

12     longer there, and then I sent the file to HR.

13            Sometimes it would be an empty

14     file, but I would still send it.

15     Q      So the only files that are

16     maintained on site are those of current

17     employees, and when I say "on site," at a

18     particular location?

19     A      Yeah.

20            I mean, you wait for them to age

21     a little bit, and then you send them out after

22     the employee left, but, yes.

23     Q      When you say "age a little bit,"

24     you mean for a couple of months?

25     A      Yeah, 90 days at most.


MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG  Document 31-6  Filed 10/25/13  Page 211 of 214

210

```
                              Plotkin
 1
 2        Q      And then the personnel files of
 3   managers at locations, is it fair to say that
 4   there are probably like anywhere from six to ten
 5   managers at a particular location?
 6        A      That's about right.
 7        Q      Those are maintained by the GM?
 8        A      Correct.
 9        Q      And theoretically in the GM's
10   office?
11        A      Correct.
12        Q      You then maintain files for the
13   people in your region at your boss' office?
14        A      Correct.
15        Q      And is it fair to say, and I know
16   that you don't have personal knowledge of this,
17   but is it fair to say that that is the general
18   protocol at Equinox, that managers maintain
19   personnel files for current employees in their
20   office or in a secure location?
21        A      Correct.
22               MR. HARMAN:  I don't have
23               any further questions.
24               MR. McPARTLAND:  I don't
25               have any questions.
```

MCM REPORTING SERVICE
(516) 775-5209

Case 1:13-cv-01374-HB-GWG   Document 31-6   Filed 10/25/13   Page 212 of 214

211

1              Plotkin

2                   THE WITNESS:  Thank you.

3                   (Whereupon, at 3:14 p.m.,

4         the deposition was concluded.)

5

6                   _____

7                    MATTHEW PLOTKIN

8     Subscribed and sworn to

9     before me

10    this ▢ day of ▢, 2013.

11    _____

12         NOTARY PUBLIC

13

14

15

16

17

18

19

20

21

22

23

24

25

212

1

2                      I N D E X    P A G E

3   Witness                Examination By        Page

4   Matthew Plotkin     Mr. Harman                  4

5

6

7                         EXHIBITS

8   Plaintiff's
    Exhibits              Description          Page
9

10     1      Letter dated January 9, 2013        101
              to Joseph Matarazzo from The
11            Harman Firm

12     2      Document Bates stamped              119
              EQX-6359 and EQX-6360
13
       3      A document Bates stamped            143
14            EQX-6397 through EQX-6399

15     4      A one-page document Bates           162
              stamped EQX-6400
16
       5      Second amended complaint            196
17
       6      Defendants' responses to           197
18            plaintiff's first set of
              interrogatories
19

20

21

22   REQUESTS:

23   Page 81:  Mauro Maietta's e-mail communications
     reviewed by Mr. Plotkin
24

25

                      MCM REPORTING SERVICE
                        (516) 775-5209

213

C E R T I F I C A T E

STATE OF NEW YORK   )

                    ) ss.

COUNTY OF NEW YORK )

        I, MARGARET M. HARRIS, a Shorthand

(Stenotype) Reporter and Notary Public of

the State of New York, do hereby certify

that the foregoing Deposition, of the

witness, MATTHEW PLOTKIN, taken at the

time and place aforesaid, is a true and

correct transcription of my shorthand

notes.

        I further certify that I am neither

counsel for nor related to any party to

said action, nor in any wise interested in

the result or outcome thereof.

        IN WITNESS WHEREOF, I have hereunto

set my hand this 10th day of October,

2013.

                        MARGARET M. HARRIS

MCM REPORTING SERVICE
(516) 775-5209