UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KERRY ASHDOWN,

       *Plaintiff*,

       *v*.

EQUINOX *a/k/a*
EQUINOX FITNESS CLUB *and incorporated as*
EQUINOX HOLDINGS, INC.,
MAURO MAIETTA,
LAWRENCE SANDERS,
MATT PLOTKIN *a/k/a* MATTHEW PLOTKIN,

       *Defendants*.
------------------------------------------------------------------X

13 CV 1374 (HB)(GWG)

**AFFIDAVIT OF
KERRY ASHDOWN IN
OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

I, Kerry Ashdown, being duly sworn, depose and say that:

    1.    I am the Plaintiff in the above-referenced action. I am British and was born in the United Kingdom on October 19, 1977. Because I was unfairly, unduly, and illegally terminated from my employment with Defendants, I filed this suit.

    2.    I am of clear, sound, and healthy mind and understand the circumstances that led to the illegal termination of my employment by Equinox, Lawrence Sanders, Matt Plotkin, and Mauro Maietta.

    3.    In addition to corporate Defendant Equinox, each of the three (3) above-referenced individuals is a Defendant in this lawsuit.

    4.    I was harassed by Mr. Maietta, a sexist and competitive misogynist who resented having me as his boss. When even my diagnosis with cancer failed to make me leave my job, Mr. Maietta began lying about the quality of my work to my supervisors. Upon information, belief, and having known Mr. Maietta, he sought to sabotage my reputation at Equinox and saw to it that I was accused of misdeeds that I did not commit.

5. On about April 4, 2010, I contacted Johanna Subotovsky at Equinox regarding my interest in personal training and I submitted my resume.

6. On about April 6, 2010, I conducted a telephone interview from London with Ms. Subotovsky. I was then invited to an in-person interview in New York City.

7. On about April 21, 2010, I met and interviewed with Joseph Matarazzo and Elizabeth Minton, both employees of Equinox.

8. Afterwards, I received an email from Ms. Minton, requesting that I return to New York City, at my convenience, for a second interview.

9. On about June 11, 2010, I returned for the second interview, which occurred on about June 13, 2010.

10. Present at the second interview were Ms. Minton, Mr. Matarazzo, David Harris, Rich Velazquez, and Darren Cappetta, all Equinox employees.

11. On about June 23, 2010, Mr. Matarazzo offered me the job of Personal Training Manager by telephone. I was informed that I would have to use Equinox's outside counsel for the visa process, a firm named Seham, Seham, Meltz & Petersen, LLP.

12. On about August 9, 2010, I transferred approximately six thousand three hundred twenty dollars ($6,320) to SSM&P for the legal and visa costs.

13. On about September 22, 2010, Mr. Matarazzo informed me that Equinox wanted to pay the expediting fee for the visa and asked if I could commit to moving within fifteen (15) days from it being processed. I agreed.

14. I immediately issued notice of my departure to my then-employers.

15. On about October 4, 2010, Matthew Herbert submitted my Non-immigration Petition to the United States Citizenship and Immigration Services ("USCIS"), which

2

represented that Defendants would compensate me sixty-seven thousand dollars ($67,000) per year.

16. On about October 28, 2010, USCIS requested more evidence in support of my petition.

17. The legal costs then expanded and I was forced to ask Equinox for a one-thousand-dollar ($1,000) payday loan for a service for which they had originally agreed to pay.

18. On about December 13, 2010, USCIS approved my H-1B visa.

19. On about January 6, 2011, the U.S. Embassy in London also approved my visa.

20. On about January 15, 2011, I moved to New York City.

21. On about January 17, 2011, I began training at Equinox for my upcoming assignment at Soho.

22. On about January 31, 2011, Ms. Minton asked me to meet with Mr. Plotkin.

23. A few days later, I met with Mr. Sanders at Equinox's Soho location.

24. The meeting with Mr. Sanders went well and he was impressed with my work history.

25. My term at Soho began February 10, 2011.

26. Equinox's job offer included costs that they agreed to cover, including travel costs. It also included legal fees associated with securing an H-1B visa, which I was required to pay, and which I later found out, the employer is required to pay.

27. I regularly worked sixteen-hour (16-hour) days and routinely worked on my nominal "day off," which was Friday. My day usually started at 5:00 a.m.

28. In about May 2011, I was diagnosed with ovarian cancer.

29. I immediately shared my diagnosis with Mr. Sanders, Mr. Maietta and Ryan Hopkins, my contemporary trainer at Equinox.

30. Mr. Sanders never informed me to contact Human Resources regarding the news—nobody did.

31. In about August 2011, I found out that I would be required to undergo chemotherapy. That is when I decided to inform the rest of my colleagues about the diagnosis.

32. As I did not want to cede control of my body to cancer, and because I was new to Equinox and new to New York City and the United States, I managed to schedule my chemotherapy around my work in order to maintain the *status quo* at Equinox.

33. I informed Mr. Sanders about this. I insisted that I would not adapt or change my life in order to accommodate the cancer diagnosis. I thought that if I did, the cancer would beat me.

34. During the chemotherapy, everything became more difficult. My energy dropped and I was exceedingly exhausted. Awaking at 5:00 a.m. is difficult for most people, but especially for patients on chemotherapy. Sores grew all over my body and my gums began to bleed randomly. My medical treatment included nine (9) weeks of radiation and three (3) cycles of chemotherapy, which were followed by six (6) months of medication.

35. I began to struggle even to breathe sometimes and suffered from terrible pain in my chest and abdomen, which has still not completely subsided. Nevertheless, I did not slow my workload or hours. Despite the adversities, I tried to remain positive at all times. My clients said things like: "she was tireless, cheerful and motivating"; "at no time during my training was I aware of her treatment for cancer"; "I began to notice how hard she was working, very often having her first clients at [6:00 a.m.] and finishing her day at [7:00 p.m.]"; "she works

ridiculously long hours"; "you would never even know what she was going through"; and even that "she is truly one of the most inspirational individuals I have ever met."

36. I recall taking one and one-half (1.5) days off while I was treated for cancer and that was because I could not breathe.

37. During August 2011, Mr. Maietta began his campaign against me, instigating malicious gossip and bringing false accusations against me to my supervisors' attention. They used Mr. Maietta's misinformation as impetus to bring false accusations to me.

38. Mr. Maietta's actions were all part of his extended crusade to have my employment terminated in order to usurp my job.

39. Mr. Maietta's fabrications included that: (i) I was purportedly getting drunk with my staff; (ii) I purportedly favored males to females; (iii) my behavior was purportedly inappropriate; and that (iv) I was purportedly not professional. None of this has ever been true.

40. Thereafter, I was asked to provide copies of all my client programs as Mr. Maietta questioned my training and attempted to have Ms. Minton terminate me.

41. Mr. Sanders brought Mr. Maietta's allegations to my attention. I asked Mr. Sanders to confirm with my staff whether I was in fact biased as Mr. Maietta had stated, or whether I treated anyone differently, or was inappropriate in any way. I was confident that I had not, but wanted my colleagues to believe it, too.

42. I requested that I be able to investigate this myself, but was castigated and told not to.

43. After Mr. Sanders had made me feel terrible by repeating these ridiculous and malicious allegations, and by coming down harshly on me, he said that they were just malicious rumors and not worth worrying about.

44. I then called for a meeting with Ms. Minton at Equinox headquarters.

45. It was my intention to inform Ms. Minton Mr. Maietta's rumors about the drinking could not be true as I was simply incapable of drinking during my treatment for cancer.

46. I brought it to Ms. Minton's attention that Defendants—especially Mr. Maietta—were targeting me and trying to ruin my career and have me terminated.

47. Thereafter, I called a meeting with Mr. Maietta to address his workplace conduct. I made a good faith attempt at reconciliation and believed at that time that things could improve.

48. Mr. Maietta had created a hostile work environment in multiple ways including, but not limited to, his having sent emails to an incorrect, dummy email address, to which I never had access (in order fabricate evidence that I was not responsive to communications).  When Mr. Maietta failed to receive responses to his ruse emails, he complained to Mr. Sanders about my purported unresponsiveness.

49. Mr. Sanders saw first-hand the false email address, but Mr. Maietta insisted to both Mr. Sanders and me that the exchange was between legitimate Equinox accounts even though the ruse address did not even end "@equinox.com" like every other firm address.  Mr. Sanders failed and refused to do anything about this.

50. Meanwhile, Mr. Maietta continued his operation to have my employment terminated.  He was overly competitive.  Instead of acting like my colleague and treating me decently, he acted as my adversary and kept short patience with me.

51. Prior to Mr. Maietta's honeymoon, Mr. Sanders was in the habit of training with him.

52. Mr. Maietta told Mr. Sanders that he thought I would "crash and burn" in Mr. Maietta's absence, in reference to my gender and health and an example of Mr. Maietta's ongoing campaign to sabotage my career and take it for his own.

53. Although Mr. Sanders recounted me this story and made it clear to me that he understood how wildly inappropriate it was, he again failed to act, react, or prevent it from happening again. At Equinox, I was on my own.

54. Nevertheless, the high quality of my work remains undisputed. For example, at a company awards presentation, Equinox's COO, Scott Rosen, referred to me as a "superstar," and told me to expect to receive awards for my performance.[1]

55. A few months after I was terminated, and after my cancer had gone into remission, I received a telephone call from Mr. Sanders. He told me that he was sorry for what had happened to me and thought that I was treated unfairly. I was so insulted and shocked by the call that I said nothing. I simply hung up on him after his monologue.

56. Finally, I am familiar with the stories that are being used by Defendants to try to defend themselves. It is my understanding that they are attempting convince this Court that I have admitted to everything of which I have been accused and that no issues are left for a jury to decide. This is plainly false.

---

1. Mr. Rosen also referred to me as a "stud." I was taken aback and thought that it was an Americanism. It was not; Mr. Rosen said that he did in fact mean it as a compliment. This exchange nonetheless underscores the deeply entrenched macho and anti-female character of Equinox and its employees.

57.  I did not bring this lawsuit without careful thought and reflection on the way in which I was harmed. I take this very seriously. This is why I respectfully request that this Court permit my claims to be decided by a jury.

58.  I suffered after my termination. I was in despair; severely depressed and disillusioned. I was not financially stable and had to leave all of my clients behind.

59.  I declare under penalty of perjury that the foregoing facts are known by me to be true and correct of my own knowledge.

Dated: November 8th 2013

_____
Kerry Ashdown

Sworn to before me on November ____, 2013

_____
Notary Public

8